IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.,*<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>U.S. BUREAU OF LAND MANAGEMENT, *et al.,*<br><br>　　　　　Defendants.<br>_____/ | Case No. C-06-4884-SI<br><br>**ORDER GRANTING PLAINTIFFS' MOTION TO COMPLETE THE ADMINISTRATIVE RECORD AND TO COMPEL FURTHER SEARCH FOR AND PRODUCTION OF RECORD DOCUMENTS** |

Before the Court is plaintiffs' motion (1) to complete the administrative record in this case, (2) to compel defendant Bureau of Land Management to conduct further searches and to produce additional record documents, and (3) to require an *in camera* review of purportedly privileged documents. The matter is scheduled for a hearing on October 19, 2007. Pursuant to Civil Local Rule 7-1(b), the Court determines that the matter is appropriate for resolution without oral argument, and VACATES the hearing. Having considered the papers submitted, the Court GRANTS plaintiffs' motion for the reasons set forth below.

**BACKGROUND**

**I.      Plaintiffs' allegations and motion**

On August 28, 2006, plaintiff Center for Biological Diversity, in concert with ten additional environmental conservation organizations, sued the U.S. Bureau of Land Management, the U.S. Fish and Wildlife Service, and Dirk Kempthorne in his capacity as Secretary of the Interior. Plaintiffs seek declaratory and injunctive relief challenging defendants' alleged failure to comply with the National

Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701-1785, and the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*, in managing the public lands and threatened and endangered species of the California Desert. Specifically, plaintiffs challenge the BLM's designation of off-road vehicle ("ORV") routes in the West Mojave Plan ("WEMO Plan") area of the California Desert Conservation Area. Plaintiffs allege that BLM legitimized routes that were illegally created; failed to provide adequate environmental review; failed to provide the public with the information required by NEPA; and violated Presidential Executive Orders, federal laws, and its own regulations, all of which require the agency to minimize the effects of ORV use on public land resources. Of particular concern to plaintiffs are threats to the desert tortoise and other threatened and endangered species in the affected area. Plaintiffs request that this Court adjudge and declare that various agency actions violate federal law, which will require this Court to review the administrative record underlying those agency decisions and actions.

Now before the Court is plaintiffs' motion to complete the administrative record and to compel defendants to search for and produce record documents. Specifically, plaintiffs seek an order: (1) declaring that certain database tables and maps are properly part of the administrative record; (2) compelling BLM to conduct an additional search of its files, to produce an additional set of documents, and to explain its search methods in writing; and (3) requiring an *in camera* review of three documents to determine whether the "deliberative process privilege" was properly invoked. Because plaintiffs plan to bring a motion for summary judgment following the Court's ruling on this motion, and because the Court will be required to review the administrative record when deciding the summary judgment motion, the Court must now determine the scope of the administrative record.

**II.     The "Box" process and its context**

Much of the data and documents sought by plaintiffs was developed in a 1998-2002 off-road vehicle route designation effort for the Western Mojave referred to by the parties as the "Box" or "Black

Box" process.[1] The parties dispute the significance of the Box data and documents; plaintiffs contend they are part of the administrative record, and defendants argue they are not.

Plaintiff's motion to complete the administrative record relates primarily to a March 13, 2006 Record of Decision and Final Environmental Impact Statement issued by the BLM in connection with the WEMO Plan Amendment. In the Record of Decision, BLM states that the document "completes a 15-year long public planning" process. BLM AR-WMP 200046. The Final Environmental Impact Statement notes that the process began in 1991 when BLM first issued a Notice of Intent to Prepare an Environmental Impact Statement for the WEMO Plan. *Id.* at 200046; 201667. Of particular concern to plaintiffs are the ROD's modifications and adoption of a set of vehicle access routes based in part on an earlier June 30, 2003 route designation. They are also concerned about the relationship between these vehicle routes and a 1994 Desert Tortoise Recovery Plan.

It was in this context that BLM engaged in a comprehensive review of off-road vehicle routes in the WEMO Plan area.[2] As part of the review, BLM assembled two teams in the summer of 1998, one in the Ridgecrest, and one in the Barstow, Field Offices. This effort was called the Box effort. The two Box teams used aerial photography, data from desert tortoise studies dating back to the 1970s, and other resources to identify "resource attributes" and "access attributes" describing the wildlife and habitat, as well as human uses, along segments of each considered vehicle route. The BLM created databases to store this information in BLM computers in the Barstow and Ridgecrest Field Offices. Using this data, BLM created large scale Geographic Information System ("GIS") maps to develop route inventories.

According to the declaration of William Haigh, Project Manager for the WEMO Plan, the Box process resulted in recommendations regarding whether to keep certain vehicle routes open or closed,

---

[1]The process gained the name "Box" because the BLM team that engaged in the process worked in a windowless "box-like" room in a field office in Barstow, California for a number of months.

[2]The WEMO Plan was an interagency land use management plan jointly prepared by local, state, and federal agencies with jurisdiction over lands in the western Mojave Desert. The Mojave Desert spans approximately twenty million acres in Southern California. The WEMO Plan area covers about 9.3 million acres within the Mojave Desert. About 3.6 million acres of the WEMO Plan area are under BLM jurisdiction and are managed by the Ridgecrest and Barstow field offices; about 2.6 million acres are administered by the Department of Defense; approximately three million acres are privately owned; and around 100,000 acres are state controlled. Haigh Decl. ¶ 2.

1 but the rationale for each recommendation was not recorded. Haigh describes the Box process in detail,
2 and states that BLM held a series of public meetings regarding the Box recommendations. Haigh Decl.
3 ¶¶ 32-33.[3] According to Haigh, the public response was highly critical due to allegedly inaccurate photo
4 inventories and the lack of explanation for route closures.

5 In response to the public criticism, BLM chose to disregard the Box effort's recommended route
6 designations, as well as much of the data compiled in the process. BLM asserts that it was faced with
7 the "impossible task" of explaining why particular routes should be open or closed. BLM then
8 undertook new field surveys beginning in September 2001. Following those surveys, BLM developed
9 a so-called "decision tree" process with the intent of presenting to the public "a clearly documented
10 rationale underlying each open, closed or limited route recommendation." Haigh Decl. ¶ 45(a). The
11 decision tree process ultimately contributed to the 2003 route designation and the final WEMO Resource
12 Management Plan.

## LEGAL STANDARD

Plaintiffs' case is based on the Administrative Procedure Act, under which the Court may hold unlawful and set aside final agency actions, findings, and conclusions that are arbitrary, capricious, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). Judicial review of the agency action must be based on the whole administrative record, which includes everything that was before the agency pertaining to the merits of its decision. *Portland Audubon Soc'y v. Endangered Species Committee*, 984 F.2d 1534, 1548 (9th Cir. 1993); *Thompson v. United States Dep't of Labor*, 885 F.2d 551, 555-56 (9th Cir. 1989). "The whole administrative record, therefore, consists of all documents and materials directly or *indirectly* considered by agency decision-makers and includes evidence contrary to the agency's

---

[3] At these public meetings, BLM provided some of the Box maps to members of one of the working groups. Although plaintiffs have provided copies to the Court, none are in the official administrative record. Plaintiffs have filed with the Court PDF copies of seven maps as well as one "index" or overview map. Anderson Decl. Ex. A. These eight map files are the only maps that remain in issue. Defendants have provided evidence that any other maps that may have existed contemporaneously with the eight maps in question no longer exist because the Geographic Information System data layers comprising map information are constantly changing due to updates and software changes. *See* LaPre Decl. ¶ 28. Defendants, however, do not challenge the authenticity of the copies of the eight maps obtained and presented by plaintiffs, and plaintiffs do not dispute that these are the only eight maps that remain.

position." *Thompson*, 885 F.2d at 555 (emphasis in original) (internal citations and quotation marks omitted). "An incomplete record must be viewed as a fictional account of the actual decisionmaking process." *Portland Audubon Soc'y*, 984 F.2d at 1548 (internal citation and quotation marks omitted). "The whole record is not necessarily those documents that the agency has compiled and submitted as the administrative record; the court must look to all the evidence that was before the decision-making body." *Public Power Council v. Johnson*, 674 F.2d 791, 794 (9th Cir. 1982) (internal citations and quotations marks omitted). Where plaintiffs seek to have included in the record material that allegedly was before the agency, supplementation of the record may be proper. *See Portland Audubon Soc'y*, 984 F.2d at 1548. However, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Federal Power Commission v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 331 (1976) (internal citation and quotation marks omitted)**.**

## DISCUSSION

### I.    The "Box" data and documents are part of the administrative record

Plaintiffs contend that the administrative record is incomplete because BLM has omitted the data and documents created during the Box process. Specifically, plaintiffs seek the inclusion of the tables of raw data contained in Excel spreadsheets stored on BLM computers, as well as a series of maps generated by the Box process. Plaintiffs contend that whether or not the BLM ultimately relied on the Box data and documents, the administrative record must include "everything that was before the agency pertaining to the merits of its decision" including any evidence considered directly or indirectly. *Portland Audubon Soc'y*, 984 F.2d at 1548; *Thompson*, 885 F.2d at 555.

Defendants contend that the Box data and documents should not be included in the administrative record because the Box process was an informal and ultimately unsuccessful exercise. Defendants emphasize the fact that BLM abandoned the Box process early in the WEMO planning process in light of public criticism, and because of allegedly inaccurate, unverified information and missing rationales for its off-road vehicle route recommendations. Defendants argue that the Box process was superceded by the decision tree process in 2002, and that the latter, not the former, was used

in arriving at the WEMO Plan approved in 2004.

The Court agrees with plaintiffs that the Box data and documents are properly considered part of the administrative record because that material was considered by the agency in its route designation process. As other courts have held, the materials should not be excluded simply because defendants did not "rely" on them in arriving at the final decision. *See Ad Hoc Metals Coalition v. Whitman*, 227 F. Supp. 2d 134, 139 (D.D.C. 2002) ("The Experts Workshop transcript, having been referred to, considered by, or used by EPA before it issued its final rule must be included in the administrative record, particularly given the adverse nature of its contents."); *see also Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 197 (D.D.C. 2005) ("The agency may not skew the record in its favor by excluding pertinent but unfavorable information. Nor may the agency exclude information on the grounds that it did not 'rely' on the excluded information in its final decision."); *Miami Nation of Indians of Indiana v. Babbitt*, 979 F. Supp. 771, 775 (N.D. Ind. 1996) (granting motion to complete administrative record to include any guidelines, directives, or manuals "directly or indirectly" considered by defendant agency).

Defendants rely on *Common Sense Salmon Recovery v. Evans*, 217 F. Supp. 2d 17 (D.D.C. 2002), and this Court's order denying a motion to supplement in the record in another case involving the desert tortoise, *American Motorcycle Ass'n District 37 v. Norton*, 2004 WL 1753366 (N.D. Cal. Aug. 3, 2004). Both cases are distinguishable. In *Common Sense Salmon Recovery*, the plaintiffs challenged the listing of several salmon species as endangered, and filed a discovery motion requesting that the court compel production of "the raw genetic data used in some of the studies relied upon by defendants when the listing decision was issued." 217 F. Supp. 2d at 22. The court denied the motion primarily on the ground that the plaintiffs were seeking the data in the context of a discovery motion. The court further ruled that the kind of information the plaintiffs sought was generally not part of the administrative record because an agency "is not normally obligated to make available the raw data upon which the reports considered by the agency were based if the agency did not rely on the raw data when it reached its decision." *Id.* at 22. The court noted that disclosure of raw data would be required if the agency "had reason to doubt the validity of a study on which it relied because a different study conducted two years earlier using the same data had reached an opposite conclusion." *Id.*

6

Here, the underlying Box data itself is at issue. Plaintiffs contend that the Box data tables contain information relating to the existence of resources such as riparian areas, views, or cultural resources along certain off-road vehicle routes, and that these are exactly the resources the governing law requires the BLM to consider in making route designations. Although defendants may argue the Box data was incomplete or inaccurate, that does not mean it is irrelevant. The Box material was before the agency, at least indirectly, as part of its decision making process. To the extent defendants contend that the Court should disregard the Box data and documents in light of their shortcomings, defendants may assert those arguments at the merits stage. At this point in the litigation, the Court finds that because the Excel spreadsheets and maps used in the Box process were before the BLM, they must also be before the Court as part of the administrative record.

Defendants' reliance on *American Motorcycle* does not change the Court's analysis. There, the plaintiff motorcyclists sought to supplement the record with 900 pages of third-party scientific literature that was not in the agency's files during the decision making process. 2004 WL 1753366 at *5. In contrast, plaintiffs here do not seek to introduce third-party scientific literature into the record; instead, they seek to complete the record with data and documents that were complied and generated by BLM itself in its self-described "15-year long public planning" process. *See* BLM AR-WMP 200046.

Accordingly, the Court ORDERS defendants to supplement the administrative record with the eight maps and the raw-data spreadsheets that BLM created during its Box process no later than **November 9, 2007**.

## II.  Additional search and document production is warranted

In addition to the Box materials, plaintiffs request that the Court order defendants to undertake a complete assessment of their computer systems to ensure that all substantive communications relating to the development of the WEMO Regional Management Plan, including the route designation process, are part of the record. Plaintiffs also ask the Court to compel the BLM to provide a written explanation of their search methods.

Plaintiffs justify their request based on the fact that BLM originally failed to produce nearly 4,000 emails due to a hard-drive crash of a BLM computer, as well as an email sent by David Walsh on

1 April 18, 2002 that should have been included in the record.[4] BLM filed a Second Supplement to the 2 record on September 7, 2007 that included more than 3,000 emails that were recovered from the 3 damaged hard drive. BLM also filed a Third Supplement to the record while this motion was pending. 4 That Supplement included a copy of the David Walsh email sought by plaintiffs, as well as a 12-page 5 declaration by Larry LaPre, the District Wildlife Biologist for the BLM's California Desert District. 6 LaPre assembled the administrative record for this litigation, and in his declaration, he provides a 7 written explanation of his search methods.

8 Although the BLM has accommodated many of plaintiffs' requests for supplements to the 9 record, plaintiffs nevertheless argue that the Court should compel still further inquiries and explanations. 10 Plaintiff's suggest that Mr. LaPre's declaration is carefully worded so as to be vague as to the actual 11 inquiries that were made, and the actual responses that were received. The Court is inclined to agree. 12 The Court is particularly concerned about paragraphs 10, 11, 12, and 23 of the LaPre declaration.

13 In paragraph 10, LaPre states that the email records of the twenty-two BLM employees who 14 worked on the West Mojave Plan in some capacity "were not available to me in electronic format 15 because those computers were no longer in use." LaPre does not state whether those computers are on 16 a shelf, or whether they have been transferred or moved, or whether email messages may remain on a 17 server computer somewhere. In paragraph 11, LaPre states that the email records of BLM employees 18 who worked from home were also not available because those computers were personally-owned and 19 "most" of them were upgraded or replaced. While this is less vague than paragraph 10, it does not 20 address whether *all* of the personally-owned computers have been upgraded or replaced, or whether one 21 or two may still exist and have retrievable data on them. In paragraph 12, LaPre states he did not have 22 access to the email messages contained in the computers of the eleven or so contractors who conducted 23 studies for the BLM. LaPre does not state whether inquiries were made of those contractors, and what 24 their responses were.

25 Finally, in paragraph 23, LaPre states that "in response to my inquiry, no information was found

---

27 [4]Plaintiffs became aware of the Walsh email because it was anonymously sent to plaintiffs' witness, Ileene Anderson, in a manila envelope with no return address in June 2002. Anderson Decl. 28 ¶ 14 & Ex. B thereto.

on any computer in the Barstow Field Office that related to the 'box' effort." This statement does not make clear whether there was indeed any response to his inquiry, whether a search was undertaken and if so by whom, or what the nature of LaPre's inquiry actually was. As plaintiffs point out, "BLM provides no further information as to what inquiries were made, and whether inquiries were made that would help determine where the Box information was originally stored or potentially transferred to." Reply at 6. "Given that electronic information is not easily destroyed, and that each inquiry by Plaintiffs has led to the discovery of additional material that should have been in the record . . . a full accounting of the inquiries that have been made for the Box databases should be required." *Id.* at 6-7.

Accordingly, the Court ORDERS the BLM to conduct further inquiries and to provide a declaration explaining that inquiry and its results no later than **November 9, 2007**.

### III.   *In camera* review of privileged documents is also appropriate

In their original motion, plaintiffs sought an order compelling an *in camera* review of 59 documents that BLM initially withheld on the ground that they were privileged. Defendants subsequently conducted a careful and candid reassessment of those documents, and no longer assert that the documents are privileged, except with respect to three documents that are protected by the deliberative process privilege[5], and another twelve documents that are protected by both the deliberative process privilege and the attorney-client privilege. Defendants have filed with their opposition the declaration of James Abbott, Associate State Director for the BLM, formally asserting the privileges and explaining the bases therefor.

Plaintiffs nevertheless continue to request *in camera* review of the three documents that BLM asserts are covered only by the deliberative process privilege. They do so without commenting on the sufficiency of the Abbott declaration. The Court, however, has examined his explanation for asserting the privilege. While the Court is mindful of Mr. Abbott's explanation, and notes the efforts defendants

---

[5] The documents are identified as P68, P70, and P92. The BLM has partially redacted the first two, and has withheld the third in its entirety. The purpose of the deliberative process privilege is to allow agencies "freely to explore possibilities, engage in internal debates, or play devil's advocate without fear of public scrutiny." *Maricopa Audubon Soc. v. United States Forest Serv.*, 108 F.3d 1089, 1092 (9th Cir. 1997) (describing Ninth Circuit jurisprudence on the privilege).

9

have made to release previously withheld documents, the Court nevertheless find that an *in camera* review is appropriate. Defendants are instructed to deliver to Chambers non-redacted copies of documents P68, P70, and P92 no later than **October 26, 2007**.

## CONCLUSION

For the foregoing reasons, and for cause shown, the Court GRANTS plaintiffs' motion (Docket No. 71).

**IT IS SO ORDERED.**

Dated: October 18, 2007

SUSAN ILLSTON
United States District Judge