1   Steven P. Quarles
    squarles@crowell.com
2   J. Michael Klise (*pro hac vice*)
    jmklise@crowell.com
3   Thomas R. Lundquist (*pro hac vice*)
    tlundquist@crowell.com
4   CROWELL & MORING LLP
    1001 Pennsylvania Ave., NW
5   Washington, D.C. 20004-2595
    Phone:  202-624-2600
6   Facsimile:  202-628-5116

7   Steven P. Rice (SBN 094321)
    CROWELL & MORING LLP
8   3 Park Plaza
    20th Floor
9   Irvine, CA 92614-8505
    Phone:  949-263-8400
10  Facsimile:  949-263-8414
    srice@crowell.com
11
    Attorneys for Intervenor-Defendants Kern County, San Bernardino County, and Imperial County,
12  California; and QuadState Local Governments Authority

13            IN THE UNITED STATES DISTRICT COURT

14          FOR THE NORTHERN DISTRICT OF CALIFORNIA

15              SAN FRANCISCO DIVISION

16
    CENTER FOR BIOLOGICAL          )
17  DIVERSITY, *et al.*,           )
              Plaintiffs,          )     No. 06-4884-SI
18                                 )
         v.                        )     **THE COUNTIES' REVISED**
19                                 )     **MEMORANDUM OF POINTS AND**
    U.S. BUREAU OF LAND            )     **AUTHORITIES IN SUPPORT OF**
20  MANAGEMENT, *et al.*,          )     **FEDERAL DEFENDANTS' CROSS-**
              Defendants,          )     **MOTION FOR SUMMARY JUDGMENT**
21                                 )
         and                       )     The Honorable Susan Illston
22                                 )
    KERN COUNTY, CALIFORNIA, *et al.*, )
23            Intervenor-Defendants. )
                                   )
24  _____ )

25

26

27

28

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES ........................................................................................iii

INTRODUCTION .........................................................................................................1

STATUTORY AND REGULATORY CONTEXT .......................................................2

ARGUMENT .................................................................................................................7

I.     WEMO And NECO Substantively Satisfy The ESA................................................8

     A.     The ESA Only Requires Federal Agencies To Avoid Actions That Degrade A Species' Status Or Critical Habitat Conditions In Some Appreciable Way. The ESA Does Not Require Conservation, Recovery, Or Improvement Actions. .................................................................................................................8

     B.     WEMO and NECO Go Beyond The ESA Minimum By Conserving Ample Habitat For The Tortoise, And By Providing Net Improvements.......................12

     C.     The Courts In *NWF v. NMFS*, *Gifford Pinchot,* And *Imperial Sand Dunes* Required Further Explanations Because Those Agency Actions Allowed Degradations That Contributed To Arguable Jeopardy/Adverse Modification Situations.  WEMO And NECO Are Different, As They Provide Net Conservation Benefits........................................................................................14

     D.     Jeopardy Is Assessed At The Level Of The Listed Species, Not Each Recovery Unit Of Tortoises ..............................................................................17

     E.     CBD's Arguments On The Burden Of Persuasion And "Insure Against Jeopardy" Are Unpersuasive...................................................................................20

     F.     WEMO And NECO Do Not Adversely Modify Critical Habitat Under FWS's Lawful Interpretation ............................................................................................23

II.     The BiOps Satisfy ESA § 7 Procedures, And Are Not Arbitrary Actions.....................28

     A.     The ESA And APA Do Not Require Great Detail ..............................................28

     B.     The BiOps Satisfy *NWF v. NMFS* And The Consultation Regulation By Providing Both A Stepwise "Incremental" And An "Aggregate" Analysis.........29

     C.     The BiOps Appropriately Considered Impacts On Recovery.............................30

     D.     The Services Procedurally Considered The Tortoise Recovery Plan..................31

     E.     CBD's Other Arguments Regarding Adverse Modification Of Critical Habitat Are Unpersuasive ................................................................................................32

     F.     FWS Did Consider The Best Science Available ................................................33

G.    FWS Did Not Violate ESA Procedures Regarding The Environmental
       Baseline ................................................................................................ 35

H.    The Amended BiOps Satisfy The Procedures For Authorizing Incidental Take .. 36

III.   BLM Has Not Violated ESA § 7(a)(2) ........................................................... 47

IV.   FLPMA And Implementing Rules Allow Multiple Uses Of The CDCA, And Do Not
      Make Resource Preservation The Dominant Use ........................................... 47

V.    The WEMO EIR/S Satisfies NEPA's Rule Of Reason .................................... 50

       A.    BLM's Compliance With NEPA Is Subject To Deferential Judicial Review ...... 50

       B.    CBD's NEPA Claims Are Without Merit ........................................... 51

              1.    The WEMO EIR/S Adequately Addresses Effects On Soils ................... 51

              2.    The WEMO EIR/S Adequately Addresses Effects On Unusual Plant
                    Assemblages, Water Resources, and Riparian Resources ....................... 52

              3.    The WEMO EIR/S Adequately Addresses Cumulative Impacts ............. 55

CONCLUSION ....................................................................................................... 59

# TABLE OF AUTHORITIES

## Cases

*Alabama v. U.S. Army Corps of Eng'rs*, 441 F. Supp. 2d 1123 (N.D. Ala. 2006)............................15

*Alsea Valley Alliance v. Evans*, 161 F. Supp. 2d 1154 (D. Or. 2001)...........................................19

*American Motorcycle Ass'n v. Norton*, Nos. C 03-03807 SI, C 03-02509 SI, 2004 WL 1753366 (N.D. Cal. Aug. 3, 2004) .................................................................... 3, 7, 12, 21, 26

*American Motorcycle Ass'n v. Watt*, 543 F. Supp. 789 (C.D. Cal. 1982).......................................50

*American Rivers v. National Marine Fisheries Serv.*, No. Civ. 96-384-MA, 1997 WL 33797790 (D. Or. Apr. 3, 1997).....................................................................................23

*American Water Works Ass'n v. EPA*, 40 F.3d 1266 (9th Cir. 1994).............................................24

*Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229 (9th Cir. 2001) .................................................................................................. 20, 37, 41, 42

*Auer v. Robbins*, 519 U.S. 452 (1997)............................................................................................36

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*, 515 U.S. 687 (1995)..................................................................................3, 10, 15, 24, 27, 36, 38, 40, 41, 43

*Bennett v. Spear*, 520 U.S. 154 (1997)...........................................................................................22

*Bering Strait Citizens for Responsible Resource Devpt. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938 (9th Cir. 2008)...................................................................................................5

*Biodiversity Legal Found. v. Norton*, 285 F. Supp. 2d 1 (D.D.C. 2004).......................................11

*Bragdon v. Abbott*, 524 U.S. 624 (1998).......................................................................................25

*Building Industries Ass'n of S. Cal. v. Norton*, 247 F.3d 1241 (D.C. Cir. 2001).........................34

*Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678 (D.C. Cir. 1982)...................................................................................................20

*California Native Plant Soc'y v. EPA*, No. C06-03604 MJJ, 2007 WL 2021796 (N.D. Cal. July 10, 2007).......................................................................................................... 11, 32

*Churchill County v. Norton*, 276 F.3d 1060 (9th Cir. 2001).................................................. 50, 51

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971) ....................................... 3, 21, 23

*Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988)........................................................................21

*Cronin v. U.S. Dept. of Agriculture*, 919 F.2d 439 (7th Cir. 1990).............................................35

*Ctr. for Biological Diversity v. BLM*, 422 F. Supp. 2d 1115 (N.D. Cal. 2006) ....................... 3, 15, 37

*Ctr. for Biological Diversity v. BLM*, No. C 03-02509 SI, 2004 WL 3030209 (N.D. Cal. Dec. 30, 2004)..........................................................................................................12

*Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv.*, 450 F.3d 930 (9th Cir. 2006).....................................................................................................................................37

*Ctr. for Native Ecosystems v. Cables*, 509 F.3d 1310 (10th Cir. 2007) ......................................30

*Defenders of Wildlife v. Bernal*, 204 F.3d 920 (9th Cir. 2000).....................................................39

*Dep't of Transp. v. Public Citizen*, 541 U.S. 752 (2004)........................................................ 2, 57

*Dickinson v. Zurko*, 527 U.S. 150 (1999)......................................................................................20

*Ecology Law Ctr. v. Austin*, 430 F.3d 1057 (9th Cir. 2005).........................................................4

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005)............................................22

*Florida Power Comm'n v. Idaho Power Co.*, 344 U.S. 17 (1952).................................................44

*FPC v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326 (1976)..........................................44

*Friends of Southeast's Future v. Morrison*, 153 F.3d 1059 (9th Cir. 1998)....................... 51, 52, 55

*Fund for Animals v. Rice*, 85 F.3d 535 (11th Cir. 1996)....................................................... 11, 23

*Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*, 378 F.3d 1059 (9th Cir. 2004) ........................................................................................... 9, 15, 24, 26, 28, 30, 36

*Greenpeace Action v. Franklin*, 14 F.3d 1324 (9th Cir. 1992) .............................................. 15, 47

*Hall v. EPA*, 273 F.3d 1146 (9th Cir. 2001) .................................................................................25

*Hayward Area Planning Ass'n v. Norton*, No. C 00-04211 SI, 2004 WL 724950 (N.D. Cal. Mar. 29, 2004) ...................................................................................... 15, 24, 27, 31

*Heartwood v. Kempthorne*, No. 1:05-cv-313, 2007 WL 1795296 (S.D. Ohio June 19, 2007) ....................................................................................................................................22

*Kern County Farm Bureau v. Allen*, 450 F.3d 1072 (9th Cir. 2006)...................................29, 34, 36
*Kleppe v. Sierra Club*, 427 U.S. 390 (1976)...........................................................................................58
*Lands Council v. McNair*, _ F.3d _, 2008 WL 2640001 (9th Cir. July 2, 2008) (en banc)...........................................................................1, 4, 5, 14, 23, 29, 31, 35, 48, 51
*Lands Council v. McNair*, 494 F.3d 771 (9th Cir. 2007), *vac'd*, __ F.3d ___, 2008 WL 2640001 (9th Cir. July 2, 2008) (en banc) .........................................................................4
*Marsh v. Oregon Natural Res. Council*, 490 U.S. 360 (1989)...............................14, 23, 34, 35, 51
*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)....................28
*National Ass'n of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518 (2007) ........................10
*National Ass'n of Home Builders v. Norton*, 340 F.3d 835 (9th Cir. 2003) ...............................18, 19
*National Cable & Tele. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ..............................49
*National Wildlife Fed'n v. Babbitt*, 128 F. Supp. 2d 1274 (E.D. Cal. 2000)......................................35
*National Wildlife Fed'n v. Burlington Northern R.R.*, 23 F.3d 1508 (9th Cir. 1994) ...............39, 40
*National Wildlife Fed'n v. National Marine Fisheries Serv.*, 524 F.3d 917 (9th Cir. 2008) .............................................................................8, 15, 16, 17, 28, 29, 30
*National Wildlife Fed'n v. National Park Serv.*, 669 F. Supp. 384 (D. Wyo. 1987) ..................10, 11
*Natural Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322 (E.D. Cal. 2007)............................22
*Navajo Nation v. U.S. Forest Service*, __ F.3d __, 2008 WL 3167692 (9th Cir. Aug. 8, 2008) (en banc).................................................................................................................5
*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372 (9th Cir. 1998).......................51
*New Mexico Cattle Growers Ass'n v. U.S. Fish and Wildlife Service*, 248 F.3d 1277 (10th Cir. 2001) .......................................................................................................................27
*Northern Spotted Owl v. Lujan*, 758 F. Supp. 621 (W.D. Wash. 1991) ..............................................24
*Oregon Natural Desert Ass'n v. Bureau of Land Management*, 531 F.3d 1114 (9th Cir. 2008) ....................................................................................................................................5
*Oregon Natural Res. Council v. Allen*, 476 F.3d 1031 (9th Cir. 2007).................................37, 38, 43
*Perkins v. Bergland*, 608 F.2d 803 (9th Cir. 1979) ..............................................................................48
*Platte River Whooping Crane Trust v. FERC*, 962 F.2d 27 (D.C. Cir. 1995) ....................................9
*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410 (9th Cir. 1990) ....................................................................................................................................15
*Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy*, 898 F.2d 1418 (9th Cir. 1990) .....................9, 47
*Robbins v. Chronister*, 435 F.3d 1238 (10th Cir. 2006) (en banc)......................................................24
*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)...............................................2, 50
*Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401 (9th Cir. 1996)........................................................48
*Sierra Club v. Clark*, 756 F.2d 686 (9th Cir. 1985) ............................................................................49
*Sierra Club v. Clark*, 774 F.2d 1406 (9th Cir. 1985) ..........................................................................49
*Sierra Club v. Espy*, 38 F.3d 792 (5th Cir. 1994)................................................................................48
*Sierra Club v. FWS*, 245 F.3d 434 (5th Cir. 2001)..............................................................................26
*Southern Or. Citizens Against Toxic Sprays, Inc. v. Clark*, 720 F.2d 1475 (9th Cir. 1983) ....................................................................................................................................53
*Southwest Ctr. for Biological Diversity v. Bartel*, 470 F. Supp. 1118 (S.D. Cal. 2006) ...................11
*Southwest Ctr. for Biological Diversity v. Norton*, 215 F.3d 58 (D.C. Cir. 2000).....................34, 36
*Southwest Ctr. for Biological Diversity v. Norton*, No. 98-0934 (RMU/JMF), 2002 WL 1733618 (D.D.C. July 29, 2002) ....................................................................................34
*Southwest Ctr. for Biological Diversity v. U.S. Bur. of Recl.*, 143 F.3d 515 (9th Cir. 1998) ....................................................................................................................................12
*Spirit of the Sage Council v. Kempthorne*, 511 F. Supp. 2d 31 (D.D.C. 2007) ................................25
*Swan View Coalition v. Barbouletos*, No. CV-05-64-M-DWM (D. Mont. Mar. 31, 2008) ................................................................................................................................9, 45
*Swanson v. U.S. Forest Serv.*, 87 F.3d 339 (9th Cir. 1996)..............................................50, 51, 55
*Trout Unlimited v. Morton*, 509 F.2d 1276 (9th Cir. 1974)..............................................................51
*TVA v. Hill*, 437 U.S. 153 (1978) ..........................................................................................4, 17, 21
*United States v. Gonzalez*, 520 U.S. 1 (1997) ......................................................................................22
*United States v. McKittrick*, 142 F.3d 1170 (9th Cir. 1998) ..............................................................11

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519
  (1978) ........................................................................................................................29
*Water Keeper Alliance v. U.S. Dep't of Defense*, 271 F.3d 21 (1st Cir. 2001)..................................34

**Statutes**

APA, 5 U.S.C. 556(d) .................................................................................................21
APA, 5 U.S.C. 559 .....................................................................................................20
APA, 5 U.S.C. 706 .............................................................................................3, 21, 50
ESA § 3(5), 16 U.S.C. 1532(5) ...................................................................................24
ESA § 3(16), 16 U.S.C. 1532(16) .........................................................................18, 19
ESA § 4(a)(1), 16 U.S.C. 1533(a)(1).........................................................................19
ESA § 4(b)(2), 16 U.S.C. 1533(b)(2) ...................................................................24, 27
ESA § 4(f), 16 U.S.C. 1533(f) .............................................................................8, 24
ESA § 7(a)(1), 16 U.S.C. 1536(a)(1)..............................................................8, 10, 24
ESA § 7(a)(2), 16 U.S.C. 1536(a)(2)...............................................3, 8, 14, 30, 42
ESA § 7(b)(3), 16 U.S.C. 1536(b)(3) ...........................3, 15, 28, 31, 36, 47
ESA § 7(b)(4), 16 U.S.C. 1536(b)(4) ...................................................3, 36, 42
ESA § 9, 16 U.S.C. 1538 ............................................................................................3
ESA § 10(a), 16 U.S.C. 1539(a) .....................................................3, 5, 25, 36
FLPMA § 102(c), 43 U.S.C. 1702(c) .........................................................................48
FLPMA § 103, 43 U.S.C. 1702 ....................................................................................2
FLPMA § 302, 43 U.S.C. 1732 ..................................................................................48
FLPMA § 601, 43 U.S.C. 1781 ...................................................................2, 12, 48
NEPA, 42 U.S.C. 4332 .................................................................................................2

**Regulations and Preambles**

36 C.F.R. 251.110(c) ..................................................................................................50
36 C.F.R. 251.114(f)(2) ..............................................................................................50
40 C.F.R. 1502.16 ......................................................................................................53
43 C.F.R. 8342.1 ........................................................................................48, 49, 50
50 C.F.R. 17.3 ..............................................................................................................3
50 C.F.R. 17.31 ............................................................................................................3
50 C.F.R. 402.02 ..............................................................................................16, 28, 36
50 C.F.R. 402.14 .............................................................................................3, 8, 29, 37
50 C.F.R. 402.14(i)(2) ................................................................................................42
50 C.F.R. Part 402 .....................................................................................................31
46 Fed. Reg. 18026 (Mar. 23, 1981)........................................................................52
51 Fed. Reg. 19926, et seq. (June 3, 1986)........................................9, 37, 42, 44
55 Fed. Reg. 12170 (Apr. 2, 1990)....................................................................18, 20
56 Fed. Reg. 54748-50 (Nov. 4, 1981) .....................................................................40
59 Fed. Reg. 5820, et seq. (Feb. 4, 1994) ..........................................................19, 27
61 Fed. Reg. 4722 (Feb. 7, 1996) .......................................................................18, 19

**Legislative History**

124 Cong. Rec. 38,655 (Oct. 14, 1978) ....................................................................26
125 Cong. Rec. 29,437 (Oct. 24, 1978) ...............................................................21, 22
134 Cong. Rec. S9766-70 (July 25, 1988)................................................................11
134 Cong. Rec. S10164-66 (July 28, 1988) ..............................................................11
H.R. Conf. Rep. No. 100-928 (1988) ..................................................................11, 32
H.R. Conf. Rep. No. 97-835, *reprinted in* 1982 U.S.C.C.A.N. 2860........................25
H.R. Rep. No. 95-1625, *reprinted in* 1978 U.S.C.C.A.N. 9453 ........................10, 26
H.R. Rep. No. 97-567, *reprinted in* 1982 U.S.C.C.A.N. 2807 ........................36, 37, 44
S. Rep. No. 95-874 (1978) .........................................................................................26

S. Rep. No. 96-151 (1979) .................................................................................... 18, 19
S. Rep. No. 97-418 (1982) ............................................................................................ 42

**Other Authorities**

BEAN & ROWLAND, THE EVOLUTION OF NATIONAL WILDLIFE LAW (3d ed. 1997) ......... 25, 27, 40, 41
Brennan, *et al.*, *Square Pegs and Round Holes:  Application of the "Best Scientific
    Data Available" Standard in the Endangered Species Act*, 16 TULANE ENVTL. L.J.
    387 (2003) ............................................................................................................. 35
Carden, *Bridging the Divide: The Role of Science in Species Conservation Law*, 30
    HARV. ENVTL. L. REV. 165 (2006) ........................................................................... 23
Council on Environmental Quality, *Guidance on the Consideration of Past Actions in
    Cumulative Effects Analysis* (June 24, 2005) ............................................................ 57
Darin, *Designating Critical Habitat Under the Endangered Species Act:  Habitat
    Protection Versus Agency Discretion*, 24 HARV. ENVTL. L. REV. 209 (2000) ............................. 26
Doremus, *The Purposes, Effects, and Future of the Endangered Species Act's Best
    Available Science Mandate*, 34 ENVTL. L. 397 (2004) ................................................. 23
Memorandum from FWS Director H. Dale Hall to Regional Directors, et al.,
    "Recovery Units and Jeopardy Determinations under Section 7 of the Endangered
    Species Act" (Mar. 6, 2006).......................................................................................... 20
Quarles & Lundquist, *Critical Habitat: Current Centerpiece of Endangered Species
    Act Litigation and Policymaking?  Critical for Whom?  The Species Or The
    Landowner?*, 46 ROCKY MT. MIN. L. INST. 18-1 (2002) ............................................. 25
Quarles & Lundquist, *When Do Land Use Activities "Take" Listed Wildlife Under
    ESA Section 9 and the "Harm" Regulation?*, ENDANGERED SPECIES ACT: LAW,
    POLICY, AND PERSPECTIVES 211-34 (Baur & Irvin eds., ABA 2002)......................... 39, 40
Ruhl*, Is The Endangered Species Act Eco-Pragmatic?*, 87 MINN. L. REV. 885 (2003) .................... 35
Ruhl, *The Battle Over Endangered Species Act's Methodology*, 34 ENVTL. L. 555
    (2004) ........................................................................................................................ 23
SULLINS, ESA: ENDANGERED SPECIES ACT (ABA Basic Practice Series 2001) ...................... 41
Sunstein, *Avoiding Absurdity?  A New Canon in Regulatory Law*, 32 ENVTL. L. REP.
    11126 (Sept. 2002)....................................................................................................... 24
U.S. General Accounting Office, *Endangered Species – A Controversial Issue
    Needing Resolution* 52, 58 (GAO  CED-79-65, 1979) ................................................. 18
Yagerman, *Protecting Critical Habitat Under the Endangered Species Act*, 20
    ENVTL. L. 811 (1990).................................................................................................... 26

**INTRODUCTION**

Plaintiffs Center for Biological Diversity *et al.* ("CBD" or "Plaintiffs") challenge two land-use plan amendments adopted by the Bureau of Land Management ("BLM").  The environmentally sensitive amendments provide future land management direction for two areas in the California Desert Conservation Area ("CDCA"):  the West Mojave Plan Amendment ("WEMO") and the Northern and Eastern Colorado Desert Coordinated Management Plan ("NECO").  CBD asserts that BLM violated the Endangered Species Act ("ESA"), National Environmental Policy Act ("NEPA"), Federal Land Policy and Management Act ("FLPMA"), and Administrative Procedure Act ("APA").

Kern County, San Bernardino County, and Imperial County, California, and QuadState Local Governments Authority ("the Counties") were granted Intervenor-Defendant status on Jan. 11, 2007.  The Counties have important governmental stakes in the challenged actions that go beyond the interests of a typical intervenor.  *See* pages 5-7, below.

In formal biological opinions, the U.S. Fish and Wildlife Service ("FWS") found that WEMO and NECO satisfy ESA § 7.  The opinions are the focus of CBD's ESA challenges.  The Counties will again concentrate on ESA issues.

After summary judgment briefing and oral argument earlier in 2008, opinions were issued which affect disposition of this case.  Most notable is the en banc opinion deferring to agency decisions under NEPA and federal land management statutes.  *Lands Council v. McNair*, __ F.3d __, 2008 WL 2640001 (9th Cir. July 2, 2008).  The Court ordered the "parties to rebrief the cross-motions for summary judgment" under current legal principles, with "simultaneous" opening briefs due on Sept. 8, 2008.  Order of Aug. 12, 2008 (docket entry 155); *see* docket entry 157.

Simultaneous briefing places Defendants' side at a slight disadvantage.  In APA review, Plaintiffs bear the burden of persuasion.  It is uncertain what claims and theories CBD will pursue this time around.  After Federal Defendants and the Counties rebutted the arguments in CBD's opening briefs, CBD switched to different arguments and claims in its opposition/reply briefs.[1]  The

---

[1]     We will refer to: (1) CBD's opening brief on its ESA claims (Mem. of Pts...for Summ. Adjudication of Claims 3 and 4, docket 116) as "CBD ESA Br."; (2) CBD's opening brief on its NEPA and other claims (Pls' Notice of Mot. for Summ. Adjudication on the First and Second

(continued...)

1   best we can do in a simultaneously-filed brief is to presume CBD's briefs will mirror the arguments

2   that appeared in either CBD's opening or reply briefs.  Accordingly, the Counties' revised brief will

3   rebut the principal arguments pursued in four prior CBD briefs.  Unfortunately, this adds to the

4   complexity and length of this brief.

5       The Counties again submit a consolidated brief, as allowed by the Aug. 22 Order.  We begin

6   by providing some regulatory context below.

7                          **STATUTORY AND REGULATORY CONTEXT**

8       **Federal Land Policy and Management Act.**  FLPMA, 43 U.S.C. 1701-84, provides that

9   BLM lands are managed for multiple uses:  "recreation, range, timber, minerals, watershed, wildlife

10  and fish, and natural scenic, scientific, and historical values."  43 U.S.C. 1702(c), 1732.  Land use

11  plans prepared under public procedures make choices on which multiple-use benefits will be

12  featured in particular areas.  Such plans can be amended or revised.  *Id.* § 1712.

13      FLPMA § 601 also established the CDCA and provided some general considerations for

14  CDCA management.  43 U.S.C. 1781.  BLM has discretion to balance devoting lands to the recovery

15  of ESA-listed species with "outdoor recreation uses" and the "economic resources of the California

16  desert."  43 U.S.C. 1781(a), (b), (d) and (f).

17      **National Environmental Policy Act.**  NEPA requires an environmental impact statement

18  ("EIS") on certain federal agency actions.  42 U.S.C. 4332(2)(C).  NEPA is a procedural statute

19  calling for disclosure of significant environmental impacts.  *Robertson v. Methow Valley Citizens*

20  *Council*, 490 U.S. 332, 349-52 (1989).  A "rule of reason" is employed in ascertaining whether an

21  EIS complies with NEPA.  *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004).

22      **Endangered Species Act.**  The ESA, 16 U.S.C. 1531-44, applies to endangered or

23  threatened species listed ("listed species"), and critical habitat designated, by FWS.

24      ESA § 7 creates duties for federal agencies.  Substantively, § 7(a)(2) allows a federal agency

25

---

26  (...continued)
    Claims, docket 123) at "CBD NEPA/FLPMA Br."; (3) CBD's opposition/reply on its NEPA and
    FLPMA claims (Pls. Combined Reply... on the First and Second Claims, docket 135) as "CBD
27  NEPA/FLPMA Reply"; and (4) CBD's opposition/reply on its ESA claims (Pls...Reply...[on] Claims
    3 and 4, docket 139) as "CBD ESA Reply."

28

to approve an action if it finds the action is "not likely to jeopardize the continued existence of" a listed species or adversely modify designated critical habitat. 16 U.S.C. 1536(a)(2). Procedurally, if the proposed action is "likely to adversely affect" listed species or critical habitat, formal "consultation" between the action agency and FWS is conducted. After formal consultation, FWS prepares a written biological opinion ("BiOp") and incidental take statement ("ITS"). 16 U.S.C. 1536(a)(2) and (b)(3); 50 C.F.R. 402.14.

ESA § 9 and regulations generally prohibit the "take" of listed wildlife by any private or public "person."[2] The 1982 ESA amendments allow some land uses to proceed which incidentally take members of a listed species. FWS has control of these processes through the conditions specified in an ESA § 7(b)(4) ITS, or in an § 10(a)(2) incidental take permit ("ITP") and habitat conservation plan ("HCP"). 16 U.S.C. 1536(b)(4) and (o)(2), 1539(a)(2).

**Administrative Procedure Act.** The APA provides for deferential judicial review of final federal agency actions. 5 U.S.C. 706. The agency action is presumed to be lawful. Plaintiffs bear the burden of proving the action is arbitrary or otherwise unlawful. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-16 (1971); *Ctr. for Biological Diversity v. BLM*, 422 F. Supp. 2d 1115, 1126-27 (N.D. Cal. 2006).[3]

---

[2]   16 U.S.C. 1538(a)(1)(B) and (G); *see* 50 C.F.R. 17.31(a) (presumptively extending the statute's prohibition against "take" of "endangered" wildlife to "threatened" wildlife. "Take" is defined to include causing "harm" to listed wildlife. Implementing rules define "harm" to include a "habitat modification" or land use activity that "actually kills or injures wildlife." 50 C.F.R. 17.3; *see Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*, 515 U.S. 687 (1995).

[3]   This "*Imperial Sand Dunes*" decision is the later of two opinions this Court has rendered on federal compliance with the ESA in CDCA contexts. The first opinion vacated a 2002 BiOp on NECO, another plan amendment ("NEMO"), and interim WEMO measures, finding that the regulatory definition of "adverse modification of critical habitat" employed in the BiOp contravened ESA § 7(a)(2). *American Motorcycle Ass'n v. Norton*, Nos. C 03-03807 SI, C 03-02509 SI, 2004 WL 1753366 (N.D. Cal. Aug. 3, 2004). In conformance with that decision, FWS prepared a revised 2005 BiOp on NECO and a 2006 BiOp on WEMO that employed a permissible interpretation of "adverse modification."

*Imperial Sand Dunes* concluded the federal agencies had inadequately explained their conclusion that reopening certain areas to off-highway vehicles ("OHVs" or "ORVs") would not violate ESA § 7 constraints (duties to avoid likely jeopardy to the species and adverse modification of critical habitat) relating to Peirson's milk-vetch. The opinion was based on unusual facts. The Imperial Sand Dunes plan allowed destruction of 50% of the milk-vetch's critical habitat before (potentially ineffective) constraints would be initiated. *See* 422 F. Supp. 2d at 1127-36. On challenges concerning the desert tortoise, the opinion found defects in the ITS (FWS has not shown
(continued...)

1       Since the earlier briefing in this case, controlling decisions have emphasized the deference a

2  court owes to a federal agency's fact and science judgments, policy judgments, and legal

3  interpretations.  Most notably, a unanimous en banc Ninth Circuit opinion deferred to a federal land-

4  managing agency (there, the Forest Service; here, BLM) and stressed how "narrow" judicial review

5  is under the APA.  *Lands Council v. McNair*, __ F.3d __, 2008 WL 2640001 at \*4-19 (9th Cir.

6  2008).  The en banc opinion overruled a panel opinion on which CBD relied, *Ecology Law Ctr. v.*

7  *Austin*, 430 F.3d 1057 (9th Cir. 2005).[4]  Contrary to the *Ecology Center* approach of disbelieving a

8  federal agency unless it had on-the-ground proof of the reliability of its desired land management

9  policy, the en banc Court found that the federal agency action is presumed to be lawful under the

10  APA, "our proper role is simply to ensure that the Forest Service made no 'clear error of judgment'

11  that would render its action 'arbitrary,'" and courts must "defer to an agency's determination" in

12  areas of prediction and scientific opinion.  2008 WL 2640001 at \*4, 9 and 15.  Thus, *Lands Council*

13  *v. McNair* undercuts the "harsh look" at federal agency actions that CBD favors.

14       The Supreme Court again stressed the federal agencies' discretion in interpreting the ESA in

15  *National Ass'n of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518, 2533-36 (2007).  *See*

16  *also Sweet Home*, 515 U.S. at 703, 708.  In *NAHB v. Defenders*, the Court reversed a Ninth Circuit

17  opinion that improperly imposed that court's preferred view of the ESA for the Services' view,

18  *Defenders of Wildlife v. EPA*, 420 F.3d 926 (9th Cir. 2005).  The Court affirmed an agency

19  interpretation of ESA § 7 that did not maximize protection of listed species.  The Court found ESA

20  § 7 does not apply to actions where the federal agency lacks discretion under its organic laws to base

21  decisions on or address impacts to listed species.  This undercuts the implication that the

22  conservation of listed species always prevails under *TVA v. Hill*, 437 U.S. 153 (1978).  *Compare* 127

---

(...continued)

that it was impractical to give a numerical estimate of the number of tortoises that could be legally taken) and the terms and conditions for allowing incidental take (the failure to include measures designed to minimize incidental take).  *Id.* at 1137-41.

[4]    *See* 2008 WL 2640001 at \*6-10.  The en banc Court also vacated the panel opinion in *Lands Council v. McNair*, 494 F.3d 771 (9th Cir. 2007).  The panel opinion had directed the issuance of a preliminary injunction.  The en banc Court sided with the district court, which had engaged in deferential review and which had denied a preliminary injunction.  2008 WL 2640001 at \*1, 19-22.

S. Ct. at 2533-38 (majority opinion) *with* 127 S. Ct. at 2538-51 (dissent).

*Lands Council* and *NAHB v. Defenders* represent a sea-change in judicial respect for agency prerogatives. At least two other recent opinions illustrate a Ninth Circuit trend towards more-deferential judicial review, and with less policy advocacy.[5]

**WEMO, The EIR/S Under Federal And State Law, And The Proposed HCP.** WEMO is not merely a BLM land use plan. BLM, San Bernardino County, and the City of Barstow are the lead authors of the *Final Environmental Impact Report and Statement for the West Mojave Plan – A Habitat Conservation Plan and California Desert Conservation Area Plan Amendment* ("WEMO EIR/S"). The WEMO EIR/S serves as both an EIS under the federal NEPA and an environmental impact report under the California Environmental Quality Act ("CEQA").[6]

An integral part of WEMO – and the principal reason for the joint WEMO EIR/S – is a proposed HCP and ITP under ESA § 10(a)(2) and the California Endangered Species Act ("CESA")

---

[5]       In another en banc opinion, the Ninth Circuit: (1) reversed a panel opinion that had read the Indian Religious Freedom Restoration Act to be a significant constraint on federal land management; (2) affirmed the portion of the panel opinion that had found no violation of NEPA's rule of reason; and (3) found that the plaintiff had not preserved the NEPA claim on which the panel had found for plaintiff. *Navajo Nation v. U.S. Forest Service*, __ F.3d __, 2008 WL 3167692 (9th Cir. Aug. 8, 2008) (en banc). Additionally, NEPA compliance was found in *Bering Strait Citizens for Responsible Resource Devpt. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938 (9th Cir. 2008).

       This trend towards greater judicial deference is not uniform. As this Court has noted, a Ninth Circuit panel found that, due to the importance of Wilderness preservation, BLM had not satisfied NEPA disclosure duties on its land use plan in Oregon. *Oregon Natural Desert Ass'n v. Bureau of Land Management*, 531 F.3d 1114 (9th Cir. 2008). That case is of little relevance here, as there are no comparable Wilderness issues in this case.

[6]       We generally follow CBD's short form for citing the administrative record, and provide parallel citations to the stand-alone BiOps and EISs (the versions most people review). San Bernardino County is a "co-lead agency" on the EIR/S (the lead agency for CEQA purposes) and a "NEPA Cooperating Agency." WEMO EIR/S at 1-3, 1-9 (AR WMP 201668, 201674). Kern County is both a "CEQA Responsible Agency" and "NEPA Cooperating Agency." WEMO EIR/S at 1-9 (AR WMP 201674). The coordinated management in WEMO carries out the intent that BLM and the Counties first recognized in a 1992 Memorandum of Understanding. EIR/S at 1-13 and Appendix A (AR WMP 201678). In 1997, the Counties and other members of a West Mojave Supergroup adopted equitable principles supporting that WEMO: (1) will provide an "improved and streamlined process" for ESA and CESA consultation; and (2) "will be equitable, predictable and compatible with local, state and federal agency permitting procedures so as to be easily administered." *Id.* at 1-14 (AR WMP 201674).

for management of listed species on interspersed federal, State, and private lands.[7]  The HCP is being sponsored by San Bernardino and Kern Counties, and over a dozen cities.  The HCP would provide: (1) protection for the threatened desert tortoise and other listed species; and (2) an efficient mechanism to comply with the ESA and CESA with respect to future uses of *private* lands.

The proposed HCP would impose mitigation fees on development of enrolled private lands.  This, in turn, would provide secure funding for greater habitat conservation activities on BLM-administered lands for the desert tortoise and other federal and State-listed species.  James Decl. ¶ 3 and Scott Decl. ¶ 4 (CR 32).  The proposed HCP would provide higher levels of funding for desert tortoise protection (e.g., fencing of roads, ORV management, restoration of habitat) on the superior habitat located on federal lands.  Consequently, the BLM plan amendment and proposed HCP are interconnected actions and were analyzed together in a document to fulfill the requirements of both NEPA and CEQA.  *See* WEMO EIR/S at 1-1 to 1-6, 2-9 to 2-223, 3-37 to 3-43 (AR WMP 201666-71, 201697-911, 201967-73).

Some of the threats facing the desert tortoise can be addressed, not through habitat acreage allocations, but only by providing additional funding.

> Numerous factors are likely involved in the decline.  Predation by common ravens and domestic and feral dogs, unauthorized off-road vehicle activity, authorized vehicular activity, illegal collecting, upper respiratory tract disease, possibly other diseases, mortality on paved roads, vandalism, drought, livestock grazing, feral burros, human development, nonnative plants, and environmental contaminants are known or potential contributing factors.

WEMO BiOp at 59 (WBO AR 1480); *see* CBD ESA Br. at 3.  The Counties' proposed HCP would provide local government and private money and other resources currently unavailable to BLM in these budget-strapped times.  The August 2008 Draft Revised Recovery Plan for the Mojave Population of the Desert Tortoise (at 31-33, 63-85) emphasizes the need for funding to protect desert tortoises, and emphasizes partnerships with local governments and the private sector to accomplish recovery plan goals.  *See* http://ecos.FWS.gov/docs/recovery_plan/080804.pdf.

---

[7]    Within the 9.5 million-acre WEMO planning area, some 3 million acres of private lands are subject to the jurisdiction of San Bernardino, Kern, Inyo, Los Angeles, and Riverside Counties.  The non-federal lands are 32% of the WEMO acreage.  BLM and other Department of the Interior agencies control 3.5 million acres.  WEMO EIR/S at 1-2, 1-4 (AR WMP 201667, 201669).

1   **NECO.** The NECO planning area encompasses portions of San Bernardino, Riverside, and

2   Imperial Counties.[8] San Bernardino and Imperial Counties are cooperating agencies on the NECO

3   EIS to provide coordinated planning of the federal and private lands interspersed in the NECO

4   planning area.  NECO EIS at 1-2 to 11 (AR NECO 101217-26).  The NECO EIS is an EIS

5   addressing: (1) the NECO plan amendment with respect to BLM-managed lands; and (2) a Sikes Act

6   Plan with the California Department of Fish and Game with respect to non-federal lands.  NECO

7   EIS at title page, 1-11 (AR NECO 101194, 101226).

8   BLM formally adopted NECO in a record of decision ("ROD") dated Dec. 19, 2002.  After

9   the *Am. Motorcycle* opinion found a 2002 BiOp on NECO (and NEMO) employed an unlawful

10  standard for assessing "adverse modification of critical habitat," FWS prepared a curative 2005

11  BiOp.  The 2005 BiOp addressed NECO and other measures BLM was taking at that time in the

12  WEMO area (interim measures) and the NEMO area (unchallenged by CBD).  *See* NECO BiOp at 1

13  (NBO AR 12535).  A 2006 BiOp addresses the effects of implementing the long-term WEMO.  *See*

14  WEMO BiOp at 1 (WBO AR 14752).

15  **ARGUMENT**

16  CBD's ESA arguments have been short on substance and long on procedural demands.  As

17  Section I of this brief explains, the environmentally-protective plan amendments clearly do satisfy

18  ESA § 7(a)(2), and even assist in discretionary conservation and recovery.  Section II explains why

19  the BiOps – each over 200 pages long – procedurally satisfy ESA and APA standards.  As a result,

20  BLM could lawfully rely on the BiOps to show ESA compliance.  *See* Section III.

21  Section IV shows that WEMO and NECO are well within BLM's discretion regarding

22  multiple-use management of the CDCA under FLPMA.  And the multi-volume WEMO EIR/S

23  satisfies NEPA's rule of reason.  *See* Section V.

24

---

25  [8]      *Proposed Northern & Eastern Colorado Desert Coordinated Management Plan – an
Amendment to the California Desert Conservation Area Plan 1980 and Sikes Act Plan with the*

26  *California Department of Fish and Game and Final Environmental Impact Statement* ("NECO EIS")
at Appendix A (AR NECO 101194, 101676-74).  Within the 5.5 million acre NECO planning area,

27  there are over 680,000 acres of private lands subject to the Counties' jurisdiction (12.3% of the total
acreage), while BLM manages 3.8 million acres (69% of the total).  *Id.* at 1-4 (AR NECO 101219).

28

1   **I.      WEMO And NECO Substantively Satisfy The ESA**

2         CBD's earlier briefs presented various arguments to support the conclusions that the ESA

3   requires federal actions tot improve the recovery prospects of a listed species, and that WEMO and

4   NECO do not satisfy that standard.  Those various claims fail both on the law and on the

5   administrative record facts.

6         **A.      The ESA Only Requires Federal Agencies To Avoid Actions That Degrade A
                    Species' Status Or Critical Habitat Conditions In Some Appreciable Way.  The**
7                 **ESA Does Not Require Conservation, Recovery, Or Improvement Actions.**

8         ESA § 7(a)(2) sets a floor.  The floor is that federal agency actions are limited to those "not

9   likely to jeopardize the continued existence of a" listed species or to "result in the destruction or

10  adverse modification of [the designated critical] habitat" of such species.  16 U.S.C. 1536(a)(2).

11        To "jeopardize" means that an "action causes some 'deterioration in the species' pre-action

12  condition."  *National Wildlife Fed'n v. National Marine Fisheries Serv.*, 524 F.3d 917, 930 (9th Cir.

13  2008) ("*NWF v. NMFS*").  "Destruction or adverse modification" of critical habitat also clearly

14  focuses on whether the proposed action subject to consultation would cause "adverse" future

15  changes in habitat conditions.  *NWF v. NMFS*, 524 F.3d at 933-36 (adverse modification considers

16  "near-term habitat loss" and whether the action "will not appreciably reduce the odds of success for

17  future recovery planning, by tipping a listed species too far into danger").  Thus, § 7(a)(2) bars

18  federal actions that *degrade* the status of the listed species or its critical habitat in some manner that

19  is significant to the species.

20        In contrast, ESA § 4(f) and § 7(a)(1) encourage – but do not compel – federal agencies to

21  take actions that assist in the "conservation" of a species, including the *improvement* actions

22  identified in a recovery plan.  16 U.S.C. 1533(f), 1536(a)(1).

23        **Section 7(a)(1).**  A BiOp's ESA § 7(a)(1) "conservation recommendations" do not "carry

24  any binding force."  50 C.F.R. 402.14(j).  The Services adopted this ESA interpretation after

25  agreeing with the following statement of the House Committee with ESA jurisdiction:

26        [W]e do not believe that it was intended that section 7(a)(1) require developmental agency
          actions to be treated as conservation programs" as this "would render the much debated
27        provisions of section 7(a)(2)...essentially meaningless and bring about endless litigation....

28

[F]ailure to accept or implement the [conservation] recommendations does not constitute a violation of section 7.[9]

If an agency action satisfies ESA § 7(a)(2), the federal agency has "discretion in ascertaining how to best fulfill the mandate to conserve." *Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy*, 898 F.2d 1418 (9th Cir. 1990). This discretion includes the ability to forgo maximizing recovery benefits, in order to achieve some of the objectives stated in the agency's organic statute. *Platte River Whooping Crane Trust v. FERC*, 962 F.2d 27, 34 (D.C. Cir. 1995) (it is too "far-fetched" to interpret the ESA as obliging federal agencies to do "whatever it takes" to conserve listed species). "ESA Section 7's 'no jeopardy' standard does not confer upon the action agency the affirmative obligation to promote the recovery of a listed species." *Swan View Coalition v. Barbouletos*, No. CV-05-64-M-DWM, slip op. at 28 (D. Mont. Mar. 31, 2008) (copy appended at Addendum A of the Counties' original summary judgment brief (Dkt. 132)).

While *NWF v. NMFS* and *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*, 378 F.3d 1059, 1069-75 (9th Cir. 2004), require *procedural* consideration of the impacts of the action on the potential that critical habitat can serve a recovery role, those opinions do not substantively prohibit any federal action that does not assist in "recovery." The *NWF v. NMFS* Court went out of its way to state "[r]equiring some attention to recovery issues does not improperly import ESA's separate recovery planning provisions into the section 7 consultation process." 524 F.3d at 936.

**Interior Agencies Have No Duty To Fully Implement An ESA § 4(f) Recovery Plan.**
Since the CBD ESA Reply asserted such a duty, we refute that theory up front. One obvious problem with CBD's theory is, since ESA § 7(a)(2) establishes a "no significant degradation" duty for every federal agency action and since conservation/recovery is discretionary under § 7(a)(1), why should § 4(f) be read to inconsistently establish a federal agency duty to implement the improvement actions in a recovery plan?

---

[9]     51 Fed. Reg. 19926, 19954 (June 3, 1986). "The "Service agrees with the Committee's comments" and accordingly added § 402.14(j) language to "emphasize the advisory, non-binding nature of conservation recommendations." *Id*. at 19954-55.

1    Federal Defendants (in their earlier opening brief at 47-48, 54, and their reply at 37-40) have

2    concluded that an ESA § 4(f) recovery plan does not impose such a duty.  To the extent there are

3    inconsistencies or ambiguities between ESA § 4(f) and § 7, courts must defer to FWS's resolution of

4    those inconsistencies or ambiguities.  *NAHB v. Defenders*, 127 S. Ct. at 2533-36; *Sweet Home*, 515

5    U.S. at 703, 708.

6    If Congress had a definitive intent that recovery plans should control in ESA § 7(a)(1) and

7    (a)(2) settings, it would have added language to § 7 to that effect when ESA § 4(f) was last amended

8    in 1988.  But Congress did not do so.  ESA § 7(a)(2) continues to state that compliance is

9    determined by assessing whether the proposed agency action is likely to jeopardize the continued

10   existence of listed species or adversely modify critical habitat.  Conformance with a recovery plan is

11   not mentioned as a relevant consideration anywhere in ESA § 7.  *See* 16 U.S.C. 1536.

12   ESA § 4(f)(1) does state the "Secretary shall develop and implement" recovery plans.  16

13   U.S.C. 1533(f)(1).  That language has been in the ESA since 1978.  The legislative intent is that a

14   recovery plan is a non-binding guidance document providing a "framework for actions directed at

15   conserving or, at least insuring the survival of the subject species."  H.R. Rep. No. 95-1625 at 19,

16   1978 U.S.C.C.A.N. 9453, 9469.  As one court correctly concluded, to avoid "misconstru[ing]

17   congressional intent," a recovery plan does not bind Interior agencies such as the National Park

18   Service or BLM.  *National Wildlife Fed'n v. National Park Serv.*, 669 F. Supp. 384, 388 (D. Wyo.

19   1987) (the claim that an Interior agency, "the Park Service and the Secretary cannot later selectively

20   decide which [recovery plan] provision to go forward with....  completely misconstrues

21   congressional intent").

22   Congress amended the recovery plan provisions in 1988.  While the intent was to encourage

23   federal agencies to assist more in carrying out a recovery plan, the degree of agency implementation

24   remains an area of agency discretion.  ESA § 4(f)(4) and (5) provide agency discretion not to carry

25   out elements in a recovery plan by stating that the "Secretary" and "[e]ach federal agency...shall

26   consider all information" the public has provided in a mandatory public comment period – such as

27   comments that the agency should fulfill its statutory mission and that implementing the recovery

28   plan would be too costly – before deciding which parts of a recovery plan that agency will indeed

1   "implement."  16 U.S.C. 1533(f)(4) and (f)(5).  As "the substantive requirements of [and discretion

2   in] section 7(a)(1) of this law are not affected by this amendment," yet again Congress chose not to

3   make an FWS recovery plan binding on all federal agencies.  H.R. Conf. Rep. No. 100-928, at 21

4   (1988).

5          BLM must be able to consider and act on "public comment" that the economic costs are too

6   high for the agency to implement some elements in a recovery plan.  Otherwise, ESA § 4(f)(5)'s

7   reference to considering "all information presented during the public comment period" is sapped of

8   meaning and its legislative intent is discarded.  16 U.S.C. 1533(f)(5); *see* 134 Cong. Rec. S9766-70

9   (July 25, 1988) and S10164-66 (July 28, 1988) (discussion on adoption of Sen. McClure's

10  amendments, which became ESA § 4(f)(4) and (5)).

11         This statutory analysis supports the dominant judicial view that ESA § 4(f) recovery plans do

12  not establish binding regulatory requirements.  And recovery plans do not dictate the results of § 7

13  consultation on a federal agency's proposed action:

14              Section 1533(f) makes it plain that recovery plans are for guidance purposes only...  There
                would be absolutely no point to the consultation and preparation of a biological opinion if the
15              F.W.S.'s opinion were predetermined based on whether the proposed project lands fell within
                the borders of properties discussed in...recovery plan documents....  [B]ecause the Recovery
16              Plan is not a document with the force of law divesting all discretion and judgment from the
                F.W.S., and because the F.W.S. identified reasonable justifications for issuing "no jeopardy"
17              Biological Opinions...we hold that Plaintiffs have failed to meet their burden of
                demonstrating that the F.W.S. acted arbitrarily....[10]

18         Against this wealth of authority, the CBD ESA Reply (at 4) offered a footnote in *Southwest*

19  *Ctr. for Biological Diversity v. Bartel*, 470 F. Supp. 1118, 1137 n.16 (S.D. Cal. 2006).  We

20  respectfully submit that aspect of *Bartel* is an unpersuasive outlier.  The footnote imposes Senior

21  District Judge Brewster's policy preference in an area where other courts have recognized the

22  responsible federal agencies have interpretive discretion.

23

24  [10]     *Fund for Animals v. Rice*, 85 F.3d 535, 547-48 (11th Cir. 1996).  *Accord United States v.*
    *McKittrick*, 142 F.3d 1170, 1176 (9th Cir. 1998) (the "Secretary has broad discretion to determine
25  what methods to use in species conservation" and "adoption of recovery plans is discretionary");
    *California Native Plant Soc'y v. EPA*, No. C06-03604 MJJ, 2007 WL 2021796 at *21 (N.D. Cal.
26  July 10, 2007) (divergence from recovery plan not significant as the "jeopardy analysis is concerned
    with whether a given federal action...would appreciably *reduce* the likelihood of recovery, not
27  whether than federal action would itself *implement* or bring about recovery"); *Biodiversity Legal*
    *Found. v. Norton*, 285 F. Supp. 2d 1, 13-14 (D.D.C. 2004); *NWF v. NPS*, 669 F. Supp. at 388.

28

1    This Court wisely declined to endorse CBD's theory that an ESA § 4(f) recovery plan

2    controls ESA § 7 compliance in at least two prior decisions. *Am. Motorcycle*, 2004 WL 1753366 at

3    *6 (N.D. Cal. Aug. 3, 2004); *Ctr.. for Biological Diversity v. BLM*, No. C 03-02509 SI, 2004 WL

4    3030209 at *9 (N.D. Cal. Dec. 30, 2004). The Court should continue that path here.

5    **Synthesis.** CBD would prefer it if BLM managed more CDCA lands primarily to provide

6    benefits to the desert tortoise. Yet, judicial review of substantive compliance with ESA § 7(a)(2) is

7    at an end where an agency adopts any alternative "which complied with the jeopardy standard."

8    *Southwest Ctr. for Biological Diversity v. U.S. Bur. of Recl.*, 143 F.3d 515, 523 (9th Cir. 1998). It is

9    irrelevant whether the Interior Department has chosen the "best alternative or the one that would

10   most effectively protect" the species at issue. *Id.*; *Sierra Club v. Glickman*, 67 F.3d 90, 97 (5th Cir.

11   1995) (if the Forest Service satisfies the minimum required by ESA §§ 7 and 9, "the district court is

12   not to substitute its judgment" on whether other "features might be most desirable").

13   Thus, once ESA § 7(a)(2)'s floor is satisfied, BLM has the discretion to structure WEMO

14   and NECO to provide for some of the "economic resources of the California desert" and "outdoor

15   recreational use" in a "framework of ...multiple use and sustained yield" under FLPMA § 601, and

16   not to make maximization of listed species recovery the dominant or sole objective. 43 U.S.C.

17   1781(a)(4) and (6), (b), (d); *see* Section IV.

18   For these reasons, ESA §§ 4(f) and 7 do not create a duty that requires WEMO and NECO to

19   be structured primarily to promote ESA conservation.

20   **B.     WEMO and NECO Go Beyond The ESA Minimum By Conserving Ample
            Habitat For The Tortoise, And By Providing Net <u>Improvements</u>**

21

22   Contrary to CBD's implication that Federal Defendants have shortchanged ESA-listed

23   species, the record shows the agencies have provided ample habitat. BLM exercised its discretion in

24   favor of going beyond what the ESA requires. In WEMO and NECO, BLM made protection of the

25   desert tortoise and other species the dominant use on *millions* of acres.

26   WEMO establishes four tortoise Desert Wildlife Management Areas ("DWMAs"), totaling

27   over 1.5 million acres, and 14 areas of critical environmental concern ("ACECs") to protect habitat

28   for different rare species. WEMO EIR/S at 2-10, 2-13 to 17 (AR WMP 207822, 207825-29).

1  NECO establishes two DWMAs ("encompassing about 1.75 million acres") and 14 other multi-

2  species wildlife habitat management areas.  NECO ROD at D-1 (AR NECO 100641).  *See also*

3  Section I.D, below on the *redundant* habitats for the desert tortoise.

4  If one examines the future for tortoises and other listed species without WEMO and NECO,

5  and compares it to the future with those plan amendments' creation of extensive DWMAs and

6  ACECs and adoption of protective regulations, the answer is clear.  WEMO and NECO are a net

7  improvement, and do not cause net degradation, for listed species and their critical habitat.  CBD

8  admits that FWS found there would be "incremental improvements in the NECO and WEMO

9  plans."  CBD ESA Reply at 9.

10  FWS supported this common-sense conclusion throughout the BiOps.  WEMO and NECO

11  "would increase protection of the desert tortoise above the current management situation," would

12  "improve management of critical habitat of the desert tortoise above the current management

13  situation," and are "consistent with most of the recommendations of the recovery plan for the desert

14  tortoise and will promote the survival and recovery of the species" within the planning areas.

15  WEMO BiOp at 129, 131, 135 (WBO AR 14880, 14882, 14886); NECO BiOp at 169, 172, 174

16  (NBO AR 12703, 12706, 12708).  Habitat *improvements* will result from such WEMO and NECO

17  elements as:  (1) "[s]ubstantial reductions in the amount of livestock grazing"; (2) "[a]cquisition of

18  private lands" with high habitat values; (3) "[r]educing" the areas within DWMAs for parking and

19  camping "from 300 feet to 50 feet" or "from 300 feet to 100 feet" of roads; and (4) "[c]losure of

20  routes, which will reduce the exposure of desert tortoises to human-related threats."  WEMO BiOp

21  at 135-36 (WBO AR at 14886-87); NECO BiOp at 174-77 (NBO AR 12708-11).[11]

22

23  [11]      FWS also responsibly concluded that WEMO is not likely to jeopardize Parish's daisy,
Cushenbury milk-vetch, or Lane Mountain milk-vetch, or to adversely modify the critical habitat

24  designated for the first two species.  WEMO BiOp at 150-71 (WBO AR 14901-22).  There is a
"limit of one percent of new disturbance within the area of critical environmental concern to reduce

25  the loss of Parish's daisy" and the two milk-vetches.  *Id.*  Habitat *improvements* will result from
several WEMO plan elements.  Those elements include:  (1) "establishment of an area of critical

26  environmental concern" and designating it "as Class L, which will provide increased protection to
Parish's daisy [and the milk-vetches] than currently provided by Class M"; (2) "[r]emoval of

27  livestock grazing from habitat occupied by Parish's daisy" and the milk-vetches; (3) "[a]cquisition
of private lands" with high habitat values; (3) a "no surface occupancy standard" within the ACEC

28                                                                                              (continued...)

1    FWS, the ESA-expert agency, concluded that WEMO and NECO do satisfy ESA § 7(a)(2) in

2    BiOps issued after formal consultation and after taking a serious look at ESA impacts.  Courts must

3    defer to FWS's reasonable judgment in an area of predictive biology.[12]  This Court should defer to

4    FWS's reasonable judgment that WEMO and NECO substantively satisfy ESA § 7(a)(2).

5    WEMO and NECO immediately provide net benefits for the desert tortoise and other listed

6    species, and critical habitat (e.g., designation of over 3 million acres of DWMAs, reducing ORV use,

7    reducing grazing).  All of this demonstrates substantive compliance with ESA § 7.

8    **C.    The Courts In *NWF v. NMFS*, *Gifford Pinchot*, And *Imperial Sand Dunes*
         Required Further Explanations Because Those Agency Actions Allowed
9         Degradations That Contributed To Arguable Jeopardy/Adverse Modification
         Situations.  WEMO And NECO Are Different, As They Provide Net
10        Conservation Benefits.**

11   CBD's prior claims of substantive ESA § 7 violations, as well as several of their procedural

12   claims, are based primarily on what is now the amended opinion appearing as *NWF v. NMFS*, 524

13   F.3d 917 (9th Cir. 2008).  *NWF v. NMFS* addressed a distinguishable situation.

14   1.    *NWF v. NMFS* concerned the effects of continued operation of the Federal Columbia

15   River Power System on ESA-listed salmon.  NMFS concluded that ESA § 7(a)(2) would not be

16   violated if federal agencies operated dams in a manner that would continue to reduce greatly the

17   numbers of listed salmon, and where structural improvements to increase the survival rate would not

18   occur until 2010.  Since salmon have short lifespans, the Ninth Circuit found that NMFS's current

19   conclusion was arbitrary.  A BiOp must provide a more-rational justification where it appears the

20   short-term effects would jeopardize listed salmon and adversely modify their critical habitat.  524

21   F.3d at 929-36.

22   Similarly, *Gifford Pinchot* required FWS to provide a greater justification for why Forest

23   Service actions would not adversely modify critical habitat where planned timber harvesting would

---

24

(...continued)

25   to "eliminate the loss of Parish's daisy as a result of mining activities"; and (4) "[d]esignation of all
     routes of travel within" the ACEC "as limited use."  *Id.*

26   [12]    *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 376-78 (1989); *Lands Council v.*

27   *McNair*, 2008 WL 2640001 at *9-10 and 15; *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1336-37
                                                                              (continued...)

28

1  alter tens of thousands of acres of critical habitat for the spotted owl.  *See* 378 F.3d at 1064-65,

2  1072-75.  In *Imperial Sand Dunes*, this Court found, because a BLM land-use plan tolerated a 50%

3  decrease in the usable critical habitat for Peirson's milk-vetch, FWS had a greater duty to explain

4  rationally and non-arbitrarily its findings of no jeopardy and no adverse modification of critical

5  habitat.  422 F. Supp. 2d at 1127-36; *see note 3*.

6       Here, WEMO and NECO do not result in a net degradation of the status of listed species and

7  critical habitat, but a <u>net improvement</u>.  *See* Section I.B, above.

8       2.       There are <u>causation</u> differences as well.  ESA § 7(a)(2) and (b)(3) speak in terms of

9  "how the agency action affects [or causes impacts to] the species or its critical habitat."  16 U.S.C.

10  1536(b)(3).  "Agency action can only 'jeopardize' a species' existence if <u>that agency action causes</u>

11  <u>some deterioration</u> in the species' pre-action condition."  *NWF v. NMFS*, 524 F.3d at 930 (emphasis

12  added).  Federal dams were a principal cause of the salmon threats in *NWF v. NMFS*.

13       "Cause" under the ESA is limited to the action that proximately causes an effect to a listed

14  species.[13]  This excludes ESA liability for acts of nature or acts by third parties.[14]

15       One significant set of threats to desert tortoises is environmental (e.g., drought depriving

16  tortoises of food sources and leaving tortoises to eat plants with high metal concentrations, upper

17  respiratory disease, predation by ravens and dogs).  NECO BiOp at 57-60 (NBO AR 12591-94);

18  WEMO BiOp at 55-59 (WBO AR 14806-10); CBD ESA Br. at 3.  Consequently, those threats do

19  _____

20  (...continued)
    (9th Cir. 1992); *Hayward Area Planning Ass'n v. Norton*, No. C 00-04211 SI, 2004 WL 724950 at
    *3-7 (N.D. Cal. Mar. 29, 2004).

21  [13]    "Proximate cause" limits ESA § 9 "take" liability.  *Sweet Home*, 515 U.S. at 697 n.9, 700
22  n.13, 709.  There is no persuasive reason to not also create a proximate cause limit on liability under
    ESA § 7.  *See NAHB v. Defenders*, 127 S. Ct. at 2534-36; 73 Fed. Reg. 47868, 347869-70 (Aug. 15,
23  2008) (preamble to Services' proposed revisions to ESA § 7 rules stating the Services' position that
    ESA § 7 is triggered only if a federal action is the "essential cause" of an effect).

24  [14]    *Sweet Home*, 515 U.S. at 709, 713 (O'Connor, J., concurring that a "farmer whose fertilizer
    is lifted by a tornado" is not the "proximate cause" of any resulting wildlife injuries); *Pyramid Lake*
25  *Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1420 (9th Cir. 1990); *Ctr. for*
    *Biological Diversity v. HUD*, 541 F. Supp. 2d 1091, 1098-1101 (D. Az. 2008); *Pacific Shores*
26  *Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 538 F. Supp. 2d 242, 260 (D.D.C. 2008)
    (proposed federal action not the "cause" of ESA "takes" by "dogs" or third parties); *Alabama v. U.S.*
27  *Army Corps of Eng'rs*, 441 F. Supp. 2d 1123, 1132-35 (N.D. Ala. 2006) (any harm to listed mussels
    comes from "drought conditions," not Corps actions).

28

1   not sustain CBD's burden of demonstrating that WEMO and NECO violate ESA § 7(a)(2).  This is

2   especially true when WEMO and NECO do not "deepen the jeopardy by causing additional harm"

3   (as compared to future conditions without WEMO and NECO, and their DWMAs and ACECs).

4   *NWF v. NMFS*, 524 F.3d at 930; *see* Section I.A and B, above.

5           Another underlying cause of threats to tortoises and other listed species and their critical

6   habitats is BLM's limited budget.  Courts cannot remedy this directly, as Congress has the

7   constitutional power to set appropriations.

8           The Counties' proposed HCP/ITP would effectively increase BLM's funding for the WEMO

9   area, and allow more acquisition of habitat, fencing, law enforcement, and research.  *See* pages 5-6,

10  above.  Accordingly, the Counties believe that setting aside WEMO and NECO documents, and

11  throwing a monkey wrench into the Counties' efforts to fund tortoise protection through an HCP,

12  creates the higher risk of jeopardy.

13          It is dispositive that CBD provides no evidence that the protective WEMO and NECO

14  actions cause impairment of the tortoise's prospects for survival and recovery.[15]  Under the logic of

15  *NWF v. NMFS* – and under the factual differences between the beneficial WEMO and NECO versus

16  the damaging federal actions in *NWF v. NMFS*, *Gifford Pinchot*, and *Imperial Sand Dunes* – WEMO

17  and NECO substantively satisfy ESA § 7.

18          3.      Further, the key defect found by the *NWF v. NMFS* Court was that NMFS had

19  improperly "use[d] a hypothetical 'reference operation'" as the current environmental baseline

20  conditions under 50 C.F.R. 402.02 and 402.14(g)(2), instead of the current status of the species and

21  critical habitat.  524 F.3d at 928-29.  The unlawful baseline infected other parts of the BiOp, as

22  discussed in 524 F.3d at 929-36.  Here, CBD has not argued that FWS used some hypothetical

23  baseline to reduce the effects of the WEMO and NECO plan amendments.  This also undercuts any

24  CBD reliance on *NWF v. NMFS*.

25

26  [15]     CBD had argued there may be a tortoise population decline in the Western Mojave Recovery
    Unit.  This is doubtful for the reasons presented by the ORV interests.  CBD admits "long-term
27  population trends may be difficult to discern."  CBD ESA Reply at 6.  And any theoretical decline is
    not caused by, or exacerbated by, WEMO.

28

4.      CBD's earlier opening brief argued that the BiOps are inconsistent with the portion of *NWF v. NMFS* imposing an "aggregation approach" on BiOps.  Procedurally, the BiOps did consider aggregated impacts.  *See* Section II.B, below.

Substantively, there is no ESA § 7 violation.  *NWF v. NMFS* might find an ESA § 7(a)(2) violation only if the proposed "agency action causes some deterioration in the species' pre-action condition" – if the action "deepens the jeopardy by causing additional harm."  524 F.3d at 930.  Even if there are degraded habitat conditions, "an agency may still take action...that lessens the degree of jeopardy."  *Id.*  FWS has reasonably and non-arbitrarily found in the BiOps that, as a whole, WEMO and NECO (e.g., with their designation of extensive DWMAs, reduced ORV use, and reduced grazing)[16] "increase protection of the desert tortoise" and "would improve management of critical habitat of the desert tortoise above the current management situation."  WBO AR 14480, 14882, 14885-88; *see* Section I.B.  Because WEMO and NECO are expected to improve (not degrade) the status of listed species (as compared to the current environmental baseline condition), the proposed federal action "lessens the degree of" risk and complies with ESA § 7.  *NWF v. NMFS*, 524 F.3d at 930.

**D.      Jeopardy Is Assessed At The Level Of The Listed Species, Not Each Recovery Unit Of Tortoises**

1.      As the Counties described in their earlier opening brief, WEMO and NECO provide <u>redundant</u> habitats for the tortoise.[17]  In 1990, FWS determined that the Mojave Desert population of the desert tortoise was a "distinct population segment" ("DPS") and a "threatened species."  55 Fed.

---

[16]      The Counties leave the details to Federal Defendants and to more directly affected intervenors as to why the reduced ORV use and reduced grazing allowed under WEMO and NECO comply with ESA § 7.  We would highlight another overarching defect in CBD's objection to some "continued" ORV uses in the desert and reduced livestock grazing.  Continuation of historic activities, and mainly at a lower level, cannot violate ESA § 7(a)(2).  The ESA has "no 'retroactive' application" – rather, it takes the world as it finds it, including the effects of "*prior* action of a federal agency."  *TVA v. Hill*, 437 U.S. 153, 186 n.32 (1978); *NWF v. NMFS*, 524 F.3d at 930.  There is no persuasive basis for finding jeopardy or adverse modification where historic activities would be continued in a reduced, more environmentally sensitive manner.

[17]      Some of the County intervenors were so concerned about the redundant habitats being provided to the desert tortoise that they filed a formal notice of an ESA citizen suit on June 27, 2003.  The Counties have subsequently worked within the administrative process to find acceptable

(continued...)

Reg. 12170 (Apr. 2, 1990).  Congress limited the smallest "species" unit to a DPS because subdividing the true biological "species" into smaller and smaller subpopulations leads to absurd results, dilutes scarce FWS resources, and increases the scope of the ESA's economic constraints.[18]

FWS and BLM have provided <u>redundant habitats for smaller subsets than the listed tortoise DPS.</u>  For example, the 1994 *Desert Tortoise (Mojave Population) Recovery Plan* subdivided the listed DPS into six "evolutionarily significant units" ("ESUs"), each of which comprised a separate "recovery unit."[19]  The Recovery Plan advocated broader and more stringent measures deemed necessary to protect and recover each of these six smaller ESUs/recovery units/subpopulations than would have been warranted if the objective was just to recover the one listed Mojave tortoise DPS.  Because the numbers of tortoises in each recovery unit were smaller and more susceptible to extinction, the Recovery Plan recommended a "reserve architecture" which contains "redundancy"

---

(...continued)
solutions.  If restrictions in critical habitat and on other tortoise matters become more severe, the Counties may have to reconsider the litigation option.

[18]    The 1978 ESA Amendments eliminated the broader ability under the 1973 ESA's definition of "species" to list any "group of fish or wildlife...in common spatial arrangement."  87 Stat. 886 (1973).  Those Amendments substituted a more-restrictive phrasing which forbids the listing of invertebrates below the "subspecies" level and only allows listing of a "distinct population segment" of vertebrates "which interbreeds when mature."  16 U.S.C. 1532(16).  As the GAO described in 1979, there was a concern that, under a loose definition of "species," the ESA could be trivialized.

> [S]quirrels in a specific city park could be listed as endangered, even though an abundance of squirrels lived in other parks in the same city and elsewhere....  Such listings could increase the number of potential conflicts between endangered and threatened species and Federal, State, and private projects and programs....  However, the purpose of the Endangered Species Act is to conserve endangered and threatened species and their critical habitats, not preserve every individual animal and plant.

*Endangered Species – A Controversial Issue Needing Resolution* 52, 58 (GAO  CED-79-65, 1979).  Responding to GAO, the Senate Report on the 1979 ESA Amendments stated an intent to list a DPS only "sparingly":  "the Committee is aware of the great potential for abuse of this authority and expects FWS to use the ability to list populations sparingly and only when the biological evidence indicates that the action is warranted."  S. Rep. No. 96-151, at 7 (1979).

[19]    Tortoise Recovery Plan at 19-26 (NBO 578-85).  Neither the ESA nor the Services' subsequent *Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act* ("DPS Policy"), 61 Fed. Reg. 4722 (Feb. 7, 1996), provide for the designation and protection of subpopulations or any other units smaller than a DPS.  The six individual ESUs may not satisfy the "significance" to the species standard of the DPS Policy.  *See National Ass'n of Home Builders v. Norton*, 340 F.3d 835, 844-52 (9th Cir. 2003).  And, the use of the ESU terminology for tortoises is questionable, as the preamble to the DPS Policy states that the

(continued...)

---

1   in the DWMAs. Recovery Plan at 34-36 and Appendix C (NBO 594-96, 644-98). Using this

2   redundancy principle, the Recovery Plan (at 36-42) recommended that 14 DWMAs be established in

3   six recovery units/ESUs for a *single* distinct population of tortoises.

4       FWS carried out this redundancy in its 1994 designation of over 6.4 million acres of critical

5   habitat for a single DPS, based on the draft recovery plan. 59 Fed. Reg. 5820 (Feb. 4, 1994). With a

6   few minor adjustments (e.g., not including already-protected National Park lands), the 14 DWMAs

7   recommended in the Draft Tortoise Recovery Plan formed the basis for the 12 critical habitat units

8   designated by FWS. *See* 59 Fed. Reg. 5825, 5842, 5847-66. As described above, WEMO and

9   NECO largely implement this redundant set of DWMA habitat protections for different subsets of

10  one listed tortoise population.

11      2.      CBD responded to the Counties' point on redundant habitats by arguing that FWS

12  should have assessed jeopardy "on a recovery unit basis." CBD Reply Br. at 7-8. CBD's proposal is

13  contrary to law and FWS policy. Federal Defendants have agreed (*see* their earlier reply at 43-45) in

14  an interpretation that is controlling under *NAHB v. Defenders* and *Sweet Home*.

15      The ESA provides for listing on a "species" basis: "whether any species is an endangered

16  species or threatened species." 16 U.S.C. 1533(a)(1). The smallest listable "species" unit is a

17  "distinct population segment" of a vertebrate species. *Id.* § 1532(16). "Listing distinctions below

18  that of subspecies or a DPS are not allowed under the ESA." *Alsea Valley Alliance v. Evans*, 161 F.

19  Supp. 2d 1154, 1162 (D. Or. 2001).[20]

20      ESA § 7 applies at the level of the entire listed "species" unit. The agencies assess whether

21  the agency action is "likely to jeopardize the continued existence of any...threatened species." 16

22  U.S.C. 1536(a)(2). The listed "threatened species" here is the entire Mojave Desert population of

23  ───────────────

24  (...continued)
    ESU policy adopted by the National Marine Fisheries Service ("NMFS") "applies only to species of
    salmonids native to the Pacific," not to tortoises in the desert. 61 Fed. Reg. 4722.

25  [20]    The legislative intent was that FWS "use the ability to list populations sparingly" because the

26  listing of every locally-rare occurrence of a species with a broad range would be an "abuse." S. Rep.
    No. 96-151, at 7 (1979). The 1996 DPS Policy carries out this intent by requiring that a population

27  be both discrete and significant to the perpetuation of the species before it can be listed. *See NAHB
    v. Norton*, 340 F.3d 835, 844-52 (9th Cir. 2003) (finding a subset of pygmy owls was not a DPS).

28

1   the desert tortoise across a four-State area, which was found to be a single DPS.  55 Fed. Reg. 12170

2   (Apr. 2, 1990).  Accordingly, the plain ESA § 7(a)(2) text requires that FWS approve any BLM

3   action that is not likely to jeopardize the continued existence of the entire listed tortoise DPS.  The

4   ESA § 7(a)(2) text precludes the "recovery unit" approach favored by CBD.

5          Lest there be any doubt, two FWS memoranda confirm what the plain ESA language

6   requires.  Most notably, a March 2006 memorandum from FWS Director Hall states that ESA § 7's

7   jeopardy constraint applies to the entire "listed entity," not to smaller "recovery units."

8   Memorandum from FWS Director H. Dale Hall to Regional Directors, et al., "Recovery Units and

9   Jeopardy Determinations under Section 7 of the Endangered Species Act" 1-2 (Mar. 6, 2006) (copy

10  at appended at Addendum B).  Additionally, Federal Defendants' reply brief provided a 2005 FWS

11  memorandum from Paul Henson of FWS's California office to the same effect.

12         CBD's comeback (ESA Reply at 7) was:  the 1994 "Recovery Plan anticipated that the

13  jeopardy analysis would be done on a recovery unit basis."  But the Recovery Plan lacks binding

14  status for ESA § 7 consultations.  *See* Section I.A, above.  Even were CBD's unsubstantiated

15  divining of intent true, a recovery plan certainly cannot override the ESA textual duty to assess

16  jeopardy with respect to the entire "threatened species."

17      **E.     CBD's Arguments On The Burden Of Persuasion And "Insure Against
               Jeopardy" Are Unpersuasive**

18

19         The CBD ESA Reply (at 3) took the extraordinary position that, in court, "the burden [is] on

20  the BLM...to 'insure' that the authorized activities under these plans will not cause jeopardy" or

21  adversely modify critical habitat – purportedly, "affirmatively establishing jeopardy or adverse

22  modification is not Plaintiffs' burden."  This is not the law.

23         1.     Judicial review of whether a federal agency has complied with ESA § 7 takes place

24  under the deferential standards in the APA.  It is not *de novo* judicial review.[21]

25  _____

    [21]    *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1235-36 (9th
26  Cir. 2001); *Friends of Endangered Species v. Jantzen*, 760 F.2d 976, 981-82 (9th Cir. 1985); *Cabinet
    Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 684-87 (D.C. Cir.
27  1982).  The APA's uniform procedures can only be "supersede[d]" by "express" statutory language.
    5 U.S.C. 559; *Dickinson v. Zurko*, 527 U.S. 150, 154-55 (1999).  Nothing in the ESA purports to
28  expressly supersede APA standards with respect to federal agency compliance with ESA § 7.

1    The APA presumes a federal agency acted lawfully, and places on Plaintiffs the burden of

2    demonstrating illegality or arbitrariness.  5 U.S.C. 556(d), 706; *Overton Park*, 401 U.S. at 415-16;

3    *Am. Motorcycle*, 2004 WL 1753366 at *3 (Illston, J.) (the APA "presumes the agency action is

4    valid").  Thus, despite CBD's assertions, Plaintiffs cannot escape their burden of persuasion.

5    2.    CBD misstates the ESA text as requiring BLM to insure against any jeopardy.  ESA

6    § 7(a)(2) is satisfied if the agency ensures its action "is <u>not likely to</u> jeopardize the continued

7    existence of a" listed species.  16 U.S.C. 1536(a)(2) (emphasis added).  FWS and BLM do not have

8    to prove the negative that there are no small risks of jeopardy to tortoises (e.g., from predation).

9    Congress amended ESA § 7 in 1979 to move from an ensure-against-no-risk-of-jeopardy

10   standard to an ensure-against-likely-jeopardy standard to allow more projects to proceed.[22]  As Rep.

11   Breaux stated in describing his adopted floor amendment:

12       No matter how many precautions are taken, there may be a small chance that the agencies'
         action will end up jeopardizing the species.  No agency can or should be expected to give a
13       100-percent guarantee of no adverse impact.  I am concerned that the language of the existing
         statute ["insure . . . do not jeopardize"] could be interpreted to require this guarantee.  The
14       language I have proposed . . . allows Federal agencies to consider the probability or
         likelihood of jeopardizing a listed species in deciding whether to go ahead with a particular
15       action.

16   125 Cong. Rec. 29,437 (Oct. 24, 1979).  ESA § 7 does not allow the Service to issue a "negative

17   biological opinion" (a jeopardy opinion) merely because small potentials for jeopardy cannot be

18   eliminated.  H.R. Conf. Rep. No. 96-697 at 12, *reprinted in* 1979 U.S.C.C.A.N. 2572, 2576.

19   3.    The CBD ESA Reply (at 19 n.14) reads *Conner v. Burford*, 848 F.2d 1441, 1454 (9th

20   Cir. 1988), as requiring that a species receive the benefit of any doubt or uncertainty.  That reading is

21   inconsistent with the legislative history discussed above and with the legislative choice in favor of

22   allowing federal actions to proceed if there may be small risks of jeopardy.

23   _____

[22]    As originally enacted in 1973, ESA § 7 only allowed a federal agency action to proceed if the
24   agency could "insure" its action "do[es] not jeopardize" listed species."  87 Stat. 892 (1973).  *TVA v.
     Hill* described ESA § 7 as affording "endangered species the highest of priorities" and reflecting
25   "institutionalized caution."  *See* 437 U.S. 153, 185, 194 (1978).  After *TVA v. Hill* described the
     potency of the enacted ESA, the 1979 Congress became concerned that ESA § 7 could be read as
26   prohibiting federal actions unless the federal agency could insure there was *no possibility* of
     jeopardy.  The 1979 ESA amendments changed ESA § 7(a)(2) to its present language allowing
27   federal agency actions to proceed if the agency could "insure" that the proposed action is "not likely
     to jeopardize the continued existence of a" listed species.  16 U.S.C. 1536(a)(2).

28

1    That reading also is inconsistent with the Supreme Court's direction that the best science

2    language prevents "needless economic dislocation produced by agency officials zealously but

3    unintelligently pursuing their environmental objectives." *Bennett v. Spear*, 520 U.S. 154, 176-77

4    (1997).  In accordance with the language change made in 1979, most courts have found that an

5    agency action satisfies ESA § 7 even if the supporting "evidence is 'weak,' and thus not dispositive"

6    and even if there are "uncertainties," unless plaintiffs show the "agency's determination [is]

7    'arbitrary and capricious.'"  *Greenpeace v. Franklin*, 14 F.3d 1324, 1336 (9th Cir. 1993).  As

8    another California district court correctly concluded, "*Conner* does not directly support the broader

9    interpretation urged by Plaintiffs, that the agency should err on the side of the species when

10   evaluating uncertain evidence" and found the ESA does not require that approach.  *Natural Res. Def.*

11   *Council v. Kempthorne*, 506 F. Supp. 2d 322, 360-62 (E.D. Cal. 2007).[23]

12   The Conference Report also states that:  "This language continues to give the benefit of the

13   doubt to the species, and would continue to place the burden on the action agency to

14   demonstrate...that its action will not violate Section 7(a)(2)."  H.R. Conf. Rep. No. 96-697 at 12,

15   1979 U.S.C.C.A.N. 2572, 2576.  This legislative history cannot be read too broadly.  Legislative

16   history not anchored in the enacted text does not create law.  *See Exxon Mobil Corp. v. Allapattah*

17   *Servs., Inc.*, 545 U.S. 546, 568-71 (2005); *United States v. Gonzalez*, 520 U.S. 1, 6 (1997).  The

18   current ESA § 7(a)(2) language gives the benefit of the doubt to listed species only in the narrow

19   sense that, where the biological facts suggest a roughly equal likelihood of jeopardy and non-

20   jeopardy, the agencies could not "insure" the proposed action "is not likely to jeopardize" the

21   continued existence of a listed species.  But the amended text allows an action to go forward where

22   "there may be a small chance that the agencies' action will end up jeopardizing the species" – "No

23   agency can or should be expected to give a 100-percent guarantee of no adverse impact."  125 Cong.

24   Rec. 29,437 (Oct. 24, 1979). The "benefit of the doubt to the species" legislative history does not

25

26   [23]  Another opinion rejected ESA § 7 claims similar to those raised by CBD (e.g., baseline, jeopardy, critical habitat, conservation) – the BiOp also concerned federal land management over broad areas.  *Heartwood v. Kempthorne*, No. 1:05-cv-313, 2007 WL 1795296 (S.D. Ohio June 19, 2007).  That court repeatedly denies ESA claims because Plaintiffs did not carry their burden by citing record evidence demonstrating the BiOp was arbitrary.  *Id.* at *11-22.

27

28

trump the legislative intent to allow projects to go forward where scientific uncertainties do not rise (in the Services' professional judgment) to a level where jeopardy is "likely." *Oceana v. Evans*, 384 F. Supp. 2d 203, 218-21 (D.D.C. 2005).

As this suggests, ESA § 7 embodies a model that relies on the Services' professional judgment, rather than a precautionary principle that places the burden of proving non-jeopardy on federal agencies.[24] That is, under the APA, FWS's professional judgment and any other federal agency action are presumed to be lawful, and the plaintiff bears the burden of showing the agency acted arbitrarily or unlawfully. *Marsh v. ONRC*, 490 U.S. at 376-78; *Overton Park*, 401 U.S. at 415-16 (1971); *Lands Council v. McNair*, 2008 WL 2640001 at *9-10, 15; *American Rivers v. National Marine Fisheries Serv.*, No. Civ. 96-384-MA, 1997 WL 33797790 at *10 (D. Or. Apr. 3, 1997) (court should "not interfere with a federal agencies' exercise of professional judgment"). Accordingly, FWS's professional judgment prevails over CBD's speculation to the contrary, where there is no data supporting either side.

Further, nothing in the ESA § 7 word "insure" inherently flips the burden of persuasion to Federal Defendants. Consequently, the ESA § 7 claims fail because "Plaintiffs have failed to meet their burden of demonstrating that the F.W.S. acted arbitrarily" or unlawfully. *Fund for Animals v. Rice*, 85 F.3d at 547-48.

### F.   WEMO And NECO Do Not Adversely Modify Critical Habitat Under FWS's Lawful Interpretation

FWS does not interpret "adverse modification of critical habitat" to prevent the disturbance of a small area within a large designated critical habitat, if the critical habitat remains functional in allowing the survival and recovery of the listed species, especially if the trend is towards improvement of critical habitat conditions over time. *See* WEMO BiOp at 84-85, 132-33, 136-37 (WBO AR 14835-36, 14882-83, 14887-88). FWS's interpretation of no adverse modification of critical habitat is lawful. *See* Federal Reply at 50-51.

---

[24]   Ruhl, *The Battle Over Endangered Species Act's Methodology*, 34 ENVTL. L. 555, 592-99 (2004); Doremus, *The Purposes, Effects, and Future of the Endangered Species Act's Best Available Science Mandate*, 34 ENVTL. L. 397, 414-50 (2004); Carden, *Bridging the Divide: The Role of Science in Species Conservation Law*, 30 HARV. ENVTL. L. REV. 165, 216-22 (2006).

1.     CBD apparently favors an interpretation that adverse modification prohibits any disturbance anywhere in the millions of acres of designated critical habitat.  But no court has found that interpretation is compelled by ESA § 7(a)(2).  *See* WEMO BiOp at 4-5 (WBO AR 14755-56, discussing the amended order in *Am. Motorcycle*).  That interpretation would broadly interfere with mankind's use of land for many productive purposes, and that was not intended by Congress.[25]

FWS's interpretation is within the range of interpretations allowed by *Gifford Pinchot*, 378 F.3d at 1075.  Further, this Court found no violation of the ESA's ambiguous provisions on critical habitat where, due to mitigation measures, a project does not adversely modify critical habitat or jeopardize a listed species even though the project "will have extensive negative effects on the critical habitat."  *Hayward*, 2004 724950 at *7.

2.     "Adverse modification of critical habitat" cannot be pushed too far in the direction of conservation/recovery without violating several ESA provisions.  First, ESA § 7(a)(2) imposes constraints against significant degradation of the current status of a listed species and its critical habitat, while "conservation" and "recovery" are the domain of the more discretionary ESA §§ 4(f) and 7(a)(1).  *See* Section I.A, above.

Second, ESA § 4(b)(2) allows FWS to exclude areas from critical habitat down to the point that the "failure to designate such area as critical habitat will result in the extinction of the species."  16 U.S.C. 1533(b)(2).[26]  Since ESA § 4(b)(2) shows the only mandatory role for critical habitat is for

---

[25]     There is "nothing remarkable about resolving the textual ambiguity against the alternative meaning the framers are highly unlikely to have intended."  *Robbins v. Chronister*, 435 F.3d 1238, 1241 (10th Cir. 2006) (en banc); *see* Sunstein, *Avoiding Absurdity?  A New Canon in Regulatory Law*, 32 ENVTL. L. REP. 11126 (Sept. 2002); *Sweet Home*, 515 U.S. at 697 n.10 (ESA § 9 literally prohibits only the taking of an entire "species," but declining to reach that absurd result); *American Water Works Ass'n v. EPA*, 40 F.3d 1266, 1271 (9th Cir. 1994).

[26]     The definition of "critical habitat" does allow designation of critical habitat that could serve a "conservation" function.  16 U.S.C. 1532(5).  But the critical habitat actually designated can be reduced below what is desirable biologically for conservation to a level that just avoids "extinction of the species," based on the "economic" and other public interest factors.  16 U.S.C. 1533(b)(2).  That is, "even though more extensive habitat may be essential to maintain the species over the long term, critical habitat only includes the minimum amount of habitat needed to avoid short-term jeopardy or habitat in need of immediate intervention."  *Northern Spotted Owl v. Lujan*, 758 F. Supp. 621, 623 (W.D. Wash. 1991).

The public can and usually does comment that areas should be excluded from critical habitat on economic or other grounds.  This has occurred with greater intensity after *Gifford Pinchot* found

(continued...)

the species' persistence, "adverse modification" can permissibly emphasize "survival."

Third, in 1982 Congress ratified the regulatory standards that § 7(a)(2) is violated only if an action impairs both the "survival and recovery" of the listed species, or the value of critical habitat for both "survival and recovery."  The 1982 Amendments to ESA § 10(a) allow incidental takes if the "taking will not appreciably reduce the likelihood of the *survival and recovery* of the species in the wild."  16 U.S.C. 1539(a)(2)(B)(iv) (emphasis added).  Congress consciously borrowed the "survival and recovery" language from the 1978 jeopardy and adverse modification rules.

> The Secretary will base his determination as to whether or not to grant the permit, in part, by using the *same standard as found in section 7(a)(2) of the Act, as defined by Interior Department regulations*, that is, whether the taking will appreciably reduce the likelihood of the *survival and recovery* of the species in the wild.

H.R. Conf. Rep. No. 97-835, at 29-30, 1982 U.S.C.C.A.N. 2860, 2870-71 (emphasis added).

Where Congress incorporates the text of a regulatory interpretation of a statute into the statute, Congress adopts and ratifies that interpretation.  *E.g., Bragdon v. Abbott*, 524 U.S. 624, 631 (1998); *Hall v. EPA*, 273 F.3d 1146, 1158 (9th Cir. 2001).  Accordingly, the 1982 Congress ratified that critical habitat is adversely modified (and that a species is jeopardized) only if the modification appreciably reduces its value for a listed species' "survival and recovery."  By allowing actions to proceed unless both "survival and recovery" are compromised, this "makes clear that ITPs can be granted even if doing so threatens the recovery of the species," as long as survival is not jeopardized.  *Spirit of the Sage Council v. Kempthorne*, 511 F. Supp. 2d 31, 43 (D.D.C. 2007).

     3.     The purpose of the 1978 ESA Amendments was to *narrow* the acreage of critical habitat designated.  Accordingly, those Amendments should not be read as a directive to apply the

---

(...continued)

that areas designated as critical habitat could be subject to more stringent land use constraints than occurs under the automatic "jeopardy" constraint.  For modern designations of critical habitat, this political process creates powerful incentives for FWS to designate as critical habitat only parts of the currently-occupied habitat needed to sustain a listed species.  *See* Quarles & Lundquist, *Critical Habitat: Current Centerpiece of Endangered Species Act Litigation and Policymaking: Critical for Whom?  The Species Or The Landowner?*, 46 ROCKY MT. MIN. L. INST. 18-1, 18-26 to 41 (2002); BEAN & ROWLAND, THE EVOLUTION OF NATIONAL WILDLIFE LAW 252-62 (1997).

ESA § 7(a)(2) constraint against adversely modifying critical habitat more *stringently*.[27]

      4.    None of this pertinent law was addressed in the opinions that reached out to declare the regulatory definition of "adverse modification" of critical habitat to be unlawful, in cases where the rules were not directly challenged and based on inadequate briefing.  *Gifford Pinchot*, 378 F.3d 1059 (9th Cir. 2004); *Sierra Club v. FWS*, 245 F.3d 434 (5th Cir. 2001); *Am. Motorcycle*, 2004 WL 1753366 at *7-10.  Once these matters are considered, this Court should recognize that the ESA does <u>not</u> force "adverse modification" of critical habitat to be read broadly in the direction of "recovery" and no small disturbances.

      5.    There are alternative, more reasonable approaches to "adverse modification" of critical habitat.  One approach is to look at whether, even with some small disturbance, the critical habitat as a whole retains the primary constituent elements needed for critical habitat to function for the survival and recovery of the pertinent listed species.  *See Gifford Pinchot*, 378 F.3d at 1075.  Another approach is to examine whether there would be material degradation of critical habitat if the

---

[27]    The 1978 ESA Amendments on critical habitat "curtailed FWS's broad [1978 regulatory] definition of critical habitat."  Darin, *Designating Critical Habitat Under the Endangered Species Act:  Habitat Protection Versus Agency Discretion*, 24 HARV. ENVTL. L. REV. 209, 215 (2000).  The 1978 Congress was incensed that FWS had proposed to designate broad areas of currently-unoccupied habitat as critical habitat for grizzly bears:

> [U]nder present regulations the Fish and Wildlife Service is now using the same criteria for designating and protecting areas to extend the range of an endangered species as are being used in designation and protection of those areas which are *truly critical to the continued existence of a species*....  The committee is particularly concerned about the implications of this policy when extremely large areas are involved in a critical habitat designation.  For example, as much as 10 million acres of Forest Service land is involved in the critical habitat being proposed for the grizzly bear in three Western States.

S. Rep. No. 95-874, at 9-10 (1978) (emphasis added).

    The "truly critical to the continued existence of a species" language from the Senate Report supports an emphasis on "survival" of the species.  Congress wanted to avoid the result that "any decrease in the likelihood of conserving the species so long as that decrease would be capable of being perceived or measured" would mean an area is critical habitat.  H.R. Rep. No. 95-1625 at 25, *reprinted in* 1978 U.S.C.C.A.N. 9453, 9475.  The House Report indicates that Congress "narrows the scope of" critical habitat so that the Services would not designate "virtually all the habitat of a listed species as its critical habitat."  H.R. Rep. No. 95-1625 at 25, *reprinted in* 1978 U.S.C.C.A.N. 9453, 9475; *see also* 124 Cong. Rec. 38,655 (Oct. 14, 1978) (House floor manager Murphy's description that the Conference Report includes an "extremely narrow definition of critical habitat").  The 1978 legislation "narrow[s] the scope of 'critical habitat.'"  Yagerman, *Protecting Critical Habitat Under the Endangered Species Act*, 20 ENVTL. L. 811, 831 (1990).

1   action is allowed, as compared to the habitat's future status if the action was not taken.  *See*

2   *Hayward*, 2004 WL 724950 (this Court found no adverse modification because, while the "Project

3   will have extensive negative effects on the critical habitat," this "will be mitigated by compensation

4   measures" and other "benefits").  FWS employed a combination of those approaches here.

5        FWS has the interpretive discretion to construe "adverse modification" in this reasonable

6   manner.  In light of the legislative materials cited above, the intended meaning of "critical habitat"

7   for ESA § 4 designation purposes and of "adverse modification" of critical habitat for ESA § 7

8   purposes is unclear[28] and does not require a strong focus on recovery.  Because the ESA does not

9   compel a preservationist or recovery-based interpretation of "adverse modification," courts should

10  defer to FWS's reasonable interpretation of the ESA.  *See NAHB v. Defenders*, 127 S. Ct. at 2533-

11  36; *Sweet Home*, 515 U.S. at 703, 708 (sustaining two other ESA rules).

12       Further, it would be very unfair to impose a preservationist reading now on "adverse

13  modification."  In the 1990s, when thousands to millions of acres were designated as critical habitat

14  for each of many species, the public was informed that the critical habitat designation had little or no

15  economic impact.  *See New Mexico Cattle Growers Ass'n v. U.S. Fish and Wildlife Service*, 248 F.3d

16  1277, 1283-85 (10th Cir. 2001).  In 1994, FWS designated over 6.4 million acres of critical habitat

17  for the Mojave Desert population of the desert tortoise, after informing the public that the

18  designation had few additional economic impacts outside the reduction of grazing that was

19  occurring.  *See* 59 Fed. Reg. 5820 (Feb. 4, 1994).  The regulatory significance and adverse economic

20  impacts of designating critical habitat should not be altered after-the-fact.  That would be contrary to

21  the public comment process and economic impact analysis that ESA § 4(b)(2) requires.

22       6.    CBD (ESA Br. at 11) argues that FWS improperly found that ORV uses would not

23  adversely modify critical habitat by just comparing the small areas disturbed (limited to 1%) to the

24  large portions of critical habitat designated as DWMAs.  Yet, a similar comparison was found lawful

25

---

26  [28]    As Michael Bean of Environmental Defense has stated:  "Is there an understanding of critical
habitat that can make sense of the 1978 legislative history?  Probably not, since Congress...failed to
27  make clear its own conception of how critical habitat was to fit in with the rest of the statutory
structure."  BEAN & ROWLAND, THE EVOLUTION OF NATIONAL WILDLIFE LAW 261 (1997).

28

1    in *Gifford Pinchot*, 378 F.3d at 1075.

2       Moreover, the BiOps also compared the status of critical habitat with and without WEMO

3    and NECO (and their designation of DWMAs and ACECs, and their more-stringent regulations).

4    The BiOps found the plan amendments reduced levels of historical disturbances that would be

5    continued without the amendments' additional protections (e.g., reduced ORV routes, "reducing the

6    distance that cars and trucks can drive and park from up to 300 feet from a route of travel to 100

7    feet") and thereby improved, as opposed to adversely modifying, critical habitat.  WEMO BiOp at

8    131-37 (WBO AR 14882-88); NECO BiOp at 171-73 (NBO AR 12705-07).[29]

9    **II.**    **The BiOps Satisfy ESA § 7 Procedures, And Are Not Arbitrary Actions**

10       The bulk of CBD's earlier briefs encouraged the Court to impose additional ESA *procedures*

11    on FWS.  As we show below, the BiOps – each over 200 pages, and already revised to respond to a

12    procedural criticism that incidental take should be quantified – are procedurally adequate.

13       **A.**      **The ESA And APA Do Not Require Great Detail**

14       CBD demands a level of detail that far exceeds the limited procedural duties in the ESA and

15    APA.  ESA § 7 merely requires a "written statement setting forth the Secretary's opinion, and a

16    *summary* of the information on which the opinion is based" on whether the agency action does or

17    does not substantively comply with ESA § 7(a)(2).  16 U.S.C. 1536(b)(3) (emphasis added).  Thus, a

18    BiOp can be "summary."

19       The APA also does not require great detail.  Courts will "uphold a decision of less than ideal

20    clarity if the agency's path may reasonably be discerned."  *Motor Vehicle Mfrs. Ass'n v. State Farm*

21    *Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  If FWS gives some consideration to the issue, that is

22    sufficient.  *Southwest Ctr. for Biological Diversity v. U.S. Bureau of Recl.*, 143 F.3d at 522-23.  A

23    court cannot "mandate that FWS answer [a plaintiff's] particular questions before making" an ESA

---

[29]      Such a comparison is required by the ESA.  Making sure a federal "action will "not result in destruction or adverse modification" (16 U.S.C. 1536(a)(2)) suggests a comparison to some baseline set of conditions.  So do 50 C.F.R. 402.02 and 402.14(g) and (h).  *NWF v. NMFS*, 524 F.3d at 934, also endorses the use of an "environmental baseline" to determine whether the "agency action in question will not appreciably reduce the odds of success for future recovery planning."

1  decision.  *Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1081 (9th Cir. 2006).

2         A court cannot add procedural explanation duties it believes best serve the public interest, if

3  they are not clearly required by statute.  *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def.*

4  *Council*, 435 U.S. 519, 541-48 (1978).  A court only reviews to assess whether the agency has made

5  such a "clear error of judgment" that its decision can be labeled "arbitrary."  *Lands Council v.*

6  *McNair*, 2008 WL 2640001 at *9.

7         WEMO and NECO clearly substantively satisfy ESA § 7(a)(2) and go beyond what that

8  provision requires.  *See* Section I.  Moreover, FWS's "path can be reasonably discerned," and that

9  path is not arbitrary.  Courts should not require more-detailed explanations in such settings.

10        **B.     The BiOps Satisfy *NWF v. NMFS* And The Consultation Regulation By**
               **Providing Both A Stepwise "Incremental" And An "Aggregate" Analysis**

11        CBD argued (ESA Br. at 8, 10-11) that the BiOps only analyze the "incremental" impacts of

12  WEMO and NECO on listed species and critical habitat.  CBD argues this violates the procedural

13  duty under *NWF v. NMFS*, 524 F.3d at 930, to consider the totality of impacts.

14        Yet, the BiOps do both.  The BiOps do examine: (1) the current status of listed species under

15  the environmental baseline (WEMO BiOp at 35-64 (WBO AR 14786-815); NECO BiOp at 39-77

16  (NBO AR 12573-611)); (2) next add and subtract the future impacts of implementing WEMO and

17  NECO (WEMO BiOp at 64-133 (WBO AR 14815-884); NECO BiOp at 77-173 (NBO AR 12611-

18  707)); and (3) then add the cumulative effects of other expected future actions to provide the totality

19  of factors that are likely to affect the desert tortoise (and other listed species) and critical habitat in

20  the future (WEMO BiOp at 133-37 (WBO AR 14884-88); NECO BiOp at 173-77 (NBO AR

21  125707-11)).  As the BiOps consider the "aggregate" of factors affecting listed species and critical

22  habitat in the future, and address whether the increment added by the "agency action causes some

23  deterioration in the species' pre-action condition," the BiOps satisfy *NWF v. NMFS*, 524 F.3d at 930.

24        *NWF v. NMFS* does not prohibit FWS from considering, as a step in this analysis, the

25  incremental impacts of the action subject to consultation.  The stepwise approach in the BiOps is

26  specifically required by 50 C.F.R. 402.14(g) and (h).  *NWF v. NMFS* also embraces a stepwise

27  approach in requiring use of an "environmental baseline" and then examining whether the "agency

28

1  action causes some deterioration in the species' pre-action condition" under the environmental
2  baseline.  524 F.3d at 930.

3      **C.     The BiOps Appropriately Considered Impacts On Recovery**

4          CBD argued (ESA Br. at 7, 9-10, 12-13) that the BiOps failed to document sufficient
5  procedural consideration of WEMO's and NECO's impacts on recovery.

6          The procedural duty to describe impacts to the recovery potential for a species and to the
7  recovery value of critical habitat under *NWF v. NMFS*, 524 F.3d at 931-33 and 936, and *Gifford*
8  *Pinchot*, 378 F.3d at 1069-71, should not be burdensome.  The text of ESA § 7(a)(2) and (b) do not
9  mention any duty to consider recovery in a "summary" BiOp.  Placing a heavy emphasis on recovery
10 or improvement in an ESA § 7(a)(2) consultation would conflict with the ESA's structure.  *See*
11 Section I.A, above.

12         The BiOps adequately discuss the impacts of WEMO and NECO on recovery of listed
13 species and on the recovery potential of critical habitat.  An electronic word search (using the "Find"
14 function) shows the BiOps use "conservation" and "recovery" over 100 times in addressing the
15 impacts of various elements of WEMO and NECO.  For example, the establishment of large
16 DWMAs, the reduced grazing, and the reduced ORV use were found to be consistent with the
17 Tortoise Recovery Plan and with survival and conservation of tortoises.  E.g., WEMO BiOp at 45-
18 50, 64, 70-75, 93-137 (WBO AR 14796-801, 14815, 14821-26, 14844-88); NECO BiOp at 78, 94-
19 183 (NBO AR 12612, 12628-717).

20         FWS concluded that the DWMAs and other protections in WEMO and NECO "will promote
21 the survival and recovery of" tortoises and "will generally improve" critical habitat or retain its
22 functionality "to serve its conservation role."  WEMO BiOp at 135-36 (WBO AR 14886-87); NECO
23 BiOp at 174-76 (NBO AR 12708-10).  Thus, the BiOps consider recovery in a procedurally adequate
24 and non-arbitrary fashion.  *Accord Ctr. for Native Ecosystems v. Cables*, 509 F.3d 1310, 1321-23
25 (10th Cir. 2007).

26         CBD also argues (ESA Br. at 7) that FWS had a duty to determine "the degree to which the
27 take anticipated from activities authorized under the Plans would be deleterious to the tortoise's
28 viability and ability to recover."  Yet, no law or regulation requires that FWS identify the "degree

1    that take" caused by some subaction affects a species if FWS concludes that the action as a whole

2    does not violate ESA § 7(a)(2).  CBD's attempt to invent duties for agencies is unpersuasive under

3    *Lands Council v. McNair*.  *See* page 4, above.

4          In any event, FWS answered CBD's question through statements that the allowed incidental

5    take "represents less than one-tenth of 1 percent of the desert tortoise population estimated to reside"

6    in the action area.  WSupp ITS 1033.

7          **D.      The Services Procedurally Considered The Tortoise Recovery Plan**

8          The CBD ESA Reply (at 3-5) also argued that FWS's BiOps must <u>procedurally</u> "consider

9    implementation of the Recovery Plan's" recommendations, such as the acreage to be set aside

10   primarily for the desert tortoise.  Either of the two rebuttals presented below is dispositive.

11         1.      The Tortoise Recovery Plan is discussed throughout the BiOps, as an electronic

12   search of that document confirms.  For example, the BiOps do address where the DWMAs and

13   ACECs diverge from the Recovery Plan's recommendations.  *See* WEMO BiOp at 45-51, 83-85

14   (WBO 14796-801, 14834-36); NECO BiOp at 45-53, 153, 160 (NBO 12579-87, 12687, 12694).

15   Additional citations are found in the Fed. Opening Br. at 47-48 notes 42 and 43.  This satisfies any

16   arguable ESA duty, as a BiOp is adequate if it provides a "summary of the information on which the

17   opinion is based."  16 U.S.C. 1536(b)(3).

18         2.      No enforceable law requires consideration of a recovery plan in a BiOp.  A BiOp is

19   not like a NEPA document that compares alternatives.  By law, the BiOp addresses how BLM's

20   chosen "action affects listed species or its critical habitat" and whether that proposed "agency

21   action" satisfies the no-jeopardy and no-adverse-modification constraints.  16 U.S.C. 1536(a)(2) and

22   (b)(3).  A BiOp does not address FWS's desired alternative of a recovery plan that maximizes

23   benefits to listed species but sacrifices other components of an agency's mission and the public

24   interest.  *See Hayward*, 2004 WL 724950 at *5 (N.D. Cal. 2004) (Illston, J.) (finding that biological

25   opinion need not compare action's impacts to alternative that FWS supported earlier).  Nothing in

26   ESA §§ 4(f), 7(a), or 7(b) – and nothing in 50 C.F.R. Part 402 – requires that a BiOp address

27   whether BLM's proposed action is consistent with FWS's desired recovery plan.  *See* H.R. Conf.

28

Rep. No. 100-928, at 21 (1988) ("section 7(a)(1) of this law [is] not affected by this amendment" regarding recovery plans).

Accordingly, BLM's small areas of divergence from a recovery plan are not pertinent to a BiOp. The "jeopardy analysis is concerned with whether a given federal action...would appreciably *reduce* the likelihood of recovery, not whether that federal action would itself *implement* or bring about recovery." *California Native Plant Soc'y v. EPA*, 2007 WL 2021796 at *21.

**E.     CBD's Other Arguments Regarding Adverse Modification Of Critical Habitat Are Unpersuasive**

1.     The CBD Reply (at 14-16) argued the 1994 Recovery Plan establishes the ESA § 7(a)(2) "adverse modification" standards that FWS should have applied in the 2005 and 2006 BiOps. This gives unwarranted regulatory effect to the Recovery Plan. *See* Section I.A, above.

2.     CBD (ESA Br. at 12) insisted that "FWS was required to *explain* how approval" of off-road uses "would nonetheless promote recovery." Since ESA § 7 creates no duty that a BLM multiple-use action must promote recovery (*see* Section I.A, above), there was no duty to explain.

The BiOps did reasonably explain why *decreased* areas for ORV use would not adversely modify critical habitat. WEMO BiOp at 80, 94-97, 125-29, 131-37 (WBO AR 14831, 14845-49, 14876-80, 14882-88); NECO BiOp at 88, 121-25, 132-34, 136-40, 153-57, 161-66, 171-73, 175-77 (NBO AR 12622, 12655-59, 12686-88, 12670-74, 12687-91, 12695-700, 12705-07, 12709-11).

3.     The DWMAs designated in WEMO and NECO largely correspond to the DWMAs recommended in the Tortoise Recovery Plan. Accordingly, the plan amendments do "not undermine the recovery value of critical habitat" (CBD ESA Br. at 12).

CBD (ESA Br. at 12-13) argued that FWS "failed to analyze the plan amendments' effect on designated critical habitat *outside* [the land areas BLM has designated as] DWMAs." Yet again, CBD's assertions are disproven by the factual record.

The BiOps did discuss the consequences that more activities could continue on critical habitat areas outside DWMAs. WEMO BiOp at 83-85, 88-89, 94-97 132-37 (WBO AR 14834-36, 14839-40, 14845-49, 14883-88); NECO BiOp at 61, 66, 69-70, 133-34, 153, 162, 171-73, 176 (NBO AR 12595, 12600, 12603-04, 1267-68, 12687, 12696, 12705-07, 12710). FWS reasonably found

1    that there was no adverse modification of critical habitat outside DWMAs as: (1) the general trend is

2    that WEMO and NECO *reduce* such critical habitat disturbances compared to future land uses

3    without WEMO's and NECO's protections; and (2) the critical habitat areas designated as DWMAs

4    still "ensure the conservation role and function of critical habitat."[30]

5         4.    CBD (ESA Reply at 16) accused FWS of "[f]ocusing solely on a vast scale" of

6    critical habitat and of ignoring site-specific impacts to some critical habitats (e.g., areas outside

7    BLM-designated DWMAs).  But that is not factually accurate, as even CBD admits.  CBD admits

8    (ESA Reply at 16, 19-20) by shifting to arguments that, "[w]here FWS does discuss site specific

9    impacts, it consistently diminishes their import" (compared to what CBD would do if it were the

10   fact-finder).

11        As this illustrates, CBD's ESA procedural arguments are a series of arguments in the nature

12   of "FWS didn't look at critical habitat issue X in sufficient depth, or FWS did look at X but we

13   disagree with the Service's expert judgment."  The Counties submit that such a scatter-shot approach

14   to litigation is not convincing for several reasons.  First, it stretches credulity for CBD to argue that

15   supplemented BiOps of about 200 pages apiece do not procedurally satisfy the ESA and APA, when

16   a BiOp may be "summary" and when FWS need only outline enough so that its path and reasoning

17   can be discerned.  Second, the lengthy BiOps do discuss all pertinent issues.  They do not arbitrarily

18   fail to even mention significant issues.  Third, CBD's scatter-gun approach should fail because

19   Plaintiffs bear the burden of persuasion and because FWS's judgments are reviewed deferentially.

20        **F.    FWS Did Consider The Best Science Available**

21        The CBD ESA Br. (at 13-16) argues that FWS did not use the best science available in its

22   BiOps.  After the Counties and Federal Defendants showed the defects in Plaintiffs' theory, the CBD

23   ESA Reply did not argue a "best science" claim.  In case CBD argues that claim again, the claim is

24   rebutted below.

25

26   ─────────────
     [30]    *See id*.  For example, FWS was "aware of areas...where the condition of critical habitat has
     been degraded...by human activities."  WEMO BiOp at 136 (WBO AR 14887).  The specific actions

27   in WEMO "will ensure that the condition of critical habitat of the desert tortoise will generally
     improve or remain functional and continue to serve its conservation role."  *Id*.

28

1.  ESA § 7(a)(2) states that "each agency shall use the best scientific and commercial data available." 16 U.S.C. 1536(a)(2). This is a procedural requirement to consider the best science currently "available," not a substantive duty to conduct new wildlife surveys or to reach particular conclusions. *Southwest Ctr. for Biological Diversity v. Norton*, 215 F.3d 58, 60-61 (D.C. Cir. 2000); *see Kern County*, 450 F.3d at 1080.[31]

Under the APA, it is presumed that FWS did rely on the best available science. Best science claims fail unless Plaintiffs have identified "superior data" that was placed before FWS and then ignored by the agency. *Building Industries Ass'n of S. Cal. v. Norton*, 247 F.3d 1241, 1246-47 (D.C. Cir. 2001); *Kern County*, 450 F.3d at 1080-81.

Since CBD has not shown that FWS ignored some new scientific principle, its best science claims fail. The CBD ESA Br. (at 14-15) asserts that there are several 2002 journal articles that are not "listed as a reference in the BO." However, the information in those articles is cumulative – it confirms what FWS's scientists already suspected and what was already in the literature. CBD ESA Br. at 14 (the "studies built on early research, that FWS did" describe in the BiOps). Where new information "supplemented FWS's existing understanding..., but did not alter the primary conclusions..., it was not critical to FWS's decision." *Kern County*, 450 F.3d at 1080; *accord Water Keeper Alliance v. U.S. Dep't of Defense*, 271 F.3d 21, 33 (1st Cir. 2001) (no likely ESA violation just because the agency "did not consult two available studies").

2.  The CBD ESA Br. (at 15-16) argued that, where there is scientific uncertainty, courts should override FWS's BiOps and "give the benefit of the doubt to the species" because there is a "pressing need for caution." This misconceives the judicial role under the APA. A court must defer to the Service's reasonable and non-arbitrary judgment on a debatable issue of fact or scientific opinion. *Marsh v. ONRC*, 490 U.S. at 376-78. *See* pages 3-4 and Section I.E, above.

Further, the legislative history presented at I.E, above, shows that the "benefit of the doubt"

---

[31] One "implication of the 'best data available' requirement is that FWS must rely on even inconclusive or uncertain information if that is the best available at the time." *Southwest Ctr. for Biological Diversity v. Norton*, No. 98-0934 (RMU/JMF), 2002 WL 1733618 at \*9 (D.D.C. July 29, 2002).

language construes the "not likely to jeopardize" phrasing adopted in 1979.  It does not place a gloss on the "best commercial and scientific data available."

3.      CBD frequently seeks to set aside FWS's judgment because, where there are no definitive field data, FWS relied on its professional judgment.  This does not provide a basis for overriding FWS's judgment.  *See Lands Council v. McNair*, 2008 WL 2640001 at *9-10, 15; pages 3-4, above.

The reality is that "species data is...often vague, ambiguous, frequently subjective, best-professional-judgment-based...and of uncertain scientific reliability."  Brennan, *et al.*, *Square Pegs and Round Holes:  Application of the "Best Scientific Data Available" Standard in the Endangered Species Act*, 16 TULANE ENVTL. L.J. 387, 390 (2003).  But, in light of the time limits for taking actions to which the "best available science" standard applies in ESA § 4 (species listings and critical habitat designations) and § 7 (consultation on federal agency actions), the Services "must move forward with decision making even in the face of limited information."[32]  Where the agencies employ the "best evidence available, the fact that the evidence is 'weak,' and thus not dispositive, does not render the agency's determination 'arbitrary.'"  *Greenpeace*, 14 F.3d at 1336.

G.      **FWS Did Not Violate ESA Procedures Regarding The Environmental Baseline**

CBD (ESA Br. at 16-17) argues that there is imperfect information about the current environmental baseline condition of the desert tortoise.  While this is true and unfortunate, CBD has not shown any procedural violation of ESA rules.  Similar complaints about baseline data on

---

[32]      Ruhl, *Is The Endangered Species Act Eco-Pragmatic?*, 87 MINN. L. REV. 885, 928 (2003); *National Wildlife Fed'n v. Babbitt*, 128 F. Supp. 2d 1274, 1286-87 (E.D. Cal. 2000) (under ESA § 7, "[w]here the 'available data' is imperfect, the Service is not obligated to supplement it or to defer issuance of its biological opinion until better information is available").

The instinct to delay decisions until better-quality information is obtained is understandable. But it can easily lead to analysis paralysis.  Our knowledge is always imperfect, and knowledge improves in small steps.  The Supreme Court requires deference to agency decisions on whether to prepare further studies precisely because chasing after better information "would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made."  *Marsh v. ONRC*, 490 U.S. at 373-74 & n.1989); *see id.* at 376-78 (since deciding the appropriate level of study "implicates substantial agency expertise," courts should not overturn agency judgments unless there has been a "clear error of judgment"); *Cronin v. U.S. Dept. of Agriculture*, 919 F.2d 439, 447 (7th Cir. 1990) (requiring better information repeats what logicians call Zeno's Paradox, where one never gets to the finish line).

1    "population size, variability, and stability" were rejected in *Gifford Pinchot*, 378 F.3d at 1068.

2          At bottom, CBD is demanding that BLM and FWS conduct more studies (e.g., how much

3    "take" of desert tortoises is occurring across millions of acres of the CDCA?) – that they are acting

4    arbitrarily until they obtain more survey information and then analyze the new data.  But the "best

5    science available" language only requires FWS to consider information that is currently "available."

6    It does not require the agency to conduct new wildlife surveys.  *Southwest Ctr. for Biological*

7    *Diversity v. Norton*, 215 F.3d at 60-61; *see Kern County*, 450 F.3d at 1080.

8          Here, the BiOps provide extensive information on the current environmental baseline

9    condition of desert tortoises (and other listed species) and their critical habitat.  *See* WEMO BiOp at

10   35-64 (WBO AR 14786-815); NECO BiOp at 39-77 (NBO AR 12573-611).  This greatly exceeds

11   the level of procedural detail required by ESA § 7(b)(3), which merely requires a BiOp to provide a

12   "summary of the information on which the opinion is based."

13         Moreover, the "environmental baseline" is largely a concept created by the ESA § 7 rules.

14   *See* 50 C.F.R. 402.02 (where the "environmental baseline" is defined in the definition of "effects of

15   the action"), 402.14(g)(2) and (h)(1) (employing the "environmental baseline" concept and only

16   requiring a "summary of the information on which the opinion is based").  FWS's interpretation that

17   it has complied with its own rule is "controlling" because it is not "plainly erroneous."  *Auer v.*

18   *Robbins*, 519 U.S. 452, 461-62 (1997).  As CBD often is challenging FWS's compliance with ESA

19   rules, this logic undercuts many of CBD's claims.

20         **H.     The Amended BiOps Satisfy The Procedures For Authorizing Incidental Take**

21         The 1982 Congress softened the absolute prohibition against "take," in order to allow some

22   productive land uses to proceed.  Congress allowed "incidental take" in 16 U.S.C. 1536(b)(4) and

23   1539(a)(2).  *See Sweet Home*, 515 U.S. at 700-01, 707-08.  Congress legislated to resolve "conflicts

24   between Section 7 and Section 9" – the conflict that, "[a]fter complying with the rigorous demands

25   of...Section 7" in avoiding jeopardy to a listed species, the project could be halted because "Section

26   9...prohibits any taking" of any individual.  H.R. Rep. No. 97-567 at 15, 26, *reprinted in* 1982

27   U.S.C.C.A.N. 2807, 2815, 2826.  Congress resolved this conflict by including provisions so that an

28   action complying with ESA § 7(a)(2), but causing incidental take, could go forward.  The

1    "Committee intends that such incidental takings be allowed provided that the terms and conditions

2    specified by the Secretary...are complied with." *Id.* This "significantly changes" the ESA "in

3    response to legitimate problems brought before Congress" by "industry" and others. *Id.*

4        "Once the Service is satisfied that an agency's action will not threaten an endangered

5    species' continued existence, it *must* issue the ITS." *Ctr. for Biological Diversity v. U.S. Fish and*

6    *Wildlife Serv.*, 450 F.3d 930, 942 (9th Cir. 2006). CBD's arguments demand excessive procedures

7    before an ITS is effective. This contravenes the objective of providing legislative relief and of

8    allowing actions that satisfy ESA § 7(a)(2) to go forward.

9        The set of ITS claims raised by CBD spring from judicial constructions of the § 7 rules.

10   Under 50 C.F.R. 402.14(i), a BiOp will provide a statement that "[s]pecifies the impact, *i.e.*, the

11   amount or extent, of such incidental take," states the "reasonable and prudent measures...appropriate

12   to minimize such impact," and states that if the "amount or extent of [allowed] incidental taking...is

13   exceeded, the Federal agency must reinitiate consultation immediately."

14       The preamble recognizes that, "in some cases, exact numerical limits on the amount of

15   permissible taking" cannot be determined as a practical matter. 51 Fed. Reg. 19953-54 (June 3,

16   1986). The "Service reserved the flexibility in the rule so that the most appropriate standard [e.g.,

17   "habitat loss"] can be used" – the "Service declines to endorse the use of numerical amounts in all

18   cases." *Id.*[33] Courts have found that this language and ESA legislative history allow FWS to

19   conclude that "no such numerical value could be practically obtained." *Arizona Cattle Growers'*

20   *Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1249-50 (9th Cir. 2001); *see Oregon Natural*

21   *Res. Council v. Allen*, 476 F.3d 1031, 1037-38 (9th Cir. 2007); *Imperial Sand Dunes*, 422 F. Supp.

22   2d at 1137-38.

23       FWS's original BiOps provided a reasonable explanation of why the agencies "cannot

24   quantify the precise numbers of desert tortoises that may be killed or injured" as a result of

25

26   _____
     [33]    The legislative history similarly states "Section 7(b)(4) requires the Secretary to specify the

27   impact o[f] such incidental taking on the species. The Committee does not intend that the Secretary
     will, in every instance, interpret the word 'impact' to be a precise number." H. R. Rep. No. 97-567
     at 27, 1982 U.S.C.C.A.N. 2807, 2827.

28

1    authorized activities on millions of acres of lands, and provided standards for reinitiating ESA

2    consultation.[34]  After CBD sued on the procedural aspects of incidental take and after the decisions

3    in *ONRC v. Allen* and *Imperial Sand Dunes*, FWS sought to eliminate litigation issues by providing

4    40 pages of greater detail on incidental take in amended BiOps issued in Nov. 2007.  *See* WSupp

5    ITS 1018; NSupp ITS 01175.  The amended BiOps continue to state cogent reasons why FWS

6    "cannot quantify the exact number of desert tortoises that may be incidentally killed or injured," but

7    provide an admirable attempt at numerical estimates.  WSupp ITS 1021, 1033; *see id*. at 1021-37.

8         Undeterred, CBD now argues that the 40 pages of additional ITS discussion fail to provide an

9    adequate explanation and are otherwise procedurally inadequate.  This record suggests CBD is

10   overreaching.  None of CBD's specific claims is persuasive.

11        1.    The CBD ESA Br. (at 20-21) argued that the BiOps disregard "take due to habitat

12   modification and degradation, even in critical habitat."  CBD improperly equates the degradation of

13   habitat with the "take" of (death or injury to) a member of a listed wildlife species.

14        The Supreme Court sustained FWS's regulation on the "harm" form of ESA § 9 "take"

15   precisely because it does "emphasize that actual death or injury of a protected animal is necessary

16   for a violation."  *Sweet Home*, 515 U.S. at 691 n.2; *see id*. at 696 n.9, 698-701 and n. 13, 708-09.

17   The Court effectively rejected CBD's argument that habitat degradation itself is "take" when it

18   stated "Section 7 imposes a broad, affirmative duty to avoid adverse habitat modifications that § 9

19   does not replicate, and § 7 does not limit its admonition to habitat modification that 'actually kills or

20   injures wildlife.'"  515 U.S. at 703; *see id*. at 705-06.  In sum, though habitat modification can be the

21   source or proximate cause of "take" (the death or injury of a live individual), the fact that some

22

23

---

24   [34]     It is often impossible to predict, in advance, whether or where chance events (e.g., a vehicle

25   intersecting a tortoise) will mean that an activity will kill or injure a tortoise.  And, if a tortoise
     "take" occurs somewhere in the CDCA, it may well not be reported to federal authorities (e.g.,

26   because the person driving a car did not know he ran over a tortoise hatchling).  For sound reasons
     like these, FWS initially refrained from attempting to provide a numerical estimate of the numbers of

27   desert tortoises likely to be incidentally taken under WEMO and NECO.  WEMO BiOp at 172-77
     (WBO AR 14923-28); NECO BiOp at 177-86 (NBO AR 12711-20).

28

1   habitat elements have been adversely modified does not prove "take."[35]

2   FWS adhered to this definition of "harm" and a "take" of wildlife in using its best

3   professional judgment on the amount of expected incidental take, and on identifying an amount of

4   reported take that would require reinitiation of ESA consultation.  *E.g.*, WSupp ITS 1020, 1025-33.

5   In contrast, CBD's speculation (ESA Br. at 20) that grazing might reduce "key native forage plants"

6   or "collapse burrows" either: (1) improperly equates habitat modification with "take"; or (2) creates

7   such a high level of speculation on the extent of any actual "take" as to make the exercise

8   unproductive in providing a trigger on when consultation should be reinitiated (e.g., how would one

9   know if a tortoise died in a burrow, how would one know the cause of a tortoise's death in the

10   absence of a cracked shell or some other clear signal?).[36]

11   2.   After the Counties had provided the above explanation of the limited meaning of

12   "take wildlife," the CBD ESA Reply (at 23) acknowledged that "habitat modification alone" does

13   not prove the "take" of a desert tortoise.  But CBD argues that habitat modification which "impairs

14   feeding and sheltering of tortoise" is "take," and which "retards recovery" of a listed species is a

15   "take" under *National Wildlife Fed'n v. Burlington Northern R.R.*, 23 F.3d 1508, 1513 (9th Cir.

16   1994), even if no tortoise is killed or suffers serious injury (e.g., the tortoise finds food elsewhere).

17   That is not the law.

18   FWS's contemporaneous regulatory intent was that:

19   To be subject to section 9, the [habitat] modification or degradation[: (1)] must be
     significant; [(2) must significantly impair essential behavioral patterns, and [(3)] must result
20   in actual injury to a protected wildlife species.

21

22

---

23   [35]   *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 2000) (dismissing a "take" claim; "habitat modification does not constitute harm unless it 'actually kills or injures wildlife'" and plaintiff bears the burden of showing the "proposed construction would harm a pygmy-owl by
24   killing or injuring it"); Quarles & Lundquist, *When Do Land Use Activities "Take" Listed Wildlife Under ESA Section 9 and the "Harm" Regulation?*, ENDANGERED SPECIES ACT: LAW, POLICY, AND
25   PERSPECTIVES 211-34 (Baur & Irvin eds., ABA 2002).

26   [36]   In any event, the Amended BiOps effectively cover death from any livestock or casual use. They require reinitiation of consultation "if 4 desert tortoises are found dead or injured in any 12-
27   month period as a result of any activity or circumstance specifically related to casual use or livestock grazing."  WSupp ITS 1035.

28

1   56 Fed. Reg. 54748-50 (Nov. 4, 1981).  This "explanation suggests harm requires both significant

2   impairment of behavioral patterns and actual injury to a protected animal."[37]  Thus, the fact that

3   grazing or ORV use may impair the food supply for a tortoise does not demonstrate "take" if the

4   tortoise finds food elsewhere and does not suffer death or injury from malnutrition.

5       Moreover, after the Ninth Circuit suggested that an injury to the recovery potential at the

6   species level could be "take" in the cryptic *NWF v. Burlington Northern* opinion, the Supreme Court

7   subsequently found that FWS has discretion in defining "take" and "incidental take," as long as FWS

8   "emphasize[s] that actual death or injury of a protected animal is necessary for a violation."  *Sweet*

9   *Home*, 515 U.S. at 691 n.2, 701-03, 708 (1995).  Thus, "harm" requires proof of the injury or death

10  of an identifiable, living individual, and does not apply to long-range impacts to the recovery of a

11  population.  *See* ENDANGERED SPECIES ACT: LAW, POLICY, AND PERSPECTIVES 225-34.  For

12  example, Justice O'Connor's concurrence stresses the need for a proven death or injury to a living

13  individual, and rejects the concept that a long-term injury to the recovery potential of a species

14  "takes" a member of a listed wildlife species.  515 U.S. at 709, 714.  Thus, the harm "test applies to

15  individual living animals, not to the species as a whole.  All members of the Court [in *Sweet Home*]

16  seem to embrace this view."[38]

17      If "harm" were to refer to concepts of injury at the population level (e.g., reducing the habitat

18  available for recovery of an expanding population), this would seem to fall down the slippery slope

19  to the result that any human uses of habitat that is adverse to the long-term interests of listed wildlife

20  is "harm."  Yet, that is impermissible under ESA § 9.  *See Sweet Home*, 515 U.S. at 703, 706.

21      In sum, CBD is arguing for a broad definition of "take" that is not required by post-*Sweet*

22  *Home* case law, and that FWS can or must lawfully decline.  Instead, the supplemental BiOps do

23  correctly account for "take."

24      3.      CBD's next complaint (ESA Br. at 21-22) was that FWS did not provide an

25

    ----

    [37]      BEAN & ROWLAND, THE EVOLUTION OF NATIONAL WILDLIFE LAW 217 n.120 (3d ed. 1997);
26  *see* Quarles & Lundquist, , ENDANGERED SPECIES ACT: LAW, POLICY, AND PERSPECTIVES 214-25.

27

28

1   explanation for the predicted numerical level of take beyond its exercise of "best professional

2   judgment."  Yet, no regulation or court decision requires that level of detail.  The Ninth Circuit

3   found the ESA does "not mean that [FWS] must demonstrate a specific number of takings: only that

4   it must establish a link between the activity and the taking of species before setting forth specific

5   conditions."  *Arizona Cattle*, 273 F.3d at 1249-50.[39]

6          The ESA and APA do not require any further explanation where the agency has already

7   explained that, because there are no adequate data, any estimate is necessarily the agency's exercise

8   of judgment.  FWS went beyond what the law requires in attempting to estimate how many desert

9   tortoises there are in the action area (e.g., WSupp ITS 1021-25), then describing how grazing and

10  other activities might "take" tortoises and stating that there are "no data" on the frequency of "take"

11  (e.g., WSupp ITS 1025-33, "No data exist on the frequency at which cattle may trample desert

12  tortoises"), and then exercising "best professional judgment" in the absence of any meaningful data

13  (e.g., WSupp ITS 1029).  Since FWS explained its basis, there was no arbitrariness.

14         4.      CBD's next claim is that, "because the RPMs [reasonable and prudent measures] and

15  T&Cs [terms and conditions] do not include any means to minimize take of tortoises in the NECO

16  and WEMO, both ITSs violate the plain language of the ESA and are thus arbitrary and capricious."

17  CBD ESA Br. at 23; *see id.* at 22-23.  But the amended BiOps do include T&Cs that implement the

18  RPMs.  *See* WSupp ITS at 1034-36.

19         5.      Also unconvincing is CBD's claim that ESA § 7(b)(4) requires FWS to "minimize

20  take."  The statutory text provides FWS with considerable discretion in stating that the Secretary

21  shall specify such "reasonable and prudent measures that the Secretary considers necessary or

---

(...continued)

[38]       BEAN & ROWLAND 218.  *Accord* SULLINS, ESA: ENDANGERED SPECIES ACT (ABA Basic Practice Series 2001) ("The *Sweet Home* majority apparently would have limited the application of the 'harm' prohibition to injury to 'particular animals.'").

[39]       Moreover, the thrust of *Arizona Cattle* is, because "it would be unreasonable for [FWS] to impose conditions on otherwise lawful land use [the reasonable and prudent measures] if a take were not reasonably certain to occur," the subject of the increased regulation can require reasoned decisionmaking on whether "take" is reasonably certain to occur.  273 F.3d at 1243; *see id.* at 1240 (FWS cannot "engage in widespread land regulation even where no Section 9 liability could be

(continued...)

1   appropriate to minimize such impact." ESA § 7(b)(4), 16 U.S.C. 1536(b)(4). CBD ignores that the

2   ESA allows FWS to decide which measures are "appropriate." As "appropriate" suggests, the

3   "Secretary may use discretion in determining such measures" and has "flexibility." S. Rep. No. 97-

4   418 at 21 (1982).

5         Further, the ESA speaks in terms of minimizing the "impact of such incidental taking on the

6   species." Accordingly, FWS can conclude that, where a small amount of incidental take has minor

7   effects on the health of a listed population, incidental take can be allowed and not minimized. That

8   is, ESA § 7(b)(4) has a sense of proportionality and allows FWS to consider the insignificance of

9   small percentages of "take."

10        As implemented in permissible and controlling rules, the ESA § 7(b)(4) "[r]easonable and

11  prudent measures...cannot alter the basic design, location, scope, duration, or timing of the action

12  and may involve only minor changes." 50 C.F.R. 402.14(i)(2). This reading is permissible as it

13  follows the legislative intent that, once a federal action satisfies ESA § 7(a)(2) at the population

14  level, the action should not be halted due to ESA § 9 "take" of a few individuals – "Congress also

15  intended that the action go forward essentially as planned." 51 Fed. Reg. 19937 (June 3, 1986).

16        Thus, once FWS has concluded that WEMO and NECO – with their constraints on grazing,

17  ORV use, etc. – comply with ESA § 7(a)(2), FWS should not impose as incidental take constraints

18  any further limits on the "location, scope,...or timing" of those uses. *See* WSupp ITS at 17 (WEMO

19  already includes measures "to reduce the adverse effects or livestock grazing and causal use

20  associated with recreation and mining on the desert tortoise"). The take-relief provisions of ESA

21  § 7(b)(4) cannot reasonably be read as upping the standard for ESA § 7 compliance from § 7(a)(2)'s

22  no significant degradation standards to minimizing any degradation. *See Arizona Cattle*, 273 F.3d at

23  1240 (rejecting an analogous argument because that "would turn the purpose behind the 1982

24  Amendment on its head").

25        "Fashioning appropriate standards...for takings that would otherwise violate § 9 necessarily

26  _____

    (...continued)
27  imposed"), 1244-50. *Arizona Cattle* does not suggest that third parties like CBD can demand such

28  detail.

1  requires the exercise of broad discretion," and a court should not "substitute [its] views of wise

2  policy for [FWS's]."  *Sweet Home*, 515 U.S. at 708; *see CBD v. FWS*, 450 F.3d at 942 (9th Cir.

3  2006) (sustaining FWS's view of an ITS).  Given FWS's wide range of discretion, the Court should

4  find the BiOps do not violate ESA § 7(b)(4).

5        5.      The CBD ESA Br. (at 23-24) faults the levels of discovered/reported "take" that FWS

6  selected to require reinitiation of consultation.  *ONRC v. Allen*, 476 F.3d at 1039-41, found a BiOp

7  was arbitrary as it provided no clear "trigger" for reinitiating consultation.  These BiOps comply

8  with *ONRC v. Allen* because they provide clear triggers that consultation must be reinitiated.  For

9  example, if "4 desert tortoises are found dead or injured in any 12-month period as a result of any

10  activity or circumstance related specifically to casual use or livestock grazing."  WSupp ITS 1035.

11        CBD argued that FWS lacks a rational basis for this number "[g]iven the high likelihood of

12  undercounting [reported] tortoise deaths from the covered activities."  CBD is again unfairly using

13  the absence of any real-world data to attempt to set aside FWS's reasonable exercise of professional

14  judgment.  But, under the APA, FWS's judgments are presumed to be correct, courts must defer to

15  FWS where the science or facts are in doubt, and the plaintiff bears the burden of proving

16  arbitrariness.  *See* Section I.E, above.

17        While FWS thought it might find perhaps 10% of any dead or injured tortoises, this is a best

18  guess.  FWS could build in a comfort factor or margin of error due to the small sample size, the

19  guesstimate nature of the exercise, and the legislative intent that projects satisfying ESA § 7(a)(2)

20  should go forward.  Accordingly, FWS had the discretion to require that consultation be reinitiated

21  only if the level of discovered tortoise deaths and injuries attributable to the covered actions were

22  more than 20% of the anticipated annual take.

23        In any case, requiring reinitiation of ESA consultation if more than a handful of "takes" are

24  reported on over a million acres of land is a low "hair trigger."  Reinitiation on the basis of zero

25  takes would be absurd.

26        6.      CBD is also mistaken in asserting (e.g., ESA Br. at 23) that, if the level of anticipated

27  incidental take is being exceeded, the agency action (here, land uses over millions of acres) must be

28  halted.  Congress clearly intended that the penalty for exceeding an ITS is reinitiation of

consultation, not that the action (an action earlier found to substantively comply with ESA § 7(a)(2))

must stop:

> If the specified impact on the species is exceeded, the Committee expects that the Federal agency or permittee or licensees will immediately reinitiate consultation since the level of taking exceeds the impact specified in the initial Section 7(b)(4) statement.  In the interim period between the initiation and completion of the new consultation, the Committee would not expect the Federal agency...to cease all operations unless it was clear that the impact of the additional taking would cause an irreversible and adverse impact on the species.

H.R. Rep. No. 97-567 at 27, 1982 U.S.C.C.A.N. 2827.  Consistent with this intent, the preamble to

the ESA § 7 rules states that "[e]xceeding the level of anticipated taking does not, by itself, require

the stopping of an ongoing action during reinitiation of consultation."  51 Fed. Reg. 19954.

       7.       CBD (ESA Reply at 8) is factually mistaken that the WEMO BiOp failed to look at

the significance of the "take authorized by FWS in the BO for the WEMO."  The WEMO BiOp

clearly does discuss the minor effect of the small amount of incidental take caused by WEMO.

Further, FWS issued a supplemental BiOp quantifying that the expected take was quite small (19

expected tortoise takes per year out of a tortoise population of about 40,000).  Since "relatively few

desert tortoises [are] likely to be killed or injured..., the anticipated level of incidental take...is not

likely to result in jeopardy to the species."  WSupp ITS 1024-33; *see* WEMO BiOp 129-36, 171-79

(WBO 14880-87, 14922-30).  Accordingly, the BiOp's conclusion that activities within WEMO will

not contribute to a jeopardy situation is rationally supported.

       8.       Perhaps recognizing that Plaintiffs are likely to lose if the Court looks at FWS's

supplemented final actions, the CBD ESA Reply (at 21-23) argued that the Court should find FWS

was powerless to supplement the ITSs.  But such judicial interference with the Executive Branch's

prerogatives in implementing the law that should be avoided.  *See Southern Utah Wilderness*

*Alliance*, 542 U.S. at 67; *FPC  v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976);

*Florida Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20 (1952).

       If for some reason the supplementation is disallowed, the relevant issue would become

whether the ITSs in the unamended BiOps satisfy existing law.  ESA authorities do not require that

"take" be quantified in all circumstances.  FWS's initial judgment was reasonable on why it is not

practicable to attempt to quantify incidental take here.  *See* pages 37-38, above.

1    CBD (at 21 n.18) argues there is no "meaningful trigger for re-consultation."  But the

2  requirements to report tortoise deaths and to consult with FWS "if more than three desert tortoises

3  are found dead or injured in any 12-month period" provide a sufficient standard.  WEMO BiOp at

4  176-79 (WBO 14927-30); *see* NECO BiOp at 185-88 (NBO 12719-22).

5    A district court within this circuit recently rejected several claims against an ESA § 7(b)(4)

6  ITS that are comparable to CBD's claims here, and that occur in a similar setting (whether an

7  amendment to a federal land use plan that is protective of listed species satisfies the ESA).  *Swan*

8  *View Coalition v. Barbouletos*, No. CV-05-64-M-DWM (D. Mont. Mar. 31, 2008) (copy at

9  Addendum A of Dkt. 132).  Most importantly, the Montana district court allowed use of surrogate

10  measures for "take" of individual grizzly bears, and seemed to recognize that agencies often cannot

11  obtain accurate counts of dead or injured grizzly bears over a broad geographic area.  *Id.*, slip op. at

12  35-36.  This suggests that FWS's initial BiOps – which employed surrogates due to uncertainties in

13  whether desert tortoises would be "taken" by activities allowed under the plan amendments and

14  whether any "takes" would be known or reported – satisfy the ESA.[40]

15    9.    CBD's main "baseline" argument is that the WEMO BiOp "failed to describe

16  significant losses to the desert tortoise due to the expansion of Fort Irwin."  CBD ESA Reply at 9;

17  *see id*. at 9-11.

18    CBD may be concerned with the level of take FWS had approved for the Army's expansion

19  of training at Fort Irwin by the time of the Jan. 9, 2006 BiOp on WEMO.  There, the answer is the

20  WEMO BiOp addressed the Fort Irwin expansion and permissibly incorporated the discussion of

21  take in the 2004 Fort Irwin BiOp.  *See* WEMO BiOp at 42-43, 53-54, 59, 91-92 (14793-94, 14804-

22  05, 14810, 14842-43).  The Fort Irwin BiOp estimates the likely take of 424 tortoises over several

23  years, after including the translocation and other mitigating measures agreed to by the Army.  WBO

---

[40]    Additionally, both CBD and the *Swan View* plaintiffs have questioned the particular measure of incidental take that FWS chose as the trigger for reinitiating ESA consultation.  The Montana district court appropriately deferred to FWS's discretion in choosing a trigger.  It rejected claims that the "standards have no scientific basis," finding that FWS has the discretion to choose either a "19/19/68 or 27/30/65" standard, as each measures "ecological conditions that are [arguably] linked to take."  *Swan View*, slip op. at 35.  Similarly here, the Court should defer to FWS's professional judgment, as it is not arbitrary in the sense of being contrary to known science.

9951.  Since this is only 1% of the estimated tortoise population in the Western Mojave Recovery Unit, since non-recovered tortoises in isolated areas are not significant to the persistence of the species, since acquired lands can provide suitable tortoise habitat, and since the listed tortoise DPS occupies a broader range, FWS rationally supported the conclusion that the Fort Irwin expansion would not jeopardize the continued existence of the listed tortoise species.  WBO 9951, 9959-63.

FWS rationally concluded that the addition of 19 takes per year from WEMO-authorized activities would not create a total situation that is likely to jeopardize the continued existence of the listed tortoise species, or even of the 40,000 tortoises within Western Mojave Recovery Unit.  *See* WSupp ITS 1033.

CBD (ESA Reply at 10) relies on faulty figures to question FWS's common-sense conclusion.  First, CBD inflates the anticipated take from Fort Irwin expansion from FWS's figure of 424 to "1470."  Second, CBD sums the minor WEMO-authorized take of 19 per year to "540" tortoises over the next 30 years to create a larger-appearing number.  Third, CBD compares this to a Western Mojave Recovery Unit population of "20,000-45,000" tortoises, when FWS's actual estimate is over 40,000.  Fourth, if a 30-year period is used, CBD fails to account for new tortoises that would be born over the 30-year period (we will conservatively assume the total number of non-juvenile tortoises that exist sometime within the next 30 years is 50,000 to 100,000).  Fifth, CBD again tortures applicable law by looking only at the "Western Mojave Recovery Unit," when ESA § 7 clearly only prohibits an action that is likely to jeopardize the continued existence of the entire listed tortoise DPS.

As a result, CBD's doctored figure of a "loss of up to 10% of the desert tortoise population" from "take" is not supported by the record.  Instead, the record suggests a loss of less than 1,000 tortoises over 30 years out of a total tortoise population of perhaps 50,000 to 100,000 in those 30 years – a loss of at most 2% in one of many recovery units.  In light of how CBD is manipulating the figures, the Court should find that: (1) under the actual figures, FWS could non-arbitrarily conclude that the allowed take of less than 2% of Western Mojave tortoises from Fort Irwin and WEMO are not likely to jeopardize the continued existence of the listed tortoise DPS in the four-State Mojave region; (2) because there is no close issue as to jeopardy, FWS had a reduced duty to describe

1  impacts in detail; and (3) the BiOps disclose sufficient information so that FWS's path can be

2  discerned and to meet the ESA § 7(b)(3) language on a "summary" BiOp.

3       Further, CBD's ire seems more directed at the Army's implementation of the legislatively

4  authorized expansion of the National Training Center at Fort Irwin, rather than directed at BLM-

5  controlled actions in WEMO. CBD recently commenced an ESA citizen suit regarding the impacts

6  of Fort Irwin activities on tortoises. *See*

7  http://www.biologicaldiversity.org/news/press_releases/2008/desert-tortoise-07-02-2008.html. This

8  Court could find that Fort Irwin matters belong in that suit for jurisdictional and practical reasons.

9  The Court could decline to consider Fort Irwin matters this suit against BLM's management of the

10  CDCA.

11  **III. BLM Has Not Violated ESA § 7(a)(2)**

12       Section I has shown that WEMO and NECO satisfy ESA § 7. Section II has shown FWS's

13  BiOps satisfy applicable law. Accordingly, BLM did not violate the ESA by relying on FWS's

14  BiOps. *See Greenpeace*, 14 F.3d at 1337; *Pyramid Lake*, 898 F.2d at 1415.

15  **IV. FLPMA And Implementing Rules Allow Multiple Uses Of The CDCA, And Do Not Make Resource Preservation The Dominant Use**

16

17       Portions of CBD's briefs suggest that, where there are conflicts between competing multiple

18  uses of the same lands, the ESA, FLPMA, and NEPA require BLM to favor preservationist uses.

19  We have shown above that this is not the case for the ESA. That is, because BLM has satisfied ESA

20  § 7(a)(2)'s basic standards of avoiding likely jeopardy to the tortoise and adverse modification of

21  critical habitat, BLM has the discretion to accomplish other multiple use objectives. *See* Section I.

22       CBD argued that, with respect to ORV uses, FLPMA and related authorities "require[] that

23  BLM minimize impacts to public land resources." CBD FLPMA/NEPA Reply at 1; *see id.* at 8,

24  12.[41] FLPMA and implementing rules grant BLM more discretion than CBD would care to admit.

25       FLPMA provides that BLM lands are managed for multiple uses: "recreation, range, timber,

26  minerals, watershed, wildlife and fish, and natural scenic, scientific, and historical values." FLPMA

27  ---

  [41]   CBD's prior arguments on BLM's route designation process for ORVs seem to be interstitial
and to be overly demanding on procedures. *See* CBD FLPMA/NEPA Reply at 1-17.

28

1   §§ 102(c), 302, 43 U.S.C. 1702(c), 1732.  FLPMA § 601 provides that CDCA shall be managed

2   "within the framework of...multiple use and sustained yield, and maintenance of environmental

3   quality"  43 U.S.C. 1781(b).  Such general multiple-use language "breathes discretion at every

4   pore."  *Perkins v. Bergland*, 608 F.2d 803, 806 (9th Cir. 1979).  CDCA land-use plans "shall take

5   into account the principles of multiple use and sustained yield in providing for resource use and

6   development, including, but not limited to, maintenance of environmental quality, rights-of-way, and

7   mineral development."  43 U.S.C. 1781(d).  FLPMA allows BLM to determine "appropriate" areas

8   for ORVs.  43 U.S.C. 1781(a)(4).  All this language represents grants of discretion to BLM to make

9   policy decisions on the appropriate balance of developmental and preservationist multiple uses.

10       That is, FLPMA's general statutory language does not make preservation of every

11  environmental resource the dominant use.  The virtually identical multiple-use mandate for national

12  forests allows compromises and does not make providing all possible benefits to wildlife the

13  dominant use.  *Lands Council v. McNair*, 2008 WL 2640001 at *8-10; *Seattle Audubon Soc'y v.*

14  *Moseley*, 80 F.3d 1401, 1404 (9th Cir. 1996); *Sierra Club v. Espy*, 38 F.3d 792, 799-802 (5th Cir.

15  1994).

16       It is true that BLM rules state: (1) ORV routes shall be designated to promote public safety

17  and "the minimization of conflicts among various users of the public lands"; and (2) ORV "[a]reas

18  and trails shall be located to minimize damage to soil" and other resources.  43 C.F.R. 8342.1.  CBD

19  reads "minimization" as requiring that ORV routes be designated as "closed" if ORV use degrades

20  any environmental resource.  CBD FLPMA/NEPA Reply at 1, 8, 12.  CBD's reading improperly

21  reads "minimize" as "eliminate" – that ORV uses are allowed only where adverse impacts to other

22  resources can be eliminated.

23       Yet, an "elimination of adverse impacts" standard is too stringent, and could well prohibit

24  ORV use (or other developmental multiple use) anywhere.  The Ninth Circuit effectively rejected, in

25  a CDCA case, environmental groups' interpretation of the "minimize" rule because it:

26       would inevitably result in the total prohibition of ORV use because it is doubtful that any
         discrete area could withstand unrestricted ORV use without considerable adverse effects.
27       However appealing might be such a resolution of the environmental dilemma, Congress has
         found that ORV use, damaging as it may be, is to be provided "where appropriate."  It left
28       determination of appropriateness largely up to the Secretary in an area of sharp conflict.

1    *Sierra Club v. Clark*, 756 F.2d 686, 691 (9th Cir. 1985).

2        A later case upheld BLM's decision to allow the Barstow-to-Las Vegas motorcycle race

3 (now prohibited by BLM) in the CDCA.  In ruling against the environmental groups' interpretation

4 of 43 C.F.R. 8342.1, the Ninth Circuit stressed BLM's discretion to balance multiple uses and not to

5 make absolute preservation the dominant use.

6       Amendment No. 6 is a proper exercise of the BLM's discretion in providing for combined
       use of the desert.  It seeks to balance desired use and ecological concerns through the

7        imposition of permit and mitigation requirements....  The mitigation requirements seek to
       assure that impacts are minimized....  The challenged amendment...seems a reasoned

8        approach to a difficult balancing act mandated by Congress.

9 *Sierra Club v. Clark*, 774 F.2d 1406, 1409-10 (9th Cir. 1985).  As the *Sierra Club v. Clark* panel

10 appeared to recognize, the "minimize" rule in § 8342.1 should be construed in a manner consistent

11 with FLPMA's multiple-use mandate and allowance of ORV uses that BLM concludes are

12 "appropriate."

13        Thus, BLM's interpretation of the "minimize" rule is consistent with Ninth Circuit precedent.

14 But, even if it were not, BLM's interpretation of its own rule would be "controlling" because it is not

15 "plainly erroneous or inconsistent with the regulation."  *Auer v. Robbins*, 519 U.S. at 461-62 (also

16 finding agency can offer its interpretation in a "legal brief").  BLM's interpretation of its own rule is

17 controlling even if prior judicial opinions had construed ambiguous regulatory language in a

18 particular way. *National Cable & Tele. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982-85

19 (2005).

20        BLM interprets "minimize" to not "prohibit...an OHV use if there is any potential for conflict

21 with another resource or use," but to mean to reduce significant adverse impacts while still allowing

22 the OHV/ORV activity.  Fed. Opening Br. at 19-20.  One further indication that BLM's

23 interpretation is not plainly erroneous – and is controlling – is:  "minimize" can mean to reduce

24 unwanted impacts to a practical degree while still allowing the activity (here, ORV use), as opposed

25 to CBD's view that "minimize" should mean "eliminate."[42]  Since BLM's use of "minimize" is

26 _____

27 [42]     As Federal Defendants point out, NEPA rules utilize "minimize" in this sense of reducing
adverse environmental impacts while still allowing the action.  Similarly, ESA § 7(b)(4) and

28 implementing rules "minimize take" by reducing the amount of take while still allowing the activity
                                                  (continued...)

1   within a range of allowed meanings, it is not plainly erroneous.

2        Additionally, the rule in context supports BLM's interpretation.  The "[a]reas and trails shall

3   be located to minimize" language assumes that some areas will be located as open to ORV use.  43

4   C.F.R. 8342.1(a).  The language on "minimization of conflicts among various uses of public lands"

5   grants BLM the discretion to allow ORV interests to prevail in some conflict situations, but not in

6   others.  43 C.F.R. 8342.1.

7        CBD emphasizes that one district court arguably read "minimize" in the sense of "eliminate."

8   *See* CBD FLPMA/NEPA Reply at 1-15 (citing *American Motorcycle Ass'n v. Watt*, 543 F. Supp.

9   789 (C.D. Cal. 1982)).  That is not controlling in light of controlling nature of an agency's

10  interpretation of its own rule.

11  **V.    The WEMO EIR/S Satisfies NEPA's Rule Of Reason**

12       Plaintiffs do not challenge the sufficiency of Defendants' compliance with NEPA in the

13  preparation of NECO, but only WEMO.  *See* CBD NEPA/FLPMA Br. at 1.  Yet, the WEMO EIR/S

14  provides an impressive multi-volume description of the environmental impacts of implementing the

15  WEMO plan amendment on BLM lands and the ITP/HCP on non-federal lands.  It more than

16  satisfies the "rule of reason" standard that governs judicial review under NEPA.

17       **A.    BLM's Compliance With NEPA Is Subject To Deferential Judicial Review**

18       NEPA is a *procedural* statute.  *Robertson v. Methow Valley*, 490 U.S. at 349-52; *Swanson v.*

19  *U.S. Forest Serv.*, 87 F.3d 339, 343 (9th Cir. 1996).  It "does not mandate particular results, but

20  simply describes the necessary process" an agency must follow to review the environmental

21  consequences of its actions.  490 U.S. at 350.

22       A court reviews an agency's compliance with NEPA under the deferential standard of the

23  APA, 5 U.S.C. 706(2)(A).  *E.g.*, *Churchill County v. Norton*, 276 F.3d 1060, 1071 (9th Cir. 2001);

24  *CBD v. BLM*, 422 F. Supp. 2d at 1126-27.  Under the APA, the scope of judicial review is narrow,

25  _____

26  (...continued)
    to go forward substantially unchanged.  Forest Service rules similarly provide the adequate access to
    inholdings guaranteed by 16 U.S.C. 3210(b), and merely state that access "route[s] [should be] so

27  located and constructed as to minimize adverse impacts" to certain resources.  36 C.F.R. 251.110(c),
    251.114(f)(2).

28

1   and an agency action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or

2   otherwise not in accordance with law."  5 U.S.C. 706(2)(A).

3        Judicial review under NEPA dovetails with the APA in the "rule of reason" standard.

4   "Review under the rule of reason standard and for abuse of discretion are 'essentially the same.'"

5   *Churchill County*, 276 F.3d at 1071 (quoting *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137

6   F.3d 1372, 1376 (9th Cir. 1998) (citing *Marsh v. ONRC*, 490 U.S. at 377 n.23)).  Under that

7   standard, the court asks "whether an EIS contains a reasonably thorough discussion of the significant

8   aspects of the probable environmental consequences."  *Churchill County*, 276 F.3d at 1071 (quoting

9   *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974)); *see Lands Council v. McNair*,

10  2008 WL 2640001 at *16-19.  The court cannot substitute its judgment for the agency's or "merely

11  determine that it would have decided an issue differently."  *CBD v. BLM*, 422 F. Supp. 2d at 1126-

12  27 (citing *Marsh v. ONRC*, 490 U.S. at 377).  Moreover,

> In determining whether the EIS contains a "reasonably thorough discussion," we may not
> "fly-speck the document and hold it insufficient on the basis of inconsequential, technical
> deficiencies...."  *Swanson v. United States Forest Serv.*, 87 F.3d 339, 343 (9th Cir. 1996)
> (internal quotations and citation omitted).  That is to say, once we are satisfied that a
> proposing agency has taken a "hard look" at a decision's environmental consequences, our
> review is at an end. *Id.*

16  *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1063 (9th Cir. 1998).

17      **B.      CBD's NEPA Claims Are Without Merit**

18      CBD's prior NEPA arguments focused on ORV issues.  We leave the detailed rebuttals on

19  those issues to Federal Defendants and the two groups of intervenors who represent off-road vehicle

20  and related interests.  We address other aspects of CBD's prior arguments below.

21          **1.      The WEMO EIR/S Adequately Addresses Effects On Soils**

22      Plaintiffs (NEPA/FLPMA Br. at 26) contended that the EIS fails to identify and analyze

23  impacts to soils from activities permitted under WEMO – specifically, that the EIS "provides no

24  discussion of grazing impacts to soil whatsoever."  But, as they admit, the grazing impacts to soil

25  "are well documented" in an Appendix to the EIR/S.  CBD NEPA/FLPMA Br. at 26 (citing EIS

26

27

28

1    Appendix J (AR WMP 205070-75)).  The inclusion of a technical discussion in an appendix

2    comports with NEPA and does not violate it.[43]

3        The body of the EIS readily satisfies the requirement for a "succinct statement" of the

4    impacts of grazing on soil.  For example, the EIS addresses concerns that grazing may affect plant

5    seed banks and germination potential, and may promote soil conditions that favor weed species

6    (WEMO EIR/S 3-75, 3-95, 3-100 (AR WMP 202005, 202025, 202030)); explains that changes in

7    grazing activities "would result in changes in disturbance rates to soil surfaces" (WEMO EIR/S 4-5

8    (AR WMP 202229)); describes new regulations and management measure for cattle and sheep

9    grazing that include soil-related factors such as removing cattle from areas where there is less

10   rainfall and less available forage, restricting grazing during the ephemeral plant growing season,

11   eliminating most temporary non-renewable grazing permits and thus prohibiting additional

12   allocations of perennial forage consumption (WEMO EIR/S 4-30 to 4-32 (AR WMP 202254-56));

13   describes constraints on grazing in desert tortoise habitat (*e.g.*, WEMO EIR/S 4-98 (AR WMP

14   202322)); and prescribes monitoring of impacts of grazing on wildlife habitat (*e.g.*, WEMO EIR/S 4-

15   54, 4-46, 4-63 (AR WMP 202278, 202285, 202287)).

16       After the Counties' opening brief had offered a NEPA defense similar to that provided again

17   above, CBD's reply largely gave up on the NEPA soils issue.

18           **2.    The WEMO EIR/S Adequately Addresses Effects On Unusual Plant
                      Assemblages, Water Resources, and Riparian Resources**
19

20       A court cannot "fly-speck the document and hold it insufficient on the basis of

21   inconsequential, technical deficiencies."  *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059,

22   1063 (9th Cir. 1998).  Plaintiffs again resort to fly-specking in their arguments concerning impacts to

23   biological resources.

24       1.    CBD initially complained that the EIS "barely mentions surface water resources in

25   the affected environment section (AR-201990)."  CBD NEPA/FLPMA Br. at 28 (emphasis added).

26   [43]     *See* Council on Environmental Quality, *Forty Most Asked Questions About CEQ's NEPA
27   Regulations*, Ans. to Quest. 25a, 46 Fed. Reg. 18026, 18033 (Mar. 23, 1981) ("The body of the EIS
     should be a succinct statement….  Lengthy technical discussions of modeling methodology, baseline
28   studies, or other work are best reserved for the appendix.").

1  Yet, the CEQ regulations caution against excessive detail in the affected environment section of an

2  EIS.  Rather, NEPA is satisfied if the EIS

3      *succinctly* describe[s] the environment of the area(s) to be affected or created by the
       alternatives under consideration.  *The description shall be no longer than is necessary to*
4      *understand the effects of the alternatives….*

5  40 C.F.R. 1502.16 (emphasis added).

6      The description of the Mojave River to which the Plaintiffs cite (WEMO EIR/S 3-63 to 3-64

7  (AR WMP 201993-94)) is more than succinct – it runs a full page and provides a basis for

8  understanding the alternatives by describing the River's physical location and attributes, noting that

9  it is a major source of groundwater in the study area, and explaining that the River's above-ground

10 flow is intermittent and for the most part occurs only after storms.  The EIS's chapter on

11 environmental impacts (Chap. 4) contains sundry discussions of Mojave River-dependent species

12 and their reliance on the Mojave River groundwater levels.  *E.g.*, WEMO EIR/S 2-77, 4-60 to 4-68,

13 4-154 to 4-158, 4-262 to 4-265 (AR WMP 201765, 202284-92, 202378-82, 202486-89)).  Beyond

14 that, other details concerning the Mojave River resource are described other portions of EIS Chapter

15 3.  *See, e.g.*, WEMO EIR/S 3-3, 3-6 (AR WMP 201933, 201936) (describing Areas of Critical

16 Environmental Concern ("ACECs") on the Mojave River).

17     Similarly, the detail Plaintiffs claim is lacking on ACECs is provided elsewhere in the EIS –

18 in EIS Appendix D, "New and Revised ACEC Management Plans."

19     The fourteen new ACECs all contain robust populations and essential habitat of threatened,
       endangered or sensitive species.  Without the added protection provided by the ACEC
20     designation, conflicting uses could lead to declines in the numbers or ranges of these species.
       A goal of the CDCA Plan is to prevent rare species from declining to the point of becoming
21     listed as threatened or endangered.  The ACEC management provisions, which are described
       in Appendix D of the West Mojave Plan, are tailored to the specific needs of the plants and
22     animals found in each new ACEC.

23 *See* WEMO ROD at 14 (AR WMP 200059).  As explained above, the placement of this type of

24 detail in an appendix rather than in the "affected environment" section is appropriate and does not

25 make the EIS defective.  *See also Southern Or. Citizens Against Toxic Sprays, Inc. v. Clark*, 720

26 F.2d 1475, 1480 (9th Cir. 1983) ("The [NEPA] label … is unimportant. We review the sufficiency of

27 the environmental analysis as a whole.").

28

1    Plaintiffs also err when they state that "UPAs are not discussed in the FEIS."  On the

2    contrary, the EIS expressly describes protections for Unusual Plant Assemblages:

3         *Native Species.* Healthy, productive and diverse habitats for native species, including special
          status species (Federal T&E, Federally proposed, Federal candidates, BLM sensitive, or
4         California State T&E, *and CDD UPAs*) are maintained in places of natural occurrence. As
          indicated by:
5         • Photosynthetic and ecological processes continue at levels suitable for the site,
            season, and precipitation regimes;
6         • Plant vigor, nutrient cycle, and energy flow are maintaining desirable plants and
            ensuring reproduction and recruitment;
7         • Plant communities are producing sufficient litter;
          • Age class distribution of plants and animals are sufficient to overcome mortality
8           fluctuations;
          • Distribution and cover of plant species and their habitats allow for reproduction and
9           recovery from localized catastrophic events;
          • Alien and noxious plants and wildlife do not exceed acceptable levels;
10        • Appropriate natural disturbances are evident; and
          • Populations and their habitats are sufficiently distributed and healthy to prevent the
11          need for listing special status species

12   WEMO EIR/S 2-121 (AR WMP 201809) (emphasis added).  Moreover, in response to the comment

13   Plaintiffs cite, the EIS explains that "CDCA prescriptions for Unusual Plant Assemblages would still

14   apply under the West Mojave Plan amendment," and points to a highly detailed table (that was

15   expanded from its draft version) summarizing goals, objectives, management strategies.  WEMO

16   EIR/S 6-130 (AR WMP 202689); WEMO EIR/S  (Table 2-26), at 2-174 to 2-195 (AR WMP

17   201863-84).[44]  The readily satisfies BLM's duty to respond to comments.  *See* 40 C.F.R. 1503.4(a).

18   Finally, contrary to Plaintiffs' implication (at 29), the EIS does address impacts to riparian

19   areas from grazing.  *See, e.g.*, WEMO EIR/S 4-11 (AR WMP 202235) (full-page discussion of

20   impacts of grazing on riparian areas); WEMO EIR/S 2-122 to 2-124 (AR WMP 201810-12)

21   (discussing objective of managing effects of grazing activities on riparian-wetland areas, springs and

22   seeps, and other projects affecting water); WEMO EIR/S 4-30 to 4-33 (AR WMP 202254-57) (table

23   ─────────────────────
     [44]    Plaintiffs (FLPMA/NEPA Br. at 29) mistakenly cite Table 2-1, which was included in
24   roughly the same form in both the draft and the final EIS.  *See* AR WMP 207815-20.  BLM's
     response to the comment refers to a "*new* table summarizing goals, objectives, monitoring and
25   adaptive management" (AR WMP 202689) (emphasis added), which appears to be Table 2-26.
     Table 2-26 provides significantly greater detail than Table 2-1.  In addition, Table 2-26, but not
26   Table 2-1, was substantially expanded from the draft version following the comment period.
     *Compare* Draft EIS at 2-155 to 2-159 (AR WMP 207967-71), *with* WEMO EIR/S at 2-174 to 2-195
27   (AR WMP 201863-84).

28

1    detailing impacts of grazing on BLM allotments under Alternative A); WEMO EIR/S 4-145 (AR

2    WMP 202369). (incorporating same into Alternative B).

3         2.    After Defendants' side provided the record citations to where the EIS discussed

4    impacts to various biological resources, CBD retreated to an argument, without citing any authority,

5    that "[a] discussion of the status of the resources and the actual impacts of route designation and

6    grazing, rather than a catalogue of the management measures proposed, is required."  Yet, what

7    NEPA requires is a "reasonably thorough discussion," not some precise formulation such as CBD

8    claims is lacking.  *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1063 (9th Cir. 1998)

9         As shown in the EIS excerpts quoted above and the 21-page EIS Table described above, the

10   WEMO EIR/S does more than just "catalogue" management measures.  It explains that they are

11   effective resource protection measures in light of the anticipated impacts on resources.

12        Similarly, as to riparian areas, the EIS's coverage is more robust than CBD's reply discussion

13   (at 23) implied.  The EIS contains a full-page discussion of impacts of grazing on riparian areas; a

14   discussion of the objective of managing effects of grazing activities on riparian-wetland areas,

15   springs and seeps, and other projects affecting water; and a table detailing impacts of grazing on

16   BLM allotments under Alternative A, which is also incorporated into Alternative B.

17        This fully satisfies NEPA's requirement of "reasonably thorough discussion of the significant

18   aspects of the probable environmental consequences."  *Swanson v. U.S. Forest Serv.*, 87 F.3d 339,

19   343 (9th Cir. 1996).  The Court should reject Plaintiffs' demand that the EIS address environmental

20   impacts in more detail.  The NEPA regulations were designed to "reduc[e] the length of

21   environmental impact statements" and "reduc[e] delay," not to overwhelm the reader with minutiae.

22   40 C.F.R. 1500.4(a), 1500.5.

23        **3.    The WEMO EIR/S Adequately Addresses Cumulative Impacts**

24        Plaintiffs' attack on the EIS's analysis of cumulative impacts is similarly myopic and

25   unpersuasive.

26        1.    For grazing, Plaintiffs focused exclusively on the conclusion of Chapter 4's

27   discussion of Alternative A.  CBD NEPA/FLPMA Br. at 35 (citing WEMO EIR/S 4-135 to 4-141

28   (AR WMP 202359-65)).  Yet, as the opening page of Chapter 4 forthrightly explains, "[c]umulative

1   impacts are addressed throughout the analyses presented in this chapter." The portion Plaintiffs cite

2   is an "overview" but not, as they imply, the entire analysis. WEMO EIR/S 4-1 (AR WMP 202225).

3           As Plaintiffs acknowledged (at 35), the Cumulative Impacts overview identifies, *inter alia*,

4   impacts *to* livestock grazing. WEMO EIR/S 4-137 to 4-138 (AR WMP 202360-61). That is entirely

5   appropriate, because one result of Alternatives A and B would be, as the EIS states, "an overall *loss*

6   of land designated for livestock grazing that the BLM administers" – a loss of "approximately

7   465,871 acres." *Id.* (emphasis added). Since this loss is attributable to constraints imposed to

8   protect resources such as wildlife, riparian areas, DWMAs, etc., as described throughout the EIS

9   (including in the Cumulative Effects overview, WEMO EIR/S 4-135 to 4-136 (AR WMP 202359-

10  60)), the effects *of* grazing are addressed here by necessary implication – the acreage available to

11  grazing was reduced out of concern for the effects of grazing.

12          In particular, Plaintiffs' complaint about an alleged failure to address impacts from grazing

13  on DWMAs is refuted by the EIS's discussion headed "Loss Of Ephemeral Sheep Grazing Due To

14  DWMA's Boundaries." It enumerates 381,729 acres that will be protected from the potential effects

15  of grazing. WEMO EIR/S 4-138 (AR WMP 202362). In addition, impacts from cattle and sheep

16  grazing, including effects on DWMAs, are fully disclosed earlier in the Chapter 4 analysis. *See*

17  Tables 4-20 and 4-21 and accompanying text, WEMO EIR/S 4-30 to 4-32 (AR WMP 202254-56).

18  Nothing requires that those impacts be broken out again as separate line items in the Cumulative

19  Effects overview when they are disclosed earlier in the EIS's review of environmental consequences.

20          Moreover, the focus of the cumulative effects analysis falls appropriately on the impacts *of the*

21  *proposed action*. The proposed action in this case is to *restrict* grazing – not to expand it. Insofar as

22  Plaintiffs would demand greater detail about the effects of past grazing, there is no NEPA violation.

23  CEQ has interpreted its NEPA rules not to require detailed information on the cumulative impacts of

24  past actions:

25

26

27

28

1

2

3

> NEPA is forward-looking, in that it focuses on the potential impacts of the proposed action that an agency is considering....  Generally, agencies can conduct an adequate cumulative effects analysis by focusing on the *current aggregate effects of past actions* without delving into the historical details of individual past actions....  CEQ regulations do not require consideration of the individual effects of all past actions to determine the present effects of past actions....

4   CEQ, *Guidance on the Consideration of Past Actions in Cumulative Effects Analysis* at 1-3 (June 24,

5   2005) (emphasis added) (available at http://www.nepa.gov/nepa/regs/Guidance_on_CE.pdf).  CEQ's

6   guidance accords with the Supreme Court's ruling that NEPA's "rule of reason" only requires

7   discussion of impacts "caused" by the agency's proposed action – in this instance, reduced acreage

8   for grazing – and that the agency can control now, not the cumulative effects of other actions.  *DOT*

9   *v. Public Citizen*, 541 U.S. 752, 767-70 (2004).

10          2.      CBD's reply objected to the *form* of the EIS's discussion of cumulative effects – i.e.,

11   that BLM opted to discuss cumulative impacts throughout Chapter 4 of the EIS and summarize them

12   in an overview, rather repeat or consolidate all discussion of cumulative impacts in a stand-alone

13   section.  But the latter is not required.  "The extent and form of the information needed to analyze

14   appropriately the cumulative effects of a proposed action and alternatives under NEPA varies widely

15   and must be determined by the federal agency proposing the action on a case-by-case basis."  CEQ,

16   *Guidance on the Consideration of Past Actions in Cumulative Effects Analysis* at 3 (June 24, 2005)

17   (available at http://www.nepa.gov/nepa/regs/Guidance_on_CE.pdf).  BLM's choice of how to

18   present cumulative impacts in the WEMO EIR/S is well within the range of alternatives permitted

19   under NEPA.

20          3.      CBD's reply (at 28) showcases BLM's alleged failure to discuss the cumulative

21   impacts of the Fort Irwin expansion, as though BLM had somehow swept that activity under the rug.

22   In reality, Chapter 4 of the WEMO EIR/S takes account of the Fort Irwin expansion repeatedly.  For

23   example, the EIR/S discusses the expansion as an underlying assumption of the entire impacts

24   analysis (WEMO EIR/S 4-2, AR WMP 202226, Table 4-1); as a potential impact on air quality

25   (WEMO EIR/S 4-6, AR WMP 202230, Table 4-3); as a residual impact on a DWMA (WEMO

26   EIR/S 4-16, AR WMP 202240, Table 4-6); and as a potential impact on the Mojave ground squirrel

27   (WEMO EIR/S 4-48, AR WMP 202272, Table 4-34) and Lane Mountain milkvetch (WEMO EIR/S

28   4-73 to 4-74, AR WMP 202297-98 ("[t]he Biological Opinion on the Fort Irwin expansion

1   recognizes the significant acquisition program of occupied habitat on private lands within the BLM's

2   Conservation Areas").[45]

3         Further, "a separate NEPA and [ESA] Section 7 process, currently being undertaken by the

4   Army, is addressing mitigation of those impacts [from the expansion of Ft. Irwin] and compliance

5   with the federal Endangered Species Act."  WEMO EIR/S 4-137, AR WMP 202361.  A federal

6   agency may lawfully defer detailed discussion of cumulative impacts to the EIS on the second action

7   (here, on the Fort Irwin expansion) that actually causes the impacts.  *Kleppe v. Sierra Club*, 427 U.S.

8   390, 407-08 n.16, 410 n.20, 415-15 n.26 (1976).

9         4.     Finally, the WEMO BLM plan amendment and HCP under consideration by the

10   Counties are interconnected actions and were analyzed together in a document to fulfill the

11   requirements of both NEPA and CEQA.  *See* pages 5-6, above.  But this interconnectedness does not

12   mean, as CBD's Reply contended (at 28-29), that the cumulative effects analysis of Alternative B is

13   defective for failing either to rule out private development and other projects that would be covered

14   under the HCP in Alternative A, or to take account of the alleged lack of species protection from

15   those developments and projects.

16         As a practical matter, the ROD could not adopt Alternative A at this time because more work

17   remains to be done on the HCP.  *See* WEMO ROD at 1, AR WMP 200045.  But BLM properly

18   incorporated the relevant portions of Alternative A's cumulative effects analysis in Alternative B

19   because the latter assumes – correctly, and contrary to CBD's preference – that the private

20   development and other projects in Alternative B will be accompanied by species protection

21

22

---

23   [45]    *See also* WEMO EIR/S 4-139, AR WMP 202363 ("[s]hould [certain areas transferred by

24   Congress to Ft. Irwin] no longer be available for motorized vehicle recreation, this loss of recreation opportunity, together with the rapidly growing Southern California population and the anticipated continued growth in motorized recreation, would displace some visitors onto the smaller remaining

25   BLM land base"); WEMO EIR/S 4-203, AR WMP 202427 (discussing impact of Alternative E on tortoises with regards to newly expanded Ft. Irwin boundaries); WEMO EIR/S 4-254, AR WMP

26   202478 (same, with respect to Alternative G); WEMO EIR/S 4-255, AR WMP 202479 (Alternative G, discussing vulnerability of public lands, in absence of designated conservation area, to "extremely

27   large projects" such as Ft. Irwin expansion); WEMO EIR/S 4-263, 4-271, AR WMP 202487, 202495 (impacts of Ft. Irwin expansion on Bendire's thrasher and Lane Mountain milkvetch).

28

1 | measures, but those measures will be embodied in project-specific incidental take permits rather than

2 | an overarching HCP as in Alternative A.  WEMO EIR/S at 2-203 to 2-204, AR WMP 201891-92.

3 | *     *     *

4 | To sum up, the multi-volume WEMO EIR/S readily satisfies NEPA's twin goals of ensuring

5 | that BLM has carefully considered environmental impacts and making the relevant information

6 | available to the public at an appropriate level of detail.  Plaintiffs' fly-specking objections go at most to

7 | the EIS's form, not its substance.  Since the EIS takes the requisite "hard look" at environmental

8 | consequences, BLM's compliance with NEPA should be upheld at summary judgment.

9 | **CONCLUSION**

10 | CBD's Complaint should be dismissed at summary judgment.

11 | Respectfully submitted,

13 | Steven P. Rice (SBN 094321)     By:    */s/ J. Michael Klise*
CROWELL & MORING LLP           J. Michael Klise (*pro hac vice*)

14 | 3 Park Plaza                      Steven P. Quarles (D.C. Bar No.
20th Floor                         351668)

15 | Irvine, CA 92614-8505         Thomas R. Lundquist (*pro hac vice*)
(949) 263-8400                 CROWELL & MORING LLP

16 | Fax:  (949) 263-8414          1001 Pennsylvania Avenue, N.W.
srice@crowell.com            Washington, D.C. 20004-2595

17 | Dated:  Sept. 8, 2008         (202) 624-2500
                              Fax:  (202) 628-5116
                              jmklise@crowell.com

19 | Attorneys for Intervenor-Defendants Kern County, San Bernardino County, and Imperial County,
California; and QuadState Local Governments Authority