1   RONALD J. TENPAS
    Assistant Attorney General
2   Environment & Natural Resources Division

3   MICHAEL R. EITEL, Trial Attorney (Neb. Bar No. 22889)
4   U.S. Department of Justice
    Environment & Natural Resources Division
5   Wildlife & Marine Resources Section
    1961 Stout Street, 8th Floor, Room 812
6   Denver, CO 80294
    Telephone:    (303) 844-1479
7   Facsimile:    (303) 844-1350
    Email:        michael.eitel@usdoj.gov
8
    CHARLES R. SHOCKEY, Attorney (D.C. Bar No. 914879)
9   Natural Resources Section
    Sacramento Field Office
10  Environment and Natural Resources Division
    United States Department of Justice
11  501 "I" Street, Suite 9-700
    Sacramento, CA 95814-2322
12  Telephone:    (916) 930-2203
    Facsimile:    (916) 930-2210
13  Email:        charles.shockey@usdoj.gov

14  Attorneys for Federal Defendants

15                  UNITED STATES DISTRICT COURT

16                 NORTHERN DISTRICT OF CALIFORNIA

17                   SAN FRANCISCO DIVISION

18
    _____
19                                          )   Case No. 3:06 CV-04884 SI
    CENTER FOR BIOLOGICAL DIVERSITY, et al., )
20          Plaintiffs,                      )   FEDERAL DEFENDANTS'
                    v.                       )   REVISED MEMORANDUM
21                                           )   IN SUPPORT OF MOTION FOR
    U.S. BUREAU OF LAND MANAGEMENT, et al., )    SUMMARY JUDGMENT
22          Federal Defendants, and         )
                                             )   Date:         TBD
23  KERN COUNTY, CALIFORNIA, et al.,         )   Time:         TBD
            Intervenor-Defendants.           )   Courtroom:    10, 17th Floor
24  _____ )   Judge:        Hon. Susan Illston

25

26

27

28

1

## TABLE OF CONTENTS

2

3

DEFENDANTS' REFILED MOTION FOR SUMMARY JUDGMENT ............................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 1

STATUTORY AND FACTUAL BACKGROUND .................................................. 2

    I.      STATUTORY BACKGROUND ..................................................... 2

          A.    Federal Land Policy and Management Act ........................................ 2

          B.    National Environmental Policy Act ............................................. 2

          C.    Endangered Species Act .................................................... 3

    II.     FACTUAL BACKGROUND ...................................................... 4

          A.    The FLPMA Land Use Planning Process ........................................ 4

                1.    The CDCA Plan of 1980 .............................................. 4

                        a.    Multiple Use Classifications ...................................... 5

                        b.    Plan Elements ................................................. 5

                        c.    Motorized Vehicle Element ....................................... 5

                2.    Development of the WEMO Plan ......................................... 6

                        a.    Ord Mountain Route Designation ................................. 8

                        b.    The "Box" Effort ............................................... 8

                        c.    WEMO Planning and Route Designation Efforts ....................... 8

                        d.    Center for Biological Diversity v. BLM Litigation ..................... 9

                        e.    Western Mojave Desert Off Road Vehicle Designation Project ............................................. 9

                        f.    The BLM Decision Tree .......................................... 10

                        g.    Adoption of the WEMO Plan ....................................... 12

          B.    Endangered Species Act Listings and Consultations .......................... 13

ARGUMENT .......................................................................... 15

    I.      STANDARD AND SCOPE OF REVIEW ............................................. 15

    II.     PLAINTIFFS' FLPMA CHALLENGES LACK MERIT ............................... 17

          A.    BLM Complied with the Regulatory Minimization Standards .......................... 17

          B.    BLM's Decisions Are Fully Supported by the Administrative Record ............. 21

C.   BLM Properly Designated Routes in Other Areas of the WEMO Plan ............ 22

D.   BLM Did Not Arbitrarily Approve "Illegal" Routes ........................................ 23

III.   PLAINTIFFS' NEPA CLAIMS LACK MERIT ........................................... 24

A.   BLM Considered a Reasonable Range of Alternatives ................................... 24

B.   BLM Properly Relied on a No Action Alternative and Baseline ...................... 26

C.   BLM Properly Identified, Considered, and Implemented Mitigation Measures  27

D.   BLM Adequately Analyzed All Impact Assessments ....................................... 28

1.   Soils ...................................................................................... 29

2.   Cultural Resources ................................................................ 30

3.   Biological Resources ............................................................ 30

a.   Riparian Resources/Uniform Plant Assemblages/Water Quality  30

b.   Spread of Non-Native Invasive Plants ....................................... 31

c.   Threatened, Endangered, Rare, and Sensitive Species ................................................................... 32

E.   Air Quality ......................................................................................... 33

F.   Cumulative Impacts .......................................................................... 34

IV.   PLAINTIFFS' ESA CLAIMS LACK MERIT .............................................. 35

A.   FWS's Biological Opinions Comply With The ESA And Should Be Upheld .............................................................................. 35

B.   Plaintiffs Cannot Satisfy Their Burden Of Demonstrating That The Challenged Biological Opinions Are Arbitrary And Capricious .......................................... 41

1.   The Consultation Provisions Of The ESA Are Not Modified, Displaced, Or Enlarged By The Recovery Planning Provisions Of The ESA ........ 42

2.   FWS's "Jeopardy" Analyses Comply With The Requirements Of The ESA ...................................................................... 45

a.   The Plain Language Of ESA § 7 Requires That FWS Issue A "Jeopardy" Determination For The Entire Listed Species Under Consideration ................................................................... 45

b.   FWS Appropriately Analyzed The "Environmental Baseline" ................................................................. 46

c.   FWS Appropriately Considered the Effects Of BLM's Actions In Reaching Its "No Jeopardy" Determinations ............................. 49

3.   FWS's "Adverse Modification" Analyses Comply With The Requirements Of The ESA ..................................................... 51

a.   The Scope Of FWS's "Adverse Modification" Analyses Complies With The Statutory Requirements of ESA § 7 .......................... 51

b.   FWS's Analyses of the Effects of BLM's Proposed Actions on The Desert Tortoise's Critical Habitat Are Reasoned And Supported By The Record ......................................... 52

C.   FWS's Incidental Take Statements Comply With The Requirements Of The ESA ......................................................................... 55

1.   The Timing Of The Revised Incidental Take Statements Does Not Render The WEMO And NECO BiOps Or The ITSs Invalid ............... 55

2.   FWS Reasonably Identified the Amount Or Extent Of Anticipated Incidental Take ................................................................... 56

3.   FWS's RPMs And T&Cs Are Reasoned And Comply With The ESA .......................................................................... 58

D.   BLM Has Complied With Its Procedural And Substantive Obligations Under The ESA ........................................................... 59

V.   REMEDY ................................................................................................ 60

CONCLUSION ............................................................................................. 60

1

2

**TABLE OF AUTHORITIES**

3   CASES                                                                                    PAGE

4   American Fed'n of Gov't Employees v. Office of Personnel Mgmt.,
    821 F.2d 761, 765 (D.C. Cir. 1987) ............................................................. 57

5   American Motorcycle Ass'n v. Watt, 543 F.Supp. 789 (C.D.Cal. 1982) ............................................. 18

6   American Rivers v. FERC, 201 F.3d 1196 (9th Cir. 2000) ........................................................ 26, 27

7   Arizona Cattle Growers' Ass'n v. FWS, 273 F.3d 1229, 1236 (9th Cir. 2001) ......................... 51, 55-58

8   Arizona Cattle Growers' Ass'n v. Kempthorne, 534 F. Supp. 2d 1013, 1036 (D. Ariz. 2008) ............ 44

9   Auer v. Robbins, 519 U.S. 452, 461 (1997) ...................................................................... 20

10  Bering Strait Citizens for Responsible Resource Development v. U.S. Army Corps of Engineers,
11  511 F.3d 1011, 1028 (9th Cir. 2008) ........................................................................ 26, 28, 35

12  Bureau of Land Management, 531 F.3d 1114 (9th Cir.  2008) ................................................... 1, 24, 29

13  Center for Biological Diversity v. BLM,
    422 F.Supp.2d 1115, 1166  (N.D.Cal. 2006) ...................................................... 17, 25, 27, 29-31, 52, 55

14  Center for Biological Diversity v. Rumsfeld, 198 F. Supp. 2d 1139, 1157 (D. Ariz. 2002) ................ 60

15  Center for Native Ecosystems v. Cables, 509 F.3d 1310, 1321-23 (10th Cir. 2007) ...................... 39-41

16  Chevron, U.S.A. v. Natural Res. Def. Council, 467 U.S. 837, 842-43, 844 (1984) ................. 45, 46, 52

17  Churchill County v. Norton, 276 F.3d 1060, 1072 (9th Cir. 2001) ........................................... 42

18  Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 195 (D.C. Cir. 1991) ................................. 25

19  Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415 (1971) ............................................. 18

20  City of Angoon v. Hodel, 803 F.2d 1016, 1021-22 (9th Cir. 1986) ................................................. 25, 26

21  City of Carmel-by-the-Sea v. U.S. Dep't of Transp., 123 F.3d 1142, 1155 (9th Cir. 1997) ................. 25

22  City of Sausalito v. O'Neill, 386 F.3d 1186, 1207 (9th Cir. 2004) ................................................ 25, 26

23  City of Tacoma v. FERC, 460 F.3d 53, 75 (D.C. Cir. 2006) .................................................... 60

24  Conservation Northwest v. Kempthorne,
25  Civ. No. 04-1331-JCC, 2007 WL 1847143, *3 (W.D. Wash. June 25, 2007) ..................................... 42

26  Dep't of Transp. v. Public Citizen, 541 U.S. 752, 764 (2004) ....................................... 33, 34

27  Ecology Center, Inc., v. Austin, 430 F.3d 1057 (9th Cir. 2005) ............................................... 16, 28, 41

28  ExxonMobil Gas Mktg. Co. v. FERC, 297 F.3d 1071,1085 (D.C. Cir. 2002) ..................................... 57

    Friends of Southeast's Future v. Morrison, 153 F.3d 1059, 1066 (9th Cir. 1998) ............................... 27

Fund for Animals, Inc. v. Rice, 85 F.3d 535, 548 (11th Cir. 1996) .................................... 3, 42

Gifford Pinchot Task Force v. FWS, 378 F.3d 1059, 1070, amended on other grounds, 387 F.3d 968 (9th Cir. 2004) ..................................................................................... 39, 48, 52, 54

Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci, 857 F.2d 505, 508 (9th Cir. 1988) .......... 27

Hayward Area Planning Ass'n v. Norton, Civ. No. 00-4211 SI, 2004 WL 724950 (N.D. Cal. Mar. 29, 2004) .............................................................................................. 54, 55

Headwaters v. BLM, 914 F.2d 1174, 1183 (9th Cir. 1990) ........................................... 22, 25

Idaho Dep't of Fish and Game v. NMFS, 850 F. Supp. 886, 895 (D. Or. 1994) .................................. 43

Keene Corp. v. United States, 508 U.S. 200, 208 (1993) ............................................. 43

Kern County Farm Bureau v. Allen, 450 F.3d 1072, 1080 (9th Cir. 2006) ........................................... 37

Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976) ....................................................... 2, 34

Lands Council v. McNair, __F.3d __, 2008 WL 2640001 (9th Cir. July 2, 2008) (en banc)...................................................................................1, 28, 37, 41-43, 47, 48

Lujan v. National Wildlife Fed'n, 497 U.S. 871, 882-83 (1990) ........................................... 15

Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 371 (1989)  ................................................. 2

Morongo Band of Mission Indians v. FAA, 161 F.3d 569, 581 (9th Cir. 1998) ............................ 26, 34

Motor Vehicle Mfrs. Ass'n., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) ............. 16

National Parks & Conservation Association v. Babbitt, 241 F.3d 722, 734 (9th Cir. 2001) ............... 28

National Wildlife Fed'n v. National Marine Fisheries Serv., 481 F.3d 1224, 1236 (9th Cir. 2007) .................................................................... 38, 51

Natural Res. Def. Council v. Kempthorne, 506 F. Supp. 2d 322, 382 (E.D. Cal. 2007) ................. 52, 59

Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059, 1971 (9th Cir. 2002) ........................... 34

Nigro v. Sullivan, 40 F.3d 990, 996 (9th Cir. 1994) ........................................................... 46

No. Alaska Envtl. Ctr. v. Kempthorne, 457 F.3d 969, 979 (9th Cir. 2006) ........................................... 28

Northwest Envtl. Advocates v. NMFS, Civ. No. 04-0666RSM, 2005 WL 1427696, *10-11 (W.D. Wash. June 15, 2005) .............................. 48

Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 69-80 (2004) .......................................... 31

Nw. Envtl. Advocates v. U.S. Army Corps of Eng'rs, 460 F.3d 1125, 1138-41 (9th Cir. 2006) .... 35, 48

Oregon Environmental Council v. Kunzman, 817 F.2d 484, 492 (9th Cir.1987)  ................................. 3

Oregon Natural Desert Ass'n v. Shuford, 2007 WL 1695162 * 6 (D.Or. 2007) ................................. 23

Oregon Natural Resources Council v. Allen, 476 F.3d 1031, 1035-36 (9th Cir. 2007) ................. 15, 59

*Oregon Natural Resources Council v. Turner*, 863 F. Supp. 1277, 1284 (D. Or. 1994) ........................ 3

*Pyramid Lake Paiute Tribe v. Department of the Navy*, 898 F.2d 1410, 1418 (9th Cir. 1990) ........... 43

*Resources, Ltd. v. Robertson*, 35 F.3d 1300, 1307 (9th Cir. 1993) ....................................................... 25

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) ........................... 2, 3, 28, 34

*Sagebrush Rebellion, Inc. v. Hodel*, 790 F.2d 760, 763 (1986) ........................................................ 2, 21

*Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 954 (9th Cir. 2003) ............................. 34, 43

*Sierra Club v. Clark*, 756 F.2d 686, 691 (9th Cir. 1985) ............................................................... 18, 19

*Sierra Club v. Clark*, 774 F.2d 1406, 1409-10 (9th Cir. 1985) ........................................................... 19

*Sierra Club v. Dombeck*, 161 F. Supp. 2d 1052, 1070-71 (D. Ariz. 2001) ......................................... 57

*State of Utah v. Babbitt*, 137 F.3d 1193, 1214 (10th Cir. 1998) ......................................................... 23

*Stop H-3 Ass'n v. Dole*, 740 F.2d 1442 (9th Cir. 1984) ...................................................................... 56

*Thomas Jefferson Univ.  v.  Shalala*, 512 U.S. 504, 512 (1994). ....................................................... 20

*United States v. W.R. Grace & Co.*, 429 F.3d 1224, 1245 (9th Cir. 2005) ........................................ 58

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*,
435 U.S. 519, 551-53 (1978) ............................................................................................. 25, 26, 42

*Village of False Pass v. Watt*, 565 F.Supp. 1123, 1154 (D. Alaska 1983) ......................................... 60

*Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ............................................................... 60

*Western Watersheds Project v. Matejko*, 468 F.3d 1099, 1104-06, 1110 (9th Cir. 2006) ................... 21

*Westlands Water Dist. v. U.S. Dep't of Interior*, 275 F. Supp. 2d 1157, 1194 (E.D. Cal. 2002) ......... 46

*Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 868 (9th Cir. 2004) ............... 25, 46

*Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1116 (9th Cir. 2000) ........ 35

STATUTES                                                                                                      PAGE
5 U.S.C. § 701-706 ................................................................................................................... 1, 15
5 U.S.C. § 706(2)(A) ...................................................................................................................... 2
16 U.S.C. § 1532(5)(A) ................................................................................................................ 51
16 U.S.C. § 1532(16) .................................................................................................................... 45
16 U.S.C. § 1533(f)(1) ............................................................................................................... 3, 42
16 U.S.C. § 1536(a)(2) ............................................................................... 1, 3, 35, 36, 43, 45
16 U.S.C. § 1536(b)(3)(A) ...................................................................................................... 45, 51
16 U.S.C. § 1536(b)(4)(I) .............................................................................................................. 56
16 U.S.C. § 1531-44 ...................................................................................................................... 1
16 U.S.C. § 1536(a)(2) .................................................................................................................. 38
42 U.S.C. § 4321 ........................................................................................................................... 1
42 U.S.C. § 4332(2)(C) .............................................................................................................. 2, 25
43 U.S.C. § 1701(a) ....................................................................................................................... 4

43 U.S.C. § 1701(a)(7) ............................................................................ 17
43 U.S.C. § 1701(a)(8) ......................................................................... 2, 17
43 U.S.C. § 1702(c) ................................................................................ 19
43 U.S.C. § 1711(a) .......................................................................... 28, 30
43 U.S.C. § 1781 ...................................................................................... 2
43 U.S.C. § 1781 ...................................................................................... 4
43 U.S.C. § 1781(a)(4) .............................................................................. 4
43 U.S.C. § 1781(d) ............................................................................. 4, 6
43 U.S.C. § 1701-85 ................................................................................. 1

REGULATIONS                                                                    PAGE

40 C.F.R. § 1502.14 ....................................................................... 25, 27, 28
40 C.F.R.  § 1502.14(a) ........................................................................... 25
40 C.F.R. § 1502.16 ................................................................................ 28
40 C.F.R. § 1508.7 ................................................................................. 34
40 C.F.R. § 1508.20 .......................................................................... 19, 27
40 C.F.R. § 1508.25(a)(2) ........................................................................ 34

43 C.F.R. § 1601.1-4 ............................................................................... 2
43 C.F.R. § 8342.1 (1981) .......................................... 6, 7, 10, 11, 13, 14, 17, 19
43 C.F.R. § 8342.1(a)-( ........................................................................... 18
43 C.F.R  § 8342.1(3) ....................................................................... 22-24

50 C.F.R. § 402.02 ................................................................. 45-47, 51, 58
50 C.F.R. § 402.14 ................................................................................. 43
50 C.F.R. § 402.14(g) ............................................................................... 3
50 C.F.R. § 402.14(g)(7) .......................................................................... 55
50 C.F.R. § 402.14(h)(2) .............................................................. 3, 49, 50
50 C.F.R. § 402.14(h)(3) .......................................................................... 45
50 C.F.R. § 402.14(I) ............................................................................. 56
50 C.F.R. § 402.16 ................................................................................. 56
50 C.F.R. § 424.02(d) ............................................................................. 51
50 C.F.R. § 402.14(i)(1)(I) ...................................................................... 56

55 Fed. Reg. 12,178 (Apr. 2, 1990) ............................................................ 13
59 Fed. Reg. 5,820 (Feb. 8, 1994) .............................................................. 13

1    **DEFENDANTS' REFILED MOTION FOR SUMMARY JUDGMENT**

2         The federal defendants, U.S. Bureau of Land Management (BLM), U.S. Fish and Wildlife Service

3    (FWS), and Secretary of the Interior Dirk Kempthorne, file this revised motion for summary judgment and

4    memorandum, as directed by the court's August 12 and 22, 2008 Orders (Doc. 155, 157). This motion

5    is filed pursuant to Fed. R. Civ. P. 56(b) and Civil L.R. 7-2, 7-3, and 56-1 and relies on all memoranda in

6    support, exhibits, declarations, the administrative records as supplemented, and argument presented at the

7    hearing on May 16, 2008. The federal defendants move for summary judgment on all claims and causes

8    of action in the plaintiffs' Second Amended Complaint for Declaratory and Injunctive Relief.

9    **MEMORANDUM OF POINTS AND AUTHORITIES**

10        Plaintiffs, Center for Biological Diversity (CBD), *et al.*, contest the BLM West Mojave (WEMO)

11   Plan and the FWS biological opinions for the WEMO Plan and the Northern and Eastern Colorado (NECO)

12   Desert Coordinated Management Plan. Their Second Amended Complaint for Declaratory and Injunctive

13   Relief (Doc. 114) alleges that BLM and FWS failed to comply with four federal statutes in approving plans

14   to manage public lands in the California Desert Conservation Area (CDCA): the Federal Land Policy and

15   Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1701-85; the National Environmental Policy Act of

16   1969 (NEPA), 42 U.S.C. §§ 4321, *et seq.*; the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-44, and

17   the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706. BLM and FWS filed administrative

18   records (Docs. 50-56), as supplemented (Docs. 66, 68, 78-80, 82, 89-90, 102, 104, 107-113). The federal

19   defendants' earlier summary judgment memorandum (Doc. 133) and reply (Doc. 146) explained that the

20   entire record before the court demonstrates that they satisfied all governing statutory obligations.

21        Following oral argument on the cross-motions for summary judgment on May 16, 2008, the court

22   withdrew the pending motions and directed the parties to refile their summary judgment briefs (Doc. 155),

23   incorporating discussions of the recent Ninth Circuit rulings in Lands Council v. McNair, __F.3d __, 2008

24   WL 2640001 (9th Cir. July 2, 2008)(en banc)(Lands Council), and Oregon Natural Desert Ass'n v. Bureau

25   of Land Management, 531 F.3d 1114 (9th Cir. 2008)(ONDA). The federal defendants file this motion and

26   consolidated memorandum to address all FLPMA, NEPA, ESA, and APA claims raised by the plaintiffs.[1]

27   _____

28   [1] The federal defendants' initial summary judgment brief (Doc. 133) had been drafted specifically in
     response to the arguments presented in the plaintiffs' summary judgment memoranda (Docs. 116, 123).

**STATUTORY AND FACTUAL BACKGROUND**

**I.    STATUTORY BACKGROUND**

**A.    Federal Land Policy and Management Act**

FLPMA directs that "public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." 43 U.S.C. § 1701(a)(8). FLPMA directs the Secretary to prepare land use plans for the public lands under Interior Department control. 43 U.S.C. § 1712. BLM's delegated authority, by regulation, directs its managers to implement FLPMA by "resource management" land use plans. 43 C.F.R. § 1601.1-4.  The APA governs judicial review of FLPMA claims.  A court may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or...without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D); <u>Sagebrush Rebellion, Inc. v. Hodel</u>, 790 F.2d 760, 763 (1986).

**B.    National Environmental Policy Act**

NEPA directs federal agencies to consider potential effects of proposed federal action, and the act's statutory purposes and goals are: "(1) to ensure the agency will have detailed information on significant environmental impacts when it makes its decisions; and (2) to guarantee that this information will be available to a larger audience." <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 349 (1989). NEPA exists to ensure a process, not a particular result, and its goal is satisfied once the information is properly disclosed. <u>Id</u>. at 350; <u>Marsh v. Oregon Natural Resources Council</u>, 490 U.S. 360, 371 (1989); <u>Lands Council</u>, at * 16.  NEPA requires that a federal agency prepare an environmental impact statement (EIS) when proposing "major Federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  The Council on Environmental Quality (CEQ) regulations provide regulatory guidance.  40 C.F.R. Parts 1500-1508.  If an agency takes the requisite "hard look" at the environmental consequences, its analysis should be affirmed. <u>Kleppe v. Sierra Club</u>, 427 U.S. 390, 410 n.21 (1976); <u>Lands</u>

---

The court's directive for simultaneous filing of revised memoranda by both sides prevents the federal defendants from anticipating the plaintiffs' revised arguments, so the federal defendants must reserve the right to address those revised contentions in more detail in the forthcoming reply memoranda.

1   Council at * 17.  "If the adverse environmental effects of the proposed action are adequately identified and

2   evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the

3   environmental costs."  Robertson, 490 U.S. at 350.  NEPA, therefore, "prohibits uninformed–rather than

4   unwise–agency action."  Id. at 351.  If an EIS contains a "reasonably thorough discussion" of significant

5   aspects of potential impacts, a court may not "fly speck" or hold the EIS insufficient for inconsequential

6   or technical deficiencies.  Oregon Environmental Council v. Kunzman, 817 F.2d 484, 492 (9th Cir.1987).

7        **C.    Endangered Species Act**

8        Congress enacted the ESA to protect and conserve endangered and threatened species. 16 U.S.C.

9   § 1531(b).  "Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure

10  that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued

11  existence of any endangered species or threatened species or result in the destruction or adverse

12  modification of [designated critical] habitat." 16 U.S.C. § 1536(a)(2); see 50 C.F.R. Pt. 402.

13       Consultation culminates in a biological opinion (BiOp), which includes a "detailed discussion of the

14  effects of the action on listed species or critical habitat."  50 C.F.R. § 402.14(h)(2).  The BiOp assesses the

15  likelihood of the proposed action resulting in jeopardy to a listed species or destruction or adverse

16  modification to designated critical habitat.  50 C.F.R. § 402.14(g).  If an action is not likely to result in

17  jeopardy, but is reasonably likely to result in "take" incidental to the proposed action, then the consulting

18  agency attaches an incidental take statement (ITS) to the BiOp. 16 U.S.C. § 1536(b)(4); 50 C.F.R. §

19  402.14(i)(1)(i-v).  If the action agency implements the project as proposed and complies with the terms and

20  conditions (T&Cs) of the ITS, ESA § 7(o)(2) exempts the specified level of take from the ESA § 9 take

21  prohibition.  16 U.S.C. § 1536(o)(2).

22        Congress directed the Secretary to develop and implement recovery plans to provide guidance for

23  the long-term objective of removing species from the list of endangered or threatened species. 16 U.S.C.

24  § 1533(f)(1).  The ESA imposes no duties on federal agencies or other persons to implement or adhere to

25  a recovery plan, and the courts have affirmed the purely advisory nature of such plans.  See Fund for

26  Animals, Inc. v. Rice, 85 F.3d 535, 548 (11th Cir. 1996) ("[T]he Recovery Plan is not a document with the

27  force of law.");  Oregon Natural Resources Council v. Turner, 863 F. Supp. 1277, 1284 (D. Or. 1994) (a

28  recovery plan does not mandate any actions, at any particular time, to obtain recovery goals).

1    **II.    FACTUAL BACKGROUND**

2         **A.    The FLPMA Land Use Planning Process**

3         Congress enacted FLPMA in 1976 to replace an outdated system of classifying public lands and

4    conserving and developing natural resources under a mixture of earlier statutes and executive orders.  43

5    U.S.C. § 1701(a) (3).  After preparing an inventory of public land resources, the present and future uses of

6    these public lands are to be governed by a coordinated land use plan. 43 U.S.C. §§ 1701(a) (2), 1711, 1712.

7    AR 221926-222080.[2]  Public lands are managed in accordance with land use plans on the basis of multiple

8    use and sustained yield principles in a manner that will protect "the quality of scientific, scenic, historical,

9    ecological, environmental, air and atmospheric, water resource, and archeological values; that, where

10   appropriate, will preserve and protect certain public lands in their natural condition; that will provide food

11   and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and

12   human occupancy and use." 43 U.S.C. §§ 1701(a) (7), (8); 1732(a).

13        The WEMO Plan area is located in the congressionally designated California Desert Conservation

14   Area (CDCA). 43 U.S.C. § 1781.  Congress found that "the use of all California desert resources can and

15   should be provided for in a multiple use and sustained yield management plan to conserve these resources

16   for future generations, and to provide present and future use and enjoyment, particularly outdoor recreation

17   uses, including the use, where appropriate, of off-road recreational vehicles." 43 U.S.C. § 1781(a)(4).  The

18   CDCA contains approximately 25 million acres, of which BLM administers slightly less than one-half.  AR

19   221935.  BLM administers 3.3 million acres of the approximately 9.4 million acres located in WEMO.  AR

20   201666–201667.  Remaining lands are owned by private persons, the State of California, or are subject to

21   other federal jurisdiction.  Id.  The Secretary was directed to prepare a long-range plan by 1980 to address

22   management, use, development, and protection of CDCA public lands.  43 U.S.C. § 1781(d).

23            **1.    The CDCA Plan of 1980**

24        BLM issued its long-range management plan in 1980 (CDCA Plan of 1980), AR 222401-222555,

25   amended over time to reflect changes in regulations, to authorize or change the authorization of class

26   activities, to add or delete or change "Areas of Critical Environmental Concern" (ACEC) boundaries, to

27

28
_____

[2]  The federal defendants adhere to the earlier protocol for citing the administrative records (AR).

1   identify archaeological and cultural areas, to address changes in grazing allotments, to change "crucial"

2   desert tortoise habitat to a categorization system, and to reflect statutory changes such as passage of the

3   1994 California Desert Protection Act.  AR 222069-222077.  The March 2006 WEMO Plan is a recent

4   amendment to the CDCA Plan.  AR 201051-201055.  The CDCA Plan of 1980, as amended, addresses the

5   conflict between the natural environment and human social demands that Congress recognized in FLPMA.

6                   **a.        Multiple Use Classifications**

7   The CDCA plan established four primary multiple use classifications of public land: "C" (potential

8   wilderness/designated wilderness areas); "L" (limited use areas established to protect sensitive, natural,

9   scenic, ecological, and cultural resource values); "M" (moderate use areas established to provide a

10  controlled balance between higher intensity use and protection of public land resources, to provide for

11  mining, livestock grazing, recreation, energy, and utility development while providing management to

12  conserve desert resources and to mitigate for damage that permitted use may cause); and "I" (intensive use

13  areas providing for concentrated use of lands and resources to meet human needs while providing

14  reasonable protection, mitigation, and rehabilitation to sensitive natural and cultural values).  Unclassified

15  lands account for scattered and isolated public land parcels within the CDCA.  AR 221941-42.

16                   **b.        Plan Elements**

17  The CDCA Plan identified 12 plan elements for consideration, including cultural resources, wildlife,

18  vegetation, livestock grazing, recreation, and motorized vehicle access, and the establishment of special

19  management areas, such as ACECs and 11 types of special areas.  AR 221936; AR 221941-48; AR 221949-

20  222027; AR 222028-222033.  The CDCA Plan lists approximately 75 ACECs, including the Desert Tortoise

21  Research Natural Area.  AR 222030-222031.  Recognizing the importance of soil, water, and air as the

22  "most essential resource components" of the CDCA, BLM provided special treatment for these resources.

23  AR 222039-222040.  BLM initiated programs to support resource protection and maintain environmental

24  quality in the CDCA. AR 222030-222044.

25                   **c.        Motorized Vehicle Element**

26  <u>Area Designations</u>.  Off-Highway Vehicle (OHV)[3] use is a central issue in this case, so the federal

27  _____

28  [3] The federal defendants use the term "Off-Highway Vehicle" or the "OHV" acronym.  Although the term
    "Off-Road Vehicle" or the "ORV" acronym appeared in FLPMA, the CDCA Plan, and BLM regulations,

1  defendants explain this element in detail.  The actual extent of vehicle use on public lands when the CDCA

2  Plan was written in 1980 was imprecise, with estimates of many thousands of miles of paved and maintained

3  routes, unmaintained dirt routes, and vehicle accessible washes.  AR 222003.  BLM therefore significantly

4  revised the Motorized Vehicle Access Element in 1983.  AR 222003-222011.  BLM determined that public

5  land <u>areas</u> within the CDCA would be designated "open," "closed," or "limited," based upon the particular

6  multiple use classification for the area.  AR 222004.[4]  "All designations shall be based on the protection of

7  the resources of the public lands, the promotion of the safety of all the users of the public lands, and the

8  minimization of conflicts among various users of the public lands," in accordance with enumerated criteria

9  and incorporated into area and route designation in the CDCA Plan.

10      <u>Route Designations</u>.  In addition to OHV areas, routes also could be designated as "open," "closed,"

11  or "limited," generally based on the corresponding area designation.  AR 222005.  Access on a particular

12  route could be allowed (open), prohibited (closed), or limited by season, type or number of vehicles, or other

13  restriction.  <u>Id</u>.  Washes, sand dunes and dry lakes had their own special management considerations.  AR

14  222006.  There was no complete inventory of routes existing in 1980 when the CDCA Plan was adopted.

15  AR 230282.  BLM, however, relied on vehicle access information depicted on motorized vehicle interim

16  access guides based on data from at least 1973 in identifying an interim route management program.  AR

17  222009.  With approval of the 1980 CDCA Plan, the interim designations became effective.  <u>Id</u>.  In 1983,

18  BLM replaced those designations with specific vehicle access guidelines.  <u>Id</u>.  Vehicles were authorized to

19  use existing routes in Class L, Class M, and certain Class I areas.  Closed areas (AR 222004-222006) and

20  closed routes were to remain closed.  AR 222009.  Route approval was based on the regulatory criteria of

21  43 C.F.R. § 8342.1 (1981).  AR 222007; AR 235669-235709.

22      <u>1985-87 Route Designations</u>.  In 1983, BLM amended the CDCA Plan to define existing routes as

23

24  OHV is more commonly accepted today, as it is consistent with the State of California's usage and avoids

25  confusion with a different "ORV" acronym in the Wild and Scenic Rivers Act.

26  [4]  Within "open" areas, vehicles could travel anywhere, while vehicle travel was prohibited in "closed"

27  areas.  <u>Id</u>.  Vehicle travel was restricted to "existing routes" <u>within "limited" use areas</u>; an existing route
   was one that was in existence prior to 1980.  AR 222005.  Area designations in 1980 were depicted on Map

28  10 to the CDCA Plan, AR 222007, pursuant to the regulation, AR 222003-07, 43 CFR § 8342.1, which
   required the authorized officer to designate public lands as open, limited, or closed to OHVs.

1    "a route established before approval of the Desert Plan in 1980, with a minimum width of two feet, showing

2    significant surface evidence of prior vehicle use or, for washes, history of prior use." AR 222005. BLM

3    began an inventory, but it realized that existing photo coverage was not adequate to identify all existing

4    routes. AR 230283. For example, no motorcycle trails were inventoried, although the CDCA Plan defined

5    them as existing routes (trails two feet or more wide). AR 202199.[5] Later route designations were made

6    to protect resources, promote safe use of public lands, and minimize conflict among users under FLPMA,

7    ESA, Executive Order Nos. 11644 and 11989, and the regulatory criteria for route designation in 43 C.F.R.

8    § 8342.1. Id. Through a public review process, BLM designated a WEMO route network, AR 230284-86,

9    and regional route designations became effective after Federal Register Notice publication. AR 211473.

10        ACEC Route Designations. Between 1982 and 1994, BLM designated routes within each of 20

11   ACECs in the WEMO Plan area. Collectively, BLM designated 317 miles of open routes in these ACECs.

12   AR 202199-202202. Because these networks were not developed as part of the 1985-87 designations, the

13   route webs did not always connect seamlessly to the 1985-87 network. AR 201843.

14                    **2.    Development of the WEMO Plan**

15        The 2006 WEMO Plan culminated an interagency land use management plan jointly prepared by

16   cities, counties, state and federal agencies having jurisdiction over lands in the western Mojave Desert.[6]

17   BLM began the planning process in 1991 by publishing a *Notice Of Intent To Prepare A West Mojave Plan*

18   *and Environmental Impact Statement,* followed by public scoping meetings. AR 201667. Several interim

19   route designation efforts occurred while the final WEMO Plan was developed.

20

21

---

22   [5] BLM used this inventory to make the first regional route designations in 1985 and 1987. Due to time
23   and manpower constraints, an intensive field inventory was not undertaken. AR 202199, 230283. BLM
     explained that "the CDCA has been mapped using a series of 21 maps called Desert Access Guides. These
24   guides show vehicle route of travel designations which were made in the CDCA Plan. The route
     designations are now being updated and revised as new information becomes available regarding needed
25   changes to improve use opportunities or protect resource values." 52 Fed. Reg. 4975 (Feb. 18, 1987).

26

27   [6] The WEMO Plan area has approximately 9.3 million acres in the Mojave Desert. About 3.3 million acres
     of the WEMO Plan area is under BLM jurisdiction managed by either the Barstow or Ridgecrest Field
28   Office; about 2.6 million acres is administered by the Department of Defense; about 3.0 million acres are
     privately owned and 100,000 acres are administered by the State of California. AR 200046.

### a.      Ord Mountain Route Designation

BLM began a pilot designation program for one CDCA planning unit in a heavily used region near Ord Mountain between the cities of Barstow and Victorville.  AR 234407–234412.  BLM designated an emergency route network in 1995, due to proliferation of vehicle routes in desert tortoise critical habitat. A consensus emerged favoring a permanent network, based on 100 % vehicle route inventory and extensive public involvement, with this effort serving as a pilot for future route designations throughout WEMO.  AR 221204.  The Ord Mountain Pilot utilized an inventory based upon air photos and 100 percent ground truthing.  The results of this pilot effort were examined in an Environmental Assessment (EA) published in January 2000, AR 221195, later adopted by the Western Mojave Desert Route Designation Project as the Ord subregion, and incorporated into the CDCA Plan by amendment on June 30, 2003.  AR 206771.

### b.      The "Box" Effort

Between June and August 1998, BLM met in Barstow (in an office known as "the Box") and in Ridgecrest and utilized the Denver Photo Inventory and available resource information to propose route designations for the western Mojave Desert.[7]  No further work occurred on route designation, other than minor GIS database corrections, until early 2000.

### c.      WEMO Planning and Route Designation Efforts

The WEMO planning team determined that conservation strategies should not be developed until the team conducted a new regional desert tortoise field survey, completed a comprehensive literature review to collect the best science reasonably available for all special status species, and identified the effectiveness of conservation measures currently being applied by all agencies and jurisdictions in the WEMO Plan area. Dr. William Boarman of the United States Geological Survey (USGS) Biological Resources Division led a team of approximately two dozen recognized experts retained to prepare species accounts for each of approximately 80 sensitive species.[8]  Dr. Boarman published a peer-reviewed analysis of *Threats to the*

---

[7]  The parties addressed the "Box" process in connection with the plaintiffs' motion to supplement the record.  Both parties agreed to supplement the record with this information, and the court agreed.  The Declaration of William Haigh, WEMO Project Manager, provides details about the Box process, its shortcomings, and why BLM ultimately abandoned that process for use in route designation.  Doc. 84-2.

[8]  Authors identified species distribution, natural history, habitat requirements, population status,  threats analysis and biological standards.  Authors provided geographical data concerning each species digitized

1   *Desert Tortoise: A Critical Review of the Literature.*  AR 212822–212912.  Desert tortoise field surveys

2   were conducted in the late summers of 1998, 1999 and 2001.[9]

3      On November 3, 1999, the WEMO Plan "Supergroup," consisting of representatives of more than

4   100 jurisdictions, agencies and non-governmental organizations, and private individuals, established four

5   task groups to prepare the WEMO Plan.  AR 221532–221538.  Task groups held more than 60 meetings

6   between November 1999 and June 2002.  Task Group 2 considered route designation issues from December

7   1999 and May 2002.  AR 211385.  The WEMO project manager recommended a new on-the-ground field

8   survey of OHV routes and route designations, based upon an "objective model" and criteria from the Desert

9   Plan, BLM regulations, and FLPMA.  AR 314151-312153.  The BLM District Manager, the Steering

10   Committee, and Task Group 2 all concurred.  AR 218900–218903; AR 218915–218921.  The resulting

11   effort became the Western Mojave Desert Off Road Vehicle Designation Project.

12             **d.**       **Center for Biological Diversity v. BLM Litigation**

13      On March 16, 2000, the Center for Biological Diversity, *et al.*, filed suit against BLM for its alleged

14   failure to consult on the adoption of the CDCA Plan of 1980.  Center for Biological Diversity v. BLM, Case

15   No. 00-0927 WHA-JCS (N.D.Cal)(CBD I). The court later approved a consent decree with five stipulated

16   agreements and hundreds of interim measures.  BLM agreed to consult with FWS on the WEMO and NECO

17   plan areas.  BLM agreed to restrict cattle and sheep grazing in desert grazing allotments until a decision on

18   the plan amendments and to defer final route designation and maintain the existing emergency route closure

19   in the Ord Mountain area until it completed the WEMO Plan, when the interim measures would expire.

20             **e.**       **Western Mojave Desert Off Road Vehicle Designation Project**

21      BLM retained the international engineering and environmental consulting firm CH2M Hill to

22

---

23   by USGS and incorporated into the WEMO Plan GIS database.  About 1,500 published scientific papers

24   were identified, copied, and included in the WEMO Plan's literature collection.  AR 203992–204497.

25   [9] Biologists recorded tortoise sign and other data concerning habitat condition and disturbance by walking

26   3,362 one-and-one-half mile transects.  These were the first regional tortoise surveys that had been conducted on WEMO public lands since the 1975-82 period.  This information was critical to identifying areas of greatest disturbance and threats to tortoise populations.  AR 307602–308491 (transect forms, 1998

27   surveys); AR 304001 (summary map and other survey results).  Additional field surveys between 1998 and 2001 covered other sensitive species, including the Lane Mountain milkvetch (AR 212126–212220) and

28   Mohave ground squirrel (AR 202079–202085).

1   conduct detailed a field survey of subregions that included desert tortoise critical habitat and other sensitive

2   species habitat.  The field survey covered 10 of 21 subregions using state-of-the-art global positioning

3   satellite (GPS) equipment to map routes precisely.[10]  The WEMO team combined data collected from

4   biological surveys and the CH2M Hill Field Survey to identify disturbance and sensitive biology polygons.

5   AR 305577–305579. This led to the development of "Make a Difference" Maps, AR 304022, AR 304028,

6   establishing biology and disturbance polygons within which a higher percentage of routes would be closed.

7                     **f.**         **The BLM Decision Tree**

8           BLM developed a "Decision Tree" methodology by April 2002 to allow route designation teams to

9   apply a systematic and analytical procedure for recommending each of approximately 5200 routes identified

10   by the CH2M Hill Field Survey as open to motorized vehicle use, closed, or open on a limited basis. The

11   intent of the Decision Tree was to provide a means to present the public with a clearly documented rationale

12   underlying each open, closed, or limited route recommendation.  All route designation recommendations

13   were to be made route-by-route.  Task Group 2 met five times during the development and early application

14   of the Decision Tree.  AR 217154–217160; AR 216341–216347; AR 214784–214787.

15           The parties dispute the validity of the Decision Tree methodology for WEMO route designations.

16   The court needs a clear understanding of how the process actually worked.  The Decision Tree provided a

17   structured framework to ensure that each recommended opening or closure was reached in a consistent

18   manner, taking into account not only the BLM data available before the Box exercise, but also information

19   gathered after its completion.[11]  Each subregion was divided into two to five Motorized Access Zones

20

---

21   [10] Fifteen field crews conducted the surveys, each with an experienced OHV operator and surveyors with

22   professional background including geologists, land use planners, technicians, and landscape architects, all

      of whom received prior training.  AR 218823–218832.  All data collected was entered into GPS units, AR

23   218823–218832, including: <u>type of route</u> (paved, graded, good dirt, rough, wash, technical four wheel

      drive, and single track (*i.e.*, motorcycle)); <u>level of use</u> (high– medium; low– infrequent); and 17 <u>resource</u>

24   <u>features</u>, including buildings, cabins, campsites, caves, guzzlers, route proliferation, mining claim, mining

25   prospect, rubble, scenic view, seep, shooting site, staging area, trailhead, water tank, well, and dead ends.

      Information was downloaded into CH2M Hill computers and reviewed, processed, and monitored for

26   quality assurance by the GIS team.  AR 218823–218832.

27   [11] Application of the Decision Tree to individual routes was guided by statutory, regulatory and policy

28   criteria, AR 201828, including but not limited to ESA, NEPA, FLPMA, Executive Orders, 43 C.F.R. §

      8342.1 (FLPMA minimization criteria), National Historic Preservation Act, Taylor Grazing Act, Mining

(MAZ), representing areas with similar management issues or constraints.  Management issues and goals were identified for each MAZ, providing additional guidance for teams applying the Decision Tree.  AR 201832–201841.  Maps of each MAZ were provided to the teams that applied the Decision Tree and displayed biology polygons, disturbance polygons, sensitive resources, and CH2M Hill Field Survey results.  See, e.g., AR 304016.  BLM then applied these criteria in the FEIS to reach a recommended decision, using an analytical process structured through the following steps.  As the record shows, the decision tree:

> was applied to each of about 5,200 enumerated vehicle routes within the redesign area.  For each route, the decision tree poses a series of questions, which fall sequentially into the five following categories: (1) legal easements and rights-of–way; (2) T&E species; (3) other environmental issues; (4) the special qualities of a route, including safety concerns, recreational qualities and user conflict; and (5) route redundancy. The manner in which each question is answered determines which decision tree "limb" or pathway is followed. Footnotes to the tree identify other concerns that need to be taken into consideration as each question is answered. By following a decision tree pathway, the route designator would reach a recommended designation of "Open" or "Closed." Each answer is alphanumerically coded such that the exact sequence of questions, as well as how they were answered, can be recorded for each vehicle route. These codes then enable each recommended decision to be easily entered into a database for future use and analysis. The result was a systematic, documented and repeatable framework for the evaluation of each route.

AR 201842.  Application of the Decision Tree was subject to limits imposed by the Footnotes, including sensitive species and habitats, cultural resources, community growth, public safety and other factors.  AR 204875.  A "record of decision" (Record) documented the application of the Decision Tree to each route.[12]

In March 2003, BLM released the *Western Mojave Desert Off Road Vehicle Designation Project Environmental Assessment and Draft CDCA Plan Amendment* for public review.  AR 211373–211726.  This document addressed the route network developed through the Decision Tree process, described how routes were designated, AR 211389–211406, and summarized the information contained on the Records prepared

---

Acts, and California State Fish and Game Code.  Data sources examined through the Decision Tree process included: (1) species accounts; (2) Dr. Boarman's tortoise threats analysis; (3) California Natural Diversity Database; (4) desert tortoise field surveys of 1998, 1999 and 2001; (5) additional field surveys; (6) 1999 Current Management Situation information; (7) Evaluation Reports; (8) Make-a-Difference Map disturbance polygons and biology polygons; and (9) CH2M Hill Field Survey results.

[12]  An example is AR 305092, prepared by the Ridgecrest field office designation team.  This Record documents the subregion (Red Mountain), route start location by universal trans mercator coordinate, route number (RM 3062), "branch" of the Decision Tree that was applied (SC-1), the recommended designation (closed), specific comments ("occupied habitat for desert cymopterus"), staff making the recommendation (in this case, biologist Bob Parker, air quality specialist Glenn Harris and planner Marti Dickes), date of recommendation and a listing of the 43 C.F.R. § 8342.1 minimization factors.

1  for each of the 5200 routes.  AR 211585–211725.  On June 30, 2003, FWS issued its "biological opinion

2  that the network of routes of travel proposed by the Bureau is not likely to jeopardize the continued

3  existence of the desert tortoise or the Lane Mountain milk-vetch or to destroy or adversely modify critical

4  habitat of the desert tortoise." AR 206749.  BLM then executed a *Decision Record CDCA Plan Amendment*

5  *Western Mojave Desert Off Road Vehicle Designation Project,* AR 206756–206777, which amended the

6  CDCA Plan to include the route network developed through the Designation Project.

7                                  **g.**        **Adoption of the WEMO Plan**

8          BLM published a *Revised Notice of Intent to Prepare West Mojave Plan and Environmental Impact*

9  *Statement* in May 2002, AR 214296–214297, and held public scoping meetings.  AR 201668.  On June 13,

10  2003, BLM released the *Proposed West Mojave Plan Draft Environmental Impact Report and Statement*

11  for a public review.  AR 207756–210195.  In January 2005, BLM published *Final Environmental Impact*

12  *Statement and Report for the West Mojave Plan*.  AR 201625–205379.  In March 2006, BLM issued a

13  Record of Decision (ROD) to adopt 12 plan amendments as adopted components of the WEMO Plan for

14  BLM-administered public lands.  AR 200044 –200066.

15          <u>Components of the WEMO Plan</u>.  BLM's WEMO Plan is not simply an OHV route designation plan

16  amendment, but instead provides a comprehensive strategy to conserve and protect the desert tortoise, the

17  Mohave ground squirrel (MGS), and over 100 other sensitive plants, animals, and natural communities.  AR

18  201666.  The conservation strategy for BLM-administered public lands includes: Conservation Areas: AR

19  201703–201705; Allowable Ground Disturbance: AR 201720; Mitigation Fee: AR 201722–201726;

20  200056; Multiple-Use Class Changes: AR 201708–201709; Areas of Critical Environmental Concern: AR

21  201710; Rand Mountains: AR 201710–201712; Route Network Modifications:  AR 200054; Stopping,

22  Parking and Camping Limits: AR 201844; Deletion of Barstow to Vegas Race Course and Stoddard to

23  Johnson Competitive Event Corridor: AR 201845; and Cultural Resources: AR 200065–200066.

24          <u>Alternatives Considered</u>.  The WEMO Plan was supported by analysis in the FEIS, which addressed

25  the six action alternatives and the no-action alternative.  AR 201689–201690.  BLM also evaluated, but

26  eliminated from detailed consideration, seven other alternatives because it found that they did not meet the

27  purpose and need for the WEMO Plan or the CDCA Plan or requirements of FLPMA.  AR 201916-201917.

28  The fully considered alternatives are summarized at AR 201914–201915 and listed below.

**Alternative A: Proposed Action**. Conservation strategies for the desert tortoise, Mohave ground squirrel, and other sensitive species, applicable to public and private lands within the WEMO Plan area. The WEMO Plan would be implemented by local jurisdictions as a habitat conservation plan on private lands, and by the BLM on public lands. The motorized vehicle access network was the network adopted on June 30, 2003, with minor modifications. AR 201697–201891.

**Alternative B: BLM Only.** This alternative consists of those elements of Alternative A applicable to, and that could be implemented on, BLM-administered public lands. BLM's 2006 Record of Decision adopted this alternative. AR 201891–201893.

**Alternative C: Tortoise Recovery Plan.** AR 201894–201898.

**Alternative D: Enhanced Ecosystem Protection.** AR 201899–201904 (environmentally preferred). This would eliminate "open" routes in DWMAs and provide only "limited" routes for street-legal OHV use.

**Alternative E: One DWMA – Enhanced Recreation Opportunities.** AR 201905–201907. This would open tens of thousands of acres to OHV "open" area use.

**Alternative F: No DWMA – Aggressive Disease and Raven Management.** AR 201908 – 201910.

**Alternative G: No Action.** Existing conservation strategies currently being applied by each of the participating agencies would continue to be implemented, including the CDCA Plan's existing route network. AR 201910–201914.[13]

**B.      Endangered Species Act Listings and Consultations**

The desert tortoise (*Gopherus agassizii*) is a large, herbivorous reptile found in portions of the California, Arizona, Nevada, and Utah deserts, and portions of Mexico. See NBO 287, 574, 12573-75 (discussion of biology and ecology of the desert tortoise; WBO 14786-88 (same).   On April 2, 1990, FWS listed the Mojave population as threatened under the ESA. 55 Fed. Reg. 12,178; NBO 287 (factors contributing to the threatened status included construction and development, grazing, off-road vehicle use, illegal collection, upper respiratory disease, and raven predation).   On February 8, 1994, FWS published a final designation of critical habitat for the Mojave population of the desert tortoise.   59 Fed. Reg. 5820; NBO 900-47. FWS identified 12 areas, with a total of 6.4 million acres, as critical habitat. NBO 908. Eight units in California contain 4.8 million acres, with the rest located in Nevada, Utah, and Arizona. Id.

In June 1994, FWS finalized the Recovery Plan for the Mojave population of the desert tortoise, describing a strategy for recovering and delisting the species.   NBO 546-899.   The Recovery Plan divides

---

[13]   The route network considered by the No Action Alternative changed between the Draft and Final Environmental Impact Report and Statement.   Because the Draft EIS was issued prior to the amendment of the CDCA Plan on June 30, 2003, it analyzed the 1985-87 network as the No Action alternative.   By the time the Final EIR/S was published, the June 30, 2003, CDCA Plan amendment had been adopted, and the route network adopted at that time became the No Action alternative.

the Mojave population range into six recovery units[14] and recommends that land management agencies establish 14 desert wildlife management areas (DWMAs)[15] throughout the recovery units, with at least one DWMA in each recovery unit. NBO 582, 596, 598. The Recovery Plan identifies activities which directly or indirectly threaten the desert tortoise and its habitat, such as domestic livestock grazing and off-highway recreational use. See NBO 700-42. While acknowledging that "cattle grazing under certain circumstances can be compatible with desert tortoise survival," the Recovery Plan generally recommends that grazing not be permitted in DWMAs because no data show that cattle grazing is compatible with tortoise recovery. NBO 618. The Recovery Plan also recommends vehicular controls and notes that the "recommendations are presented to aid land managers in the development of management plans," such as the NEMO, NECO, and WEMO plans, as "DWMA-specific management actions cannot yet be precisely defined." NBO 606.

BLM and FWS have completed over 300 formal consultations for actions affecting the desert tortoise or its critical habitat within the boundary of the CDCA. NBO 12585-87; WBO 14802-06.[16] These consultations have included several analyzing the effects of livestock grazing on the desert tortoise and its critical habitat. See NBO 406, 954, 1076, 12586; WBO 14802. Id. In 2004, the FWS issued a BiOp to the U.S. Department of the Army (Army) regarding the effects of military activities on the desert tortoise and its critical habitat on additional training lands at the Army's National Training Center at Fort Irwin.

_____

[14] A "recovery unit" is a geographic area harboring an evolutionary distinct population segment of the desert tortoise within the Mojave region. NBO 553. The six recovery units are Northern Colorado, Eastern Colorado, Upper Virgin River, Eastern Mojave, Northeastern Mojave, and Western Mojave. NBO 598; see also NBO 12726. Of the six recovery units, the NEMO area falls within the Eastern Mojave Recovery Unit, and, to a lesser extent, the Northeastern Mojave Recovery Unit. NBO 6259. The NECO planning area falls within the Northern and Eastern Colorado Recovery Units. NBO 5905. The WEMO planning area falls within the Western Mojave Recovery Unit. WBO 7946.

[15] "DWMA" is an administrative area in a recovery unit managed to afford reserve-level protection to desert tortoise populations while maintaining and protecting other sensitive species and ecosystem functions. NBO 553. BLM established three DWMAs (Piute-Fenner, Ivanpah Valley, and Shadow Valley) in NEMO, NBO 12555, two DWMAs (Chemehuevi, Chuckwalla) in NECO, NBO 12561, and four (Fremont-Kramer, Superior-Cronese, Ord-Rodman, and Pinto Mountain) in WEMO. WBO 14761.

[16] Although over 300 formal consultations were completed, the actual number of actions that BLM authorized or implemented period differed slightly for reasons such as the programmatic nature of some consultations, re-initiation of consultations when critical habitat was designated, and consultations on projects that were never implemented. NBO 12585-86; WBO 14802.

1   WBO 9959, 14804, 14798-99.  In addition to other conservation actions in this consultation, the Army

2   purchased approximately 99,000 acres of lands and private interests in three cattle allotments in the western

3   Mojave Desert.  WBO 14804.  On March 31, 2005, FWS issued a BiOp concluding that implementation

4   of the CDCA Plan, as amended by previous amendments, the NEMO and NECO bioregional plans, and the

5   interim conservation measures in the WEMO planning area, was not likely to jeopardize the desert tortoise

6   or to destroy or adversely modify its critical habitat.  NBO 12535, 12708-12711; see 12538-72 (discussing

7   proposed actions under review).  On January 9, 2006, FWS issued a BiOp concluding that implementation

8   of the CDCA Plan, as amended by previous amendments and the proposed WEMO bioregional plan, was

9   not likely to jeopardize the desert tortoise or destroy or adversely modify desert tortoise critical habitat.

10  WBO 14752, 14885-14889.  On November 30, 2007, the FWS issued amended ITSs for both the NECO

11  BiOp and the WEMO BiOp.  NSupp ITS 1175; WSupp ITS 1018.

12        The Lane Mountain milk-vetch (*Astragalus jaegerianus*) ("LMMV") is a slender, light-gray or

13  greenish perennial plant species in the pea family which grows 12 to 27.5 inches tall.  WBO 14911-12

14  (describing biology and ecology of the LMMV). The LMMV is known only from four occurrences and

15  "does not appear to have been more widespread than is currently known; no extirpations of populations have

16  been documented."  WBO 14913, 14916 (further discussing occurrences and distribution of LMMV). The

17  LMMV was listed as an endangered species on October 6, 1998.  63 Fed. Reg. 53596.  In the final critical

18  habitat rule published on April 8, 2005, FWS did not designate critical habitat for the species. 70 Fed. Reg.

19  18220.  The occurrences of LMMV in the WEMO planning area are entirely within areas designated as

20  critical habitat for the desert tortoise.  WBO 4915-16.  On January 9, 2006, FWS issued a BiOp concluding

21  that implementation of the CDCA Plan, as amended by previous amendments and the proposed WEMO

22  bioregional plan, was not likely to jeopardize the LMMV.  WBO 14921-22.

23                                              **ARGUMENT**

24  **I.    STANDARD AND SCOPE OF REVIEW**

25        The plaintiffs' NEPA, FLPMA, and ESA claims are reviewed pursuant to the APA judicial review

26  provisions, 5 U.S.C. §§ 701-706.  <u>Lujan v. National Wildlife Fed'n</u>, 497 U.S. 871, 882-83 (1990) (FLPMA,

27  NEPA); <u>Lands Council</u> at * 4 (FLPMA, NEPA); <u>Oregon Natural Resources Council v. Allen</u>, 476 F.3d

28  1031, 1035-36 (9th Cir. 2007)(ESA).  On August 12, this court directed the parties to refile their briefs and

1    address how <u>Lands Council</u> opinion applies with respect to the APA standard of review.  Doc.  155.

2         <u>Lands Council</u> unquestionably is one of the most important Ninth Circuit opinions in the field of

3    environmental law.  The opinion reflects a binding judgment that clarifies the proper application of the APA

4    arbitrary and capricious standard of judicial review to environmental decisions.  Expressly overruling

5    <u>Ecology Center, Inc., v. Austin</u>, 430 F.3d 1057 (9th Cir. 2005), the 11-judge <u>en banc</u> panel unanimously

6    held that the APA requires federal courts to defer to an agency's determination in areas within its particular

7    scientific and technical expertise.  The plaintiffs in <u>Lands Council</u> had asked the court

8         to act as a panel of scientists that instructs the Forest Service how to validate its hypotheses
9         regarding wildlife viability, chooses among scientific studies in determining whether the
          Forest Service has complied with the underlying Forest plan, and orders the agency to
10        explain every possible scientific uncertainty.  As we will explain, <u>this is not a proper role for
          a federal appellate court</u>.  But Lands Council's arguments illustrate how, <u>in recent years, our
11        environmental jurisprudence has, at times, shifted away from the appropriate standard of
          review and could be read to suggest that this court should play such a role</u>.

12   <u>Lands Council</u> at *4 (emphasis added).  The court's proper role, to the contrary, is "simply to ensure that

13   the Forest Service made no clear error of judgment that would render its action arbitrary and capricious."

14   <u>Id</u>. at * 9 (citation omitted). The courts are "not free to 'impose on an agency [our] own notion of which

15   procedures are 'best' or most likely to further some vague, undefined public good.'" <u>Id</u>.  at *10 (citations

16   omitted).  The court also may not impose procedural requirements that are not explicitly found in the statute.

17   <u>Id</u>.  Judicial review under the arbitrary or capricious standard is limited to examining the evidence that the

18        Forest Service has provided to support its conclusions, along with other materials in the
          record, to ensure that the Service has not, for instance "relied on factors which Congress has
19        not intended it to consider, entirely failed to consider an important aspect of the problem,
          offered an explanation for its decision that runs counter to the evidence before the agency,
20        or [an explanation that] is so implausible that it could not be ascribed to a difference in view
          or the product of agency expertise."

21
22   <u>Id</u>. (quoting <u>Motor Vehicle Mfrs. Ass'n., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983).

23   Deference "to an agency's determination in an area involving a high level of technical expertise" is

     particularly important.  <u>Id</u>. (internal quotation marks and citation omitted).  Agencies including BLM and
24
     FWS are delegated the authority by Congress to undertake scientific analyses and render difficult decisions,
25
     often based on less than exact data.  These agencies must be provided the latitude to use their expertise
26
     without undue judicial interference, and the court's role is to ensure that an agency has made "no 'clear error
27

28

1   of judgment' that would render its action 'arbitrary and capricious.'" Id. at *9 (citations omitted).[17]

2   **II.    PLAINTIFFS' FLPMA CHALLENGES LACK MERIT**

3          FLPMA declared that "public lands must be managed for multiple uses in a manner that will protect

4   the quality of the scientific, scenic, historical, ecological, environmental, air and atmospheric, water

5   resources, and archeological values." Center for Biological Diversity v. BLM, 422 F.Supp.2d 1115, 1166

6   (N.D.Cal. 2006)(CBD II), citing 43 U.S.C. § 1701(a)(7) & (8).  FLPMA, however, also directs that BLM

7   management, "where appropriate, will preserve and protect certain public lands in their natural condition;

8   that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for

9   outdoor recreation and human occupancy and use." 43 U.S.C. § 1701(a)(8).  The statute does not single out

10  any of the important and often competing uses of public lands for special protection or higher priority over

11  other uses.  The agency's responsibility is to exercise statutory discretion to base management decisions "on

12  the basis of multiple use and sustained yield unless otherwise specified by law."  43 U.S.C. § 1701(a)(7).

13         The plaintiffs' FLPMA claim focuses on the OHV route designation process and decisions.  The

14  defendants presented a detailed summary of that process above.  While the plaintiffs improperly attempted

15  to downplay the Footnotes to the Decision Tree, AR 211560, those Footnotes were a critical element in the

16  process, directing evaluators and the agency to take into account many specific factors relevant to the

17  statutory and regulatory provisions.  The plaintiffs presented four objections to BLM's Decision Tree

18  process in the route designation decisions.  The federal defendants explain why none has merit.

19         **A.    BLM Complied with the Regulatory Minimization Standards**

20         The plaintiffs claimed that the BLM Decision Tree failed to base route designations on the

21  "minimization" factors in 43 C.F.R. § 8342.1 and improperly elevated consideration of motorized access

22

23  ───────────────

24  [17]   The scope of judicial review is governed by the administrative records that BLM and FWS filed and
    supplemented.  Docs. 50-55, 66, 82, 90, 102, 108-113.  The plaintiffs filed several declarations and extra-

25  record documents with their motions for summary judgment, inviting this court to review such extra-record
    materials in deciding the merits of plaintiffs claims.  That is wholly improper. As the Ninth Circuit ruled,

26  a court "look[s] to the evidence the [agency] has provided to support its conclusions, along with other
    materials in the record" to prove only that the agency has "explain[ed] the conclusions it has drawn from

27  its chosen methodology, and the reasons it considers the underlying evidence to be reliable."  Lands
    Council at *9-10.  Accordingly, federal defendants renew their objection to the evidence on the grounds

28  set forth in Defendants' Objections to Plaintiffs' Evidence (Doc. 133-5) (filed March 7, 2008).

over all other factors.  Pl. NEPA SJ Memo at 12.[18]  They fail to understand the Decision Tree process and ignore its analytical framework.  Before the Decision Tree was applied, each route was subjected to a complete physical examination using GIS data, including surveys of the area adjacent to the route for any resources (e.g., plants, animal species, habitat, cultural resources, riparian features, etc.) that require special consideration.  Each route was subjected to all regulatory minimization criteria, listed on the individual route form that the team must consider.  Each route then was subjected to the Footnote inquiries, which require the team to evaluate and take into account such factors as impacts to sensitive species, other completing uses, impacts on habitat quality, and "any other special circumstances that would warrant reconsideration."  AR 211560.  The record is replete with examples demonstrating how the process actually resulted in <u>closure</u> of a large number of routes.  <u>See</u>, <u>e.g.</u>, 2003 EA, Appendix C, AR 211584-211725; AR 214896-214930 (Superior subregion)(showing route closure recommendations for multiple reasons).  This agency analysis is entitled to a presumption of regularity.  <u>Citizens to Preserve Overton Park v. Volpe</u>, 401 U.S. 402, 415 (1971).  The plaintiffs have presented no evidence to prove that BLM failed to carry out its responsibility by applying the Decision Tree criteria in a thorough, conscientious, and consistent manner.

The plaintiffs' reliance on <u>American Motorcycle Ass'n v. Watt</u>, 543 F.Supp. 789 (C.D.Cal. 1982), provides no support.  That district court ruling must be examined in light of subsequent Ninth Circuit opinions, which specifically <u>upheld</u> BLM's authorization of OHV use in the CDCA.  <u>Sierra Club v. Clark</u>, 756 F.2d 686, 691 (9th Cir. 1985), rejected a challenge to the BLM minimization regulations in the CDCA, specifically finding that Congress had authorized ORV use where appropriate, leaving that determination to the Secretary's discretion.  The appellate court opinion, issued three years after <u>AMA v. Watt</u>, constitutes governing Ninth Circuit precedent and establishes BLM's broad discretion in applying the minimization criteria under its regulations to allow OHV use to continue in the CDCA.  The court squarely rejected the Sierra Club's insistence "that the sacrifice of any area to permanent resource damage is not justified under

---

[18]  The regulations adopted in 1979 direct BLM to "designate all public lands as either open, limited, or closed to off-road vehicles . . . in accordance with the following criteria," which state that "[a]reas and trails shall be located to minimize damage to soil, watershed, vegetation, air, or other resources," "to minimize harassment of wildlife or significant disruption of wildlife habitats," with special attention to ESA-listed species, and "to minimize conflicts between off-road vehicle users and other existing or proposed recreational uses," and to ensure compatibility of such uses "in populated areas, taking into account noise and other factors."  43 C.F.R. § 8342.1(a)-( c).

the multiple use management mandate of 43 U.S.C. § 1702(c)."  756 F.2d at 691.  A federal court is "not free to ignore the mandate which Congress wrote into the Act.  Sierra Club's interpretation of the regulation would inevitably result in the total prohibition of ORV use because it is doubtful that any discrete area could withstand unrestricted ORV use without considerable adverse effects."  Id.  "Congress has found that ORV use, damaging as it may be, is to be provided 'where appropriate.'  It left determination of appropriateness largely up to the Secretary in an area of sharp conflict. If there is to be a change it must come by way of Congressional reconsideration."  Id.  The "Secretary's interpretation that this legislative determination calls for accommodation of ORV usage in the administrative plan, we must conclude, is not unreasonable and we are constrained to let it stand."  Id.  The court emphasized the narrow scope of judicial review of BLM's interpretation of its regulation, 43 C.F.R. § 8342.1.  Id.  Circuit Judge Farris, concurring, noted that, when an agency interprets its own regulation, it is entitled to "even more deference than the 'considerable deference' it would enjoy if it were merely interpreting a statute it administers."  Id. (citing cases).[19]

In WEMO, BLM applied the minimization criteria in the Executive Orders and the regulations to decisions regarding OHV routes.  See, e.g., AR 214896.  BLM included those regulatory criteria on all route recommendation forms, directing each team member to apply the regulations to every route.  The record shows many examples where the agency applied the criteria to close routes in order to avoid adverse impacts to other resources and to avoid conflicts with other uses.  See AR 211517-211521.

The plaintiffs object to BLM decisions "reducing" rather than "minimizing" impacts. Pl. NEPA SJ Memo at 14 n.11.  While BLM's regulations direct it to "minimize" damage to resources, harassment of wildlife, and conflicts with other uses, the regulations do not define or describe "minimize."  The CEQ's NEPA regulations are instructive. They define "mitigation" to include "minimizing impacts by limiting the degree or magnitude of the action and its implementation."  40 C.F.R. § 1508.20 (emphasis added).  To

---

[19]  A second ruling, Sierra Club v. Clark, 774 F.2d 1406, 1409-10 (9th Cir. 1985), upheld BLM's exercise of discretion to balance OHV use in the CDCA with ecological concerns as "a reasoned approach to a difficult balancing act mandated by Congress."  The court again noted that "an agency's interpretation of its own regulations is entitled to a high degree of deference."  Id. at 1408.  The agency decision "is a proper exercise of BLM's discretion in providing for combined use of the desert.  It seeks to balance desired use and ecological concerns through the imposition of permit and mitigation requirements," noting that harm could not be prevented but that the impacts could be minimized.  Id. at 1409-10.  The court approved BLM's "reasoned approach to a difficult balancing act mandated by Congress."  Id.

1   "minimize" environmental impacts under NEPA means "limiting the degree or magnitude." The term does

2   not mandate that BLM prohibit or restrict all OHV use if there is any potential for conflict with another

3   resource or use. Any such interpretation would contravene FLPMA's authorization of OHV use and Ninth

4   Circuit cases upholding BLM discretion to balance multiple uses of the CDCA. BLM specifically included

5   "minimize" in the Decision Tree flowchart, and the directive to minimize and limit impacts is clear

6   throughout the narrative description of the Route Designation Methodology. "Minimize" also is used

7   extensively in the Motorized Access Zones Issues and Goals Table in the EA and FEIS. AR 211396-

8   211403; AR 201933-201840. BLM's reasonable interpretation of its regulations must be given "controlling

9   weight unless it is plainly erroneous or inconsistent with the regulation" itself. Thomas Jefferson Univ. v.

10  Shalala, 512 U.S. 504, 512 (1994). Because BLM's interpretation of its own "minimization" regulation is

11  neither plainly erroneous nor plainly inconsistent with the regulation, it is entitled to judicial deference and

12  must be given effect by this court. See Auer v. Robbins, 519 U.S. 452, 461 (1997).

13          The plaintiffs submit that, even if BLM identified "special circumstances" in the Footnotes, neither

14  the Decision Tree nor the supporting record documents how BLM considered those resources or whether

15  route designations changed as a result. Pl. NEPA SJ Memo at 15. This assertion is demonstrably wrong,

16  as illustrated by the list of nearly 5200 routes in Appendix C to the 2003 EA, AR 211584-AR 211725, along

17  with the supporting individual Decision Records. See, e.g., AR 213027-213073 (El Mirage subregion,

18  including desert tortoise avoidance). Hundreds of routes were closed, based on the "Specific Comments"

19  column, which lists impacts to desert tortoise habitat and Barstow woolly sunflower, as two examples.

20          The plaintiffs submit that BLM's Decision Tree "improperly elevated consideration of motorized

21  vehicle access over all other factors." Pl. NEPA SJ Memo at 16-17. The preceding discussion refutes this

22  charge. BLM carefully examined the location and use of every single route, based on current mapping and

23  detailed inventories of resources, then applied a rational set of analytical criteria to determine if the route

24  should be open or closed. The 2003 EA (Table 2-3) lists the goals of the MAZ process and contains

25  extensive references to ensure that the route designation will "minimize" conflicts with other resources and

26  uses, including protection of the desert tortoise and other sensitive species. AR 211396-211403.[20] Table

27  ──────────────

28  [20]  Appendix C to the 2003 EA shows that BLM decided to close a substantial number of routes, often
    because the regulatory criteria "elevated" those other factors over motorized vehicle access. AR 211584-

1    2-7 of the EA indicates that 4,069 miles were surveyed (not including the Juniper and Ridgecrest

2    subregions), with 1,987 (49%) recommended closed and 2,082 miles (51%) opened.  AR 211416.  These

3    extensive closures completely refute the charge that BLM "improperly elevated" OHV use over other uses

4    and resources.  BLM applied the regulatory criteria to benefit many resources and adopted a well-

5    documented, rational decisional process based on individual treatment of each route, with no bias toward

6    OHV use.  The assertion that the "Decision Tree is the exclusive standard for route designations, and allows

7    – indeed, requires – designation of routes without considering other public lands resources and minimizing

8    impacts to them," Pl. NEPA SJ Memo at 17, is contradicted by the evidence in the record and could <u>not</u> be

9    more wrong.  Approximately 49% of closures reflected redundant routes, clearly showing BLM's decision

10   to limit OHV use.  BLM fully complied with its regulations, and any minor flaws could not negate BLM's

11   substantial compliance.  <u>See</u> <u>Sagebrush Rebellion v. Hodel</u>, 790 F.2d 760, 765-66 (9th Cir. 1986).

12       **B.     BLM's Decisions Are Fully Supported by the Administrative Record**

13       The plaintiffs assert that route designations are not supported by the record.  Pl. NEPA SJ Memo

14   at 17-19.  They assert that the information collected in the "Box" effort, which included "numerous resource

15   attributes associated with ORV routes," is missing from the record "because there is not consideration of

16   the resources BLM is legally required to consider, and if those resources were considered elsewhere there

17   is no evidence of it in the record."  <u>Id</u>. at 18-19.  As BLM has explained in the background above and in

18   briefing over supplementing the administrative record, the Box effort was deeply flawed and could not

19   support rational decision-making. Haigh Declaration, Doc. 84-2, ¶¶ 20-23.  BLM relied on thorough, state-

20   of-the-art GIS mapping and ground-truthed surveys to compile real-world resource data along routes of

21   travel throughout WEMO.  The 2003 EA and 2005 FEIS examined every resource of concern.  Using the

22   flawed Box process would have been arbitrary and capricious, while the Decision Tree process epitomizes

23   rational, well-supported, well-documented decision-making that satisfies the APA and <u>Lands Council</u>.

24

25   ────────────────

26   211725.  While the plaintiffs assert that 638 routes were left open under Pathway SO-5 in the Decision
     Tree flowchart, the Route Designation Table shows that 1,033 routes were <u>closed</u> under this pathway –
     62% of the total of 1671 routes assessed – clearly negating any notion that the process favored unfettered

27   OHV access at the expense of other resources.  Moreover, for many routes left open, an existing legal right-
     of-way to access private land prevented closure.  <u>See</u> <u>Western Watersheds Project v. Matejko</u>, 468 F.3d

28   1099, 1104-06, 1110 (9th Cir. 2006)(recognizing valid historic rights-of-way).

1    The plaintiffs also assert that the record contains "no reasoned analysis of the likely direct, indirect,

2    and cumulative impacts of these resources from the designation of specific routes."  Pl. NEPA SJ Memo

3    at 18.  They contend that the regional treatment of impacts, rather than 5200 separate environmental

4    assessments and records of decision, is flawed under FLPMA and arbitrary and capricious.  Two points

5    refute this charge.  First, the Decision Tree and 2003 EA treated every route on a site-specific and resources-

6    specific basis.  Individual recommendation sheets for all routes provide specific evidence for each route,

7    including any special considerations.  BLM provided a summary of the results of the analysis in Appendix

8    C to the 2003 EA, and the record contains all individual Decision Records.  Second, BLM incorporated the

9    results into the EA, then in the plan-wide EIS, subjecting its proposals to extensive internal and public

10   review to comply with both NEPA and FLPMA.  BLM need not prepare both a region-wide WEMO Plan

11   and individual environmental assessments and records of decision for 5,200 routes.  Headwaters v. BLM,

12   914 F.2d 1174, 1183 (9th Cir. 1990)("no authority suggests that a site-specific analysis is required when the

13   regional plan complies with the application multiple use requirements" under FLPMA).  The EA and FEIS

14   properly assess impacts on all resources, including sensitive resources and species of concern.

15       **C.    BLM Properly Designated Routes in Other Areas of the WEMO Plan**

16       The plaintiffs contest route designations in areas not evaluated by the Decision Tree and assert that

17   the route inventory is outdated.  Pl. NEPA SJ Memo at 19. They acknowledge that BLM reviewed these

18   lands outside the "redesign area" to ensure that they were compatible with the WEMO Plan's conservation

19   strategy, but they complain that the ROD and EIS do not explain or document how this was done.  BLM

20   properly considered routes throughout WEMO.  The Public Land Motorized Vehicle Access Network in

21   the FEIS reviewed the existing network of designated routes and revised them as necessary.  AR 201825.

22   BLM listed five examples of this review process.  AR 201842-201843.  The record confirms that BLM

23   applied the minimization criteria in making these decisions.  "The addition of these short routes is intended

24   to minimize some route proliferation through sensitive resources that is occurring" in one subregion, and

25   routes in another subregion, previously left open, were closed expressly "in accordance with 43 CFR

26   8342.1(3)."  Id.  Even though routes outside the redesign area were not subjected to the Decision Tree

27   analytical process, the Decision Tree was never as a stand alone method, but constitutes one tool of analysis

28   later subjected to the broader review of impacts under NEPA.  The FEIS examined impacts of OHV use on

1   plant and animal species, cultural resources, and other resources of concern, regardless of where in the

2   WEMO Plan area they exist and regardless of which route network was applicable, whether the 1985-87,

3   the ACEC, Ord Mountain Pilot Project, or the Decision Tree.

4   **D.    BLM Did Not Arbitrarily Approve "Illegal" Routes**

5          The plaintiffs insist that the route designations are arbitrary and capricious because BLM ignored

6   the "ban on post-1980 routes in the CDCA Plan" and failed to provide a reasoned explanation for doing so.

7   Pl. NEPA SJ Memo at 19-20.  They contend that BLM should examine the routes that pre-dated the 1980

8   CDCA Plan.  They submit that to do otherwise would amount to "legitimizing hundreds, if not thousands,

9   of illegally created routes," which cannot be squared with its obligations under FLPMA, and contend that

10  the record has no explanation to justify allowing these "illegal" routes to remain open.  Id.

11         The plaintiffs' description of these routes as illegal is incorrect.  BLM initially adopted OHV routes

12  based on incomplete inventories from the late 1970s (AR 230282) as an *interim* network.  Those routes were

13  represented as such through publication of access maps to the area, with adoption of the CDCA Plan and

14  later Federal Register Notices updating the interim management network.  A comprehensive inventory with

15  pre-plan "baseline" data that the plaintiffs now demand (such as the Decision Tree process, formal route

16  designation efforts such as the 1985-87 route designation process, or land use plan amendment like the 2003

17  WEMO route designation) simply did not exist.  BLM used information developed and relied on for over

18  20 years to prepare the 2003 route designation effort for the WEMO Plan area.  But neither FLPMA nor

19  NEPA requires that BLM impose a blanket closure on all routes and restore them to pre-1980 status.

20  Instead, FLPMA directs BLM to prepare and maintain a current inventory of resources, including outdoor

21  recreation uses such as OHV routes.  BLM has done so through the route designation process and the

22  WEMO Plan and FEIS.[21]  Many (perhaps most) routes to which plaintiffs object were created before the

23  1980 CDCA Plan.  Many routes were established for historic mining or authorized OHV activities such as

24  old motorcycle race routes permitted before BLM established "open" areas.  Regardless of when a route was

25

26  ────────────────────

27  [21]  An inventory of resources under FLPMA does not amend a management plan or constitute a major
    federal action.  State of Utah v. Babbitt, 137 F.3d 1193, 1214 (10th Cir. 1998).  Moreover, "neither NEPA

28  nor FLPMA require that BLM perform a new wilderness inventory each time BLM develops an RMP,..."
    Oregon Natural Desert Ass'n v. Shuford, 2007 WL 1695162 * 6 (D.Or. 2007).

1   created, BLM undertook a comprehensive, analytical, ground-truthed assessment using the Decision Tree
2   process, examining routes individually for possible impacts to resources and documenting rational decisions
3   for each route.  BLM explained its method in the 2003 EA and the 2005 FEIS and included individual
4   decision sheets for each route as part of the administrative record.  That process and record documentation
5   easily satisfies BLM's statutory responsibilities under FLPMA, NEPA, and the APA.[22]

6   **III.     PLAINTIFFS' NEPA CLAIMS LACK MERIT**

7            The plaintiffs allege that the 2003 route designation EA and the 2005 FEIS for the WEMO Plan
8   do "not analyze a full range of alternatives, include a proper and accurate 'no action' alternative, or
9   adequately analyze the impacts of the proposed action on the resources of CDCA."  Second Amended
10  Complaint (Doc. 214), ¶ 114.  They also allege that BLM failed to consider mitigation measures to reduce
11  impacts.  The court must apply the APA standard of judicial review in Lands Council.  As long as the
12  agency "provides a full and fair discussion of environmental impacts and its EIS includes these necessary
13  components, [the agency] has taken the requisite 'hard look.'"  Id. * 17.[23]

14           **A.      BLM Considered a Reasonable Range of Alternatives**

15           NEPA and the CEQ regulations require an agency to consider the environmental impact of a

16

17  _____

18  [22]  For the Motorized Vehicle Access/Transportation element of the 1980 CDCA Plan, the limited use
    (Class L) classification originally allowed motorized use on approved routes of travel.  Existing routes of
19  travel were closed unless specifically designated open.  The 1980 CDCA Plan, amended in 1983, approved
    motorized vehicle use on all existing routes until formal designation could occur.  There were no "illegal"
20  routes in 1982 because, at that time, BLM amended the CDCA Plan to authorize motor vehicle use of all
    preexisting routes.  These routes were authorized until further designation actions.
21
22  [23]  This court also directed the parties to address the Ninth Circuit's opinion in ONDA, 531 F.3d 1114 (9th
    Cir. 2008).  ONDA, like this case, concerns a BLM land management plan approved under FLPMA and
23  concerns both OHV and grazing impacts.  There is one a fundamental difference between the two cases,
    however, which precludes any possible application of that ruling to WEMO.  ONDA concerned a complete
24  failure by BLM to address the wilderness characteristics of the lands, as incorporated into FLPMA from
    the 1964 Wilderness Act.  As is evident throughout the ONDA ruling, the basis for the holding that BLM
25  failed to comply with FLPMA's inventory requirement and failed to prepare an adequate EIS under NEPA
    resulted directly from the agency's refusal to acknowledge the relevance of the wilderness concerns.
26  BLM's WEMO Plan and FEIS in this case, in contrast, do not involve any wilderness considerations.  The
    plaintiffs have not alleged, much less proven, that BLM has failed to conduct the requisite analysis
27  regarding wilderness resources.  As a result, ONDA simply has no application or relevance in this case to
    the WEMO Plan under FLPMA or the BLM FEIS under NEPA.
28

1  proposed action.  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.14.  NEPA requires the agency to examine a

2  reasonable range of alternatives, but not all possible alternatives, based on the purpose and need for the

3  action.  Westlands Water Dist. v. U.S. Dep't of the Interior, 376 F.3d 853, 868 (9th Cir. 2004); see Vermont

4  Yankee Nuclear Power Corp. v. Natural Resources Defense Council, 435 U.S. 519, 551-53 (1978);

5  Resources, Ltd. v. Robertson, 35 F.3d 1300, 1307 (9th Cir. 1993); Headwaters, Inc. v. Bureau of Land

6  Management, 914 F.2d 1174, 1181 (9th Cir. 1990), reh'g denied, 940 F.2d 435 (1991).[24]

7       The purpose and need for the WEMO Plan is to establish "a regional biological strategy to conserve

8  plan and animal species and their habitats and present future listing" and to provide for "an efficient,

9  equitable and cost-effective process for complying with threatened and endangered species law."  AR

10  200058.  The WEMO Plan "addresses over 100 species of plants and animals, designates Areas of Critical

11  Environmental Concern and other special management areas specifically designed to promote species

12  conservation, designates routes of travel on the public lands, and establishes other management prescriptions

13  to guide grazing, mineral exploration and development, recreation, and other public land uses."  Id.

14       The plaintiffs claim that BLM did not assess a reasonable range of alternatives, asserting that all

15  action alternatives assessed the same ORV routes, Pl. NEPA SJ Memo at 21, and "considered the same

16  5,098 mile route system."  Pl. NEPA Reply at 17:27-28.  This is incorrect.  The alternatives are not limited

17  to OHV routes, which are only one aspect of each alternative's regional conservation strategy.  Even so,

18  they vary widely in their approaches for managing OHV routes in WEMO.[25]  These options represent vastly

19

20  [24]  An EIS "need not consider an infinite range of alternatives, only reasonable or feasible ones."  City of

21  Sausalito v. O'Neill, 386 F.3d 1186, 1207 (9th Cir. 2004); quoting City of Carmel-by-the-Sea v. U.S. Dep't of Transp., 123 F.3d 1142, 1155 (9th Cir. 1997); 40 C.F.R. § 1502.14(a)-( c).  The rule of reason "guides

22  both the choice of alternatives as well as the extent to which [an EIS] must discuss each alternative."  City of Sausalito, 386 F.3d at 1207.  The range of alternatives relates to the agency's goals and objectives for

23  the project set forth in the purpose and need statement of the EIS.  Carmel, 123 F.3d at 1155.  A "proposed

24  alternative is reasonable only if it will bring about the ends of the federal action" measured by whether it fulfills the goals the agency sets out to achieve.  Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190,

25  195 (D.C. Cir. 1991), citing City of Angoon v. Hodel, 803 F.2d 1016, 1021-22 (9th Cir. 1986); Westlands Water Dist., 376 F.3d at 865-68; CBD II, 422 F.Supp.2d at 1159-60.

26

27  [25]  Alternative A proposed a comprehensive habitat conservation plan (HCP) on all public and private

28  lands.  Alternative B (selected by the ROD) limited measures to BLM-only public lands because the HCP including private lands was not complete.  Alternative C would adopt measures outlined by the FWS Desert Tortoise Recovery Plan, while Alternative D (environmentally preferred) emphasized conserving

1   different approaches toward achieving the purposes and goals of the WEMO Plan.  See AR 202573

2   (Response to Topical Comment 6d).  The alternatives provided BLM and the public with a broad range of

3   approaches to managing the WEMO Planning Area.  See Bering Strait Citizens for Responsible Resource

4   Development v. U.S. Army Corps of Engineers, 511 F.3d 1011, 1028 (9th Cir. 2008).[26]

5              **B.      BLM Properly Relied on a No Action Alternative and Baseline**

6              The plaintiffs alleged that the EA and FEIS do not prescribe a clearly defined "baseline" from which

7   to compare the analysis of potential impacts of the route designation alternatives.  Pl. NEPA SJ Memo at

8   23.  They assert that the "correct baseline under the CDCA plan would be the subset of routes existing in

9   1980 and meeting the other criteria for use."  Id.  Their arguments are untenable.  They rely on American

10  Rivers v. FERC, 201 F.3d 1196 (9th Cir. 2000), a case that supports BLM's position.  The Ninth Circuit held

11  that the baseline is "not an independent legal requirement" under NEPA, but instead a practical analytical

12  tool to identify the environmental consequences of a proposed agency action.  201 F.3d at 1195 & n.15.[27]

13  ─────────────────

14  ecosystems and natural communities to conserve and protect sensitive plants and animals by proposing to

15  *eliminate* all use of dirt bikes, ATVs, quads, dune buggies and sand rails in Desert Wildlife Management
    Areas (DWMAs), limiting routes to "street legal" vehicles less likely to degrade habitat and travel cross

16  country, imposing vehicle quarantines during droughts, and limiting stopping, parking and camping.
    Alternative E would greatly *expand* recreational use, with only one designated DWMA, opening thousands

17  of acres to OHV use.  Alternative F focused on desert tortoise protection through management of disease

18  control and raven predation.  Alternative G (no action) would maintain the network of existing
    conservation strategies, including the existing OHV route designation.

19  [26] The plaintiffs claim that BLM failed to consider or summarily rejected four "obvious" alternatives.  Pl.

20  NEPA SJ Memo at 22.  The make absolutely no effort to explain how any of these would meet the WEMO
    purpose and need and why they present a more "reasonable" approach than those options that BLM

21  selected through public scoping. A plaintiff's NEPA participation, to be meaningful, must alert the agency

22  of its contentions.  City of Sausalito, 386 F.3d at 1208; City of Angoon v. Hodel, 803 F.2d 1016, 1022 (9th
    Cir. 1986); Morongo Band of Mission Indians v. FAA, 161 F.3d 569, 576-577 (9th Cir. 1998); accord,

23  Vermont Yankee Nuclear Power v. Natural Resource Defense Council, 435 U.S. 519 (1978).  To the extent

24  that they did comment, BLM properly considered and responded in the FEIS and in response to protests
    after the ROD.  AR 202619 (Response to Comment 182-25); AR 300341-300354 (CBD Protest); AR

25  300177-300187 (Response to CBD Protest).

26  [27] The Ninth Circuit in American Rivers relied on CEQ guidance:

27              There are two distinct interpretations of "no action" that must be considered,
            depending on the nature of the proposal being evaluated.  The first situation might involve

28              an action such as updating a land management plan where ongoing programs initiated under
            existing legislation and regulations will continue, even as new plans are developed.  In these

1   The purpose of a baseline analysis is to enable the agency decision maker and the public to <u>compare</u> the

2   various alternatives as "the heart of the environmental impact statement."  40 C.F.R. § 1502.14.  The no-

3   action alternative provides "a baseline against which the action alternatives are evaluated."  <u>Friends of

4   Southeast's Future v. Morrison</u>, 153 F.3d 1059, 1066 (9th Cir. 1998).[28]  The baseline data in the DEIS and

5   FEIS enabled both the public and BLM decision-maker to compare the relative impacts among the

6   alternatives, when compared to impacts expected under baseline conditions.

7        **C.    BLM Properly Identified, Considered, and Implemented Mitigation Measures**

8            The plaintiffs submit that the EA and FEIS do not "address whether the implementation measures

9   included as part of the action will actually be effective in preventing further expansion of illegal ORV

10  routes."  Pl. NEPA SJ Memo at 24.  While conceding that BLM discussed mitigation, they question whether

11  route designations will be enforced effectively.  <u>Id</u>.  This objection cannot withstand scrutiny.  CEQ

12  regulations prescribe an agency duty to address mitigation[29] with appropriate measures "not already

13  _____

14      cases "no action" is "no change" from current management direction or level of
        management intensity.  <u>To construct an alternative that is based on no management at all
15      would be a useless academic exercise.  Therefore, the "no action" alternative may be
        thought of in terms of continuing with the present course of action</u> until the action is
16      changed.

17  Forty Most Asked Questions Concerning CEQ's NEPA Regulations, 46 Fed. Reg. 18026-38 (Mar. 23,
    1981)(emphasis added), <u>cited with approval</u> in 201 F.3d at 1200 & n.21.  That ruling applies to BLM's
18  decision in WEMO to compare impacts of alternatives for OHV route designation to the current
    environment, rather than recreating hypothetical, unknowable WEMO land use patterns that existed in
19  1980 when the CDCA was adopted.  This court reached a similar conclusion in <u>CBD II</u>, 422 F.Supp.2d at
    1157-58 (quoting CEQ's Forty Questions and upholding BLM's exclusion of interim closures).
20

21  [28]  BLM's baseline update for OHV routes in the FEIS does not violate NEPA or the CEQ regulations.
    BLM did so because of the intervening CDCA plan amendment adopted on June 30, 2003, which amended
22  the route designations from the 1985-87 and ACEC route designations.  The June 2003 Decision Record
    was issued shortly after BLM published the Draft EIS in May 2003, but well in advance of when the Final
23  EIS was published in January 2005, so that there was ample opportunity for public review and comment.
    The <u>environmental</u> "baseline" did not change in any significant way, and the impact analyses for the
24  alternatives in the 2005 FEIS were unaffected.  This is entirely proper.  <u>Half Moon Bay Fisherman's
    Marketing Ass'n v. Carlucci</u>, 857 F.2d 505, 508 (9th Cir. 1988).
25

26  [29]  "Mitigation" includes (a) avoiding impacts by not taking an action, (b) limiting the degree of magnitude
27  of the action, (c) repairing, rehabilitating, or restoring the environment, (d) reducing or eliminating the
    impact over time by preservation and maintenance, and (e) compensating for impact by replacing or
28  substituting resources.  40 C.F.R. § 1508.20.

FEDERAL DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT                27                CASE NO. 3:06 CV-04884 SI

1   included in the proposed action or alternatives," 40 C.F.R. § 1502.14 (f), and identifying means "to mitigate

2   adverse environmental impacts (if not fully covered under § 1502.14 (f))."  40 C.F.R. § 1502.16 (h).

3       The WEMO Plan developed conservation strategies for listed species, and mitigation measures

4   appear throughout the FEIS.  See, e.g., AR 201722-201727 (mitigation fees); AR 201745-701754 (desert

5   tortoise take-avoidance measures and survey protocols); AR 201863-201891.  These measures offer

6   practical, constructive means to avoid adverse impacts and promote conservation and recovery for listed

7   and sensitive species.[30]  The plaintiffs emphasize closures of "illegal route proliferation" in WEMO,

8   asserting that the "efficacy of many of BLM's proposed measures" lacks supporting data and that OHV

9   route designations "have not been respected" in the past.  Pl. NEPA Reply at 20-21, citing Ecology Center

10  v. Austin, 430 F.3d 1057 (9th Cir. 2005).  That contention, however, is foreclosed by the unanimous

11  Supreme Court ruling in Robertson v. Methow Valley, 490 U.S. 332, 348 (1989), reversing a Ninth Circuit

12  ruling that demanded "the presence of a fully developed plan that will mitigate environmental harm before

13  an agency can act."  Id. at 353.  Methow Valley constitutes the law-of-the-land and controls the outcome

14  here, especially since the Ninth Circuit explicitly overruled Ecology Center v. Austin as NEPA precedent

15  in Lands Council, 2008 WL 2640001, *17.  An agency "is not required to develop a complete mitigation

16  plan detailing the precise nature" of mitigation measures.  Bering Strait, 511 F.3d at 1028, citing National

17  Parks & Conservation Association v. Babbitt, 241 F.3d 722, 734 (9th Cir. 2001).  The FEIS discussed

18  potential mitigation measures, and NEPA does not require an agency to prove "that the implementation

19  measures in the route designations will actually work."  No. Alaska Envtl. Ctr. v. Kempthorne, 457 F.3d

20  969, 979 (9th Cir. 2006), citing Methow Valley, supra.

21      **D**.      **BLM Adequately Analyzed All Impact Assessments**

22      The plaintiffs insist that BLM must "prepare and maintain on a continuing basis an inventory of all

23  public lands and their resources and their values."  Pl. NEPA SJ Memo at 26, citing 43 U.S.C. § 1711(a).

24  _____

25

26  [30]  BLM describes mitigation measures in FEIS Appendix C–Implementation Tasks, AR 204532-204597,
    identifying funding assumptions and needs to carry out the plan, estimated at $79 million over 30 years.

27  AR 204534.  That document provides a Draft Implementation Plan for the Desert Tortoise and Mohave
    Ground Squirrel, AR 204563-204597.  BLM addressed the plaintiffs' challenge the agency's funding

28  commitment in response to comments.  AR 202566-204567 (Topical Comment 1).

1    They aver that approving the WEMO Plan based on "outdated and inadequate inventories" is arbitrary and

2    capricious, citing this court's ruling in the Imperial Sand Dunes case, <u>CBD II</u>, 422 F.Supp.2d at 1167.  There

3    is no merit to this contention.  BLM prepared and maintained an extensive inventory of both public lands

4    and the many resources throughout the WEMO planning area, which satisfies the FLPMA directive.  The

5    FEIS incorporates detailed appendices and a wealth of scientific literature that informed the NEPA process

6    and constitutes a current, comprehensive inventory of data and information concerning all resources.  This

7    stands in stark contrast to the BLM plan and EIS that the Ninth Circuit set aside in <u>ONDA</u>, where the court

8    held that the agency improperly found that wilderness values were outside the scope of the plan and

9    declined to consider those wilderness values.  531 F.3d at 1123-24.  Moreover, unlike the inventory found

10   lacking in <u>CBD II</u>, the WEMO FEIS provides a comprehensive and reliable database of affected resources.

11          **1.     Soils.**  The plaintiffs acknowledge that the FEIS identifies potential OHV impacts

12   on soils, but insist that BLM must provide a more detailed discussion of soils on existing open routes.  They

13   also complain that the FEIS fails to discuss grazing impacts.  Pl. NEPA SJ Memo at 26.  To the contrary,

14   the AR and FEIS are more than adequate.[31]  BLM conducted soil inventories in a number of areas

15   throughout WEMO, starting with the 1980 CDCA Plan.  AR 222040-222041 (analyzing other impacts on

16   soils such as grazing); AR 201986-201990 (regional overview of geology and soils).  BLM also discussed

17   impacts from OHV use, including vehicle-dust generation and soil compaction.[32]

18

---

19   [31]  The 2005 FEIS states that "OHVs impact soils properties in several ways.  OHVs increase soil

20   compaction, which in turn effects infiltration and water erosion, soil moisture, wind erosion, and soil

21   chemistry."  AR 222490-222491.  The FEIS notes that most desert soils "are susceptible to intense

      compaction if driven across a sufficient number of times.  Places heavily used by OHVs such as pit areas,

22   trails, and hillclimbs generally are intensely compacted."  <u>Id.</u> at 222491.  Compaction depends on factors

      such as vehicle type, amount of activity, and soil water present.  <u>Id.</u>  That discussion acknowledges adverse

23   impacts from OHV use along routes and in open areas, which is precisely what the public disclosure

      function of NEPA is designed to achieve, and it also furthers the companion objective of informing the

24   BLM decision-maker.  Similarly, the 2003 EA for the route designation provided a detailed discussion of

25   soils in WEMO and the surrounding areas.  AR 211423-211426.

26   [32]  The FEIS analyzed soil-related impacts: habitat restoration credits involving soil and other restoration

      criteria, AR 201727-201731; soil stabilization in DWMAs, including revegetation and control erosion by

27   wind and water, AR 201748; soil infiltration and permeability rates and maintenance of microbiotic crusts

      to implement public land health standards, AR 201908-201810; OHV impacts to soils, AR 202057, AR

28   202232-202233; soil types favored by particular species, including the desert tortoise, AR 212856 -

---

1        **2.    Cultural Resources.**  The plaintiffs contest BLM's cultural resources assessment.

2   Pl. NEPA SJ Memo at 27.  While they concede that the EA and FEIS identify adverse impacts to

3   archeological sites and other cultural resources adjacent to open ORV routes, they complain about the level

4   of detail for some sites.  This contention fails.  First, the objection is too vague to satisfy the rudimentary

5   notice requirements under <u>Vermont Yankee</u>, as they fail to identify even a single cultural resource or site

6   of concern.  Second, the record documents BLM's thorough treatment of cultural resource impacts.  AR

7   221935-36; 221941-42.  BLM applied the Decision Tree analysis by subjecting individual route decisions

8   to the cultural resources review.  AR 204875.  BLM also included a detailed discussion of cultural resources

9   in the 2003 EA.  AR 211478-211487.[33]  The FEIS also provided additional details regarding the status of

10  cultural resources and ongoing efforts to identify and protect such resources from human use, including

11  OHVs.  AR 202209-202224;  AR 202349-202358; AR 202422, AR 202446; AR 202351.

12       **3.    Biological Resources**.

13           **a.    Riparian Resources/Uniform Plant Assemblages/Water Quality.**  The

14  1980 CDCA Plan contains goals for "unusual plant assemblages" (UPAs) and wetland-riparian areas, but

15  the plaintiffs insist that BLM must prepare and maintain an "inventory" of current information on these

16  resources, Pl. NEPA SJ Memo at 28, and submit BLM failed to provide sufficiently detailed information

17  concerning impacts to riparian areas from route designation or grazing.  <u>Id.</u> at 29.  These claims cannot

18  prevail.  The "inventory" issue arises only under FLPMA, not NEPA.  43 U.S.C. § 1711(a).  This court has

19  ruled that "FLPMA does not require that the BLM have current inventory data on every species potentially

20  in the [plan area] prior to approving" the resource management plan.  <u>CBD II</u>, 422 F.Supp.2d at 1167.  The

21  WEMO Plan encompasses 9.3 million acres, including 3.3 million acres of public lands administered by

22  BLM.  AR 200046.  A broad, plan-wide EIS need not address in specific detail every single resource at

23  every location that the plaintiffs demand, and this court ruled that "directives in management plans, such

24

25  212858; AR 212871 - 212877; and grazing restrictions, AR 202254-202256, AR 202322.

26

27  [33]    BLM reviewed existing data, inventory reports, site records, and information from the State of
    California Office of Historic Preservation.  AR 211481-211482; AR 211282-211284.  The EA discusses

28  cultural resources, AR 211516-211525, noting that route activity affecting such resources "should not be
    undertaken until cultural resources inventories and evaluations have taken place."  AR 211525.

1    as directives to monitor and study species, are not legally enforceable." CBD II, 422 F.Supp.2d at 1167,

2    citing Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 69-80 (2004).

3         The WEMO Rangeland Standards of Public Land Health require "healthy, productive and diverse

4    habitats for native species, including…UPAs…maintained in places of natural occurrence" and protect

5    wetland systems and hydrologic conditions, including vegetative cover to protect banks and dissipate peak

6    water flows, soil stabilization, and cover to protect native plant species. AR 201809–201810. The 1980

7    CDCA Plan identified plant communities associated with water as UPAs including mesquite thickets, salt

8    and brackish water marshes, seeps and springs, palm oases, and riparian and river bottomland. AR 202689.

9    The Plan addresses the "Proper Functioning Conditioning of riparian areas, particularly where these are

10   within grazing allotments." Id.[34] The Rangeland Standards of Public Land Health measures include shade

11   for stream courses, water sources for riparian dependent species, stream channel meandering for soils and

12   geology, and organic matter to protect sites and replenish soil nutrients through decomposition.

13   AR202764–202766. The record demonstrates that BLM prepared and maintained a sufficient inventory of

14   wetlands resources in the FEIS to satisfy any possible requirement under FLPMA and NEPA.

15        The FEIS also addresses groundwater, including regional water quality, AR 210990–210994, and

16   BLM's Rangeland Standards of Public Land Health provide that both surface water and groundwater

17   management must comply with the Clean Water Act and applicable water quality requirements, including

18   California State Standards. AR 201810. The FEIS also discusses water quality and groundwater impacts,

19   including grazing standards and guidelines. AR 202233–202235. The plaintiffs can identify no relevant

20   specific information or analysis that BLM failed to include.

21             **b.    Spread of Non-Native Invasive Plants**. The plaintiffs allude to OHV use

22

23   _____

24   [34] The FEIS contains a four-page discussion devoted to water and water-related resources. AR 201990-
     201994. The "planning area is one of the most arid areas on the nation," making water supply "the single
25   most important resource," with surface water very scarce and most listed or sensitive species dependent
     on the presence of groundwater. AR 201990. The FEIS contains a separate detailed listing (i.e., an
26   "inventory") of plants found in the planning area. AR 202114-202126. For each species, BLM
     summarizes the life history, population status in the planning area, regulatory status, and threats affecting
27   the plant. Id. The threats to plants include OHV travel(Barstow Woolly Sunflower, four species of
     Carbonate Endemics, Crucifixion Thorn, Lane Mountain Milkvetch). AR 202115-202117, 202120. For
28   each alternative, the FEIS discusses the potential impact on plants and water resources.

1    land grazing as activities with "the potential for spread of weeds and noxious plants" and contend that BLM

2    did not address this issue.  Pl. NEPA SJ Memo at 30.  The FEIS refutes this charge.  Dr. Boarman's

3    "Threats" analysis document, Appendix J to the FEIS, addresses invasive plant concerns for the desert

4    tortoise. The tortoise "take-avoidance" mitigation measures include avoiding invasive weeds in landscaping

5    in or near DWMAs.  AR 201747.  The FEIS discusses measures "to restore degraded habitats infested with

6    invasive weeds (e.g., tamarisk) prescribed burning may be utilized as a tool for restoration."  AR 201811;

7    see also AR 202025; AR 202088; AR 202261.[35]

8              c.        **Threatened, Endangered, Rare, and Sensitive Species**.  The FEIS contains

9    extensive discussions of sensitive species, see AR 201627; AR 201960; AR 201967 (listing federally and

10   state-listed species), and the impact analysis for Alternative A (Proposed Action), provides a comprehensive

11   review of all listed and sensitive species.  AR 202236–202304. The plaintiffs identify only three species –

12   of more than 100 species covered by the WEMO Plan – for which they contend that BLM's NEPA analysis

13   is insufficient.  None of their objections has any merit.

14   Mojave Fringe-toed Lizard.  The USGS species account for the "MFTL" cites 39 studies provided

15   to the WEMO team.  AR 204473–204478.  The FEIS discusses the species' conservation needs, AR 201779,

16   and lists nine specific conservation actions, AR 201780.  The FEIS states that "existing open roads do not

17   appear to be impacting this species because of the very light use, but are not appropriate for conservation

18   of the habitat for this vehicle-sensitive species."  AR 202289.  While OHV use can be a threat, it does not

19   present a problem in this particular location outside of the DWMAs.  This disclosure of potential adverse

20   impacts is fully consistent with NEPA.  The plaintiffs cannot refute BLM's assessment, and they ignore the

21   fact that the WEMO Plan closes routes to benefit this species and consolidates other routes and sandy

22   washes, which benefit the Mojave fringe-toed lizard and its habitat.  AR 202289.

23

24

25

─────────────────────

26   [35]  The FEIS notes that "casual use by off-highway vehicles could damage or destroy known sites and
     promote the spread of invasive weeds," AR 202298, and notes the importance of implementing a route
27   network (the proposed action) to reduce potential spread of invasive weeds.  The FEIS also discusses
     "vehicles and weeds" and grazing.  AR 202643; AR 202765.  BLM identified and analyzed this issue in
28   its NEPA documents, addressing the concern and proposing mitigation to alleviate potential effects.

1    Mohave ground squirrel.  The plaintiffs fail to allege or identify any specific flaws in BLM's NEPA

2    analysis, and there are none.  The USGS species account cites 17 studies, AR 204216–204222, and the FEIS

3    contains a 25-page general background and baseline description of the MGS, AR 202074–202099, including

4    recent survey data collected from 344 field transects.  AR 202079-85.  BLM's impact analysis is thorough.

5    AR 202269-202274, AR 202375-202378; 202394-202398; 202417-202417; 202441-202443; 202471-

6    204473; and 202484-204486.  This detailed analysis in the FEIS easily satisfies NEPA.

7    Barstow woolly sunflower.  The USGS species account cites 31 studies.  AR 204272–204279.  The

8    WEMO Plan prescription cited, AR 201821-201824, indicates that voluntary relinquishment of grazing

9    allotments could benefit the BWS.  AR 202293.  The "proposed core reserve would allow coordinated

10    management of BLM and CDFG lands northeast of Kramer Junction for conservation. Route designation

11    in this area would benefit the Barstow woolly sunflower over the existing situation because larger blocks

12    of undisturbed habitat would be created."  This NEPA analysis informs the public and the BLM decision-

13    maker of potential impacts and a clear benefit of this alternative.[36]

14        **E.      Air Quality**

15    The plaintiffs concede that NEPA documents recognize the potential threat to human health caused

16    by Respirable Particulate Matter (PM10), Pl. NEPA SJ Memo at 31, and that dirt roads in the desert can add

17    to the impact, but they contest the adequacy of the analysis for OHV use along unpaved roads and trails and

18    in open areas.  Id. at 32-33.  Their concern is misplaced.  See Dep't of Transp. v. Public Citizen, 541 U.S.

19    752, 764 (2004)(no evidence that air quality impacts violate NEPA).  Significantly less acreage would be

20    accessible to OHV use under WEMO when implemented than under the 1985-87 route network, as areas

21    for stopping-parking-camping along designated open routes in DWMAs would be reduced substantially

22    from 600 feet (300 feet on each side) to 100 feet (50 feet on each side).  This element of the WEMO Plan

23    implemented by the ROD significant reduces OHV use in open areas, with a commensurate reduction in

24    ─────────────────

25    [36] The BLM Decision Tree analysis also considered redundant routes in the Barstow Woolly Sunflower
     conservation area.  The 2003 EA, Appendix C, documents 32 routes that were closed because they were

26    located within this conservation area.  AR 211610, 211611, 211621, 211623.  BLM responded to the
     plaintiffs' comments regarding BWS and route closure recommendations, AR 202696 (Response 190-55),

27    noting that some routes were closed while others were left open.  Plaintiff California Native Plant Society
     protested the route closure decision, but the table cited, AR 300236-300237, provides specific reasons why

28    11 route closure recommendations were not accepted.  This satisfies NEPA and the APA.

1   dust and particulate emissions. The FEIS contains detailed discussions of air quality impacts, displaying

2   the federal PM10 planning areas. AR 201979, AR 201981 ("Implementation of dust control rules and

3   controls on a number of critical sources have led to reductions in PM10 concentrations."). Id.[37]

4          **F.    Cumulative Impacts**

5          An agency considers cumulative impacts when actions "viewed with other proposed actions have

6   cumulatively significant impacts." Morongo Band of Mission Indians v. FAA, 161 F.3d 569, 581 (9th Cir.

7   1998), citing 40 C.F.R. § 1508.25(a)(2). CEQ regulations define cumulative impacts as the "impact on the

8   environment which results from the incremental impact of the action  when added to other past, present, and

9   reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person

10  undertakes such other actions." 40 C.F.R. § 1508.7.[38] The plaintiffs challenge the adequacy of BLM's

11  cumulative impact analysis, especially regarding the Department of the Army's Fort Irwin expansion. Pl.

12  NEPA Reply at 28. They also assert that impacts from proposed private development were not adequately

13  addressed. Id. Neither claim has merit.

14

15  _____

16  [37] The FEIS identified one alternative that could result in increased emissions, providing the public and
    decision-maker with an important assessment of differing environmental consequences from selecting that
17  alternative compared to the proposed action. AR 202423, AR 202232. BLM responded to the public
    comments, AR 202621, noting that "all of the alternatives except Alternative E result in fewer miles of
18  vehicle routes used than at present, and less resultant bare ground. Bare disturbed soil in vehicle routes is
    one source of PM10 emissions that changes as a result of the plan. This is the reason there would be
19  reductions in PM10 emissions as a result all but one of the plan alternatives." Id. Alternative E, in
    contrast, "reflects that there would be increased PM10 emissions and that it would not pass conformity."
20  Id. BLM noted that "implementation of a motorized vehicle access network that leads to the actual closure
    of vehicle routes, reductions in livestock grazing, restrictions on camping and rehabilitation of disturbed
21  areas will result in reductions in PM10 emissions due to a reduction in the amount of disturbed area in all
22  but Alternative E." AR 202626. This assessment satisfies BLM's duty to examine potential air quality
    impacts and provide a rational assessment on this topic.
23

24  [38]  The determination of cumulative impacts is "a task assigned to the special competency of the
    appropriate agencies." Kleppe v. Sierra Club, 427 U.S. 390, 414 (1976). Courts review cumulative
25  impacts pragmatically and defer to the agency's selection of the scope of analysis. Neighbors of Cuddy
26  Mountain v. Alexander, 303 F.3d 1059, 1971 (9th Cir. 2002); Selkirk Cons. Alliance v. Forsgren, 336 F.3d
    944, 959-60 (9th Cir. 2003). The analysis of "reasonably foreseeable" impacts does not include highly
27  speculative harm that would distort the decision-making process by emphasizing consequences beyond
    those of "greatest concern to the public and of greatest relevance to the agency's decision." Robertson v.
28  Methow Valley Citizens Council, 490 U.S. 332, 356 (1989).

1    BLM addressed the Fort Irwin expansion throughout the FEIS.  AR 202361 (noting that the Army

2    is undertaking a separate NEPA analysis for the proposed expansion and that the expansion would curtail

3    grazing on public land); AR 202363 (lands in Superior subregion no longer be available for motorized

4    vehicle recreation). BLM provided a detailed response to a Sierra Club comment regarding Fort Irwin.  AR

5    202657-202658 (Response 184-2). Interior and the Army established a desert tortoise conservation team

6    "to identify measures to ensure the long-term survival and recovery of the tortoise" if that plan were

7    implemented.  AR 202657.  The record contains detailed studies of desert tortoise abundance, which BLM

8    reviewed in the FEIS. AR 216493-216814; 216815-217102. The FEIS "succinctly but adequately discusses

9    the cumulative impacts of the project," which is sufficient under NEPA.  Bering Strait, 511 F.3d at 1027.[39]

10    With regard to Alternatives A and B, the plaintiffs identify no significant difference that would

11    require additional discussion of cumulative impacts for Alternative B.  They do not explain why reasonably

12    foreseeable impacts of private development would be greater under Alternative B than Alternative A.  Other

13    alternatives clearly would allow significantly greater impacts than Alternative B, and those options assessed

14    the potential cumulative impacts.  The FEIS analysis of cumulative impacts complies with NEPA.  See

15    Wetlands Action Network v. U.S. Army Corps of Eng'rs, 222 F.3d 1105, 1116 (9th Cir. 2000); Nw. Envtl.

16    Advocates v. U.S. Army Corps of Eng'rs, 460 F.3d 1125, 1138-41 (9th Cir. 2006).

17    **IV.    PLAINTIFFS' ESA CLAIMS LACK MERIT.**

18    **A.    FWS's Biological Opinions Comply With The ESA And Should Be Upheld.**

19    At issue in this case are two program-level BiOps, in which FWS reviewed the effects of the CDCA

20    Plan, as amended by the NECO, NEMO, and WEMO bioregional plans, on listed species and designated

21    critical habitat.  NBO 12535; WBO 14752.  Pursuant to Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2),

22    FWS was tasked with issuing an expert opinion on the likely effects of BLM's plan amendments on listed

23    species, such as the desert tortoise and the Lane Mountain milk-vetch ("LMMV"), and on designated critical

24

---

25    [39]  The departments convened a Blue Ribbon Panel, which provided a report that led the Army to reduce
to configuration by 50 square miles.  AR 202657.  They presented a report to Congress, which led to the

26    enactment of Public Law No. 106-554, authorizing appropriation of funds including implementation of the
conservation measures.  Id.  BLM noted that the Army was preparing a supplemental EIS to address the

27    expansion proposal and that the Army would be responsible for ensuring the implementation of those
conservation measures.  Id. at 202658.  That document provides the appropriate vehicle for the plaintiffs

28    to address any NEPA-related concerns regarding the Army's proposal.

1   habitat.  Following an extensive review, FWS concluded that the bioregional plans are not likely to

2   jeopardize the continued existence of the desert tortoise and the LMMV or destroy or adversely modify the

3   desert tortoise's critical habitat. As demonstrated below, FWS considered all relevant factors, its analyses

4   and conclusions are reasoned and supported by the record, and the BiOps should be upheld.

5        The NECO, NEMO, and WEMO bioregional plans are multi-faceted conservation plans that

6   improved upon the then-existing management of the planning areas to conserve and provide additional

7   protections to the desert tortoise and other sensitive and listed species. See WBO 14759-85 (WEMO plan

8   amendment's proposed actions); NBO 12540-12572 (NECO and NEMO plan amendments' proposed

9   actions). The bioregional plans designate numerous conservation and special resource protection areas, such

10  as DWMAs and ACECs, and the plans provide protective management guidelines and prescriptions

11  governing future actions in the planning areas. See NBO 12538-71; WBO 14759-84, 14916-22. In

12  accordance with BLM's multiple-use mandate, the plan amendments also encompass activities

13  fundamentally authorized by the CDCA Plan, as amended and modified by the NECO, NEMO, and WEMO

14  plans, such as casual mining exploration, OHV use on designated routes (and of open wash zones in NECO

15  only), hiking, and vehicle camping along designated routes, and the plans provide for limited ongoing

16  grazing in all three planning areas and the removal of burros in the NEMO and NECO planning areas.  Id.

17  As program-level BiOps, future site-specific actions, and any action not explicitly analyzed and reviewed

18  in the BiOps, can proceed only following additional environmental review under NEPA and the ESA.  NBO

19  12611; WBO 14815, 14918.

20       In concluding that the plan amendments are not likely to jeopardize the continued existence of the

21  desert tortoise, FWS explained that "the general trend for desert tortoises within the action area is one of

22  decline," noting that while "some statistical tests do not indicate obvious declines, other studies and

23  observations clearly indicate that desert tortoise populations are not functioning properly."  NBO 12593;

24  see also WBO 14810, 14818, 14849 (noting a combination of factors, such as OHV activity, illegal

25  collecting, disease, vandalism, drought, and grazing, is the likely cause of the decline). Analyzing BLM's

26  plan amendments, FWS found that some authorized activities are likely to adversely affect the desert

27  tortoise and its habitat, but that the plan amendments lessen the current impacts to the desert tortoise, the

28  expected impacts are not likely to reduce appreciably the reproduction, numbers, or distribution of the desert

Case3:06-cv-04884-SI   Document159   Filed09/08/08   Page45 of 69

1    tortoise, and the plan amendments contain numerous actions that affirmatively promote the recovery of the

2    species. NBO 12701-04; WBO 14880-82.

3        For example, the use of existing roads, route networks, open wash zones in NECO, and grazing will

4    adversely affect desert tortoises by resulting in the injury or death to, in the aggregate, a small number of

5    individuals. NBO 12701-04; WBO 14880-82 (explaining that "the best data available seem to indicate that

6    none of these actions have severe adverse effects on the desert tortoise.").[40] However, FWS found that the

7    plan amendments are likely to lessen the impact of these activities and provide greater levels of protection

8    to the desert tortoise. In the plan amendments, BLM reduced the areas where grazing can occur; imposed

9    protective management prescriptions applicable to ongoing grazing, such as the requirement to remove

10   cattle from allotments when forage levels reach certain threshold levels; designated routes and reduced the

11   vehicle route access network; restricted the areas in which OHV users can stop, camp, and park to 50 feet

12   off the centerline of routes in WEMO; authorized camping only within 50 feet of the centerline of a route

13   and only in disturbed areas in WEMO; authorized OHV use in open wash zones in NECO only within

14   navigable washes and only when such use will not result in the crushing of perennial vegetation or the banks

15   of the washes and reduced the overall area in which such activities may occur; withdrew lands from mineral

16   entry and exploration; provided for the voluntary relinquishment of grazing leases and permits; and provided

17   many other beneficial and conservation-focused actions.  See WBO 14759-85; NBO 12540-72.

18       The plan amendments further ensure that the majority of the desert tortoise habitat remains protected

19   and managed for the recovery of the species.  In WEMO, over ten years of data shows that approximately

20   1.3% of the WEMO DWMAs – large areas set aside for intensive conservation-based management and for

21   the protection of desert tortoise – has been disturbed to date, and that the DWMAs in the NECO and NEMO

22   planning areas have been disturbed to a lesser extent.  WBO 14815; NBO 12610-11.  BLM's designation

23   _____

24   [40] FWS predicated its analyses and conclusions on an extensive body of scientific data and evidence and
     utilized its considerable discretion in determining what body of evidence constitutes the best available
25   scientific data. Kern County Farm Bureau v. Allen, 450 F.3d 1072, 1080 (9th Cir. 2006) (agency has
     discretion to identify best available scientific data).  Therefore, any arguments by Plaintiffs that FWS was
26   remiss by not expressly relying on particular studies, e.g., Plaintiffs' opening ESA brief at 14 (Dkt. 116),
     ignores the fact that FWS – not Plaintiffs – has considerable discretion to identify the body of evidence that
27   "support[s] its conclusions." Lands Council v. McNair, No. 07-35000, 2008 WL 2640001, *9-10 (9th Cir.
     2008) (courts "look to the evidence the [agency] has provided to support its conclusions. . . ").
28

1    of DWMAs and the corresponding management guidelines and prescriptions, such as the reduction of

2    authorized uses within the DWMAs and the limit of no more than one percent of ground disturbance in

3    DWMAs, ensures that the overall disturbance within the DWMAs will not increase and that the vast

4    majority of desert tortoises and habitat located on public lands are conserved and protected. WBO 14880-81;

5    NBO 12701.

6              After "evaluat[ing] all of these effects, whether beneficial or adverse to the desert tortoise," NBO

7    12612; WBO 14815, FWS found that full and swift implementation of the bioregional plans is likely to

8    reduce the severity and duration of the species' decline, if the decline is tied to anthropogenic factors.  NBO

9    12703; WBO 14882.  The WEMO, NECO, and NEMO plan amendments lessen the extent of adverse

10   impacts on the desert tortoise, contain conservation measures expected to improve the overall status of the

11   listed species, and ensure that the species' habitat "will generally improve or remain functional and continue

12   to serve its conservation role." WBO 14886-88 (explaining that BLM's plans "will promote the survival

13   and recovery of the species"); NBO 12703, 12708-11.  FWS's BiOps comply with the dictates of the ESA

14   and should be upheld. See National Wildlife Fed'n v. NMFS, 481 F.3d 1224, 1236 (9th Cir. 2007) ("Agency

15   action can only 'jeopardize' a species' existence if that agency causes some deterioration in the species' pre-

16   action condition.").

17             As part of the consultation process, FWS also concluded that BLM's plan amendments are not likely

18   to "result in the destruction or adverse modification" of desert tortoise critical habitat.  16 U.S.C. §§

19   1536(a)(2), (b)(3)(A); NBO 12538, 12704-07, 12709-11; WBO 14759, 14882-84, 14887-89 (noting that

20   FWS's analysis is governed by the statutory requirements of ESA and not by FWS's regulatory definition

21   of "adverse modification").  In arriving at its conclusions, FWS methodically examined the current status

22   of the species' critical habitat units.  See NBO 12581-12583, 12594-12611; WBO 14798-99, 14810-15.

23   FWS identified and assessed the areas designated as critical habitat on federal, state, and private lands,

24   including areas on BLM-managed lands within and outside of DWMAs, and FWS identified the activities

25   that have resulted and continue to result in disturbance to the species' critical habitat.  Id.; see, e.g., NBO

26   12601 (noting habitat conditions characterized as being in excellent condition in the Chemehuevi Critical

27   Habitat Unit and that cumulative visible surface disturbance over the past 100 years is approximately 0.5%

28   of the area of the critical habitat unit). As FWS explained:

> The critical habitat units within the Western Mojave Recovery Unit clearly experience the most visitation by recreational users and economic interests, primarily because of their proximity to the Los Angeles Basin.  Despite this level of use, large areas of critical habitat in the western Mojave Desert remain undisturbed. . . .  Given that the critical habitat units throughout the remainder of the [CDCA] have been disturbed to a lesser degree than those in the western Mojave Desert planning area, we conclude that all of the critical habitat units within the action area are capable of supporting their conservation role and function.  We acknowledge that the critical habitat units and [DWMAs] do not overlap completely; however, this information comprises the best available data with regard to surface disturbance in the planning area.

NBO 12610-11; WBO 14814-15. Based on the best available scientific data, FWS explained that, at "this level of disturbance, we anticipate that the critical habitat units should function fully to support the conservation of the desert tortoise."  NBO 12611; WBO 14815.

Next, FWS analyzed the likely effects of BLM's proposed action on desert tortoise critical habitat. FWS noted that adverse impacts to portions of the habitat would continue, but that numerous impacts to critical habitat have been removed.  BLM's plans significantly reduce the extent of cattle grazing within critical habitat, designate routes and reduce the overall route network, reduce the area where OHVs can stop, park, and camp within DWMAs, remove and reduce the amount of burros within critical habitat, and limit future cumulative ground disturbance in DWMAs, which contain the vast majority of the designated critical habitat, to no more than one percent.  See NBO 12704-07; WBO 14882-84.  Overall, relatively small amounts of critical habitat have been disturbed and, while some areas (within and outside of DWMAs) will be adversely affected by BLM's proposed action, the vast majority of critical habitat is located in the DWMAs and managed specifically to promote the recovery of the desert tortoise:

> Although [BLM] has authorized many projects under the guidance of the [CDCA] Plan, large expanses of habitat, including most critical habitat of the desert tortoise, remain undisturbed by [BLM's] management actions. In our analysis, we place particular emphasis on [BLM's] commitment to ensure that no more than one percent of land within the [DWMAs] under its management will be disturbed by future actions; this measure should ensure that the conservation role and function of critical habitat of the desert tortoise are maintained.

NBO 12705-07 (emphasis added); WBO 14881-84.  Considering both the conservation function and role of designated critical habitat, FWS reasonably concluded that BLM's plan amendments are not likely to destroy or adversely modify the desert tortoise's critical habitat. See Gifford Pinchot Task Force v. FWS, 378 F.3d 1059, 1070, amended on other grounds, 387 F.3d 968 (9th Cir. 2004) (noting that the "destruction or adverse modification" inquiry assesses whether "sufficient critical habitat is lost so as to threaten a species' recovery even if there remains sufficient critical habitat for the species' survival"); Center for

1    Native Ecosystems v. Cables, 509 F.3d 1310, 1321-23 (10th Cir. 2007) (consideration of the conservation

2    role of the critical habitat and the effects of an action on the PCEs satisfies ESA's statutory mandates).

3         As with the desert tortoise, FWS's analysis and conclusions regarding the likely effects of BLM's

4    WEMO plan amendment on the LMMV are reasoned and amply supported by the record.  In the WEMO

5    BiOp, FWS recognized the importance of conserving LMMV occurrences on public lands, WBO 14916,

6    and FWS candidly examined the likely effects of the plan amendment on the LMMV, including the effects

7    resulting from mining activities, OHV use, BLM's route designations, and the establishment of several

8    conservation areas with corresponding protective management prescriptions, see WBO 14916-22.  FWS

9    found that the overall effects of activities authorized by the WEMO plan amendment are not likely to

10   appreciably reduce the reproduction, distribution, or numbers of LMMV. Id. 14916-22.  For example, the

11   best available scientific data indicated that dust associated with OHV use, at the levels authorized by the

12   plan amendments, is expected to have only minor impacts to LMMV. WBO 14919.

13        FWS also found that BLM's plan amendment "implements measures to avoid or reduce adverse

14   effects to the [LMMV] and to further its conservation." WBO 14921 (emphasis added); id. 14921-22.  The

15   WEMO plan amendment provides that permits will not be issued for activities that result in the loss of

16   LMMV and that "up to approximately 2.6 acres of the West Paradise Conservation Area and 101 acres of

17   the Coolgardie Mesa Conservation Area may be disturbed.  Conversely, [LMMV] occurring on the

18   remaining 254 and 10,006 acres of the two conservation areas, respectfully, will not be disturbed by project-

19   level activities." WBO 14918. BLM established ACECs to be managed to promote the survival and

20   recovery of the LMMV, designated routes and reduced the OHV route network, provided for the acqustion

21   of private lands to ensure a higher level of protection to LMMV, provided for the withdrawal of LMMV

22   habitat from mineral location and entry, and ensured that the levels of disturbance to LMMV habitat will

23   not increase over time.  WBO 14921-22;  id. 14919, 14049 (eliminating five miles of routes in LMMV

24   habitat); id. 14782 (authorizing camping only in pre-existing, disturbed areas, which do not support

25   LMMV); id. 14761, 14763 (one percent cap on disturbance applies to BLM lands within the Superior-

26   Cronese DWMA, which contains LMMV habitat); id. 14921, 14775, 14804, 14858, 9918 (no grazing

27   authorized in LMMV habitat).  Accordingly, FWS reasonably and rationally concluded that the WEMO plan

28   is not likely to reduce appreciably the LMMV's reproduction, numbers, or distribution, contains elements

1   that are expected to contribute to the conservation of the LMMV, and ultimately is not likely to jeopardize

2   the continued existence of the LMMV. Id.

3        In sum, FWS fully considered all relevant factors and provided a reasoned and rational explanation

4   supporting its "no jeopardy" and "no adverse modification" determinations.  As the expert wildlife agency

5   charged by Congress with implementing the ESA, FWS's expertise is entitled to considerable deference,

6   and FWS's BiOps should be upheld.  See Lands Council, 2008 WL 2640001, *9 (reviewing court should

7   defer to the agency as to what evidence is, or is not, necessary to support its scientific analysis and the court

8   is most differential when the federal agency is "making predictions, within its [area of] special expertise,

9   at the frontiers of science." (citations omitted)).

10       **B**.    **Plaintiffs Cannot Satisfy Their Burden Of Demonstrating That The Challenged
               Biological Opinions Are Arbitrary And Capricious.**

11       Through constantly changing arguments, Plaintiffs in this case have complained generally that FWS

12   failed to consider "adequately" various issues and that FWS should have utilized a different methodology

13   in analyzing the effects of BLM's proposed actions on listed species.[41]  However, Plaintiffs' arguments that

14   FWS was required to analyze the likely effects to listed species in a certain manner and arrive at different

15   conclusions would require this Court to substitute its judgment for that of the agency experts on how to

16   assess a particular technical issue, a role for federal courts that a unanimous Ninth Circuit en banc panel

17   rejected in Lands Council, 2008 WL 2640001.

18       In Lands Council, the Ninth Circuit en banc panel not only reversed the Lands Council three-judge

19   panel, but also overruled the earlier decision in Ecology Ctr., Inc. v. Austin, 430 F.3d 1057 (9th Cir. 2005),

20   because the Ecology Center Court "created a requirement not found in any relevant statute or regulation"

21   and "defied well-established law concerning the deference we owe to agencies and their methodological

22   choices." Lands Council, 2008 WL 2640001, at *8. The Lands Council Court emphasized that federal courts

23   are to "defer to the [federal agency] as to what evidence is, or is not, necessary to support [technical]

24

25   _____

     [41]  Following Plaintiffs' initial motion for summary judgment, Defendants filed a combined cross-motion
26   for summary judgment and opposition to Plaintiffs' motion for summary judgment.  Because the Court
     ordered the parties to submit new briefs simultaneously, Defendants herein cite to Plaintiffs' arguments
27   previously made by referencing their opening motion for summary judgment (Dkt. 116) ("Pl. ESA Br.")
     and their combined opposition to Defendants' motion for summary judgment and reply in support of their
28   motion for summary judgment (Dkt. 139) ("Pl. ESA Reply").

1  analyses," and that "as non-scientists," federal judges must "decline to impose bright-line rules on the

2  [agency] regarding particular means that it must take in every case to show [them] that it has met the

3  [statute's] requirements." Id. at *9-10.

4          Here, Plaintiffs seek to have this Court run afoul of the Ninth Circuit's unanimous pronouncement

5  in Lands Council by imposing on FWS Plaintiffs' own notions of how best to determine the likely effects

6  of BLM's land-use plans on listed species and their habitat.   As demonstrated below, Plaintiffs'

7  disagreement with FWS's analyses and the conclusions, and their strained interpretations of the ESA, are

8  legally and factually unsupported and must fail. See Lands Council, 2008 WL 2640001, at *10 ("we are

9  not free to 'impose on the agency [our] own notion of which procedures are 'best' or most likely to further

10 some vague, undefined public good.") (quoting Churchill County v. Norton, 276 F.3d 1060, 1072 (9th Cir.

11 2001), Vermont Yankee Nuclear Power Corp. v. Natural Res. Defense Council, 435 U.S. 519, 549 (1978)).

12          **1.      The Consultation Provisions Of The ESA Are Not Modified, Displaced, Or Enlarged By The Recovery Planning Provisions Of The ESA.**

13         In this case, Plaintiffs have challenged only FWS's BiOps and its compliance with ESA § 7(a)(2).

14 Second Amended Complaint ("SAC") ¶¶ 116-124 (Dkt. #114).  Plaintiffs have not challenged any agency's

15 compliance with the ESA's separate recovery planning provisions, such as FWS's obligation to "develop

16 and implement [recovery] plans."  16 U.S.C. § 1533(f)(1).  Nonetheless, underlying nearly every claim

17 Plaintiffs have advanced is the notion that ESA § 4(f) governs and dictates FWS's analysis in a biological

18 opinion, that BLM's actions must be viewed against the recommendations contained in the desert tortoise

19 recovery plan, and that the agencies must affirmatively implement recommendations contained in a recovery

20 plan to comply with ESA § 7(a)(2).[42]   Contrary to Plaintiffs' claims, there is no legal support for the

21 proposition that the agencies must implement a recovery plan through an ESA §7(a)(2) consultation.

22          Under the ESA, FWS possesses several means to comply with its statutory mandates in ESA § 4(f),

23 and nothing in the ESA mandates that FWS do so in the context of ESA § 7 consultation.  See Fund for

24 Animals v. Rice, 85 F.3d 535 (11th Cir. 1996) (rejecting nearly identical claim that a BiOp is invalid because

25 _____

26 [42]  See, e.g., Pl. ESA Br. at 19 (arguing FWS's consideration of the effects of grazing is superfluous
   because BLM did not implement the recovery plan in full); id. at 10, 12 (arguing FWS erred by not
27 predicating its adverse modification analyses on a comparison to the desert tortoise recovery plan); Pl. ESA
   Reply at 3-6; id. at 7 (arguing that the scope of FWS's analysis must conform to the recovery plan's
28 recommendations).

a recovery plan was not implemented); <u>Conservation Northwest v. Kempthorne</u>, Civ. No. 04-1331-JCC, 2007 WL 1847143, *3 (W.D. Wash. June 25, 2007) ("Nothing in the statute requires that implementation [of a recovery plan] be completed by a certain date."); <u>cf.</u> <u>Pyramid Lake Paiute Tribe v. Department of the Navy</u>, 898 F.2d 1410, 1418 (9th Cir. 1990) (noting that federal agencies have "some discretion in ascertaining how best to fulfill the mandate to conserve under section 7(a)(1)").

Similarly, there is no authority for the claim that ESA § 4(f) is incorporated into ESA § 7(a)(2), or that ESA § 4(f) and a recovery plan modify or alter the obligations explicitly set forth in ESA § 7(a)(2). Rather, where Congress has intended overlap between sections of the ESA, Congress has made that point expressly. That Congress similarly did not incorporate ESA § 4(f)'s recovery planning provisions into ESA § 7(a)(2) is therefore dispositive. <u>See</u> <u>Keene Corp. v. United States</u>, 508 U.S. 200, 208 (1993) ("[W]here Congress includes particular language in one section of a statute but omits it in another . . ., it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citations omitted)); <u>Lands Council</u>, 2008 WL 2640001, *10 ("we are not free to 'impose on the agency [our] own notion of which procedures are 'best' or most likely to further some vague, undefined public good.'" (citations omitted)).

In addition, the claim that FWS must require the full implementation of a recovery plan under the guise of a Section 7(a)(2) consultation is fundamentally at odds with the plain language and structure of ESA § 7(a)(2). FWS's role under ESA § 7(a)(2) is advisory – it reviews a proposed action another Federal agency seeks to undertake, examines a variety of factors and the best available scientific data, and issues an expert "opinion" on the likely effects of that action on listed species and designated critical habitat. <u>See</u> 16 U.S.C. § 1536(a)(2), (b); 50 C.F.R. § 402.14; 51 Fed. Reg. 19,926, 19,928 (June 3, 1986) ("The Service performs strictly an advisory function under section 7"). Further, ESA § 7(a)(2) does not preclude Federal actions from proceeding that do not promote or advance a species' recovery, but rather imposes a prohibition against actions which have too great an impact on the survival and recovery of a species. 16 U.S.C. § 1536(a)(2); <u>Selkirk Conservation Alliance v. Forsgren</u>, 336 F.3d 944, 954 (9th Cir. 2003) (noting existence of adverse effects does not mandate "jeopardy" determination under ESA § 7). Thus, Congress neither required the implementation of a recovery plan in the Section 7 context nor evinced an intent to halt activities that affirmatively do not recover or promote the recovery of a species. <u>See</u> <u>Idaho Dep't of Fish</u>

and Game v. NMFS, 850 F. Supp. 886, 895 (D. Or. 1994) (ESA contains different procedures, with "several critical differences," by which species protection and recovery are addressed); Arizona Cattle Growers' Ass'n v. Kempthorne, 534 F. Supp. 2d 1013, 1036 (D. Ariz. 2008) (rejecting invitation "to fashion an entirely new requirement, unsupported by any ESA-related precedent, simply based upon what Plaintiff believes to be sound environmental policy").

In addition to reading requirements into the ESA that are not there, Plaintiffs also have previously mischaracterized Defendants' position as advocating that FWS "need not consider [the Recovery Plan's] recommendations in" issuing a biological opinion. Pl. ESA Reply at 5. However, FWS clearly and unambiguously considered the desert tortoise recovery plan, and FWS specifically analyzed the aspects of the plan amendments that implement various provisions of the recovery plan, such as the designation of and conservation-based management within DWMAs. See WBO 14789-92, 14796-97, 14799, 14800, 14804, 14806-10, 14834, 14843, 14880, 14882, 14886-87; NBO 12554, 12576-80, 12583-84, 12587, 12590-92, 12594, 12639-40, 12666-67, 12678, 12680, 12685-87, 12694, 12701, 12704, 12708-10, 12720 (detailing consideration of the desert tortoise recovery plan). Indeed, FWS's conclusions were premised in part on the finding that the DWMAs "will be administered in a manner consistent with most of the recommendations of the recovery plan for the desert tortoise and will promote the survival and recovery of the species within this portion of its range." WBO 14886 (emphasis added); id. 14887; NBO 12708-11. Thus, any attempt by Plaintiffs to write-off a significant component of FWS's analyses – the consideration of the desert tortoise recovery plan - fails.[43]

Similarly, any argument that FWS failed to consider the recovery needs of the desert tortoise or other species lacks merit. For example, FWS noted that the desert tortoise requires significant expanses of largely undisturbed habitat to ensure long-term viability, and FWS found that BLM's proposed actions

_____

[43] Importantly, FWS also appropriately recognized that, pursuant to the ESA, it must consider more than just a recovery plan, such as the scale and intensity of effects, prior to reaching a final "jeopardy" determination. For instance, while noting that grazing within portions of the Chemehuevi Critical Habitat Unit exceeds the 10% experimental management zone recommended by the recovery plan, FWS proceeded to consider BLM's reduction in overall grazing, the exclusion of grazing from high-density tortoise habitat, low utilization levels, grazing habitat located in elevations not generally supporting desert tortoise, and other factors in concluding that the management of the allotment is compatible with the function and conservation role of the critical habitat. See NBO 12694-95.

1  ensure that most desert tortoise habitat within the planning areas, including the vast majority of desert

2  tortoise critical habitat, is sufficiently protected and will remain largely undisturbed.  See NBO 12583-85,

3  12610-11, 12670-71; WBO 14799-14801, 14827, 14835, 14881.  FWS determined that BLM's proposed

4  actions *conserve* the desert tortoise over large expanses of its range and afford the opportunity for the

5  recovery of the species. NBO 12701-12707, 12708-12711; WBO 14880-84, 14885-88.  Therefore, there is

6  no merit to Plaintiffs' prior suggestions that the consideration of either the recovery plan or the recovery

7  needs of the desert tortoise is missing from the challenged BiOps.

8      In sum, Defendants' position is not that the recovery plan can be or was ignored, but that

9  implementation of the recovery plan is not required to satisfy the statutory mandates of ESA § 7 and that

10  the ESA's consultation provisions provide the standards by which BLM's actions are assessed, not a

11  recovery plan or ESA § 4(f).  Accordingly, any attempt by Plaintiffs to transform the consultation provisions

12  of the ESA into a mandate to implement a recovery plan or recover a species must be rejected.  See

13  Chevron, USA v. Natural Res. Def. Council, 467 U.S. 837, 842-43, 844 (1984) ("If the intent of Congress

14  is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the

15  unambiguously expressed intent of Congress.").

16          **2.    FWS's "Jeopardy" Analyses Comply With The Requirements of the ESA.**

17          **a.    The Plain Language of ESA § 7 Requires That FWS Issue a "Jeopardy" Determination for the Entire Listed Species Under Consideration.**

18      In ESA § 7(a)(2), Congress expressed an intent to allow Federal actions to proceed, unless the

19  proposed action is "likely to jeopardize the continued existence of any endangered species or threatened

20  species."  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02 (definition of "jeopardize the continued existence

21  of").  To facilitate compliance with the substantive requirement of ESA § 7, Congress provided that FWS

22  shall provide a "written statement setting forth the Secretary's opinion . . . detailing how the agency action

23  affects the species."  16 U.S.C. § 1536(b)(3)(A) (emphasis added); 50 C.F.R. § 402.14(h)(3).  ESA § 7

24  speaks in terms of "species," which Congress defined as "any subspecies of fish or wildlife or plants, and

25  any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when

26  mature."  16 U.S.C. § 1532(16); 50 C.F.R. § 402.02 (defining "listed species").  Thus, the plain language

27  of the ESA and FWS's implementing regulations make clear that the obligations expressed in ESA § 7 apply

28  to the "listed species" under consideration, not smaller units of the listed entity, such as desert tortoises

1   within a recovery unit.[44]

2        Here, the "listed species" is the Mojave population of the desert tortoise, which includes all tortoises

3   north and west of the Colorado River in California, southern Nevada, southwestern Utah, and northwestern

4   Arizona. See 55 Fed. Reg. 12,178-80 (Apr. 2, 1990). In accordance with the ESA and FWS's implementing

5   regulations, FWS's "jeopardy" determinations in the WEMO and NECO BiOps assessed whether BLM's

6   proposed actions are likely to jeopardize the entire Mojave population of desert tortoise. WBO 14885-87;

7   NBO 12708-09. Because desert tortoises in each recovery unit are not separately listed as a "species," any

8   arguments by Plaintiffs (see, e.g., Pl. ESA Br. at 8) that FWS should conduct a separate jeopardy analysis

9   for each recovery unit have no foundation in the ESA and must be rejected. See Chevron, 467 U.S. at 842-

10  43.[45]

11            **b.      FWS Appropriately Analyzed the "Environmental Baseline."**

12       The term "environmental baseline" does not appear in the ESA but rather appears in FWS's

13  consultation regulations. See 50 C.F.R. § 402.02 (defining environmental baseline). An environmental

14  baseline analysis is intended to provide "a 'snapshot' of a species' health at a specified point in time." See

15  Endangered Species Consultation Handbook, NMFS & FWS, March 1998, at 4-22[46]; Westlands Water Dist.

16  v. U.S. Dep't of Interior, 275 F. Supp. 2d 1157, 1194 (E.D. Cal. 2002), aff'd in part, rev'd in part, 376 F.3d

17  _____

18  [44] "The recovery plan . . . recognized six recovery units or evolutionarily significant units across the range
19  of the listed taxon, based on differences in genetics, morphology, behavior, ecology, and habitat use of the
    desert tortoises found in these areas." WBO 14799. The recovery plan, however, only vaguely described
20  the boundaries of the recovery units, and "the recovery team intended for land management agencies to
    establish [the DWMA] boundaries, based on the site-specific needs of the desert tortoise." Id. at 14800;
21  14801 (chart identifying relationship between critical habitat units, DWMAs, and recovery units).

22  [45] Indeed, FWS has issued guidance directly refuting Plaintiffs' interpretation that FWS must conduct
23  separate jeopardy analyses for each desert tortoise recovery unit, explaining that FWS does "not make final
    jeopardy determinations at some subordinate level, such as the 'action area,' a 'recovery unit,' a
24  'population,' a State, or any other scale below that of the listed entity." See Dkt. No. 146-1, Exhibit A,
    Guidance on Conducting Endangered Species Act (ESA) Section 7 Consultations on the Desert Tortoise
25  and Other Species, February 15, 2005.

26  [46] FWS has published an ESA § 7 Consultation Handbook, which  is available online at
27  "http://www.fws.gov/endangered/consultations/s7hndbk/s7hndbk.htm." FWS published this Handbook
    after providing public notice and comment, 60 Fed. Reg. 8,729 (Feb. 15, 1995), and the interpretations
28  therein are entitled to substantial deference. Nigro v. Sullivan, 40 F.3d 990, 996 (9th Cir. 1994).

853 (9th Cir. 2004).  Thus, a baseline analysis "will involve consideration of the present environment in which the species or critical habitat exists, as well as the environment that will exist when the action is completed, in terms of the totality of factors affecting the species or critical habitat.  The evaluation will serve as the baseline for determining the effects of the action on the species or critical habitat." 51 Fed. Reg. at 19,932.

FWS's environmental baseline analyses fulfilled the purpose of a baseline analysis under the ESA. In the WEMO BiOp, FWS analyzed: past consultations within the action area, WBO 14802-06; past and ongoing actions, threats to desert tortoises, desert tortoise abundance, and trends in the Western Mojave Recovery Unit and within individual DWMAs, WBO 14806-10; and the status of critical habitat in the action area and recovery unit, WBO 14810-14815.[47]  After assessing the past factors affecting desert tortoises, such as OHV use, grazing, land management prescriptions, and the Fort Irwin expansion, FWS appropriately identified the requisite snapshot of the species' status and health in the action area, enabling FWS to appropriately assess how BLM's proposed actions are likely to affect the desert tortoise.  See 50 C.F.R. § 402.02; 51 Fed. Reg. at 19,932.  Importantly, Plaintiffs do not contest the outcome of FWS's baseline analysis and cannot demonstrate that FWS's conclusions are "so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Lands Council, 2008 WL 2640001, *4 (citations omitted).

Instead, Plaintiffs have focused on the method by which FWS analyzed the environmental baseline, for instance by arguing that FWS failed to consider desert tortoise mortality resulting from past activities authorized by BLM in the planning areas.  See Pl. ESA Br. at 7; Pl. ESA Reply at 10-11.  The BiOps, however, are replete with FWS's analysis of desert tortoise mortality resulting from past activities in the planning area.  See WBO 14790, 14804-08, 14818-19 (analyzing quantitative data on desert tortoise mortality); NBO 12614, 64, 86 (same); see also NBO 12562, 12588-89, 12613-15, 12618, 12641-42, 12646,

---

[47] Similarly, in the NECO BiOp, FWS analyzed a host of factors affecting the desert tortoise, including past consultations in the action area (NBO 12585-87); past and ongoing actions, threats to desert tortoise, and desert tortoise abundance and trends in the Eastern Mojave Recovery Unit (NBO 12588-89), the Northern Colorado Recovery Unit (NBO 12589), the Eastern Colorado Recovery Unit (NBO 12589-90), the Western Mojave Recovery Unit (NBO 12590-94); and the status of critical habitat in the action area and affected recovery units (NBO 12594-12611).

12649-50, 12654, 12658, 12662-65, 12672, 12674-75, 12682, 12686, 12692-94, 12698, 12700 (analyzing mortality data to assess the likely extent of future mortality resulting from BLM's proposed action); WBO 14792-93, 14801, 14803, 14805, 14817-20, 14822, 14827, 14829, 14831-32, 14848-49, 14854-56, 14771-72, 14875.[48] Likewise, while contending that FWS failed to identify the "population size or survival rate necessary to sustain viable populations," Pl. ESA Br. at 8, FWS in fact performed this analysis. See, e.g., NBO 12574 (analyzing information relating to survival rates of desert tortoise and finding that "maintaining favorable habitat conditions for small desert tortoises is crucial for the continued viability of the species"); WBO 14787 (same); NBO 12643-44 (assessing how grazing can impact survival and growth rates of desert tortoises); id. 12579-80 (discussing general population size, growth rates, and other requirements for long-term viability and recovery of the species).

Courts have repeatedly resisted claims that the ESA requires a particular type of analysis where the statute is silent on how that analysis should be conducted. See Gifford Pinchot Task Force v. FWS, 378 F.3d 1059, 1067 (9th Cir. 2004) (deferring to FWS's methodology used to determine whether an action is likely to jeopardize listed species); Northwest Envtl. Advocates v. NMFS, Civ. No. 04-0666RSM, 2005 WL 1427696, *10-11 (W.D. Wash. June 15, 2005) (applying ESA "jeopardy" framework and rejecting plaintiff's claim that the discussion of the environmental baseline was insufficiently comprehensive where nothing in the ESA required the analysis and the BiOp's conclusions were not arbitrary), aff'd, 460 F.3d 1125 (9th Cir. 2006). Accordingly, any arguments by Plaintiffs contesting the method by which FWS analyzed the environmental baseline fail, as FWS's baseline analyses yielded a reasoned assessment of the

---

[48] Previously, Plaintiffs referred to the Fort Irwin biological opinion and accompanying incidental take statement ("ITS") and asserted that FWS authorized the death of 1,197 desert tortoises, or "a loss of between 2-9% of the population of the West Mojave [Recovery Unit]." Pl. ESA Reply at 10 (emphasis added). However, the Fort Irwin ITS actually states: "The translocation of approximately 1,197 adult desert tortoises and an unknown number of immature animals would involve the take, in the form of capture, of all of these individuals." WBO 9961 (emphasis added) (further explaining that FWS anticipated the direct mortality of "approximately 136 adult desert tortoises" and "the same percentage of immature animals"). Quantifying all incidental take associated with the planned activities at Fort Irwin, FWS found that the anticipated "level of mortality translates to approximately 1.03 to 2.07 percent of the 20,420 to 41,224 adult desert tortoises" estimated to be within the Western Mojave Recovery Unit. WBO 9951. Thus, there is no basis for Plaintiffs' assertions that FWS authorized the death of ten percent of the desert tortoise population in the Western Mojave Recovery Unit, and Plaintiffs' efforts to inflate the estimated mortality of desert tortoises to create a conflict in FWS's analysis do not substantiate their claims.

1    current status of the desert tortoise and fulfilled the purposes of a baseline analysis under the ESA.

2                       **c.    FWS Appropriately Considered the Effects of BLM's Actions in Reaching Its "No Jeopardy" Determinations.**

3           In challenging FWS's jeopardy analyses, Plaintiffs have contended that FWS failed to analyze the

4    effects within desert tortoise recovery units, disregarded site-specific effects, and failed to analyze the

5    aggregate effects of actions authorized by BLM's plan amendments.  See, e.g., Pl. ESA Reply at 9-10 n. 8

6    (contending that "FWS ignored any unit specific analysis").  As demonstrated below, any claim that FWS

7    failed to perform a full and in-depth "effects" analysis in arriving at its ultimate conclusions are belied by

8    the challenged BiOps.

9           During the consultation process and in its extensive biological opinions, FWS provided the requisite

10   "detailed discussion of the effects of the action on listed species."  50 C.F.R. § 402.14(h)(2); id. § 402.02

11   (defining "effects of the action").  As part of its jeopardy analyses, FWS analyzed the status of, impacts to,

12   and trends in desert tortoise populations within each of the recovery units.  See WBO 14788-14799

13   (analyzing the Upper Virgin River, NEMO, Eastern Mojave, NECO, Eastern Colorado, and WEMO

14   recovery units); WBO 14806-10 (analyzing the WEMO Recovery Unit); NBO 12575-12583 (analyzing the

15   Upper Virgin River, Northeastern Mojave, and Eastern Mojave recovery units); NBO 12588-94 (analyzing

16   the Eastern Mojave, NECO, Eastern Colorado, and WEMO recovery units).  Further, FWS considered and

17   analyzed the available data on desert tortoise population trends in the recovery units and range-wide, and

18   FWS found that the limited available scientific data indicated a downward decline in population trends in

19   some portions of its range.  See WBO 14810 (noting a decline in the WEMO Recovery Unit); NBO 12593

20   ("some statistical tests do not indicate obvious declines, other studies and observations clearly indicate that

21   desert tortoise populations are not functioning properly").

22          FWS also assessed the effects of BLM's proposed actions, and FWS did so at several spatial scales.

23   For example, in the WEMO BiOp, FWS reviewed the anticipated effects of grazing within specific

24   allotments, ranging from 1 to 318 square miles in size, see WBO 14858-71; WSupp ITS 1026, and FWS

25   analyzed the aggregate effects of grazing in all allotments,  WBO 14871-72.  Thereafter, FWS analyzed the

26   aggregate effects of grazing and other activities authorized by BLM in the Western Mojave Recovery Unit.

27   See WBO at 14880-82.  FWS engaged in a similar analysis, at multiple spatial scales, in analyzing the likely

28   effects of OHV use on desert tortoise.  For example, in analyzing the effects of OHV use in the open wash

zones in NECO, FWS examined the abundance and density of desert tortoises and habitat conditions within the open wash zones, and FWS explained that: habitat conditions "play a larger role than vehicle use in the density of desert tortoises within the Chuckwalla" DWMA, NBO 12685; desert tortoise use of open wash zones is low, NBO 12686; and desert tortoises rarely den in open washes in the Chemehuevi DWMA, id.; NBO 579.  FWS noted that OHV use in the open wash zones provided a potential for desert tortoise mortality due to the area available for use, but that the overall OHV use in the open wash zones is low and generally limited to activities not based on speed, such as hunting, sight-seeing, nature study, and camping. NBO 12683.[49]  As FWS explained:

> based on the best available data, the level of vehicle use in the open wash zones in the Chemehuevi and Chuckwalla [DWMAs] seems to be low and most users of the area are engaged in lower impact recreational activities.  We also note that the best available data on desert tortoises in these areas implies that vehicle use in open wash zones is not affecting their distribution.  Consequently, we conclude that [BLM's] designation of open wash zones in the Chemehuevi and Chuckwalla [DWMAs] is not likely to result in a high level of mortality of desert tortoises and therefore is not likely to reduce substantially the reproduction, numbers, or distribution of desert tortoise in this recovery unit.

NBO 12686; id. 12685, 12702 (noting that BLM has "closed washes on 1,213,061 acres" in NECO and the "amendment clearly reduced the size of the open wash zones from historic levels; that action is also beneficial to the desert tortoise.").

FWS did not analyze separate activities in isolation, but rather integrated all of its effects analyses in issuing its determination as to whether BLM's proposed actions are likely to jeopardize the continued existence of the desert tortoise.  See WBO 14885-87.  In doing so, FWS considered how the aggregate effects of BLM's proposed actions are likely to affect the desert tortoise, in light of overall current status of the desert tortoise.  See WBO 14880-82; NBO 12701-04. Based on the broader analysis, FWS concluded that the overall management direction within the plan amendments is "highly protective of desert tortoises." WBO 14882; see also Section IV.A., supra.

Because BLM's plan amendments reduce and minimize the effects of past actions that may have

---

[49] Not all washes in the open wash zones can or will be used by OHVs.  NBO 5495 ("The implication of this definition is that washes can be considered as routes of travel only if wash banks are not compromised (primarily a function of width), soil stability is not adversely affected, and vegetation is not destroyed consequent to the passage of vehicles.  If access to a wash by motorized vehicles results in vegetative destruction, disturbance to the integrity of the wash banks, or an unacceptable degree of soil erosion – the destruction of natural features – the wash is not considered to be a route of travel.").

1   contributed to the declines in desert tortoise populations, and because BLM adopted conservation-based

2   management prescriptions providing for and promoting the recovery of the desert tortoise and the LMMV,

3   FWS rationally concluded that BLM's plan amendments are not likely to jeopardize the continued existence

4   of the desert tortoise and the LMMV.  50 C.F.R. § 402.02; see National Wildlife Fed'n v. NMFS, 481 F.3d

5   1224, 1236 (9th Cir. 2007) ("Agency action can only 'jeopardize' a species' existence if that agency causes

6   some deterioration in the species' pre-action condition.").  FWS's technical effects analyses, and its expert

7   conclusions, comport with the requirements of the ESA and should be upheld. Arizona Cattle Growers'

8   Ass'n v. FWS, 273 F.3d 1229, 1236 (9th Cir. 2001) (courts are to be "deferential to the agency's expertise

9   in situations, like that here, where resolution of this dispute involves primarily issues of fact." (internal

10  quotations and citations omitted)).

### 3.   FWS "Adverse Modification" Analyses Comply With The Requirements of the ESA.

#### a.   The Scope Of FWS's "Adverse Modification" Analyses Complies with the Statutory Requirements of ESA § 7.

14          Similar to their challenge to FWS's "jeopardy" analyses, Plaintiffs contest FWS's methodology for

15  determining whether BLM's proposed actions are likely to destroy or adversely modify the desert tortoise's

16  critical habitat. Specifically, Plaintiffs have argued that FWS's "destruction or adverse modification"

17  determinations must be directed at specific parcels within the species' critical habitat, rather than to the

18  species' critical habitat as a whole.  See Pl. ESA Reply at 14-18; id. at 15 (citing NBO 12350-51 as an

19  example, which discussed disturbance to "an area that is approximately 20 acres in size").  As demonstrated

20  below, ESA § 7's substantive mandates focus on the likely effects to a species' critical habitat as a whole

21  and not, as Plaintiffs claim, to individual parcels within the broader critical habitat designation.

22          In the ESA, Congress defined "critical habitat" as "the specific areas within the geographical area

23  occupied by the species, . . . on which are found those physical or biological features (I) essential to the

24  conservation of the species and (II) which may require special management considerations or protection .

25  . ." 16 U.S.C. § 1532(5)(A); 50 C.F.R. § 424.02(d) (same).  ESA § 7, in turn, requires FWS to issue an

26  opinion "detailing how the agency action affects the species or its critical habitat." 16 U.S.C. §

27  1536(b)(3)(A).  Congress referred to all of the "specific areas" designated by the Secretary as "critical

28  habitat" and required FWS to issue a single "destruction or adverse modification" determination applicable

1   to the species' "critical habitat." Id.  Congress did not instruct FWS to issue separate "destruction or adverse

2   modification" determinations for each "specific area" within the broader critical habitat designation.  See

3   WBO 10103 (FWS's interpretation of the "destruction or adverse modification" standard, stating that FWS

4   shall "discuss the relationship of the affected unit(s) in the action area to the entire designated or proposed

5   critical habitat with respect to the conservation of the listed species.").

6        In accord, the Ninth Circuit has found that the "destruction or adverse modification" standard

7   requires an inquiry broader than that of examining impacts to a portion of the species' designated critical

8   habitat, explaining that "'destruction or adverse modification' could occur when sufficient critical habitat

9   is lost so as to threaten a species' recovery even if there remains sufficient critical habitat for the species'

10  survival." Gifford Pinchot, 378 F.3d at 1070. In reviewing FWS's "destruction or adverse modification"

11  analysis in a specific biological opinion, the Ninth Circuit expressly rejected an argument, similar to

12  arguments Plaintiffs have made in this case, that a "large scale analysis" is improper under the ESA.  Id.

13  at 1075; see also Center for Biological Diversity v. BLM, 422 F. Supp. 2d 1115, 1145 n. 22 (N.D. Cal.

14  2006) ("the critical habitat designation determines the geographic scope of the critical habitat analyzed in

15  future Section 7 consultations."); Natural Res. Def. Council v. Kempthorne, 506 F. Supp. 2d 322, 382 (E.D.

16  Cal. 2007) ("the agency defined critical habitat to have a geographic scope. Absent any alterations to the

17  critical habitat designation, the agency must address in the BiOp the full extent of impacts to the currently

18  designated critical habitat.").

19        Thus, the Ninth Circuit's analysis of the "destruction or adverse modification" standard in Gifford

20  Pinchot focused on the amount and quality of remaining critical habitat following a proposed action and

21  confirms that FWS's inquiry must examine the functioning of the species' "critical habitat" as a whole as

22  part of its ESA § 7 inquiry.  Therefore, any claim by Plaintiffs that FWS erred by "viewing [impacts] only

23  in light of the all [sic] critical habitat designated for the desert tortoise," Pl. ESA Reply at 14, has no basis

24  in the ESA and fails.  See Chevron U.S.A., v. Natural Res. Def. Council, 467 U.S. 837, 842, 844 (1984).

25              **b.      FWS's Analyses of the Effects of BLM's Proposed Actions on The Desert**
                         **Tortoise's Critical Habitat Are Reasoned And Supported by the Record.**

26        In addition to challenging the scale of FWS's adverse modification analyses, Plaintiffs have asserted

27  that FWS failed to analyze or adequately consider various factors in the course of its "adverse modification"

28  analyses.  See Pl. ESA Reply at 14-18. Such claims lack merit, as FWS thoroughly considered the relevant

1  factors, and its ultimate determinations that BLM's proposed actions are not likely to destroy or adversely

2  modify the desert tortoise's critical habitat are reasoned and supported by the record.

3  In the WEMO BiOp,[50] FWS examined the overall status of the desert tortoise's critical habitat, both

4  range-wide (WBO 14797-14799) and within the action area (WBO 14810-15), and FWS found that "large

5  areas of critical habitat . . . remain undisturbed" within the four critical habitat units located within the

6  Western Mojave Recovery Unit.  WBO 14810, 14815. FWS explained that, "[a]t this level of disturbance,

7  we anticipate that the critical habitat units should function fully to support the conservation of the desert

8  tortoise." WBO 14815; id. at 14798 ("for all critical habitat units, the primary constituent elements ["PCEs"]

9  are generally functioning, to the best of our knowledge, in a manner that would support the key biological

10  and physical needs of the desert tortoise").  Thus, Plaintiffs' prior contention that "large areas of [the desert

11  tortoise's] remaining habitat have been degraded" is wrong.  See Pl. ESA Reply at 13-14.

12  FWS also extensively analyzed the effects of BLM's proposed actions on designated critical habitat.

13  See, e.g., WBO 14821-25, 14834-41, 14884-45, 14851-71, 14872-73, 14876-79, 14879, 14882-84. Contrary

14  to Plaintiffs' prior claims, Pl. ESA Reply at 19-20, FWS appropriately analyzed the location, status, and

15  effects to the 18,460 acres of critical habitat outside of DWMAs but within the four critical habitat units

16  located in the Western Mojave Recovery Unit.   See, e.g., WBO 14232, 14834; see WBO 14834 (Ord-

17  Rodman Critical Habitat Unit ("CHU")); WBO 14935-36, 14884 (Fremont-Kramer CHU); WBO 14835,

18  14884 (Superior-Cronese CHU); WBO 14835 (Pinto Mountain CHU).  In fact, FWS found that disturbance

19  within critical habitat, including portions located outside of DWMAs, will not exceed the one percent limit

20  on cumulative future ground disturbance.  WBO 14836-37 (explaining rationale).

21  Moreover, FWS's analysis of specific activities – such as grazing - is detailed and extensive.  For

22  instance, within the 1,670,479 acres of critical habitat within the action area, grazing is authorized to occur

23  only on 110,000 acres, see WBO 14864, 14873, and FWS analyzed the effects of authorized grazing

24  activities within each of the allotments, see WBO 14857-71; WBO 13937.  Of the 110,000 acres where

25  grazing is authorized in critical habitat, 107,961 acres lie within the Ord Mountain Allotment located within

26  the Ord-Rodman DWMA.  WBO 14864, 14873.  Within the Ord Mountain Allotment, BLM's management

27  ───────────────

28  [50] While Defendants focus on the WEMO BiOp, the same scope of analysis was applied in the context of
the NECO BiOp, and the arguments presented herein are equally applicable to the NECO BiOp.

1   prescriptions require the exclusion of cattle from 34,185 acres of the Allotment between March 15 to June

2   15 of each year, when forage levels fall below 230 pounds, thus reducing the effects of grazing on desert

3   tortoise forage conditions. WBO 14865. Moreover, large portions of the Allotment are located above 4,000

4   feet in elevation, which do not support PCEs on a wide-spread basis. WBO 14865. Based on its review,

5   FWS found: the PCEs of the critical habitat within the Ord Mountain Allotment are not uniformly

6   distributed and are scattered throughout the Allotment; critical habitat in the Allotment continues to support

7   the PCEs, as grazing does not result in the complete or total removal of PCEs from every acre of an

8   allotment; and most of the larger areas where the PCEs for the Ord-Rodman CHU are present lie outside

9   of the Ord Mountain Allotment. Id. at 14851, 14857-58, 14864-65.

10       Like its jeopardy analyses, FWS appropriately analyzed the aggregate effects of the actions on the

11   desert tortoise's critical habitat. See, e.g., WBO 14882-84; see also Section IV.a. supra. As such, FWS

12   properly analyzed specific activities, such as OHV use and grazing, NBO 12580-81, 12617-21; WBO

13   14797-99, 14821-25, and FWS also appropriately assessed the degree to which the localized effects would,

14   in the aggregate, impact larger areas of designated critical habitat, NBO 12704-07; WBO 14882-84. FWS

15   reasonably concluded that "large expanses of habitat, including most critical habitat of the desert tortoise,

16   remain undisturbed by the [BLM's] management actions" and that the proposed action ensures "that the

17   conservation role and function of critical habitat of the desert tortoise are maintained." WBO 14884.

18   FWS's analyses and conclusions comply with the requirements of the ESA and should be left undisturbed.

19   Gifford Pinchot, 378 F.3d at 1075 ("Without evidence in the record supporting that some localized risk was

20   improperly hidden by use of large scale analysis, we will not second-guess the FWS.").

21       This Court's opinion in Hayward Area Planning Ass'n v. Norton, Civ. No. 00-4211 SI, 2004 WL

22   724950 (N.D. Cal. Mar. 29, 2004), is instructive. There, the Court upheld FWS's destruction or adverse

23   modification determination, noting that FWS acknowledged the project's "extensive negative effects on the

24   critical habitat, including direct loss of habitat, reduced connectivity, reduction of prey base due to habitat

25   loss, increase in pets and other urban-adapted predators, and chronic human-related disturbance." Id at *7.

26   The Court, however, went on to consider FWS's evaluation of "the ways in which these impacts will be

27   mitigated by compensation measures, such as the dedication of 1,197 acres for the preservation and

28   management of whipsnake critical habitat and for the benefit of the whipsnake and the frog, the created rock

1  outcrop scrub habitat, and the increased management in conservation areas." <u>Id</u>.  Recognizing that the APA

2  "requires that substantial deference be given to agency decisions," the Court deferred to FWS's analysis,

3  finding all relevant factors were considered and that FWS's determination was reasoned and supported by

4  the record.  <u>Id</u>.  In this case, as in <u>Hayward Area</u>, FWS candidly considered and assessed a wide-range of

5  factors – including the adverse and beneficial aspects of BLM's proposed actions – and FWS's adverse

6  modification analyses similarly are entitled to considerable deference and should be upheld.

7      **C.**    **FWS's Incidental Take Statements Comply With the ESA and Should Be Upheld.**

8      If, as here, FWS determines that a proposed action will not jeopardize the continued existence of

9  a listed species, FWS will, as appropriate, "[f]ormulate a statement concerning incidental take."  50 C.F.R.

10  § 402.14(g)(7); 16 U.S.C. § 1536(b)(4).  On November 30, 2007, FWS issued revised ITSs for the NECO

11  and WEMO BiOps, which cover livestock grazing, removal of burros, and casual use activities within the

12  action areas that are authorized by the approval of the CDCA Plan, as amended by the NECO, NEMO, and

13  WEMO plans.  NSupp ITS 1177, WSupp ITS 1020-21.  FWS's ITSs fully comply with the ESA, bear a

14  rational connection to the facts and record, and should be upheld.

15      **1.**    **The Timing of the Revised Incidental Take Statements Does Not Render The WEMO and NECO BiOps or the ITSs Invalid.**

16      Following the issuance of the WEMO and NECO BiOps, FWS re-examined the ITSs accompanying

17  the biological opinions to, among other reasons, "clarify [FWS's] anticipated level of incidental take" and

18  address this Court's opinion reviewing the incidental take statement accompanying the biological opinion

19  for the Imperial Sand Dunes Recreation Area.  WSupp ITS 1018-19; NSupp ITS 1175-76; <u>see also</u> <u>Center</u>

20  <u>for Biological Diversity</u>, 422 F. Supp. 2d at 1137-41.  As part of its proactive review, FWS considered new

21  data on desert tortoise densities and abundance, re-examined existing data to supplement its analyses in the

22  prior ITSs for the WEMO and NECO BiOps, and reasonably concluded that the information considered or

23  presented in the revised ITSs did not alter the conclusions reached in the NECO and WEMO BiOps.  <u>See</u>

24  NSupp ITS 1176; WSupp ITS 1019 ("The information presented in this amendment does not, in any way,

25  alter the conclusions reached in" the NECO or WEMO BiOps.).

26      Contrary to Plaintiffs' prior claims, Pl. ESA Reply at 21-22, neither FWS's ITSs nor its BiOps are

27  rendered invalid because FWS proactively revised its ITSs.  Under the ESA, an ITS is not part of the

jeopardy analysis, but rather the ITS is only an exemption from liability under ESA § 9.  <u>Arizona Cattle Growers Ass'n v. FWS</u>, 273 F.3d 1229, 1239, 1242 (9th Cir. 2001).  Congress provided that an ITS shall be issued <u>after</u> FWS has completed its jeopardy analysis: "If <u>after</u> consultation under subsection (a)(2) of this section, the Secretary concludes that" the agency action and any incidental taking will not violate the substantive provisions of ESA § 7(a)(2), then "the Secretary shall provide the Federal agency" with an incidental take statement.  16 U.S.C. § 1536(b)(4) (emphasis added).  Because an ITS is issued only to protect an agency from liability under ESA § 9 after the jeopardy determination is made, Plaintiffs' prior claims that a subsequently issued ITS renders the ITSs and the BiOps unlawful are wrong as a matter of law.

In addition, FWS's reexamination of the NECO and WEMO BiOps does not give rise to a duty to reissue the biological opinions. In <u>Stop H-3 Ass'n v. Dole</u>, 740 F.2d 1442 (9th Cir. 1984), the Ninth Circuit found that an action agency's reliance on a BiOp was lawful, particularly because "the expert agency determined on two separate occasions that no further inquiry was necessary." <u>Id.</u> at 1460.  The Ninth Circuit's findings are consistent with the structure of the ESA, which expressly envisions continuing review and assessment of previously issued biological opinions in order to determine whether reinitiation of consultation is required.  <u>See</u> 50 C.F.R. § 402.16 (setting forth the standards for when new information requires reinitiation of consultation).  As such, Plaintiffs cannot demonstrate that FWS's proactive review - expressly envisioned by the ESA - automatically renders its biological opinions invalid.

### 2. FWS Reasonably Identified the Amount or Extent of Anticipated Incidental Take.

Under the ESA, an ITS must specify the impact, <u>i.e.</u>, the amount or extent, of any incidental taking on the species. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(I). Here, FWS reasonably specified the amount of anticipated take and provided "a clear standard for determining when the authorized level of take has been exceeded." <u>Arizona Cattle Growers</u>, 273 F.3d at 1249; 16 U.S.C. § 1536(b)(4)(I); 50 C.F.R. §§ 402.14(i)(1)(I), (i)(4). FWS arrived at the incidental take estimates "by considering the interrelationship of factors such as the likely intensity and frequency of the involved activities, the area over which the activities may occur, and the estimated density of desert tortoises in the area." NSupp ITS 1194; WSupp ITS 1032-33. FWS identified the area in which a particular use occurs, estimated the number of desert tortoises that reside in the areas affected by the use, assessed the nature and intensity of the use, and assessed other

1   information in examining the extent to which a use may result in injury or mortality to tortoises. <u>See, e.g.</u>,

2   NSupp ITS 1191-94.  Due to the paucity of available data, and because estimating the amount or extent of

3   any incidental "take" is "not a technical question for which data can provide a mathematically 'correct'

4   answer," <u>American Fed'n of Gov't Employees v. Office of Personnel Mgmt.</u>, 821 F.2d 761, 765 (D.C. Cir.

5   1987), FWS utilized its judgment and expertise to estimate the amount or extent of "take" found likely to

6   occur, NSupp ITS 1194; WSupp ITS 1032-33.  FWS also recognized that the detection of incidental take

7   "is difficult due to the large action area, the nature of these uses, and the desert ecosystem; also, it is not

8   possible for [BLM] to detect every instance of incidental taking of desert tortoises that may occur as a result

9   of these activities."  NSupp ITS 1194; WSupp ITS 1033. Thus, FWS specified the extent of detected

10  incidental take that indicates when take levels are exceeded and when reinitiation is required.  <u>Id</u>.[51]

11         Far from constituting mere "guess work," Pl. ESA Br. at 21, FWS's findings are predicated on a

12  reasoned examination of the available data regarding the extent to which authorized activities are likely to

13  result in injury or death to desert tortoises, in light of the nature of the authorized activities and estimated

14  densities of desert tortoises in the area.[52] Plaintiffs' apparent belief that FWS is precluded from utilizing its

15  judgment and expertise in fashioning an ITS lacks merit, <u>see</u> Pl. ESA Br. at 21-22, 23-24, as Congress

16  expressly contemplated – and the Ninth Circuit has recognized – that FWS is permitted to utilize its

17  expertise in the course of fashioning an ITS.  <u>See</u> <u>Arizona Cattle Growers</u>, 273 F.3d at 1236 (citing cases).

18  Consequently, FWS's reliance on its expertise, as contemplated by Congress, does not "demonstrate that

19  [the] lines drawn . . . are patently unreasonable, having no relationship to the underlying regulatory

20  problem." <u>ExxonMobil Gas Mktg. Co. v. FERC</u>, 297 F.3d 1071,1085 (D.C. Cir. 2002) (citations omitted).

21

22  _____

    [51] The ITS for the NECO and NEMO plan amendments contains a clerical error regarding the amount of

23  dead or injured tortoises that indicates when anticipated incidental take levels have been exceeded.  <u>See</u>
    NSupp ITS 1194.  As the specific discussion immediately preceding that sentence makes clear (as does a

24  parallel discussion in the WEMO ITS, WSupp ITS 1033) the number should be three injured or dead

25  tortoises for the NEMO plan area and six for the NECO plan area. <u>Id</u>.

26  [52] Plaintiffs previously opined that another method to establish a reinitiation trigger would appear to be
    "more reasonable."  Pl. ESA Br. at 24.  Respectfully, Plaintiffs' opinion on what may be more reasonable

27  in no way demonstrates that FWS's consideration of this factor is irrational.  <u>Sierra Club v. Dombeck</u>, 161
    F. Supp. 2d 1052, 1070-71 (D. Ariz. 2001) ("Mere disagreement with an agency's policies, methodologies,

28  and conclusions does not render the decision arbitrary and capricious." (citation omitted)).

FEDERAL DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT                  57                   CASE NO. 3:06 CV-04884 SI

1    Recognizing that they cannot show that FWS's identification of the anticipated levels of incidental

2 take is arbitrary and capricious, Plaintiffs have asserted that the ITSs do not cover all of the alleged take of

3 listed species that purportedly is attributable to BLM's proposed actions.  Pl. ESA Reply at 23-24.  For

4 instance, in Plaintiffs' opening memorandum, Plaintiffs previously disregarded FWS's analyses of the

5 impacts of grazing as authorized by the plan amendments, cited the general effects that grazing can have

6 on habitat and desert tortoise, and asserted that FWS should have found that "take" in the form of "harm"

7 was reasonably likely to occur.  See Pl. ESA Br. at 10; 50 C.F.R. § 17.3 (definition of "harm").   FWS,

8 however, concluded that no "take" in the form of "harm" is likely to occur because authorized grazing is

9 not likely to result in significant habitat degradation such that actual injury or morality to desert tortoises

10 is reasonably likely to occur.  See NBO 12544, 12559-61, 12597, 12602, 12673-76, 12692-95; WBO 14810-

11 14, 14848-54, 14857, 14859-71.  Because FWS found that such "take" was not "reasonably likely" to occur,

12 FWS appropriately did not specify the amount or extent of such "take" in the ITS.  See Consultation

13 Handbook at 4-47 (interpreting the ESA to require specification of the impacts of "take" that is "reasonably

14 likely" to occur incidental to a proposed action);[53] Arizona Cattle Growers, 273 F.3d at 1242 ("[I]t is

15 arbitrary and capricious to issue an [ITS] when [FWS] has no rational basis to conclude that a take will

16 occur incident to the otherwise lawful activity.").   References to the general effects of grazing, while

17 ignoring the actual extent to which grazing is authorized and FWS's analysis of such grazing activities, does

18 not demonstrate otherwise, and FWS's ITSs should be upheld.

19              **3.      FWS's RPMs and T&Cs Are Reasoned and Comply with the ESA**.

20    Under the ESA, an ITS must contain RPMs "that the Secretary considers necessary or appropriate"

21 to minimize the impact of the incidental taking on the species.  16 U.S.C.  §  1536(b)(4)(C)(ii); 50 C.F.R.

22 § 402.14(i)(1)(ii).  RPMs are defined at 50 C.F.R. § 402.02 as "those actions [FWS] believes necessary or

23 

---

24  [53] Plaintiffs also have asserted that "[t]here is more than sufficient evidence to show that livestock grazing
25 and ORV use directly impair feeding and sheltering of tortoise by destroying burrows and competing for
   scarce forage – significantly degrading the value of critical habitat."  Pl. ESA Reply at 23.  Notably,
26 Plaintiffs did not cite one single piece of this "sufficient evidence."  Id.  Plaintiffs' unsupported assertions
   do not render FWS's detailed analyses of the likely impacts of BLM's authorized actions superfluous.  See
27 United States v. W.R. Grace & Co., 429 F.3d 1224, 1245 (9th Cir. 2005) ("we will not delve further to
   second-guess the underlying data absent a showing of specific evidence that the [agency's] conclusions
28 were not warranted") (emphasis added).

1  appropriate to minimize the impacts" of incidental take.  They are "minor changes [to the proposed action]

2  that do not alter the basic design, location, duration, or timing of the action."  51 Fed. Reg. 19,926, 19,937

3  (June 3, 1986).  Here, Plaintiffs previously challenged FWS's monitoring-based RPMs (RPM 1 in the

4  WEMO ITS and RPM 4 in the NECO ITS) on the basis that  "[m]onitoring, while important, will not

5  minimize take."  Pl. ESA Reply at 24; see NSupp ITS at 1196; WSupp ITS 1034.  However, absent the

6  monitoring provisions, BLM would not be able to review its actions to determine whether reinitiation is

7  necessary; consequently, monitoring is an essential component of ensuring that the ITSs are effective and

8  appropriately "minimize[s] the impact" of incidental take, as specified under the ESA. See 16 U.S.C. §

9  1536(b)(4)(C)(ii);  Oregon Natural Res. Council v. Allen, 476 F.3d 1031, 1039 n. 7 (9th Cir. 2007) ("FWS

10  Section 7 Consultation Handbook [at 5-4] provides as examples concrete activities that may allow those

11  implementing the project to reduce the number of animals taken, such as . . . monitoring.").[54]

12       Viewed under the correct legal standards, the record provides clear support for both the need to

13  collect data in the course of managing public lands and the fact that this data collection will benefit desert

14  tortoises and minimize the impact of any incidental take.  See WBO 9303-04, 9306, 9321, 9397, 9430,

15  9431-32, 9466-67. FWS's RPMs will minimize the impact of the anticipated incidental take by requiring

16  FWS and BLM to review the circumstances surrounding the incidental take to determine if additional

17  protective measures or environmental review should be implemented.  See NSupp ITS 1198; WSupp ITS

18  1035.  In addition, FWS's RPMs provide safeguards to ensure that, should incidental take levels approach

19  or exceed the levels anticipated by FWS, FWS has the data and the ability to ensure that reinitiated

20  consultation occurs immediately, obviously to the benefit of the desert tortoise.  See NSupp ITS at 1196;

21  WSupp ITS 1034.  Because FWS's RPMs are reasonably likely to "minimize the impact" of incidental take,

22  and because FWS is accorded significant discretion to identify RPMs it deems "necessary or appropriate,"

23  Plaintiffs' mere disagreement with the RPMs identified by FWS is insufficient and must fail. Cf. Natural

24  Res. Def. Council v. Kempthorne, 506 F. Supp. 2d 322, 358-59 (E.D. Cal. 2007) (refusing to dictate the

25

26  [54]  FWS's ITSs also contain additional RPMs that "minimize the impact" of incidental take. See WSupp

27  ITS 1034; NSupp ITS 1195-96.  Therefore, Plaintiffs cannot show that FWS improperly exercised its
   extremely broad discretion to identify those RPM's it "considers necessary or appropriate." 16 U.S.C. §

28  1536(b)(4)(C)(ii); 50 C.F.R. § 402.14(i)(1)(ii).

1  precise means by which an agency must acquire water resources, concluding that it "must leave to the

2  agency the application of its expertise and authority to manage the complex hydrologic, legal, financial,

3  physical, and logistical aspects of protecting the [listed species]").

4      **D.**    **BLM Has Complied with its Procedural and Substantive Obligations under the ESA.**

5      "[W]hen [courts] are reviewing the decision of an action agency to rely on a BiOp, the focus of [the

6  Court's] review is quite different than when [it is] reviewing a BiOp directly. In the former case, the critical

7  question is whether the action agency's <u>reliance</u> was arbitrary and capricious, not whether the BiOp itself

8  is somehow flawed." <u>City of Tacoma v. FERC</u>, 460 F.3d 53, 75 (D.C. Cir. 2006) (citations omitted); <u>Center

9  for Biological Diversity v. Rumsfeld</u>, 198 F. Supp. 2d 1139, 1157 (D. Ariz. 2002) (BLM "has an

10  independent duty to insure that its actions satisfy § 7 and the jeopardy standard." ); <u>Village of False Pass

11  v. Watt</u>, 565 F. Supp. 1123, 1154 (D. Alaska 1983), <u>aff'd</u>, 733 F.2d 605 (9th Cir. 1984).  Here, BLM

12  reasonably has relied on the BiOps <u>and</u> has supplied additional rationale and support demonstrating full

13  compliance with the substantive mandates of the ESA.  <u>See, e.g.</u>, Docket Nos. 51, 56 (BLM's administrative

14  records).  Like the plaintiffs in <u>City of Tacoma</u>, Plaintiffs here cannot demonstrate that BLM's reliance on

15  the BiOps – and BLM's additional stated rationales and justifications – are in any manner arbitrary and

16  capricious, and Plaintiffs' challenge to BLM's compliance with the ESA should be rejected.

17  **V.**    **REMEDY**

18      The plaintiffs are not entitled to declaratory relief and no basis to seek the extraordinary relief

19  required to enjoin final agency action.  <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 312 (1982).

20                              **CONCLUSION**

21      The federal defendants are entitled to summary judgment as a matter of law on all claims and causes

22  of action alleged in the Second Amended Complaint.  The federal defendants complied with all applicable

23  statutory obligations and request that the court grant their motion for summary judgment, deny the

24  plaintiffs' motion for summary judgment, enter judgment for the federal defendants, and dismiss the

25  plaintiffs' Second Amended Complaint with prejudice.

26  Dated: September 8, 2008          Respectfully submitted,

27

                                    RONALD J. TENPAS,

28                                      Assistant Attorney General

1    Environment & Natural Resources Division

2    /s/ *Michael R. Eitel*

3    MICHAEL R. EITEL, Trial Attorney (Neb. Bar No. 22889)
     U.S. Department of Justice
4    Environment & Natural Resources Division
     Wildlife & Marine Resources Section
5    1961 Stout Street, 8th Floor, Room 812
     Denver, CO 80294
6    Telephone:     (303) 844-1479
     Facsimile:     (303) 844-1350
7    Email:         michael.eitel@usdoj.gov

8    /s/ *Charles R. Shockey*

9    CHARLES R. SHOCKEY, Attorney (DC Bar No. 914879)
     U. S. Department of Justice
10   Environment and Natural Resources Division
     Natural Resources Section
11   501 "I" Street, Suite 9-700
     Sacramento, CA 95814-2322
12   Tel: 916-930-2203 / Fax: 916-930-2210
     Email: charles.shockey@usdoj.gov

13   Attorneys for Federal Defendants

14

15   **OF COUNSEL**:

16   CHERYLL DOBSON
     ERICA NIEBAUER
17   Assistant Regional Solicitors
     Office of the Regional Solicitor
18   U.S. Department of the Interior
     Sacramento, California

19

20                    **CERTIFICATE OF SERVICE**

21        I hereby certify that on September 8, 2008, I electronically filed the "Federal Defendants'

22   Memorandum in Support of Motion for Summary Judgment with the Clerk of Court using the CM/ECF

23   system, which will automatically send email notification to the attorneys of record.

24                           /s/ *Michael R. Eitel*

25                           MICHAEL R.  EITEL

26

27

28