Lisa T. Belenky (CA Bar No. 203225)
CENTER FOR BIOLOGICAL DIVERSITY
351 California Street, Suite 600
San Francisco, CA 94104
Telephone: (415) 436-9682 x 307
Facsimile: (415) 436-9683
Email: lbelenky@biologicaldiversity.org

Deborah A. Sivas (CA Bar No. 135446)
Leah J. Russin (CA Bar No. 225336)
Environmental Law Clinic
MILLS LEGAL CLINIC
STANFORD LAW SCHOOL
Crown Quadrangle
559 Nathan Abbott Way
Stanford, California 94305-8610
Telephone: (650) 723-0325
Facsimile: (650) 723-4426
Email: dsivas@stanford.edu

Attorneys for Plaintiffs Center for Biological Diversity, Sierra Club,
Public Employees for Environmental Responsibility, and Desert Survivors

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,<br><br>           Plaintiffs,<br><br>v.<br><br>BUREAU OF LAND MANAGEMENT, *et al.*,<br><br>         Defendants. | Case No. 3:06 CV 04884 SI<br><br>**PLAINTIFFS CBD ET AL.'S NOTICE OF MOTION AND MOTION FOR SUMMARY ADJUDICATION OF CLAIMS 3 AND 4; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing Date:  May 16, 2006<br>Time:         9:00 am<br>Courtroom:  10, 17th Floor<br>Judge:      Hon. Susan Illston |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: PLEASE TAKE NOTICE that at 9:00 a.m. on May 16, 2008, this matter was heard in Honorable Judge Susan Illston's department (Courtroom 10) of the United States District Court for the Northern District of California, 450 Golden Gate, 19th Floor, San Francisco, California. On August 12, 2008, the Court stated that the previous motions were deemed withdrawn and ordered the parties to refile briefing on cross-motions for summary judgment. Plaintiffs Center for Biological Diversity, Sierra Club, Public Employees for Environmental Responsibility, and Desert Survivors hereby move this Court for Summary Judgment on the Third and Fourth Claims for Relief in this action. This motion is based on the accompanying Memorandum of Points and Authorities, the pleadings, records, files, and hearing in this action.

Plaintiffs Center for Biological Diversity, Sierra Club, Public Employees for Environmental Responsibility, and Desert Survivors request that the Court: set aside both of the challenged biological opinions (as recently amended by Defendant U.S. Fish and Wildlife Service); find that Defendant Bureau of Land Management's reliance on the two biological opinions is invalid; and set aside Defendant Bureau of Land Management's adoption of the Record of Decision for the West Mojave Plan amendments to the California Desert Conservation Area ("CDCA") Plan. Plaintiffs Center for Biological Diversity, Sierra Club, Public Employees for Environmental Responsibility, and Desert Survivors seek interim injunctive relief to protect the desert tortoise and its critical habitat and other listed species until such time as the agencies remedy these violations of law.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................1

II.   BACKGROUND ...................................................................................................1

    A.   Statutory and Regulatory Background ........................................................ 1

    B.   Factual Background ....................................................................................3

        1.   Listed Species in the NECO and WEMO Planning Areas ........................3

        2.   NECO Plan, 2005 Biological Opinion, 2007 Amendment to the ITS ...................5

        3.   WEMO Route Designation, 2006 WEMO Plan, 2006 WEMO
            Biological Opinion, 2007 Amendment to the ITS ...................................5

    C.   Procedural Background ...............................................................................6

III.  STANDARD OF REVIEW ..................................................................................6

IV.   ARGUMENT ........................................................................................................7

    A.   The NECO and WEMO Biological Opinions are Unlawful ..............................7

        1.   FWS Failed to Insure Against  Jeopardy and Adverse Modification........................8

            a.   FWS Failed to Insure Against Jeopardy for the Tortoise and LMMV ............8

            b.   FWS' Consideration of Destruction or Adverse Modification Violated
                the ESA ................................................................................... 10

                i.   FWS reversed its earlier position without explanation ...........................10

                ii   FWS dismissed significant effects on critical habitat and recovery ........11

                iii.  FWS improperly focused on effects to DWMAs not all
                    critical habitat  ................................................................... 14

                iv.  Impacts of ORV use on Critical Habitat .................................................14

                v.   Effects of Grazing on Critical Habitat ....................................................17

            c.   FWS failed to use the best scientific and commercial data available
                in the BOs ................................................................................ 18

         3.   FWS' Incidental Take Statements Fail to Comply with the ESA ...........................19

            a.   FWS failed to consider all take that is likely to occur .................................21

            b.   The numbers of allowable take and re-initiation triggers are irrational .......22

            c.   The RPMs and T&Cs in the BOs Fail to Comply with the ESA ................23

    B.   BLM Failed to Comply with its Duties Under the ESA in Adopting the Plans ...........24

    VI.  CONCLUSION AND RELIEF..........................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*America Motorcycle Association District 37 v. Norton*, 2004 U.S. Dist. LEXIS 15662 (N.D. Cal. Aug. 3, 2004) ................................................................................5

*Babbitt v. Sweet Home Chapter*, 515 U.S. 687 (1995) ................................................21

*Bennett v. Spear*, 520 U.S. 154, 117 S. Ct. 1154 (1997) ....................................6, 15

*Center for Biological Diversity v. Bureau of Land Management,* 422 F. Supp. 2d 1115 (N.D. Cal. 2006) ............................................................................*Passim*

*Center for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139 (D. Ariz. 2002)....................7

*Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988) ................................................18, 19

*Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121 (D.D.C. 2001) ........................9

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Service*, 378 F.3d 1059 (9th Cir. 2004) ............................................................................*Passim*

*Greenpeace v. NMFS*, 80 F. Supp. 2d 1137 (W.D. Wash. 2000) ................................18

*Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977) ........................6

*Marbled Murrelet v. Babbitt*, 83 F.3d 1060 (9th Cir. 1996)........................................21

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) ....................................................................7, 11

*NRDC v. Evans*, 364 F. Supp. 2d 1083 (N.D. Cal. 2003)................................15, 18, 23

*NRDC v. Kempthorne*, 506 F. Supp. 2d 322 (E.D. Cal. 2007) ................................14, 19

*National Wildlife Foundation v. NMFS*, 524 F.3d 917 (9th Cir. 2008)........................8, 9, 11, 13

*Nebraska v. Wyoming*, 507 U.S. 584 (1993)........................................................6

*ONDA v. BLM*, __ F.3d __, 2008 U.S. App. LEXIS 14896 (9th Cir. July 14, 2008)....................12

*Oregon Natural Resource Council v. Lowe*, 109 F.3d 521 (9th Cir. 1997)................................22

*Oregon Natural Resources Council v. Allen*, 476 F.3d 1031 (9th Cir. 2007) ....................6, 19, 22

*Pacific Coast Federation v. NMFS*, 265 F.3d 1028 (9th Cir. 2001)................................18

*Pacific Rivers Council v. Thomas*, 30 F.3d 1050 (9th Cir. 1994)........................................3

*Pyramid Lake Paiute Tribe of Indians v. United States Department of Navy*, 898 F.2d 1410 (9th Cir. 1990) ........................................................25

*Resources Ltd. v. Robertson*, 35 F.3d 1300 (9th Cir. 1994) ................................25

*Southwest Ctr. for Biological Diversity v. Bartel*, 470 F. Supp. 2d 1118 (S.D. Cal. 2006) ............2

*T.V.A. v. Hill*, 437 U.S. 153 (1978).......................................................................................2

*Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985).................................................................3

## DOCKETED CASES

*Center for Biological Diversity v. Bureau of Land Management*,  No. C 03-0259 SI,
    (N.D. Cal. Dec. 30, 2004) .....................................................................................5

## FEDERAL STATUTES

Endangered Species Act, 16 U.S.C. §§ 1531-1534 ..................................................*Passim*

5 U.S.C. § 706(2)(A)....................................................................................6, 7, 25

16 U.S.C. § 1531(a)(1)..........................................................................................1

16 U.S.C. § 1531(b)..............................................................................................2

16 U.S.C. § 1532(19)........................................................................................2, 21

16 U.S.C. § 1532(3)..............................................................................................2

16 U.S.C. § 1533..................................................................................................2

16 U.S.C. § 1533(b)(2)..........................................................................................2

16 U.S.C. § 1533(f)(1)..........................................................................................2

16 U.S.C. § 1536(a)(2)................................................................................*Passim*

16 U.S.C. § 1536(b)(3)(A)..................................................................................3, 13

16 U.S.C. § 1536(b)(4) ...............................................................................2, 3, 20

16 U.S.C. § 1536(b)(4)(C)(ii)..............................................................................23

16 U.S.C. § 1538(a)(1)..........................................................................................2

## FEDERAL RULES AND REGULATIONS

50 C.F.R. § 402.02................................................................................................3

50 C.F.R. § 402.14(i)(4)........................................................................................22

50 C.F.R. § 402.16................................................................................................20

50 C.F.R. § 17.3 ..............................................................................................2, 21

50 C.F.R. § 17.31 ..................................................................................................2

50 C.F.R. § 402.02................................................................................................9

50 C.F.R. § 402.14(g)-(h) ...........................................................................................3, 18

50 C.F.R. § 402.14(i) ........................................................................................................3

Fed. R. Civ. P. 56(c) .........................................................................................................6

**FEDERAL REGISTER CITATIONS**

70 Fed. Reg. 18220, 18234-35 (April 8, 2005)...............................................................5

# I. INTRODUCTION

In this action, Plaintiffs Center for Biological Diversity, Sierra Club, Public Employees for Environmental Responsibility, and Desert Survivors ask this Court to once again turn its attention to the plight of the desert tortoise and the ongoing destruction of its habitat on public lands in the California Desert Conservation Area ("CDCA"), particularly on lands managed by the Bureau of Land Management ("BLM") in the Northern and Eastern Colorado ("NECO") and West Mojave ("WEMO") planning areas pursuant to amendments to the CDCA Plan.  The tortoise gained legal protection under the Endangered Species Act ("ESA") in 1989 and critical habitat was designated in 1994.  That same year, scientists prepared the Desert Tortoise Recovery Plan providing a roadmap for recovery of tortoise populations as required by the ESA.  Unfortunately, the Recovery Plan recommendations have never been fully implemented by the Secretary as required under the ESA, and the desert tortoise population has continued to decline in this area.  The decline of the desert tortoise is caused by many threats.  Of these threats, many cannot be controlled by Defendants here, but others can.  It is the controllable threats to the tortoise and its critical habitat on public lands that are the focus of this action, primarily BLM's authorization of off-road vehicle ("ORV") use and livestock grazing within designated critical habitat.  Defendants have repeatedly chosen to authorize these activities, that are known to kill tortoises and alter or diminish the value of its habitat, rather than implement the Recovery Plan's science-based recommendations to protect the species and its critical habitat to promote recovery as required by the ESA.  Plaintiffs also ask this Court to review Defendants' determinations regarding impacts to the threatened Lane Mountain milk-vetch which was listed under the ESA in 1998.

# II. BACKGROUND

## A.    Statutory and Regulatory Background

Congress passed the Endangered Species Act, 16 U.S.C. §§ 1531-44, in response to growing concern over the extinction of fish, wildlife, and plants.  16 U.S.C. § 1531(a)(1).  The purpose of the ESA is to conserve the ecosystems on which endangered and threatened species depend and to conserve and recover those species so that they no longer require the protections of

the Act.  16 U.S.C. § 1531(b); 16 U.S.C. § 1532(3) (defining "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary").  The Supreme Court has held that the ESA reflects "an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species." *T.V.A. v. Hill*, 437 U.S. 153, 185 (1978).  As the Ninth Circuit emphasized, "the ESA was enacted not merely to forestall the extinction of species (i.e., promote species survival), but to allow a species to recover to the point where it may be delisted."  *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Service* ("*GP Task Force*")*,* 378 F.3d 1059, 1070 (9th Cir. 2004).

ESA protections only apply to formally "listed" species. 16 U.S.C. § 1533.  Concurrently with listing, the Secretary must also designate the species' "critical habitat."  16 U.S.C. § 1533(b)(2).  "[T]he purpose of establishing 'critical habitat' is for the government to carve out territory that is not only necessary for the species' survival but also essential for the species' recovery." *GP Task Force*, 378 F.3d at 1070.  The Secretary must also develop and implement recovery plans.  16 U.S.C. § 1533(f)(1); *see Sw. Ctr. for Biological Diversity v. Bartel*, 470 F. Supp. 2d 1118, 1136-37 & n.16 (S.D. Cal. 2006).  Section 9 of the ESA prohibits "take" of a threatened or endangered species of animal, such as the desert tortoise.  16 U.S.C. § 1538(a)(1); 50 C.F.R. § 17.31.  "Take" is defined broadly to include harming, harassing, trapping, capturing, wounding, or killing a protected species either directly or by degrading its habitat sufficiently to impair essential behavior patterns.  16 U.S.C. § 1532(19); 50 CFR § 17.3.  One exception to Section 9's take prohibitions is relevant here; a federal agency may take listed species only in accordance with an Incidental Take Statement ("ITS").  16 U.S.C. § 1536(b)(4).

Section 7(a)(2) requires that "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species."  16 U.S.C. § 1536(a)(2).  The Secretary has delegated compliance with the ESA consultation

1   requirements for terrestrial species to the Fish and Wildlife Service ("FWS").  The consultation

2   process is designed "to ensure compliance with the [ESA's] substantive provisions." *Thomas v.*

3   *Peterson,* 753 F.2d 754, 764 (9th Cir. 1985).  BLM's approvals of the NECO plan amendments,

4   WEMO route designation, and WEMO plan amendments, are agency actions requiring ESA

5   Section 7 consultation.  *See Pacific Rivers Council v. Thomas,* 30 F.3d 1050, 1057 (9th Cir. 1994).

6       Formal Section 7 consultation results in a biological opinion ("BO") determining whether

7   the proposed action is likely to jeopardize a listed species or destroy or adversely modify its critical

8   habitat.  16 U.S.C. § 1536(b)(3)(A).  In making this determination, FWS must use the best

9   available scientific information to evaluate the current status of the species and habitats, the effects

10  of the action on species conservation, and the cumulative effects.  16 U.S.C § 1536(a)(2),

11  (b)(3)(A); 50 C.F.R. §§ 402.14(g)-(h), 402.02. If the BO concludes that the action will not

12  jeopardize a listed species or destroy or adversely modify its critical habitat, FWS may authorize

13  incidental take and issue an ITS based on the BO.  An ITS must specify the impact of any

14  incidental take and reasonable and prudent measures necessary to minimize impacts, and set forth

15  terms and conditions to implement those measures.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

16  **B.    Factual Background**

17      **1.    Listed Species in the NECO and WEMO Planning Areas**

18      If any species epitomizes the California Desert and BLM's mismanagement of it, it is the

19  desert tortoise.  Due to a precipitous decline in desert tortoise populations throughout the species'

20  range, FWS published an emergency rule listing the desert tortoise as endangered in 1989.  WBO[1]

21  14788.  The Mojave population of the tortoise, including all tortoises in California as well as in

22  parts of Arizona, Nevada and Utah, was listed as "threatened" in 1990.  *Id.*  Critical habitat was

23  designated in 1994.  WBO 14797.  The primary threats identified at the time of listing were:

24          loss and degradation of habitat caused by numerous human activities including
            urbanization, agricultural development, military training, recreational use, mining,

25          and livestock grazing.  The loss of individual tortoises to increased predation by

26  ────────────────

27  [1] Citations to administrative record documents: WEMO BO AR ("WBO"); WEMO Supp ITS
    AR ("WSupp"); NECO BO AR ("NBO"); NECO Supp ITS AR ("NSupp").  Identical documents

28  that appear in both records are only cited once.

common ravens, collection by humans for pets or consumption, collisions with vehicles on paved and unpaved roads, and morality resulting from diseases . . .

*Id.* at 14788. Many of these same threats to the desert tortoise remain today in designated critical habitat on public lands managed by the BLM. *See, e.g.,* WBO 14806-07. Despite listing and designation of critical habitat, tortoise populations have continued to decline at alarming rates. *See* WBO 14810; WBO 9366 (Desert Tortoise Recovery Plan Assessment ("DTRPA"); "significantly negative trend in adult density estimates"), 9369 ("downward trend in adult tortoise densities in the Western Mojave clearly dominates the analyses"), 9365 (decline on Chuckwalla Bench in NECO).

The NECO includes two designated critical habitat units—the Chuckwalla (1,020,600 acres) and Chemehuevi (937,400 acres). NBO 12585. The WEMO includes four designated critical habitat units—Superior-Cronese (766,900 acres), Ord-Rodman (253,200 acres), Fremont-Kramer (518,000 acres), and Pinto Mountains (171,700 acres). WBO 14834. Expansion of the Army's Fort Irwin National Training Center ("Fort Irwin") transferred approximately 97,860 acres of the Superior-Cronese unit out of BLM management; resident tortoise populations will be removed from much of that habitat which will be used for tank training and military exercises. WBO 14793-94. The NECO and WEMO plans designated Desert Wildlife Management Areas ("DWMAs") which exclude thousands of acres of designated critical habitat. NBO 12600 (122,823 acres of Chemehuevi unit outside the DWMA), 12603 (95,915 acres of Chuckwalla unit outside the DWMA); WBO 14834-35 (10,000 acres of critical habitat outside of the Ord-Rodman DWMA is within ORV open area). Despite the increasingly precarious state of tortoise populations in the CDCA, the WEMO and NECO plan amendments allow preventable impacts to the tortoise and its critical habitat to continue and even expand.

The Lane Mountain milk-vetch ("LMMV") was listed as threatened under the ESA on October 6, 1998 in response to increased threats including mining and ORV use; it is known in only 4 occurrences or clusters within an 18 mile radius. WBO 14912-13. Due to expansion of Fort Irwin, up to half of the known population of LMMV may be subject to direct impacts from training exercises. In light of those impacts, FWS recognized that "conservation of the occurrences

1   on public lands is essential." WBO 14915-16.[2]

2          **2. NECO Plan, 2005 Biological Opinion, 2007 Amendment to the ITS.**

3          In December, 2002, BLM issued the Record of Decision ("ROD") for the NECO Plan

4   amendment which authorized, *inter alia*, ORV "open wash zones" on 218,711 acres (25%) in the

5   Chemehuevi DWMA (NBO 12682) and 352,633 acres (43%) in the Chuckwalla DWMA (NBO

6   12682), and in an additional 1,042 square miles (666,880 acres) of desert tortoise habitat outside of

7   both the DWMAs and critical habitat (NSupp 01191).[3]  BLM authorized grazing to continue on

8   235,529 acres of critical habitat, 25% of the Chemehuevi unit.  NBO 12694.  Plaintiffs challenged

9   FWS' 2002 BO on which BLM relied in adopting the NECO Plan and, on August 3, 2004, this

10  Court found that the BO was arbitrary and capricious because it relied on an improper definition of

11  adverse modification that conflated key statutory concepts of "survival" and "recovery."  *Am.*

12  *Motorcycle Ass'n Dist. 37 v. Norton*, 2004 U.S. Dist. LEXIS 15662, *27-28 (N.D. Cal. Aug. 3,

13  2004).  Subsequently, this Court enjoined ORV use of the washes within the NECO DWMAs until

14  a revised BO was issued.  *CBD v. BLM ("CBD I")*, No. C 03-0259 SI, *Order* at *5, *9 (Dec. 30,

15  2004).  Just three months later, on March 31, 2005, FWS issued a hastily rewritten BO for the

16  desert tortoise.  NBO 12535-737 ("NECO BO").  On November 30, 2007, FWS issued a new ITS

17  for the 2005 NECO BO.  NSupp 01175.

18          **3.      WEMO Route Designation, 2006 WEMO Plan, 2006 WEMO Biological
                        Opinion, 2007 Amendment to the ITS**

19          The BLM's 2003 WEMO Route Designation and the 2006 WEMO Plan amendment

20  authorized an ORV route network including over 5,444 miles of open routes and over 30 miles of

21  "limited" routes within desert tortoise habitat  (WBO 14781); of these, over 2,230 miles of routes

22  are in designated critical habitat (*id*. at 14873).[4]  The WEMO Plan authorized continued grazing on

23  141,757 acres of designated critical habitat on public lands.  WSupp 00812.  Grazing is also

24

25  _____

26  [2] FWS designated zero acres of LMMV critical habitat. 70 Fed. Reg. 18220, 18234-35 (April 8,
    2005).  Pursuant to a settlement agreement, FWS will reconsider the LMMV critical habitat
27  designation. *CBD v. Kempthorne*, Case No. CV 07-08221 JFW (JCRx) (C.D. Cal.)
    [3] FWS did not identify the amount of critical habitat in open wash zones outside of the DWMAs.
28  [4] This figure does not include paved roads in desert tortoise habitat or ORV use in open areas.

1    authorized on over 646,000 acres of other occupied desert tortoise habitat.  WBO 14872.  FWS

2    issued a biological opinion for the WEMO plan and route designations on January 9, 2006 (WBO

3    14752-949 ("WEMO BO")) and BLM issued the ROD on March 13, 2006.  On June 8, 2007, FWS

4    issued an amendment to the WEMO BO regarding the Valley Well allotment only.  WSupp 00810-

5    22.  On November 30, 2007, FWS issued a new ITS for the WEMO BO.  *Id.* 01018-0137.

6    **C.    Procedural Background**

7            Plaintiffs provided Defendants 60-days notice of our intent to sue for failure to comply with

8    the ESA regarding, *inter alia*, the NECO BO, WEMO Plan (and WEMO Route Designation), and

9    the WEMO BO on March 23, 2006, and filed this action on August 28, 2006.  On November 30,

10   2007, FWS issued amendments to the NECO BO and WEMO BO providing completely new ITSs

11   for both BOs.  On December 4, 2007, Plaintiffs provided 60-days notice regarding the amended

12   BOs and filed the Second Amended Complaint on February 7, 2008.[5]

13                              **III. STANDARD OF REVIEW**

14          A court shall render summary judgment when no genuine issue as to any material fact

15   exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see*

16   *also Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993).

17          Biological opinions and the accompanying incidental take statements represent final

18   agency action subject to judicial review.  "As the ESA does not itself specify a standard of review

19   of its implementation, we apply the general standard of review of agency action established by the

20   Administrative Procedure Act ("APA")."  *Oregon Natural Resources Council v. Allen ("ONRC")*,

21   476 F.3d 1031, 1035-36 (9th Cir. 2007) (internal citations omitted).  Under the APA, the reviewing

22   court is directed to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an

23   abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A); *Bennett v.*

24   *Spear*, 520 U.S. 154, 174 (1997).   To withstand judicial review under the APA, 5 U.S.C. §

25   706(2)(A), the agency must have "examine[d] the relevant data and articulate[d] a satisfactory

26

27   [5] Plaintiffs have standing to bring this action.  *See* Declarations of Ileene Anderson (Dkt #117),
     Elden Hughes (Dkt #118), Karen Schambach (Dkt #120), and Steve Tabor (Dkt #119). *Hunt v.*
28   *Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977).

explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.,* 463 U.S. 29, 43 (1983) (citation omitted).  An agency action is arbitrary and capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* at 43.  As the Ninth Circuit stated in reviewing the validity of biological opinions:

> Our review is "narrow" but "searching and careful," [] and we must ensure that the FWS's decisions are based on a consideration of relevant factors and we assess whether there has been a clear error of judgment. [] The FWS must state a rational connection between the facts found and the decision made. []

*GP Task Force*, 378 F.3d at 1065 (citations omitted).  Moreover, "the Court may not make up for deficiencies in the Final BO; nor may it supply a 'reasoned basis for the agency's action that the agency itself has not given.'" *CBD v. Rumsfeld*, 198 F. Supp. 2d 1139, 1145 (D. Ariz. 2002) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

FWS' reasoning and consideration in the BOs at issue here fall far short of these standards.  The ESA places the burden on the BLM, in consultation with FWS, to "insure" that authorized activities are not likely to cause jeopardy to the species or destroy or adversely modify critical habitat. 16 U.S.C. § 1536(a)(2).  As detailed below, FWS' "no jeopardy" and "no destruction or adverse modification" conclusions in the challenged BOs were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A).  In relying on these flawed BOs, BLM has also violated its substantive duties under the ESA. [6]

## IV. ARGUMENT

## A.    The NECO and WEMO Biological Opinions are Unlawful.

Contrary to its duties under Section 7 of the ESA, FWS conducted a grossly inadequate assessment of the effects of the NECO and WEMO Plans on desert tortoise survival and recovery

---

[6] While Plaintiffs maintain that the record in this case clearly demonstrates that the WEMO route designation, WEMO Plan and NECO Plan may jeopardize the desert tortoise and the Lane Mountain milk-vetch and will destroy and adversely modify desert tortoise critical habitat, affirmatively establishing jeopardy and destruction or adverse modification is not Plaintiffs' burden.

and of the WEMO Plan on the survival and recovery of the Lane Mountain milk-vetch.

**1. FWS Failed to Insure Against Jeopardy and Adverse Modification.**

**a. FWS Failed to Insure Against Jeopardy for the Tortoise and LMMV.**

In the BOs, FWS should have determined the degree to which the take anticipated from activities authorized under the Plans would be deleterious to the tortoise's viability and ability to recover. This FWS failed to do, in violation of its duties under the ESA. *See Nat'l Wildlife Fed'n v. NMFS ("NWF")*, 524 F.3d 917, 933 (9th Cir. 2008) (holding that the ESA requires consideration of impacts to species' prospects for recovery in jeopardy analysis). In particular, FWS failed to consider relevant information regarding the ability of the desert tortoise to recover in light of the effects of authorized activities in the NECO and WEMO and also failed to analyze effects on the tortoise in light of the species' degraded baseline condition. Instead, FWS largely *compared* the effect of the WEMO and NECO plans to the effects under existing management. FWS focused on the incremental changes between the NECO and WEMO and BLM's prior management under the CDCA Plan in the jeopardy analysis. NBO 12701-05; WBO 14880-82. As a result, FWS failed to analyze the impacts of the action on the tortoise in the context of a proper baseline; rather, it looked only at "the proportional share of responsibility the federal agency bears for the decline in the species," when it should have considered "what jeopardy might result from the agency's proposed actions in the present and future human and natural contexts." *NWF,* 524 F.3d at 930 (citations omitted). FWS' incremental approach is not permissible because it would allow the desert tortoise to be "gradually destroyed, so long as each step on the path to destruction is sufficiently modest. This type of slow slide into oblivion is one of the very ills the ESA seeks to prevent." *Id.*

FWS' failure to adequately assess the baseline status of the tortoise undermined all of its determinations regarding effects to species survival and recovery in the BOs and, thus, its no jeopardy conclusions. FWS admitted that tortoise populations in both the WEMO and NECO are in decline. NBO 12589-90; WBO 14810. Given this continued decline more than 15 years after listing, FWS needed to take into account all ongoing impacts on the tortoise from other activities in

the action areas, in order to meaningfully analyze the effects of the plans on tortoise status and trend; FWS could not lawfully address the plans' effects in isolation. *See* 50 C.F.R. § 402.02; *NWF*, 524 F.3d at 933 (invalidating BO where agency "failed to incorporate degraded baseline conditions into its jeopardy analysis"). A list of prior consultations and a recitation of impacts from future implementation of the Plans does not constitute a sufficient baseline analysis. *See* WBO 14802-15; NBO 12585-611; *Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 128 (D.D.C. 2001). In the baseline for the WEMO, FWS also failed to fully account for the impacts to the tortoise and LMMV due to the expansion of Fort Irwin. WBO 14794, 14884-85, 14915-16.

FWS also failed to consider the tortoise population's current status or ability to withstand additional take in light of its declining status and existing threats. As the Recovery Plan explains, the tortoise's survival relies heavily on high adult survivorship in light of the slow rate of reproduction and high mortality rates of juveniles. NBO 586-87. As a result, "even moderate downward fluctuations in adult survivorship rates can result in rapid population declines." NBO 586. Tortoise populations are especially vulnerable to extinction and unable to withstand even a low rate of take of adults. In light of the ongoing declines in the NECO, FWS acknowledged that, "when populations of a long-lived animal, such as the desert tortoise, decline so precipitously, the continued loss of individuals in any age class is deleterious to the species viability." NBO 12641. However, in the BOs FWS both stated that it could not make an initial determination of population size or survival rate necessary to sustain viable populations (NBO 12574, 12576, 12611-13; WBO 14787, 14789, 14815-16), and disregarded the rate determined in the Recovery Plan. NBO 586-89 (discussing adult survival rates and reproduction necessary to maintain population), 591-94 (population viability analysis). Moreover, FWS did not consider survival on a recovery unit basis in the jeopardy analysis as anticipated in the Recovery Plan. NBO 554. FWS failed to consider the species' ability to survive, let alone recover, in the face of the impacts authorized in the plans.

FWS' jeopardy analysis for the LMMV suffers the same legal deficiencies; it failed to assess the ability of LMMV to survive and recover in the face of the effects of the WEMO plan. The BO relied on the creation of a new conservation area and closure of some routes for its

conclusion, although approximately 21 miles of routes will officially remain open in the remaining LMMV habitat on BLM lands (an area of approximately 10,000 acres). WBO 14918-19.  Further, FWS conceded that "administrative designation of a route as closed may be ineffective" until funding is available to "eliminate the road on the ground."  WBO 14920.  Thus, FWS' conclusion that route closures will improve conditions for the LMMV is unsupported.  FWS assumed impacts of dust on LMMV pollinators were "minor" although no studies had been done.  WBO 14919. FWS recognized that dust associated with ORV use adversely impacts photosynthesis, but it concluded it would not "greatly affect" LMMV under current use, and simply ignored the potential impacts of increased ORV use under the WEMO plan.  *Id.*  Although more than half of the known occurrences of LMMV are within the Fort Irwin expansion area, FWS also failed to examine the impact the potential loss of this habitat will have on survival and recovery.  WBO 14915-16. Finally, contrary to FWS' statement in the BO, BLM did not adopt a 1% cap on new ground disturbance to protect the LMMV within the West Paradise and Coolgardie Mesa conservation areas.  WBO 14918, 14921; BLM AR WMP-201704-05, 201796.  These conservation areas overlap with DWMAs which have a 1% *overall* cap on disturbance, but nothing in the WEMO prohibits aggregation of more than 1% disturbance in LMMV conservation areas.

Because FWS failed to fully consider the effects activities authorized under the NECO or WEMO plans would have on tortoise survival and recovery or the effects of the WEMO plan on LMMV survival and recovery, its determinations of "no jeopardy" should be set aside.

**b. FWS' Consideration of Destruction or Adverse Modification Violated the ESA.**

FWS' determinations that the plans would cause no destruction or adverse modification of critical habitat are flawed in several significant respects. NBO 12709-11; WBO 14887-88.

**i. FWS reversed its earlier position without explanation.**

When FWS designated critical habitat, it stated that activities "inconsistent with land management recommendations [in the Recovery Plan] would likely be considered to adversely modify critical habitat."  NBO 916.  The Recovery Plan provides delisting criteria, monitoring baselines, and management prescriptions to ensure long-term viability leading to conservation and

1   recovery of the species.  NBO 603.  Recovery Plan "Priority 1" recommendations for ensuring the

2   tortoise's survival and eventual recovery include a total prohibition of activities in critical habitat

3   that are "generally incompatible with desert tortoise recovery," including "all vehicle activity off

4   designated roads[,] domestic cattle grazing," and "any other surface disturbance that diminishes the

5   capacity of the land to support desert tortoises, other wildlife, and native vegetation."   NBO 616-

6   17, 623, 629. Thus, according to FWS' own statements, off-road vehicle activity and grazing

7   should be prohibited in critical habitat because they are likely to cause adverse modification.

8          Nonetheless, BLM authorized activities in both the WEMO and NECO that conflict with

9   the terms and recommendations of the Recovery Plan.  Compounding this error, FWS failed to

10  adequately consider the Recovery Plan and the recovery standard in addressing the likely effects to

11  critical habitat in either BO.  FWS provided no basis for its conclusions that the authorized

12  activities will *not* undermine the recovery value of critical habitat, or destroy or adversely modify

13  critical habitat. Nor did FWS *explain* how approval of these activities would nonetheless promote

14  recovery,[7] and FWS failed to articulate a scientifically supported rationale or any other basis for

15  reversing its position that activities that are inconsistent with the Recovery Plan's

16  recommendations are likely to cause adverse modification.  NBO 616-17, 623, 629.  In *NWF*, the

17  Ninth Circuit noted that a novel approach in a biological opinion "completely at odds with [the

18  agency's] prior scientific approaches . . . merits little deference." 524 F.3d at 928.  *See also Motor*

19  *Vehicle Mfrs. Ass'n*, 463 U.S. at 41-42  ("[A]n agency changing its course  . . . is obligated to

20  supply a reasoned analysis for the change beyond that which may be required when an agency does

21  not act in the first instance.").  As a result, FWS' conclusions are arbitrary and capricious.

22                    **ii. FWS dismissed significant effects on critical habitat and recovery.**

23         In designated critical habitat in both the NECO and WEMO, FWS approved BLM's

24  authorization of many activities that are incompatible with desert tortoise recovery including

25

26  [7] Recitations of the requirements of the ESA, the Recovery Plan, and the desert tortoise delisting

27  criteria (*see, e.g.,* NBO 12538, 12579-80; WBO 14759, 14796-97), do not suffice.  *See GP Task
    Force*, 378 F.3d at 1065, 1072-73 (mere recitations of policy "cannot be considered an adequate

28  evaluation of the impact of the proposed action").

grazing, ORV use off "designated roads," and even ORV use off designated routes by providing wide areas off routes for stopping, parking and camping. The NECO Plan, for instance, allows for: (1) ORV use on over 1,416 miles of routes, and in over 893 square miles of washes within critical habitat (571,520 acres) and the Johnson Valley to Parker race corridor, NSupp 01191; (2) stopping, parking and camping within 100 feet of centerline of routes on over 52 square miles (33,280 acres) in critical habitat within the DWMAs (and an undetermined amount of critical habitat within 300 feet of the centerline of routes in critical habitat *outside* the DWMAs), NSupp 01191; (3) an additional 1% ground disturbance of critical habitat within the DWMAs (with no cap on disturbance in critical habitat outside of the DWMAs), NBO 12705; and (4) grazing in 413 square miles (264,320 acres) of critical habitat, NSupp 01185. In the WEMO, FWS approved BLM's authorization of, among other activities: (1) over 2,230 miles of ORV routes in designated critical habitat, WBO 14873; (2) stopping, parking and camping within 50 feet[8] of centerline of routes in an additional 42 square miles (26,880 acres) of critical habitat within DWMAs (and an undetermined amount of critical habitat within 300 feet of the centerline of routes in critical habitat outside the DWMAs, *see* WSupp 01030, no calculation given); (3) an additional 1% ground disturbance of critical habitat within the DWMAs, WBO 14835 ("one percent limit is tied to the size of the desert wildlife management area but not to the critical habitat unit"); and (4) continued grazing on over 201 square miles (128,640 acres) of critical habitat, WSupp 01026.

As the Ninth Circuit recently explained with regard to a similar provision that would allow camping off existing routes in a BLM plan, ORV-related damage will occur "both on existing routes and en route to camping sites" because "ORV users may venture off trail . . . to find a camping site, thereby creating ORV tracts . . . criss-crossing existing routes." *ONDA v. BLM*, __ F. 3d __, 2008 U.S. App. Lexis 14896, *89 (9th Cir. July 14, 2008). ORV use and grazing in critical habitat destroys and degrades primary constituent elements (including soil structure necessary for burrows, forage, and vegetation needed for sheltering), and thereby inhibit the tortoise's long-term

---

[8] Plaintiffs have been unable to find any explanation for FWS' identical conclusions regarding impacts from activities within 100 feet (NECO) vs. 50 feet (WEMO) of centerline of routes in critical habitat although the impacts would clearly be greater in a wider corridor.

population viability, conservation and recovery.  As a result, these activities that adversely effect critical habitat are incompatible with recovery.  *See* NBO 616-17, 623, 629.

FWS improperly justifies its conclusion to the contrary that these activities would not "adversely modify" critical habitat by comparing the "scale of those effects" in light of the "vast areas" of the critical habitat units.  WBO 14884; NBO 12707.  Even where FWS admits that the activity will have greater impacts on the function of critical habitat (*e.g.*, WBO 14884 (stopping and camping off routes in critical habitat in WEMO); NBO 12703 (open wash zones and Johnson-Valley to Parker race corridor in the NECO)), it finds them to be "minor in comparison with the area of critical habitat."  WBO 14884; NBO 12706 ("truly minor").  As noted above, the Ninth Circuit has rejected "this so called comparative approach rather than a more holistic, aggregate approach" in connection with a jeopardy analysis, *NWF,* 524 F.3d at 926, and its use for the critical habitat analysis here is similarly flawed.

FWS largely ignored the life cycle and habitat needs of the tortoise that inform the Recovery Plan's recommendations and the FWS' designation of large areas of critical habitat.  *Id.* at 934 (finding adverse modification analysis arbitrary and capricious because it failed to take into account, *inter alia*, "affected species' life cycles and migration patterns").  In the Recovery Plan, FWS found that the tortoise *required* large critical habitat units in order to survive.

> Desert tortoises require a great deal of space to survive.[] Over its lifetime, each desert tortoise may require more than 1.5 square miles of habitat and may make forays of more than 7 miles at a time []. In drought years, desert tortoises forage over larger areas [] and thus have a greater probability of encountering potential sources of mortality. Roads and urban areas form barriers to movement and tend to create small, local populations which are much more susceptible to extinction than large, connected ones [].

NBO 567; *see also* NBO 906 ("The desert tortoise requires large, contiguous areas of habitat to meet its life requisites."). FWS failed to provide any scientific or other explanation for its conclusion in the BOs that activities authorized in the NECO and WEMO that will destroy and adversely effect the value of habitat for tortoises, including by causing fragmentation of large areas needed by the tortoise, will not adversely modify critical habitat and impair recovery.  *GP Task Force*, 378 F.3d at 1074 (holding that a critical habitat analysis is unlawful when it fails to discuss

"specific impact[s] on recovery").  FWS' comparative approach also failed to acknowledge that maintenance of healthy tortoise populations and large areas of "protected functional habitat" *in each of six distinct recovery units* are essential components of recovery. NBO 553-54 (delisting criteria and actions needed), 579-81 ("evolutionarily significant units" or recovery units).

### iii.  FWS improperly focused on effects to DWMAs not all critical habitat.

FWS improperly focused its analysis of effects to critical habitat in the DWMAs and largely ignored critical habitat *outside* of DWMAs (NBO 12704-08; WBO 14882-85), although critical habitat outside the DWMAs is subject to greater impacts than areas within the DWMAs. Over 215,000 acres of critical habitat remains outside DWMAs in the NECO (NBO 12600, 12603) and approximately 18,000 acres of critical habitat are outside the DWMAs in the WEMO (WBO 14834-35).  In the NECO DWMAs vehicles can only travel up to 100 feet from designated routes for stopping and camping (NBO 12566), but outside the DWMAs, even in designated critical habitat, vehicles may travel up to 300 feet from designated routes (NBO 12541, 12695).  In the WEMO, stopping and camping is limited to within 50 feet in the DWMA but allowed up to 300 feet from designated routes in critical habitat outside the DWMAs.  WBO 14883.

While the DWMAs include much of the designated critical habitat they are not legal equivalents.  16 U.S.C. § 1536(a)(2); *GP Task Force*, 378 F.3d at 1075-76 (holding that in a Section 7 consultation, FWS may not analyze management areas instead of critical habitat itself); *NRDC v. Kempthorne*, 506 F. Supp. 2d 322, 382 (E.D. Cal. 2007) ("the agency must address in the BiOp the full extent of impacts to the currently designated critical habitat").  FWS designated critical habitat and, absent a revision of that designation, it was required under the ESA to determine whether these actions would destroy or adversely modify critical habitat, its failure to do so is unlawful. *GP Task Force*, 378 F.3d at 1076 (to hold otherwise "would impair Congress' unmistakable aim that critical habitat analysis focus on the actual critical habitat"). As a result, FWS' BOs are invalid.

### iv. Impacts of ORV Use on Critical Habitat

FWS admitted that "vehicles using designated routes of travel constitute the greatest threat

1    of [BLM's] recreation program to desert tortoises."  NBO 12657.  The Recovery Plan recognized

2    that ORV use is "generally incompatible" with tortoise recovery and should be banned within the

3    DWMAs.  NBO 616.  ORVs directly and indirectly impact tortoises by, for example, crushing

4    them above and below ground, collapsing burrows, destroying forage, and increasing stress.  NBO

5    7319-20.  ORVs also impact critical habitat by damaging soil structures that support burrows,

6    introducing invasive plant species that out-compete native plant forage, and increasing the risk of

7    fatal fires. NBO 5545, 12621, 12690.

8            Nonetheless, FWS justified its finding that BLM's designation of thousands of miles of

9    open routes and open washes within the DWMAs and other critical habitat would not "destroy or

10   adversely modify critical habitat" by stating that "[w]e are unaware of any research that

11   *conclusively shows* the density at which roads would be likely to extirpate desert tortoises from a

12   region."  NBO 12613 (emphasis added); WBO 14817.  Nothing in the ESA requires *conclusive*

13   *proof* that an activity will completely eradicate a listed species from an area before FWS can find

14   that the value of the habitat has been adversely modified.  *See NRDC v. Evans,* 364 F. Supp. 2d

15   1083, 1131 (N.D. Cal. 2003) (invalidating attempts to rewrite the best available science standard to

16   "perfect science").  Such a rule would run counter to the ESA's purpose and focus on recovery.

17   Further, it conflates destruction and adverse modification; complete extirpation of tortoises from a

18   region could be a standard for destruction of all habitat value and, a lesser impact may still be

19   likely to adversely modify that habitat.  By conflating "destruction" and "adverse modification,"

20   FWS fails to give effect to each word of the statute.  *See Bennett v. Spear*, 520 U.S. 154, 173

21   (1997) ("It is the 'cardinal principle of statutory construction' . . . [that] it is our duty 'to give

22   effect, if possible, to every clause and word of a statute.'")(citation omitted).

23           Similarly, when discussing the use of routes, even where FWS admits activities will

24   *degrade* critical habitat it relies on the absence of definitive evidence of *complete destruction* of

25   critical habitat to dismiss concerns regarding the reduced quality and function of critical habitat.

26   For example, FWS notes that most of the primary constituent elements are not generally "present

27   within roadbeds" but admits that "[r]outes have the potential to fragment habitat and interfere with

28

movement, dispersal, and gene flow; this ability to move and disperse is a central tenant [sic] of the first primary constituent element of critical habitat of the desert tortoise." WBO 14876. But FWS does not analyze the impacts of fragmentation on tortoise movement in critical habitat, rather it assumes use will be low to conclude that: "Unpaved roads that are used infrequently likely do not pose a threat of fragmentation; we are unaware of any dirt road or track within critical habitat of the desert tortoise that is so heavily traveled that movement of desert tortoises would be *precluded*." WBO 14876 (emphasis added). Thus, FWS both minimizes the importance of the acknowledged impacts and raises the bar for a finding of "adverse modification" by requiring a showing that desert tortoise movement is entirely *precluded* in order to consider any impact of routes on desert tortoise critical habitat to be "adverse." The finding ignored road maintenance that entirely precludes movement by creating raised berms which trap tortoises on roads. WBO 14822.

FWS also failed to explain how it reached its conclusion that the documented impacts on desert tortoise critical habitat from ORV use in washes would not impair the recovery function of critical habitat. FWS acknowledged the importance of washes to tortoise. *See, e.g.,* NBO 12573 (tortoises find preferred forage in washes; "banks and berms of washes are preferred places for burrows"), 5112 (during the spring, tortoises spend 92% of their time in washes, washlets, and hills). FWS admitted that washes are particularly attractive to ORV users and that the NECO plan does not limit the amount of use of washes. NBO 12605 ("most recreationists . . . also drive in drivable washes;" washes in the southern part of the planning area are "wide flat sandy and relatively free of rocks, and lined with tall trees. These features are attractive to recreational users"), 12683 ("any wash that can support a vehicle . . . is open to use"). But then, FWS adopted BLM's conclusion that use of open washes is low (NBO 12683), based on how the use was characterized by a hunting group, Desert Wildlife Unlimited, in only two washes. NBO 5481-82.

FWS found that ORV use (including race corridors and stopping, parking, and camping) causes both direct and indirect take of tortoises through crushing, habitat loss and fragmentation, and increased predation. *See* WBO 14874-80. But FWS failed to analyze whether the extreme habitat fragmentation from the excessive number of routes in critical habitat in the WEMO, results

1    in a loss in the recovery value of critical habitat.  *See* WBO 14875 (extensive route network

2    "[r]ealistically" consists of "any route that shows evidence of prior use"); Ps' Exh. 5 at 5-16.

3    Instead, FWS focused on the relative amount of ground disturbance, largely ignoring the

4    *fragmentation* caused by routes criss-crossing habitat. WBO 14814-15; NBO 12610-11.  Because

5    FWS failed to analyze many effects of ORV use and existing routes on-the-ground on tortoise

6    critical habitat, its determinations of no destruction or adverse modification are without foundation.

7                          **v.  Effects of Grazing on Critical Habitat**

8         FWS admits that livestock grazing "likely kills or injures desert tortoises," by directly

9    trampling tortoises (NBO 12641; WBO 14849, 14848-54, 14871-72), and that livestock grazing

10   "will continue" to adversely affect critical habitat by reducing tortoises' forage and shelter,

11   crushing tortoise burrows, and rendering critical habitat more prone to wildfire. NBO 12642-46;

12   WBO 14872-73.   Further, FWS found that "livestock grazing adversely affects the primary

13   constituent elements of critical habitat of the desert tortoise." NBO 12646.   Nonetheless, FWS

14   concluded that continued livestock grazing in critical habitat would not "compromise the

15   conservation role and function of critical habitat." WBO 14873; NBO 12695 (grazing "is

16   compatible with the function and conservation role of the Chemehuevi Critical Habitat Unit").

17   FWS cites no evidence or science to explain its departure from the Recovery Plan's

18   recommendation that grazing should be eliminated in critical habitat and the use of the term

19   "conservation" does not constitute an analysis nor provide an explanation for its summary

20   conclusion. *GP Task Force*, 378 F.3d at 1072-73 (holding that mere recitation of policy "cannot

21   be considered an adequate evaluation of the impact of the proposed action").

22        FWS also failed to analyze the aggregate effects from all activities authorized by the Plans

23   including, for example, in areas where tortoises are subject to both grazing and ORV use within

24   critical habitat.   Instead, FWS provided disjointed analyses without making the requisite

25   comprehensive reflection on aggregate effects, although FWS admitted that if multiple small

26   "disturbances are repeated numerous times in a localized area, the aggregate effects of this

27   disturbance are likely to result in the complete loss of habitat value."  NBO 12619; WBO 14823.

28

1    In sum, FWS failed to adequately assess the impacts to the recovery value of critical habitat and

2    therefore its conclusions of no destruction or adverse modification are invalid.

3              **c. FWS failed to use the best scientific and commercial data available in the BOs.**

4              FWS admitted there is significant scientific evidence that activities authorized in the NECO

5    and WEMO (including ORV use and grazing) kill, harass, and harm tortoises in many ways and

6    degrade critical habitat. Nonetheless, FWS failed to use the best available scientific information in

7    reaching its conclusions in the BOs, as the ESA requires. 16 U.S.C. §§ 1536(a)(2), (b)(3)(A); 50

8    C.F.R. § 402.14(g)-(h); *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988); *Pacific Coast*

9    *Fed'n v. NMFS*, 265 F.3d 1028, 1034 (9th Cir. 2001). "[A]n agency 'cannot ignore available

10   biological information or fail to develop projections' which may indicate potential conflicts

11   between the proposed action and the preservation of endangered species." *Greenpeace v. NMFS*,

12   80 F. Supp. 2d 1137, 1150 (W.D. Wash. 2000) (quoting *Conner*, 848 F.2d at 1454).

13             As noted above, FWS attempted to ignore impacts to critical habitat where there was no

14   conclusive proof they would cause complete extirpation of tortoises in the area.  *Supra* at 15. In

15   other instances, FWS attempted to minimize the import of many threats because it could not

16   *quantify* all uses or effects.  *See, e.g.,* NBO 12612, 12616, 12621, 12700.[9]  However, nothing in the

17   ESA requires that each threat be quantified before it can be taken into account; the statute requires

18   reliance on the best *available* data, not perfect data.  *NRDC v. Evans,* 364 F. Supp. 2d  at 1131  ("to

19   exclude highly relevant research because its methodology—like most studies—can be criticized

20   effectively eviscerates the requirement to use the best available science and rewrites the standard to

21   perfect science").  For example, FWS admitted that abundant annual native forage is particularly

22   important to neonates and juveniles, WBO 14787-88, 14852, that grazing has caused replacement

23   of native herbaceous species with non-native grasses in tortoise habitat, WBO 14852, but did not

24

25   [9] FWS relied on survey data from permanent study plots, triangular transects, and line distance
     sampling and noted the difficulty in comparing results from different methods and shortcomings
26   of various methodologies. WBO 14788-89, 14807.  While much of the data may not be ideal,
     some of this same data was used by Dr. Heaton to map critical habitat conditions that FWS
27   largely ignored in the BOs, including route density. *See* Dkt #122, Plaintiffs' Request for Judicial
     Notice, Exhibit ("Ps' Exh") 5 at 2, 5, 15, 26.
28

consider the impacts of changes in forage quality in its analysis of critical habitat and its value for recovery.  WBO 14815.  The Recovery Plan, DTRPA, and the declining status of the species all indicate a pressing need for caution and for aggressive measures to protect the species.  *See, e.g.,* WBO 9302 (tortoise population trends "indicate a need for more aggressive initiatives to facilitate recovery").  In this context, FWS was required to do more than critique the available data and information; it was required to utilize that information to determine the effects on tortoise survival and recovery and where uncertainties arose as to the best available science, FWS should have "give[n] the benefit of the doubt to the species." *Conner*, 848 F.2d at 1454.  This it failed to do.

FWS relied heavily on a review of scientific literature available before 2002.  WBO 4488.  But it dismissed or ignored findings in other studies.  *See, e.g.,* WBO 14817-18, 4717-24; WBO 4716 (table of contents "Special Focus Issue"); Dkt# 122, Ps' Exh. 3 (grazing); Ps' Exh. 4.  For example, FWS failed to consider a highly relevant study finding: "current data suggest that the operation of ORVs in the western Mojave Desert results in major reductions in habitat and tortoise numbers, and possibly the body mass of surviving tortoises" and that studies "suggest both direct and sublethal effects on tortoises from operation of ORVs in their habitats.  Such effects occur in areas with low to moderate ORV activities, which occupy large portions of the Mojave Desert." WSupp 465, 469 (study is in Supplemental record, but not mentioned or referenced in the BOs).

Because FWS did not use the best available science in evaluating effects on listed species and critical habitat in violation of the ESA, the BOs are invalid and must be set aside.  16 U.S.C. § 1536(a)(2); *CBD II,* 422 F. Supp. 2d at 1127; *NRDC v. Kempthorne*, 506 F.Supp. 2d  at 367.

### 3.  FWS' Incidental Take Statements Fail to Comply with the ESA.

As early as May 25, 2006, four months after the WEMO BO was issued, FWS acknowledged that the ITSs were invalid[10] and began to revise them.  WSupp 524-25, 529, 533; NSupp 489-90.  On November 30, 2007, FWS issued two lengthy "amendments" to the BOs that

---

[10] The 2005 and 2006 BOs are invalid because the ITSs fail to provide any numeric limit on take of desert tortoise or explain why FWS could not; fail to provide any measures to assess whether the take limit has been reached or exceeded; and fail to provide a meaningful trigger for re-consultation. *See ONRC*, 476 F.3d at 1037-41; *CBD II,* 422 F.Supp. 2d at 1137-38.

replaced the existing ITSs.  These amendments are improper because FWS "simply piled on more evidence" to shore up the conclusions it had already reached years before.  *See GP Task Force,* 378 F.3d at 1077.  An ITS is issued after FWS studies the full impact of the proposed actions in a BO, 16 U.S.C. § 1536(b)(4), and must be based on the BO, not on additional data and information that was not before the agency when it issued the BO.

> If the data is new and the new data may affect the jeopardy or critical habitat analysis, then FWS was obligated to reinitiate consultation pursuant to 50 C.F.R. § 402.16.  If the data was preexisting, then FWS is to be faulted for not generating the information in time for the initial BiOp. Stated another way, the evidence either was old and cumulative, or was new data that mandated reconsideration.

*GP Task Force,* 378 F.3d at 1077.  In this case, FWS both (1) took existing data and generated new information from it, a task FWS should have done at the time it issued the BOs in 2005 and 2006 but did not, and (2) added new data without reconsideration.  For example, FWS took existing density data on tortoise populations and the areas affected by various impacts and generated new information on the likely extent of take in both NECO and WEMO, and FWS compiled existing data to generate new information on routes and open washes in critical habitat in the NECO outside of the DWMAs.  *See, e.g.,* NSupp 673-74 (request for information on the extent of open washes in critical habitat outside DWMAs), 678 (color map of routes), 967 (calculation); WSupp 534 ("providing you with information on use of the NECO washes and other routes is the top priority so that the incidental take statements in the BOs can be fixed"), 528-532 (June 16, 2006; discussing the need to obtain information on tortoise densities and the "best available data" regarding impacts to tortoises from activities already authorized in 4 BOs).  FWS also improperly added new "data" to the record including, but not limited to, an informal "survey" of observations of dead tortoises on unpaved routes solicited from anonymous sources (NSupp 485), impressions from a 5 hour tour of washes in one area in the NECO (NSupp 686-88), and information solicited from BLM employees regarding the use of washes in the NECO (NSupp 675-77).

FWS then relied on both the new information generated from existing data and new "data" to shore up the conclusions it had already reached years before.[11]  FWS "did not change its mind"

---

[11] Initially the process was intended to result in new BOs.  WSupp 641 (these will be new BOs).

or reopen the consultation process, but rather "simply piled on more evidence" and reached the same foregone conclusion. *GP Task Force,* 378 F.3d at 1077; *see id.* at 1071 n.7 (post hoc rationalizations provide an inadequate basis for judicial review of BOs). Because this is impermissible, Plaintiffs ask this Court to disregard the amendments to the BOs in determining whether the FWS complied with the ESA in issuing the 2005 NECO and 2006 WEMO BOs. If the Court does so, then the Court should find that both BOs are invalid and grant Plaintiffs' motion on Claims 3 and 4. Even if the Court finds the amendments of the BOs were allowable, however, Plaintiffs' motion should be granted because the new ITSs are invalid, as detailed below.

### a. FWS failed to consider all take that is likely to occur.

FWS considered only direct take causing tortoise death in the ITSs and disregarded take due to habitat modification and degradation which kills or injures tortoises by impairing essential behaviors including feeding and sheltering. The ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532 (19).

> Harm in the definition of "take" in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering.

50 CFR § 17.3. *See Babbitt v. Sweet Home Chapter*, 515 U.S. 687, 691 (1995); *Marbled Murrelet v. Babbitt,* 83 F.3d 1060, 1064-65 (9th Cir. 1996) (recognizing prospective harm through habitat modification that will result in death or injury). For example, although FWS recognized that livestock grazing "will continue" to reduce the availability of native forage critical to tortoise survival, reduce long-term survival of native plants, crush tortoise burrows, and damage soils, (NBO 12693-94, 12642-46; WBO 14851-54), the ITSs fail to account for injury that FWS admits will result from livestock grazing due to collapsed burrows used for sheltering or reduction in the availability of key native forage plants essential to feeding (particularly for neonate and juvenile tortoises). FWS only "counted" direct trampling of tortoises by livestock as "take." NSupp 01185; WSupp 01025. The ITSs also failed to include injury from loss of forage and collapsed burrows due to ORV use in washes. *See* NSupp 01189, 01191-93 (discussing only direct take).

**b. The numbers of allowable take and re-initiation triggers are irrational.**

The amount of take authorized in the ITSs is unsupported by any clear rational basis in the record.  In the amended ITSs, FWS provided numerical values for take that bear no rational connection to the biological analysis in the BO.  Notably, FWS staff recognized the futility of the exercise from the outset.[12]  The ITSs referenced density estimates and the size of areas impacted by authorized activities to calculate the number of tortoises in each area. *See, e.g.,* NSupp 01191; WSupp 01030.  But then, FWS simply picked a number that bears no connection to the discussion in the BO.  *See, e.g.,* NSupp 01193; WSupp 01032.  FWS' bare conclusions on the likely amount of take are insufficient; the agency must articulate a rational connection between the facts found and the conclusions made. *Or. Natural Res. Council v. Lowe,* 109 F.3d 521, 526 (9th Cir. 1997).

For example, FWS failed to provide any rational basis for its assumption that the take of smaller individuals omitted from the calculations would be roughly offset by FWS' inclusion of areas within critical habitat that may have had lower density of tortoises in the calculations. NSupp 01183; WSupp 01024-25. The take calculations for areas outside of the DWMAs and critical habitat display an additional error.  FWS had no data on tortoise density estimates outside of the DWMAs and simply took the DWMA density numbers and reduced them by 90%.  NSupp 01181; WSupp 01023. FWS stated that 10% was, in its "professional opinion," a reasonable approximation of the comparative density in those areas, NSupp 01181, WSupp 01023, but admits elsewhere that "[t]he one-tenth factor is a guess," NSupp 00608, and that extrapolating density estimates outside critical habitat is "an even further reach."  NSupp 00491.  In sum, FWS did not provide a rational basis for the amount of take authorized in the ITSs, it simply guessed.

Even assuming *arguendo* that the take limits were supportable, FWS unlawfully selected too low a number of dead tortoises to serve as a "trigger" to re-initiate consultation.  *See* 50 C.F.R. §402.14(i)(4); *ONRC,* 476 F.3d at 1041 (trigger for re-initiation is inadequate if it is coextensive

---

[12] Initially, the FWS staff stated, "I will not be able to produce a calculation of the number of desert tortoises that may reside in such areas."  NSupp 00493.  Further, "[w]e have no quantitative data on how many desert tortoises are killed and injured by vehicle use on open and limited routes."  NSupp 00666, 00645 ("Other than the fact that you don't have any data to work with, it looks like you are doing a good job of explaining where everything is coming from.").

1    with the full take authorized in the ITS because it "render[s] the monitoring and reinitiation

2    provisions of the regulation meaningless"); *NRDC v. Evans,* 364 F. Supp. 2d at 1139 (finding a

3    trigger arbitrary and capricious where defendants could not adequately detect that level of take).

4    FWS conceded that establishing when authorized take is exceeded is complicated by the difficulty

5    in detecting tortoise deaths and assigning a definitive cause.  WSupp 01021 ("finding carcasses and

6    assigning a cause of death are problematic over such a large area and in the presence of numerous

7    scavengers that are likely to find desert tortoises soon after they die"), 00780 ("we are assuming

8    that finding 10 percent of the animals that are killed or injured is a reasonable estimate").   But

9    FWS also made a contrary assertion: "we expect that the cause of any injury or death resulting

10   from these activities is likely to be reasonably identifiable."  WSupp 01035-36, NSupp 01198.

11   Even if the cause of death were "reasonably identifiable" on those carcasses found, given the

12   uncertainty of finding tortoises killed by ORVs or grazing and FWS' own estimate that only 10

13   percent of all tortoises killed or injured are likely to be found, logically the only way to preserve

14   the monitoring and re-initiation functions of the ITS would be to set the trigger for re-initiation at

15   no more than 10 percent of the total allowable take.  Instead, FWS set triggers far higher.  In

16   NECO, FWS selected a number that is approximately one-fifth of the total to trigger a new

17   consultation. NSupp 01194 (trigger is 6 or 5 out of 32 total per year).  In WEMO, FWS set the

18   trigger at more than one-fifth of the total.  WSupp 01035 (tigger is 4 dead tortoises), 01034 (19

19   total per year).  Because FWS set the triggers for re-initiation too high to ensure that the allowable

20   take has not been exceeded when the number is detected, the ITSs should be set aside.

### c. The RPMs and T&Cs in the BOs Fail to Comply with the ESA

22           FWS failed to provide terms and conditions ("T&Cs") to implement the reasonable and

23   prudent measures ("RPMs") in the ITSs to minimize impact of the authorized take on the tortoise.

24   The ESA requires an ITS to specify those RPMs the Secretary deems "necessary or appropriate" to

25   minimize the impact on listed species and set forth T&Cs implementing each RPM. 16 U.S.C. §

26   1536(b)(4)(C)(ii), (iv).   As this Court has found: "The Service's failure to include T&C to

27   minimize the potential for incidental take of desert tortoises during recreational use violates the

28

1   plain language of the ESA, 16 U.S.C. § 1536(b)(4), and is therefore arbitrary and capricious."

2   *CBD II*, 422 F. Supp. 2d at 1141.

3       In the NECO, RPM 4 provides: "The Bureau must ensure that the use of the open wash

4   zones in the Northern and Eastern Colorado Desert Planning Area does not result in the take of

5   substantial numbers of desert tortoises."   NSupp 01196. "[S]ubstantial numbers" is not defined.

6   T&C 4 only provides for monitoring[13] of wash use.  NSupp 01197.  FWS provides no explanation

7   of how monitoring alone will minimize the impacts of take from ORV use in open wash zones

8   although FWS admits this is the "greatest risk" to the tortoise.  NBO 12716.

9       In the WEMO BO, FWS stated that actions are needed to "reduce the density of routes and

10  thereby reduce mortality of desert tortoises," but FWS failed to require any RPM to minimize the

11  impact of the authorized route network by, for example, reducing overall route density or closing

12  redundant routes.  WBO 14875.   In the ITS, FWS specified only monitoring in RPM 1 "to ensure

13  that the level of take is commensurate with the analysis contained in the Biological Opinion."

14  WSupp 01034.  Thus, RPM 1 did not even purport to minimize the impacts of take as the ESA

15  contemplates.  The T&C implementing RPM 1 required development of a monitoring plan but did

16  not include any clear timelines or specific requirements for monitoring.  WSupp 01035.

17      As in *CBD II*, the T&Cs here "fail[] to include any discussion of methods to minimize the

18  impact of recreational use, and in particular OHVs, on the desert tortoise."  422 F. Supp. 2d at

19  1140.  Because the RPMs and T&Cs do not include any means to minimize the impact of take on

20  the tortoise, both ITSs violate the plain language of the ESA and are thus arbitrary and capricious.

21  **B.     BLM Failed to Comply with its Duties Under the ESA in Adopting the Plans.**

22      The BLM violated its obligations under 16 U.S.C. §1536(a)(2) to insure against jeopardy to

23  desert tortoise and LMMV and destruction or adverse modification of desert tortoise critical habitat

24  in adopting the WEMO and NECO plans. An action agency, such as BLM, may rely on the

25  Service's determination that an action is not likely to cause jeopardy or adverse modification as

26  long as that agency's reliance is not "arbitrary, capricious, an abuse of discretion, or otherwise not

27

28  ───────────────

[13] There is no evidence in the record that the 2005 ITS' monitoring requirements have been met.

1   in accordance with law." 5 U.S.C. § 706(2)(A); *see Resources Ltd. v. Robertson*, 35 F.3d 1300,

2   1304-05 (9th Cir. 1994); *Pyramid Lake Paiute Tribe of Indians v. United States Dep't of Navy*, 898

3   F.2d 1410, 1415 (9th Cir. 1990) ("A federal agency cannot abrogate its responsibility to ensure that

4   its actions will not jeopardize a listed species.").  Accordingly, an agency "may not rely solely on a

5   FWS biological opinion to establish conclusively its compliance with its substantive obligations

6   under [ESA] section 7(a)(2)." *Id.* at 1415; *CBD II,* 422 F. Supp. 2d at 1142 (BLM's reliance on a

7   legally inadequate biological opinion is arbitrary and capricious).   Here, BLM exercised its

8   discretion to authorize activities in the NECO and WEMO that are not only likely to but will

9   directly and indirectly take desert tortoise and will likely destroy and adversely modify critical

10  habitat in violation of Section 7.  16 U.S.C. § 1536(a)(2).  BLM's reliance on FWS' flawed BOs

11  and ITSs cannot relieve it of its own duty to comply with the ESA or cure its failure to do so.

12          BLM's reliance on the NECO BO which is legally and factually flawed for all of the

13  reasons discussed above is arbitrary and capricious and contravenes its duty to ensure that the

14  activities authorized in the NECO Plan are not likely to jeopardize the desert tortoise or destroy or

15  adversely modify its critical habitat. 16 U.S.C. § 1536(a)(2).  BLM's reliance on the WEMO BO

16  which is legally and factually flawed for all of the reasons discussed above in adopting the WEMO

17  ROD contravenes its duty to ensure that the activities authorized in the WEMO Plan Amendment

18  and WEMO route designation, are not likely to jeopardize the LMMV or the desert tortoise or

19  destroy or adversely modify its critical habitat.

20                              **V.  CONCLUSION AND RELIEF**

21          In light of the above, Plaintiffs respectfully request that the Court set aside both of the

22  biological opinions challenged herein, vacate BLM's adoption of the WEMO ROD, and find that

23  BLM's reliance on the NECO and WEMO biological opinions is invalid.   Plaintiffs seek interim

24  injunctive relief to protect the desert tortoise and its critical habitat and the Lane Mountain milk-

25  vetch until such time as Defendants have fully complied with the ESA mandates to ensure the

26  conservation and recovery of these species.

27

28

1  DATED: September 8, 2008                    /s/ Lisa T. Belenky
                                               Lisa T. Belenky (CA Bar No. 203225)
2                                              CENTER FOR BIOLOGICAL DIVERSITY
                                               351 California Street, Suite 600
3                                              San Francisco, CA 94104
                                               Telephone: (415) 436-9682 x 307
4                                              Facsimile: (415) 436-9683
                                               Email: lbelenky@biologicaldiversity.org
5

6                                              Deborah A. Sivas (CA Bar No. 135446)
                                               Leah J. Russin (CA Bar No. 225336)
7                                              Environmental Law Clinic
                                               MILLS LEGAL CLINIC
8                                              STANFORD LAW SCHOOL
                                               Crown Quadrangle
9                                              559 Nathan Abbott Way
                                               Stanford, California  94305-8610
10                                             Telephone: (650) 723-0325
                                               Facsimile: (650) 723-4426
11                                             Email: dsivas@stanford.edu

12

13                                             Attorneys for Plaintiffs Center for Biological
                                               Diversity, Sierra Club, Public Employees for
14                                             Environmental Responsibility, and Desert Survivors

15

16

17

18

19

20

21

22

23

24

25

26

27

28