David P. Hubbard, Esq.
Gatzke Dillon & Ballance LLP
1525 Faraday Avenue, Suite 150
Carlsbad, CA  92008
Telephone: (760) 431-9501
Facsimile: (760) 431-9512
Email: dhubbard@gdandb.com

Attorneys for Intervenor-Defendants' AMA
District 37; California Off Road Vehicle
Association; Off Road Business Association;
San Diego Off Road Coalition; and American
Sand Association

Paul Andrew Turcke
Moore Smith Buxton & Turcke
950 West Bannock Street, Suite 520
Boise, ID  83702
Telephone: (208) 331-1807
Facsimile: (208) 331-1202
Email: pat@msbtlaw.com

Attorney for Intervenor-Defendants Blue Ribbon Coalition, and  California Association of Four-Wheel Drive Clubs

Dennis L. Porter
Dennis L. Porter Attorney at Law
8120 36th Avenue
Sacramento, CA  95824
Telephone: (916) 381-8300
Facsimile: (916) 381-8726
Email: dlporter2@yahoo.com

Attorney  for  Intervenor-Defendants'  Blue  Ribbon
Coalition;  California  Association  of  Four-Wheel
Drive  Clubs;  and  United  Four-Wheel  Drive
Associations

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT

## SAN FRANCISCO DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,<br><br>          Plaintiffs,<br><br>     v.<br><br>U.S. BUREAU OF LAND MANAGEMENT, *et al.*,<br><br>          Defendants,<br><br>_____<br><br>AMA DISTRICT 37 *et al.*<br><br>          Intervenor-Defendants'<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 06-4884-SI

Honorable Susan Illston

**OHV INTERVENOR-DEFENDANTS' BRIEF
IN SUPPORT OF FEDERAL DEFENDANTS'
CROSS-MOTION FOR SUMMARY
JUDGMENT**

Courtroom:    10, 19th Floor
Judge:        Susan Illston

**TOPICAL INDEX**

Page

Preface ..................................................................................................................... 1

I.      INTRODUCTION......................................................................................... 2

II.     THE COURT'S REQUEST FOR RE-BRIEFING IN LIGHT OF RECENT
        DECISIONS ISSUED BY THE NINTH CIRCUIT COURT OF APPEALS ................... 3

        A.      LANDS COUNCIL V. MCNAIR, 2009 WL 2640001 (9TH CIR. 2008) ........................... 4

        B.      OREGON NATURAL DESERTS ASSOCIATION V. BLM, 430 F.3D 1057 (9TH CIR. 2008) . 6

        C.      APPLICABILITY OF LANDS COUNCIL AND OREGON NATURAL DESERTS ASSOCIATION
                TO THE CASE AT BAR ........................................................................................ 7

III.    FLPMA ARGUMENT .................................................................................... 7

        A.      PROPER STANDARD OF REVIEW UNDER LANDS COUNCIL V. MCNAIR........................ 7

        B.      IN DESIGNATING ROUTES, BLM CONSIDERED ALL LEGALLY-REQUIRED
                CRITERIA ....................................................................................................... 8

                1.      Evidence Shows that Decision Tree was Only One Part of BLM's OHV
                        Impacts Assessment Process ........................................................................ 9

                2.      WEMO EIS Explains How Route Designation Process Applied Impact
                        Minimization Criteria................................................................................ 13

                3.      Route Designation Table Shows that Minimization Criteria Were
                        Used........................................................................................................ 14

        C.      BLM'S ROUTE DESIGNATION DECISIONS ARE SUPPORTED BY EVIDENCE IN THE
                ADMINISTRATIVE RECORD ................................................................................ 16

IV.     NEPA ARGUMENT....................................................................................... 17

        A.      PROPER STANDARD OF REVIEW UNDER LANDS COUNCIL V. MCNAIR..................... 17

        B.      BLM CONSIDERED A SUFFICIENT NUMBER AND RANGE OF ALTERNATIVES.......... 18

                1.      Oregon Natural Desert Association v. BLM Refines Rule
                        Regarding OHV Alternatives .................................................................. 18

                2.      Range of Alternatives Determined by Purpose and Need of Proposed
                        Action ..................................................................................................... 19

                3.      The Alternatives Are Sufficiently Distinct................................................. 21

        C.      BLM DESCRIBED AND USED THE PROPER ANALYTICAL BASELINE ...................... 23

V.      ESA ARGUMENT.......................................................................................... 25

        A.      THE BIOLOGICAL OPINION (BIOP) ADEQUATELY ASSESSES OHV IMPACTS ON THE
                DESERT TORTOISE........................................................................................... 25

                1.      No Data Showing Region-wide Tortoise Declines .................................... 25

2. No Data Showing that OHVs "Take" Tortoises ........................................ 27

B. THE BIOP'S INCIDENTAL TAKE STATEMENT COMPLIES WITH THE ESA ................. 29

1. The ITSs Considered All Likely "Take" of Desert Tortoises .................. 29

2. The ITSs Includes a Very Conservative Estimate of Take ...................... 30

3. The ITSs Terms & Conditions are Adequate ........................................... 31

4. The ITSs Re-Initiation "Triggers" are Reasonable ................................... 31

VI. CONCLUSION ............................................................................................................. 32

1

# TABLE OF AUTHORITIES

2

Page

3

**FEDERAL CASES**

4

*American Motorcyclist Association v. Watt*
543 F.Supp. 789 (C.D. Cal. 1982)..................................................................9, 16, 24

5

*American Rivers v. Federal Energy Regulatory Commission*
201 F.3d 1186 (9th Cir. 2000)..................................................................23

6

*Arizona Cattle Growers' Association v. FWS*
273 F.3d 1229 (9th Cir. 2001)..................................................................28

7

8

*Babbitt v. Sweet Home Chapter*
515 U.S. 687 (1995)..................................................................28

9

*City of Carmel-by-the-Sea v. U.S. Department of Transportation*
123 F.3d 1142 (9th Cir. 1997)..................................................................18, 19, 23

10

*City of Sausalito v. O'Neill*
386 F.3d 1207 (9th Cir. 2004)..................................................................18, 23

11

12

*Earth Island Institute v. U.S. Forest Service*
351 F.3d 1291(9th Cir. 2003)..................................................................17

13

*Ecology Center, Inc. v. Austin*
430 F.3d 1057 (9th Cir. 2005)..................................................................4, 5

14

*Half Moon Bay Fishermans' Mktg. Association v. Carlucci*
857 F.2d 505 (9th Cir. 1988)..................................................................23

15

16

*Inland Empire Pub. Lands Council v. U.S. Forest Service*
88 F.3d 754 (9th Cir. 1996)..................................................................17

17

*Lands Council v. McNair*
2008 WL 264001 (9th Cir. 2008)..........................................3, 4, 5, 6, 7, 8, 9, 16, 17, 18, 23, 28

18

19

*Marbled Murrelet v. Babbit*
83 F.3d 1060 (9th Cir. 1996)..................................................................28

20

*Motor Vehicle Manufacturers Association, Inc. v. State Farm Mutual Auto Insurance Co.*
463 U.S. 29 (1983)..................................................................5, 7

21

22

*Northern Alaska Environmental Center v. Kempthorne*
457 F.3d 969 (9th Cir. 2007)..................................................................18

23

*Oregon Natural Desert Association v. BLM*
531 F.3d 1114 (9th Cir. 2008)..................................................................3, 6, 7, 18, 19

24

*Oregon Natural Resources Council v. Allen*
476 F.3d 1031(9th Cir. 2007)..................................................................31

25

26

*Roberston v. Methow Valley Citizens Council*
490 U.S. 332(1989)..................................................................18

27

28

iii

1

**FEDERAL CASES CONT.**

2

Page

3

*Seattle Audubon Society v. Moseley*
80 F.3d 1401 (9th Cir. 1996)...................................................................................18

4

*Westlands Water District v. U.S. Dept. of Interior*
376 F.3d 853(9th Cir. 2004)....................................................................................19

5

*Wilderness Society v. Tyrrel*
918 F.2d 813 (9th Cir. 1990)......................................................................................8

6

**FEDERAL STATUTES**

7

16 U.S.C. § 470 .......................................................................................................14

8

16 U.S.C. §§ 1531-1544.............................................................................................1

9

16 U.S.C. § 1536 (b)(4).............................................................................................31

10

42 U.S.C. § 4321 ...................................................................................................1, 16

11

42 U.S.C. § 4332 (c)................................................................................................18

12

43 U.S.C. §§ 1701-1785.............................................................................................1

13

43 U.S.C. § 1732 (a)...................................................................................................2

43 U.S.C. § 1732 (b) ...........................................................................................9, 16

14

**FEDERAL REGULATIONS**

15

40 C.F.R. § 1502.14 .................................................................................................18

16

43 C.F.R. § 8342.1 .............................................................................7, 8, 9, 14, 15, 16, 17

17

50 C.F.R. § 17.3 .......................................................................................................28

18

50 C.F.R. § 402.14 (i)(4)...........................................................................................31

**FEDERAL EXECUTIVE ORDERS**

19

Executive Order 11644..............................................................................................16

20

Executive Order 11989..............................................................................................16

21

22

23

24

25

26

27

28

*OHV INTERVENOR-DEFENDANTS' BRIEF IN SUPPORT OF*
*FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT*

# PREFACE

## A Note Regarding the Limited Focus of OHV-Intervenors' Brief

The Intervenor-Defendants in this case consist of the following eight off-highway vehicle (OHV) organizations – the Blue Ribbon Coalition, the California Association of Four-Wheel Drive Clubs, United Four-Wheel Drive Clubs, American Motorcyclists Association District 37, the American Sand Association, the California Off-Road Vehicle Association, the Off-Road Business Association, and the San Diego Off-Road Coalition.  To eliminate duplication and to ease the burden on the Court, these eight groups (hereafter, the "OHV Intervenors") have consolidated their arguments into a single brief requesting that the Court grant the Federal Defendants' cross-motion for summary judgment and deny all relief sought by plaintiffs.

In addition, the OHV Intervenors are aware that the Federal Defendants in this action have filed an exhaustive brief that provides a full factual and procedural background for the case and responds point-by-point to the claims made by the plaintiffs.  Likewise, the OHV Intervenors are aware that Kern County, San Bernardino County, and Imperial County, as well as the Quad State Local Governments Authority (the "County Intervenors"), have submitted their own brief in support of the Federal Defendants' motion.

In an effort to provide the Court with coordinated as opposed to redundant briefing, the OHV Intervenors will address only those issues they feel require amplification from an OHV end-user perspective.   These include (1) plaintiffs' claims under the Federal Land Policy and Management Act (FLPMA)[1]; (2) plaintiffs' assertion that the WEMO Plan Environmental Impact Statement (EIS) provides an inadequate range of alternatives and employs an improper analytical baseline in violation of the National Environmental Policy Act (NEPA)[2]; and (3) plaintiffs' claim that the Biological Opinions (BiOp) for the WEMO and NECO Plans inadequately assess OHV impacts on the desert tortoise in violation of the federal Endangered Species Act (ESA).[3]

---

[1]      43 U.S.C. §§ 1701 - 1785
[2]      42 U.S.C. §§ 4321, *et seq.*
[3]      16 U.S.C. §§ 1531 - 1544

## I.    INTRODUCTION

The plaintiffs' lawsuit is directed toward a single objective: Unraveling the BLM's West Mojave (WEMO) Plan (including its attendant OHV route designation) and BLM's Northern and Eastern Colorado (NECO) Plan, both of which are court-ordered amendments to BLM's California Desert Conservation Area (CDCA) Plan, first adopted in 1980.

The OHV Intervenors oppose plaintiffs' efforts in this regard – not because the WEMO and NECO Plans optimize OHV recreational opportunities (they don't), but because the plans, despite their flaws, represent the best and most reasoned approach to conserving the diverse resources in these two, remarkably vast desert regions, while still making the resources available for multiple uses, as federal law requires. 43 U.S.C. § 1732 (a).  In almost every respect, the two plans are state-of-the-art, the product of stakeholder input, expert analysis, data gathering from the field, technical literature reviews, and the kind of frustrating, occasionally mind-numbing work that is increasingly the job of federal agencies to perform.  The OHV Intervenors are disappointed in certain aspects of the plans, as they close trails that have long been popular among OHV enthusiasts.  Yet the OHV Intervenors recognize that the world does not revolve around their interests, and that the lands of the WEMO and NECO must be managed if they are to sustain recreation and other uses into the future. For the OHV Intervenors, a cohesive, intelligent plan – albeit one that reduces OHV routes – is better than a haphazard "interim" plan (which is what exists now) or no plan at all.

Before presenting their substantive responses to plaintiffs' arguments, the OHV Intervenors would like to make one additional point:  In their complaint, plaintiffs tend to de-contextualize the WEMO and NECO Plans and make them appear to be primarily, if not exclusively, blueprints for federally-sponsored OHV trail systems.  This is incorrect.  OHV use is not the major focus of either plan.  On the contrary, the WEMO and NECO documents are each subtitled "A Habitat Conservation Plan and California Desert Conservation Area Plan Amendment." BLM AR WMP 201625, NECO BO AR 02434, NECO BO AR 05272.  Conservation, not OHV use, is the driving activity behind the plans. NECO BO AR 02477, NECO BO AR 05295, BLM AR WMP 201652-201654.  Moreover, the plans are intended to accommodate a wide array of uses, most of which

*OHV Intervenor-Defendants' Brief In Support of*
*Federal Defendants' Cross-Motion for Summary Judgment*

have no relation to OHVs.  These include hiking, mining, filmmaking, rockhounding, cultural resource preservation, natural resource preservation, horseback riding, mountain biking, hunting, sightseeing, energy production, camping, and national defense. BLM AR WMP 201655, NECO BO AR 02602, NECO BO AR 05478.  Moreover, the WEMO and NECO are huge desert areas, encompassing more than 9.3 million acres and 2.5 million acres, respectively.[4]  OHV use takes place on only a tiny fraction of these desert lands, which is why BLM has confidently imposed a "less than 1% ground disturbance" standard in much of the WEMO and NECO. So it is important that the Court place plaintiffs' claims in perspective and locate them properly within the larger geographic/spatial context of the WEMO and NECO.

## II.      THE COURT'S REQUEST FOR RE-BRIEFING IN LIGHT OF RECENT DECISIONS ISSUED BY THE NINTH CIRCUIT COURT OF APPEALS

This case was extensively briefed by all parties in advance of the Court hearing held on May 16, 2008.  Subsequent to the hearing, however, the 9th Circuit Court of Appeals issued two opinions — *Lands Council v. McNair*[5] and *Oregon Natural Desert Association v. BLM*[6] — that have the potential to affect the outcome of the current action.  Plaintiffs and the Federal Defendants asked permission to brief these two new Ninth Circuit decisions.  The Court not only granted this request but declared all prior briefing withdrawn and directed the parties to submit new briefs which address and accommodate the new legal authority.  The OHV Intervenors hereby submit this brief in response to the Court's directive.

Before getting to the merits of the cross-motions for summary judgment, however, the OHV Intervenors would like to summarize the holdings in *Lands Council* and *Oregon Natural Desert Association*, as they will guide the Court's analysis of the arguments made for and against the WEMO and NECO Plans.

---

[4]      The WEMO Plan includes 3.3 million acres of BLM land, 3 million acres of private land, 102,000 acres administered by the State of California, and 2.7 million acres of military lands administered by the Department of Defense.  AR WMP-00046.

[5]      2008 WL 2640001 (9th Cir. 2008)

[6]      430 F.3d 1057 (9th Cir. 2008)

**A.** *LANDS COUNCIL V. MCNAIR,* 2008 WL 2640001 (9TH CIR. 2008)

*Lands Council v. McNair* represents a significant doctrinal shift in the Ninth Circuit's approach to lawsuits challenging federal agency decisions, especially where the technical expertise of the agency is implicated.  Just three years ago, in *Ecology Center, Inc. v. Austin*, 430 F.3d 1057 (9th Cir. 2005), the court expanded the scope of its review power to invalidate the scientific methodologies employed by the U.S. Forest Service when assessing soil conditions. *Id.,* at 1064.  The *Lands Council* decision — which was issued *en banc* — halts the trend of judicial intrusion into the realm of agency expertise, and seeks to reestablish the proper balance between agency discretion and judicial oversight.  *Lands Council v. McNair, supra,* 2008 WL 2640001, at 6-10.  In short, the Court in *Lands Council* stated that federal judges are not scientists and should not act as if they are.  *Id.,* at 4.  When reviewing the actions of federal agencies whose work is driven by highly technical concerns, the Courts must defer to the agencies' decisions unless clearly erroneous, in conflict with statutory directive, or irreconcilable with the evidence in the record.  *Id.,* at 9-10.

The facts of *Land Council* are typical of federal environmental litigation.  The plaintiffs — two environmental groups — filed suit against the U.S. Forest Service, challenging its decision to approve a commercial logging project in the Idaho Panhandle National Forests District (IPNF).  *Id.,* at 1-3. The plaintiffs alleged that the project violated both the National Forest Management Act (NFMA) and the National Environmental Policy Act (NEPA).  *Id.,* at 4-5.  The NFMA claims specifically attacked the methodology the Forest Service used to determine proposed logging impacts on the "old growth" habitat of the flammulated owl.  *Id.,* at 6-14.  Plaintiffs argued that under *Ecology Center, supra,* the Forest Service was required to "demonstrate the reliability" of its analytical approach, which it had not done.  *Id.*, at 6, 7.  With regard to NEPA, plaintiffs asserted that the Supplemental Final EIS (SFEIS) for the project failed to resolve alleged "scientific uncertainties" surrounding the impacts of the logging project and for that reason was inadequate.  *Id.,* at 16-19.

The Court rejected plaintiffs' claims on all counts, holding that (1) neither NFMA nor the APA required the Forest Service to prove up the reliability of its scientific methods, and (2) NEPA

imposed no duty on the Forest Service to address "scientific uncertainty surrounding its strategy for maintaining species viability." *Id.,* at 6-14, 16-19. In coming to this decision, the Court acknowledged that, in a string of recent cases, it had succumbed to the temptation to act as a kind of meta-scientific tribunal, sitting in judgment of technical work performed by federal agencies. *Id.,* at 4. This, said the court, was not appropriate to the role of the judiciary — especially since most federal judges lack the scientific expertise necessary to evaluate the fine technical points that often influence agency decisions in matters of ecology and environmental protection. *Id.,* at 9-10. The following passage illustrates the Court's renewed sense of restraint:

> "In essence, Lands Council asks this Court to act as a panel of scientists that instructs the Forest Service how to validate its hypothesis regarding wildlife viability, chooses among scientific studies in determining whether the Forest Service has complied with the underlying Forest Plan, and orders the agency to explain every possible scientific uncertainty. As we will explain, this is not a proper role for a federal appellate court." *Id.,* at 4.

The court then acknowledged that its approach in *Ecology Center* — the case relied upon by the plaintiffs — was too far-reaching, too intrusive into the province of agency decision-making, and lacked the deference required under APA's "arbitrary and capricious" standard of review:

> "We made three key errors in *Ecology Center*. First, we read the holding of *Lands Council I* too broadly. Second, we created a requirement not found in any relevant statute or regulation. And third, we defied well-established law concerning the deference we owe to agencies and their methodological choices. Today, we correct those errors." *Id.,* at 8.

Ultimately, the court concluded that the Forest Service — not a panel of judges — was in the best position to determine how to satisfy its requirements under NFMA. *Id.,* at 10, 13. The challenged action, said the court, will stand provided that the Forest Service, in approving the project, has not (a) relied on factors which Congress had not intended it to consider, (b) entirely failed to take account of an important aspect of the problem, or (c) "offered an explanation for its decision that was counter to the evidence before the agency, or is otherwise so implausible that is cannot be ascribed to a difference of opinions among experts." *Id.,* at 9, quoting *Motor Vehicle*

1    *Mfrs. Assn.*, *Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed2d 443

2    (1983).

3    **B.**    *OREGON NATURAL DESERTS ASSOCIATION V. BLM,* 430 F.3D 1057 (9TH. CIR. 2008)

4    Though less dramatic than *Lands Council* in its jurisprudential ramifications, *Oregon*

5    *Natural Deserts Association v. BLM* is nevertheless important to this case because it addresses one

6    of the specific claims advanced by plaintiffs, namely that the WEMO EIS failed to consider any

7    alternative that would reduce the number of "open" OHV routes to something less than the 5,200

8    contemplated in the proposed action.

9    In *Oregon Natural Deserts Association,* the plaintiffs challenged the BLM's resource

10    management plan for southern Oregon (the "Southern Oregon Plan"), on grounds that it violated

11    FLPMA, the federal Wilderness Act, and NEPA. *Oregon Natural Deserts Association v. BLM,*

12    *supra,* 430 F.3d at 1115-116. With respect to NEPA, the plaintiffs argued that the EIS for the

13    Southern Oregon Plan was flawed in that none of the seven alternatives considered by BLM would

14    have closed any existing OHV (also known as "ORV") routes. *Id.,* at 1125-1126. Instead, the seven

15    alternatives differed only terms of the number of ORV routes that were designated "limited" as

16    opposed to "open." *Id.,* at 1126.

17    The court agreed with plaintiffs that BLM's alternatives analysis was inadequate.

18    Specifically, the court found that BLM never considered "alternatives [that] would have closed

19    more acreage to ORV use than was closed before the Plan went into effect." *Id.,* at 1126; *see also,*

20    *id.,* at 1145. In fact, said the court, "every alternative *opened* more land to some kind of ORV use

21    than was permitted before." *Id.,* at 1126; *see also, id.,* at 1145. In failing to consider any alternative

22    that would have meaningfully reduced the number of existing ORV routes, BLM had engaged in the

23    kind of "uncritical privileging of one form of use over another" that the court has held violates

24    NEPA. *Id.,* at 1145.

25    The court was also unmoved by BLM's argument that some of the considered alternatives

26    "down-graded" many of the existing ORV routes from "open" to "limited," thus reflecting tighter

27    ORV use restrictions. According to the court, there is a big difference between a "limited" ORV

28

route and a "closed" ORV route: "A limited designation, even with the possibility of closure, does not provide protection equivalent to a straightforward closure." *Ibid.* Ultimately, the court ruled that "the BLM must consider closures of significant portions of the land it manages, including, if found appropriate on remand, lands with wilderness characteristics." *Ibid.*

### C. APPLICABILITY OF *LANDS COUNCIL* AND *OREGON NATURAL DESERTS ASSOCIATION* TO THE CASE AT BAR

*Lands Council* and *Oregon Natural Deserts Association* provide a fresh context in which to evaluate plaintiffs' challenge to the WEMO and NECO Plans and their respective Biological Opinions and NEPA documents. The OHV-Intervenors will address four issues within this context: (1) whether BLM's route designation process complied with FLPMA and its implementing regulations, most notably the "impact minimization criteria" of 43 C.F.R. §8342.1; (2) whether BLM considered an adequate range of alternatives to the proposed WEMO Plan; (3) whether the WEMO EIS employed a proper analytical baseline; and (4) whether the Biological Opinion (BiOp) sufficiently assessed the WEMO and NECO Plans for their potential to cause OHV-related impacts on the federally-listed Mojave desert tortoise.

## III. FLPMA ARGUMENT

### A. PROPER STANDARD OF REVIEW UNDER *LANDS COUNCIL V. MCNAIR*

As *Lands Council* makes clear, the role of a federal court is very limited when reviewing actions taken by a federal agency. The court must defer to — not challenge — the technical and scientific determinations made by the agency in question. *Lands Council, supra,* at 9-10. Those determinations shall stand provided the federal agency: (1) supports its conclusions with evidence, (2) has not relied on factors that Congress had not intended for it to consider, (3) considers each important aspect of the problem, and (4) does not offer an explanation for its decision that runs counter to the evidence in the record or is so implausible that it cannot be ascribed to a difference of opinion among experts. *Lands Council, supra,* at 9, citing *Motor Vehicle Mfrs. Assn., Inc., v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43.

1    In addition, in the absence of express statutory directive, the court may not question the

2    procedures used by the federal agency in meeting its legal obligations; nor may the court dictate

3    what those procedures shall be.  As stated by the court in *Lands Council*: "We are not free to impose

4    on the agency our own notion of which procedures are best . . . . Nor may we impose 'procedural

5    requirements [not] explicitly enumerated in the pertinent statutes.'"  *Id.,* at 10, quoting *Wilderness*

6    *Society v. Tyrrel,* 918 F.2d 813, 818 (9th Cir. 1990).

7    **B.    IN DESIGNATING ROUTES, BLM CONSIDERED ALL LEGALLY-REQUIRED CRITERIA**

8    The doctrinal shift announced in *Lands Council* affects directly the outcome of the case at

9    bar.  Plaintiffs have alleged that BLM, when developing and adopting the WEMO Plan, failed to

10   consider the effects of OHV recreation on key resource values, as required under 43 C.F.R.

11   §8342.1, one of FLPMA's implementing regulations.  When one looks deeper into this argument,

12   however, one sees that plaintiffs are attacking only *one part* of BLM's resource impact assessment

13   process — the so-called "Decision Tree" — for its purported failure to consider OHV impacts on

14   soils, habitat, cultural resources, and other users (e.g., hikers).[7]

15       "The ORV route network adopted by BLM in the March 2006 WEMO
16       plan amendment and ROD does not comply with the executive orders,
         laws and regulations governing designation of ORV routes because the
17       routes were adopted using a flawed process, called the 'Decision Tree,'
         which failed to consider the factors required by the regulations, such as
18       minimizing impacts to public land resources, and instead weights the
         designation process in favor of leaving routes open regardless of the
19       consequences to other resources.  As a result of the use of this process, the
         BLM left open routes unnecessarily damaging scarce cultural resources,
20       riparian areas, and other public resources."

21   (Second Amended Complaint, at p. 41, lines 9-21.)

22

23   In making this allegation, plaintiffs fail to acknowledge the other steps BLM took to address

24   impacts on public land resources, and likewise fails to accept the evidence in the record which

25   shows that BLM not only considered all required resource categories, but eliminated established

26   OHV routes due to their impacts on these categories.  Instead, plaintiffs argue that the Decision

27   _____

28   [7]    *See,* 43 C.F.R. §8342.1 for list of "impact minimization criteria".

---

8

1   Tree — and *only* the Decision Tree — matters for purpose of determining BLM's compliance with

2   43 C.F.R. §8342.1, and that analyses performed outside the Decision Tree process must be ignored.

3   In this way, plaintiffs are inviting this court to do exactly what the Ninth Circuit in *Lands Council*

4   expressly prohibited — dictate to a federal agency the particular method or procedure it must follow

5   when attempting to comply with the technical requirement of the prevailing regulations.   *Lands*

6   *Council*, *supra*, at 10.

7          The issue for the Court to decide, however, is not whether the Decision Tree process itself

8   adequately addressed all of the resource impact criteria (although it did), but whether the record as a

9   whole demonstrates that BLM, by whatever processes it saw fit to use, evaluated the OHV aspects

10  of the proposed plan for potential adverse effects on the resource criteria.   It is to this question that

11  we now turn.

12          1.   Evidence Shows that Decision Tree was Only One Part of BLM's OHV
                 Impacts Assessment Process

13

14          Plaintiffs contend that BLM utilized a "Decision Tree" process as its exclusive

15  means of evaluating OHV routes for possible designation in the WEMO, and that this process gave

16  primacy to OHV values and disregarded mandatory "minimization" factors such as user conflicts

17  and impacts on soil, air, wildlife habitat, and cultural resources.  (Sec. Amend. Complaint, at 41; *see*

18  *also,* 43 C.F.R. §8342.1.)  Plaintiffs are wrong.  BLM did *not* use the Decision Tree as its sole

19  means of making final route designation decisions.  In fact, the Decision Tree is just the last phase

20  of BLM's overall route designation process – a process that takes public land resource values into

21  account, as required by 43 U.S.C. § 1732(b), 43 C.F.R. § 8342.1, Executive Orders 11,644 and

22  11,989, and the holding in *American Motorcyclist Association v. Watt,* 543 F.Supp. 789 (C.D. Cal.

23  1982).

24          For example, in Section 2.2.6.2 of the WEMO Plan EIS (entitled "Criteria"), BLM

25  provides a comprehensive description of the route designation methodology it used to develop the

26  route network ultimately approved as part of the WEMO Plan. BLM AR WMP 201826.  It warrants

27  a full quotation, as it dispels the dual myth, advanced by plaintiffs, that (1) BLM used only the

28

Decision Tree to designate routes and (2) the decision tree did not account for the proper "menu" of minimization criteria:

> "Within the redesign area, the redesignation process employed successful aspects of past efforts, sought to avoid their pitfalls and involved the public extensively in its development.  Consultation with the architects of past designation efforts, other land use planners and extensive conversations and meetings with the public identified a number of issues and concerns that needed to be addressed if a designation process were to be successful.  **As a result, it was decided to base the route designation revision on the following:**

> - A variety of data, **including biological, cultural, and recreational resources, commercial uses and land ownership.**
> - Current ground-truthed maps that displayed not only route location, but also route type, use level, and recreational points of interest such as campsites and staging areas.
> - A process that:
>   - Is standardized, repeatable and that can be logically followed.
>   - Assesses each route on its own merits and issues, and documents that assessment.
>   - Identifies a desired future condition and implements a process to attain that condition.
>   - Creates a system of routes that work together for positive synergy.
>   - Systematically assesses both individually and cumulatively the effects of each route on **biological, cultural** and recreational resources, as well as the general access requirements of commercial and private property interests.
>   - Establishes a clear link between the route designation decision and the rationale for that decision.
>   - Involves the public and incorporates their input.
>   - Considers the history of use, public safety, the intensity and season of use and the effect of concentrating versus dispersing use.
>   - Takes into account the variety of recreational visitors by offering a variety of routes (e.g. 4WD vs. motorcycle).
>     - Considers the length of the typical visitor's stay by providing enough recreational opportunity for that stay (which would decrease route proliferation).
>     - Protects or maintains "feeder" and historic routes, as well as commercial and private property access.

> "The process could consider: **(1) level of impact of each route; (2) the number, density and intensity of use of each route and its relationship to**

**habitat fragmentation and cumulative effects; and (3) ways to minimize the number and intensity of conflicting land uses** (e.g., urban interface, noise, dust, visual impacts.)"

BLM AR WMP 201826-201827.  (*Emphasis added.*)

The process described above actually involved several steps.[8] First, BLM selected eleven sub-regions for detailed designation updates because of new and significant concerns regarding desert tortoise critical habitat, cultural, ecologic resources, and biodiversity.  WMP AR 2113964.  Then BLM conducted a detailed field inventory.  Using global positioning system units, motorized routes were mapped for location, type of route, route condition and level of use, and then integrated with other data (e.g., desert tortoise data) to construct detailed maps of the area.  WMP AR 211394; see WMP AR 217221 [aerial photos of desert tortoise critical habitat].  Each mapping team consisted of "a note taker possessing a natural/earth science/planning background" to record public land resources.  WMP AR 219227.

Next, BLM designated Motorized Access Zones ("MAZs"), which addressed both the "conservation of sensitive species and public access needs" including recreation, commercial and business concerns.  WMP AR 211396; see also, WMP AR 216272 [more detailed ground survey performed to accumulate biological data.]  For example, MAZ-1's goals were to "facilitate tortoise recovery" and "maintain access to active mine sites."  *Id*.  MAZ-3's goals were to protect the integrity of the ACEC; to minimize the creation of "volunteer" routes into the ACECs; to minimize route redundancy; and to allow for connectivity to the California Back Country Discovery Trail.  BLM AR WMP 211408; AR 211397.[9]  Using the MAZ maps, the designation team was able to consider the following environmental concerns: "T&E and sensitive species and their habitats",

---

[8]    The following discussion is taken from the Environmental Assessment (EA) for the WEMO Off-Road Vehicle Route Designation Project, which was ultimately incorporated into the WEMO Plan proper.  See, WMP AR 211393-211413.  Because the ORV network adopted through the Route Designation Project is also a component of the Western Mojave Plan's conservation strategy, the route designation analysis in the Designation Project EA was included in the Western Mojave EIR/S.  Accordingly, the route designation information in the Western Mojave EIR/S (WMP AR 201823-201844) is the same as the information in the Designation Project EA (WMP AR 211393-211413.)

[9]    Each MAZ's management issues and goals are listed.  WMP AR 211396-211403.

---

1    "sensitive cultural sites", "highly erosive soils", private property, and commercial operations.  WMP

2    AR 211403.  Access needs and other land use data were also mapped.  *Id.*

3            In addition, the maps identified areas of high biological importance ("biology

4    polygons") and areas of high human disturbance ("disturbance polygons").  WMP AR 211404.

5    Biology polygons were "created using recent field data gathered from tortoise critical habitat."  *Id.*

6    These biology polygons identify areas where tortoise "sign" were higher than average.  *Id.*  The

7    Designation Project EA states, "[w]ithin biology polygons, special emphasis was to be placed on

8    eliminating routes determined to be unnecessary for commercial or private property access or whose

9    contribution to recreational opportunities was adequately or better met by maintaining recreational

10   opportunities in other areas with either less tortoise sign or habitat of lesser quality."  *Id.*

11           The final step in the process involved "the identification of a motorized vehicle

12   access network using a decision tree."  *Id.*

13           "BLM staff and management first reviewed each sub region and MAZ.
             Past, present and future management concerns and issues were considered,
14           including the effect the use of  motorized routes was having on natural
             resource conservation, the distribution of recreation, types of recreation,
15           resource impacts, law enforcement issues, land use conflicts, mineral
             development, livestock grazing, and maintenance issues."  *Id.*
16

17           According to the Designation Project EA , "the decision tree poses a series

18   of questions, which fall sequentially into the five following categories: (1) legal

19   easements and rights-of-way; (2) T&E species; (3) other environmental issues; (4) the

20   special qualities of a route, including safety concerns recreational qualities and user

21   conflict; and (5) route redundancy."  *Id.*[10]

22

---

23   [10]      Furthermore, the Designation Project EA established an El Paso Collaborative Access
     Planning Area for the El Paso Mountains and Ridgecrest sub regions.  WMP AR 211407.  The
24   Designation Project EA states that this process would be conducted subject to certain biological and
     cultural resource criteria, which include "adequate protection of raptor nests[,]" "adequate
25   protection of the Red Rock poppy and Red Rock tarplant[,]" "limitation of vehicle access to wildlife
     springs and artificial water sources[,]" "protection of riparian habitat adjoining significant roosts for
26   Townsends big-eared bat[,]" "full compliance with the National Historic Preservation Act, and the
     cultural resources element of the [CDCA] Plan[,]" *etc*.  WMP AR 211407.
27

28

---

2.      WEMO EIS Explains How Route Designation Process Applied
Impact Minimization Criteria

Due to the complexity of the multi-step process BLM used to develop the route

network, the WEMO Plan EIS makes an effort to explain how that process addressed potential

impacts on archaeological, historical, paleontological, and ethnographic resources, a point

illustrated by the following passage from the Cultural Resources Section of the WEMO Plan/EIS:

> Effects to cultural resources would be generated by specific implementing
> actions, such as fence construction, structure and debris removal, and **route
> designation.**  Because specific locations for some actions have not yet been
> identified, it is not possible at this time to fully identify the entire area of
> potential effect (APE) . . . **For route designation, which is the action being
> considered by the West Mojave Plan with the greatest potential to affect
> cultural resources,** the area of effect is the actual routes under consideration
> plus the 600-foot-wide corridor along open routes that is available for pulling
> off, parking, and camping, plus areas near or adjacent to routes that may be
> subject to effects related to use of the route.  Such effects include access to
> historic and prehistoric sites in the areas that may be subject to vandalism,
> artifact theft, removal of wood for campfires, and other similar types of
> effects.   In some cases, presence of vehicle access may have effects on
> traditional landscapes that extend well beyond the route and 600-foot corridor
> of use.

(*Emphasis added.*) AR WMP 202209.

As this passage demonstrates, BLM (1) had a very definite and practical

understanding of the types of impacts that OHV use may impose on cultural resources, and (2) fully

intended to assess such impacts during the route designation process. BLM reiterated its

commitment to protecting cultural resources from vehicle impacts just a few pages later:

> The CDCA Plan [of which the WEMO is a part] recognizes the importance to
> the public, scientists, Native Americans, and others of the prehistoric,
> historic, and paleontological resources.  Plan goals are to inventory to the
> fullest extent possible and expand knowledge of these resources, protect and
> preserve to the greatest extent possible representative samples of resources,
> give full consideration to these resources **during land planning and
> management decisions**, manage to maintain and enhance resource values,
> ensure BLM's activities avoid inadvertent damage to these resources, and
> achieve proper data recovery where adverse impacts cannot be avoided.
> **Special guidance regarding vehicle route approval is to use resource data
> during the route approval process to help** minimize **or eliminate adverse
> impacts on the resources from access and vehicle use.**

*OHV Intervenor-Defendants' Brief In Support of
Federal Defendants' Cross-Motion for Summary Judgment*

1      (*Emphasis added.*) AR WMP-202223.

2          Moreover, BLM stated that because OHV impacts on cultural resources are difficult

3  to determine except on a case-by-case basis, potentially problematic routes would be reviewed

4  under the process established under Section 106 of the National Historic Preservation Act,[11] in

5  consultation with the State Historic Preservation Officer and federally-recognized Indian tribes.  AR

6  WMP-211516—211517.

7          BLM also directed its staff to be alert to user conflicts when assessing "Limited"

8  vehicle routes:  "In all areas of limited vehicle use, **special attention will be given to identifying**

9  **conflict areas,** zones of route proliferation, and specific sites or resources being damaged by

10  vehicle use."  AR WMP 220005.

11          3.    Route Designation Table Shows that Minimization Criteria Were Used

12          The best evidence that BLM applied the Section 8342.1 minimization criteria is the

13  actual "Route Designation Table," which identifies each of the 5,200 routes reviewed by BLM,

14  states whether that route is to be left open or closed, and then explains the rationale for the decision.

15  AR WMP 211584 - 211725.  As one can see, many of the routes were closed.  *Id.*  In the majority of

16  cases, this was because the routes were redundant and/or provided no recreational value. *Id.*  In

17  addition, a large number of the routes were closed because they either entered or came too close to

18  desert tortoise habitat. See, e.g., AR WMP 211602.  These, however, were not the only reason

19  routes were closed. The following examples are instructive:

20  •  In the Middle Knob MAZ, three routes were closed due to erosion problems
21     (MK3A, MK4, and MK60), while three were closed due to potential cultural
       resource issues (MK18—20), and one was closed because it dead-ended near a
22     riparian creek that provided habitat for salamanders, birds, and rare frogs.   AR
       WMP 211655, 211657.
23

24  •  In the Newberry-Rodman MAZ, routes were closed to eliminate conflicts (NR1014),
       to protect excellent habitat in Kane Wash (NR2032A—2032I), and to protect the
25     white-margined beardtongue (NR3079).  AR WMP 211659, 211661; WMP 200047.

26

27  _____

28  [11]     16 U.S.C. § 470, *et seq.*

- In the Coyote MAZ, two routes were closed because they traversed a dry lake bed "with sensitive conditions" (C112 and C112A).  AR WMP 211589.[12]

- In the Ord MAZ, one route was closed to protect the Mojave monkeyflower (OJ322).  AR WMP 200047.

- In the Juniper MAZ, five routes were closed to protect cultural resources (RJ1003, RJ 1005, RJ 1056—1057, RJ 1059).  AR WMP 200047. Additionally, in response to a protest, BLM and the state archaeologist visited the Juniper Flats ACEC and based on evidence of damage to cultural and riparian resources, elected to "designate **no** single-track routes within the Juniper Flats ACEC as open."   SAR WMP 300033_Protests.

- In the Fremont MAZ, one route was closed because it passed through Desert cymopterus habitat (F1009), three routes were closed because they traversed a dry lake bed (F1046, F1046A, and F1047), one route was closed because it "detracts from the Watchable Wildlife Area" (F1035), at least four routes were closed at the request of the California Department of Fish & Game (F2017, F2022 - 2024), and more than 20 routes were closed because they intersected the Barstow woolly sunflower Habitat Conservation Area (F2203, 2204, 2206, F5016 - 5019, F5021 - 5026)).  AR WMP 211607 - 211611, AR WMP 211621).[13]

- In the Lane Mountain milk vetch conservation area, all routes were closed to protect the plant.  AR WMP-200054.

As these examples demonstrate, BLM applied the required "minimization" criteria when deciding which routes to close and which to leave open.  Plaintiffs are simply wrong to suggest that when designating OHV routes, BLM failed to consider anything other than recreation and impacts to desert tortoise habitat.

In conclusion, the BLM's route designation process, as described in the Route Designation EA and the WEMO Plan EIS, considered public land resources, including water, air, soil, wildlife habitat, cultural resources, and user conflicts, as required under 43 C.F.R. § 8342.1.[14]

---

[12]   As a general planning policy, BLM tried to eliminate routes near or through dry lake beds.  AR WMP 211516.

[13]   Note that the "evaluation sheets" used for decision tree purposes actually include a pre-printed list of the 43 C.F.R. § 8342.1 Designation Criteria at the bottom of the page for easy reference.  See, e.g., AR WMP 211907.

[14]   It is important to note that the Designation Project EA is not the end of the route designation process. The Designation Project EA is part of, and incorporated into, the larger (and subsequent) WEMO Plan, which is itself an amendment to the CDCA Plan.  As explained in the WEMO Plan/EIS, routes designated in the Designation Project EA may be modified or eliminated during the WEMO Planning Process:  "Because the motorized vehicle access network is also a component of the West

1  Although plaintiffs allege that the route designation process favors recreational use above other

2  considerations (Sec.Amend.Comp., at 41), this assertion cannot be squared with the AR excerpts

3  cited above.  As these documents indicate, the process was much more involved than described in

4  plaintiffs' complaint and took into account both natural and cultural resources in addition to

5  recreational use.[15] The Decision Tree, while an important step in the route designation process, was

6  just that – a step.  It did not constitute the entire process; nor does plaintiffs' characterization of it

7  accurately reflect how it was used in practice.

8  ### C.   BLM's ROUTE DESIGNATION DECISIONS ARE SUPPORTED BY EVIDENCE IN THE ADMINISTRATIVE RECORD

9  Plaintiffs contend that despite the BLM's arduous and deliberate route designation process –

10  a process that was interactive and involved extensive input from a wide range of stakeholders and

11  specialists – the route designation decisions are not supported by evidence in the record.  As the

12  discussion above illustrates, however, the record is replete with evidence that supports BLM's

13  decision to close the routes it did and to leave the others open.  Plaintiffs have cited no statute,

14  regulation, rule, or case that requires BLM to provide a comprehensive assessment of each route it

15  has elected to include in the designation.  See, 43 U.S.C. § 1732(b); 43 C.F.R. § 8342.1; Executive

16  Orders 11,644 and 11,989; and *AMA v. Watt, supra,* 543 F.Supp. at 797.  The Route Designation

17  Table and Decision Tree matrix (as well as the field data sheets from which that matrix is derived)

18  provide all the information the law requires to demonstrate BLM's rationale for keeping some

19  routes open and closing others.  *Id.*  To demand more would not only impose a legal duty where

20  none currently exists, it would also place a crushing burden on the route designation process itself.

21  *See, Lands Council, supra,* at 8, 13.  In short, the evidence clearly shows that BLM and its agents

22

23

24  _____

25  Mojave Plan's conservation strategy, the analysis presented in the Designation Project EA was included in the West Mojave EIR/S.  Comments regarding the network and suggested minor modifications were offered during the public review of the Draft EIR/S.  This is important because the West Mojave Plan will also amend the CDCA Plan.  Thus, the motorized vehicle access network that was incorporated into the CDCA Plan on June 30, 2003 could be modified by the CDCA plan amendment at the time the West Mojave Plan is approved."  AR WMP 201825.

28  [15]  See, BLM's response to Protest Issue 6, at SAR WMP 300117_Protests.

(including stakeholder volunteers) reviewed each route with the Section 8342.1 minimization criteria in mind.  Based on that evidence, plaintiffs' claim must be rejected.

Plaintiffs are also incorrect to assert that the record provides inadequate support for  BLM's effort to designate routes outside the decision tree area.  BLM made it clear that all such routes – which comprise about 2,671 miles of trails – were evaluated against the conservation strategies of the WEMO Plan and against the minimization criteria of 43 C.F.R. § 8342.1.  Furthermore, one need only review the WEMO Plan EIS to see that BLM was intent on eliminating redundant and/or environmentally suspect routes both inside *and* outside the decision tree area.  For example, at pages 2-154 - 2-156, the EIS explains that due to the incomplete nature of some of the surveys conducted during the 1985-1987 designation, a number of routes were reviewed and updated as part of the WEMO Plan. AR WMP 201842-201843.   These included routes in the following areas *outside* the Decision Tree area: (1) North Searles Sub Region, (2) El Mirage Sub Region, (3) Black Mountain ACEC, and (4) 25 locations where the ACEC, 1985-1987 and 2002 networks "bounded each other." *Id.*  Note that the EIS, in discussing BLM's effort to update the route analysis in these areas, states explicitly that "this action was carried out in accordance with 43 C.F.R. § 8342.1." AR WMP 201843.

IV.    **NEPA ARGUMENT**

   A.    PROPER STANDARD OF REVIEW UNDER *LANDS COUNCIL V. MCNAIR*

As with the FLPMA claims, plaintiffs' NEPA allegations must be reviewed under the APA's highly deferential "arbitrary and capricious" standard.  *Lands Council, supra,* at 4.  Such review "is narrow, and [the court may] not substitute [its] judgment for that of the agency." *Id.,* at 4, quoting *Earth Island Inst. V. U.S. Forest Service*, 351 F.3d 1291, 1156 (2003).  In addition, the court may not demand that the agency employ any particular procedure for meeting its obligations except those expressly articulated in the statute or its implementing regulations. *Id.,* at 10.

NEPA, unlike FLPMA or the ESA, does not impose substantive requirements on federal agencies.  *Inland Empire Pub. Lands Council v. U.S. Forest Service*, 88 F.3d 754, 758 (9th Cir. 1996).  Instead, it demands that the agency follow a process which allows the environmental effects

of a proposed action to be identified, analyzed, and disclosed to decision-makers and the public alike. *Roberston v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). "To that end, NEPA requires agencies to take a 'hard look' at the environmental consequences of their actions by preparing an EIS for each 'major Federal action [ ] significantly affecting the quality of the human environment.'" *Lands Council, supra,* at 16, quoting 42 U.S.C. § 4332(C). An agency satisfies the "hard look" requirement when it "provides a full and fair discussion of the environmental impacts and its EIS includes [the] necessary components," as established by NEPA. *See, Lands Council, supra,* at 17.

**B.     BLM CONSIDERED A SUFFICIENT NUMBER AND RANGE OF ALTERNATIVES**

      1.     <u>*Oregon Natural Desert Association v. BLM* Refines Rule Regarding OHV Alternatives</u>

It is standard NEPA law that the alternatives analysis is an integral part of any EIS, as it gives the decision-maker and the public the ability to compare options intelligently. *City of Sausalito v. O'Neill,* 386 F.3d 1186, 1207 (9th Cir. 2004), citing 40 C.F.R. § 1502.14. The rule of reason "guides both the choice of alternatives as well as the extent to which the [EIS] must discuss each alternative." *City of Carmel-by-the-Sea v. U.S. Department of Transportation,* 123 F.3d 1142, 1155 (9th Cir. 1997). NEPA requires that the EIS discuss a "reasonable range" of alternatives and mandates that at least one of them be a "No Action" alternative. 40 C.F.R. § 1502.14(d). What NEPA expressly ***does not*** require is that the acting agency – in this case, BLM – consider every conceivable alternative or, for that matter, every alternative brought to its attention by a member of the public. *Seattle Audubon Society v. Moseley,* 80 F.3d 1401 (9th Cir. 1996); *Headwaters, Inc. v. Bureau of Land Management,* 914 F.2d 1174, 1181 (9th Cir. 1990). Nor is the agency required to evaluate alternatives that are "infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area." *Northern Alaska Environmental Center v. Kempthorne,* 457 F.3d 969, 978 (9th Cir. 2007).

Recently, in *Oregon Natural Desert Association v. BLM,* 531 F.3d 1114 (9th 2008), the Ninth Circuit added to these general rules a corollary that applies specially to resource

---

18

1   management plans that allow OHV use on some portion of the public land within the agency's

2   control.  Specifically, the court concluded that BLM, in a resource management plan EIS, must

3   consider one or more alternatives that would close a meaningful number of the OHV routes in

4   existence *prior* to the plan's adoption.  *Oregon Natural Desert Association, supra,* 531 F.3d at 1145.

5   BLM's failure to discuss such an alternative in its EIS for the Southern Oregon Plan rendered the

6   EIS inadequate.  *Ibid.*

7       Plaintiffs will likely seize on this holding and argue that it effectively vitiates the

8   WEMO EIS as well, as the WEMO EIS only considers alternatives that would allow 5,098 miles of

9   OHV routes.  However, there is a critical distinction between the EIS challenged in *Oregon Natural*

10  *Deserts Association* and the EIS challenged here.  Whereas the Southern Oregon Plan EIS included

11  *no* alternative that would have eliminated then-existing OHV routes, the WEMO EIS discusses *six*

12  alternatives, including the "preferred" alternative, which call for the *elimination* of a significant

13  number of OHV routes.[16]   Therefore, the WEMO EIS complies with the directive set forth in

14  *Oregon Natural Desert Association.*

15       2.      Range of Alternatives Determined by Purpose and Need of Proposed Action

16       To determine whether an EIS explores a "reasonable" range of alternatives, the

17  alternatives in question must be tested against the purpose of the proposed action.  *Westlands Water*

18  *District v. U.S. Dept. of Interior,* 376 F.3d 853, 865 (9th Cir. 2004); *City of Carmel-by-the-Sea v.*

19  *U.S. Dept. of Transportation, supra,* 123 F.3d at 1155.  In this case, the WEMO Plan's driving

20  purpose is not, as intimated by plaintiffs, to designate OHV routes.  The Plan actually has a much

21  larger objective – one that extends well beyond the limited act of designating OHV routes.  The

22  Executive Summary of the WEMO Plan/EIS makes this plain.  It says:

23       The West Mojave Plan (Plan) is a **habitat conservation plan** and federal use
24       plan amendment that (1) presents a comprehensive strategy to conserve and
             protect the desert tortoise, the Mojave ground squirrel (MGS) and nearly 100
25       other sensitive plants and animals and the natural communities of which they
             are a part, and (2) provides a streamlined program for complying with the
26

27  [16]      *See, e.g.,* EIS Table 4-45, at AR WMP 202342 - 202343 [showing that the proposed action
28  reduces the number of OHV routes as compared to 2001 route inventory.]

requirements of the California and federal Endangered Species Acts (CESA and FESA, respectively).

AR WMP 201652.

When discussing the seven alternatives considered by BLM, the EIS is even more pointed in describing the purpose of the WEMO Plan:

The West Mojave Plan identifies measurable biological goals and objectives for each of the sensitive species that is addressed by the Plan.  The Final EIR/S examines seven alternative conservation strategies, each of which presents a different and unique approach to achieving those biological goals and objectives.

AR WMP 201653.

To reach these biological goals, the WEMO Plan proposes very specific conservation actions.  For example, Alternative A (the Proposed Action) not only creates an enlarged habitat conservation area (HCA) for the desert tortoise — consisting of 1,523,936 acres — it creates new conservation areas for a multitude of other sensitive plants and animals.  These include the following:

- An HCA for the Mohave Ground Squirrel consisting of 1,726,712 acres. AR WMP 201702.
- An HCA for the Barstow Woolly Sunflower consisting of 36,211 acres. AR WMP 201703.
- An HCA for the Bendire's thrasher consisting of 28,046 acres. *Id.*
- An HCA for Carbonite Endemic plants, which provide habitat for the gray vireo and the San Diego horned lizard, consisting of 5,169 acres. *Id.*
- A four-unit HCA for the Mojave fringe-toed lizard consisting of 42,865 acres. AR WMP 201704.
- An HCA for the Parish's phacelia consisting of 898 acres, most of which exists on dry lakes where OHV travel will be prohibited. AR WMP 201705.
- An HCA for the Alkali Mariposa lily. AR WMP 201787 - 201788.
- An HCA for the Charlotte's phacelia. AR WMP 201791.
- An HCA on the Edwards Air Force Base for the desert cymopterus. AR WMP 201792.
- Two HCAs (one in Coolgrade Mesa and one in West Paradise) for the Lane Mountain milkvetch. AR WMP 201796.
- Two core reserves for the Mojave monkeyflower. AR WMP 201797 - 201798.[17]

---

[17]     See Table 2-1 of the WEMO Plan EIS AR WMP 201691 - 201697

In addition, the plan calls for special protective measures – including tight restrictions on vehicle use – for additional wildlife species, such as bats (roost protection), the yellow-eared pocket mouse, burrowing owl, ferruginous hawk, golden eagle, long-eared owl, prairie falcon, Inyo towhee, LeConte's thrasher, Panamint alligator lizard, Southwestern pond turtle, crucifixion thorn, Kelso Creek monkeyflower, Kern buckwheat, Little San Bernardino Mountains gilia, Mojave tarplant, Reveal's buckwheat, short-joint beavertail cactus, triple-ribbed milkvetch, and white-margined beardtongue. AR WMP 201766 - 201804.

As these excerpts from the EIS establish, the WEMO Plan is not just or even primarily about OHV use and OHV route designations.  It is a habitat plan with wide-ranging but specific biological goals in mind.  The seven alternatives (six if not counting the "No Action" alternative) provide different pathways to those goals.

### 3.    The Alternatives Are Sufficiently Distinct

Contrary to plaintiffs' assertions, the six alternatives are different in scope and emphasis.  Alternative A would apply a multi-species conservation strategy to all public and private lands in the planning area, affecting more than 9 million acres. AR WMP 201653.  Alternative B, by contrast, would apply this same conservation strategy but only to lands administered by the BLM, which comprise only 3.3 million acres of the planning area.  AR WMP 201654.  This is a very important distinction, because it means that Alternative A, unlike Alternative B, would provide a streamlined Section 10(a) permitting process for private developers in exchange for their support in habitat and species conservation. AR WMP 201653 - 201654.  In addition Alternative A would apply to military bases and state-owned properties, whereas Alternative B would not. *Id.*

Alternative C would combine the elements of Alternative A with the management program recommended in the 1994 Desert Tortoise Recovery Plan (the "1994 Recovery Plan"). AR WMP 201654.  As the EIS explains, the 1994 Recovery Plan, while not binding, contains a number of "general recommendations" which, with the benefit of new data and survey methodologies, could be "fleshed out" and actually implemented in the WEMO. AR WMP 201895.  Under Alternative C,

1    implementation of the 1994 Recovery Plan would be *the* management priority, with a heavy

2    emphasis on scientific research. AR WMP 201898.

3          Alternatives D and E stand at opposite ends of the conservation-recreation

4    continuum.  The first would place a high priority on species conservation, even at the expense of

5    popular recreational activities, including motorized recreation. AR WMP 201654; 201899 - 201905.

6    The second would seek to enhance recreational opportunities and multiple use generally, even if

7    such uses would make it difficult to implement some of the conservation strategies of the Plan. AR

8    WMP 201654; 201905 - 201907.  Note that Alternative D differs from each of the other alternatives

9    in two very critical respects – (1) it would reclassify nearly all multiple use areas designated I, M, or

10   U within conservation areas as Limited Use or "L; and (2) it would prohibit all but street-legal

11   vehicles from using routes within biologically sensitive Motorized Access Zones (MAZs), closing

12   them to dirt bikes, quads, all-terrain vehicles, sand rails, and dune buggies. AR WMP 201899 -

13   201900; 201904.

14         Alternative F, by contrast, has a different orientation.  It would address, on a priority

15   basis, two of the most serious causes of desert tortoise mortality – disease and raven predation. AR

16   WMP 201908.

17         When viewed from the perspective of the WEMO Plan's clearly articulated purpose

18   – conservation of sensitive species and habitats in a multiple use context – the range of alternatives

19   considered in the EIS is reasonable indeed.  That most of them incorporate the routes identified as

20   "open" in the Designation Project is not surprising; nor does it make them so similar as to disqualify

21   them as distinct alternatives.   As can be seen from their respective descriptions, each of the

22   alternatives is substantially different than the others, with unique attributes and shortcomings.

23         These seven alternatives give BLM (and the public) a reasonable range of options to

24   choose from, and they are presented in a comparative format so that one can test the benefits and

25   drawbacks of one against the others. AR WMP 201662 - 201665.  Still, plaintiffs will likely claim

26   there are a number of feasible alternatives that BLM should have considered but did not. NEPA,

27   however, imposes no such duty on BLM.  As stated above, BLM was not required to consider every

28

conceivable alternative. *City of Sausalito v. O'Neill, supra,* 386 F.3d at 1207.  So long as the range of alternatives was reasonable, NEPA has been satisfied.  *City of Carmel-by-the-Sea v. U.S. Dept. of Transportation, supra,* 123 F.3d at 1155.  BLM complied with this mandate fully.

### C.    BLM DESCRIBED AND USED THE PROPER ANALYTICAL BASELINE

An EIS must include a stable and reasonably accurate description of existing (or "pre-action") conditions, as these conditions form the baseline for conducting the required NEPA impact analysis.  *See, Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci,* 857 F.2d 505, 510 (9th Cir. 1988). Here, plaintiffs allege that BLM, in the WEMO EIS, employed an invalid analytical baseline. Plaintiffs are incorrect.

It should be noted at the outset that neither NEPA nor its implementing regulations define "environmental baseline" or dictate how agencies are to establish one for purposes of conducting an impacts assessment.  *American Rivers v. Federal Energy Regulatory Commission,* 201 F.3d 1186,1195-1196 (9th Cir. 2000).   An environmental baseline "is not an independent legal requirement, but rather, a practical requirement in environmental analysis often employed to identify the environmental consequences of a proposed agency action." *Id.,* at fn. 15, citing 54 Fed.Reg. 23756 (1989).  In the absence of a statutory directive regarding analytical baselines, the court may not establish its own and impose it on the agency.  See, *Lands Council, supra,* 2008 WL 2640001 at 10.

When assessing a resource management plan EIS, the heart of the NEPA impact analysis is the "plan-to-ground" comparison.  In the WEMO EIS, this comparison is provided in Table 4-45. AR WMP 202342 - 202343.  The first column of that table sets forth the number of miles of open OHV routes per subregion contemplated in the Plan.  These mileage figures can then be compared against both the 1985-1987 route designation mileage and the 2001 route "inventory" mileage from Table 3-58.  If one performs this analysis, one will see that the proposed WEMO Plan, which includes implementation of the 2003 Route Designation, *reduces* OHV route mileage in *every* applicable subregion as compared to the 2001 route inventory, indicating that the Plan eliminates many of the redundant and/or environmentally problematic routes that "proliferated" during the late

1   1980s and 1990s. See AR WMP 202342 - 202343; AR WMP 202203 - 202204.  One would also

2   see that in some subregions, such as Kramer, the WEMO Plan *increases* the number of miles of

3   OHV routes, as compared to the 1985-1987 designation, indicating that the more thorough 2003

4   Designation Project captured some routes of recreational importance that had been missed in the

5   earlier designation effort.[18] AR WMP 202203; AR WMP 202343.  In other subregions, such as

6   Juniper, the WEMO Plan calls for *fewer* miles of routes than existed in either 1985-1987

7   designation or the 2001 inventory. *Id.*

8      As this discussion illustrates, the EIS provides precisely the kind of "baseline" information

9   that one needs to conduct a NEPA impacts analysis of the proposed action.  Due to the WEMO's

10  unique history of route designation and route "creation," it was appropriate to provide two baselines

11  against which to test the proposed plan – the 1985-1987 designation and the 2001 inventory.  This

12  gives the decision-maker and the public a richer context in which to place the proposed plan and

13  determine whether it should be adopted.  NEPA requires nothing more.

14     Plaintiffs, however, contend that BLM should have used the 1980 route designation as the

15  "no action" baseline.  This argument fails for at least four reasons.  First, BLM – not the plaintiffs –

16  are vested with the discretion and authority to select the analytical baseline for the proposed plan.

17  So long as that baseline is reasonable in its assumptions, it stands.  Second, the 1980 route

18  designations were developed without the aid of modern technology and mapping techniques,

19  without sufficient public input, and without ground-truthing.  Third, the 1980 route designations

20  were deemed invalid by the federal district court in *AMA v. Watt, supra,* 543 F. Supp. at 797 for not

21  applying the proper minimization criteria.  Fourth and most important, the 1980 route designations

22  no longer reflect conditions on the ground.

23     In summary, the EA and the EIS utilized appropriate analytical baselines, thus allowing

24  meaningful assessment of environmental impacts under NEPA.

25

26

27  [18] In the Kramer subregion, there were 254 miles of open routes in the 1985-1987 designation and 642
  miles of routes in the 2001 inventory, whereas the WEMO Plan calls for 361 miles of designated

28    "open" routes.

# V.    ESA ARGUMENT

## A.    THE BIOLOGICAL OPINION (BIOP) ADEQUATELY ASSESSES OHV IMPACTS ON THE DESERT TORTOISE

In their ESA claims, the plaintiffs refuse to come to grips with the limitations of data collection on the desert tortoise.  In the process, they seek to perpetuate two misconceptions about the tortoise that are not supported by the scientific evidence at hand: (1) that the desert tortoise population is experiencing sharp declines region–wide, and (2) OHV use contributes substantially to this decline by running over tortoises, crushing their burrows, and so ravaging their habitat as to cause malnutrition, reproductive stasis, and death.

### 1.    No Data Showing Region-wide Tortoise Declines

For many years, BLM and FWS advanced these same theories.  More recently, however, these agencies have come to realize that the data simply do not support them.  This realization came as the result of the 1994 Recovery Plan Reassessment.  During that Reassessment, a select panel of experts – including wildlife biologists, herpetologists, statisticians, and land managers – began to recognize that the "population trend" data was statistically weak for at least five reasons. AR WMP 205472 - 205475.

First, almost all of the data on tortoise declines and tortoise mortality came from approximately 20 specially-established study plots. AR WMP 205523.  Because the study plots were neither large nor randomly selected, those data could not be extrapolated region-wide.  AR WMP 205490, 205526 ("[T]he plots are not random samples of desert tortoise habitat, so extrapolations from them cannot be made."); see also AR WMP 205529 ("[A]nalyzing permanent study plots cannot give insight into population trends occurring within larger management areas unless the plots are randomly placed…").

Second, the study plots were not sampled consistently, year after year, so no longitudinal trends could be discerned.  AR WMP 205523 ("Only a small subset of the plots have been surveyed in any one year, and fixed survey intervals have not been maintained"); *see also*, AR WMP 205524-205525, 205526.

Third, no uniform sampling technique was employed, which means that the data derived from the sampling effort could not be cohesively integrated into statistically valid results. WBO AR WMP 14788-89, 14807, 205490.

Fourth, most of the study plot surveys used "tortoise sign" – e.g., evidence of scat – to determine the presence of tortoises in a given location.  When this approach was evaluated by statistician Anthony Krzysik, Ph.D., it was found to be inherently unreliable in terms of predicting whether tortoises were actually in residence.  "Scat and TCS [total corrected sign] counts were inconsistently and unreliably correlated with live tortoises.  Scat counts would occasionally produce significant *negative* correlations with tortoise counts, and this was observed in all three data sets." AR WMP 212256.  (Emphasis in the original.)

Fifth, when random sampling of tortoises was conducted outside the study plots, the method used was simply not sophisticated enough or powerful enough to detect population trends. AR WMP 205471, 205474.   This problem is largely related to the furtive behavior of desert tortoises. *Id.* They spend the vast majority of their time underground; and when above ground, they are camouflaged and often difficult to detect for purposes of conducting a census.  *Id,* see also, AR WMP 205489.

In light of these limitations on prior tortoise "trend" data, the members of the Recovery Plan Reassessment Team did a courageous and smart thing – they explicitly stated that, contrary to past representations, they did not possess adequate data to discern tortoise population trends: "No existing data or analyses are adequate to estimate long term status or trends in (a) desert tortoise populations, (b) habitat for desert tortoises in any recovery unit, and/or (c) threats to tortoise populations regionally."  AR WMP 205523.   This did not mean that the Recovery Plan Reassessment ignored the study plot data or found it completely useless; and those data certainly showed that at certain plots within the WEMO, tortoises have suffered die-offs.   Ultimately, however, the Recovery Plan Reassessment Team acknowledged that study plot data were not sufficient to detect population trends.  AR WMP 205539.

These scientific realities inform much of the analysis set forth in the Biological Opinions (BiOps) for the WEMO and NECO Plans. For example, when the FWS biologists state that they cannot at this time determine tortoise population size or the survival rate necessary to sustain viable populations, they are not dodging the issue (as suggested by plaintiffs). NBO AR 12574, 12576; WBO AR 14787, 14789. No one can describe that "baseline" within anything approaching statistical accuracy, and it would be intellectually dishonest for the FWS scientists to try.

Undaunted, however, the plaintiffs continue to state myth as fact. For example, on page 23 of the Second Amended Complaint, lines 2-3, they declare: "Studies show that tortoise populations in the Mojave Desert are facing a near total collapse." The scientific data, however, tell a different story; and both FWS and BLM, with the help of the Recovery Plan Reassessment Team, now recognize that the data do not support such sweeping pronouncements on the status of the tortoise.

### 2.   No Data Showing that OHVs "Take" Tortoises

The other myth perpetuated by plaintiffs is that OHV use results in substantial "take" of desert tortoises, thus causing jeopardy to the species and thwarting its recovery. (Sec.Amend.Comp., at 23-24.) The data do not support this allegation either. As an initial matter, "take" of tortoise – by whatever means – is extremely difficult to identify or quantify. WSupp ITS 01021. Not only are dead tortoises hard to find (they often die in their burrows, unseen), cause of death is usually impossible to determine. Necropsies are expensive to perform and often inconclusive.

Despite these limitations, however, one would think that vehicle strikes on tortoises would be fairly easy to discern and document. But that's the curious thing. While there is ample evidence of tortoises being crushed by vehicles on paved roads, there is virtually no evidence of tortoises being crushed on OHV routes. If one pores over the entire AR in this case, one will be hard-pressed to find any verified "take" of a tortoise by an OHV. Ultimately, the most telling statement regarding OHV-related "take" (or lack thereof) comes from a FWS staff member working

1  on the BiOp: *"We have no quantitative data on how many desert tortoises are killed and injured*

2  *by vehicle use on open and limited routes."*  NSupp ITS 00666, 00645. (*Emphasis added.*)

3          In the absence of credible evidence showing that OHVs strike and kill tortoises – the

4  kind of evidence needed to establish "take" under Section 9 of the ESA – plaintiffs allege that

5  OHVs degrade and fragment tortoise *habitat*, thus causing "harm" as that term is defined in 50

6  C.F.R. § 17.3, and interpreted by the courts in *Babbitt v. Sweet Home Chapter,* 515 U.S. 687, 691

7  (1995), *Marbled Murrelet v. Babbitt,* 83 F.3d 1060, 1064-65 (9th Cir. 1996), and *Arizona Cattle*

8  *Growers' Ass'n v. FWS,* 273 F.3d 1229, 1237-38 (9th Cir. 2001).  However, although "harm" is a

9  subset of "take" under Section 9, it has a very specific meaning when applied to habitat degradation.

10  "Such act may include significant habitat modification or degradation where it actually kills or

11  injures wildlife." 50 C.F.R. § 17.3.  Thus, to qualify as "take," the harm from habitat modification

12  must actually result in death or injury to the species; loss or degradation of habitat by itself is not

13  enough.  *Arizona Cattle Growers' Ass'n v. FWS, supra,* 273 F.3d 1229, 1237-1238 ("The word

14  'actually' before the words 'kills or injures' . . . makes it clear that habitat modification or

15  degradation, standing alone, is not a taking pursuant to section 9.").  *See also, Lands Council v.*

16  *McNair, supra,* 2008 WL 2640001, at 13 ("A habitat disturbance does not necessarily mean that a

17  species' viability will be threatened.")

18          Note also that it does not matter whether "take" of a species (in this case, the desert

19  tortoise) is being analyzed under Section 7 of the ESA (dealing with consultations, biological

20  opinions, and Incidental Take Statements) or Section 9 of the ESA (dealing with criminal and

21  unauthorized "take" of listed species).  This was thoroughly discussed in *Arizona Cattle Growers,*

22  where the court was unconvinced by the FWS's argument that the "harm" form of "take" (namely,

23  habitat degradation) should be more broadly construed in the Section 7 context than in the Section 9

24  context:

25          "We reject the argument that 'taking' should be applied differently
            because the two sections serve different purposes.  Interpreting the

26          statutes in the manner urged by the Fish and Wildlife Service could
            effectively stop the proposed cattle grazing entirely.  Such a broad

27          interpretation would allow the Fish and Wildlife Service to engage

28

1
2
3

in widespread land regulation **even where no Section 9 liability could be imposed.**  This interpretation would turn the purpose behind the 1982 Amendment [to the ESA] on its head."
*Id.* at 1240.

4
5
6
7
8

The court then clarified the connection between a Section 7 ITS and a Section 9 criminal "take": "If the sole purpose of the Incidental Take Statement is to provide shelter from Section 9 penalties, as previously noted, it would be nonsensical to require the issuance of an Incidental Take Statement when no takings cognizable under Section 9 are to occur."  *Id.,* at 1242, citing H.R.Rep. No. 97-567, at 26 (1982).

9
10
11
12
13
14
15
16
17
18

Given there is virtually no evidence of OHVs actually striking tortoises in the NECO or WEMO and causing injury or death, and given there is virtually no evidence of OHVs crushing tortoises in their burrows, and given there is no evidence that OHV-related habitat modification has "actually" killed or injured tortoises, there is little to support the claim – whether made by plaintiffs or FWS – that OHV use causes "take" of tortoises under either Section 7 or Section 9 of the ESA. This is a difficult notion for plaintiffs to grasp, which is why they continue to deny it.  The data, however, cannot be ginned up to create an impact that isn't there.  The quotation from the FWS biologist drafting the desert tortoise ITS says it all : *"We have no quantitative data on how many desert tortoises are killed or injured by vehicle use on open and limited routes."*  NSupp ITS 00666.  *(Emphasis added.)*

19

**B.    THE BIOP'S INCIDENTAL TAKE STATEMENT COMPLIES WITH THE ESA**

20
21
22
23
24

Within this evidentiary context, one can properly evaluate plaintiffs' claims that the ITSs for the NECO and WEMO plans (1) failed to consider all take that is likely to occur, (2) failed to provide a rational explanation for the estimated take, (3) failed to include terms and conditions (T&Cs) to adequately implement the reasonably prudent measures (RPMs), and (4) failed to include rational "triggers" for re-initiating consultation.

25

1.    The ITSs Considered All Likely "Take" of Desert Tortoises

26
27
28

Plaintiffs allege that in drafting the ITSs for the NECO and WEMO plans, FWS considered only direct take causing death of tortoise and disregarded "take" (or "harm") caused by

habitat modification resulting from grazing and OHV use.  According to plaintiffs, this makes the ITSs inadequate under Section 7.  Plaintiffs are wrong.  As indicated above, there is no evidence that OHV-related habitat modification in the NECO or WEMO "actually kills or injures" tortoises. Therefore, it was appropriate for FWS to exclude OHV-related habitat modification from the ITS.

### 2.   The ITS Includes a Very Conservative Estimate of Take

Plaintiffs complain that FWS's "take" estimate of eight (8) tortoises per year "killed or injured" in the NECO washes bears no rational connection to the BO.  To a certain extent, the plaintiffs have a point, as there is *no* evidence that *any* tortoises have ever been killed or injured in the NECO washes.  NSupp ITS 00666.  Strictly speaking, the most "rational" estimate would be zero tortoises "killed or injured" in the NECO washes.  Nevertheless, in light of the roundly-acknowledged difficulty of locating dead tortoises and determining their cause of death, it is reasonable for FWS to estimate that, in the NECO washes, eight tortoises will be "taken" per year.[19] It is a very conservative estimate, based on highly-limited data, but it is hardly irrational or arbitrary.  As such, it should not be disturbed by the Court.

The same result should obtain with respect to the take calculations for areas outside the DWMAs and critical habitat.  With no evidence of OHV-related take and no tortoise density figures for these areas, FWS was left to estimate how many tortoises exist in these lightly-populated (in terms of tortoises) parts of the desert.  *See*, NSupp ITS 01181, WSupp ITS 01023.  The FWS biologists made a reasonable extrapolation, based on their best professional judgment, that the number of tortoises living *outside* DWMAs and critical habitat would be approximately 90% less than the number of tortoises living *inside* DWMAs and critical habitat. NSupp ITS 01181, WSupp ITS 01023.  The take number would be reduced accordingly.  While these estimates are hardly the acme of scientific rigor, they are rational under the circumstances.  More important, plaintiffs have

---

[19]    Plaintiff also argue that FWS should have included neonate and juvenile tortoises in the ITS "take" calculus.  However, plaintiffs provide cite to no evidence in the record that OHV activity in the NECO washes has killed or injured neonate or juvenile tortoises.  Neonate and juveniles are most often lost through raven predation.

1    provided no evidence that the estimates are significantly out of synch with the best available

2    tortoise population data.

3                        3.        The ITS Terms & Conditions are Adequate

4                        Plaintiffs claim that FWS failed to identify properly the terms and conditions

5    required to ensure that the activities authorized in the NECO and WEMO will not take tortoises

6    beyond the limit permitted in the ITS.  FWS imposes reasonably prudent measures (RPMs) on the

7    acting federal agency (here, BLM) to prevent the amount of actual "take" from exceeding the limits

8    set forth in the ITS.  16 U.S.C. § 1536(b)(4).  To guarantee implementation of the RPMs, FWS

9    makes them subject to term and conditions.  Plaintiff's complaint here is that some of the terms and

10   conditions do not actually aid in the implementation of that RPM.  Plaintiffs' contention is without

11   merit.  In all cases, the terms and conditions guide and assist BLM in putting the RPMs into action.

12   Nothing in the record suggests otherwise.

13                       4.        The ITS Re-Initiation "Triggers" are Reasonable

14                       Plaintiffs' final allegation regarding the ITSs is that they do not include rational

15   "triggers" for purposes of re-initiating consultation. Although the NECO re-initiation "trigger" is

16   four dead tortoises per year, and the WEMO re-initiation "trigger" is five, plaintiffs still feel these

17   numbers are arbitrary and too high.  However, no legal authority and no evidence in the record

18   supports plaintiffs' position.  The only requirement is that consultation be reinitiated prior to the

19   point when the full amount of "take" is exceeded.  *See,* 50 C.F.R. § 402.14(i)(4); *Oregon Natural*

20   *Resources Council v. Allen,* 476 F.3d 1031, 1041 (9th Cir. 2007).  The re-initiation trigger

21   established in the ITS for NECO and WEMO easily meet this test.  Specifically, total tortoise take

22   in the NECO is 19, but the trigger is four.  Total tortoise take in the WEMO is 32, but the trigger is

23   5.  These triggers are quite conservative and well within the applicable legal standard.  Plaintiffs

24   simply object to them because they (plaintiffs) think they should be higher.  The Court, however, is

25   not free to substitute plaintiffs' wishes for the professional judgment of the FWS.

26

27

28

## VI.      CONCLUSION

Based on the foregoing, the OHV-Intervenors respectfully request that the Court grant the Federal Defendants' motion for summary judgment/summary adjudication and allow the Records of Decisions for the WEMO Route Designation, the WEMO Plan and EIS, and the NECO Plan EIS to stand.   The OHV-Intervenors further request that the Court grant the Federal Defendants' motion for summary judgment/summary adjudication and allow the respective BiOps for the NECO and the WEMO to stand.   Finally, the OHV-Intervenors request that the Court deny the plaintiffs motion for summary judgment/summary adjudication.

DATED:  September 8, 2008

Respectfully submitted,

David P. Hubbard
Gatzke Dillon & Ballance LLP

Attorneys for Intervenor-Defendants AMA District 37;
California Off Road Vehicle Association; Off Road
Business Association; San Diego Off Road Coalition;
and American Sand Association

By   ___/s/ David P. Hubbard_____
              David P. Hubbard

Dennis L. Porter
Dennis L. Porter Attorney at Law

Attorney for Intervenor-Defendants Blue Ribbon
Coalition, California Association of 4 Wheel Drive
Clubs and United 4 Wheel Drive Associations

By_____/s/ Dennis L. Porter_____
              Dennis L. Porter

Paul A. Turcke
Moore Smith Buxton & Turcke

Attorney for Intervenor-Defendants Blue Ribbon
Coalition and California Association of 4 Wheel Drive
Clubs

By_____*/s/ Paul A. Turcke*_____
        Paul A. Turcke

33