1 | Steven P. Quarles
squarles@crowell.com
2 | J. Michael Klise (*pro hac vice*)
jmklise@crowell.com
3 | Thomas R. Lundquist (*pro hac vice*)
tlundquist@crowell.com
4 | CROWELL & MORING LLP
1001 Pennsylvania Ave., NW
5 | Washington, D.C. 20004-2595
Phone:  202-624-2600
6 | Facsimile:  202-628-5116

7 | Steven P. Rice (SBN 094321)
CROWELL & MORING LLP
8 | 3 Park Plaza
20th Floor
9 | Irvine, CA 92614-8505
Phone:  949-263-8400
10 | Facsimile:  949-263-8414
srice@crowell.com

11 | Attorneys for Intervenor-Defendants Kern County, San Bernardino County, and Imperial County,
12 | California; and QuadState Local Governments Authority

13 | IN THE UNITED STATES DISTRICT COURT

14 | FOR THE NORTHERN DISTRICT OF CALIFORNIA

15 | SAN FRANCISCO DIVISION

CENTER FOR BIOLOGICAL                  )
DIVERSITY, *et al.*,                   )      No. 06-4884-SI
               Plaintiffs,             )
                                       )      **THE COUNTIES' REVISED**
       v.                              )      **MEMORANDUM OF POINTS AND**
                                       )      **AUTHORITIES IN OPPOSITION TO**
U.S. BUREAU OF LAND                    )      **PLAINTIFFS' MOTION FOR SUMMARY**
MANAGEMENT, *et al.*,                  )      **JUDGMENT, AND REPLY IN SUPPORT**
               Defendants,             )      **OF FEDERAL DEFENDANTS' CROSS-**
                                       )      **MOTION FOR SUMMARY JUDGMENT**
       and                             )
                                       )      The Honorable Susan Illston
KERN COUNTY, CALIFORNIA, *et al.*,     )
               Intervenor-Defendants.  )
                                       )
                                       )

1

# TABLE OF CONTENTS

2  TABLE OF CONTENTS.................................................................................................... i

3  TABLE OF AUTHORITIES .......................................................................................... iii

4  INTRODUCTION .......................................................................................................... 1

5  ARGUMENT ................................................................................................................. 1

6  I.    The Deferential Review Required By The APA And *Lands Council v. McNair*............... 1

7      A.    Plaintiffs' Failure To Sustain Their Burden Of Persuasion In Opening Briefs ...... 1

8      B.    Limited Procedural Duties .................................................................................. 3

9      C.    Deference To The Agency On Policy Issues ........................................................ 4

10     D.    Deferential Review On Facts And The Agencies' Scientific Opinions ................. 5

11     E.    Deference To The Agency On Many Legal Issues ............................................... 7

12  II.    CBD's ESA Claims Should Be Dismissed........................................................................ 8

13     A.    WEMO And NECO Substantively Satisfy The ESA ............................................ 8

14     B.    The BiOps Comply With ESA And APA Procedures......................................... 10

15         1.    The BiOps Did Consider Aggregate Effects ............................................ 10

16         2.    CBD's Baseline Arguments Lack Merit .................................................. 10

17         3.    The BiOps Do Not Disregard The Tortoise Recovery Plan ...................... 11

18         4.    The BiOps Did Not Have To Consider "Survival On A Recovery Unit

19               Basis" ...................................................................................................... 11

20         5.    The BiOps Adequately Considered Effects On The Milk Vetch ............. 12

21         6.    CBD's Arguments Are Unpersuasive On A Recovery Plan And

                 Critical Habitat.......................................................................................... 12

22         7.    FWS Did Not Dismiss Effects On Critical Habitat And Recovery .......... 13

23         8.    The BiOps Did Consider The Impacts On Critical Habitat Areas Not

24               Designated As DWMAs............................................................................. 14

25         9.    CBD's Other Arguments On OHV And Grazing Impacts On Critical

                 Habitat Lack Merit .................................................................................... 14

26        10.    FWS Did Use The Best Science Available ............................................... 15

27        11.    The Incidental Take Statements Are Adequate ....................................... 16

28

1        C.    BLM Could Rely On Reasonable BiOps ............................................................ 19

2  III.   CBD's FLPMA Claims Are Not Persuasive .................................................... 19

3  IV.    CBD's NEPA Claims Are Not Convincing ...................................................... 19

4  V.     Remedy Issues .................................................................................................. 22

5        A.    If The Court Needs Any Further Explanation, It Can Come By Agency
              Declaration Or On Remand.  The Agency Action Should Not Be Found
6             Arbitrary And Set Aside In The Interim. ............................................... 22

7        B.    Plaintiffs Have Not Sustained Their Burden In Obtaining An Extraordinary
              Injunction Or Set Aside Relief .............................................................. 23
8
        C.    Some Factors Pertinent To Injunctive Or Set-Aside Relief ............................... 24
9
       CONCLUSION ......................................................................................................... 28

# TABLE OF AUTHORITIES

## Cases

*Alabama v. U.S. Army Corps of Eng'rs*, 441 F. Supp. 2d 1123 (N.D. Ala. 2006)............................27
*Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531 (1987)........................................24, 25, 26
*Animal Defense Council v. Hodel*, 840 F.2d 1432 (9th Cir. 1988) ........................................22
*Auer v. Robbins*, 519 U.S. 452 (1997) ........................................................................8
*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*, 515 U.S. 687 (1995).............17, 18
*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87 (1983) ......................5
*Bear Lake Watch, Inc. v. FERC*, 324 F.3d 1071 (9th Cir. 2003) ..........................................3
*Bennett v. Spear*, 520 U.S. 154 (1997) ......................................................................16, 23
*Bowoto v. Chevron Corp.*, 2007 WL 2349338 (N.D. Cal. 2007)..........................................2
*Brock v. Pierce County*, 476 U.S. 253 (1986)................................................................25
*Building Indus. Ass'n of S. Cal. v. Babbitt*, 979 F. Supp. 893 (D.D.C. 1997)........................12
*Building Indus. Ass'n of S. Cal. v. Norton*, 247 F.3d 1241 (D.C. Cir. 2001)........................15
*Camp v. Pitts*, 411 U.S. 138 (1973)............................................................................22
*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)..............................................................1
*Cetacean Community v. Bush*, 386 F.3d 1169 (9th Cir. 2004)............................................27
*Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 863 (1984) ........................5, 7
*Churchill County v. Norton*, 276 F.3d 1060 (9th Cir. 2001)....................................4, 20, 21
*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971)..................................1, 6
*Clark v. Coye*, 60 F.3d 600 (9th Cir. 1995) ................................................................25
*Coalition on Sensible Transportation v. Dole*, 826 F.2d 60 (D.C. Cir. 1987)........................21
*County of Los Angeles v. Shalala*, 192 F.3d 1005 (D.C. Cir. 1999)........................22, 23, 24
*Ctr. for Biological Diversity v. BLM*, 422 F. Supp. 2d 1115 (N.D. Cal. 2006) ............6, 17, 18
*Ctr. for Biological Diversity v. BLM*, No. C 03-2509 SI, 2006 WL 2788252 (N.D. Cal. Sept. 26, 2006) ........................................................................................................25
*Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv.*, 450 F.3d 930 (9th Cir. 2006)............18
*Dep't of Transp. v. Public Citizen*, 541 U.S. 752 (2004)..................................................4
*Duncan v. Cohen*, 2008 WL 2891065 (N.D. Cal. 2008) ..................................................2
*eBay v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) ....................................................23
*Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005 (9th Cir. 2006)........................27
*Friends of Southeast's Future v. Morrison*, 153 F.3d 1059 (9th Cir. 1998).........................4
*Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000)....................28
*Fund for Animals v. Frizzell*, 530 F.2d 982 (D.C. Cir. 1975)............................................27
*Fund for Animals v. Lujan*, 962 F.2d 1392 (9th Cir. 1992)..............................................23
*Fund for Animals v. Rice*, 85 F.3d 535 (11th Cir. 1996)..................................................12
*Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*, 378 F.3d 1059 (9th Cir. 2004).........9, 17
*Gorbach v. Reno*, 179 F.3d 111 (9th Cir. 1999)............................................................16
*Greenpeace v. Franklin*, 14 F.3d 1324 (9th Cir. 1993) ..............................................7, 13
*Greenwood v. FAA*, 28 F.3d 971 (9th Cir. 1994) ..........................................................3
*Hartford-Empire Co. v. United States*, 323 U.S. 386 (1945)............................................25
*Hayward Area Planning Ass'n v. Norton*, No. C 00-04211 SI, 2004 WL 724950 (N.D. Cal. Mar. 29, 2004)..................................................................................................15
*Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146 (9th Cir. 1998).......................................7
*IMC Kalium Carlsbad v. Interior Bd. of Land Appeals*, 206 F.3d 1003 (10th Cir. 2000) ............12
*Kern County Farm Bureau v. Allen*, 450 F.3d 1072 (9th Cir. 2006)......................4, 6, 15, 16
*Kleppe v. Sierra Club*, 427 U.S. 390 (1976)................................................................21
*Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008)..............1, 3, 4, 5, 6, 7, 13, 19, 20, 21, 25, 27
*Lujan v. National Wildlife Fed'n*, 497 U.S. 871 (1990)..................................................1
*Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989) ........................6, 16, 21
*Midwater Trawlers Co-op. v. Dep't of Commerce*, 393 F.3d 994 (9th Cir. 2004)......................23
*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)....................3

*National Ass'n of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518 (2007) .......................5, 7
*National Audubon Soc'y v. U.S. Forest Serv.*, 46 F.3d 1437 (9th Cir. 1994) ...................................22
*National Wildlife Fed'n v. National Marine Fisheries Serv.*, 524 F.3d 917 (9th Cir. 2008).... 9, 10, 13
*Natural Res. Def. Council v. Kempthorne*, No. 05-cv-1207 OWW TAG, 2007 WL 1989015
   (E.D. Cal. July 3, 2007) ...............................................................................................................27
*Northern Cheyenne Tribe v. Norton*, 503 F.3d 836 (9th Cir. 2007)..............................................23
*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004)..........................................12, 21
*Orantes-Hernandez v. Thornburgh*, 919 F.2d 549 (9th Cir. 1990).................................................25
*Oregon Natural Desert Ass'n v. BLM*, 531 F.3d 1114 (9th Cir. 2008) ..........................................14
*Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633 (1990).................................................23
*Schweiker v. Hansen*, 450 U.S. 785 (1981) ...................................................................................12
*Sierra Club v. Morton*, 405 U.S. 727 (1972) .................................................................................27
*Sierra Nevada Forest Prot. Campaign v. Rey*, No. 05-cv-0205 MCE GGH, 2007 WL
   3034931 (E.D. Cal. Oct. 16, 2007), *rev'd on other grounds sub nom. Sierra Forest Legacy
   v. Rey*, 526 F.3d 1228 (9th Cir. 2008), *petitions for rehearing pending*...............................27
*Southern Or. Citizens Against Toxic Sprays, Inc. v. Clark*, 720 F.2d 1475 (9th Cir. 1983)...............16
*Southwest Ctr. for Biological Diversity v. Norton*, 215 F.3d 58 (D.C. Cir. 2000)...............................7
*Southwest Ctr. for Biological Diversity v. U.S. Bureau of Recl.*, 143 F.3d 515 (9th Cir. 1998) ...........4
*State of Alaska v. Andrus*, 580 F.2d 465 (D.C. Cir. 1978)..............................................................20
*State of Louisiana ex rel. Guste v. Verity*, 853 F.2d 322 (5th Cir. 1988) ........................................4
*Swanson v. United States Forest Serv.*, 87 F.3d 339 (9th Cir. 1996) ........................................4, 12
*United States v. James Daniel Good Real Property*, 510 U.S. 43 (1993) .......................................25
*United States v. Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483 (2001)..............................24
*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519 (1978).........3, 17
*Water Keeper Alliance v. U.S. Dep't of Defense*, 271 F.3d 21 (1st Cir. 2001)...........................16, 27
*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) ......................................................23, 24, 25

**Statutes**

APA, 5 U.S.C. 702 .......................................................................................................................23
APA, 5 U.S.C. 706 .......................................................................................................................24
ESA § 4(f), 16 U.S.C. 1533(f).............................................................................................5, 8, 11
ESA § 7(a)(2), 16 U.S.C. 1536(a)(2)..................................................3, 5, 7, 8, 9, 11, 15, 19
ESA § 7(b)(3), 16 U.S.C. 1536(b)(3) ..........................................................................................3, 10
ESA § 7(b)(4), 16 U.S.C. 1536(b)(4) .............................................................................................18
ESA § 11(g), 16 U.S.C. 1540(g) ..................................................................................................23
FLPMA § 202, 43 U.S.C. 1712 ....................................................................................................26
FLPMA § 210, 43 U.S.C. 1720 ....................................................................................................26
FLPMA § 211, 43 U.S.C. 1721 ....................................................................................................26
FLPMA § 303, 43 U.S.C. 1733 ....................................................................................................26
FLPMA § 317, 43 U.S.C. 1747 ....................................................................................................26

**Regulations**

40 C.F.R. 1500.4 .........................................................................................................................19
40 C.F.R. 1502.7 .........................................................................................................................19
43 C.F.R. Part 9 ..........................................................................................................................26
43 C.F.R. Part 24 ........................................................................................................................26
43 C.F.R. 1601.0-8 ......................................................................................................................26
43 C.F.R. 1610.3-1 ......................................................................................................................26

**Other Authorities**

Brennan, *et al.*, *Square Pegs and Round Holes:  Application of the "Best Scientific Data
   Available" Standard in the Endangered Species Act*, 16 TULANE ENVTL. L.J. 387 (2003) ............6

1

Levin, *"Vacation" at Sea: Judicial Remedies and Equitable Discretion in Administrative Law*, 53 DUKE L. J. 291 (2003)......................................................................................................23

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

The Court ordered rebriefing on August 12, 2008 (docket entry 155), in light of an *en banc* opinion that requires greater judicial deference within the Ninth Circuit to federal land-managing agencies. *Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008). Per the Court's Order, opening briefs on both Plaintiffs' side and Defendants' side were simultaneously filed on Sept. 8.[1] The current opposition briefs are due simultaneously by Sept. 22.

**ARGUMENT**

**I.    The Deferential Review Required By The APA And *Lands Council v. McNair***

At some points, Plaintiffs acknowledge that the deferential review standards in the Administrative Procedure Act ("APA") apply to all claims in this case. CBD ESA Br. at 7-8; CBD NEPA/FLPMA Br. at 10-11. But the merits sections of CBD's briefs proceed to argue for levels of detail and distrust of federal agencies that cannot be reconciled with APA review. Some of CBD's general APA errors are described below.

**A.    Plaintiffs' Failure To Sustain Their Burden Of Persuasion In Opening Briefs**

Judicial review under the APA starts with the presumption that the federal agencies have acted lawfully. Plaintiffs lose unless they sustain their burden of proving a federal action is arbitrary or otherwise unlawful. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-16 (1971); *see* Counties' Br. at 3-5, 20-23; Fed. Br. at 15-17. CBD has not sustained its burden in its opening briefs.

Defendants are not required to "negate the elements" of Plaintiffs' claims. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 885 (1990). Since CBD's opening briefs do not carry Plaintiffs' burden of persuasion, summary judgment should be granted to Defendants' side. *Id.; Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

---

[1]    We will refer to those Sept. 8 briefs as follows. "Counties' Br." is the shorthand for "The Counties' Revised Mem...." "CBD ESA Br." refers to "Plaintiffs CBD...Motion for Summ. Adjudication of Claims 3 and 4...." "CBD NEPA/FLPMA Br." refers to "Plaintiffs' Revised... Motion for Summ. Adjudication on the First and Second Claims for Relief...." "Fed. Br." is "Federal Defendants' Revised Mem... for Summ. Judgment." "OHV Br." is the "OHV Intervenor-Defendants' Br...." We will employ the same acronyms established in the Counties' Br.

1   Plaintiffs had the opportunity to restructure their revised opening brief(s) and to narrow the

2   claims in light of the prior briefing.  But Plaintiffs have declined to do so.  They have filed briefs that

3   closely resemble their earlier opening summary judgment briefs.  For example, the CBD ESA Br.

4   does not even mention the en banc Ninth Circuit decision in *Lands Council v. McNair*.[2]

5   In the prior briefing, CBD's ESA arguments changed dramatically between its opening and

6   response briefs.  *See* Fed. Br. at 41 (describing CBD's "constantly changing arguments").  CBD's

7   revised ESA Br. suggests that Plaintiffs have just tangentially mentioned many issues, and that

8   Plaintiffs' response briefs will again: (1) provide the bulk of legal support for CBD's views; and (2)

9   develop issues only obscurely alluded to in opening briefs.

10   The Court should not consider any new arguments in CBD's Sept. 22 response brief(s) for

11   two reasons.  First, Plaintiffs have the burden of proving their claims in an opening brief – courts

12   routinely refuse to consider new arguments in a reply or other response brief.  *E.g., Duncan v.*

13   *Cohen*, 2008 WL 2891065 at *7 (N.D. Cal. 2008); *Bowoto v. Chevron Corp.*, 2007 WL 2349338 at

14   *4 and 10 (N.D. Cal. 2007) (Illston, J.).  Second, under the simultaneous briefing ordered by the

15   Court, Defendants will have no opportunity to respond to any new citations or arguments in

16   Plaintiffs' Sept. 22 briefs.  Fairness and due process would be compromised if the Court were to rule

17   in CBD's favor on any argument that Defendants' side has not had an opportunity to rebut.  That is,

18   the Court should not countenance Plaintiffs' sandbagging of Defendants as would occur if CBD

19   were allowed to change arguments or provide supporting authority only in a response brief, when it

20   is Plaintiffs who bear the burden of persuasion on all issues.

21   A related problem is that the CBD ESA Br. is a jumble of accusations that are usually not

22

---

23   [2]   CBD wastes the Court's and the parties' resources by just repeating old arguments and not
confronting the rebuttals that Defendants' side proffered in the earlier briefing.  CBD has not
24   advanced a resolution of this case by: (1) dropping unpersuasive arguments; or (2) at least revising
its opening brief to address the weaknesses identified by Defendants' side, when it is Plaintiffs who
25   bear the burden of persuasion and when Defendants' side will have no opportunity to respond to
arguments in the simultaneous Sept. 22 briefs.

26   In contrast, the Counties have strived to assist the Court in resolving this case in the current
rebriefing.  The Counties did provide a revised opening brief that responds to the principal
27   arguments CBD had advanced in its prior opening *or* response briefs.  Where CBD recycles old

(continued...)

28

---

1    supported by case law or any coherent development of an argument.  Almost every paragraph – and

2    sometimes each sentence – contains a new, undeveloped accusation.  Matters that CBD argues FWS

3    ignored or should have explained further are in fact explained in the administrative record, including

4    on the very pages cited by CBD.  The Court should decline to address such undeveloped arguments

5    and *ad seriatim* accusations.  *Bear Lake Watch, Inc. v. FERC*, 324 F.3d 1071, 1077 n.8 (9th Cir.

6    2003); *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) (courts "will not manufacture

7    arguments for" a plaintiff as "judges are not like pigs, hunting for truffles buried in briefs").

8              **B.      Limited Procedural Duties**

9              CBD fly-specks the adequacy of multi-volume EISs and amended BiOps that are each over

10   200 pages.  CBD would impose unreasonable duties to explain and other procedural/informational

11   duties on BLM and FWS.  But the procedural duties are nowhere near as stringent as CBD would

12   have it.

13             Courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably

14   be discerned."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

15   A court cannot add procedural explanation duties it believes best serve the public interest, if they are

16   not clearly required by statute.  *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*,

17   435 U.S. 519, 541-48 (1978).  As the en banc Ninth Circuit recently phrased it:

18             "[W]e are not free to 'impose on the agency [our] own notion of which procedures are 'best'
             or most likely to further some vague, undefined public good'".... Nor may we impose
19             "procedural requirements [not] explicitly enumerated in the pertinent statutes."

20   *Lands Council v. McNair*, 537 F.3d at 993.

21             For example, with respect to FWS's BiOps, ESA § 7 merely requires a "written statement

22   setting forth the Secretary's opinion, and a *summary* of the information on which the opinion is

23   based" on whether the agency action does or does not substantively comply with ESA § 7(a)(2).  16

24   U.S.C. 1536(b)(3) (emphasis added).  Thus, a BiOp is designed to be "summary."  If FWS has given

25   some consideration to significant issues, that is procedurally sufficient.  *Southwest Ctr. for*

26   _____

     (...continued)
27   arguments, we will reduce the paper burden on the Court by providing page citations to the
     refutation of a specific argument in the Counties' revised opening brief.
28

1   *Biological Diversity v. U.S. Bureau of Recl.*, 143 F.3d 515, 522-23 (9th Cir. 1998). A court cannot

2   "mandate that FWS answer [a plaintiff's] particular questions before making" an ESA decision.

3   *Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1081 (9th Cir. 2006). The "agency's decision

4   need not be ideal, so long as it is not arbitrary or capricious, and so long as the agency gave at least

5   minimal consideration to relevant facts contained in the record." *State of Louisiana ex rel. Guste v.*

6   *Verity*, 853 F.2d 322, 327 (5th Cir. 1988) (sustaining ESA rules).

7       A "rule of reason" is employed in ascertaining whether an EIS complies with NEPA. *Dep't*

8   *of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004) (reversing a Ninth Circuit decision that had

9   required more NEPA analysis). NEPA is satisfied if "an EIS contains a reasonably thorough

10   discussion of the significant aspects of the probable environmental consequences." *Churchill*

11   *County v. Norton*, 276 F.3d 1060, 1071 (9th Cir. 2001); *see Lands Council v. McNair*, 537 F.3d at

12   1001 ("none of NEPA's statutory provisions or regulations requires the Forest Service to

13   affirmatively present every uncertainty in its EIS").

14       The multi-volume EISs here satisfy NEPA's rule of reason. CBD's demand for greater and

15   greater detail amounts to what courts have stylized as unpersuasive fly-specking of procedurally-

16   adequate documents.

17       In determining whether the EIS contains a "reasonably thorough discussion," we may not
      "fly-speck the document and hold it insufficient on the basis of inconsequential, technical

18       deficiencies...." *Swanson v. United States Forest Serv.,* 87 F.3d 339, 343 (9th Cir. 1996)
      (internal quotations and citation omitted). That is to say, once we are satisfied that a

19       proposing agency has taken a "hard look" at a decision's environmental consequences, our
      review is at an end. *Id.*

20

21   *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1063 (9th Cir. 1998).

22     **C.**     **Deference To The Agency On Policy Issues**

23       CBD's procedural attacks on extensive BLM and FWS documents are thinly-disguised

24   attempts to enlist the Court in imposing CBD's policy preferences on CDCA management. Such

25   attempts should fail. The Constitution entrusts policy decisions to the Executive and Legislative

  Branches.

26

27       [I]t is entirely appropriate for this political [Executive or administrative] branch of
      Government to make such policy choices – resolving the competing interests which Congress
      itself either inadvertently did not resolve, or intentionally left to be resolved by the agency

28       charged with the administration of the statute in light of everyday realities. When a

1
2
3
4

 challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail.  In such a case, federal judges – who have no constituency – have a duty to respect legitimate policy choices made by those who do....  "Our Constitution vests such responsibilities in the political branches."  *TVA v. Hill*, 437 U.S. 153, 195...(1978).

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 863, 865-66 (1984).

5
6
7
8
9
10

   One recent manifestation of this principle is the Supreme Court's overturning of a Ninth Circuit opinion.  The Supreme Court found that the federal agencies' permissible interpretation of the limited scope of ESA § 7 prevails over the policy preference of a Ninth Circuit panel.  *National Ass'n of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518, 2533-36 (2007).  Notably, in *NAHB v. Defenders*, the Supreme Court sustained an agency interpretation that did not maximize protection of listed species.

11
12
13
14
15
16
17
18
19
20
21

   The general thrust of *NAHB v. Defenders* is that the ESA has limits, and should be reconciled with other statutory mandates.  Here, this supports that, once a federal agency has satisfied ESA § 7(a)(2)'s base-level requirement of ensuring that its action avoids likely jeopardy to an entire listed species and does not adversely modify critical habitat, the federal agency has policy discretion to advance other objectives stated in the agency's organic laws.  Because the environmentally-responsible WEMO and NECO substantively satisfy ESA § 7(a)(2), BLM could lawfully devote part of the WEMO and NECO land base to achieving other multiple-use objectives under FLPMA. *Accord Lands Council v. McNair*, 537 F.3d at 990 and 992.  That is, there is no ESA violation just because WEMO and NECO may not maximize costly protections for the desert tortoise DPS and may not fully implement the ESA§ 4(f) Tortoise Recovery Plan.  *See* Counties' Br. at 8-28, 47-50.

22
23
24

   **D.**  **Deferential Review On Facts And The Agencies' Scientific Opinions**

   CBD frequently attacks BLM's and FWS's scientific opinions and other factual assessments.  Those attacks should fail in light of the great deference to the responsible federal agencies the APA requires on such issues.

25
26
27
28

   A "reviewing court must generally be at its most deferential" when reviewing an agency's scientific opinion or other technical matter.  *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 103 (1983).  "[A]n agency must have discretion to rely on the reasonable opinions of its

1   own qualified experts even if, as an original matter, a court might find contrary views more

2   persuasive." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989); *Lands Council*

3   *v. McNair*, 537 F.3d at 1000.

4        The agency's judgments on all matters of fact and opinion must be affirmed unless there is

5   such a "clear error" of judgment that the agency can be said to have acted arbitrarily.  *Overton Park*,

6   401 U.S. at 415-16; *Ctr. for Biological Diversity v. BLM*, 422 F. Supp. 2d 1115, 1126 (N.D. Cal.

7   2006) ("*Imperial Sand Dunes*").  As the en banc Ninth Circuit stated in *Lands Council*:

8        Review under the arbitrary and capricious standard "is narrow and [we do] not substitute
        [our] judgment for that of the agency"....  In essence, Lands Council asks this court to act as a
9        panel of scientists that instructs the Forest Service...and order the agency to explain every
        possible scientific uncertainty.  As we will explain, this is not a proper role for a federal
10       appellate court.  But Lands Council's arguments illustrate how, in recent years, our
        environmental jurisprudence has, at times, shifted away from the appropriate standard of
11       review and could be read to suggest this court should play such a role....  We made...key
        errors in *Ecology Center*....  we created a requirement [of on-the-ground verification that the
12       agency's management view will work in practice] not found in any relevant statute or
        regulation.  And...we defied well-established law concerning the deference we owe to
13       agencies and their methodological choices.  Today, we correct those errors....

14       [O]ur proper role is simply to ensure that the Forest Service made no "clear error of
        judgment" that would render its action "arbitrary and capricious"....  We are to be "most
15       deferential" when the agency is "making predictions, within its [area of] special expertise"....

16   *Lands Council v. McNair*, 537 F.3d at 987 and 993.

17       A related issue is that CBD sometimes challenges agency decisions where the reality is there

18   is little information.  Consequently, the agency must rely on its best professional judgment.  E.g.,

19   CBD ESA Br. at 19-24 (complaints about the incidental take statement).  The reality is that "species

20   data is...often vague, ambiguous, frequently subjective, best-professional-judgment-based...and of

21   uncertain scientific reliability."  Brennan, *et al.*, *Square Pegs and Round Holes:  Application of the*

22   *"Best Scientific Data Available" Standard in the Endangered Species Act*, 16 TULANE ENVTL. L.J.

23   387, 390 (2003).  Yet, awaiting additional information "would render agency decisionmaking

24   intractable, always awaiting updated information only to find the new information outdated by the

25   time a decision is made."  *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 373 (1989).

26   For practical reasons such as these, the best science requirement in the ESA only requires the use of

27   "available" science or professional judgment, and does not mandate studies before an agency action

28   can proceed.  *Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1080-81 (9th Cir. 2006);

1    *Southwest Ctr. for Biological Diversity v. Norton*, 215 F.3d 58, 60-61 (D.C. Cir. 2000). *See*

2    *generally* Counties' Br. at 33-47.

3         Accordingly, courts must defer to a non-jeopardy BiOp even if the supporting "evidence is

4    'weak,' and thus not dispositive" and even if there are "uncertainties," unless plaintiffs show the

5    "agency's determination [is] 'arbitrary and capricious.'" *Greenpeace v. Franklin*, 14 F.3d 1324,

6    1336 (9th Cir. 1993).

7         Moreover, the CBD NEPA/FLPMA Br. (at 5 and 11) unpersuasively downplays the

8    significance of *Lands Council v. McNair* for NEPA claims. CBD (at 5) argues that an "agency may

9    not base its conclusions regarding environmental impacts on its unsupported 'professional opinion.'

10    *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998)." But the en banc Ninth

11    Circuit expressly "overruled" portions of "*Thomas*" in *Lands Council v. McNair*, 537 F.3d at 997.

12    More generally, the en banc Court rejected the argument that the Forest Service must have scientific

13    evidence to justify each position, citing favorably to an opinion that such a requirement "cannot be

14    derived from the procedural parameters of NEPA." *Lands Council v. McNair*, 537 F.3d at 990-94;

15    *see id.* 537 F.3d at 1001-02. Thus, *Lands Council* means that courts should defer to an agency's

16    non-arbitrary assessment of the science on a particular matter. Further, *Lands Council* supports that

17    NEPA does not require supporting scientific evidence for most projections in an EIS. *See also* pages

18    20-21, below.

19        **E.**       **Deference To The Agency On Many Legal Issues**

20         On several claims, CBD seeks to impose its interpretation of the ESA, NEPA, or FLPMA –

21    or their implementing rules – for the interpretation offered by Federal Defendants. But the Court

22    does not review such issues of law *de novo*.

23         Rather, in interpreting a statute that is implemented by a federal agency, the agency's

24    interpretation is "controlling" if it is a "permissible" interpretation of a statutory provision that

25    admits of more than one construction. *Chevron*, 467 U.S. at 843-45. Accordingly, in *NAHB v.*

26    *Defenders*, 127 S. Ct. at 2533-36, the majority opinion found the Services' construction of limits in

27    ESA § 7(a)(2) to be controlling, notwithstanding a lower court's desired interpretation. That

28

1  deferential approach to judicial review is controlling on issues such as whether WEMO and NECO

2  substantively satisfy ESA § 7(a)(2), and whether ESA § 4(f) recovery plans bind BLM.

3        CBD also attacks FWS's and BLM's compliance with their own rules.  An agency's

4  interpretation that it has complied with its own rule is "controlling unless 'plainly erroneous or

5  inconsistent with the regulation.'"  *Auer v. Robbins*, 519 U.S. 452, 461-62 (1997).  And even if the

6  interpretation of an agency rule is provided in Federal Defendants' "legal brief," that does not reduce

7  the deference owed.  *Id.*

8  **II.    CBD's ESA Claims Should Be Dismissed**

9        CBD's scatter-gun claims of ESA violations and of failures-to-adequately-explain lack merit.

10 This is particularly true under the deferential APA review standards described above.

11       The opening briefs of the Counties and Federal Defendants already have developed the

12 reasons why CBD's ESA challenges (as well as Plaintiffs' NEPA and FLPMA claims) lack merit.

13 To assist the Court in a manner that also reduces the paper burden, we summarize those reasons

14 below.  We provide pinpoint citations to the pertinent pages in the opening briefs where CBD's ESA

15 arguments are refuted.

16       **A.    WEMO And NECO Substantively Satisfy The ESA**

17       CBD's ESA claims are long on procedural demands and short on substance.  The CBD ESA

18 Br. presents few coherent arguments on alleged substantive violations of ESA § 7(a)(2) or § 4(f)

19 recovery plans.  The substantive arguments that seem to be buried in CBD's brief are not persuasive.

20       ESA § 4(f) Recovery Plans Do Not Create Binding Duties.  CBD is unconvincing in arguing

21 that ESA § 4(f) requires Interior Department agencies fully implement the 1994 Tortoise Recovery

22 Plan.  That argument is contrary to the reasonable and permissible interpretation of ambiguous

23 statutory language by the implementing agency.  *See* Counties' Br. at 9-12; Fed. Br. at 43-44.

24       ESA § 7(a)(2) Is Satisfied If A Federal Action Avoids Significant Degradation.  The

25 structure of the ESA, the legislative intent behind ESA § 7(a)(2), and the ability to achieve

26 objectives Congress has supported in other statutes (here, a mix of multiple uses under FLPMA)

27 support Federal Defendants' interpretation.  Under that compelled or permissible interpretation,

28 WEMO and NECO satisfy the ESA because they avoid causing the *degradation* that constitutes

1    jeopardizing the continued existence of a listed species or adversely modifying its critical habitat.

2    *See* Counties' Br. at 8-12; Fed. Br. at 42-45.

3        WEMO And NECO Provide Net Improvements For Listed Species And Critical Habitat.

4    WEMO and NECO provide *net improvements* that benefit listed species.  Hence, those land-use plan

5    amendments go beyond the floor set by ESA 7(a)(2).  The amendments substantively satisfy the

6    ESA.  *See* Counties' Br. at 12-14; Fed. Br. at 36-41.

7        The judicial decisions in *National Wildlife Fed'n v. National Marine Fisheries Serv.*, 524

8    F.3d 917 (9th Cir. 2008); *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*, 378 F.3d 1059

9    (9th Cir. 2004); and *Imperial Sand Dunes* required a greater procedural explanation because the

10   agency actions at issue there appeared to degrade the status of the listed species or its critical habitat.

11   Those are not the administrative record facts here.  Accordingly, those decisions: (1) do not support

12   finding a substantive violation of the ESA here; and (2) do not support requiring extensive

13   explanations on ESA § 7 compliance where the federal agency action clearly would not degrade the

14   conditions for listed species.  *See* Counties' Br. at 14-17.

15       No Adverse Modification Of Critical Habitat.  FWS permissibly concluded that WEMO and

16   NECO – with their millions of acres of protected Desert Wildlife Management Areas and Areas of

17   Critical Environmental Concern – satisfy the ESA § 7(a)(2) constraint against adverse modification

18   of designated critical habitat.  FWS's interpretation that "adverse modification" allows some human

19   uses of critical habitat as long as the critical habitat remains functional to assist in recovery of the

20   desert tortoise is legally permissible and, hence, controlling.  *See* Counties' Br. at 23-28; Fed. Br. at

21   51-52.

22       CBD complains that WEMO and NECO allow public camping, driving, and parking in some

23   areas of tortoise critical habitat.  CBD ESA Br. at 12-17.  This suggests CBD is indeed arguing that

24   almost any human uses within the 6.4 million acres of tortoise critical habitat are prohibited, because

25   they would adversely modify some small amount of habitat for some short time.  But that draconian

26   interpretation of "adverse modification" is not required by the ESA's text and was not intended by

27   Congress.  *See* Counties' Br. at 23-28.

28

1

**B.      The BiOps Comply With ESA And APA Procedures**

2          Unlike an EIS, a BiOp can be "summary."  16 U.S.C. 1536(b)(3); *see* pages 3-4, above.  Yet,

3  CBD has the temerity to argue that the 200-page plus amended BiOps here do not provide sufficient

4  procedural detail on many issues, even though a BiOp can be "summary" and even though FWS's

5  path on the major issues can be discerned.  Especially now that the BiOps were amended in good

6  faith to provide the greater specificity on incidental take this Court desired in *Imperial Sand Dunes*,

7  the Court should conclude enough is enough.  That is, the Court should not demand greater

8  procedural detail in extensive BiOps on land-use amendments that clearly substantively satisfy the

9  ESA and that go beyond the ESA's basic standards.

10         The subsections below show why CBD's most-prominent allegations of procedural

11  shortcomings fail to persuade.

12                 **1.      The BiOps Did Consider Aggregate Effects**

13         The opening paragraph in CBD's ESA argument (ESA Br. at 8) alleges that the BiOps

14  looked only at the incremental effects of WEMO and NECO, and did not consider the aggregate

15  effects of all future influences on desert tortoises as required by *NWF v. NMFS*, 524 F.3d at 930.[3]

16  Yet, the BiOps comply with *NWF v. NMFS* and with 50 C.F.R. 402.14 by looking at both

17  incremental and total/aggregate impacts.  Defendants' side established this in the initial briefing –

18  without any rebuttal in CBD's revised opening brief.  *See* Counties' Br. at 14, 17, and 29-30; Fed.

19  Br. at 50-51.

20                 **2.      CBD's Baseline Arguments Lack Merit**

21         The second and third paragraphs in CBD's argument (at 8-9) switch to complaints that there

22  is imperfect information on the status of the tortoise under current "baseline" conditions.  The reality

23  of imperfect information does not establish an informational violation of the ESA.  *See* Counties' Br.

24  _____

25  [3]       In that paragraph, CBD also argues that the BiOps "should have determined the degree to which the take anticipated from activities authorized under the Plans would be deleterious to the tortoise" and CBD repeats this assertion on page 9.  But ESA § 7, the implementing rules, and *NWF*

26  *v. NMFS* do *not* require a separate analysis in a BiOp of the effects of each subset (actions that might cause "take") of an overall agency action.  And, though CBD favors assessing the incremental

27  impacts of a subset of the agency action, this is contrary to CBD's general theme in favor of aggregating the total future impacts to listed species.

28

1   at 33-36; pages 6-7, above.  The Fed. Br. (at 46-49) shows that the baseline analysis in the BiOps is

2   legally and factually sufficient.

3           **3.      The BiOps Do Not Disregard The Tortoise Recovery Plan**

4           CBD's third paragraph (the full paragraph on page 9) contains other unpersuasive assertions

5   as well.  For example, it claims that the BiOps did not consider certain issues when CBD's own

6   quotations and citations show that FWS did consider those issues and that FWS does understand

7   tortoise biology.

8           This paragraph is the first instance where CBD seems to assert that: (1) the 1994 Tortoise

9   Recovery Plan is substantively binding on FWS and BLM; and (2) FWS failed to procedurally

10  consider the Recovery Plan.  The assertion that an ESA § 4(f) recovery plan is substantively binding

11  on Interior agencies is not persuasive as a matter of law.  *See* Counties' Br. at 9-12; Fed. Br. at 42-

12  45; page 8, above.

13          Further, the administrative record facts show that the BiOps did procedurally consider the

14  Recovery Plan and conservation concepts.  *See* Counties' Br. at 30-31; Fed. Br. at 44-45.  The law

15  requires no more.

16          **4.      The BiOps Did Not Have To Consider "Survival On A Recovery Unit
                       Basis"**

17

18          CBD's third paragraph (ESA Br. at 9) also obscurely states that the BiOps "did not consider

19  survival on a recovery unit basis."  But CBD does not support that there is a legal requirement to

20  assess jeopardy on a recovery unit basis.

21          There is no such legal requirement.  ESA § 7(a)(2) allows a federal action to proceed unless

22  it is likely to jeopardize the continued existence of an entire listed species (here, the listed Mojave

23  Desert Tortoise DPS across a four-State area).  The ESA precludes CBD's approach of finding

24  jeopardy based on effects within a particular recovery unit identified in the non-regulatory recovery

25  plan.  *See* Counties' Br. at 17-20; Fed. Br. at 45-46.  Nonetheless, the BiOps did procedurally

26  consider the effects on each recovery unit.  *See* Fed. Br. at 49.

27

28

5.      **The BiOps Adequately Considered Effects On The Milk Vetch**

The CBD ESA Br. (at 8-9) then continues its descent into minutiae by alleging the WEMO BiOp did not adequately consider certain effects on the Lane Mountain milk vetch. But, as Federal Defendants have shown in both sets of briefs, the procedural consideration of the LMMV exceeds the ESA and APA standards. *See* Fed. Br. at 40-41. No detailed discussion in a "summary" BiOp should be required because WEMO furthers the "conservation" of the LMMV. *Id.* (quoting WBO 14921).

6.      **CBD's Arguments Are Unpersuasive On A Recovery Plan And Critical Habitat**

In a section whose title suggests that CBD will argue substantive violations of the ESA ("FWS' Consideration of Destruction or Adverse Modification Violated the ESA"), CBD confusingly begins with two procedural arguments under the APA. CBD ESA Br. at 10-11. Neither argument is persuasive.

1.      The recovery team on the 1994 Tortoise Recovery Plan stated its hope that activities "inconsistent with land management recommendations [in the Recovery Plan] would likely be considered to adversely modify critical habitat." NBO 916. This statement in a non-regulatory recovery plan clearly does not bind the Department of the Interior. *See Fund for Animals v. Rice*, 85 F.3d 535, 547-48 (11th Cir. 1996); Counties' Br. at 9-12; Fed. Br. at 42-45. Informal agency publications do not have the force of law and do not create enforceable duties. *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 67-72 (2004) ("*SUWA*") (most statements made by lower-level employees in a BLM land-use plan are unenforceable); *Schweiker v. Hansen*, 450 U.S. 785, 789 (1981); *Swanson v. United States Forest Serv.*, 87 F.3d 339, 345 (9th Cir. 1996).

Consequently, CBD moves to an argument that an "agency changing its course" has a procedural duty to explain its departure from the Recovery Plan. But there has been no change in official FWS policy for two reasons. First, a duty to explain a departure does not attach to documents that do not state official agency policy. *See IMC Kalium Carlsbad v. Interior Bd. of Land Appeals*, 206 F.3d 1003, 1009 (10th Cir. 2000); *Building Indus. Ass'n of S. Cal. v. Babbitt*, 979 F. Supp. 893, 904-05 (D.D.C. 1997). Because a recovery plan is not a legally-binding document, a

1    duty to explain should not attach every time an Interior agency departs from non-binding statements

2    in one of hundreds of recovery plans.

3           Second, the 1994 Recovery Plan stated no definitive policy that was later changed.  The Plan

4    just speculates on what would "likely" happen when critical habitat is designated.  The critical

5    habitat designation later in 1994 did not state a legal policy that inconsistency with a non-regulatory

6    Recovery Plan equates to adverse modification of critical habitat.  Thus, there has been no legally-

7    relevant change in FWS's view that must be explained to make a BiOp procedurally sufficient.

8    Unlike CBD's cited case, the BiOps are not "completely at odds with [the agency's] prior scientific

9    approaches."  *NWF v. NMFS*, 524 F.3d at 928.

10         2.       CBD (at 11) asserts that the BiOps "failed to adequately consider the Recovery Plan

11    and the recovery standard in addressing the likely effects to critical habitat."  This assertion is

12    disproven by the administrative record.  The factual record shows considerable discussion of the

13    Tortoise Recovery Plan and effects on recovery.  *See* Fed. Br. at 44-45, 52-55; Counties' Br. at 30-

14    33.  Moreover, CBD is demanding a level of informational detail in BiOps that is not required by

15    law.  *See* pages 3-4, above.

16         **7.**      **FWS Did Not Dismiss Effects On Critical Habitat And Recovery**

17           CBD (at 11-14) argues that the BiOps inadequately considered the allowed activities (e.g.,

18    camping and reduced OHV uses) on some areas of critical habitat, and the effect of such activities on

19    the recovery potential for critical habitat.  But, as a procedural matter, the BiOps do consider those

20    impacts, as CBD's own citations confirm.  *See also* the detailed record citations in Fed. Br. at 44-45,

21    51-55.  For example, the BiOps reasonably explain why *decreased* areas of OHV use would not

22    adversely modify critical habitat.  *See* citations in Counties' Br. at 32.

23           CBD's real beef seems to be that FWS did not give the weight to the effects of OHV use, etc.

24    that CBD would have preferred.  However, such calls on an appropriate procedural methodology are

25    for the agency, not for courts.  *See Lands Council v. McNair*, 537 F.3d at 990-1000.  Additionally, if

26    CBD is questioning FWS's substantive scientific opinion, FWS's judgment calls must be respected

27    unless they are "arbitrary and capricious."  *Greenpeace v. Franklin*, 14 F.3d at 1336 (9th Cir. 1993);

28    *see* pages 6-7, above; Fed. Br. at 41-42.  And, if CBD is making a disguised substantive challenge

1   that "adverse modification" of critical habitat prohibits most human uses of critical habitat, FWS's

2   contrary interpretation of that term is reasonable and controlling.  *See* pages 7-9, above.

3   Within that argument, CBD (at 14) cites to the Lexis version of a decision that has had a

4   permanent citation for some time.  *Oregon Natural Desert Ass'n v. BLM*, 531 F.3d 1114 (9th Cir.

5   2008).  While CBD leaves the implication that *ONDA v. BLM* is an ESA case, it is a case concerning

6   the interrelationship of NEPA and Wilderness provisions.  Thus, it is not controlling here.

7   ### 8.   The BiOps Did Consider The Impacts On Critical Habitat Areas Not Designated As DWMAs

8
9   CBD argues that FWS "largely ignored [impacts on designated] critical habitat *outside* of

10  DWMAs" protected under WEMO and NECO.  CBD ESA Br. at 14.  The telling word is CBD's

11  subjective use of "largely."  When viewed objectively, the BiOps did procedurally consider the

12  effects that will occur to critical habitat areas that are not within protective DWMAs.  *See* Counties'

13  Br. at 32-33; Fed. Br. at 53.  Thus, any procedural duty to consider or to explain has been satisfied.

14  FWS's path can be discerned in BiOps that go far beyond the "summary" opinions allowed by the

15  ESA.

16  Yet again, CBD's real argument boils down to "FWS did not give the weight CBD would

17  have given to certain impacts."  But this does not demonstrate any procedural or substantive

18  violation of law under the applicable APA standards.

19  ### 9.   CBD's Other Arguments On OHV And Grazing Impacts On Critical Habitat Lack Merit

20  CBD then continues its opposition to OHV uses and to grazing uses through additional – and

21  picayune – critical habitat arguments.  *See* CBD ESA Br. at 14-18.  FWS did procedurally consider

22  the impacts mentioned by CBD.  CBD sometimes misstates FWS's basis for not finding "adverse

23  modification" of critical habitat.  We leave detailed rebuttals to the groups representing those

24  interests, and to Federal Defendants.

25  But we note one overarching reason why those uses do not adversely modify critical habitat.

26  Compared to the present environmental baseline and a future without WEMO and NECO, those

27  land-use amendments *reduce and restrict* OHV use and grazing.  Accordingly, they do not adversely

28

1   modify critical habitat compared to what would occur under the status quo.  *See* Counties' Br. at 13-
2   14, 26-27.

3       This Court used similar reasoning on no adverse modification of critical habitat in *Hayward*
4   *Area Planning Ass'n v. Norton*, No. C 00-04211 SI, 2004 WL 724950 at *3-7 (N.D. Cal. Mar. 29,
5   2004).  *See id.*; Fed. Br. at 54-55.  Despite Defendants' earlier citation to *Hayward*, Plaintiffs do not
6   confront *Hayward* in their revised brief.

7           **10.    FWS Did Use The Best Science Available**

8       CBD (at 18-19) recycles various arguments that FWS allegedly did not use the best science
9   available.  But CBD declines to come to grips with Defendants' rebuttals.  This includes the rebuttals
10  again provided in the Counties' Br. at 20-23 and 33-35, and Fed. Br. at 37 n.40.

11      As described there, best "available" science claims fail unless Plaintiffs identify "superior
12  data" that was placed before FWS and then ignored by the agency.  *Building Indus. Ass'n of S. Cal.*
13  *v. Norton*, 247 F.3d 1241, 1246-47 (D.C. Cir. 2001); *Kern County*, 450 F.3d at 1080-81.  Since CBD
14  has not done so, its "available" science claims fail.

15      CBD strives to get around this problem through at least two types of unpersuasive arguments.
16  First, CBD (at 18) asserts that FWS "ignore[d] impacts to critical habitat where there was no
17  conclusive proof."  But the administrative record facts show that FWS did not ignore information.
18  Instead, FWS accurately described the limitations on scientific knowledge.  That is not a violation of
19  a standard that allows decisions to be made on the basis of "available" information.

20      Second, CBD (at 19) argues that, where the limited science available creates small
21  uncertainties, the best science available language requires that FWS "give the benefit of the doubt to
22  the species."  CBD's view is unpersuasive.  That view: (1) misconstrues the language and intent of
23  the 1979 amendment to ESA § 7(a)(2); (2) is contrary to the majority case law; and (3) misconstrues
24  a provision allowing non-jeopardy opinions where there is a small risk of jeopardy to control the
25  meaning of the neutral term "available" information.  *See* Counties' Br. at 20-23 and 33-35.  For
26  example, CBD's view that all uncertainties should be resolved in favor of listed species and in favor
27  of constraints on projects cannot be reconciled with the Supreme Court's direction that the best
28  science language prevents "needless economic dislocation produced by agency officials zealously

1  but unintelligently pursuing their environmental objectives." *Bennett v. Spear*, 520 U.S. 154, 176-77

2  (1997).

3  Third, CBD (at 19) notes that one study was not referenced in the original BiOps, but was

4  described in the supplemental portions of the BiOps providing detail on incidental take. But CBD

5  has not shown that the study provided a new scientific principle. Rather, the study was additive in

6  confirming what FWS thought the science suggested. Where new information "supplemented

7  FWS's existing understanding..., but did not alter the primary conclusions..., it was not critical to

8  FWS's decision." *Kern County*, 450 F.3d at 1080; *accord Water Keeper Alliance v. U.S. Dep't of

9  *Defense*, 271 F.3d 21, 33 (1st Cir. 2001) (no likely ESA violation just because the agency "did not

10  consult two available studies").

11  **11.    The Incidental Take Statements Are Adequate**

12  CBD continues to fly-speck incidental take analyses in the BiOps that have already been

13  supplemented to provide additional information. *See* CBD ESA Br. at 19-24. But CBD fails to

14  confront the rebuttals Defendants offered when those arguments were first made. CBD's critique of

15  the incidental take provisions remains unconvincing for reasons we reiterated in the Counties' Br. at

16  36-47.

17  1.    For example, CBD (at 20-21) argues that FWS lacked authority to provide additional

18  detail and quantification on incidental take in supplements, and had to redo the entire BiOps.

19  However, a federal agency has inherent authority to amend or supplement its opinions, and the

20  Executive Branch has discretion in choosing how to conduct its function of implementing the law.

21  *See* Counties' Br. at 44; *Gorbach v. Reno*, 179 F.3d 111, 1123-24 (9th Cir. 1999) (an agency has

22  inherent authority to reconsider its decisions). Just as an agency decision on whether and how to

23  supplement a NEPA document is reviewed very deferentially, an agency decision on whether and

24  how to supplement a BiOp should not be overturned unless it is clearly arbitrary. *See Marsh v.*

25  *ONRC*, 490 U.S. at 376-85; *Southern Or. Citizens Against Toxic Sprays, Inc. v. Clark*, 720 F.2d

26  1475, 1480 (9th Cir. 1983) ("The [NEPA] label … is unimportant. We review the sufficiency of the

27  environmental analysis as a whole.").

28

1    CBD's cited case of *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*, 378 F.3d

2    1059, 1077 (9th Cir. 2004), concerned a distinguishable situation where FWS relied on "new facts"

3    and sought to update central "baseline" portions of a BiOp.  In contrast here, FWS cited no new

4    information that calls into question the no-jeopardy BiOp, and merely provided detail on the

5    incidental take trigger for reinitiating consultation.  Further, the ITS is not a central portion of a

6    BiOp.  *See* Fed. Br. at 56; *compare* 16 U.S.C. 1536(b)(3) (content of a BiOp) *with* § 1536(b)(4) (the

7    ITS can be provided separately).  *Gifford Pinchot* should not be read as giving courts free rein to

8    impose their desired procedures on agencies.  That would be inconsistent with *Vermont Yankee* and

9    the en banc decision in *Lands Council v. McNair*.  *See* pages 3-4, above.

10    In sum, FWS should not be punished for striving to eliminate a litigable issue under *Imperial

11    Sand Dunes* by attempting to quantify incidental take in a cost-effective supplement.  FWS's good

12    deed should go unpunished.

13    2.    Assuming *arguendo* that the supplements should be ignored, the question before the

14    Court would become whether FWS non-arbitrarily concluded that the lack of incidental take

15    quantification in the unamended BiOps satisfies FWS's own rules.  The answer to that question is

16    "yes."  *See* Counties' Br. at 37-38, 44.  FWS's attempt at quantification of take largely reinforced

17    that it is impractical to quantify take from random events over millions of acres of federal lands.

18    3.    CBD (at 21) argues that "FWS failed to consider all take that is likely to occur."

19    CBD's assertion is based on the mistaken notion that adverse modification of habitat ("loss of forage

20    and collapsed burrows") alone proves "take."  But the "take" of wildlife means that "actual death or

21    injury of a protected animal is necessary for a violation" – ESA § 9 does not impose "a broad,

22    affirmative duty to avoid adverse habitat modification."  *Babbitt v. Sweet Home Chapter of Cmtys.*

23    *for a Great Oregon*, 515 U.S. 687, 691 n.2, 703 (1995); *see* Counties' Br. at 38-40.  Once one

24    recognizes the limited scope of the "take" prohibition, it is clear that FWS considered all forms of

25    "take."  *See* Fed. Br. at 58; Counties' Br. at 38-40; OHV Br. at 28-30.

26    4.    CBD (at 22-23) next quibbles with the "numbers of allowable take and re-initiation

27    triggers."  In the absence of data, FWS relied largely on its professional judgment.  This reality does

28    not render FWS's judgment arbitrary.  Instead, FWS's judgment is presumed lawful, CBD bears the

1   burden of proving irrationality, and CBD cannot do so where there is simply a difference of opinion

2   and the information does not compel CBD's desired result.  *See* pages 1 and 5-7, above; Counties'

3   Br. at 40-43; Fed. Br. at 56-58.

4           "Fashioning appropriate standards...for takings that would otherwise violate § 9 necessarily

5   requires the exercise of broad discretion," and a court should not "substitute [its] views of wise

6   policy for [FWS's]."  *Sweet Home*, 515 U.S. at 708; *see Ctr. for Biological Diversity v. U.S. Fish*

7   *and Wildlife Serv.*, 450 F.3d 930, 942 (9th Cir. 2006) (sustaining FWS's view of an ITS).  Given

8   FWS's wide range of discretion, the Court should find the BiOps do not violate ESA § 7(b)(4).

9           As an example of an unwarranted intrusion on FWS's discretion, CBD (at 22-23) argues that

10  "FWS unlawfully selected too low a number of dead tortoises to serve as a 'trigger' to re-initiate

11  consultation."  Perhaps CBD means "too high a number."  But the triggers for reinitiating

12  consultation of six reported taken tortoises in all of NECO and four in all of WEMO in one year are

13  quite low – they are "hair triggers."  Those triggers are rational.  They are not too high as they are

14  well below the level of anticipated (but possibly not reported) take, and are well below 1% of the

15  tortoise population.  Counties' Br. at 43; Fed. Br. at 56-58.

16          5.      Finally, leaving no ITS issue unlitigated, CBD (at 23-24) argues that the reasonable

17  and prudent measures FWS specified to make operative the benefit of an incidental take statement

18  are unlawful because they do not "minimize...incidental take."  But ESA § 7(b)(4) does not require

19  the minimization or elimination of such minor amounts of take.  *See* authorities in Counties' Br. at

20  41-43; Fed. Br. at 59.

21          CBD argues this Court found an ESA duty to minimize incidental take in *Imperial Sand*

22  *Dunes*, 422 F. Supp. 2d at 1140-41.  But a review of that opinion suggests the primary logic was

23  that, since FWS in its discretion had adopted a reasonable and prudent measure to "minimize the

24  potential for take," to avoid being arbitrary, FWS had a duty to include terms and conditions that

25  would carry out the RPM by minimizing take.  *See* 422 F. Supp. 2d at 1140-41.  To the extent this

26  Court might have also said or implied that take minimization is required by ESA § 7(b)(4), after

27  consideration of the authorities cited in the Counties' Br. at 41-43, the Court should find that is not

28  the law.  *See Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1173-74 (9th Cir. 2004) (*dicta* in prior cases

1    does not prevent a court from changing its view after full briefing).  As illustrated by *Lands Council*

2    *v. McNair*, courts should not impose requirements not clearly required by law.

3          **C.    BLM Could Rely On Reasonable BiOps**

4          CBD argues that, *if* the BiOps did not reasonably conclude that WEMO and NECO were not

5    likely to jeopardize any listed species or adversely modify its critical habitat, BLM could not rely on

6    those BiOps to document ESA § 7(a)(2) compliance.  CBD ESA Br. at 24-25.  But since the BiOps

7    were not arbitrary in reaching no-jeopardy conclusions, BLM is in compliance with ESA § 7 with

8    respect to WEMO and NECO.  *See* Counties' Br. at 47; Fed. Br. at 60.

9    **III.   CBD's FLPMA Claims Are Not Persuasive**

10         CBD argues the OHV-related decisions in WEMO do not satisfy a FLPMA rule that

11   supposedly requires "minimization" of OHV impacts.  CBD NEPA/FLPMA Br. at 12-19.  But, as

12   the Counties described in both rounds of briefing, FLPMA contemplates a variety of multiple uses in

13   the CDCA and does not mandate that tortoise conservation always be the dominant use.  Counties'

14   Br. at 47-48.

15         In light of its discretion over allowed multiple uses, BLM can reasonably interpret its own

16   rule as not requiring "minimization" in the sense that OHV uses must be eliminated any time they

17   cause some adverse impacts or conflict with other potential multiple uses.  *See* Counties' Br. at 48-

18   50; Fed. Br. at 17-20.  Accordingly, BLM has not violated FLPMA in allowing continuation of some

19   OHV uses, but at reduced rates and under greater restrictions.  *See id*.

20         The Counties leave detailed rebuttals on OHV claims to Federal Defendants and the OHV

21   Intervenors.

22   **IV.   CBD's NEPA Claims Are Not Convincing**

23         To keep the length of NEPA documents within a rule of reason that is cost effective and that

24   avoids mind-numbing detail, controlling NEPA rules provide that an EIS on a even "proposals of

25   unusual scope of complexity shall normally be less than 300 pages."  40 C.F.R. 1502.7; *see id*. at

26   § 1500.4 ("Reducing paperwork").  The 300-page limit illustrates why CBD is unpersuasive in

27   attacking the adequacy of the far lengthier, multi-volume WEMO EIS.  Since that EIS does contain a

28   "reasonably thorough discussion of the significant" environmental impacts – and since an EIS need

1   not discuss lesser-significance impacts in any depth – the EIS satisfies NEPA.  *Churchill County*,

2   276 F.3d at 1071.

3        CBD's NEPA claims continue to focus on OHV issues.  We again leave those issues to

4   Federal Defendants and the OHV Intervenors.

5        CBD has recycled several NEPA arguments on non-OHV matters.  *See* CBD NEPA/FLPMA

6   Br. at 25-35.  Those arguments remain unconvincing.  They were rebutted in the prior briefing –

7   without any response from CBD in its opening brief – and in the Counties' Br. at 51-59, and Fed. Br.

8   at 28-35.

9        Impacts To Soils.  CBD (at 26) objects to the general level of soils discussion in one section

10   of the WEMO EIS.  But CBD ignores that there is a more-detailed technical discussion of soils

11   Appendix J of the EIS (AR WMP 205070-75), and that BLM has discretion on how to organize the

12   EIS.  The EIS is adequate on soils issues for reasons developed in the Fed. Br. at 29 and Counties'

13   Br. at 51-52.

14        Moreover, the Ninth Circuit en banc recently found the soils discussion adequate in *Lands*

15   *Council v. McNair*, 537 F.3d at 991-94, without some site-specific soils information.  In light of this

16   ruling, we are surprised that CBD continues to make a soils argument.

17        Inventory Information.  CBD's real claim may be that BLM did not have detailed inventory

18   information on soils conditions, wildlife, plant assemblages, etc., on every acre of the multi-million

19   acre CDCA.  *See* CBD NEPA/FLPMA Br. at 4 and 25-27.  One answer is that the CEQ regulations

20   caution against excessive detail in the baseline or affected environment section of an EIS.  Rather,

21   NEPA is satisfied if the EIS

22        *succinctly* describe[s] the environment of the area(s) to be affected or created by the
          alternatives under consideration.  *The description shall be no longer than is necessary to*
23        *understand the effects of the alternatives*….

24   40 C.F.R. 1502.16 (emphasis added).

25        Moreover, NEPA and FLPMA, like the ESA, do not require perfect information.  "NEPA

26   simply does not specify the quantum of information that must be in the hands of a decisionmaker."

27   *State of Alaska v. Andrus*, 580 F.2d 465, 473-74 (D.C. Cir. 1978).  The acquisition of information

28   can be costly, and NEPA places that cost-benefit decision in the discretion of the agency.  *See id.*;

1    *Kleppe v. Sierra Club*, 427 U.S. 390, 410 and n.21 (1976); *Coalition on Sensible Transportation v.*

2    *Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987).

3            The Supreme Court has expressed similar themes of not wanting to make agency

4    decisionmaking intractable by requiring better information, and of avoiding conflicts with

5    Congress's constitutional power over appropriations by making most statements in federal land-use

6    plans aspirational and not enforceable. *See Marsh v. ONRC*, 490 U.S. at 373; *SUWA*, 542 U.S. at

7    67-72. The Ninth Circuit en banc recognized similar constraints at several points in deferring to

8    agency decisions based on cost-effective, but imperfect, information. *See Lands Council v. McNair*,

9    537 F.3d at 991-94 (no verification required for an agency's scientific projections), 994-99 (suitable

10   habitat can be used as a proxy in lieu of attempting to inventory and count wildlife over a broad

11   area), 1001-03 (not all uncertainties need be described in an EIS). Accordingly, the reality of

12   incomplete resource inventory information does not violate NEPA or FLPMA or the ESA.

13           <u>Impacts To Riparian Resources, Unusual Plant Assemblages, And Water Quality.</u> CBD (at

14   27-29) repeats the same arguments on these matters. The pertinent rebuttals are in the Counties' Br.

15   at 52-55, and Fed. Br. at 30-31.

16           <u>Impacts To Sensitive Species.</u> CBD (at 30-33) seems to raise both FLPMA and NEPA

17   claims with respect to a variety of species. Substantively, FLPMA, like the identical mandate for

18   multiple-use compromises in the National Forest Management Act, does not require that

19   conservation of each species be the highest priority. *See* Counties' Br. at 46-49. Any goals on

20   species protection in the CDCA plan are likely not judicially enforceable, due to the wording of the

21   plan and its aspirational nature. *SUWA*, 542 U.S. at 67-72.

22           Procedurally, CBD's own citations show, the citations in the Fed. Br. at 32-33 show, and the

23   Court's review of the EIS will show, that the EIS provides the pertinent and available information on

24   impacts to CBD's species-of-concern. While BLM did not have perfect information and the EIS

25   does not address some minutiae, this is not required by NEPA. The EIS complies with NEPA

26   because it provides a "reasonably thorough discussion of the significant aspects of the probable

27   environmental consequences." *Churchill County*, 276 F.3d at 1071.

28

1    _Cumulative Impacts._  CBD (at 34-35) largely repeats its earlier claims that the WEMO EIS

2    did not address cumulative impacts in the right place or in sufficient detail.  Defendants' rebuttals

3    can be found in the Counties' Br. at 55-58, and Fed. Br. at 34-35.

4    **V.    Remedy Issues**

5          As summarized above, Defendants are entitled to summary judgment on Plaintiffs'

6    substantive and procedural claims regarding WEMO and NECO, and their EISs and BiOps.

7          At most, CBD might have a credible claim that the BiOp or EIS did not explain an issue in

8    sufficient depth.  Such a procedural shortcoming does not warrant set aside or injunctive relief for

9    reasons explained below.

10         **A.    If The Court Needs Any Further Explanation, It Can Come By Agency
               Declaration Or On Remand.  The Agency Action Should Not Be Found
11             Arbitrary And Set Aside In The Interim.**

12         Sometimes a court needs a further explanation from the agency of some matter to complete

13   the judicial function of review to ensure the agency is not acting arbitrarily.  The court may obtain

14   that information either by a declaration from the agency or by a remand.  If there has been "such a

15   failure to explain administrative action as to frustrate effective judicial review, the remedy [is]...to

16   obtain from the agency, either through affidavits or testimony, such additional explanation of the

17   decision as may provide necessary."  _Camp v. Pitts_, 411 U.S. 138, 142-43 (1973); _National Audubon_

18   _Soc'y v. U.S. Forest Serv._, 46 F.3d 1437, 1447 n.9 (9th Cir. 1994); _Animal Defense Council v. Hodel_,

19   840 F.2d 1432, 1436 (9th Cir. 1988).

20         But the agency action does not become "arbitrary" and should not be set aside until after the

21   court considers the agency's further explanation.  "[B]edrock principles of administrative law

22   preclude us from declaring definitively that [an agency's] decision was arbitrary and capricious

23   without first affording [the agency] an opportunity to articulate, if possible, a better explanation."

24   _County of Los Angeles v. Shalala_, 192 F.3d 1005, 1023 (D.C. Cir. 1999).

25         This approach is logical because no statute provides that a federal agency violates the law

26   unless it compiles an exhaustive contemporaneous administrative record of the reasons the agency

27   chose a particular action on every issue that might come up in litigation.  Since the absence of a

28   complete agency explanation is not unlawful or "arbitrary," it does not provide a basis for

immediately setting aside the action.  *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654

(1990); *Midwater Trawlers Co-op. v. Dep't of Commerce*, 393 F.3d 994, 1006 (9th Cir. 2004);

*Shalala*, 192 F.3d at 1023.

### B.   Plaintiffs Have Not Sustained Their Burden In Obtaining An Extraordinary Injunction Or Set Aside Relief

An injunction is "extraordinary remedy" which does not issue "as of course" or for "trifling"

injuries.  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-12 (1982) (finding that the Clean Water

Act did not require an injunction where a Navy program lacked a required CWA permit).  To obtain

an extraordinary injunction, under

> well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a
> four factor-test before a court may grant such relief.  A plaintiff must demonstrate: (1)that it
> has suffered an irreparable injury; (2) that remedies available at law, such as monetary
> damages, are inadequate to compensate for that injury; (3) that, considering the balance of
> hardships between plaintiff and defendant, a remedy in equity is warranted; and (4) that the
> public interest would not be disserved by a permanent injunction.

*eBay v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see Romero-Barcelo*, 456 U.S. at 312.

For example, a "NEPA violation is subject to traditional standards in equity for injunctive relief and

does not require an automatic blanket injunction."  *Northern Cheyenne Tribe v. Norton*, 503 F.3d

836, 842-43 (9th Cir. 2007).[4]

CBD has not attempted to sustain its burden of persuasion on any of the equitable factors.

Accordingly, extraordinary set aside or injunctive relief should not be granted in the summary

judgment order.

---

[4]     A "procedural violation of NEPA does not compel issuance of a preliminary injunction."
*Fund for Animals v. Lujan*, 962 F.2d 1392, 1400 (9th Cir. 1992).  The same is true for CBD's
ESA/APA claims.  CBD's procedural ESA § 7 claims against FWS's BiOps are "maladministration"
claims that cannot be brought under the ESA § 11(g) citizen suit provision, but only under the APA.
*Bennett v. Spear*, 520 U.S. at 173-75.  This takes CBD outside the scope of any arguable mandatory
injunction under 16 U.S.C. 1540(g).

The APA does not mandate "set aside" relief every time there is some legal misstep in a
federal agency action.  Instead, the APA preserves a court's traditional discretion to grant or deny
injunctive relief.  *See* Levin, *"Vacation" at Sea: Judicial Remedies and Equitable Discretion in
Administrative Law*, 53 DUKE L. J. 291, 309-44 (2003).  The APA provides that "[n]othing
herein...affects...the power...of the court to...deny relief on any other appropriate legal or equitable
ground."  5 U.S.C. 702.  Accordingly, the APA should be read to not eliminate a court's
longstanding equitable discretion "to mould each decree to the necessities of the particular case."

(continued...)

---

1     There is an inconsistency between CBD's two briefs on whether Plaintiffs request any relief

2     before remedies briefing and a hearing.  The position in the CBD NEPA/FLPMA brief (at 35) is

3     "no."  It requests a "separate hearing on interim injunctive relief" and requests only declaratory relief

4     in the interim.  We do not oppose that approach.

5     The CBD ESA Br. (at 25) is more confused.  It requests a "set aside" of certain documents

6     but does not support such an injunction.  It also ambiguously states that "Plaintiffs seek interim

7     relief."  But that brief provides no argument supporting any such relief.

8            **C.     Some Factors Pertinent To Injunctive Or Set-Aside Relief**

9     If the Court finds some procedural shortcoming in FWS's BiOps or BLM's WEMO EIS, we

10    agree with the CBD NEPA/FLPMA Br. that the Court should schedule further briefing on an

11    appropriate remedy.  At this time, the Counties provide some general reasons for declining an

12    extraordinary injunction.

13    <u>Curable Procedural Defects Do Not Warrant A Substantive Injunction.</u>  The procedural

14    nature of CBD's claims and the different agencies those claims are brought against provide powerful

15    reasons for denying an injunction.

16    First, as indicated by *County of LA v. Shalala* and other authorities cited above, courts should

17    not presumptively set aside agency actions for curable procedural defects.

18    Second, there are mismatches between the narrow deficiencies argued by CBD and any broad

19    remedies.  If FWS's BiOps have some procedural shortcoming, why should this dictate any relief

20    against BLM's WEMO and NECO actions?  No such relief should be granted where BLM's action

21    substantively satisfies the ESA.  And, because 5 U.S.C. 706 only empowers a court to "set aside" the

22    particular "agency action" found to be in contravention of the procedures required by law, why

23    should any shortcoming in the EIS actions mean that WEMO and NECO should be set aside?

24    WEMO and NECO substantively comply with FLPMA and the ESA.

25    An "injunction must be narrowly tailored to give only the relief to which plaintiffs are

26    ─────────────────────
      (...continued)

27    *United States v. Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483, 496 (2001); *see Amoco
      Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542-46 (1987); *Romero-Barcelo*, 456 U.S. at 312-13.

28

1   entitled" and which is in the public interest. *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 558

2   (9th Cir. 1990); *Clark v. Coye*, 60 F.3d 600, 604 (9th Cir. 1995). Courts should not enjoin the

3   "whole conduct of the defendants' business," as would occur if the Court were set aside WEMO and

4   NECO, which control the management of millions of acres in the CDCA. *Hartford-Empire Co. v.*

5   *United States*, 323 U.S. 386, 410 (1945). Relief should be confined to the specific defect found.

6        Courts prefer less-drastic relief that does not prevent the agency from operating. *E.g.*, *United*

7   *States v. James Daniel Good Real Property*, 510 U.S. 43, 63-64 (1993); *Brock v. Pierce County*, 476

8   U.S. 253, 260 (1986). For example, if the legal deficiency is that BLM or FWS does not have

9   sufficient inventory information on resource X, the curative injunction would be to compel the

10  agency to acquire the legally-required information.[5]

11        <u>Public Interest And Balance Of Harms.</u> The public interest and the balance of harms among

12  the parties are often determinative on whether to grant or deny an extraordinary injunction against an

13  Executive Branch action. *See Amoco Prod.*, 480 U.S. at 542-46; *Romero-Barcelo*, 456 U.S. at 312-

14  20; *Lands Council v. McNair*, 537 F.3d at 1003-05. Those factors weigh heavily against enjoining

15  WEMO and NECO.

16        First, WEMO and NECO, with their extensive DWMAs and ACECs and protective

17  regulations, are environmentally sensitive. They provide greater protection of environmental

18  resources than would occur if WEMO and NECO were set aside. *See* Counties' Br. at 12-15.

19  WEMO and NECO should not be enjoined, particularly as those actions substantively satisfy the

20  ESA and FLPMA. *See Ctr. for Biological Diversity v. BLM*, No. C 03-2509 SI, 2006 WL 2788252

21  at *2-3 (N.D. Cal. Sept. 26, 2006) (though this Court's *Imperial Sand Dunes* opinion found errors in

22  the critical habitat designation for Peirson's milk-vetch, the remedy order kept the protective

23  designation in effect).

24

25  _____
    [5]      As another example, if FWS needs to improve its reasoning on some portion of the BiOps:

26  (1) other portions of the BiOps (such as the ITS that Congress required as a relief measure) should
    remain intact; and (2) WEMO and NECO should not be set aside. The concept of narrowly tailoring

27  injunctive relief also might support, for example, requiring supplementation of the WEMO EIS on
    some OHV or grazing issue that the Court finds was not adequately addressed, but not setting aside

28  the EIS or WEMO and NECO.

1    Second, BLM, the Counties, and the public have strong interests in not having the results of

2   multi-year coordinated planning set aside. The Counties have been active participants in the WEMO

3   and NECO planning processes due to the need for coordination among the main regulatory entities

4   in those areas.[6] The Counties' proposed HCP depends on the legality of WEMO and the adequacy

5   of the WEMO EIR/S under federal and state law. Additionally, two Counties are cooperating

6   agencies on the NECO EIS. *See* Counties' Br. at 5-7. The Counties' interests in efficient planning,

7   and the public interest in coordinated planning, suggest that WEMO and NECO (and their

8   supporting documents) not be set aside. If the Court were to set aside any of the joint work products,

9   this would have significant adverse impacts on joint planning efforts, on County resources, and on

10   the Counties' proposed HCP.

11    Third, a court must consider the public interest reflected in statutes. *Amoco Prod.*, 480 U.S.

12   at 544-46 (reversing the Ninth Circuit because it presumed environmental injury was irreparable and

13   because it failed to consider the public interest in oil and gas development under OSCLA). Here, the

14   NEPA and ESA regulatory provisions cited by CBD are procedural, whereas FLPMA expresses a

15   multiple-use policy which WEMO and NECO permissibly implement. Accordingly, preservation

16   factors should not and need not control the public interest balancing.

17    <u>Irreparable Injury.</u> Courts cannot presume that environmental injury is irreparable. *Amoco*

18   *Prod.*, 480 U.S. at 544-46 (reversing the Ninth Circuit's former presumption that environmental

19
_____

20   [6]    For example, coordination is needed on: (1) ESA and CESA matters, including regulation of
land uses and identification of high-wildlife value lands for federal acquisition; (2) providing linear

21   rights-of-way (e.g., roads and utilities) through areas of mixed land ownership; (3) economic
activities (e.g., mining) that contribute to local economies; and (4) providing public services (e.g.,

22   road maintenance, microwave towers for communications including those associated with
emergencies in the desert, solid waste disposal landfills). *See* James Decl. ¶¶ 3-4; Scott Decl. ¶¶ 6-7;
Leimgruber Decl. ¶¶ 4-5; Hillier Decl. ¶¶ 5-6 (CR 32).

23          Due to their regulatory functions, the Counties have special rights under several statutes and

24   policies. Counties have review and comment rights under NEPA. *See* 42 U.S.C. 4332(2)(C)
(requirements that the NEPA comments of "State, and local agencies" be solicited, and that those

25   comments be part of the final EIS). FLPMA emphasizes coordination between BLM and local
governments on BLM land use plans and land ownership adjustments. *See* 43 U.S.C. 1712(c)(9) and

26   (f), 1720, 1721, 1733(d), 1747. Moreover, the regulatory policy of the Department of the Interior is
to coordinate with State and local governments on wildlife and other issues of common interest. *See*

27   43 C.F.R. Parts 9 and 24, 1601.0-8 ("impact on local economies...shall be considered" in BLM land-
use planning), 1610.3-1 (coordination with local planning).

28

1    injury is irreparable); *see Lands Council v. McNair*, 537 F.3d at 1004-05.  CBD has not shown

2    irreparable injury or that its injuries outweigh the interests described above.

3         The potential loss of a few desert tortoises, where incidental take is limited to "one-tenth of

4    one percent of the desert population estimated to reside within the action area" (WSupp ITS 1033),

5    is not an irreparable injury.  Under the majority view in the case law, CBD must show that an

6    injunction is needed to avoid an irreparable injury to wildlife at the population level.[7]

7         Logically, this is the correct result because the loss of a few individuals is not irreparable

8    from the standpoint of population biology.  If an activity poses risks to just a few members of a

9    wildlife species, but a reproducing population is retained over time, truly irreparable injury is

10   avoided.  If a sufficient population is maintained through time, the species continues to reproduce

11   and thrive.  Moreover, if a sufficient wildlife population remains for viewing by CBD's members,

12   they may well lack standing and at least do not suffer irreparable harm to their interests.[8]

13        Finally, if the Court were to find a NEPA violation, the purpose of NEPA supports a focus on

14   the species as a whole in assessing the likelihood of irreparable injury.  NEPA focuses on "adverse

15   effects on a species, not the impact on individuals."  *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451

16   F.3d 1005, 1010 (9th Cir. 2006).

17                          *       *       *

18        As the foregoing illustrates, different permutations of remedies issues may arise depending

19   on how this Court disposes of different claims.  This supports post-summary judgment briefing on

---

20   [7]      *Water Keeper Alliance v. U.S. Dep't of Defense*, 271 F.3d at 33-34; *Fund for Animals v.*
21   *Frizzell*, 530 F.2d 982, 986-87 (D.C. Cir. 1975) (refusing to accept the "extreme contention that the
     loss of only one bird is sufficient injury to warrant a preliminary injunction; rather, a proponent of
22   such an injunction must raise a substantial possibility that the harvest of excessive numbers of these
     waterfowl will irretrievably damage the species"); *Sierra Nevada Forest Prot. Campaign v. Rey*, No.
23   05-cv-0205 MCE GGH, 2007 WL 3034931 at *9 (E.D. Cal. Oct. 16, 2007) ("irreparable harm in this
     context depends on a demonstrable impact to the species as a whole"), *rev'd on other grounds sub*
24   *nom. Sierra Forest Legacy v. Rey,* 526 F.3d 1228 (9th Cir. 2008), *petitions for rehearing pending*;
     *Natural Res. Def. Council v. Kempthorne*, No. 05-cv-1207 OWW TAG, 2007 WL 1989015 at *13
25   (E.D. Cal. July 3, 2007); *Alabama v. U.S. Army Corps of Eng'rs*, 441 F. Supp. 2d 1123, 1135-36
     (N.D. Ala. 2006).
26   [8]      Individual wildlife and wildlife species lack standing.  *E.g.*, *Sierra Club v. Morton*, 405 U.S.
27   727 (1972); *Cetacean Community v. Bush*, 386 F.3d 1169 (9th Cir. 2004).  To have standing, a

                                                                                    (continued...)

28

---

1  remedies.  But no set aside or injunctive relief should be ordered at the time of the summary

2  judgment opinion.  CBD has not carried a plaintiff's burden with respect to an extraordinary

3  injunction against a federal land-use program.

4                                    **CONCLUSION**

5       CBD's Complaint should be dismissed at summary judgment.

6                               Respectfully submitted,

7

8  Steven P. Rice (SBN 094321)        By:   */s/  J. Michael Klise*
   CROWELL & MORING LLP                     J. Michael Klise (*pro hac vice*)
   3 Park Plaza                             Steven P. Quarles (D.C. Bar No.
9  20th Floor                               351668)
   Irvine, CA 92614-8505                    Thomas R. Lundquist (*pro hac vice*)
10 (949) 263-8400                           CROWELL & MORING LLP
   Fax:  (949) 263-8414                     1001 Pennsylvania Avenue, N.W.
11 srice@crowell.com                        Washington, D.C. 20004-2595
                                            (202) 624-2500
12 Dated:  Sept. 22, 2008                   Fax:  (202) 628-5116
                                            jmklise@crowell.com
13

14 Attorneys for Intervenor-Defendants Kern County, San Bernardino County, and Imperial County,
              California; and QuadState Local Governments Authority

15

16

17

18

19

20

21

22

23

24

25

26  ─────────────────────

27  (...continued)
    plaintiff must show some personal injury to an interest in viewing wildlife.  *See id.*; *Friends of the
    Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181-83 (2000).

28