David P. Hubbard, Esq. (Bar No. 148660)
Gatzke Dillon & Ballance LLP
1525 Faraday Avenue, Suite 150
Carlsbad, CA  92008
Telephone:     (760) 431-9501
Facsimile:      (760) 431-9512
E-mail:        dhubbard@gdandb.com

Dennis L. Porter (Bar No. 67176)
Dennis L. Porter Attorney at Law
8120 36th Avenue
Sacramento, CA  95824
Telephone:     (916) 381-8300
Facsimile:      (916) 381-8726
E-mail:        dlporter2@yahoo.com

Attorneys for Applicants for Intervention;AMA District 37; California Off Road Vehicle Association; Off Road Business Association; San Diego Off Road Coalition; and American Sand Association

Attorney for Intervenor-Defendants' Blue Ribbon Coalition; California Association of Four-Wheel Drive Clubs; and United Four-Wheel Drive Associations

Paul Andrew Turcke
Moore Smith Buxton & Turcke
950 West Bannock Street, Suite 520
Boise, ID  83702
Telephone:     (208) 331-1807
Facsimile:      (208) 331-1202
E-mail:        pat@msbtlaw.com

Attorneys for Intervenor-Defendant California Assocation of Four-Wheel Drive Clubs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT

## SAN FRANCISCO DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,<br><br>                  Plaintiffs,<br><br>        v.<br><br>U.S. BUREAU OF LAND MANAGEMENT, *et al.*,<br><br>                  Defendants,<br><br>_____<br><br>AMA DISTRICT 37 *et al.*<br><br>                  Intervenor-Defendants. | Case No. 06-4884-SI<br><br>**OHV INTERVENORS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION**<br><br><br><br><br>Courtroom:     10, 19th Floor<br>Judge:          Honorable Susan Illston |

**TOPICAL INDEX**

Page

I.    INTRODUCTION ...................................................................................................1

II.   ARGUMENT .......................................................................................................5

  A.    BLM's Route Designation effort complies with FLPMA .............................5

    1.    BLM Applied the "Minimization" Criteria Properly ...................................5

      a.    *BLM Applied Minimization Criteria Throughout
            Route Designation Process*................................................6

      b.    *Route Designation Process Did Not Favor
            Recreational Values*.........................................................9

    2.    BLM's Route Designation Decisions Are Supported
          by Substantial Evidence................................................11

    3.    The WEMO Plan Supersedes the 1980 CDCA Plan ................................12

  B.    Plaintiff's NEPA Claims are Rebutted by Evidence in
        the Record ...........................................................................13

    1.    EIS Considered Reasonable Range of Alternatives.................................13

    2.    EIS Used Appropriate Analytical Baseline..............................................16

    3.    NEPA Does Not Require That BLM Demonstrate the
          Effectiveness of the Route Designation Network ....................................17

  C.    The Evidence Supports the BiOp's No Jeopardy Finding
        Re OHV Impacts on Desert Tortoises.............................................18

III.  CONCLUSION....................................................................................................20

# TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*American Rivers v. Federal Energy Regulatory Commission*
201 F.3d 1186, 1195-1196 n. 15 (9th Cir. 2000) ...................................... 16

*Carr v. Pacific Maritime Association*
904 F.2d 1313 (9th Cir. 1990) .................................................................. 18

*General Chemical Corporation v. United States*
817 F.2d 844, 857 (D.C. 1987) ................................................................ 12

*Half Moon Bay Fishermans' Marketing Association v. Carlucci*
857 F.2d 505, 510 (9th Cir. 1988) ............................................................ 16

*Kleppe v. Sierra Club*
427 U.S. 390 (1976) .................................................................................. 17

*Lands Council v. McNair*
537 F.3d 981 (9th Cir. 2008) ................................... 1, 2, 6, 11, 14, 17, 20

*Marsh v. Oregon Natural Resources Council*
490 U.S. 360 (1989) .................................................................................. 19

*NSK Ltd. v. United States*
390 F.3d 1352, 1357-1358 (Fed. Cir. 2004) ............................................ 12

*Northern Alaska Environmental Center v. Kempthorne*
457 F.3d 969 (9th Cir. 2007) .................................................................... 14

*Oregon Natural Desert Association v. BLM*
531 F.3d 1114 (9th Cir. 2008) ....................................................... 2, 10, 12

*Selkirk Conservation Alliance v. Forsgren*
336 F.3d 944 (9th Cir. 2003) .................................................................... 20

*Sierra Club v. Bosworth*
510 F.3d 1016 (2007) ................................................................................ 11

*Sierra Club v. Clark*
774 F.2d 1406 (9th Cir. 1985) .................................................................... 5

*Sierra Club v. Clark*
756 F.2d 686 (9th Cir. 1985) ...................................................................... 8

*Southern Utah Wilderness Alliance v. Norton*
326 F.Supp.2d 102 (D.D.C. 2004) ........................................................... 20

*Westlands Water Dist. v. U.S. Dept. of the Interior*
376 F.3d 853 (9th Cir. 2004) .................................................................... 15

**FEDERAL STATUTES**

43 U.S.C. § 1701 (a)(7) .............................................................................. 9

43 U.S.C. § 1701 (a)(8) .............................................................................. 9

Page

**FEDERAL REGULATIONS**

43 C.F.R. § 8342.1 ................................................................. 3, 5, 6, 7, 8, 9, 10, 11, 12

1      The OHV Intervenor-Defendants — the Blue Ribbon Coalition, the California Association

2  of Four-Wheel Drive Clubs, United Four-Wheel Drive Clubs, the American Motorcyclists

3  Association District 37, the American Sand Association, the California Off-Road Vehicle

4  Association, the Off-Road Business Association, and the San Diego Off-Road Coalition (the

5  "OHV Intervenors") — hereby provide this brief in opposition to the plaintiffs' Cross-Motion for

6  Summary Adjudication.

7  **I.      INTRODUCTION**

8      The plaintiffs have brought this action in an effort to derail the Bureau of Land

9  Management's ("BLM's") resource management plans for the Western Mojave and Northern

10  Colorado Deserts. They allege that BLM and the Fish and Wildlife Service (the "Federal

11  Defendants"), in approving these plans, violated the Federal Land Policy and Management Act

12  (FLPMA), the National Environmental Policy Act (NEPA), and the Endangered Species Act

13  (ESA).  Plaintiffs, however, have failed to carry their burden on any cause of action set forth in

14  their Second Amended Complaint and therefore should receive no relief from this Court.

15      The law in this Circuit, as expressed by the *en banc* decision in *Lands Council v. McNair*,

16  is that courts shall not disturb the actions of expert federal agencies absent clear evidence those

17  actions were arbitrary and capricious.[1]  In this case, plaintiffs have presented no evidence that the

18  Federal Defendants acted arbitrarily or capriciously when performing their respective duties on the

19  WEMO and NECO Plans.  This is no surprise, given that few projects undertaken by BLM and

20  FWS have received more agency attention than the WEMO and NECO Plans.  One may disagree

21  with the resource management strategies BLM selected in the Plans, and one may disagree with

22  the findings FWS made in the Biological Opinions ("BiOps"), but there is no question that those

23  strategies and findings were tested extensively against the applicable rules and regulations of

24  FLPMA, NEPA, and the ESA.  Moreover, the NECO and WEMO Plans, as well as their

25  environmental documents, were revised repeatedly in response to public input, expert debate, and

26  new field data.  Nothing about the plan-development process, including final approval of the Plans,

27

28  _____
[1]  *Lands Council v. McNair*, 537 F.3d 981, 986-988, (9th Circuit 2008).

Environmental Impact Statements, and BiOps, was arbitrary or capricious.   The ever-looming specter of litigation made sure of that.

Nevertheless, Plaintiffs have invited the Court to disregard these facts and to ignore the hundreds of thousands of man-hours spent developing, editing, vetting, and finalizing the NECO and WEMO plans and their respective environmental documents (EAs, EISs, BiOps).   Worse, plaintiffs have asked the Court to sit in judgment of the Federal Defendants' scientific conclusions regarding the impacts of the Plans on cultural and natural resources, and to rule on the methods by which those conclusions were reached – the very things that the Ninth Circuit, in *Lands Council,* instructed District Courts *not* to do.

Of course, plaintiffs do not discuss *Lands Council* much in their briefs.   Despite the Court's directive to address this highly important case, plaintiffs pay it little attention in their first brief (Causes of Action 1 and 2) and never touch upon its actual holding.   In their second brief (Causes of Action 3 and 4), plaintiffs do not mention *Lands Council* at all.   Likewise, plaintiffs give the other new Ninth Circuit case, *Oregon Natural Desert Association v. BLM,*[2] short shrift, even though, on its face, it would seem to support plaintiffs' cause.   However, as plaintiffs may have figured out, the rule in *Oregon Natural Deserts Association* – that BLM must offer at least one alternative that reduces OHV routes from what existed prior to the challenged action – actually works in favor of the WEMO Plan, which closes thousands of pre-existing OHV routes to eliminate redundancy and protect resources.

There is no question that the stakes in this litigation are high.   Not only are endangered species involved; so too are the management prerogatives of the BLM, the scientific integrity of FWS, and the future of public recreation in two of the largest and most popular open deserts in the world. Given the resources expended to produce the WEMO and NECO Plans, and given the ability of those plans to shape — for good or ill — land management in the Western Mojave and Northern Colorado Deserts for the next 15 to 20 years, one would expect the arguments for and against the plans to be backed by strong evidence.   Indeed, this lawsuit is effectively a contest between plaintiffs on one hand and the Federal Defendants and Intervenors on the other to see who

---

[2]    *Oregon Natural Desert Association v. BLM,* 531 F.3d 1114 (9th Cir. 2008).

1    can marshal the best evidence in support of their respective positions.  After months of poring over

2    a 102,000-page administrative record (AR), and after more than 400 pages of briefing, it is clear

3    that plaintiffs have lost this fight.

4         Take, for example, plaintiffs' argument that BLM, when devising the WEMO route

5    designation network, failed to consider the impact minimization criteria set forth in 43 C.F.R.

6    Part 8342.1.  The Federal Defendants and OHV Intervenors have provided a multitude of AR cites

7    showing how BLM and stakeholder volunteers applied the minimization criteria when assessing

8    OHV routes for possible inclusion in the network.  The OHV Intervenors even identified specific

9    routes that were designated "closed" due to potential OHV impacts on cultural resources, habitat,

10   soils, sensitive species, and other uses.  Yet plaintiffs act as if this evidence does not exist.  Instead

11   they simply repeat, mantra-like, that BLM's "Decision Tree" provides no explicit indication that

12   the minimization criteria were applied.  The proof, however, is in the batter; and one need only

13   look at the final Route Designation Table to see that BLM closed many routes due to their impacts

14   on soils, habitat, species, cultural resources, and/or other uses — the very minimization factors that

15   Part 8342.1 demands be considered.

16        In their NEPA allegations, plaintiffs argue that the WEMO EIS failed to analyze a

17   sufficient range of alternatives, on grounds that Alternatives A through F each included an OHV

18   route network consisting of approximately 5,098 miles of trails.  The Federal Defendants and OHV

19   Intervenors have provided evidence that the WEMO Plan is, at base, a conservation plan designed

20   to protect sensitive wildlife and habitat, not an OHV recreation plan.  Therefore, the alternatives

21   must be evaluated with that purpose in mind.  When considered in that context, Alternatives A

22   through F are each distinctive in their own right, differing one from the other in terms of their

23   scope and conservation focus.  Plaintiffs ignore this fact and continue to demand that the

24   alternative analysis be invalidated for incorporating the same OHV route network into each of the

25   options.  In making this demand, plaintiffs fail to recognize that the route network assumed in the

26   various alternatives had already been approved and, for that reason, constituted an existing

27   condition.  It is not unusual or illegal for an agency to incorporate previously-adopted actions or

28   projects into the various alternatives considered in an EIS.

1    Plaintiffs' Endangered Species Act (ESA) claims suffer from a slightly different evidentiary

2    problem.   Whereas plaintiffs' FLPMA and NEPA arguments *ignore* evidence in the record,

3    plaintiffs' ESA arguments float along untethered to much evidence at all.  Specifically, plaintiffs

4    allege that the desert tortoise is "in decline" *region-wide*, although there is no evidence to support

5    this assertion and the Desert Tortoise Recovery Plan Reassessment Team has determined that the

6    existing monitoring techniques and statistical models are not sensitive enough to discern tortoise

7    population trends.  Plaintiffs also allege that *site-specific* tortoise declines, most of them registered

8    in specially-selected study plots, are the result of OHV recreation; yet plaintiffs cite no hard

9    evidence in support of this contention.  Finally, plaintiffs allege that OHVs "take" tortoises by

10   physically crushing them and by severely degrading their habitat; yet plaintiffs present little data to

11   corroborate this charge.  Even BLM and FWS admit they possess no solid evidence that OHVs

12   "take" tortoises.  The evidence of OHV damage to the Lane Mountain milk-vetch ("LMMV") is

13   equally weak.  Therefore, plaintiffs have not met their burden and their ESA claims regarding

14   OHV threats to the desert tortoise and LMMV must be rejected.

15                                              * * * *

16   Consistent with their Opening Brief, the OHV Intervenors will limit this Opposition to

17   eight issues which, while addressed by the Federal Defendants, require additional commentary

18   from an OHV-user perspective.  These issues include the following:

19   • Whether BLM properly considered the "minimization" criteria when evaluating

20   routes for potential inclusion in the route designation network;

21   • Whether BLM impermissibly favored recreational values over ecological factors

22   when developing the WEMO OHV route network;

23   • Whether the WEMO Plan supersedes the 1980 CDCA Plan and its restrictions on

24   new OHV Routes;

25   • Whether the WEMO EIS considered a reasonable range of alternatives;

26   • Whether the WEMO EIS used the proper analytical baseline;

27   • Whether the WEMO EIS was required to assess the effectiveness of the proposed

28   route designations in advancing the ecological goals of the Plan;

- Whether the BiOp adequately assesses OHV impacts on desert tortoises; and
- Whether the Incidental Take Statements (ITSs) in the WEMO and NECO BiOps comply with the ESA.

With respect to all other issues raised in plaintiffs' Cross-Motion for Summary Judgment, the OHV-Intervenors join in the arguments made by the Federal Defendants and the County-Intervenors in their respective Opening and Opposition briefs.

## II.   ARGUMENT

### A.   BLM'S ROUTE DESIGNATION EFFORT COMPLIES WITH FLPMA

#### 1.   BLM Applied the "Minimization" Criteria Properly

Plaintiffs argue that the "Decision Tree" BLM employed as part of its route designation process was fatally flawed because it did not consider the impact minimization factors described in 43 C.F.R. Part 8342.1.  (Pltf. FLPMA Brf., at 12-15).[3]  Plaintiffs' argument, however, finds little support in the law or the record.

The AR contains ample evidence that BLM did, in fact, apply the required minimization criteria and then eliminated various routes *based* on those criteria.  *See, e.g.*, AR WMP 211655, 211657, 200047, 211659, 211661, 211589, 211607-211611, 211621, 200054; SAR WMP 300033_Protests.  Regardless of whether BLM considered these minimization factors as part of the "Decision Tree" or at some other point during the route designation process is immaterial, as Part 8342.1 does not mandate that the minimization factors be applied in any particular way, according to any particular format, or at any particular stage of the designation effort.  *Sierra Club v. Clark,* 774 F.2d 1406, 1409-10 (9th Cir. 1985).  That is, Part 8342.1 does not dictate a method for applying the minimization criteria.  Method is left to the discretion of the BLM supervisor.

---

[3]    Throughout this opposition, the OHV-Intervenors will refer to plaintiffs' Opening FLPMA and NEPA brief as "Pltf FLPMA Brief" and to plaintiffs' Opening ESA brief as "Pltf ESA Brief."

a.    *BLM Applied Minimization Criteria Throughout Route Designation Process*

Section 8342.1 provides that the "authorized officer [of BLM] shall designate all public lands as either open, limited, or closed to off-road vehicles," and shall make such designations "in accordance" with the following criteria:

"(a) Areas and trails shall be located to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability.

"(b) Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats.  Special attention will be given to protect endangered or threatened species and their habitats.

"(c) Areas and trails shall be located to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.

"(d)  Areas and trails shall not be located in officially designated wilderness areas.  Areas and trail shall be located in natural areas only if the authorized officer determines that off-road vehicle use in such locations will not adversely affect their natural, esthetic, scenic, or other values for which such areas are established."

As one can see, the text of Section 8342.1 does not mandate that the authorized officer develop a "Decision Tree."  All Section 8342.1 requires is that BLM designate OHV areas and trails "in accordance" with these four criteria.  No case cited by plaintiffs has amplified on that language.  The Court cannot now require something more or different.  *Lands Council v. McNair, supra*, 537 F.3d 981, 993-994.  So the only issue is whether evidence in the AR shows that BLM, through the WEMO route designation process (including the "Decision Tree" component), designated OHV areas and trails "in accordance" with the four minimization criteria.  That is, does the evidence establish that BLM considered whether the routes in question minimized OHV impacts on (1) soil, watershed, air, other public land resources, (2) sensitive species and their habitats (with special emphasis on listed species), (3) other uses, and (4)

1   designated wilderness and primitive areas?   The answer is: Yes, it does, as can be seen by

2   reviewing the documents which describe BLM's *entire* route designation process.

3          To develop the WEMO route network, BLM took a multi-phase approach.

4   First, it divided up the WEMO into subregions and used GPS mapping to locate routes precisely.

5   WMP AR 218823-218832.   Second, it compiled biological and human impact data to identify

6   biology polygons and "disturbance" polygons.   WMP AR 305577-305579.   Third, BLM created

7   maps placing these polygons in the larger existing route network, thus allowing BLM to identify

8   which routes should be closed to "minimize" impacts on the public land values described in 43

9   CFR Part 8342.1.  WMP AR 304022, 304028.   Fourth, BLM then developed a "Decision Tree" to

10  assist the route designation teams and ensure they reviewed each of the 5,200 candidate routes in a

11  systematic way, taking into account the biology and "disturbance" data already collected by BLM.

12  WMP AR 201828, 217154-217160; AR 216341-216347; AR 214784-214787; AR 201832-

13  201834; AR 304016.   In addition, the Decision Tree evaluation sheets, in a prominent note at the

14  bottom of the page, reminded members of the route designation teams that each recommendation

15  they make — be it to close a route or to leave it open — must be informed by the "minimization"

16  criteria set forth in 43 CFR Part 8342.1.  WMP AR 204875.

17         That BLM's route designation teams performed their duties well and in

18  compliance with 43 CFR Part 8342.1 can be readily discerned from the final Route Designation

19  Table.   As this table shows, the route designation teams not only recommended that hundreds of

20  pre-existing routes be closed due to their redundancy (and unnecessary impacts to soil, air quality,

21  etc.), they recommended that many other, *non-redundant* routes be closed to minimize impacts on

22  (1) sensitive biological resources, (2) sensitive cultural resources, (3) sensitive topographic or

23  geologic resources, and/or (4) other approved uses.   The following examples illustrate the point:

24      • In the Middle Knob MAZ, three routes were closed due to erosion problems
25        (MK3A, MK4, and MK60), while three were closed due to potential cultural
          resource issues (MK18—20), and one was closed because it dead-ended near a
26        riparian creek that provided habitat for salamanders, birds, and rare frogs.   AR
          WMP 211655, 211657.

27

28

- In the Newberry-Rodman MAZ, routes were closed to eliminate conflicts (NR1014), to protect excellent habitat in Kane Wash (NR2032A—2032I), and to protect the white-margined beardtongue (NR3079).  AR WMP 211659, 211661; 200047.

- In the Coyote MAZ, two routes were closed because they traversed a dry lake bed "with sensitive conditions" (C112 and C112A).  AR WMP 211589.[4]

- In the Ord MAZ, one route was closed to protect the Mojave monkeyflower (OJ322).  AR WMP 200047.

- In the Juniper MAZ, five routes were closed to protect cultural resources (RJ1003, RJ 1005, RJ 1056—1057, RJ 1059).  AR WMP 200047. Additionally, in response to a protest, BLM and the state archaeologist visited the Juniper Flats ACEC and based on evidence of damage to cultural and riparian resources, elected to "designate **no** single-track routes within the Juniper Flats ACEC as open."  SAR WMP 300033_Protests.

- In the Fremont MAZ, one route was closed because it passed through Desert cymopterus habitat (F1009), three routes were closed because they traversed a dry lake bed (F1046, F1046A, and F1047), one route was closed because it "detracts from the Watchable Wildlife Area" (F1035), at least four routes were closed at the request of the California Department of Fish & Game (F2017, F2022 - 2024), and more than 20 routes were closed because they intersected the Barstow woolly sunflower Habitat Conservation Area (F2203, 2204, 2206, F5016 - 5019, F5021 - 5026)).  AR WMP 211607 - 211611, AR WMP 211621.[5]

- In the Lane Mountain milk vetch conservation area, all routes were closed to protect the plant.  AR WMP 200054.

Note that this list is not exhaustive, merely representative.  It shows that BLM not only *considered* the Part 8342.1 minimization criteria, it *applied* those criteria to eliminate a large number of formerly-open OHV routes.  Moreover, BLM, in the Route Designation Table, indicated *why* these routes were closed, allowing members of the public to draw the causal link between the minimization criteria on one hand and the closure decision on the other.  AR WMP 211584-725. That is all the law requires.  *See, Sierra Club v. Clark,* 756 F.2d 686, 691 (9th Cir. 1985).

Plaintiffs do not address this evidence.  Instead, they harp on the fact that the Decision Tree flow chart does not appear to include a "question box" for applying the Part

---

[4]     As a general planning policy, BLM tried to eliminate routes near or through dry lake beds.  AR WMP 211516.
[5]     Note that the "evaluation sheets" used for Decision Tree purposes actually include a pre-printed list of the 43 C.F.R. Part 8342.1 Designation Criteria at the bottom of the page for easy reference.  *See*, *e.g*., AR WMP 211907.

8342.1 minimization criteria.   (Pltf. FLPMA Brf., at 2-10).   Plaintiffs' myopic focus on the Decision Tree is misdirected.  The legal issue here does not turn on whether "question boxes" on the Decision Tree included the precise language plaintiffs believe is required.  The issue is whether BLM did or did not apply the required minimization criteria.  As shown above, BLM closed a large number of routes for a host of reasons *not* related to recreation values or desert tortoise impacts.  These routes were closed because they had the potential to create unacceptable impacts on soils, water, sensitive species (including but not limited to desert tortoises) and habitat, cultural resources, and other uses.  Thus, it is clear that BLM considered the Part 8342.1 minimization criteria during one or more phases of the route designation process.  Indeed, these criteria informed *all* phases of the process.  *See*, WMP AR 218823-218832; AR 305577-305579; AR 304022, 304028; AR 201828, 217154-217160; AR 216341-216347; AR 214784-214787; AR 201832-201834; AR 304016; AR 204875.  As a result, the law has been satisfied.

Given the data-driven, multi-phase process that BLM used to analyze and designate routes, and given the results which that process produced — results explained in the final Route Designation Table itself — plaintiffs' claim that BLM failed to apply the minimization criteria of 43 CFR Part 8342.1 must fail.   Plaintiffs have not carried their burden of proof.

        b.   *Route Designation Process Did Not Favor Recreational Values*

Plaintiffs' next argument is that BLM's route designation decisions, to an unacceptable degree, favored recreational values over ecological ones.  (Pltf. FLPMA Brf., at 15-16.)   The first problem with plaintiffs' position is that no statute, regulation, or case decision prohibits BLM from giving primacy to recreational interests so long as the requisite minimization criteria are applied.   Indeed, Section 8342.1 and the entire multiple use mandate of FLPMA contemplate that human uses, including those relating to OHV recreation, will be accommodated at the expense of disturbing, to some extent, the natural environment.  *See*, *e.g.*, 43 U.S.C. § 1701 (a)(8) [BLM shall "where appropriate… provide for outdoor recreation and human occupancy use"].   This is a trade-off that plaintiffs dislike, but it is nevertheless built into FLPMA and its OHV regulations.  *See*, 43 U.S.C. § 1701 (a)(7), 43 C.F.R. Part 8342.1.

1    Thus, it is neither unlawful nor surprising that BLM's route designation

2    process has an OHV orientation.  It would make no sense for BLM to go through an OHV route

3    designation process if it did not intend to support OHV recreation to some degree.  This does not

4    mean, however, that BLM is free to turn the entire WEMO (or even a large portion of it) into an

5    open OHV "play" zone.  Such an action *would* impair the integrity of the multiple use mandate.

6    This is precisely the situation that caused the Ninth Circuit to overturn BLM's Southern Oregon

7    Plan in *Oregon Natural Desert Association v. BLM*, 531 F.3d 1114 (9th Cir. 2008).  In that case,

8    BLM's management plan would have permitted OHV use over the entire planning area, adding

9    significantly to the amount of land open to OHV recreation.  *Id.*, at 1126-1127, 1145.  The Ninth

10    Circuit Court of Appeals ruled BLM's approach reflected the kind of single-use preference that the

11    court had previously determined to be invalid.  *Id.*, at 1145.

12    The WEMO Plan makes no such commitment to OHV use.  While the Plan

13    does designate OHV routes in support of recreational interests, it does not allow OHV use over the

14    entire WEMO; in fact, the plan reduces substantially the number of OHV routes compared to what

15    exists currently.  And, as noted above, BLM chose to close many of the routes not because they are

16    redundant or provide no additive recreational value, but because other values—namely resource

17    protection and conflict avoidance—trump the recreational benefits of the routes in question.

18    Therefore, the issue here is not whether BLM "elevated" OHV recreational values over the

19    conservation values that plaintiffs hold dear, but whether BLM, in developing an OHV network,

20    failed to consider the impact of such a network on the public land values described in Part 8342.1.

21    As shown above, BLM elected repeatedly to close non-redundant routes, some of high recreational

22    quality, to protect desert tortoises, salamanders, rare frogs, the white-margined beard tongue (a

23    plant), sensitive dry lake beds, the Mojave monkeyflower, cultural resources, desert cymopterus,

24    "watchable wildlife areas," Barstow wooly flower habitat, and the Lane Mountain Milkvetch.  *See,*

25    BLM SAR WMP 300701 Priv to Pub [closing 66% of the routes applied to the Decision Tree];

26    WMP AR 211584-725, 214896-930.  In each of these cases, OHV recreational interests were

27    forced to yield to the greater demands of conservation.  BLM did its job properly and in full

28    conformance with the law.  And while the OHV Intervenors do not like to lose routes, they agree

that BLM's decision to close the routes cited above was required both by federal regulation and by an informed environmental consciousness.

Simply put, plaintiffs have failed to establish that BLM impermissibly favored OHV recreation to the unlawful detriment of ecological concerns. *See, Sierra Club v. Bosworth,* 510 F.3d 1016, 1022 (2007). The data simply do not support such a contention.

## 2.   BLM'S Route Designation Decisions Are Supported by Substantial Evidence

Next, plaintiffs argue that BLM's route designations are not supported by substantial evidence. (Pltf. FLPMA Brf., at 16-18.) Specifically, plaintiffs claim that BLM should have explained how each of the 5,200 "open" routes was evaluated against the Part 8342.1 minimization criteria. *Id.*, at 17. For plaintiffs, it is not enough that BLM explained why a given route was *closed*. They want BLM to explain why a route was left *open* (*Id.*, at 17), which essentially means that BLM must prove a negative—*i.e.,* the absence of impacts on soil, biological resources, water, other uses, etc.

It is difficult to imagine what kind of explanation would satisfy plaintiffs on this point. Perhaps BLM should have included a box on the route evaluation sheet which, if checked, would say, "This route will not significantly affect the public land values described in 43 Part 8342.1." Still, it is doubtful that such a statement would have made plaintiffs content. Instead, it appears that plaintiffs want BLM to prepare a mini-EIS for each of the 5,200 routes designated as "open" in the Plan. However, nothing in FLPMA requires that BLM conduct such a detailed route-by-route analysis, and neither plaintiffs nor the Court are at liberty to demand one here. *Lands Council v. McNair, supra,* at 992-994.[6]

BLM's The multi-phase route designation process, which is documented throughout the AR, was designed expressly to ensure that the OHV route network would not degrade public land values or otherwise create significant impacts on the resources identified in 43 C.F.R. Part

---

[6]     As explained in the Federal Defendants' Opening Brief, BLM did conduct a route-by-route analysis for potential impacts on public land values. (Fed. Def. Opening Brf., at 20.) However, this analysis did not include the kind of exhaustive discussion that plaintiffs claim is required under FLPMA. Plaintiffs' position, however, finds no support in the statute, its regulations, or prevailing case law.

8342.1   The AR confirms this fact repeatedly.   As a result, plaintiffs' "substantial evidence" argument fails.

### 3.   The WEMO Plan Supersedes the 1980 CDCA Plan

Finally, plaintiffs contend that entire route designation effort is defective because it does not adhere to the alleged moratorium that the 1980 CDCA Plan imposed on new OHV routes. (Plntf FLPMA Brf., at 19.)  But here plaintiffs misapprehend one of the fundamental mechanics of land planning:  When a plan is amended or superseded, its various strategies, designations, and constraints dissolve in favor of those set forth in the new document.  As an amendment to the 1980 CDCA Plan, the WEMO Plan sets new policies and establishes new restrictions.  To the extent it expressly incorporates features of the old 1980 CDCA Plan, those features are retained; everything else falls into history.  Nothing in FLPMA or its regulations, and nothing in the AMA, requires that BLM explain why each and every aspect of a prior planning document is being changed, superseded, or eliminated.  Plaintiffs contend that such a requirement exists, but cite no credible authority in support of their position.[7]

Furthermore, it is not clear that BLM could permit any aspect of the CDCA Plan to survive, absent formal readoption, without running afoul of Judge Alsup's series of orders in the original *CBD v. BLM* litigation, as those orders, at the urging of CBD, directed BLM to develop and adopt new plans that would update the 1980 CDCA Plan.  In light of this history, plaintiffs cannot now ask that isolated provisions of the CDCA Plan be retained *in perpetua* simply because they advance plaintiffs' anti-OHV agenda.  When Judge Alsup directed BLM to adopt new plans to take the place of the 1980 CDCA Plan, he *did* throw out the baby with the bathwater; and it is too late now for plaintiffs to complain about this "unintended consequence" of the court orders they requested and received seven and a half years ago.  Simply put, the WEMO Plan supersedes the 1980 CDCA Plan, including its moratorium on new OHV routes.  As a result, BLM has no lingering obligation to retain the 1980 route network — a network that was created without benefit of a sound designation strategy or modern conservation principles.

---

[7]    Plaintiffs refer to *Gen. Chem. Corp. v. United States,* 817 F.2d 844, 857 (D.C. 1987), and *NSK Ltd. v. United States,* 390 F.3d 1352, 1357-1358 (Fed. Cir. 2004), neither of which stand for the proposition that BLM—or any federal agency—must explain why elements of an old plan are not being retained in the new, superseding plan.

### B.     PLAINTIFFS' NEPA CLAIMS ARE REBUTTED BY EVIDENCE IN THE RECORD

Plaintiffs advance four NEPA claims: (1) that BLM, in the WEMO EIS, failed to consider a reasonable range of alternatives, (2) that the EIS failed to include a proper "analytical baseline" for purposes of assessing the Plan's impacts, (3) that BLM failed to evaluate the public's past and future compliance with route designations, and (4) that BLM failed to inventory, identify, and analyze the Plan's potential impacts on sensitive resources. (Pltf. FLPMA Brf., at 19-35.) As the Federal Defendants have addressed item (4) extensively in their brief, the OHV Intervenors will focus only on plaintiffs first three arguments.

### 1.     EIS Considered Reasonable Range of Alternatives

Plaintiffs persist in mischaracterizing the WEMO Plan as little more than an OHV route designation project,[8] when in fact it is a comprehensive resource management plan whose driving purpose is species and habitat conservation.  OHV recreational access, while not an inconsequential concern, is not the focus of the document.  Therefore, when assessing the adequacy of the EIS's alternatives analysis, it is important that the inquiry not fixate on the OHV components of the plan to the exclusion of its larger conservation objectives.

As the OHV-Intervenors explained in their Opening Brief, Alternatives A through F each provide different approaches to achieving BLM's conservation goals while also accommodating a variety of human uses, as required under FLPMA.  WMP AR 201697-201908. Some of these alternatives are more aggressive than others in terms of conservation scope and geographic reach.  (*Id.*)  For example, Alternative A is actually multi-jurisdictional and would impose conservation measures not just on BLM land but on land owned by the State, the County, the Department of Defense, and private in-holders.  WMP AR 201697.  Alternative B, by contrast, would apply to BLM lands exclusively.  WMP AR 201891.  The difference between the two options amounts to 5.7 million acres.  WMP AR 201697; 201891; 201652.  They are hardly identical, save that both incorporate the Route Designation Network previously approved by BLM. *Id.;*WMP AR 200064

---

[8]     *See*, Pltf FLPMA Brf., at 20 (asserting that the "purpose and need of the action" is to "designate routes.")

The other alternatives likewise can be distinguished one from the other. Alternative C, while embracing many features from Alternative A, focuses more intently on implementing specific recommendations of the 1994 Desert Tortoise Recovery Plan. WMP AR 201894-98; 201654. Alternative D would impose a very strict conservation regime at the expense of some forms of recreation, including OHV recreation with ATVs and OHVs. WMP AR 201654; 201899-905. Alternative E moves in the other direction; it does not increase the number of OHV route miles but it does expand recreational opportunities in other ways. WMP AR 201654; 201905-07. And, finally, Alternative F would target two of the chief causes of desert tortoise mortality (and impediments to recovery) — disease and raven predation. WMP AR 201908.

Nevertheless, plaintiffs believe the alternatives are not sufficiently distinct, in that each assumes roughly the same number of OHV routes. (Pltf. FLPMA Brf., at 20.) NEPA, however, does not require that each *component* of an alternative be different from each *component* of the other alternatives. In other words, NEPA does not prohibit alternatives from sharing identical aspects — such as the size of a habitat reserve, or the number of geothermal wells to be installed — provided other aspects of the alternatives are different and provide the decision-makers with a range of options. Under plaintiffs reasoning, if two or more alternatives contemplate the same number of camping pads or the same number of creek crossings they are invalid, even though they differ substantially in other key respects. Plaintiffs, however, provide no legal authority in support of their position. Instead, they have asked this Court to invent new NEPA rules and impose them on the Federal Defendants. The *Lands Council* decision prohibits the Court from accepting this invitation. *Lands Council*, *supra*, 537 F.3d at 993.

There is no question that the six alternatives considered in the EIS share certain features; if they did not, they likely would not be able to meet many of the WEMO Plan objectives. *See, Northern Alaska Environmental Center v. Kempthorne,* 457 F.3d 969, 978 (9th Cir. 2007). That one of these common features is the already-approved OHV route network is neither surprising nor an offense to NEPA's requirement that an EIS consider a reasonable range of

1   alternatives.[9]   Indeed, it would have been difficult, if not outright non-sensical, for BLM to

2   consider alternatives that did not include the previously-approved route network.   Such

3   alternatives, if adopted, would have effectively nullified the earlier action and rendered it

4   meaningless.   NEPA does not require federal agencies to consider alternatives that cancel out

5   previously-approved actions.[10]

6            Plaintiffs also look to the Ninth Circuit's recent decision in *Oregon Natural Desert*

7   *Association v. BLM,* 531 F.3d 1114 (9th Cir. 2009) *(ONDA)* for assistance; but the facts in *ONDA*

8   do not align themselves well for plaintiffs' use in this case.   Unlike the management plan at issue in

9   *ONDA*, which allowed OHV activity over the entire planning area and substantially increased the

10  number of OHV routes when compared to pre-existing conditions,[11] the WEMO Plan only permits

11  OHV use in select locations; all non-designated areas are off-limits to vehicles.   Moreover, the

12  WEMO Plan *closes* hundreds of pre-existing OHV routes, reducing substantially the total number

13  of route-miles open to OHVs.   *See, e.g.,* WMP AR 211416.   This fact alone fundamentally

14  distinguishes this case from *ONDA*.

15           Given the broad objectives of the WEMO Plan—objectives that stress conservation

16  while still serving the multiple use mandate of FLPMA—the six alternatives assessed in the EIS

17  provided BLM with a reasonable range of options from which to choose.   *See*, *Westlands Water*

18  *Dist. v. U.S. Dept. of the Interior,* 376 F.3d 853, 865 (9th Cir. 2004).   NEPA requires nothing

19  more. (*Id.*, at 856)   [NEPA requires a reasonable range of alternatives, not all possible

20  alternatives].

21

22

23

24  _____

9    The BLM issued a Decision Record for the Route Designation network, and its attendant EA, on June 4, 2003.
    The Decision Record and Route Designation network were then incorporated into the WEMO Plan and EIS.   WMP
25  AR 201910-201914; WMP AR 207432-207435.

    10    Note that if plaintiffs had intended to challenge BLM's alternatives analysis, they should have done so during the
26  administrative process for the WEMO Route Designation Project EA, when those designations were being adopted,
    not during the WEMO Plan process.   By the time the WEMO Plan was approved, the Route Designation network had
    already been adopted with its own Decision Record.   That is, the Route Designations were already part of the
27  baselines conditions.   However, plaintiffs' "protest" of the Route Designation EA, dated June 20, 2003, did not raise
    this issue.   WMP AR 207308-207324.   So plaintiffs are precluded from raising it now.

28  11    *See, Oregon Natural Desert Association, supra,* 531 F.3d at 1126, 1145.

## 2.  <u>EIS Used Appropriate Analytical Baseline</u>

Plaintiffs contend that the EIS uses an inappropriate "baseline" for purposes of conducting its environmental impact analysis.  (Pltf. FLPMA Brf., at 22.)   Whereas the EIS compares the WEMO Plan's potential impacts against both current conditions and those extant during the last route-designation effort (1987) (WMP AR 202342-43; 202203-04), plaintiffs believe the Plan's impacts should be compared against conditions as they existed when the 1980 CDCA Plan was adopted.  (Pltf. FLPMA Brf., at 19.)

NEPA does not address analytical base-lines specifically, but its implementing regulations acknowledge that the acting agency (in this case, BLM) must identify a set of known environmental conditions against which the proposed action can be compared.  *American Rivers v. Federal Energy Regulatory Commission,* 201 F.3d 1186, 1195-1196 n. 15 (9th Cir. 2000)  BLM did this, and its choices were rational:   It wanted to test the proposed action against 1987 conditions and current conditions to show the public two things:   (1) the degree of route proliferation that occurred between 1987 and the present, and (2) the extent to which the proposed WEMO Plan would reverse that trend.

The plaintiffs, however, are not satisfied with this approach and insist that 1980 conditions be used as the analytical baseline.  (Pltf. FLPMA Brf., at 19.)   There are a host of problems with this idea.

First, standard NEPA practice is to use existing ground conditions (also known as the "No Action" alternative) as the point of reference for impact assessments.  *See, Half Moon Bay Fishermans' Mktg. Assn. v. Carlucci,* 857 F.2d 505, 510 (9th Cir. 1988).   BLM followed this general guideline when preparing the WEMO Plan EIS.  Plaintiffs, however, are demanding that Court force BLM to deviate from this practice.  They want a court order directing the BLM to use conditions that existed 25 to 30 years ago as its EIS baseline.  This would be unprecedented — a fact proved by plaintiffs' failure to cite any case where such an order has been issued.  (Pltf. FLPMA Brf., at 19-20.)

Second, plaintiffs do not seem to realize that the 1980 baseline, if employed, would have to apply to *all* aspects of the environmental analysis, not just the OHV route component.

1   Given the dramatic changes that have taken place since 1980 — in the regulatory arena and on the

2   ground — such an approach would result in an impacts assessment that is artificial and

3   anachronistic.  For example, the Mojave desert tortoise was not even listed as a threatened species

4   in 1980.  If one were to compare the proposed WEMO Plan against 1980 conditions, impacts on

5   desert tortoises would be viewed in a very different light, since neither the tortoise nor its habitat

6   enjoyed any protective status at that point in time.   In addition, conservation strategies and

7   techniques have improved substantially over the last 28 years; OHV use patterns have changed as

8   well during that same period.  An EIS that uses 1980 conditions as its analytical baseline would

9   miss all of these important developments and likely be deemed inadequate for that reason.

10        Third, neither BLM nor anyone else has the tools to re-create the past (at least the

11   1980 version of it) and thereby construct a sufficient "existing conditions" baseline for purposes of

12   a proper NEPA analysis.  (Fed. Def's MSJ Brf., at 6 ["recognizing the imprecise nature of vehicle

13   use on public lands in 1980 when the CDCA Plan was written"]; 23-24.)  Little institutional

14   knowledge remains at BLM from that period, and the archives, while no means bare with respect

15   to conditions extant in 1980, are hardly complete.  (*Id;* WMP AR 211405.)  What's more, the 1980

16   data that *do* exist were compiled using techniques that no longer constitute or conform to best

17   scientific practices, so the information would be suspect from the get-go and vulnerable to legal

18   challenge.  WMP AR 211405 [Modern GPS equipment "not in existence in the mid-1980's"].

19        Ultimately, plaintiffs have not shown that the analytical baseline used in the EIS

20   violates NEPA.  For their own reasons, plaintiffs want BLM to compare the WEMO Plan against

21   conditions that may have existed 28 years ago.  However, no statute, regulation, or case decision

22   requires that BLM conduct such an analysis.  BLM's determination of what constitutes the proper

23   EIS baseline is entitled to deference and should not be disturbed here.  *See, Kleppe v. Sierra Club,*

24   427 U.S. 390, 410 n.21 (1976); *Lands Council, supra,* at 993-994..

25        **3.   NEPA Does Not Require That BLM Demonstrate the Effectiveness of
          the Route Designation Network**

26

27        Plaintiffs most novel NEPA argument is that BLM was required to demonstrate, in

28   the EIS, that the adopted Route Designation Network would be effective in minimizing OHV

---

17

1   impacts on natural and cultural resources.  (Pltf. FLPMA Brf., at 23-25.)  There are two problems

2   with plaintiffs' position – one procedural and one substantive.  As a procedural matter, plaintiffs

3   never alleged in the Second Amended Complaint that the EIS failed to address the effectiveness of

4   the Route Designation Network.  (*See,* Second Amended Complaint, at 33-35, 41-43.)  Federal law

5   in the Ninth Circuit is clear that unless an allegation is set forth in the operative complaint, it

6   cannot be raised in a motion for summary judgment or at trial.  *Carr v. Pacific Maritime*

7   *Association,* 904 F.2d 1313 (9th Cir. 1990) (court will not consider allegations not stated in the

8   complaint.)  As a result, plaintiffs cannot pursue this argument here.

9           Leaving the procedural objection to one side, however, plaintiffs' "effectiveness"

10  argument also operates upon an incorrect premise – *i.e.,*  it assumes the Route Designation

11  Network is *a mitigation measure* to reduce other impacts of the Plan,[12] when in fact it is a project

12  in its own right, with its own EA.  The only NEPA issue here is whether the EA and/or EIS

13  adequately addressed the environmental impacts of the WEMO Route Designation Network, not

14  whether the route network would effectuate the objectives of the WEMO plan.  This second issue

15  is a policy question, not a legal one.  As such, it is not an inquiry this Court is authorized or

16  qualified to pursue.  Policy issues are by law assigned to the appropriate federal agency—in this

17  case, BLM.  And if BLM believes the OHV route network will enable it to meet its multiple use

18  and conservation goals, neither plaintiffs nor the Court may second-guess BLM's decision to

19  approve that network.

20  **C.      THE EVIDENCE SUPPORTS THE BIOP'S NO JEOPARDY FINDING RE OHV IMPACTS ON**
        **DESERT TORTOISES**

21

22          In their Opening Brief, plaintiffs repeat the time-worn argument that desert tortoises are

23  declining throughout their range and that OHV use is largely responsible for this problem.  (Pltf.

24  ESA Brf., at 1, 3, 4, 8, 9, 11-18.)  OHV Intervenors, however, demonstrated through citations to

25  the AR that this argument no longer finds support in the technical evidence.  (OHV Intervenor's

26  Opening Brf., at 25-29.)  In fact, the scientists who comprise the Reassessment Team for the

27  Desert Tortoise Recovery Plan now acknowledge that the study plot data used to predict area-wide

28  _____
    [12]     *See*, Pltf. FLPMA Brf., at 24.

1  and region-wide population trends were simply inadequate to such a purpose.  *Id.* at 25-26; WMP

2  AR 205472-75; 205523; 205539.  New monitoring tools and statistical models have since been

3  developed, but even these are not sophisticated enough to discern population trends.  WBO AR

4  14875; OHV Intervenor's Opp. at 24 (citing WSupp ITS 00465, 00469).

5      This does not mean, however, that there have not been tortoise die-offs in select areas of

6  the Western Mojave Recovery Unit.  There have been.  The issue is whether those die-offs can be

7  causally linked to OHV use; and here, plaintiffs have failed to make their case.  Time after time,

8  plaintiffs assert the OHVs "take" tortoises by crushing them, caving in their burrows, or

9  fragmenting their habitat to such an extent that the species can no longer function.  But assertions

10  are not evidence, and plaintiffs have presented little proof to substantiate their claims.

11      Ultimately, plaintiffs must confront the brute fact that OHVs are not the tortoise-killing

12  machines they thought they were.  Few species have been studied as extensively as desert

13  tortoises.  They have been monitored, surveyed, tested for disease, and assessed for real and

14  potential threats, including those posed by OHV recreation.  Yet, despite all of this study, FWS

15  recently concluded that: "We have no quantitative data on how many desert tortoises are killed and

16  injured by vehicle use on open and limited routes."  NSupp ITS 00666, 0645.  Plaintiffs have

17  identified little evidence to disturb this conclusion.

18      What, then, about habitat fragmentation?  Plaintiffs claim, without evidence, that OHV

19  trails create barriers to tortoise mobility and, as a consequence, contribute to habitat fragmentation.

20  (Pltf. ESA Brf., at 15-16.)  FWS, meanwhile, takes a different view, holding that:

21          "unpaved roads that are used infrequently likely do not pose a threat of
22          fragmentation; *we are unaware of any dirt road or track within critical habitat
            of the desert tortoise that is so heavily traveled that movement of desert tortoises*
23          *would be precluded*."  WBO 14876.  (*Emphasis added*)[13]

24      As the entity with presumptive expertise in the area of wildlife biology, FWS is entitled to

25  deference on this point.  *See, Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 377

26

27  [13]    This statement implicitly addresses two other issues.  First, it indicates that the OHV trails in tortoise critical
    habitat have not resulted in vehicle strikes.  Second, it establishes that such trails have not (at least as of yet) developed
28  the kind of "berms" that trap tortoise and prevent their escape.

(1989); *see also, Lands Council, supra,* at 993, 1000 (agency entitled to rely on own experts when specialists express conflicting views); *see also, Selkirk Conservation Alliance v. Forsgren,* 336 F.3d 944, 954 (9th Cir. 2003) ("Disputes involving 'primary issues of fact' must be resolved in favor of the expert agency so long as the agency's decision is based on a reason evaluation of the relevant factors").  FWS is charged with reviewing the best scientific evidence available and consulting with BLM about the impacts of the proposed desert plans.  It is in the best position to determine whether OHV trails frustrate tortoise mobility.  *See, Southern Utah Wilderness Alliance v. Norton,* 326 F.Supp.2d 102, 113 (D.D.C. 2004) ("The agency still has discretion to rely on its chosen experts or research").  Yet plaintiffs refuse to yield.  Instead, they seize on the single word "precluded" and argue that FWS has now imposed a new and unreasonably high threshold for determining when adverse modification of critical habitat occurs:

> "Thus, FWS both dismisses the impacts and raises the bar by requiring a showing that desert tortoise movement is entirely *precluded* in order to consider any adverse impact of routes on desert tortoise critical habitat -- thus also conflating destruction and adverse modification." (Pltf. ESA Brf., at 16.) (*Emphasis in original.*)

This is another example of plaintiffs seeing villains where none exist.  When considered in its proper context, FWS's use of the word "precluded" does not evince a new legal or regulatory standard.  FWS simply meant to convey that, based on the data it has reviewed, dirt trails do not operate to prevent tortoises from moving between habitat areas.  This finding is consistent with the other data in the record indicating that OHVs rarely if ever strike tortoises.  FWS was not attempting to "conflate" habitat *destruction* with adverse habitat *modification*, as claimed by plaintiffs.  WBO AR 14822, 14876.  Instead, FWS was simply pointing out that there is no evidence that tortoises cannot cross OHV trails safely.

## III.   CONCLUSION

For the foregoing reasons, the Court should deny plaintiffs' Cross-Motion for Summary Judgment and all relief requested therein, and should instead grant the Federal Defendants' Motion for Summary Judgment, thus allowing the WEMO Plan, its EIS, and its BiOp to stand.  Summary

1   Judgment in favor of the Federal Defendants would also eliminate the last litigation cloud on the

2   BiOp for the NECO Plan.

3

4   September 22, 2008                          Respectfully submitted,

5                                               David P. Hubbard
                                                Gatzke Dillon & Ballance LLP

6
                                                Attorneys for Intervenor-Defendants AMA District
7                                               37, *et al.*

8                                               By _____/s/ David P. Hubbard_____
                                                        David P. Hubbard
9

10
                                                Dennis L. Porter
11                                              Dennis L. Porter Attorney at Law

12                                              Attorney for Intervenor-Defendants Blue Ribbon
                                                Coalition, California Association of 4 Wheel Drive
13                                              Clubs and United 4 Wheel Drive Associations

14
                                                By_____/s/ Dennis L. Porter_____
15                                                      Dennis L. Porter

16

17                                              Paul A. Turcke
                                                Moore Smith Buxton & Turcke
18

19                                              Attorney for Intervenor-Defendant California
                                                Association of 4 Wheel Drive Clubs
20
                                                By_____/s/ Paul A. Turcke_____
21                                                      Paul A. Turcke

22

23

24

25

26

27

28

*OHV Interventors' Brief in Opposition to Plaintiffs' Motion for Summary Adjudication*