United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,

                Plaintiffs,

  v.

U.S. BUREAU OF LAND MANAGEMENT, *et al.*,

                Defendants.

                                     /

No. C 06-4884 SI

**ORDER RE: SUMMARY JUDGMENT MOTIONS**

**INTRODUCTION**

      Plaintiffs are eleven environmental organizations[1] who have sued the Bureau of Land Management ("BLM") and the U.S. Fish and Wildlife Service ("FWS"). The BLM manages a vast area of public land known as the California Desert Conservation Area ("CDCA"), home to a number of protected species, including the threatened desert tortoise and an endangered plant, the Lane Mountain milk-vetch. FWS consults with the BLM and is required to evaluate BLM actions that affect these protected species.

      Plaintiffs' claims arise out of the BLM's approval of three land management plans that amend the California Desert Conservation Area Plan of 1980, the land use plan governing the CDCA: the West Mojave ("WEMO") Plan; the Northern and Eastern Mojave ("NEMO") Desert Management Plan, and the Northern and Eastern Colorado ("NECO") Desert Coordinated Management Plan. With respect to

---

     [1] Defendants do not challenge plaintiffs' standing, and have conceded that at least one or more of the plaintiffs meets the necessary requirements to challenge the agency actions at issue here.

the WEMO Plan, plaintiffs claim that the BLM's designation of an extensive "Off-Highway Vehicle" ("OHV") route network throughout the WEMO planning area violates the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701-85.  Plaintiffs also claim that the *Final Environmental Impact Statement and Report for the West Mojave Plan* ("FEIS") prepared for the WEMO Plan violates the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*  Finally, plaintiffs claim that Biological Opinions ("BiOps") issued by the U.S. Fish and Wildlife Service for the WEMO, NEMO and NECO Plans do not comply with the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-44, and that all three management plans imperil the desert tortoise and the Lane Mountain milk-vetch.[2]

The Court recognizes the complexity of the issues presented in this case, and that defendants have been given the difficult task of addressing the interests and needs of OHV recreationists while at the same time protecting listed species as required by law.  In deciding the pending summary judgment motions, the Court has been mindful that its review is "narrow" but "searching and careful," *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989), and that the Court will "reverse a decision as arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (internal citations omitted).

In summary, after careful consideration of the parties' papers and the arguments of counsel, as well as of the voluminous administrative record, the Court concludes the BLM violated the FLMPA and the NEPA in numerous respects, but that defendants complied with their obligations under the ESA. With regard to FLPMA, the BLM's route designation process – insofar as that process is documented

---

[2]  FWS issued a consolidated BiOp for the NEMO and NECO Plans on March 31, 2005, NBO 12535-12737, and a separate BiOp for the WEMO Plan on January 9, 2006, WBO 14752. This opinion uses the parties' citation style when citing to the administrative record.  Thus, citations to the NEMO/NECO BiOp and amended Incidental Take Statement are "NBO ____" and "NSupp ___"; citations to the WEMO BiOp and amended Incidental Take Statement are "WBO ____" and "WSupp ____"; and citations to the administrative record for the WEMO, NECO and NEMO plans are "AR _____" or "SAR ____."

in the administrative record – did not comply with regulations mandating that the BLM consider various "minimization criteria" when designating OHV routes. In addition, because the WEMO Plan authorizes numerous OHV routes that were not in existence in 1980, the WEMO Plan is inconsistent with the governing CDCA land use plan, which limits OHV routes to those existing in 1980. With regard to NEPA, the Court concludes that the FEIS is flawed because it does not contain a reasonable range of alternatives to the proposed action, and its discussion of the "no action" alternative is incomplete. However, the Court finds that other aspects of the FEIS comply with NEPA, such as the FEIS's discussion of mitigation measures, and its analysis of some of the impacts of the WEMO Plan.

Turning to the ESA claims and the two BiOps at issue, the Court finds that FWS considered all relevant factors, and that its analyses and conclusions are reasoned and supported by the record. The BiOps explain in detail why FWS concluded that the WEMO and NECO Plans would not jeopardize the continued existence of the desert tortoise and the Lane Mountain milk-vetch, as well as why those plans would not destroy or adversely modify designated critical habitat of the desert tortoise. The Court also finds that the amended Incidental Take Statements ("ITSs") for both BiOps comply with the law.

## BACKGROUND

### I.     Statutory background

####     A.     Federal Land Policy and Management Act

The FLPMA, 43 U.S.C. §§ 1701-1785, declares that public lands must be managed for multiple uses in a manner that will protect the quality of the scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values, but also provides for outdoor recreation and human occupancy and use. *See* 43 U.S.C. § 1701(a)(7) & (8).

As part of FLPMA, Congress designated 25 million acres of southern California as the CDCA. 43 U.S.C. § 1781(c). Congress declared in FLPMA that the CDCA is a rich and unique environment teeming with "historical, scenic, archeological, environmental, biological, cultural, scientific, educational, recreational, and economic resources." *Id*. Congress found that this desert and its resources are "extremely fragile, easily scarred, and slowly healed." *Id*. For the CDCA and other public lands, Congress mandated that the BLM "shall, by regulation or otherwise, take any action necessary

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

to prevent unnecessary or undue degradation of the lands." *Id.* § 1732(b).

Of particular relevance to this case are regulations addressing OHV[3] use on public lands.  In 1978, the BLM promulgated 43 C.F.R. § 8342.1, which governs the opening of OHV routes within public lands under the agency's control.  *See* Recodification of Recreation Regulations, 43 Fed. Reg. 40,734 (Sept. 12, 1978).  43 C.F.R. § 8342.1 provides:

> The authorized officer shall designate all public lands as either open, limited, or closed to off-road vehicles. All designations shall be based on the protection of the resources of the public lands, the promotion of the safety of all the users of the public lands, and the minimization of conflicts among various uses of the public lands; and in accordance with the following criteria:
>
> (a) Areas and trails shall be located to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability.
>
> (b) Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats. Special attention will be given to protect endangered or threatened species and their habitats.
>
> (c) Areas and trails shall be located to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.
>
> (d) Areas and trails shall not be located in officially designated wilderness areas or primitive areas. Areas and trails shall be located in natural areas only if the authorized officer determines that off-road vehicle use in such locations will not adversely affect their natural, esthetic, scenic, or other values for which such areas are established.

43 C.F.R. § 8342.1(a)-(d).  These route designation criteria are referred to by the parties and throughout this order as the "minimization criteria."

**B.      The National Environmental Policy Act**

The NEPA requires federal agencies to analyze the environmental impacts of a proposed action before proceeding with that action.  *See* 42 U.S.C. § 4332(2)(C).  Under NEPA and the regulations promulgated thereunder by the Council on Environmental Quality ("CEQ"), federal agencies must

---

[3]    The Court uses defendants' term "Off-Highway Vehicle" and the acronym "OHV." Defendants state that although the term "Off-Road Vehicle" and the "ORV" acronym appear in FLPMA, the CDCA Plan, and BLM regulations, "OHV" is more commonly accepted today as it is consistent with the State of California's usage and avoids confusion with a different "ORV" acronym in the Wild and Scenic Rivers Act.

United States District Court
For the Northern District of California

1  prepare and circulate to the public a comprehensive environmental impact statement ("EIS") so that the

2  environmental impacts can be considered and disclosed to the public during the decision-making

3  process.  *See* 40 C.F.R. §§ 1501.2, 1502.5.  In the EIS, the agency must identify direct, indirect, and

4  cumulative impacts of the proposed action, consider alternative actions (including the alternative of

5  taking no action) and their impacts, and identify all irreversible and irretrievable commitments of

6  resources associated with the action.  *See* 42 U.S.C. § 4332(2); 40 C.F.R. § 1502.14(d).

7

8  **C.      The Endangered Species Act**

9  Congress enacted the ESA to protect and conserve endangered and threatened species.  16 U.S.C.

10  § 1531(b).  "Each Federal agency shall, in consultation with and with the assistance of the Secretary,

11  insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize

12  the continued existence of any endangered species or threatened species or result in the destruction or

13  adverse modification of [designated critical] habitat."  *Id.* § 1536(a)(2); *see* 50 C.F.R. Pt. 402.   After

14  the agencies engage in the consultation process, the consulting agency issues a biological opinion

15  ("BiOp"), which includes a "detailed discussion of the effects of the action on listed species or critical

16  habitat."  50 C.F.R. § 402.14(h)(2).  The BiOp assesses the likelihood of the proposed action resulting

17  in jeopardy to a listed species or destruction or adverse modification to designated critical habitat.  *See*

18  50 C.F.R. § 402.14(g)(4).  If an action is not likely to result in jeopardy, but is reasonably likely to result

19  in "take" incidental to the proposed action, then the consulting agency attaches an ITS to the BiOp.  16

20  U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)(i-v).  If the agency implements the project as proposed

21  and complies with the terms and conditions ("T&Cs") of the ITS, ESA § 7(o)(2) exempts the specified

22  level of take from the ESA § 9 take prohibition.  16 U.S.C. § 1563(o)(2).

23  Congress also directed the Secretary to develop and implement recovery plans to provide

24  guidance for the long-term objective of removing species from the list of endangered or threatened

25  species.  16 U.S.C. § 1533(f)(1).  In 1994, the Secretary prepared a recovery plan for the desert tortoise.

26

27  **II.      Factual background**

28  **A.      Management of the CDCA**

In establishing the CDCA, Congress declared that the California desert is a "total ecosystem that is extremely fragile, easily scarred, and slowly healed," and that it is a rich and unique environment with "historical, scenic, archaeological, environmental, biological, cultural, scientific, educational, recreational, and economic resources." 43 U.S.C. § 1781(a)(1)-(2). Congress also stated that "the use of all California desert resources can and should be provided for in a multiple use and sustained yield management plan to conserve these resources for future generations, and to provide present and future use and enjoyment, particularly outdoor recreation uses, including the use, where appropriate, of off-road recreational vehicles." *Id.* § 1781(a)(4).

The CDCA contains approximately 25 million acres of land, of which the BLM administers slightly less than one-half. AR 221935. The WEMO and NECO Plan[4] areas are located within the CDCA. The BLM issued a long-range management plan for the CDCA in 1980. AR 222401-222555. The CDCA Plan identified 12 plan elements for consideration, including cultural resources, wildlife, vegetation, livestock grazing, recreation, and motorized vehicle access, and the establishment of special management areas, such as Areas of Critical Environmental Concern ("ACEC"), and 11 types of special areas. AR 221936, 221941-222033. The CDCA Plan lists approximately 75 ACECs, including the Desert Tortoise Natural Research Area. AR 222030-220031. Over the years, the CDCA Plan has been amended a number of times. The WEMO and NECO Plans amended the CDCA Plan.

### 1.   1982 amendment to the CDCA Plan and "existing" OHV routes

A central issue in this case relates to the designation of OHV routes in portions of the CDCA. In 1982,[5] the BLM significantly revised the 1980 CDCA Plan to address OHV use. The BLM determined that public land areas within the CDCA would be designated as "open," "closed," or

---

[4] The parties generally refer to the NEMO Plan in conjunction with the NECO Plan, and collectively as "NECO Plan," and this order similarly will refer to the "NECO Plan."

[5] The BLM's summary judgment papers state that the CDCA plan was amended in 1983. However the CDCA plan, as amended, that is contained in the record reflects that those amendments occurred in 1982. *See, e.g.*, AR 221929 (explaining that amendment changes are referenced with the amendment number and year in brackets).

"limited" based upon the particular multiple use classification for the area.[6] AR 222004. Within "open" areas, vehicles could travel anywhere, while vehicle travel was prohibited in "closed" areas. *Id*. With regard to "limited" areas, the CDCA Plan, as amended in 1982, states:

> "Limited" vehicle access means that motorized-vehicle access is allowed only on certain "routes of travel," which include roads, ways, trails, and washes. At the minimum, use will be restricted to existing routes of travel. *An existing route of travel is a route established before approval of the Desert Plan in 1980, with a minimum width of two feet, showing significant surface evidence of prior vehicle use or, for washes, history of prior use.* Where necessary, other limitations will be stipulated.

> In all areas of limited vehicle use, special attention will be given to identifying conflict areas, zones of route proliferation, and special sites or resources being damaged by vehicle use. The public will be involved in each step of this process. Appropriate actions will then be taken to reduce or eliminate the problem, depending on the multiple-use class and degree of control needed.

AR 222005 (emphasis added). Somewhat confusingly, in addition to OHV *areas* being designated as "open," "closed," or "limited," OHV *routes* could also be designated as "open," "closed," or "limited." *Id*. "Open" routes were open to OHVs, generally without restriction; "closed" routes prohibited OHV use except for certain official, emergency or otherwise authorized vehicles; and "limited" routes permitted OHVs, subject to limitations on the number and types of vehicles allowed, as well as restrictions on time or season and speed limits. AR 222005-222006. The CDCA Plan provided special management considerations for OHV use on washes, sand dunes and dry lakes. AR 222006.

Although the CDCA Plan defines "existing routes" as those established before approval of the 1980 CDCA Plan and provides a description of the characteristics of those routes, there was no complete inventory of routes existing in 1980 when the plan was adopted. AR 230282. The original 1980 plan relied on vehicle access information depicted on motorized vehicle interim access guides based on data from at least 1973 in identifying an interim route management program. AR 222009. When the 1980

---

[6] The CDCA Plan established four primary multiple use classifications of public land: "C" (potential wilderness/designated wilderness areas); "L" (limited areas established to protect sensitive, natural, scenic, ecological and cultural resource values); "M" (moderate use areas established to provide a controlled balance between higher intensity use and protection of public land resources, to provide for mining, livestock grazing, recreation, energy, and utility development while providing management to conserve desert resources and to mitigate for damage that permitted use may cause); and "I" (intensive use areas providing for concentrated use of lands and resources to meet human needs while providing reasonable protection, mitigation, and rehabilitation to sensitive natural and cultural values). Unclassified lands account for scattered and isolated public land parcels within the CDCA. AR 221941-221942.

United States District Court
For the Northern District of California

7

United States District Court
For the Northern District of California

CDCA Plan was approved, the interim designations became effective. *Id.* In 1982 when the CDCA Plan was amended, the BLM replaced those interim designations with the guideline that "existing routes of travel" may be used in Class L, Class M, and certain Class I areas. *Id.* There is, of course, an inherent tension between the CDCA Plan's statement that OHV routes are limited to those in existence at the time of the adoption of the 1980 Plan, and the factual reality that the BLM did not have an inventory or listing of what those routes were in 1980. In part, the roots of the current litigation can be traced to this conflict.[7]

### 2.    1985-1987 OHV route designations

After the CDCA Plan was amended in 1982, the BLM began the process of creating an inventory of existing OHV routes using aerial photographs from 1979 and, where available, U.S. Geological Survey base maps. AR 230283. The BLM concluded that "the photo coverage, in and of itself, was not [an] adequate means of identifying all existing routes." *Id.*[8] As a result, BLM staff conducted a route designation project that resulted in the "1985-1987 OHV route designations." The FEIS for the WEMO Plan describes this process as follows:

> **1985-87 Off-Road Vehicle Designations:** BLM conducted a field and map inventory of off highway vehicle routes throughout the planning area in the mid-1980s and, based upon that inventory, identified a network of open motorized vehicle access routes. BLM personnel inventoried and evaluated existing routes of travel. Information from existing maps and aerial photos was supplemented by field checks. This information was then

---

[7] As the author of the report on the BLM's 1985-1987 route designation project (discussed *infra*) colorfully stated,

> Enter the 1982 Desert Plan amendment to the Motorized Vehicle Access Element. For the sake of time as well as my own sanity, I am not going to attempt to explain this amendment to you here. . . . In brief this amendment, in conjunction with various district Instruction Memorandums [], set the stage for the current route designation concept and procedure. In concept it represents a somewhat perverted definition of "Designated routes and trails" by attempting to identify and designate all roads and trails in the desert while maintaining a user perception of "Existing roads and trails" knowing it could never fully accomplish the first task. Interpret it as you will, but in my opinion, the current system falls somewhat short.

AR 230282 (from "1985 and 1987 Route Designations: Barstow and Ridgecrest Resource Areas," by Bruce DiGennaro, Sept. 15, 1987).

[8] The parties' disagreement on whether the 1979 aerial photographs are a sufficient basis for identifying the extant routes in 1980 is discussed *infra*.

utilized to create a known route inventory that primarily consisted of known "two-track" routes (i.e., "single-track" motorcycle routes were generally not part of the inventory). Public meetings were conducted and members of the public also reviewed these route inventories. Criteria for determining which routes were to remain open was based upon public access needs, recreational values and resource conflicts. Following public meetings, decisions to designate the route network were announced.

On August 21, 1985, BLM published a notice in the Federal Register titled *Off-Road Vehicle Designation Decisions; Ridgecrest Resource Area, CA* (Federal Register, Vol. 50, No. 182). Two years later, on June 19, 1987, BLM published Federal Register notice titled *Off-Road Vehicle Route Designation Decisions for the California Desert District, Barstow Resource Area* (Federal Register, Vol. 52, No. 118, p. 23364); and, on September 22, 1987 BLM published a Federal Register notice titled *Off-Road Vehicle Route Designation Decisions for the California Desert District, Barstow Resource Area* (Federal Register, Vol. 52, No. 183, p. 35589). These notices opened 2,949 miles of off highway vehicle routes.

AR 202199; *see also* AR 230278-230795 ("1985 and 1987 Route Designations: Barstow and Ridgecrest Resource Areas).

### 3.     ACEC OHV route designations

In addition to the 1985-1987 OHV route designations, between 1982 and 1994 BLM designated 317 miles of OHV routes within each of the 20 ACECs in the WEMO Plan area. AR 202199-202202. Because these routes, referred to as the "ACEC routes," were designated separately from the 1985-1987 OHV routes, the ACEC routes did not always connect seamlessly to the 1985-1987 network. AR 201843.

### 4.     Development of the WEMO Plan and OHV route designations

The WEMO Plan establishes a 5,098 mile OHV route network in the WEMO Plan area, and a significant portion of these routes are derived from the 1985-1987 OHV routes, as well as the ACEC routes. AR 201843. The background leading up to the WEMO OHV route network is long and complicated, but a full recounting is necessary to understanding the claims and issues in this case.

### a.     Ord Mountain route designation

In 1995, BLM staff in the Barstow Field Office designated an emergency OHV route network for the Ord Mountain planning unit due to a "noted increase in regional route proliferation, concern for

1  desert tortoises within the designated Ord Mountain Desert Tortoise Critical Habitat Unit [], and other

2  at-risk natural resources." AR 221204. According to the record, the emergency designation involved

3  only limited public input, and "[a] consensus emerged between BLM and representatives of several

4  interest groups, that a 100 percent vehicle route inventory, as well as a higher level of public

5  involvement, was needed." *Id*. As a result, the BLM began a pilot route designation program in the Ord

6  Mountain planning unit. The pilot program used an inventory based on air photos and ground

7  verification. AR 221205. The results of the pilot program were examined in an Environment

8  Assessment published in January 2000, AR 221195, and were later incorporated into a larger Western

9  Mojave Desert Off Road Vehicle Designation Project. The Western Mojave Desert Off Road Vehicle

10  Designation Project was the subject of a 2003 Environmental Assessment ("2003 EA"), and was

11  ultimately approved by the BLM and incorporated into the CDCA. The 2003 EA, and the BLM's

12  decision to approve the 2003 EA, played a significant role in the BLM's OHV route designation process

13  and profoundly affected the OHV route network adopted in the WEMO plan. The 2003 EA is discussed

14  in greater detail *infra*. AR 211390.[9]

15

16                    **b.    The "Box" effort**

17          Between June and August 1998, the BLM met in Barstow (in an office known as "the Box") and

18  in Ridgecrest. The two Box teams used aerial photography, data from desert tortoise studies dating back

19  to the 1970s, and other resources to identify "access and resource" attributes such as "recreational,"

20  "redundant route," "tortoise," "sensitive plants," "cultural," and "8342 criteria." AR 240696. Using

21  this data, the BLM created large scale Geographic Information System ("GIS") maps to develop route

22  inventories.

23  _____

24          [9]   The OHV routes designated through the Western Desert Off Road Vehicle Designation Project, which include the routes designated through the Ord Mountain pilot, were ultimately incorporated into the CDCA Plan by amendment on June 30, 2003. AR 206771. In March 2003, the

25  BLM released the *Western Mojave Desert Off-Road Vehicle Designation Project Environmental Assessment and Draft CDCA Plan Amendment* ("2003 EA"). AR 211373-211726. On June 13, 2003, the BLM released the *Proposed West Mojave Plan Draft Environmental Impact Report and Statement*.

26  AR 207756-210195. ("DEIS") On June 30, 2003, the BLM issued a *Decision Record CDCA Plan Amendment Western Mojave Desert Off Road Vehicle Designation Project* ("2003 ROD"). AR 206756-

27  77. The OHV routes designated in the 2003 EA – which were then incorporated into the CDCA plan – became the "no action" alternative in the FEIS for the WEMO.

28

**United States District Court**
For the Northern District of California

According to the declaration of William Haigh,[10] Project Manager for the WEMO Plan, the Box process resulted in recommendations regarding whether to keep certain vehicle routes open or closed, but the rationale for each recommendation was not recorded. Haigh describes the Box process in detail, and states that the BLM held a series of public meetings regarding the Box recommendations. Haigh Decl. ¶¶ 32-33 (Docket No. 82-4). According to Haigh, the public response was highly critical due to allegedly inaccurate photo inventories and the lack of explanation for route closures. *Id.* In response to the public criticism, the BLM chose to disregard the Box effort's recommended route designations, as well as much of the data compiled in the process.

### c.     Western Mojave Desert Off Road Vehicle Designation Project

On November 3, 1999, the WEMO Plan "Supergroup," consisting of representatives of over 100 jurisdictions, agencies and non-governmental agencies, and private individuals, established four task groups to prepare the WEMO Plan. AR 221532-221538. The WEMO project manager, Haigh, recommended a new on-the-ground field survey of OHV routes and route designations, and various stakeholders agreed. The resulting effort became the Western Mojave Desert Off Road Vehicle Designation Project.

The BLM first divided the entire WEMO region into three general groups comprised of (1) twenty-one sub-regions, (2) the existing ACECs, and (3) remaining areas with routes designated in 1985-1987. AR 201830, 211393-211394. Eleven of the twenty-one sub-regions were selected for "redesign" based in part on the designation of the desert tortoise and Lane Mountain milk-vetch as threatened and endangered species. AR 201832. Nine of the eleven selected sub-regions were redesigned using the "Decision Tree" process discussed in detail below.[11] All areas outside the redesign area were "reviewed to ensure that they were compatible with the West Mojave Plan's conservation strategy and were in compliance with federal regulations (specifically 43 CFR 8342)." AR 201842-

---

[10] The administrative record was supplemented with information about the "Box" effort.

[11] The other two redesign sub-regions, called Ridgecrest and El Paso, were designated using a "Collective Access Planning Area process," which plaintiffs do not appear to challenge except insofar as the designations made in these regions include routes that did not exist in 1980. *See* Discussion I.C., *infra.*

11

201843.

The BLM retained the consulting firm CH2M Hill to conduct on-the-ground surveys in ten of the eleven redesign sub-regions using GPS equipment; those surveys occurred between September 2001 and March 2002.[12]  The data collected during these surveys concerned route data (type, condition, level of use), and recreation or commercial data (camping, mining, utilities).  AR 201832; *see also* SAR 3-320433-Public (chart of data to be surveyed).  The BLM downloaded the resulting data into a database for integration with biological data regarding the desert tortoise, as well as population data.  AR 201832, 201841.

The BLM further divided the surveyed redesign sub-regions into Motorized Access Zones ("MAZs") which possessed similar "issues" and "goals" as defined by the BLM.  AR 211396-211403. The "issues" include some mentioning of biological resources other than the desert tortoise.  *See, e.g.*, AR 211399 ("location of very rare Kern buckwheat.").  Under "goals," almost every MAZ lists the elimination of redundant routes, several list "minimize land-use conflicts," and three MAZs cite 43 C.F.R. § 8342.1 specifically.[13]  The BLM redesign teams used maps of each MAZ, which contained information about "biology polygons" and "disturbance polygons."  AR 201841.   The biology and disturbance polygons were limited to information obtained from desert wildlife management areas ("DWMAs"), and identified areas where tortoise sign was higher than average (the biology polygons), as well as areas where the amount of vehicle-related/dependent disturbance was greater than average (the disturbance polygons).  *Id.*  The BLM then applied a "Decision Tree" to all of the 5200 routes identified in the redesign areas to determine which routes should be designated "open" and which should be closed.  The Decision Tree is the focus of plaintiffs' FLPMA claims, and is discussed in greater detail *infra*.

---

[12]  The remaining sub-region, Juniper, was mapped in Fall 2003 due to time constraints and the prior existence of apparently good data.  AR 201832.  The route designations for this sub-region were described in the FEIS for the WEMO Plan, and integrated into the CDCA Plan via a March 2006 Record of Decision ("2006 ROD") approving the WEMO Plan amendment.  AR 201847-201850.

[13]  These goals are stated as: "[r]ecognize that better tortoise habitat is typically found in areas with slopes less than 20%; therefore allow for adequate recreational commercial, private property access, yet eliminate duplicity in order to minimize impacts to physical, biological and cultural resources (43 C.F.R. 8342.1)."  AR 211400-211401.

United States District Court
For the Northern District of California

For the non-redesign areas, the record contains much less information about the process used to evaluate OHV routes. The 2003 EA states:

> **Revision of 1985-87 and ACEC Off Road Vehicle Designations:** Those portions of the existing motorized vehicle access network that were not included in the 2002 route designations were reviewed to ensure that they were compatible with the conservation strategy being developed by the West Mojave Plan and were in compliance with federal regulations (specifically, 43 C.F.R. § 8342). In some cases, minor adjustments were necessary, based upon available new information (resource, law enforcement, land use or recreation concerns). This arose, in part, due to the comparatively incomplete nature of the field survey conducted for the 1985-87 network, which lacked modern GPS equipment (not in existence in the mid-1980s) and which did not include most technical 4WD and motorcycle routes.

AR 211405. The 2003 EA provides five specific examples of how route information was updated in different regions. AR 211405-211406. The 2005 FEIS contains an almost identical description of how OHV routes in "Public Lands Not Included in Redesign Area" were evaluated, and provides the same five examples. AR 201842-201843.

In March 2003, the BLM released the *Western Mojave Desert Off Road Vehicle Designation Project Environmental Assessment and Draft CDCA Plan Amendment* for public review. AR 211373-211726. This document, the "2003 EA," addressed the route network developed through the Decision Tree process, as well as the routes designated in the non-redesign areas. On June 30, 2003, FWS issued a "biological opinion that the network of routes of travel proposed by the Bureau is not likely to jeopardize the continued existence of the desert tortoise or the Lane Mountain milk-vetch or to destroy or adversely modify critical habitat of the desert tortoise." AR 206749.[14] The BLM then executed the 2003 ROD. AR 206756-206777.

>     **5.** ***Center for Biological Diversity v. BLM ("CBD I"), C No. 00-927 WHA (N.D. Cal.) and Center for Biological Diversity v. BLM ("CBDII"), C No. 03-2509 SI (N.D. Cal.), and adoption of the WEMO and NECO Plans***

On March 16, 2000, the Center for Biological Diversity, *et al.*, filed suit against the BLM for its alleged failure to consult with FWS to address the CDCA Plan's impact on the desert tortoise and other protected species. The court later approved a consent decree with five stipulated agreements and numerous interim measures. Under the consent decree, the BLM agreed to consult with FWS on, *inter*

---

[14] Plaintiffs do not challenge this BiOp.

13

*alia*, the WEMO, NECO and NEMO Plan areas. The BLM also agreed to restrict cattle and sheep grazing in desert grazing allotments until a decision on the plan amendments, and to defer final route designation and maintain the existing emergency route closure in the Ord Mountain area until it completed the WEMO Plan, when the interim measures would expire.

In May 2002, the BLM published a *Revised Notice of Intent to Prepare West Mojave Plan and Environmental Impact Statement*, AR 214296-214297, and held public scoping meetings. AR 201668. On June 13, 2003, the BLM released the *Proposed West Mojave Draft Environmental Impact Report and Statement* ("DEIS") for public review. AR 207756-210195. In January 2005, the BLM published the FEIS. AR 201625-205379. On January 9, 2006, FWS issued a BiOp concluding that implementation of the WEMO Plan was not likely to jeopardize the desert tortoise or adversely modify desert tortoise critical habitat. WBO 14752-14949. In March 2006, the BLM issued the 2006 ROD to adopt the WEMO Plan to amend the CDCA Plan. AR 200044-200066.

In February 2001, the BLM issued a combined Proposed California Desert Conservation Area Plan Amendment for the Northern and Eastern Colorado Desert Coordinated Management Plan ("NECO Plan"), and a DEIS for the proposed plan. On June 17, 2002, FWS issued a BiOp regarding the impact of the NECO Plan. The BiOp concluded that the NECO Plan was not likely to jeopardize the continued existence of the desert tortoise and was not likely to destroy or adversely modify designated critical habitat of the desert tortoise.

On May 27, 2003, Center for Biological Diversity *et al.*, filed a lawsuit against BLM and FWS challenging the June 17, 2002 BiOp, *Center for Biological Diversity v. BLM (CBD II)*, C No. 03-2509 SI (N.D. Cal.). In 2004, the court held that FWS had relied on an invalid regulatory definition of "adverse modification" when analyzing effects to designated desert tortoise critical habitat in the June 17, 2002 BiOp. The BiOp was vacated and remanded to FWS with instructions to reissue the BiOp after applying the appropriate definition of adverse modification. On March 31, 2005, FWS issued a new BiOp analyzing the impacts of the CDCA Plan, and the NEMO and NECO Plan amendments on the desert tortoise. It is this March 31, 2005 BiOp, along with the January 9, 2006 BiOp issued by FWS for the WEMO Plan amendment, that are challenged in this lawsuit in connection with plaintiffs' ESA claims.

United States District Court
For the Northern District of California

1

2      **B.      The desert tortoise and the Lane Mountain milk-vetch**

3       The desert tortoise (*Gopherus agassizii*) is a large, herbivorous reptile, with adults measuring

4  up to 15 inches in shell length and found in portions of the western United States and Mexico.  The

5  Mojave population of the desert tortoise was listed as a threatened species in 1990.  *See* Endangered and

6  Threatened Wildlife and Plants; Determination of Threatened Status for the Mojave Population of the

7  Desert Tortoise, 55 Fed. Reg. 12,178 (Apr. 2, 1990).  On February 8, 1994, FWS published a final

8  designation of critical habitat for the Mojave population of the desert tortoise. Endangered and

9  Threatened Wildlife and Plants; Determination of Critical Habitat for the Mojave Population of the

10  Desert Tortoise, 59 Fed. Reg. 5820 (Feb. 8, 1994); NBO 900-47.  FWS identified 12 areas,

11  encompassing a total of 6.5 million acres, as critical habitat.  NBO 908.  Eight units totaling 4.8 million

12  acres were designated in California; the rest are located in Nevada, Utah, and Arizona.  *Id.*

13       In June 1994, FWS finalized the Recovery Plan for the Mojave population of the desert tortoise,

14  which describes a strategy for recovering and delisting the desert tortoise.  NBO 546-899.  The

15  Recovery Plan divides the range of the Mojave population of the desert tortoise into 6 recovery units

16  and recommends that land management agencies establish 14 DWMAs throughout the recovery units,

17  with at least one DWMA in each recovery unit.  NBO 582, 596, 598.  The Recovery Plan also identifies

18  activities which directly or indirectly threaten the desert tortoise and its habitat, such as domestic

19  livestock grazing and OHV use.  NBO 700-42.  The Recovery Plan generally recommends that grazing

20  not be permitted in DWMAs because no data exist to show that cattle grazing can be compatible with

21  desert tortoise recovery.  NBO 618.  The Recovery Plan also recommends establishing vehicular

22  controls and notes that the "recommendations are presented to aid land managers in the development

23  of management plans," such as the  NECO and WEMO Plans, as "DWMA-specific management plans

24  cannot yet be precisely defined."  NBO 606.

25       The Lane Mountain milk-vetch (*Astragalus jaegerianus*) ("LMMV) is a slender light-gray or

26  greenish perennial plant species in the pea family which grows 12 to 27.5 inches tall.  WBO 14911-12

27  (describing biology and ecology of the LMMV).  The LMMV is known only from four occurrences and

28  "does not appear to have been more widespread than is currently known; no extirpations of populations

have been documented." WBO 14913, 14916 (discussing occurrences and distribution of LMMV). The LMMV was listed as an endangered species on October 6, 1998. 63 Fed. Reg. 53596. In the final critical habitat rule published on April 8, 2005, FWS did not designate critical habitat for the species. Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for Astragalus jaegerianus (Lane Mountain milk-vetch), 70 Fed. Reg. 18,220 (Apr. 8, 2005). The occurrences of LMMV in the WEMO planning area are entirely within areas designated as critical habitat for the desert tortoise. WBO 4915-16. On January 9, 2006, FWS issued a BiOp concluding that implementation of the CDCA Plan, as amended by previous amendments and the proposed WEMO bioregional plan, was not likely to jeopardize the LMMV. WBO 14921-22. Plaintiffs challenge that "no jeopardy" finding.

### III.   Procedural background

This lawsuit was filed on August 14, 2006. By order filed January 11, 2007, the Court granted a motion by Kern County, San Bernadino County, Imperial County, and the Quadstate County Government Coalition to intervene with full party rights with regard to liability and remedial matters. In addition, by order filed January 4, 2007, the Court approved a stipulation by all parties to allow various OHV interest groups to intervene with full party rights as to remedy issues, and as *amicus curiae* with respect to liability.[15] On February 7, 2008, plaintiffs filed a second amended complaint for declaratory and injunctive relief.

The parties filed cross-motions for summary judgment, and on May 16, 2008 the Court held a hearing on the motions. On August 12, 2008, the Court directed the parties to file revised cross-motions that incorporated two Ninth Circuit decisions issued after the May 16, 2008 hearing, *Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) (en banc), and *Oregon Natural Desert Ass'n v. Bureau of Land Management* (*ONDA*), 531 F.3d 1114 (9th Cir. 2008).

### LEGAL STANDARDS

---

[15]   The Counties and the OHV intervenors have filed summary judgment papers in support of defendants' motion for summary judgment and in opposition to plaintiffs' motion. For ease of reference, this order generally refers to "defendants" rather than separately distinguishing between the various defendants and defendants-intervenors.

United States District Court
For the Northern District of California

1

**United States District Court**
For the Northern District of California

## I.      Summary judgment

Summary adjudication is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. *See T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence presented by the parties must be admissible. *See* Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## II.      Review of administrative action

Judicial review of final agency actions is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.  See Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*, 898 F.2d 1410, 1413 (9th Cir. 1990). The court "shall" set aside any agency decision that the Court finds is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA precludes the trial court reviewing an agency action from considering any evidence outside of the administrative record available to the agency at the time of the challenged decision. *See* 5 U.S.C. § 706(2)(E); *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985);

1   *Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991).

2          The Court must determine whether the agency decision "was based on a consideration of the

3   relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton*

4   *Park v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds, Califano v. Sanders*, 430 U.S.

5   99 (1977). The Supreme Court has explained that an agency action is arbitrary and capricious if "the

6   agency has relied on factors which Congress has not intended it to consider, entirely failed to consider

7   an important aspect of the problem, offered an explanation for its decision that runs counter to the

8   evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or

9   the product of agency expertise." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463

10  U.S. 29, 43 (1983). Although the arbitrary and capricious standard "is narrow and presumes the agency

11  action is valid, . . . it does not shield agency action from a 'thorough, probing, in-depth review.'"

12  *Northern Spotted Owl v. Hodel*, 716 F. Supp. 479, 481-82 (W.D. Wash. 1988) (citations omitted). The

13  Court cannot, however, substitute its judgment for that of the agency or merely determine that it would

14  have decided an issue differently. *See Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 377

15  (1989).

16

17                                              **DISCUSSION**

18  **I.      Federal Land Policy and Management Act claims**

19          Plaintiffs challenge the OHV route designations in the WEMO Plan on three grounds. First,

20  plaintiffs contend that the Decision Tree process failed to consider the "minimization criteria" contained

21  in 43 C.F.R. § 8342.1, and further that there is no information or documentation in the administrative

22  record regarding application of that criteria to the Decision Tree routes. Second, plaintiffs contend that

23  there is nothing in the administrative record to show that BLM's designation of OHV routes outside of

24  the redesign areas complied with 43 C.F.R. § 8342.1. Third, plaintiffs contend that the BLM's

25  designation of all new OHV routes after 1980 are arbitrary and capricious because those routes were

26  not "existing routes" in 1980 as required by the language of the CDCA Plan.

27

28

1

United States District Court
For the Northern District of California

**A.     The Decision Tree routes**

Plaintiffs contend that the Decision Tree OHV route designation process is fatally flawed because it did not explicitly consider the minimization criteria contained in 43 C.F.R. § 8342.1.  43 C.F.R. § 8342.1 provides:

> The authorized officer shall designate all public lands as either open, limited, or closed to off-road vehicles. All designations shall be based on the protection of the resources of the public lands, the promotion of the safety of all the users of the public lands, and the minimization of conflicts among various uses of the public lands; and in accordance with the following criteria:
>
> (a) Areas and trails shall be located to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability.
>
> (b) Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats. Special attention will be given to protect endangered or threatened species and their habitats.
>
> (c) Areas and trails shall be located to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.
>
> (d) Areas and trails shall not be located in officially designated wilderness areas or primitive areas. Areas and trails shall be located in natural areas only if the authorized officer determines that off-road vehicle use in such locations will not adversely affect their natural, esthetic, scenic, or other values for which such areas are established.

43 C.F.R. § 8342.1(a)-(d).

The Decision Tree begins by asking "Is the route a commercial right-of-way, officially recognized or maintained or [sic - to?] serve as a regional route that serves more than on[e] sub-region or represents a principal means of connectivity within a sub-region?" AR 211559.  Based on the answer to this question, the reviewer proceeds down the tree, answering further questions such as "Is route closure likely to lead to increased conservation of sensitive species?" and "Are the commercial or private uses of this route adequately met by another route(s) that avoid or minimize the impact to occupied habitat of sensitive species?" *Id.*  At the end of the process, the Decision Tree assigns each route a code which allows a reviewer to determine the path down the Tree, *i.e.*, the answers to each question presented in the Tree.  AR 211585.  Appendix C to the 2003 EA lists each route designated using the Decision Tree, its location, its code assigned by the Decision Tree questions, and the reasons for the recommendation of open or closed.  AR 211584-211725.

1

The Decision Tree is reproduced in full below:

2

BLM AR WMP-211559

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



BLM AR WMP-211559

United States District Court
For the Northern District of California

The Decision Tree also includes footnotes which identify "other concerns that need to be taken into consideration as each question is answered":

**West Mojave Route Designation Tree Footnotes**

1. **Question 2**: Evaluate and take into account:

    • both season and intensity of use as it relates to impacts to sensitive species or their habitat;
    • the number of sensitive species and/or the amount of sensitive habitat potentially impacted;
    • Other areas already designated or set aside or other measures that may be already contributing to the conservation of these species (e.g. Wilderness Areas and raptor nests, bat grates, etc.)

2. **Question 3**: E.g. utility, military mining, ranching facilities; monitoring sites; guzzlers)

3. **Questions 8, 10**: I.e. Would this route closure likely lead to a reduction of those indirect impacts suspected of leading to a significant decline in habitat quality (e.g. litter, poaching, harassment, plinking, etc.) or lead to a decline in impacts that directly negatively impact sensitive species?

4. **Questions 11, 13, 15, 16**: When evaluating the duplicity of this route take into consideration the quality of this route, particularly as it relates to public safety.

5. **\*1**:

    • Are there any other special circumstances that would warrant reconsideration? (e.g. unusual public safety issues, Section 106 considerations, current or future community growth/zoning issues, current or reasonably foreseeable land acquisitions or trades (e.g. for mitigation as part of this planning effort or by other resource organizations/agencies), special permits (e.g. Mining Plan of Operations), environmental benefits of a route (e.g. facilitating the maintenance of a guzzler), legal easements, user conflicts, neighboring uses, etc.).
    • Should a limited designation be used in lieu of either an open or closed designation in order to mitigate for impacts?

AR 211560.[16]

Plaintiffs contend that the Decision Tree method used to designate routes inside the redesign area does not comply with 43 C.F.R. § 8342.1 because it does not address a route's minimization of damage to soil, watersheds, vegetation, air or other resources, such as cultural resources; does not consider minimization of conflicts between OHV uses and compatibility with existing populated areas; does not mention "noise" anywhere; and does not ask if routes dead-end into private land or otherwise lead to

---

[16] The Decision Tree does not define "guzzlers" or "plinking." However, those issues are not material to the questions presented.

21

circumstances where conflicts with private landowners might arise.  Plaintiffs also contend that the sequence of questions in the Decision Tree improperly prefers motorized vehicle access over any other resource.

The issue here is very similar to the one considered by then-District Court Judge Tashima in *American Motorcycle Association v. Watt*, 543 F. Supp. 789 (C.D. Cal. 1982).  *Watt* involved a challenge to the following OHV route designation criteria contained the CDCA Plan: "(1) Is the route new or existing? (2) Does the route provide access for resource use or enjoyment? (3) Are there alternate access opportunities? (4) Does the route cause considerable adverse impacts? (5) Are there alternate access routes which do not cause considerable adverse impacts?" *Id.* at 797.  The court found that these criteria were "presented in such a manner so as to appear to be the exclusive standard pursuant to which route designation decisions are to be made," did not explicitly prohibit route designation in any defined situation, and thus "would permit agency officials to make route designations without the minimization of environmental impacts and conflicts between uses expressly required by 43 C.F.R. § 8342.1." *Id.*

Defendants contend that *Watt* must be "viewed in light of" *Sierra Club v. Clark* (*Sierra I*), 756 F.2d 686 (9th Cir. 1985), and *Sierra Club v. Clark* (*Sierra II*), 774 F.2d 1406 (9th Cir. 1985).  In *Sierra I*, the plaintiffs sought review of the BLM's failure to close a portion of the CDCA previously designated as open to unrestricted OHV use.  756 F.2d at 688.  The plaintiffs relied on  43 C.F.R. § 8341.2, which states that "where the authorizing officer determines that off-road vehicles are causing or will cause considerable adverse effects . . . the authorized officer shall immediately close the areas or trails affected." 43 C.F.R. § 8341.2(a).  The plaintiffs argued that the regulation's use of "shall" required the agency to close all routes for which "considerable adverse effects" were found.  The Ninth Circuit determined that the plaintiffs' interpretation would inevitably result in the total prohibition of OHV use because there was no dispute as to the extent of damage caused by OHV use.  *Sierra*, 756 F.2d at 690-91.  The court rejected the plaintiffs' argument that the Secretary was required to close any area damaged by OHV use: "However appealing might be such a resolution of the environmental dilemma, Congress has found that OHV use, damaging as it may be, is to be provided 'where appropriate.'  It left determination of appropriateness largely up to the Secretary in an area of sharp conflict." *Id.* at 691

(quoting FLPMA, 43 U.S.C. § 1781(a)(4)).[17]  Defendants contend that under *Sierra I*, the BLM retains

broad discretion to designate OHV routes anywhere it deems "appropriate."   However, *Sierra I*

addressed the Secretary's discretion to *close* areas previously designated as open to OHV use, and the

court simply rejected an interpretation of 43 C.F.R. § 8341.2(a) that would contradict FLPMA.  *Sierra*

*I* did not change the mandated minimization criteria that must be applied during route designation.  *Id.*

at 690 ("the closure standard of the Executive Orders and the Regulation [43 C.F.R. 8341.2(a)] applies

independently of the designation of the land as open under the Act [FLPMA]").

In *Sierra II*, the Ninth Circuit reviewed the BLM's decision to open a race course extending from

Barstow to Las Vegas pursuant to an amendment to the CDCA and purportedly in compliance with the

minimization criteria of 43 C.F.R. § 8342.1.  774 F.2d at 1409-10.  The amendment was issued in

response to what had become a regular occurrence of "protest rides," which, if not controlled, would

have produced even greater harm.  *Id.*  The Ninth Circuit found that the amendment was a proper

exercise of BLM discretion because it included mitigation requirements which sought to assure the

"minimization" of impacts from the race.[18]  *Id.*  Neither *Sierra I* nor *Sierra II* altered the regulatory

mandate that all OHV route designations within the CDCA must meet the minimization criteria of 43

C.F.R. § 8342.1.  If anything, *Sierra II* confirmed this fact, notwithstanding the Ninth Circuit's

description of Congressional intent in *Sierra I*.  Likewise, neither case overruled the holding in *Watt* as

it applied to the designation process in that case.  Thus, the Court must still determine whether the

designation process here complies with the criteria laid out in 43 C.F.R. § 8342.1.

The BLM's *Decision Record CDCA Plan Amendment Western Mojave Desert Off Road Vehicle*

*Designation Project*, AR 206756-206777, which amended the CDCA Plan to include the OHV route

network developed through the Designation Project, states that "the questions that comprise the

'branches' in the Decision Tree were based upon statutory requirements concerning resource protection,

---

[17]  FLPMA, 43 U.S.C. § 1781(a)(4), states: "the use of all California desert resources can and should be provided for in a multiple use and sustained yield management plant (sic) to conserve these resources for future generations, and to provide present and future use and enjoyment, particularly outdoor recreation uses, including the use, where appropriate, of off-road recreational vehicles."  43 U.S.C. § 1781(a)(4) (2009).

[18]  The specific mitigation requirements, described as "extensive," are not set forth in the Ninth Circuit's opinion.

United States District Court
For the Northern District of California

the provision of commercial and recreational access, and criteria set forth in the CDCA." AR 206773. However, the Decision Tree itself does not reference 43 C.F.R. § 8342.1 or the particular factors cited therein.[19]   The only resource-related questions in the Decision Tree concern sensitive species and sensitive species' habitat, and several questions indirectly ask about soil erosion ("Does this route contribute to recreational opportunities, dispersed use (i.e. thereby reducing impacts, e.g. soil erosion), connectivity, public safety, etc.?"  AR 211559.  Just as in *Watt*, considering only the questions asked by the Decision Tree would permit the BLM to designate routes open "without the minimization of environmental impacts and conflicts between uses expressly required by 43 C.F.R. § 8342.1." *Watt,* 543 F. Supp. at 797.

For example, consider those routes designated "open" using the Decision Tree code SO-3.  Any route so designated has the following properties:

(1)     Is the route a commercial right-of-way, officially recognized or maintained or serve as a regional route that serves more than on[e] sub-region or represents a principal means of connectivity within a sub-region?
        Answer: NO

(2)     Does the route provide commercial, administrative or private land access?
        Answer: NO

(3)     Is the route closure likely to lead to increased conservation of sensitive species?
        Answer:  NO

(4)     Would this route closure mitigate other cumulative habitat impacts and/or help maintain more/larger contiguous blocks of habitat which might aid in the recovery of sensitive species?
        Answer: NO

AR 211559.  Thus, routes designated as "SO-3" open routes have been evaluated for their impact on sensitive species and their habitat; however, even that consideration is not necessarily equivalent to determining whether an OHV route is located "to minimize harassment of wildlife or significant disruption of wildlife habitats."  43 C.F.R. § 8342.1(b).  More importantly, even assuming that the Decision Tree's consideration of impacts on species and their habitat did comply with § 8342.1, the Decision Tree is still deficient because the minimization criteria apply to more than just conservation

---

[19]  The "Vehicle Route Designation Record of Decision" – which is a form that was completed for each route evaluated under the Decision Tree, does reference 43 C.F.R. § 8342.1.  The Court addresses BLM's argument that those forms are evidence of compliance with the minimization criteria *infra*.

United States District Court
For the Northern District of California

of sensitive species and habitat.  43 C.F.R. § 8342.1(a) requires the minimization of damage to "soil, watershed, vegetation, air, or other resources of public land."  None of these resources are addressed by the questions posed above for "SO-3" open routes (and numerous other branches leading to other designated open routes), and yet the Decision Tree determines such routes should be opened based on these questions alone.

Conversely, and equally problematic, a route cannot be closed using the Decision Tree, regardless of the level of impact on sensitive species or potential to mitigate cumulative effects, unless it either:  (a) does not contribute to recreational opportunities, dispersed use (i.e. thereby reducing impacts, e.g. soil erosion), connectivity, public safety, etc. (SC-1, SC-3, SC-5); or (b) makes such a contribution, or provides some other commercial or private use, but is redundant with other routes that provide the same opportunity or use (SC-2, SC-4, SC-6, SC-7).  *Id.*

Routes designated as "SO-4" open routes are instructive.  To reach the SO-4 designation, one must take the following path down the Decision Tree:

(1)    Is the route a commercial right-of-way, officially recognized or maintained or serve as a regional route that serves more than one region or represents a principal means of connectivity within a sub-region?
Answer: YES

(2)    Does the route provide commercial, administrative, or private land access?
Answer:  YES

(3)    Is route closure likely to lead to increased conservation of sensitive species?
Answer: YES

(4)    Does most of the route impact occupied habitat of sensitive species?
Answer: YES

(5)    Are the commercial or private uses of this route adequately met by another route(s) that avoid or minimize the impact to occupied habitat of sensitive species?
Answer: NO

After answering all of these questions, a route is designated as open to OHV use, and assigned the "SO-4" code.  AR 211559.  Thus, although "most" of a SO-4 route impacts occupied habitat of a sensitive species, and route closure is likely to lead to increased conservation of sensitive species, because the commercial or private uses of the route are not "adequately met by another route that avoids or minimizes the impact to occupied habitat of sensitive species," the route is designated open.  There is

nothing on the face of the Decision Tree to reflect that routes designated as S0-4 comply with § 8342.1's requirement that routes "shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats." 43 C.F.R. § 8342.1(b).  Indeed, as with the flawed OHV route designation criteria in *Watt*, the Decision Tree questions "would permit agency officials to make route designations without the minimization of environmental impacts and conflicts between uses expressly required by 43 C.F.R. § 8342.1," and "in practice is almost certain to skew route designation decision-making in favor of ORV use." *Watt*, 543 F. Supp. at 797.

Defendants contend that the Decision Tree only produced a recommendation that was later evaluated in light of the minimization criteria in 43 C.F.R. § 8342.1, and that taken as a whole, the process adequately addressed and considered all the required factors.  In other words, defendants argue that the Decision Tree questions were not the "exclusive standard to which route designations were made" like the route designation questions in *Watt*.  To support this position, defendants cite four general pieces of the record: (1) the stated goals for the overall route designation project, (2) the stated goals and issues identified for each MAZ, (3) the footnotes that were part of the Decision Tree itself, and (4) the Route Designation Forms that were completed for each route.

The stated goals for the overall route designation project are set forth in the March 2003 EA. They include a table of authorities which must be complied with during the process, including NEPA, FLPMA and 43 C.F.R. § 8342.1.  AR 211391-92.  The goals also indicate a desire to utilize a process which concerns a "variety of data, including biological, cultural, and recreational resources."  AR 211390.  Likewise, the issues and goals for each MAZ express, at least in some cases, an acknowledgment of concerns relevant to the minimization criteria of 43 C.F.R. § 8342.1.  However, the stated goals for the overall project and for each MAZ do not explain how they would be achieved, and simply citing stated goals is not tantamount to showing that the BLM actually applied the minimization criteria in the OHV route designation process.  As Judge Tashima observed in *Watt*, references in the record that "the BLM did not intend nor was authorized to designate routes not in conjunction with 43 C.F.R. § 8342.1 are not sufficient to counteract the impression that [the challenged route designation] criteria are the exclusive bases for route approval decisions."  *Watt*, 543 F. Supp. at 797.

Defendants describe the footnotes to the Decision Tree as a "critical" part of the process.  At

the end of each Decision Tree branch (both routes designated open as well as closed), the reviewer is directed to the route code (e,g, "SO-4"), and footnote "**\*1**". AR 211559. Footnote **\*1** states:

- Are there any other special circumstances that would warrant reconsideration? (e.g. unusual public safety issues, Section 106 considerations, current or future community growth/zoning issues, current or reasonably foreseeable land acquisitions or trades (e.g. for mitigation as part of this planning effort or by other resource organizations/agencies), special permits (e.g. Mining Plan of Operations), environmental benefits of a route (e.g. facilitating the maintenance of a guzzler), legal easements, user conflicts, neighboring uses, etc.)

- Should a limited designation be used in lieu of either an open or closed designation in order to mitigate for impacts?

AR 211560. The BLM argues that reviewers considered § 8342.1 criteria in connection with assessing whether there were "special circumstances that would warrant reconsideration." There are several problems with this assertion. First, footnote **\*1** does not reference the criteria set forth in 43 C.F.R. § 8342.1, such as "minimiz[ing] damage to soil, watershed, vegetation, air, or other resources of the public lands." 43 C.F.R. § 8342.1(a). Although the footnote mentions "user conflicts," that reference is not equivalent to directing reviewers to locate trails "to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors." *Id*. § 8342.1(c).

Moreover, even if the BLM did determine that "special circumstances" based on the § 8342.1 minimization criteria warranted reconsideration and routes were changed from the "open" designation to a "closed" one, it is impossible to determine that from the administrative record. Every Decision Tree route has a corresponding route designation form. *See, e.g.*, AR 214896-214955. The forms contain a recommendation based on the Decision Tree, as well as additional specific information concerning the route in question; this information was later incorporated into Appendix C of the 2003 EA. *See* AR 214896-214955 (route designation forms), 211700-211703 (corresponding records in Appendix C). A review of these forms demonstrates that the information included in the "specific comments/special circumstances" section virtually never includes any mention of anything outside of recreational values and occasional references to species prevalence and type of habitat: all items already addressed by the questions in the Decision Tree itself. *See, e.g.*, AR 211910 (SC-4 closed route: "Redundant parallel

1   route, Not expanding recreation opportunity"), 211911 (SO-5 open route: "Good dirt, connective

2   route"), 211922 (SO-5 open route: "Good dirt, Jeep route serving recreation").[20]  Each form also

3   includes a verbatim recitation of 43 C.F.R. § 8342.1 directly above the final signature line for the "Field

4   Manager."[21]  *Id.*  However, there is no indication on the forms themselves that these criteria have

5   actually been considered or applied.  *See id.*

6          Here, nothing in the record documents that anything other than the Decision Tree questions and

7   the route-type and recreation data collected during the on-the-ground surveys determined the

8   designation of routes.  Defendants repeatedly emphasize the extensive route surveys and information

9   gathering process leading up to the application of the Decision Tree.  The Court recognizes that the

10  BLM expended considerable effort in surveying and inventorying OHV routes.  However, there is

11  nothing in the record to show that the minimization criteria were in fact applied when OHV routes were

12  designated. To the extent that the Decision Tree footnotes and route designation forms truly were

13  "critical," BLM failed to adequately explain and document how and when they entered the decision

14  process.  Moreover, there are suggestions in the record that the BLM may have interpreted 43 C.F.R.

15  § 8342.1 simply to require the elimination of redundant routes when required to reduce resource

16  damage.  For example, in response to questions from the public, the BLM stated:

17          In those cases where an evaluator determined a route to be redundant (that is, serving the
18          same purpose, providing access to the same location, or offering a similar recreational
            experience), and where retaining more than one route could lead to increased resource
19          damage, the route was usually closed in accordance with 43 C.F.R. § 8342.1.  This
            regulation provides guidance criteria concerning route designation, specifically requiring
20          minimization of resource damage and wildlife harassment.

21  AR 202570-202571. Likewise, the 2003 ROD states that the OHV route network meets the "full range"

22  of visitor needs while remaining "compatible" with wildlife and plant conservation.  AR 206773.

23  "Compatibility" was achieved by closing redundant routes, and closures were "offset (i.e. mitigated)

24  by opening routes where resource concerns were minimal."  *Id.*  However, nothing in the language of

26          [20] The record indicates that the designation teams filled out the form immediately after applying
27  the Decision Tree questions.  AR 216344 (notes of April 24, 2002 meeting of West Mojave Plan Task
    Group 2, discussing Decision Tree process).

28          [21] None of the route forms in the Administrative Record appear with signatures on this line.

United States District Court
For the Northern District of California

§ 8342.1 provides that the minimization criteria is to be applied solely or primarily when another route would provide a similar recreational experience.

Defendants assert that the fact that many routes were closed as a result of the Decision Tree process demonstrates that BLM implemented the § 8342.1 criteria. Defendants cite three pieces of evidence for support of their decisions in the record, (1) Appendix C to the 2003 EA, (2) the fact that almost two-thirds of the routes were closed, and (3) the fact that several "open" designations were changed in response to public comments. However, the overarching problem with this evidence is that while it explains how the Decision Tree was applied, nothing in the administrative record explains or documents how the factors in 43 C.F.R. § 8342.1 were considered.

Appendix C of the 2003 EA contains a table of records for each designated route, purportedly enabling the public and the Court to discover the reasons for each route's designation as open or closed. AR 211584-211725. A review of Appendix C shows that the vast majority of routes that were closed were closed because they were considered redundant. As stated above, redundancy is indeed one of only two reasons that a route could be closed using the Decision Tree process. In any event, if it is true that the BLM minimized the impacts identified in 43 C.F.R. § 8342.1 in some manner other than the Decision Tree questions, there is no way to glean that information from Appendix C. For example, Appendix C does not explain how the minimization criteria have been applied to routes designated as "SO-4" open routes, despite the fact that, as discussed *supra*, these routes both "impact sensitive species or occupied habitat of sensitive species," and "most of the route impact[s] occupied habitat of sensitive species." AR 211559. For example, Appendix C contains the following information for four SO-4 routes, three designated open and one closed. The specific comments for the three open SO-4 routes are "Access to private property including water tank"; "Primarily private property access dead-end route"; and "Camping access and interesting terrain." AR 211609. The specific comment for the closed SO-4 route is "Redundant low use parallel route." *Id*.; *see also* AR 211696 (SO-4 open route: "short route connects to larger routes"), 211705 ("Route provides access to Rainbow Basin").[22] While the

---

[22] Other examples of specific comments for routes designated "open" include: "fun route" (SO-7), AR 211673; "Jeep route offering recreation opportunity" (SO-5), AR 211626; and "Popular rock hounding route" (SO-3), AR 211665.

1    information provided in Appendix C identifies the particular resource or use served by the route, it does

2    not speak to how impacts on other resources were minimized.   In sum, neither the Decision Tree nor

3    Appendix C reflect or document any analysis of the § 8342.1 minimization criteria.

4         Nor does the fact that the BLM closed almost two-thirds of the evaluated routes constitute

5    evidence that the BLM complied with 43 C.F.R. § 8342.1.  "Minimize" as used in the regulation does

6    not refer to the number of routes, nor their overall mileage.[23]   It refers to the *effects* of route

7    designations, i.e. the BLM is required to place routes specifically to minimize "damage" to public

8    resources,  "harassment" and "disruption" of wildlife and its habitat, and minimize "conflicts" of uses.

9    43 C.F.R. § 8342.1(a)-(c).  Thus, simply because the BLM closed two-thirds of the routes evaluated

10   does not, on its own, compel the conclusion that the minimization criteria were applied.

11

12        **B.        Routes designated outside the redesign area**

13        Over half of OHV route network (2,833 miles) that the BLM designated lies outside of the

14   redesign areas.  AR 201843.[24]  As noted *supra*, the explanation of the route designation process for those

15   lands outside the redesign area is markedly different from the extensive description of the Decision Tree

16   process.  The process for the non-redesign area routes is summarized by nearly identical two-page

17   statements in both the 2003 EA and the 2005  FEIS.  AR 211405-211406, 201842-201843.  These

18   descriptions are cursory and poorly-documented at best.  For instance, the FEIS states only that "[l]ands

19   outside the redesign area were reviewed to ensure that they were compatible with the federal regulations

20   (specifically, 43 C.F.R. 8342)."  AR 201842.  The FEIS then identifies five regions where routes were

21   altered, purportedly to comply with 43 C.F.R. § 8342.1, and a brief description of why these alterations

22   were necessary.  AR 201842-201843.  Beyond this conclusory statement and the five limited examples

23   provided, defendants point to nothing in the record that explains how BLM conducted the review of the

24   OHV routes outside the redesign areas, let alone how it ensured compliance with the minimization

25

26        [23]  The Court notes that while 64% of the routes evaluated were closed, the total mileage of the
     network designated " open" increased by 15% over the 1985-87 network that it replaced.  AR 206773.

27        [24]  This total consists of "159 miles within the Ord Pilot region, 406 miles within ACECs for
28   which route networks were designated after 1980, and 2,268 miles of remaining 1985-87 designations."
     *Id.*

criteria of 43 C.F.R. § 8342.1.

Defendants rely on the Ninth Circuit's en banc decision in *The Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) (en banc), to support their position that the BLM is not required to engage in an on the ground, site-specific analysis for every route.  *Lands Council* does not support defendants' position.  The plaintiffs in *Lands Council* contended that the Forest Service had violated the National Forest Management Act because it had not demonstrated the reliability of the scientific methodology underlying the Service's analysis of the effect of a proposed project on a protected species and its habitat.  *Id*. at 990.  Specifically, the plaintiffs contended that the Forest Service was required to "verify[] its prediction regarding the effect of treatment on old-growth species' habitat with observation or on-the-ground analysis."  *Id*.  The Ninth Circuit rejected "a broad rule that, in effect, requires the Forest Service to always demonstrate the reliability of its scientific methodology or the hypotheses underlying the Service's methodology with 'on the ground analysis.'" *Id.*  The court held that there was no requirement in either the law or the regulations specifically requiring on the ground analysis, and that instead "[g]ranting the Forest Service the latitude to decide how best to demonstrate that its plans will provide for wildlife viability comports with our reluctance to require an agency to show us, by any particular means, that it has met the requirements of the NFMA every time it proposes action."  *Id*. at 992.  Nothing in *Lands Council* changes the fundamental principle of administrative law that an agency must comply with applicable laws and regulations, and must establish a rational connection between the facts it considered and the decisions it made.  *Id*. at 994 (holding that the Forest Service must support its conclusions that a project meets the relevant legal requirements with studies it deems reliable, explain the conclusions it drew from its chosen methodology, and provide reasons it considers the supporting evidence to be reliable); *see also Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (an agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made") (internal quotations and citations omitted).

Here, the BLM has not identified any factual basis in the record to support the assertion that the OHV routes outside the redesign areas were designated in compliance with the minimization criteria set forth in 43 C.F.R. § 8342.1.  Moreover, what information is in the record suggests otherwise.  Although the 2003 EA and FEIS state that the five examples of "updating" are not exhaustive, the FEIS

31

1   also states in the public comment and response section:

2       **Topical Comment 5a:** It is critical to complete a survey of existing motorized vehicle
3       routes in those areas where BLM has relied on the 1985-87 route surveys.

4       **Response to Topical Comment 5a:** A network of motorized vehicle access routes was
        designated in the western Mojave Desert in 1985 and 1987, and during the development
5       of ACEC management plans during the 1980s and early 1990s.  All twenty-one
        polygons, or "subregions," were surveyed at that time, and the route network that was
        adopted was based upon the findings of those surveys.

6
7           Since the middle 1980s, new issues have arisen that created a need to redesign
        portions of the existing network.  Among these developments was the listing of the
8       desert tortoise as threatened in the early 1990s.  The BLM decided to redesign portions
        of the existing network to address these concerns.  Funds were available to resurvey
9       eleven subregions.  These included the seven subregions that are located entirely within
        desert tortoise critical habitat, which had not been designated when the original network
10      was designed. *The remainder of the existing network was unchanged (excepting a very
        few site-specific modifications).*

11  AR 202567 (emphasis added).  Moreover, in response to another public comment in the FEIS, the BLM

12  describes the route network adopted in 1985-87 as having "a design [that] did not ensure that those

13  routes were located outside of biologically sensitive areas" and "based on a relatively cursory field

14  inventory conducted in the 1980s, prior to the availability of GPS technology and modern field data

15  recording equipment."  AR 202573.[25]

16      The essence of the BLM's position is that the Court should find that the BLM complied with 43

17  C.F.R. § 8342.1 when it designated thousands of miles of OHV routes outside the redesign area because

18  the BLM says that it did.  This is not enough, even under a deferential level of review.  *See Klamath-*

19  *Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 996 (9th Cir. 2004) ("In sum, the only mention of

20  cumulative effects in the two EAs comes in the form of generalized conclusory statements that the

21  effects are not significant or will be effectively mitigated.  At oral argument, counsel for the BLM

22  assured us that to the eye of the 'agency specialists,' the scant information included in the EAs is

23  sufficient to determine what the cumulative environmental impacts will be and supports the conclusory

24  statements that they will not be significant. But while the conclusions of agency experts are surely

25

26      [25]  Moreover, the FEIS rejected the 1985-87/ACEC route network from consideration as an
        alternative to the proposed project because it included many design flaws, in that, *inter alia*, "it did not
27      provide for adequate recreational and commercial access."  AR 201916.  Yet for those areas outside the
        redesign area, this same 1985-1987/ACEC network was formally adopted by the June 2003 ROD, with
28      very few site-specific modifications.  AR 202569.  The BLM provides no explanation for its inconsistent
        analysis of the 1985-1987 network.

1    entitled to deference, NEPA documents are inadequate if they contain only narratives of expert

2    opinions.").

3

4    **C.    Routes designated after 1980**

5          Plaintiffs challenge all OHV route designations after 1980 – whether through the Decision Tree,

6    the ACEC designations, or the 1985-1987 designations – as being in violation of the  language of the

7    CDCA Plan which defines "Limited Areas" for the purposes of route designation.  The BLM has

8    amended the CDCA several times since 1980. The third amendment, passed in 1982 and unchanged

9    since, defined "Limited Area" as follows:

> "'Limited' designation vehicle access means that motorized-vehicle access is allowed only on certain 'routes of travel,' which include roads, ways, trails, and washes.  *At the minimum, use will be restricted to existing routes of travel.  An existing route of travel is a route established before approval of the Desert Plan in 1980*, with a minimum width of two feet, showing significant surface evidence of prior vehicle use or, for washes, history of prior use."

13   AR 222005 (emphasis added).

14         Plaintiffs contend that this definition places a fixed cap on the routes that may be designated

15   open in "Limited Areas" at those routes that were "established before the approval of the Desert Plan

16   in 1980."   As discussed above, the route designations challenged here were finalized pursuant to

17   amendments to the CDCA issued in June 2003 and March 2006.  AR 206756-206777, 200044-200066.

18   Plaintiffs argue that in contravention of the definition of "Limited Area,"[26] and without explanation, the

19   BLM has legitimized hundreds, if not thousands, of routes that did not exist before the approval of the

20   Desert Plan in 1980, and therefore the decisions are arbitrary and capricious.

21         Defendants do not really dispute that the plain language of the CDCA Plan imposes a cap on

22   OHV routes to those that existed in 1980, and the Court agrees with plaintiffs' interpretation of the

23   CDCA's "at the minimum" language as forbidding the establishment of routes that did not exist before

24   1980.  That the CDCA Plan contains such a ceiling on OHV routes is made clear by the definitions of

25   "Class I" and "Class M" sub-areas that follow the general definition for "Limited Areas" cited above:

26

27   _____

28         [26] All individual routes designated in the amendments are contained in "Limited" areas. *See* AR 211475.

United States District Court
For the Northern District of California

> Class I: Unless it is determined that *further* limitations are necessary, those areas not "open" will be limited to use of existing routes.
>
> Class M: access will be on existing routes, unless it is determined that use on specific routes must be limited *further*."

AR 222005 (emphasis added).  These definitions reveal that the "at the minimum" language refers to the *minimum limitation* that can be imposed on an area, which is to keep all existing routes open but forbid the creation of any new routes.  If necessary, *further limitations* would be imposed, the *maximum limitation* being to close all routes.  This section of the CDCA shows a clear intention to limit the routes designated open within the "Limited Areas" to no more than the routes that existed before the approval of the CDCA in 1980.

Indeed, the record reflects that throughout the BLM's various post-1980 OHV route designation projects, including the Western Mojave Desert Off Road Vehicle Designation Project that resulted in the OHV route network in the 2003 EA and the WEMO Plan, the BLM staff have been acutely aware of the OHV route limitation contained in the CDCA Plan, and of the potential conflict between that language and the post-1980 OHV route designations.  Indeed, the WEMO Plan manager expressed the view that post-1980 OHV route designations would require an amendment to CDCA Plan, along with a justification for the post-1980 routes.  Mr. Haigh received an email from a BLM employee asking,

> Bill,
>
> I don't know to what extent the various CDCA Plan amendment efforts completed or underway have or will designate routes as open that did not exist in 1980.  However, on a CDCA wide basis, I think that if we have and will deviate with the CDCA Plan with respect to the route designation procedures (limiting consideration to routes that existed in 1980), we may be heading toward an unsecured situation.  If we are designating or are considering designating routes as open that didn't exist in 1980, we should have a plan amendment to back us up rather than to make the change and designate post 1980 routes simultaneously.
>
> Thoughts?

AR 211762 (Jan. 15, 2003 email from Jeffrey Aardahl to Bill Haigh).  On January 18, 2003, Mr. Haigh responded,

> I agree that we would need a plan amendment.  Since the plans are themselves "plan amendments", I think we can do it all at once, if it proves necessary.  It will be a lot more defensible if any variations from "proven" 1980 routes are relatively minor, and would further the intent of regulations and desert plan criteria (for example, a non-1980 route that avoids a 1980 route through a wash on a bajada of the type favored by tortoises).  Maybe, in the West Mojave, a comparison with the 1985 route inventory will help – if

34

a route existed in 1985, it certainly isn't one that emerged from route proliferation during the past 15 years.

How did NEMO and NECO handle this? I haven't read their RODs yet, so I don't know if they explicitly took care of any post-1980 routes through the plan amendment process, and explained why a post-1980 route was necessary. I think they should have done that, at least. Do you know?

*Id.*; *see also* AR 211763-211674, 211305 ("I want to make sure that the decisions, and the EIS, are very clear why we are not limiting the route network to routes 'existing in 1980' (see CDCA Plan language which some interpret as imposing such as limit)"), 230281-230282 (1985-1987 OHV route designation); SAR 305745.

Defendants respond with a variety of arguments about why the post-1980 OHV designations are not "illegal." The BLM argues that "neither FLPMA nor NEPA requires that the BLM impose a blanket closure on all routes and restore them to pre-1980 status. Instead, FLPMA directs the BLM to prepare and maintain a current inventory of resources, including outdoor recreation uses such as OHV routes. The BLM has done so through the route designation process and the WEMO Plan and FEIS." Rev. MSJ at 23:18-22. The BLM is correct that neither FLPMA nor NEPA directly imposes the 1980 OHV route limitation; that limitation is contained in the CDCA Plan itself. However, the BLM is required under FLPMA to comply with the terms of the CDCA Plan, unless those terms are amended. *See Oregon Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007). Despite the numerous amendments to the CDCA Plan, including the WEMO Plan amendment, the language imposing the 1980 OHV route limit has never been amended or removed from the CDCA Plan.

In *Brong*, the Ninth Circuit held that the BLM acted arbitrarily and capriciously when it interpreted a land use plan as permitting a logging project in an area designated protected under a land use plan. *Id.* The court first noted that "once a land use plan is developed, "[a]ll future resource management authorizations and actions . . . shall conform to the approved plan." *Id.* (quoting FLPMA regulations, 43 C.F.R. § 1610.5-3(a)). The court found that while the land use plan permitted salvage logging in limited circumstances and clearly prioritized the preservation of protected ecosystems over commercial benefits, the BLM had interpreted the salvage guidelines as balancing environmental concerns and economic factors equally. *Id.* at 1127. The court found that several aspects of the salvage logging project were "inconsistent with the Plan and, consequently, violate[d] FLPMA." *Id.* at 1128;

*see also Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 69 (2004) (BLM actions that are inconsistent with the provisions of a land use plan are properly set aside under the APA as contrary to law).

Defendants argue that there is no inconsistency between the post-1980 OHV route designations and the CDCA Plan because the WEMO Plan amended the CDCA Plan.  However, the WEMO Plan amendment did not amend or remove the language imposing a cap on OHV routes to those existing in 1980, nor is there any effort in the WEMO Plan to explain *why* the limitation should not apply to the post-1980 designated OHV routes.  Instead, the WEMO Plan simply ignores the language capping OHV routes to those existing in 1980, and designates thousands of OHV routes, a significant portion of which did not exist in 1980.[27]  As in *Brong*, the WEMO plan, which designates numerous OHV routes that were not in existence in 1980, is in conflict with the governing land use plan, the CDCA Plan, and therefore violates FLPMA.

The Court does *not* hold that OHV route designations in the WEMO are forever frozen at the 1980 OHV route network.  The BLM has the authority to amend the CDCA Plan to lift the restriction on routes established after 1980, so long as those amendments satisfy NEPA, FLPMA, and all other applicable statutes and regulations.  But the BLM must actually amend that language, not ignore it, and presumably any such amendment would require a reasoned explanation based on information and data in the record why post-1980 routes should be designated.  Indeed, as the emails and other documents cited above indicate, the WEMO planning staff were aware of this need to justify the designation of post-1980 OHV routes, and there is no explanation why the final WEMO Plan did not, in fact, contain such an explanation.

## II.    National Environmental Policy Act claims

Plaintiffs contend that the BLM violated NEPA in three respects: (1) BLM did not consider a

---

[27]  Defendants and intervenors argue that many of the designated routes were in existence in 1980.  This is undoubtedly true.  However, the record also reflects that numerous routes that were designated did not exist in 1980.  The Court also recognizes that it is difficult, if not impossible, to reconstruct the 1980 OHV route network.  However, this fact does not permit the BLM to ignore the limitations contained in the CDCA Plan.  To the contrary, the BLM is required to follow the CDCA Plan or amend it.

1   full range of reasonable alternatives because every action alternative left open the same 5,098 miles of

2   OHV routes, (2) BLM did not properly analyze the environmental impacts of the WEMO Plan because

3   the environmental baseline was never clearly identified, and (3) BLM failed to present accurate

4   information regarding many of the most critical impacts resulting from OHV route designations and the

5   other activities authorized under the WEMO Plan.

6

7   **A.      Alternatives analysis**

8           The NEPA regulations require that an agency "[r]igorously explore and objectively evaluate all

9   reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss

10  the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). Such rigorous exploration and

11  objective evaluation of all reasonable alternatives is "the heart of an EIS." *Natural Res. Def. Council*

12  *v. U.S. Forest Serv.*, 421 F.3d 797, 813 (9th Cir. 2005). As the Ninth Circuit has held,

13          In order to be adequate, an environmental impact statement must consider not every
            possible alternative, but every reasonable alternative. The existence of a viable but
14          unexamined alternative renders an environmental impact statement inadequate. The
            question for the district court, therefore, is whether the [omitted alternative] was
15          reasonable.

16  *Citizens for a Better Henderson v. Hodel*, 768 F.2d 1051, 1057 (9th Cir. 1985) (internal citations

17  omitted). Put differently, "[t]he touchstone for [the court's] inquiry is whether an EIS's selection and

18  discussion of alternatives fosters informed decision-making and informed public participation."

19  *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982).

20           "The stated goal of a project necessarily dictates the range of 'reasonable' alternatives and an

21  agency cannot define its objectives in unreasonably narrow terms." *City of Carmel-By-The-Sea v. U.S.*

22  *Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). The range of alternatives that the BLM did and

23  did not consider are evaluated in light of the BLM's stated project goals. *Id.* The stated purpose and

24  need for the WEMO Plan as set forth in the FEIS and the 2003 ROD is to "establish[] a regional

25  biological strategy to conserve plant and animal species and their habitats and prevent future listing"

26  and to "provide an efficient, equitable and cost-effective process for complying with threatened and

27  endangered species law." AR 200058. Plaintiffs do not challenge the BLM's stated goal. Instead,

28  plaintiffs contend that because every alternative contained in the FEIS is based on the same 5,098 OHV

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    route network, the range was too limited to foster informed decision-making.  Plaintiffs argue that the

2    BLM should have, but did not, consider alternatives that reduced the overall OHV route network, thus

3    rendering the FEIS inadequate under NEPA.  *See Hodel*, 768 F.2d at 1057; *Westlands Water Dist. v.*

4    *United States Dept. of Interior*, 376 F.3d 853, 868 (9th Cir. 2004).

5    　　　　Plaintiffs challenge both the range of alternatives contained in the 2003 EA and the FEIS.  The

6    alternatives in the two documents are similar, and in some instances identical.  The FEIS considered

7    seven alternatives: Alternative A ("Proposed Action – Habitat Conservation Plan"); Alternative B

8    ("BLM only"); Alternative C ("Tortoise Recovery Plan"); Alternative D ("Enhanced Ecosystem

9    Protection"); Alternative E ("One DWMA – Enhanced Recreation Opportunities"); Alternative F ("No

10   DWMA – Aggressive Disease and Raven Management"); and Alternative G: ("No Action").[28]  Although

11   the seven alternatives differed in some respects,[29] all seven considered the same 5,098 miles[30] of

12   designated OHV routes set out in Alternative A.  The FEIS states that

13   　　　　Alternative A recommends a route network that includes 2,265 miles of open routes
     within the redesign area, 159 miles within the Ord Pilot region, 406 miles within ACECs
14   for which route networks were designated after 1980, and 2,268 miles of remaining
     1985-87 designations, or 5,098 miles overall, a total that includes single-track
15   motorcycle routes.  This compares to 4,260 miles currently designated open, although
     that network does not include all single-track routes (many of which were not surveyed
16   in 1985-7) and provided little or no designations for the Middle Knob, Amboy and Ord
     subregions.  Proposed mileage of non-motorcycle routes in higher density tortoise
17   populations (see Chapter 3) would be 384, a decrease from the 439 miles currently open.
     The 406 miles within the ACECs would be a decrease from current 427.
18
19   AR 201843-201844.  Alternative A also proposed route closures within DWMAs; the FEIS states that

20   "[i]n DWMAs, the network would result in the closure of 1,855 of the 4,225 total linear miles of routes

21   on public land, which is a 44% reduction of routes in DWMAs," and that "[u]se of the remaining 2,370

22   linear miles of open routes in DWMAs, representing 56% of existing routes in DWMAs, would continue

23

24   　　　　　　　[28]  The 2003 EA contained four similar alternatives.

25

26   　　　　　　　[29]  For example, Alternative C would adopt measures outlined by the FWS Desert Tortoise
     Recovery Plan, and Alternative F focused on desert tortoise protection through management of disease
     control and predation.
27

28   　　　　　　　[30]  In different places in the FEIS, and in the parties' papers, the total route network is sometimes
     stated as 5,098 miles, and sometimes stated as 5,041 miles.

to result in permitted and un-permitted impacts." AR 202261.[31]

All seven alternatives allowed OHV use to some degree on the 5,098 mile network; for example, Alternative B (which was ultimately selected) included 5,098 miles of "open" routes and 0 miles of "limited" routes, while other alternatives had different levels of "open" versus "limited" routes. The alternatives also differed in that the areas affected by stopping-parking-camping limits for OHVs varied, as do drought closures, and one alternative (Alternative D) banned non-street legal OHVs. However, it is undisputed that all of the alternatives considered OHV access on the same 5,098 miles of routes, and no alternative considered OHV use on a lesser route network. The BLM also eliminated from consideration seven other alternatives on the ground that they did not meet the purpose and need for the WEMO Plan or the CDCA Plan. AR 201914-17. The rejected alternatives include the Interim Management Alternative that was the subject of this Court's order in *CBD II*, 422 F. Supp. 2d 1115 (N.D. Cal. 2006), and the 1985-87/ACEC network that was considered as the No Action Alternative in both the EA and the DEIS. *Id.* At least some of the eliminated alternatives, such as the Interim Management Alternative, included a smaller OHV route network than the 5,098 mile network considered in each of the seven alternatives.

Plaintiffs rely heavily on *ONDA*, 531 F.3d 1114 (9th Cir. 2008), to challenge the FEIS's range of alternatives. In *ONDA*, the Ninth Circuit considered the adequacy of a range of alternatives in an EIS, and in *ONDA* as in this case, the plaintiffs challenged the range of alternatives as too limited because all of the presented alternatives varied "almost entirely by the amount of land they allocate[d] between the open and limited use categories" and none of the alternatives closed a significant amount of land to OHVs. *Id.* at 1126. The Ninth Circuit held that the EIS violated NEPA because:

> It considered no alternative that proposed closing more than a fraction of the planning area to ORV use, as opposed to merely designating areas for "limited" use. As ONDA observes, the BLM did not consider any alternative that would have closed more than 0.77% of the planning area to ORVs. Indeed, every alternative would have reduced the extent of closed areas from that in effect previously.

*Id.* at 1145. In *ONDA*, the BLM argued that "its analysis of ORV designations is adequate because it considered a wide range of use allocations between open and limited ORV designations, and because

---

[31] The 2,370 miles of open routes in DWMAs are part of the 5,098 mile OHV route network considered in every alternative.

United States District Court
For the Northern District of California

it could implement emergency closures if necessary." *Id.* The Ninth Circuit disagreed: "Limited ORV use is simply not identical to no ORV use. A limited designation, even with the possibility of closure, does not provide protection equivalent to a straightforward closure." *Id.*

Defendants argue that *ONDA* is irrelevant to the Court's inquiry because that case turned largely on the BLM's failure to consider wilderness characteristics in the EIS, an issue not present here. However, while the *ONDA* court found the EIS inadequate because the BLM did not consider "wilderness" values, the Ninth Circuit held that "the ORV analysis [in the range of alternatives] is also flawed, however, *for a reason independent of wilderness issues*," namely the BLM's failure to include any alternatives that did not include "closures of significant portions of the land it manages." *Id.* (emphasis added).

Here, the range of alternatives in the FEIS suffers from flaws similar to those identified in *ONDA*. All of the alternatives in the FEIS considered the same OHV route network, with variations on the extent to which the routes would be designated "open" versus "limited": no alternative proposed closing additional routes to OHV use. Indeed, in assessing Alternative A, the FEIS states that "All alternatives share the same proposed route designation and implementation characteristics." AR 202269. As in *ONDA*, all of the alternatives resulted in an increase in the amount of miles formally designated as open to OHV use. AR 201843. Defendants argue that this case differs from *ONDA* in that the 2003 route designations actually reduce OHV route mileage as compared to the 2001-2002 on the ground route inventory, whereas in *ONDA* all of the alternatives increased OHV usage over the "no action" alternative. However, as discussed in greater detail in connection with plaintiffs' challenges to BLM's designation of the "no action" alternative, the 2001-2002 inventory identified the actual on the ground route network in various subregions; many of those routes had not been formally designated by BLM but instead were the result of informal and illegal proliferation. *See* AR 202203 (chart comparing, for various subregions, mileage designated open in 1985-1987 versus 2001 route inventory, and showing significant mileage increases for every subregion covered by both the 1985-1987 designation and the 2001 route inventory). Thus, the factual distinction that defendants emphasize between this case and *ONDA* is not a meaningful one because the OHV route network designated in the WEMO Plan, while smaller than the 2001-2002 inventoried network, is indisputably more extensive than the "designated"

United States District Court
For the Northern District of California

OHV route network leading up to the WEMO Plan (the ACEC and 1985-1987 designated routes).

Defendants emphasize other differences between the alternatives, such as the fact that dirt bikes and ATVs were banned from Alternative D, or that speed limits were set for designated routes in DWMAs under Alternative C. However, under both Alternatives C and D, all 5,098 miles of routes were designated for some level of OHV use. Thus, despite the differences in levels and intensity of use – which are similar to the types of differences in the *ONDA* alternatives– all of the alternatives in the FEIS are based on the same 5,098 mile OHV route network. The BLM also stresses the fact that Alternative B narrows the stopping-camping-parking corridors from 600 feet (300 feet on each side from the centerline of routes) to 100 feet (50 feet from the centerline) within tortoise DWMAs, thus reducing the acreage accessible by OHVs. While this is a significant impact, the fact remains that all of the alternatives, including Alternative B, are based on the same OHV route network, and thus do not provide a truly meaningful range of alternatives.

The BLM also argues that Alternative E, which expands certain of the "open access" areas, demonstrates that the agency complied with its NEPA obligations. However, providing a range of alternatives that allow for OHV use to differing – and in the case of Alternative E, much greater – degrees on the same basic route network does not satisfy the requirement to provide a reasonable range of alternatives. As the Ninth Circuit held, "[i]t is precisely this sort of 'uncritical [ ]' privileging of one form of use over another that we have held violates NEPA," and "[c]losures, not just 'limited' designations, must be considered to comply with NEPA." *ONDA*, 531 F.3d at 1145.

Plaintiffs posit four possible alternatives that the BLM could have considered, including one under which the BLM could have retained the interim route designations in five specific sub-regions put in place pursuant to the previous settlement agreements and consent decrees.[32] The other three alternatives suggested by plaintiffs are: (1) designating less route mileage and focusing on minimizing impacts to soil, cultural and other resources, and species and habitats; (2) reducing vehicular access in the DWMAs to provide "reserve level" protection as recommended in the Desert Tortoise Recovery

---

[32] The five sub-regions are Fremont, Kramer, Red Mountain, Newberry/Rodman, and Superior. These interim closures were to remain in effect until the BLM issued a formal Record of Decision designating routes in the WEMO area, which it did on June 30, 2003. AR 207936.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Plan; and (3) designating only those routes in existence in 1980 and closing all other routes.  The Court finds it unnecessary to decide whether any of these specific proposed alternatives should have been considered by the BLM.  Suffice it to say, there are clearly a range of alternatives that could have been considered that would have reduced the OHV route network.[33]

### B.    "No action" alternative/baseline

NEPA regulations provide that an EIS must include "the alternative of no action" as well as "all reasonable alternatives."  42 U.S.C. § 4332(C); 40 C.F.R. § 1502.14(a), (d).  Plaintiffs contend that neither the 2003 EA nor the FEIS uses a clearly defined baseline from which environmental impacts are discussed and compared.  Plaintiffs contend that the correct baseline is the OHV route as it existed in 1980 because that is the only OHV route that is permitted by the CDCA Plan.  In contrast, the BLM and the intervenors argue that the baseline in the 2003 EA and the FEIS (which are different) accurately reflect the baseline as it currently existed, and that is all that is required under the law.

The parties' arguments highlight one of the central difficulties of this case.  While plaintiffs are correct that the CDCA Plan limited the OHV route network to those routes in existence in 1980, it is also true that there is no readily identifiable inventory of the OHV routes extant in 1980.  It is also a fact that since 1980, the BLM has designated numerous OHV routes through the ACEC and 1985-1987 route designation processes – at least some of which did not exist in 1980 –  that have become part of the actual on the ground OHV route network.  Further complicating matters is the fact that over the years, numerous "illegal" OHV routes that were not designated by the BLM have proliferated and also became part of the *de facto* OHV route network.  Defendants are correct that NEPA does not impose an independent requirement of setting a "legal" environmental baseline.  *See Am. Rivers v. FERC*, 201 F.3d 1186, 1195 (9th Cir. 1999) ("A baseline is not an independent legal requirement, but rather, a practical

---

[33] Plaintiffs also argue that the FEIS's range of alternatives was insufficient because none of the alternatives would end grazing in the DWMAs and desert tortoise critical habitat as recommended in the Desert Tortoise Recovery Plan.  The BLM does not address this argument.  The Court finds it unnecessary to decide whether the range of alternatives is also deficient on this ground.  The Court notes that while the Recovery Plan is certainly relevant to assessing the reasonable range of alternatives, the Recovery Plan is not determinative of that question.  On remand, the BLM will consider a host of factors, including grazing issues, in its alternatives analysis.

requirement in environmental analysis often employed to identify the environmental consequences of a proposed agency action.").  Instead, the purpose of setting a baseline is because the "'no action' status quo alternative . . . is the standard by which the reader may compare the other alternatives' beneficial and adverse impacts related to the applicant doing nothing."  *Kilroy v. Ruckelshaus*, 738 F.2d 1448, 1453 (9th Cir. 1984) (internal citation and quotation omitted).

To the extent that plaintiffs contend that the BLM was required to use the "1980" OHV route network as the "no action" alternative, the Court disagrees.  As a practical matter, there is no way to easily identify that network.  More importantly for NEPA purposes, the "1980 OHV network" cannot be the "no action" alternative against which the proposed action would be compared because the 1980 network has not been the status quo since 1980, decades before the proposed action.  That does not mean that the BLM can ignore the CDCA Plan's language limiting the OHV route network to routes existing in 1980; the BLM must recognize that limitation either by amending the CDCA Plan to eliminate that limitation, as discussed *supra*, or by prospectively ensuring that only those routes that are "designated" are the routes that existed in 1980.

NEPA requires that agencies "present complete and accurate information to decision makers and to the public to allow an informed comparison of the alternatives considered in the EIS."  *Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d at 813.  "Where the information contained  in the initial EIS was so incomplete or misleading that the decision maker and the public could not make an informed comparison of the alternatives, revision of the EIS may be necessary to provide a reasonable, good faith, and objective presentation of the subjects required by NEPA."  *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1439 (9th Cir. 1988), *amended by* 867 F.2d 1244 (9th Cir. 1989) (internal citation and quotations omitted).

To fulfill NEPA's goal of providing the public with information to assess the impact of a proposed action, the "no action" alternative should be based on the status quo – with a full description of what the status quo is and how it was reached – and should be consistently used as the benchmark by which the various alternatives are compared.  The FEIS defined the "no action" alternative as the route network that had been adopted by the 2003 ROD (the 2003 EA routes), because that was the "status quo" at the time of the FEIS.  However, in order to present an accurate picture of that status quo

United States District Court
For the Northern District of California

"no action" alternative to the public, the FEIS should have informed the public that many of the routes included in that alternative were not part of the 1980 route network.  The FEIS also should have informed the public that the "no action" alternative consisted of a route network that was *larger* than both the 1980 OHV route network, as well as the 1985-1987/ACEC network, but *smaller* than the actual on the ground network as identified in the 2001-2002 inventory.  Only with all of this information could the public  accurately assess the true nature of the status quo, as well as the proposed alternatives against which it is compared.  Of course, the development of the OHV route network from 1980 through the creation of the WEMO Plan is relevant both in the context of explaining and justifying the need to deviate from the 1980 cap (and amend the CDCA Plan language to eliminate that limitation), and in the context of the "no action" alternative.

Another problem arises out of the fact that it is not always clear in the FEIS that the same baseline is used in the "no action" alternative as a basis for comparison.  As plaintiffs note, Table 3-58 in the FEIS compares the 1985-1987 route network against the 2001-2002 route inventory, AR 202203-202204, while Table 4-45, which purportedly compares Alternative A against the no action alternative states, *inter alia*, that "a proportionally higher number of route closures occurred in those areas characterized by 'bajada' topography."  AR 202342.  However, because the no action alternative in the FEIS consisted of the routes designated through the 2003 EA, and Alternative A only incorporated "several minor network modifications" suggested by the public when the 2003 EA routes were presented in the DEIS[34], the differences between Alternative A and the no action alternative, at least with respect to the OHV route network, were not significant.  Thus, it is not clear what route network Alternative A is being compared against in Table 4-45 – the 1985-1987 network?  The 2001-2002 inventory?  This lack of clarity – and potential inconsistency – undermines the purpose underlying NEPA's requirement to present information about the actual impact of a proposed action, and its alternatives, in comparison to the alternative of doing nothing.  The same OHV network should be used as the basis of comparison

---

[34] At least part of the confusion and the shifting "no action" baseline arises out of the timing between the 2003 EA, the DEIS, and the FEIS.  The 2003 EA and DEIS used the same "no action" alternative, namely a combination of the 1985-1987 routes and the ACEC routes.  However, by the time the FEIS was prepared, the BLM had adopted the 2003 EA, and thus the 2003 EA routes (which incorporated the Decision Tree routes), became the status quo, and thus the "no action" alternative.

for all types of impacts – recreational, biological, cultural, etc.

The fluidity and inconsistent definition of the "no action" alternative is more evident in the 2003 EA.  There, the "no action" alternative was defined as those routes put in place during the preparation of the ACEC management plans since 1980, and states that for all other areas the 1985-87 OHV route designations would "remain in place."  AR 211415.  Alternative A in the 2003 EA, which was the "Proposed Action" compared against the "no action" alternative, consisted of the routes designated through the Decision Tree process.  However, all non-recreational  impacts are compared between Alternative A and the 2001 inventory, or the actual on-the-ground OHV route network, while all recreational impacts are compared between Alternative A and the 1985-87 network.  For example, in evaluating the cumulative impacts of Alternative A on biological resources, the BLM stated: "[w]ithout an education and enforcement program, and signing of open routes, the public will continue under the impression that off road travel is allowable anywhere it is possible (outside wilderness and established ACECs)," concluding "the No Action Alternative has a moderate cumulative adverse impact on biological resources."  *Id.*  AR 211544.[35]  On the very next page of the 2003 EA, the BLM describes the impacts on recreation, stating:

> The existing network entirely ignores motorcycle routes and recreation.  In fact, few single-track routes were either inventoried or designated.  It provides fewer opportunities for popular motorcycle tours, camping areas and other traditional activities than Alternative A. . . .  The current network is not seamless; rather, it is composed of different components designed years apart, and the routes in any given two components (such as an ACEC network and a portion of the 1985-87 network) do not necessarily match at the boundaries."

AR 211545.

### C.     Discussion of mitigation measures

Plaintiffs contend that the 2003 EA and the FEIS do not address whether the implementation measures included as part of the action will actually be effective in preventing further expansion of

---

[35] In describing impacts on cultural resources, the BLM stated: "On-going impacts to cultural resources from the existing route network would continue at existing levels, much of which is described in Alternative A.  In some areas, impacts from existing routes are severe and significant resources are being degraded or completely lost."  AR 211547.  Similar statements are made with regard to a reduction in emissions.  In the 2003 ROD: "[a]ll routes in the redesign area are located on existing vehicle routes, as confirmed by 2002 field surveys.  No new roads would be established."  AR 206774.

"illegal" OHV routes.  Plaintiffs note that the BLM has acknowledged that illegal route proliferation does indeed occur, and that several of its previous measures to stop it have been unsuccessful.  Plaintiffs argue that the 2003 EA and the FEIS contain broad statements, without reference to data, concerning implementation and compliance efforts.  Plaintiffs assert that the BLM was required to demonstrate, through data or studies, that its management strategy would be effective.  Plaintiffs also assert that the various enforcement and education measures are dependent on the BLM obtaining future funding, thus adding to the uncertainty.

Defendants respond that the BLM's obligation under NEPA is procedural, not substantive, and that the BLM has adequately identified and assessed potential mitigation measures.  The BLM notes that the FEIS contains numerous proposed mitigation measures, such as mitigation fees (AR 201722-201727); desert tortoise take-avoidance measures and survey protocols (AR 201745-201754); and a monitoring and adaptive management program for various species, including the desert tortoise, the LMMV, the Barstow Wooly Sunflower, and the Mojave monkeyflower (AR 201863-201891).  *See also* AR 204532-204597 (Appendix C – Implementation Tasks).  More importantly, the FEIS does contain a fairly detailed discussion of the measures that BLM would take with regard to signing and maintaining the OHV route network, which would prevent against proliferation of illegal, non-designated OHV routes.  *See* AR 201851-201855.

The Court agrees with the BLM that there is no requirement that BLM "prove" in an EIS that its mitigation measures will work, and that "NEPA requires only that an EIS contain 'a reasonably complete discussion of possible mitigation measures.'"  *N. Alaska Envt'l Ctr. v. Kempthorne*, 457 F.3d 969, 979 (9th Cir. 2006) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989)).[36]  The mitigation must "be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." *City of Carmel-By-The-Sea v. U.S. Dept. of Transp.*, 123 F.3d at 1142, 1154 (9th Cir. 1997).  While an EIS must include "[m]eans to mitigate adverse environmental impacts," 40 C.F.R. § 1502.16(h), "NEPA does not require an agency to formulate and adopt a complete

---

[36] "Mitigation" includes (a) avoiding impacts by not taking an action, (b) limiting the degree of magnitude of the action, (c) repairing, rehabilitating, or restoring the environment, (d) reducing or eliminating the impact over time by preservation and maintenance, and (e) compensating for impact by replacing or substituting resources.  40 C.F.R. § 1508.20.

United States District Court

For the Northern District of California

mitigation plan." *Kempthorne*, 457 F.3d at 979.  The Court finds that the FEIS's discussion of

mitigation measures is adequate.[37]

### D.     Analysis of impacts on resources

Plaintiffs next contend that BLM failed to inventory, identify and analyze significant impacts

to sensitive resources.  Plaintiffs rely on FLPMA, which states that "[t]he Secretary shall prepare and

maintain on a continuing basis an inventory of all public lands and their resource and other values," and

this "[t]his inventory shall be kept current so as to reflect changes in conditions and to identify new and

emerging resource and other values."  43 U.S.C. § 1711(a).  Plaintiffs also rely on this Court's decision

in *CBD II*.  There, the plaintiffs claimed that the BLM relied on incomplete and insufficient inventory

data in the Final Environmental Impact Statement regarding the resources of the Imperial Sand Dunes

Recreation Area ("ISDRA"), and thus that the BLM's approval of a management plan tied to that FEIS

was arbitrary and capricious.  The Court held,

> Defendants are correct that FLPMA does not require that the BLM have current
> inventory data on every species potentially in the ISDRA prior to approving the
> [management plan].  Defendants are also correct that directives in management plans,
> such as directives to monitor and study species, are not legally enforceable.  *See
> Southern Utah Wilderness Alliance*, 542 U.S. at 69-70, 124 S.Ct. 2373.  However, the
> problem here is not that the BLM did not update the inventory data so that it was
> exhaustive and current; to the contrary, the problem lies with the fact that, despite
> extensive evidence in the record indicating the existence of numerous other species
> found at the ISDRA, discussed *supra*, the BLM nevertheless approved the [management
> plan] which does not take these species into consideration.

*CBD II*, 422 F. Supp. 2d at 1167.  The Court found that the BLM had violated NEPA's requirement to

consider every significant aspect of the environmental impact of a proposed action because "despite

extensive information in the record and available to the BLM regarding scores of invertebrates that are

known or believed to be endemic to the Dunes, the EIS only identifies five invertebrates."  *Id*. at 1162.

The Court found that despite the existence of resource inventories describing the other species, "there

is no indication from the EIS itself that the BLM considered the environmental impact of the

[management plan] on the numerous endemic invertebrates that are known or likely to occur in the

---

[37] Of course, in light of the disposition of plaintiffs' claims, BLM may supplement its discussion
of mitigation measures on remand.

47

1    Dunes." *Id*. at 1164.

2          With this framework in mind, the Court turns to plaintiffs' specific challenges.

3

4                **1.      Soils**

5          First, plaintiffs contend that the BLM did not adequately consider the effects of the WEMO Plan

6    on soils.  Plaintiffs argue that the FEIS simply notes a number of impacts that OHVs may have on soils,

7    including infiltration, erosion, and soil chemistry, but that the FEIS does not discuss the impact on soils

8    of the actual route network designated as open, nor does it discuss the impacts of grazing on soils.

9          Defendants counter that the FEIS contains a more than adequate discussion of the impacts on

10   soils.  The Court agrees that the FEIS contains a detailed discussion of the general impacts of OHV use

11   on soils.  *See, e.g.*, AR 202232-202233.  The FEIS also discusses measures to address disturbance to

12   soils, such as revegetation and controlling erosion.  *See e.g.*, AR 201748.  However, what is lacking

13   from the FEIS is a discussion of how soils would be impacted by the proposed WEMO OHV route

14   network.  A general discussion of how soils are affected by OHV use, while informative, does not

15   provide the public with information about how to assess the particular impact of the proposed project.

16   Of course, the BLM need not provide a detailed description on a route-by-route basis; however, the

17   FEIS should contain some discussion of the particular impacts on soils of the proposed Plan, both with

18   regard to the designated OHV route network, and livestock grazing.  "NEPA requires federal agencies

19   to examine the environmental effects of a proposed project and, for those actions that will significantly

20   affect the environment, to inform the public in an EIS of the relevant factors that were considered in the

21   decision-making process." *Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 811 (9th Cir.

22   2005).

23

24                **2.      Cultural resources**

25          Plaintiffs also challenge the FEIS's discussion of impacts to cultural resources.  The FEIS

26   contains a section describing cultural resources in the chapter on "Affected Environment."  AR 202209-

27   202223.  The cultural resources include a number of known cultural sites that are listed in the National

28   Register of Historic Places, such as Last Chance Canyon (with "known values" listed as

**United States District Court**
For the Northern District of California

"prehistoric/historic/Native American"), Fossil Falls Archaeological District ("prehistoric"), Rodman Mountain Petroglyphs ("scientific, conservation, traditional use, public"), and Alf's Blacksmith Shop ("conservation, public, only known complete blacksmith shop remaining in San Bernadino County"). AR 202212-202213. The cultural resources also include a number of "potentially significant areas," such as prehistoric sites, and "significant paleontological localities." *See, e.g.*, AR 202215-202216, 202218-202222. The FEIS states:

> Activities proposed in Alternative A that may affect cultural resources include the following listed actions:
>
> • Implementing actions for Conservation Areas and new, non-cultural resource ACECs within DWMAs, such as construction of fences or culverts, placement of signs and kiosks, rehabilitation and restoration of routes or larger areas, removal of structures and debris if 50 years old or older;
>
> • Multiple use class changes that increase or decrease protection of cultural resources, depending on the nature of the change (generally, L to M decreases protection of cultural resources, e.g., and vice versa);
>
> • Land exchanges that result in removal of important cultural resources from protective federal management (which would be mitigated through CEQA for development);
>
> • Designation of routes of travel as open to vehicle use if those routes occur on or near cultural resources; and
>
> • Decisions to continue use of existing designated routes that are located inside, near, or in the vicinity of cultural resources.
>
> For many of these activities, significance of effect would be evaluated when specific actions are proposed and their locations are known. Specific actions would be subject to full compliance with cultural resource statutes and regulations, and managers must not approve proposed activities until compliance with Section 106 of the Natural Historic Preservation Act has been completed and documented, including consultation with the State Historic Preservation Officer and federally recognized Indian tribes.

AR 202349. Plaintiffs focus on the following paragraph in the FEIS's discussion of impacts to cultural resources:

> The effect of BLM routes of travel on public land cultural resources has not been fully determined because information needed to assess effect is incomplete at the present time; however, records and observation indicate the effect on some public land sites is significant. To mitigate significant impacts, route designation would be reviewed under the Section 106 process, and a programmatic approach to Section 106 compliance for routes of travel within this planning area is being discussed with the California State Office of Historic Preservation.

AR 202350. Plaintiffs contend that it is inadequate to simply state that OHV use has a "significant"

**United States District Court**
For the Northern District of California

1    effect on cultural resources, but that "[t]he effect of BLM routes of travel on public land cultural

2    resources has not been fully determined because information needed to assess effect is incomplete at

3    the present time."  Plaintiffs argue that the BLM is not permitted to take such actions without first

4    expending reasonable costs to ascertain what it can.  *See* 40 C.F.R. § 1502.22.

5         The BLM generally responds that plaintiffs' objection is "too vague" and that plaintiffs fail to

6    identify any particular cultural resources or site of concern.  However, it is not plaintiffs' burden to

7    identify specific cultural resources that may be negatively impacted by the WEMO Plan; to the contrary,

8    the onus is on the BLM to inform the public of the impacts of the Plan on cultural resources.  The BLM

9    also relies on the Decision Tree to assert that the BLM subjected individual route decisions to cultural

10   resources review.  For all of the reasons stated *supra*, the record does not document a cultural resources

11   review, and there is no way for the Court to assess whether, in fact, cultural resources were considered

12   in the route designation process.  If impacts on cultural resources *were* considered in the route

13   designation process, BLM has this information and it should have been distilled and presented in the

14   FEIS.  While the FEIS does contain some information about effects on cultural resources, *see, e.g.*, AR

15   202355 ("A number of open routes within these sub-regions cross significant archaeological sites and

16   are causing damage, sometimes severe, to the resources."), there are numerous statements throughout

17   the FEIS indicating that the BLM has not made an assessment of the impact of the WEMO OHV routes

18   on cultural resources.  *See, e.g.*, AR 202352 ("Within the Ridgecrest Field Office Area, no cultural

19   resources field inventory data has been carried out on the proposed 2002 route designation updates.").

20   To the extent that the FEIS does contain a discussion of the impact of the WEMO Plan on specific

21   cultural resources, the BLM has satisfied its obligation under NEPA.  However, for those areas in which

22   "[t]he effect of BLM routes of travel on public land cultural resources has not been fully determined

23   because information needed to assess effect is incomplete at the present time," the FEIS is inadequate

24   because it does not inform the public of the scope and extent of the impacts of the WEMO Plan.

26         **3.    Biological resources**

27         Plaintiffs identify several specific biological resources of concern, but also state that these are

28   just examples of the BLM's broad failure to keep adequate inventories of biological resources as

required by FLPMA.  Plaintiffs cite riparian concerns, "unusual plant assemblages" ("UPAs"), and water quality, for which plaintiffs contend the BLM has no inventory whatsoever.  Plaintiffs also cite the spreading of non-native plants (i.e. weeds) and several sensitive species.  Defendants counter that FLPMA does not require the BLM to have a current inventory on every species potentially in the plan area prior to approving a plan.  *CBD II*, 422 F. Supp. 2d at 1167.

### a.   "Unusual plant assemblages" and riparian and water resources

Plaintiffs challenge the FEIS's treatment of the impacts of OHV routes and grazing on water-associated UPAs and on riparian and water resources.  Plaintiffs argue that the FEIS does not contain basic information regarding the condition of water resources or UPAs, and more importantly, that the FEIS does not assess the impact of the OHV routes or grazing on these resources.  The BLM responds by citing the BLM's WEMO Rangeland Standards of Public Land Health, which require healthy, productive, and diverse habitats for native species, including UPAs, and protect riparian and water resources.  The BLM also cites portions of the FEIS that generally discuss water quality and water resources, and the general threats posed by OHV use.  However, as with the FEIS's discussion of impacts to soils, there is no discussion or analysis of the impacts flowing from the OHV route network designated by the WEMO plan, or from grazing.  Again, while NEPA does not require a detailed discussion of how every designated route will affect every riparian resource or UPA, the FEIS should contain some discussion of the particular impacts flowing from the WEMO Plan.

### b.   Spread of non-native plants

Plaintiffs also contend that the FEIS does not adequately address another impact of OHV use and grazing, namely the spread of non-native plants.  Plaintiffs note that the FEIS only contains a few references to the spread of non-native plants, usually in connection with discussion of a mitigation measure.  Plaintiffs argue that although the BLM concluded that the route network would reduce the spread of invasive weeds, there is no analysis in the FEIS to support that conclusion.

The FEIS concludes that implementation of the BLM's motorized vehicle access network would reduce the "spread of exotic weeds," and that the reduction "would be proportionate to the linear miles

of routes closed." AR 202261. The BLM cites various portions of the FEIS which mention invasive weeds and mitigation measures to address invasive weeds. The Court finds that this discussion is adequate under NEPA.

**c.** **Sensitive species**

Plaintiffs contend that the FEIS fails to provide adequate information or analysis of impacts to State listed and BLM sensitive species, including, but not limited to, the Mojave fringe-toed lizard, the Barstow wooly sunflower, the desert cymopterus, and the Mojave monkeyflower. Plaintiffs provide several examples of the BLM's allegedly inadequate analysis, and they state that the examples are "representative, not exclusive." However, plaintiffs have not identified a general deficiency that would apply more broadly to the BLM's treatment of sensitive species in the FEIS, and thus the Court limits its review to the specific examples identified by plaintiffs.

With regard to the Mojave fringe-toed lizard, plaintiffs note that the "Species Account"[38] for the lizard states that there is no recent data on population status and relative density, AR 204475, but that the FEIS nevertheless concludes, *inter alia*, that "light" OHV travel on three "primary routes across fringe-toed lizard habitat . . . which cover about one-fourth of the occupied habitat, does not appear to be impacting this species." AR 202289. While the FEIS's discussion of impacts to the fringe-toed lizard is detailed, and when viewed in isolation appears adequate, when assessed in conjunction with the Species Account, the BLM's statement that the OHV routes over one-quarter of the lizard's habitat do "not appear to be impacting these species" is unsupported by any factual basis. *See Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) ("To have not acted in an arbitrary and capricious manner, the agency must present a rational connection between the facts found and the conclusions made.") (internal quotations omitted).

With regard to the Barstow wooly sunflower, the desert cymopterus, and the Mojave monkeyflower, plaintiffs argue that the BLM has failed to adequately identify and analyze the impacts of the WEMO Plan on these species. However, the FEIS discusses specific threats and impacts of the

---

[38] A Species Account was prepared for each plant or animal addressed by the WEMO Plan. AR 204451.

1   WEMO Plan to these species.  *See, e.g.*, AR 203284 (stating Alternative B can conserve most, but not

2   all, of the known occurrences of the Barstow wooly sunflower outside Edwards AFB, noting other

3   measures that would promote conservation), 202385 (stating that under Alternative B, the majority of

4   Mojave monkeyflower populations would be conserved), 202385 (stating that the desert cymopterus

5   would remain protected on public land by the requirement of avoidance and would benefit from route

6   designation in certain subregions, and noting other threats that could lead to its listing as a threatened

7   or endangered plant).  This NEPA analysis sufficiently informs the public of impacts to these species.

8

9       **E.**     **Impacts on air quality**

10       The FEIS states that under Alternative B (the selected BLM alternative) "[t]here would be

11   reductions in emissions of particulate matter from BLM managed lands.  This would result in

12   corresponding declines in $PM_{10}$ concentrations in a number of areas.  On an overall plan basis, there

13   would be a significant reduction in particulate emissions.  Reductions would occur on BLM lands away

14   from population centers."  AR 202261.[39]

15       Plaintiffs contend that the BLM's conclusion that $PM_{10}$ will be reduced by the implementation

16   of the WEMO Plan is flawed because the BLM did not adequately quantify or analyze emissions from

17   increased OHV use, and because the BLM did not quantify or analyze emissions from OHV use in open

18   *areas*, as opposed to on designated routes.

19       The BLM cites pieces of the record which support its conclusion that $PM_{10}$ will be reduced from

20   what they were "at present."  AR 201979, 201981, 202232, 202423, 202621, 202626.  There can be little

21   doubt that reducing the parking-camping area that is available from 600 ft. (300 ft. in each direction)

22   to 100 ft. (50 ft. in each direction) reduces OHV impacts and will likewise reduce $PM_{10}$.  However, the

23   BLM does not assert that the FEIS assessed the impact of emissions in open *areas*, and the discussion

24   in the FEIS does not reflect that any such analysis was conducted.  *See* SAR 300183-300184.  While

25   the BLM's conclusion that reducing the on the ground network of designated *routes* would result in

26   reduced emissions is supported and discussed, plaintiffs are correct that the discussion of impacts on

27

28       [39]  $PM_{10}$ is particulate matter with particles with a diameter of 10 micrometers or less.  *See* http://www.epa.gov/air/airtrends/aqtrnd95/pm10.html.

1    air quality is incomplete without consideration of emissions in open areas.

2        Plaintiffs also contend that the FEIS is inadequate because the BLM did not discuss the impacts

3    to air quality from increased OHV use.  Plaintiffs cite statements from chapter 3 of the FEIS, "Affected

4    Environment," in which the BLM describes general statewide trends in OHV use.  *See, e.g.*, AR 202174.

5    However, the cited statements consist of general background information, and do not contain projections

6    about future OHV levels under the WEMO Plan.  The FEIS's discussion of impacts on air quality –

7    aside from the failure to discuss OHV use in open areas – is sufficient.

8

9        **F.    Cumulative impacts**

10       Plaintiffs' final NEPA contention is that the BLM failed to fully analyze the cumulative impacts

11   of the WEMO Plan, and in particular of the 5,098 OHV route network.  As discussed *supra*, because

12   the specific impacts of the route network are not analyzed (for example, with regard to soils, cultural

13   resources, and water and riparian resources), the Court finds that the cumulative impacts analysis is

14   deficient as well. Because the BLM will be required to reassess the specific impacts of the WEMO Plan

15   on remand, the Court finds it unnecessary to address the parties' specific arguments about the

16   cumulative impacts analysis.

17

18

19   **III.   Endangered Species Act claims**

20       On March 31, 2005, FWS issued a BiOp concluding that implementation of the CDCA Plan, as

21   amended by previous amendments, the proposed NEMO and NECO bioregional plans, and the interim

22   conservation measures in the WEMO planning area, was not likely to jeopardize the desert tortoise or

23   to destroy or adversely modify its critical habitat.  NBO 12535-12737 ("NECO BiOp").  On January 9,

24   2006, FWS issued a BO concluding that implementation of the CDCA Plan, as amended by previous

25   amendments and the proposed WEMO bioregional plan, was not likely to jeopardize the desert tortoise

26   or the Lane Mountain milk-vetch, or destroy or adversely modify desert tortoise critical habitat.  WBO

27   14752-14949 ("WEMO BiOp").  The BiOps also contain Incidental Take Statements for the desert

28

tortoise that permit "take"[40] of the tortoise within the plan areas.  On November 30, 2007, FWS issued

amended ITSs for the NECO and WEMO BiOps.  NSupp ITS 1175; WSupp ITS 1018.

### A.    The "No Jeopardy" conclusion for the desert tortoise

Plaintiffs contend that in arriving at its "no jeopardy" findings, the FWS failed to adequately

address the impacts of proposed activities on desert tortoise recovery.  In particular, plaintiffs argue that

FWS ignored a Desert Tortoise Recovery Plan issued by the FWS in 1994.  Section 4 of the ESA

requires the Secretary of the Interior "to develop and implement plans . . . for the conservation and

survival of endangered and threatened species . . . to the maximum extent practicable."  16

U.S.C. § 1533(f).  FWS issued the Desert Tortoise Recovery Plan pursuant to Section 4(f), and that plan

recommends that many activities, including livestock grazing and off-road vehicle activity, "be

prohibited throughout all DWMAs because they are generally incompatible with tortoise recovery."

NBO 616-17.

The Court's review of the "no jeopardy" conclusion is deferential.  A final agency decision, such

as a BiOp, may only be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law."  5 U.S.C. § 706(2)(A).  However, the Court "must ensure that the FWS's

decisions are based on a consideration of relevant factors and we assess whether there has been a clear

error of judgment." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1065 (9th

Cir. 2004) (internal citations omitted).  The BiOp must articulate "a rational connection between the

facts found and the choice made." *Pac. Coast Fed'n of Fishermen's Ass'n, v. Nat'l Marine Fisheries

Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001) (internal quotations omitted).

### 1.    Consideration of ability to recover

---

[40] Section 9 of the ESA and its implementing regulations prohibit the "take" of a threatened or
endangered species of animal. *See* 16 U.S.C. § 1538(a)(1); 50 C.F.R. § 17.31.  "Take" is defined
broadly under the ESA to include harming, harassing, trapping, capturing, wounding or killing a
protected species either directly or by degrading its habitat sufficiently to impair essential behavior
patterns. *See* 16 U.S.C. § 1532(19).  The ESA provides an exception to its prohibitions on take: a
federal agency may take listed species in accordance with an Incidental Take Statement issued with a
BiOp. *See id.* at § 1536(b)(4).

United States District Court
For the Northern District of California

Plaintiffs generally assert that FWS failed to consider relevant information regarding the ability of the desert tortoise to recover in light of the effects of authorized activities in the NECO and WEMO Plans, and also failed to analyze effects on the tortoise in light of the species' degraded baseline condition. Plaintiffs assert that FWS improperly compared the effects of the WEMO and NECO Plans to the effects under existing management, rather than conducting a correct jeopardy analysis that focused on what jeopardy might result from the BLM's proposed actions. For the most part, plaintiffs do not identify specific deficiencies with FWS's analysis, and instead just generally assert that the no jeopardy findings are unsupported.

In order to evaluate plaintiffs' largely generalized attack,[41] it is important to first understand how the NECO and WEMO Plans amended the CDCA. In addition to the OHV route network contained in the WEMO Plan and discussed *supra,* the proposed NECO and WEMO bioregional plans designate numerous conservation and special protection areas, such as DWMAs, and ACECs. In the plan amendments, the BLM reduced the areas where livestock grazing can occur; imposed protective management prescriptions applicable to ongoing grazing, such as the requirement to remove cattle from allotments when forage levels reach certain threshold levels; designated routes and reduced the overall vehicle route access network from the actual on the ground OHV route network; restricted the areas in which OHV users can stop, camp, and park to 50 feet off the centerline in WEMO; authorized camping only within 50 feet of the centerline of a route and only in disturbed areas in WEMO; authorized OHV use in open washes in NECO only within navigable washes and only when such use will not result in the crushing of perennial vegetation on the banks of the washes, and reduced the overall area in which such activities may occur; withdrew lands from mineral entry and exploration; and provided for the voluntary relinquishment of grazing leases and permits. WBO 14759-14785; NBO 12540-12572. In addition, the plans establish a one percent threshold for "new ground disturbance" in the DWMAs. "New ground disturbance includes any clearing, excavating, grading or other manipulation of the terrain, whether or not a permanent use is proposed for the site." WBO 14763; *see also* NBO 12555-12556.

FWS summarized its no jeopardy finding for the WEMO Plan as follows:

---

[41] To the extent plaintiffs raise specific challenges, such as plaintiffs' contention that FWS failed to consider survival on a recovery unit basis, the Court addresses those arguments *infra.*

The proposed amendment of the California Desert Conservation Area Plan for the Western Mojave Recovery Unit would increase protection of the desert tortoise above the current management situation that occurs within this region. Additionally, except for casual uses (e.g., casual mining exploration, vehicle use on existing roads, hiking, and vehicle camping along existing roads) and ongoing grazing, activities and projects will receive site-specific environmental review and consultation with the Service, pursuant to section 7(a)(2) of the Act, as appropriate. Therefore, all activities and projects, except casual uses, may be denied, modified, or mitigated to reduce adverse effects to desert tortoise if, as proposed for some future specific activity, they would violate section 7(a)(2) of the Act. . . .

The Bureau's proposal to designate all lands within desert wildlife management areas as Class L should provide increased protection to the desert tortoise over that currently provided by Class M guidance; however, the Bureau can authorize actions within Class L areas that could kill desert tortoises. The proposal to limit the cumulative amount of ground disturbance to one percent should ensure that the vast majority of desert tortoises residing on public lands within the desert wildlife management areas are conserved in a manner that provides for their survival and recovery.

The designation of routes in desert wildlife management areas, with an overall reduction in the amount of the road network, should reduce the level of mortality of desert tortoises on roads; it should also reduce the area in which they are threatened by other human activities related to access (e.g., poaching, vandalism). Neither the Bureau nor the Service has definitive information on how differing route networks affect the desert tortoise. Roadless areas would have the least adverse effect on desert tortoises; an access network that provides for large expanses of undisturbed habitat for the desert tortoise would seem to provide the opportunity for recovery. The extent that the changes in the access network affect the desert tortoise will be difficult to measure because of the slow reproductive rate of the species and other factors, such as disease, drought, and predation, which may be affecting the number of individuals in a region.

The desert tortoise will benefit from the Bureau's proposal to allow the voluntary relinquishment of grazing leases and related authorizations; cattle have been removed from several allotments and sheep have not grazed substantial areas of critical habitat since it was designated. As a result of this action, only one cattle allotment remains within a desert wildlife management area in this bioregion; desert tortoises will be threatened with trampling and crushing by cattle and operators on a far smaller area.

Reducing the distance that cars and trucks can drive and park from up to 300 feet from a route of travel to 50 feet in the desert wildlife management areas provides a great degree of protection to the desert tortoise. The requirement that camping be limited to existing disturbed areas provides an additional level of protection.

Maintaining a corridor for competitive events along the Johnson Valley to Parker route is likely to kill or injure desert tortoises. We do not have sufficient information to assess the likely level of mortality at this time. The Bureau's review of a specific proposed race in the future will provide an opportunity to review the potential level of mortality in adequate detail. We note that the Bureau eliminated the western fragment of the corridor for the Barstow to Las Vegas race course; this action eliminates a potential threat to desert tortoises.

The Bureau has proposed to withdraw several areas from mineral location and entry. This action has the potential to reduce to a substantial degree the number of desert tortoises that may be killed during casual use and under future plans of operation.

The acquisition of private lands within desert wildlife management areas will remove at least some threats that desert tortoises may face on non-federal lands; this acquisition will also facilitate the Bureau's management. The addition of lands to the retention zone in the West Mojave Land Tenure Adjustment Program will increase the area within which desert tortoises may be conserved.

Programs to educate visitors about the desert tortoise and how they can assist in conserving the species will also promote recovery of the species. A permitting and education program for use of vehicles in the Rand Mountains may be particularly beneficial, given the difficulty that the Bureau has had in enforcing compliance with the route network in this area.

The California Desert Conservation Area Plan, as amended by the West Mojave Plan, provides guidance, including the requirement to consider the needs of listed species, sufficient to ensure the survival and recovery of the desert tortoise in the Western Mojave Recovery Unit. The decline in this region prompts concern; desert tortoise numbers are low enough in certain areas to make them almost undetectable. Full and swift implementation of the amended California Desert Conservation Area Plan may reduce the severity and duration of the decline, if it is tied to anthropogenic causes.

In summary, the actions in the West Mojave Plan were proposed with consideration of the Bureau's mandates to manage public lands and after careful evaluation of the current situation in these areas and input from the public and numerous agencies. With a few exceptions, such as the Johnson Valley-to-Parker race corridor and permitting vehicles to stop and camp off of routes, the actions that were adopted by the Bureau are highly protective of desert tortoises. Even the exceptions as noted provide greater protection to the desert tortoise than the California Desert Conservation Area Plan of 1980. In addition, as we discussed previously in this biological opinion, the best data available seem to indicate that none of these actions have severe adverse effects on the desert tortoise. However, the cause of the recent declines in the number of desert tortoises across California has not been identified. Consequently, the mechanisms needed to reverse these declines are also unknown. The potential exists that reversal of the decline of the desert tortoise may require substantial additional management; another scenario is that we may not be able to identify or manage the agent or agents responsible for the decline.

WBO 14880-12882. FWS's summary of the effects of the NECO Plan on the desert tortoise is similar. *See* NBO 12701-12704.

Plaintiffs assert that the BiOps are flawed because they do not determine the degree to which the take anticipated from activities authorized under the Plans would be deleterious to the tortoise's viability and ability to recover. In making this argument, plaintiffs cite various portions of the Desert Tortoise Recovery Plan, as well as *National Wildlife Federation v. National Marine Fisheries Service (NWF)*, 524 F.3d 917 (9th Cir. 2008). In *NWF*, the consulting agency (NMFS) prepared a BiOp addressing the effects of dams and related facilities on threatened and endangered fish, and found that the proposed agency action would not jeopardize the continued existence of the listed fish. *Id.* at 926. The BiOp "did not point to any improvement in the fishes' status" and "also omitted any clear

consideration of the impact of proposed operations on listed species' chances of recovery." *Id*.  The Ninth Circuit held that  the agency's failure to consider the proposed actions' impacts on the chances of recovery as opposed to just survival, violated ESA regulations that prohibit any action "that reasonably would be expected, directly or indirectly, to *reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild*." *Id*. at 931 (quoting 50 C.F.R. § 402.02) (emphasis in opinion); *see also id*. at 933 ("The only reasonable interpretation of the jeopardy regulation requires NMFS to consider recovery impacts as well as survival.").

Here, unlike *NWF*, FWS did consider impacts to desert tortoise recovery.  FWS identified the survival and recovery needs of the species, explaining that the desert tortoise requires significant expanses of largely undisturbed habitat to ensure long-term viability, and finding that BLM's proposed actions ensure that most desert tortoise habitat within the planning areas, including the vast majority of critical habitat, is sufficiently protected and will remain largely undisturbed. *See* WBO 14799-14801 (discussing "Relationship of Recovery Units, Distinct Population Segments, Desert Wildlife Management Areas, and Critical Habitat Units"), 14827, 14835, 14880-14881 (noting that limiting amount of cumulative ground disturbance to 1% in each DWMA "will likely ensure that proposed actions do not cause injury to or mortality of a large number of desert tortoises," "should ensure that large numbers of individuals are not disturbed by activities associated with specific projects," "will likely ensure that proposed actions do not appreciably compromise the function and conservation role of critical habitat units in the Mojave Desert planning area," and "should ensure that the vast majority of desert tortoises residing on public lands within the desert wildlife management areas are conserved in a manner that provides for their survival and recovery"); NBO 12610-12611 ("[W]e conclude that all of the critical habitat units within the action area are capable of supporting their conservation role and function."), 12701 (stating that limiting cumulative amount of surface disturbance to 1% should ensure that "vast majority" of desert tortoises within DWMAs "are conserved in a manner that provides for their survival and recovery").  FWS explicitly found that the proposed actions improve conditions for the desert tortoise and afford the opportunity for the species' recovery. *See* WBO 14880-14888; NBO 12701-12711.  Unlike the "structural" flaw in the *NWF* BiOp where the agency did not address recovery needs whatsoever, *NWF*, 532 F.3d at 926, here the WEMO and NECO BiOps repeatedly

United States District Court
For the Northern District of California

address recovery and conclude that the proposed plans will not reduce appreciably the likelihood of recovery, but in fact will promote recovery.

Plaintiffs appear to suggest that FWS's no jeopardy finding is flawed because the WEMO and NECO Plans do not fully implement the Desert Tortoise Recovery Plan. However, while the Recovery Plan is certainly relevant to assessing the impact of the proposed actions on desert tortoise recovery, the ESA does not require that a Recovery Plan be fully implemented. In *Fund for Animals v. Rice*, 85 F.3d 535 (11th Cir. 1996), the Eleventh Circuit rejected the plaintiffs' contention that a no jeopardy conclusion was flawed on the ground that it conflicted with habitat provisions in the recovery plan for the Florida Panther:

> The Plaintiffs' line of reasoning is flawed in several respects. First, the practical effect of the Plaintiffs' position would be to elevate the 1987 Recovery Plan into a document with the force of law. We cannot take such an approach. Section 1533(f) makes it plain that recovery plans are for guidance purposes only. *See* 16 U.S.C. § 1533(f). By providing general guidance as to what is required in a recovery plan, the ESA "breathe[s] discretion at every pore." *Strickland v. Morton*, 519 F.2d 467, 469 (9th Cir. 1975).
>
> Second, the Plaintiffs' position cannot be reconciled with the Corps' statutory duty under § 7 of the ESA to consult with the F.W.S. about the environmental impact of proposed agency actions and the F.W.S.'s duty to arrive at a biological opinion based upon the best scientific data available. There would be absolutely no point to the consultation and preparation of a biological opinion if the F.W.S.'s opinion were predetermined based upon whether proposed project lands fell within the borders of properties discussed in one of any number of recovery plan documents. The Plaintiffs thus misconstrue the interrelationship and legal effect of the 1987 Recovery Plan on the 1995 F.W.S. Biological Opinion.

*Id.* at 547. The Eleventh Circuit found that FWS issued "reasonable justifications" for its no jeopardy conclusion, including the facts that there had been no verified panther sightings in the area at issue, and the contested land was not designated as critical habitat for the panther. *Id.*

Thus, to the extent plaintiffs' challenge is grounded in the fact that there may be substantive differences between the Recovery Plan and the WEMO and NECO Plans, that challenge fails. Plaintiffs must point to a specific aspect of the no jeopardy finding that is arbitrary and capricious, and they have not done so. As discussed above, FWS concluded that the WEMO and NECO Plans would *improve* conditions for the desert tortoise, and thus would promote recovery. Clearly, the plans do not promote recovery to the full extent recommended in the Recovery Plan or as much as the plaintiffs would like. However, that does not render FWS's no jeopardy findings unsupported, or arbitrary and capricious.

United States District Court
For the Northern District of California

1

2. **Baseline condition**

2      Plaintiffs also contend that FWS used an improper "environmental baseline" when analyzing the

3   effects of the WEMO and NECO Plans on the desert tortoise.  ESA regulations define the environmental

4   baseline as including "the past and present impacts of all Federal, State or private actions and other

5   human activities in the action area" and "the anticipated impacts of all proposed Federal projects in the

6   action area that have already undergone formal or early section 7 consultation."  50 C.F.R. § 402.02.

7   A baseline analysis "will involve consideration of the present environment in which the species or

8   critical habitat exists, as well as the environment that will exist when the action is completed, in terms

9   of the totality of factors affecting the species or critical habitat.  The evaluation will serve as the baseline

10  for determining the effects of the action on the species or critical habitat."    Interagency

11  Cooperation-Endangered Species Act of 1973, as Amended; Final Rule, 51 Fed. Reg. 19,932 (June 3,

12  1986).[42]

13     Plaintiffs assert that FWS simply listed prior consultations and recited impacts from future

14  implementation of the plans, and that FWS failed to adequately account for other authorized take from

15  ongoing activities in the West Mojave planning area in analyzing the impact of the WEMO Plan.

16  Specifically, plaintiffs assert that the impacts from the existing on-the-ground destruction of habitat by

17  routes (both previously designated routes and illegally created routes) should have been included as part

18  of the baseline, and that authorization for use of the routes and the terms of that use in the future

19  (including, *inter alia*, routes networks, speed limits and seasons of use) should have been considered

20  in the jeopardy analysis.  Plaintiffs do not cite any portions of the WEMO BiOp in support of their

21  argument that FWS did not consider the impacts of the on the ground OHV route network, and in fact

22  the BiOp discusses OHV routes in connection with the environmental baseline and future impacts.  *See,*

23

24

25

26

27      [42]  The ESA baseline analysis focuses on the impacts of the proposed action on a protected species, whereas the NEPA baseline analysis discussed *supra* is directed at providing the public with an assessment of the broader impacts of a proposed project in comparison to a variety of alternatives, including the alternative of taking no action.

28

*e.g.*, WBO 14803-14804, 14816-14818, 14845-14847; *see also* NBO 12583, 12613-12614, 12623.[43]

Plaintiffs also assert that the environmental baseline did not adequately account for take of desert tortoises as a result of the expansion of Fort Irwin. Plaintiffs rely on language from the Fort Irwin BiOp, in which FWS discussed the Army's proposal to translocate desert tortoises from areas where new training exercises would occur to managed areas where the translocated tortoises would be protected. WBO 9949-9950. Plaintiffs emphasize language in the Fort Irwin BiOp in which FWS recognized that it was theoretically possible that all translocated tortoises could die: "At the worst, both translocated and resident animals will be subjected to high levels of mortality; if such an event happens, the information we gather as we monitor the translocation would be the sole benefit of the action." *Id.* at 9950. However, plaintiffs isolate that sentence and ignore the context of that statement:

> To reduce the level of mortality associated with training, the Army has proposed to translocate as many desert tortoises as it can from the Superior Valley and UTM 90 parcels. Translocation of desert tortoises to managed parcels of land may, at best, prevent the loss of a large number of animals, allow these individuals to contribute to the conservation of the species in the Western Mojave Recovery Unit, and provide valuable information on how to use translocation as a recovery tool. At the worst, both translocated and resident animals will be subjected to high levels of mortality; if such an event happens, the information we gather as we monitor the translocation would be the sole benefit of the action. Given the results of the Nussear study[44] at Bird Springs Valley, *we expect that the translocation effort will be successful in large part*.

*Id.* (emphasis added). The Fort Irwin BiOp concluded that based on a variety of factors, "approximately 136 adult desert tortoises may die during translocation," that this loss may be spread out over many years, and that when the estimated deaths of 136 tortoises from translocation was added to other expected deaths of tortoises (located in another area not subject to translocation) "[t]his level of mortality translates to approximately 1.03 to 2.07 percent of the 20,420 to 41,224 adult desert tortoises

---

[43] Of course, FWS's assessment of the impact of the WEMO Plan is based, in large part, on the OHV route network designated in that Plan. The Court's finding that those route designations did not comply with FLPMA, however, does not affect the Court's analysis of whether FWS complied with the ESA in reviewing the effect of the WEMO Plan on the desert tortoise and its critical habitat.

[44] The Fort Irwin BiOp states that "[a]s shown by the Nussear study, desert tortoises that are moved to more distant locations exhibited a high rate of survival." *Id.*

United States District Court
For the Northern District of California

that Heaton et al. (2004) estimated resided in the Western Mojave Recovery Unit. *Id*. at 9951.[45]

The WEMO BiOp addressed the Fort Irwin expansion and the Fort Irwin BiOp in its discussion of the current status and environmental baseline for the desert tortoise. WBO 14794, 14804-14805.[46] There is no support for plaintiffs' assertion that FWS was required to assume that the Army's translocation of desert tortoises would result in the death of all tortoises when the language of the Fort Irwin BiOp expressly states that FWS expects the translocation efforts to be largely successful.

Plaintiffs' reliance on *NWF* is unavailing, and again the differences between that case and this one are instructive. In *NWF*, the agency completely excluded from the environmental baseline all impacts from "nondiscretionary" federal activities such as operations relating to irrigation, flood control and power generation. 524 F.3d at 926. The Ninth Circuit held that this exclusion was improper and that nothing in the ESA or case law "permits agencies to ignore potential jeopardy risks by labeling parts of an action nondiscretionary." *Id*. at 928. Here, FWS did not ignore the impact of the Fort Irwin expansion or OHV use in formulating its environmental baseline.

Relatedly, and again citing *NWF*, plaintiffs argue that FWS improperly compared the effect of the NECO and WEMO Plans to the effects under existing management, rather than conducting a comprehensive jeopardy analysis. In *NWF*, the agency segregated its jeopardy analysis as follows:

> [I]nstead of assessing whether the listed fish would be jeopardized by the aggregate of the proposed agency action, the environmental baseline, cumulative effects, and current status of the species, NMFS segregated its analysis, first evaluating whether the proposed agency action – consisting only of the proposed discretionary operation of the FCRPS – would have an appreciable net effect on the species. It considered additional context only if it found such an effect. By using this so-called comparative approach rather than a more holistic, aggregate approach, NMFS concluded that the proposed action would not jeopardize the continued existence of the fish. Although the 2004 BiOp did not point to any improvement in the fishes' status or the impacts of FCRPS operations, its new approach attributed only a much smaller portion of the fishes' perilous condition to the proposed operations under review.

---

[45] The Fort Irwin BiOp also concluded that the loss of this number of adult desert tortoises "will not appreciably reduce the ability of the species to survive and recover in the Western Mojave Recovery Unit." *Id*.

[46] Although the area within the boundaries of Fort Irwin is not within the action area of the NECO BiOp, the NECO BiOp also addressed the Fort Irwin expansion in its discussion of the current status and environmental baseline for the desert tortoise because "the conservation measures being implemented by the Army as part of the proposed action are likely to have substantial beneficial effects on the desert tortoise and its critical habitat within the action area." NBO 12587.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

524 F.3d at 926.  The Ninth Circuit rejected the agency's argument that "it may satisfy the ESA by comparing the effects of proposed FCRPS operations on listed species to the risk posed by baseline conditions [and] [o]nly if those effects are 'appreciably' worse than baseline conditions must a full jeopardy analysis be made.  Under this approach, a listed species could be gradually destroyed, so long as each step on the path to destruction is sufficiently modest." *Id*. at 930.

Here, the critical difference is that FWS concluded that the WEMO and NECO Plans *improved* conditions for the desert tortoise.  Thus, unlike in *NWF* where the true adverse impact of the proposed agency action was distorted and minimized – and possibly placing the listed species in "jeopardy" – here the proposed agency actions improve the status quo.  The Ninth Circuit emphasized that "[o]ur approach does not require [the agency] to include the entire environmental baseline in the 'agency action' subject to review.  It simply requires that [the agency] appropriately consider the effects of its actions 'within the context of other existing human activities that impact the listed species.'" *Id*. (quoting *ALCOA v. BPA*, 175 F.3d 1156, 1162 n.6 (9th Cir. 1999)).  Both BiOps contain extensive discussions of "other existing human activities" that impact the desert tortoise, and plaintiffs have failed to demonstrate anything arbitrary or capricious about FWS's assessment of the environmental baseline.

### 3.     Survival on recovery unit basis

Plaintiffs also challenge the BiOps on the ground that FWS failed to consider survival on a recovery unit basis.  Plaintiffs rely on the Recovery Plan, which defines a "recovery unit" as a "geographic unit harboring an evolutionarily distinct population segment of the desert tortoise within the Mojave region," NBO 553 n.1, and states that the goal of the Recovery Plan is to protect and recover each of these unique populations of desert tortoise: "[p]reserving viable populations of desert tortoises within each of these units is essential to the long-term recovery, viability, and genetic diversity of the species."  NBO 591.   Plaintiffs argue that even moderate losses in the already declining Western Mojave recovery unit could cause a rapid population decline and impede the prospects for recovery of the species.  As such, plaintiffs contend that FWS "failed to consider an important aspect of the problem," and that the analyses and conclusions in the BiOps are arbitrary and capricious.

Plaintiffs do not cite any portions of the BiOps to support their argument that FWS did not

United States District Court
For the Northern District of California

1    consider survival on a recovery unit basis.  Indeed, the WEMO BiOp states,

2        The California Desert Conservation Area Plan, as amended by the West Mojave Plan,
         provides guidance, including the requirement to consider the needs of listed species,
3        sufficient to ensure the survival and recovery of the desert tortoise in the Western
         Mojave Recovery Unit.  The decline in this region prompts concern; desert tortoise
4        numbers are low enough in certain areas to make them almost undetectable.  Full and
         swift implementation of the amended California Desert Conservation Plan may reduce
5        the severity and duration of the decline, if it is tied to anthropogenic causes.

6    WBO 14882.  Thus, contrary to their assertions, FWS did consider survival within the recovery units,

7    including the depleted Western Mojave Recovery Unit.  To the extent that plaintiffs suggest that FWS

8    was required to conduct a separate jeopardy analysis for each recovery unit, there is no authority for that

9    position.  To the contrary, the ESA requires that FWS issue a jeopardy determination for the entire listed

10   species.  16 U.S.C. §1536(b)(3)(A) (agency shall provide a "written statement setting forth the

11   Secretary's opinion . . . detailing how the agency action affects the species").

12

13       **B.    "Adverse modification" of desert tortoise critical habitat**

14       As part of the consultation process, FWS also concluded that the BLM's plan amendments are

15   not likely "to result in the destruction or adverse modification" of desert tortoise critical habitat.[47]  In

16   reaching its conclusions, FWS assessed the current status of the species' critical habitat units:

17       The critical habitat units within the Western Mojave Recovery Unit clearly experience
         the most visitation by recreational users and economic interests, primarily because of
18       their proximity to the Los Angeles Basin.  Despite this level of use, large areas of critical
         habitat in the western Mojave Desert remain undisturbed.  We base this statement on
19       information provided by [BLM] that was gathered in support of the West Mojave Plan.
         Using aerial photographs from 1994 of the proposed [DWMAs] in the planning area for
20       the western Mojave Desert region, [BLM] used conservative calculations (i.e., it erred
         on the side of overestimating the amount of disturbance) and concluded that
21       approximately 1.3 percent of the proposed [DWMAs] had been disturbed to date (LaPre
         2005e).  Given that the critical habitat units throughout the remainder of the [CDCA]
22       have been disturbed to a lesser degree than those in the western Mojave Desert planning
         area, we conclude that all of the critical habitat units within the action area are capable
23       of supporting their conservation role and function.  We acknowledge that the critical
         habitat units and [DWMAs] do not overlap completely; however, this information
24       comprises the best available data with regard to surface disturbance in the planning area.
         At this level of disturbance, we anticipate that the critical habitat units should function

25

26       [47]   The NECO Plan area includes two designated desert tortoise critical habitat units, the
     Chuckwalla Critical Habitat Unit (1,202,600 acres) and the Chemehuevi Critical Habitat Unit (937,000
27   acres).  NBO 12585.  The WEMO Plan area includes four designated critical habitat units: Superior-
     Cronese (766,900 acres), Ord-Rodman (253,000 acres), Fremont-Kramer (518,000 acres), and Pinto
28   Mountains (171,700 acres).  WBO 14834.

1    fully to support the conservation of the desert tortoise.

2    WBO 14814-14815; NBO 12610-12611 (similar discussion about NECO Plan); *see also* WBO 14798-

3    14800, 14810-14813; NBO 12581-12583, 12594-12609.

4        FWS then analyzed the likely effects of the BLM's proposed action on desert tortoise critical

5    habitat.  FWS found that certain adverse impacts to portions of the habitat would continue, but that a

6    number of adverse impacts would be lessened and/or removed.  Specifically, FWS found that the BLM's

7    plans significantly reduce the extent of cattle grazing within critical habitat, designate routes and reduce

8    the overall route network, reduce the areas where OHVs can stop, park and camp within DWMAs,

9    remove and reduce the amount of burros within critical habitat, and limit future cumulative ground

10   disturbance in DWMAs to no more than one percent.  WBO 14882-14884; NBO 12704-12707.[48]  Based

11   upon these findings, FWS concluded that the plan amendments would not destroy or adversely modify

12   the desert tortoise critical habitat:

13       In summary, the California Desert Conservation Area Plan, as amended by the West
         Mojave Plan, provides guidance, including the requirement to consider the needs of
14       listed species, sufficient to ensure the conservation role and function of critical habitat
         of the desert tortoise in the Western Mojave Recovery Unit.  Additionally, the specific
15       actions that were adopted by the Bureau are highly protective of critical habitat.  The
         best data available seem to indicate that the few exceptions to this statement, such as
16       permitting vehicles to stop and camp off of routes, are not likely to have severe adverse
         effects on the overall function of affected critical habitat units; in these cases, the scale
17       of the impact is minor in comparison with the area of critical habitat.  Although recent
         declines in the numbers of desert tortoises in several regions of the desert prompt
18       concern, we have not been able to attribute those declines in a definitive manner to
         changes in the condition of desert tortoise habitat.
19
20       Any consideration of the effects of an action on a species must consider the scale of
         those effects; that is, how much of the species' range would be degraded or enhanced by
21       the proposed action.  The range, recovery units, and critical habitat units of the desert
         tortoise encompass vast areas.  The scale of the California Desert Conservation Area
22       Plan is also vast.  Its goal is to provide for the use of public lands and resources in a
         manner that enhances, where possible, and does not diminish, on balance, the
23       environmental, cultural, and aesthetic values of the desert and its productivity (Bureau
         1999).  The immensity of the range and the large amount of critical habitat assist in
24       achieving this balance.  Although the Bureau has authorized many projects under the
         guidance of the California Desert Conservation Plan, large expanses of habitat, including
25       most critical habitat of the desert tortoise, remain undisturbed by the Bureau's

26   _____

     [48]  The WEMO and NECO Plans contain the same general proposed actions, such as the
27   designation of DWMAs and the one percent cap on cumulative ground disturbance in DWMAs.  There
     are some differences.  For example, in WEMO the distance that cars and trucks can drive and park from
28   a route of travel would be reduced from 300 feet to 50 feet in large portions of critical habitat, WBO
     14883, while in NECO that distance is reduced from 300 feet to 100 feet.  NBO 12706.

management actions. In our analysis, we place particular emphasis on the Bureau's commitment to ensure that no more than one percent of land within the desert wildlife management areas under its management will be disturbed by future actions; this measure should ensure that the conservation role and function of critical habitat of the desert tortoise are maintained.

WBO 14884; NBO 12706-12707 (virtually identical statement about NEMO and NECO).

### 1.    "Conflict" with Recovery Plan

Plaintiffs first challenge the "no adverse modification" finding on the ground that it conflicts with earlier statements made by FWS in the critical habitat designation and the desert tortoise Recovery Plan. Plaintiffs emphasize that the Recovery Plan's "Priority 1" recommendations for ensuring the tortoise's survival and eventual recovery include a total prohibition of activities in critical habitat that are "generally incompatible with desert tortoise recovery," including "all vehicle activity off designated roads[,] domestic cattle grazing," and "any other surface disturbance that diminishes the capacity of the land to support desert tortoises, other wildlife, and native vegetation." NBO 616, 623, 629. Plaintiffs argue that based on these statements, OHV use and grazing should be completely prohibited in critical habitat because they are likely to cause adverse modification. Plaintiffs argue that FWS "did not explain how these activities would promote recovery," and thus that FWS's conclusions are arbitrary and capricious.

Defendants respond that there is no conflict between FWS's adverse modification analyses and statements made in the critical habitat designation or the Recovery Plan, and that while FWS recognized that there would be continued adverse impacts from OHV use and grazing, those impacts would be lessened under the WEMO and NECO Plans. Defendants argue that the general recommendations in the Recovery Plan do not supplant the detailed and specific analyses in the BiOps, and that FWS's extensive analyses of the plan amendments' impact on desert tortoise critical habitat explicitly took into account the Recovery Plan.

The Court agrees with defendants that plaintiffs have failed to show that FWS's analyses or conclusions about critical habitat are arbitrary and capricious. Plaintiffs ignore FWS's detailed assessments of the specific plan amendments, and explanations of why those amendments generally improved conditions for desert tortoises and their critical habitat. *See, e.g.*, WBO 14834, 14844, 14847,

14851, 14856, 14858-14870, 14872, 14876, 14880, 14882.  Contrary to plaintiffs' assertions, FWS did not ignore the Recovery Plan, but instead explicitly considered that plan in conjunction with the jeopardy and adverse  modification analyses.  *See* WBO 14789-14792, 14796-14797, 14799-14800, 14806-14810, 14834, 14843, 14880, 14882, 14886-87; NBO 12554,12576-12580, 12583-12584, 12587, 12590-12592, 12594, 12639-12640, 12666-12667, 12678.  Moreover, the record shows that FWS considered how critical habitat within each recovery unit would be impacted.  *See generally id.*

Relatedly, plaintiffs assert that FWS overlooked significant adverse impacts in order to reach the "no adverse modification" conclusion.  Plaintiffs argue that FWS "largely ignored" the life cycle and migration needs of the tortoise, and that FWS failed to adequately consider impacts that disproportionately affect juveniles, such as raven predation.  However, the record shows that FWS considered these factors.  *See, e.g.*, WBO 14786-14788, 14797; NBO 12573-12575, 12580 (life cycles and migration needs); *see also* WBO 14834-14841, 14882, 14882-14884, NBO 12666-12667, 12687-12692, 12704-12707 (discussing the BLM's proposals to set aside majority of desert tortoise critical habitat for conservation-based management); WBO 14825 (stating that in proposed ACECs, the BLM's general management strategy includes a program to reduce predation by ravens on the desert tortoise); NBO 12668 (same) .  Plaintiffs have not shown that FWS ignored adverse impacts; they just disagree with FWS's conclusions.

Plaintiffs also argue that FWS improperly diluted the adverse effects of the proposed plans by analyzing the scale of those effects in light of the "vast areas" of the critical habitat units.  Plaintiffs rely on *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Service*, 378 F.3d 1059,1075 (9th Cir. 2004), which cautioned that "[f]ocusing solely on a vast scale can mask multiple site-specific impacts that, when aggregated, do pose a significant risk to a species."  However, the *Gifford Pinchot* court found that, in fact, FWS had properly considered local impacts:

> After a careful review of the record, we conclude that the FWS is correct.  The BiOps considered the important local effects, analyzing critical habitat more broadly when individual effects were not important.  Appellants do not show that material local effects were missed, but merely point out that large scale analysis can pose a risk of masking. The possibility of risk alone here does not mean that the agency's decision-making was arbitrary and capricious, an abuse of discretion, or contrary to law.  Without evidence in the record supporting that some localized risk was improperly hidden by use of large scale analysis, we will not second-guess the FWS.

United States District Court
For the Northern District of California

*Id.*  Similarly, although the critical habitat here is "vast," the record shows that FWS considered important local effects.  *See, e.g.*, WBO 14874 (addressing BLM's proposal to designate 15 miles of new open routes and approximately 20 miles of open routes as competition routes adjacent to Spangler Hills Off-highway Vehicle Management Area), 14883 (discussing impact of maintaining a corridor for competitive events along Johnson Valley-to-Parker route).  Plaintiffs have not identified any localized risk that was "improperly hidden by use of large scale analysis," and instead simply disagree with FWS's assessment of those risks.  As in *Gifford Pinchot*, this Court "will not second-guess the FWS." 378 F.3d at 1075.

### 2.  Effects to critical habitat outside DWMAs

Plaintiffs next assert that FWS improperly focused its analysis of effects to critical habitat in the DWMAs and largely ignored critical habitat outside of DWMAs.  Plaintiffs note that over 215,000 acres of critical habitat remain outside DWMAs in the NECO (NBO 12600, 12603), and approximately 18,000 acres of critical habitat remain outside DWMAs in the WEMO (WBO 14834-14835), and they emphasize that critical habitat outside of DWMAs is subject to less protection.

A review of the BiOps, including the portions cited by plaintiffs, refutes plaintiffs' argument that FWS overlooked critical habitat outside of the DWMAs.  In the WEMO BiOp, FWS analyzed the location, status and effects to the critical habitat outside of the DWMAs.  For example, FWS discussed 9,678 acres of the Ord-Rodman critical habitat unit that were not included in a DWMA:

> . . . . [T]hese lands lie within the northern portion of the Johnson Valley Off-highway Vehicle Management Area.  In this situation, the Service used section lines to draw the boundaries of the critical habitat unit; however, the Bureau had previously established the boundary of the off-highway vehicle management area along an unpaved road, which provides a much more well-defined boundary than section lines.  The 9.678 acres are located in numerous parcels along approximately 16 miles of the boundary.  The primary constituent elements on at least some of these parcels, particularly along the western portion of the boundary, were degraded prior to the designation of critical habitat.  Given the location of the critical habitat that was excluded from the desert wildlife management area (i.e., at its edge) and the degraded condition of the primary constituent elements in at least a portion of the unit, its exclusion from the desert wildlife management area will not affect the conservation role and function of the Ord-Rodman Critical Habitat Unit.

WBO 14234.  Plaintiffs challenge the above-quoted passage by asserting that FWS "speculat[es] (without any citation or reference) that some areas 'were degraded prior to the designation of critical

69

United States District Court
For the Northern District of California

habitat' and noting that in other areas there *remains* 'less disturbed' habitat because 'the level of off-road vehicle use is lower.'" Rev. Reply at 19:6-8.  However, there is no requirement that FWS provide citations or references for its statements that certain areas were degraded and others less disturbed, and the case law is clear that courts should not fly-speck a BiOp for this level of detail.

FWS also addressed other critical habitat areas located outside DWMAs in WEMO.  *See* WBO 14834-14836 (discussions of critical habitat outside DWMAs in Fremont-Kramer, Superior-Cronese, and Pinto Mountain critical habitat units).  FWS concluded that disturbance within critical habitat, including those portions located outside DWMAs, was not likely to exceed the one percent limit on cumulative future ground disturbance:

> We note that the one percent limit is tied to the size of the desert wildlife management area but not to the critical habitat unit.  For this reason and because we do not know where future actions may occur, we cannot, with absolute certainty, state that only one percent of the critical habitat unit will be affected.  We expect, however, that project impacts within the portions of the Superior-Cronese, Fremont-Kramer, Ord-Rodman, and Pinto Mountain critical habitat units managed by the Bureau will not exceed the one percent limit for several reasons.  First, given the past history of the area, most actions will be relatively small in scale and will be spread across the critical habitat units.  Second, the large degree of overlap between the desert wildlife management areas and critical habitat should ensure that many actions would not be concentrated within critical habitat but outside of the desert wildlife management areas.  Finally, at least some projects will likely occur within the desert wildlife management areas but outside of critical habitat.  Consequently, we conclude that the one percent limit on cumulative ground disturbance within desert wildlife management areas is also likely to confer a high degree of protection to critical habitat.

WBO 14836.  As these portions of the BiOps demonstrate, FWS did not ignore or overlook critical habitat outside the DWMAs.

The NEMO BiOp contains a similar level of detail in its discussion of critical habitat located outside of DWMAs.  *See e.g.*, NBO 12600-12601 (Chemehuevi critical habitat unit),12603-12604 (Chuckwalla critical habitat unit), 12704-12707 (summarizing effects of plan on critical habitat located within and outside DWMAs).   FWS explained why BLM did not include particular areas of critical habitat within DWMAs.  *See e.g.*, NBO 12600 ("In the northwest corner of the critical habitat unit, in the upper Cadi Valley, the Bureau did not include an area with a checker-boarded land ownership").  In a number of instances, the non-DWMA critical habitat is located within Joshua Tree National Park, conservation areas, wilderness areas, and other areas that receive increased protection.  *See, e.g.*, NBO 12600 (15,843 acres of non-DWMA critical habitat in Chemehuevi critical habitat unit are included in

United States District Court

For the Northern District of California

wilderness "which provides the highest level of protection afforded any land use class" in the CDCA, and 5,615 acres are located in multi-species wildlife habitat management area "which provides a level of protection somewhat greater than Class M lands"), 12687 ("The amount of critical habitat captured within [BLM's] Chuckwalla [DWMA], when combined with additional critical habitat within Joshua Tree National Park and the Chocolate Mountains Aerial Gunnery Range, will promote the conservation role and function of Chuckwalla Critical Habitat Unit."); *see also* NBO 11892, 12501, 12738 (maps of NECO and NEMO planning areas showing non-DWMA critical habitat located within other protected areas such as Joshua Tree National Park and wilderness areas).

### 3.     OHV use

Plaintiffs contend that FWS improperly found that there was no adverse modification of critical habitat unless there was complete extirpation of that habitat.  For example, plaintiffs cite FWS's statements that "[w]e are unaware of any research that conclusively shows the density at which roads would be likely to extirpate desert tortoises from a region."  WBO 14817; NBO 12613.  However, that statement is contained within a broader assessment of the state of existing scientific knowledge on the effects of roads on desert tortoises, *see* WBO 14816-14818; NBO 12613-12614, and is it not an articulation of the standard that FWS applied in analyzing whether the WEMO or NECO Plans adversely modified desert tortoise critical habitat.  In the same paragraph containing the sentence quoted by plaintiffs, FWS also noted, *inter alia*, that "[i]ntuitively fewer desert tortoises are likely to be killed if fewer roads are available for travel."  WBO 14817.

Plaintiffs also contend that FWS minimized the negative impacts on critical habitat from OHV use, and again argue that FWS's findings are inconsistent with the Recovery Plan.  However, the Recovery Plan recommended that "all vehicle activity off of designated roads" or routes should be prohibited.  NBO 616.  Here, the plan amendments largely limit OHV use to designated routes.  Where the BLM did authorize OHV use off of designated routes (for stopping, parking and camping), FWS analyzed the impacts of that use as it affected the conservation role and function of critical habitat, as well as the survival and recovery of the desert tortoise.  *See, e.g.*, WBO 14874 (noting that proposed amendment would reduce the amount of existing open routes in subregions that overlap critical habitat

United States District Court
For the Northern District of California

from 4,062 to 2,475 miles),14876-14878; NBO 12655, 12658, 12672-12673, 12682-12686, 12696, 12698, 12700.[49]  Plaintiffs rely on *ONDA* for the proposition that OHV use on existing routes and en route to camping sites significantly impacts the land, and they suggest therefore that any OHV use must result in adverse modification of desert tortoise critical habitat.  However, *ONDA* did not address OHV use within an ESA and adverse modification context, and did not suggest that OHV use *per se* results in adverse modification.  Here, the BiOps demonstrate that FWS analyzed the likely effects of OHV use and camping on critical habitat.  *See e.g.*, WBO 14874 (noting that proposed amendment would reduce the amount of existing open routes in subregions that overlap critical habitat from 4,062 to 2,475 miles),14876-14878; NBO 12655, 12658, 12672-12673, 12682-12686, 12696, 12698, 12700.

Similarly, FWS analyzed the impacts of the BLM's designation of certain routes as open on critical habitat.  *See, e.g.,* WBO 14874 ("[F]or several subregions, a proportionately higher number of route closures are in areas characterized by bajada topography.  Conversely, a proportionately higher number of routes were designated as open in more mountainous terrain.  Desert tortoises are generally more abundant on bajadas and valleys than in mountains areas; also, instances of authorized and unauthorized off-road travel would likely occur less frequently in mountainous terrain.").[50]

Plaintiffs next assert that FWS arbitrarily and incorrectly found that OHV use of washes in the Chemehuevi critical habitat unit in NECO is low, thus masking the extent of the adverse effects from OHV use in that area.  Plaintiffs note that FWS observed that washes in the NECO planning area are "wide, flat, sandy, relatively free of rocks, and lined with tall trees [and that] [t]hese features are attractive to recreational users," NBO 12605, and that FWS recognized that "any wash that can support a vehicle within large acreages is open to use."  NBO 12683.  However, the fact that FWS recognized a theoretical negative impact does not render FWS's specific analysis arbitrary.  Indeed, as FWS found

---

[49]  Plaintiffs also argue that FWS relied on uncertain future improvements to critical habitat, primarily route closures, that FWS "admits may not occur" due to funding contingencies.  Rev. Reply at 14:9.  Plaintiffs cite WBO 14920, in which FWS discusses route closures in the context of Lane Mountain milk-vetch habitat; plaintiffs raised the identical challenge in conjunction with FWS's no jeopardy finding for the LMMV, and the Court addresses this argument *infra* in its review of that finding.

[50]  Statements such as these show that, contrary to plaintiffs' assertions, FWS did consider the location of routes in making its evaluation of the impacts to the desert tortoise and critical habitat.

72

in assessing OHV use of washes in NECO:

> Obviously, the potential exists that desert tortoises in an open wash zone are at a much higher degree of risk of being struck by a vehicle than those in an area where only a few specific washes are available for use. . . . In this case, we know desert tortoises reside in the Chemehuevi and Chuckwalla desert wildlife management areas.  We will next evaluate the level of vehicle use that the open wash zones receive.

> The final environmental impact statement for the Northern and Eastern Colorado Desert Coordinated Management Plan notes that washes in the open zone provide motorized vehicle access for hunting, sight-seeing, nature study and camping (Bureau and California Department of Fish and Game 2002, page 3-56).  The final environmental impact statement continues to describe the level of use of the washes as generally low, based on information provided by members of Desert Wildlife Unlimited; the Bureau notes that "very little cross-country travel occurs due to the extensive nature of existing roads, trails, and washes."  The Bureau provides some quantification of the level of use; compared to other popular recreational areas in the California Desert Conservation Area, such as the Imperial Sand Dunes and Dumont Dunes, the numbers provided by the Bureau seem to indicate a low degree of use.  Clearly, as we stated previously in this discussion, the number of desert tortoises that could be killed by vehicular use in open wash zones is a function of the level of use and type of use.  A high volume of traffic would result in more desert tortoises being struck by vehicles; vehicles that are traveling faster, such as motorcycles, may also strike more desert tortoises.  We conclude that the level of vehicle use in the open wash zones is generally low and that it generally consists of recreationists whose primary activity is not based on speed.

NBO 12683.  Plaintiffs criticize FWS for extrapolating the information about OHV use of certain washes in NECO to OHV use of open washes in NECO more generally.  However, FWS "acknowlege[d] that the information available in the final environmental impact statement for the [NECO] is not comprehensive.  It is, however, the only published documentation of the level of use that was available to us.  Any attempt to gather new information on the level of vehicle use in the open wash zones will require years to gain a comprehensive view of use over such a large area; consequently, we could not obtain this information during the course of this consultation."  NBO 12683-12684.  Thus, contrary to plaintiffs' arguments, FWS did explain how it reached its conclusion that OHV use of the washes was low, and why that use would not adversely modify desert tortoise critical habitat.

Plaintiffs also contend that FWS did not appropriately consider the extent to which OHV use fragments critical habitat.  FWS found that while major highways constitute a barrier to movement, "[u]npaved roads that are used infrequently likely do not pose a threat of fragmentation."  WBO 14876.  FWS also concluded that "because the disturbance and loss of habitat would likely occur through the implementation of numerous actions, separated through the desert wildlife management area by distance and over time, we do not anticipate that habitat is likely to be fragmented to the extent that the function

1    and conservation role of the critical habitat unit as a whole is compromised." WBO 14836. Similarly,

2    plaintiffs take issue with FWS's treatment of the impact of "road maintenance" on critical habitat.

3    While plaintiffs argue that FWS's analysis is flawed, plaintiffs do not cite to any evidence in the record

4    that renders FWS's findings arbitrary or capricious. *See Greenpeace Action v. Franklin*, 14 F.3d 1324,

5    1336 (9th Cir. 1992) (disagreement with agency's analysis "is not a sufficient basis for [the court] to

6    conclude that the [agency's] action was arbitrary and capricious.").

7            Plaintiffs also assert that FWS did not consider the likely increase in OHV use when assessing

8    impacts. As support, plaintiffs rely on statements from the FEIS in which the BLM discusses the great

9    interest in and demand for OHV recreational opportunities. However, there is nothing inconsistent

10   about the BLM's general statement that the public is increasingly interested in OHV recreation, and

11   FWS's conclusions in the BiOps based upon the information assessed that impacts from OHV use will

12   be lessened as a result of route designations and closures. Somewhat relatedly, plaintiffs also assert that

13   FWS "knew that the number and amount of routes that remained on the ground and would continue to

14   be used in critical habitat was not likely to decrease simply because of the adoption of the plans," and

15   they quote this sentence from the WEMO BiOp: "Realistically, however, the route network in the

16   western Mojave Desert at the current time consists of any route that shows evidence of prior use."

17   WBO 14875. However, plaintiffs' selective quotation is misleading, as a full reading of the quoted

18   paragraph demonstrates:

19           Finally, we note that the proposed action establishes a network of roads that is more
             extensive than those proposed by the 1985-97 inventory and the interim network that
20           resulted from the settlement agreement with the Center for Biological Diversity.
             *Realistically, however, the route network in the western Mojave Desert at the current*
21           *time consists of any route that shows evidence of prior use.* The proposed alternative
             would allow vehicle use only on routes marked as open. Clearly, establishing a well-
22           defined system of marked routes would reduce the density of routes and thereby reduce
             mortality of desert tortoises.
23

24   WBO 14875 (quoted sentence emphasized).

25

26           **4.      Grazing**

27           Plaintiffs also contend FWS overlooked and minimized the negative impact of grazing on desert

28   tortoise critical habitat. Plaintiffs assert that FWS's recognition that livestock grazing "will continue"

74

to adversely affect critical habitat by reducing tortoises' forage and shelter, crushing tortoise burrows, and rendering critical habitat more prone to wildfire, is inconsistent with FWS's conclusion that the grazing permitted under the WEMO and NECO Plans would not adversely modify desert tortoise critical habitat.

However, a review of the BiOps shows that FWS conducted a detailed and extensive analysis of livestock grazing and its impacts, and that the "no adverse modification" conclusion is supported by the record. In the WEMO BiOp, FWS noted that within the 1,670,479 acres of critical habitat within the action area, grazing is authorized only on 110,000 acres:

> Most of this acreage is located within the Ord Mountain Allotment. The remaining areas of critical habitat that would continue to be grazed are relatively small parcels that are located at the edges of critical habitat units. These parcels, in total, cover approximately 8,000 acres.
>
> We conclude that the grazing program proposed by the Bureau is not likely to compromise the conservation role and function of critical habitat of desert tortoise in the action area. We have reached this conclusion because grazing would occur on approximately 110,000 acres of critical habitat. At least portions of the grazed areas are located at elevations where some of the primary constituent elements of critical habitat are not found naturally. Most of the critical habitat within the planning area, which totals approximately 1,670,479 acres (Service 2005g), would not be grazed. Additionally, the intensity at which the Bureau proposes to allow grazing within critical habitat should reduce, to some degree, the adverse effects of grazing on the primary constituent elements.

WBO 14873. The last sentence refers to the BLM's management prescriptions for the Ord-Mountain allotment, which require the exclusion of cattle from 34,185 acres between March 15 to June 15 of each year, when forage levels fall below 230 pounds per acre. WBO 14864.

The NECO BiOp contains similar analyses and conclusions about grazing and the impact on desert tortoise habitat. In the NECO, cattle grazing is only permitted within the Lazy Daisy allotment, which is contained within the Chemehuevi DWMA. NBO12693-12695. As in the WEMO BiOp, FWS found that the removal of cattle from desert wildlife management areas when ephemeral forage production is less than 230 pounds per acre from March 15 through June 15 "should, to some degree, protect the primary constituent elements of critical habitat related to the availability of food." NBO 12693. FWS recognized, however, that continuing grazing at "even these lower levels may prevent desert tortoises from acquiring enough nutrition in good years to survive through times that provide fewer resources." *Id*. However, FWS explained that "[t]he overall effect of an action on the primary

1    constituent elements of critical habitat . . . is a combination of the intensity and scale of the effect."

2    NBO 12694.  FWS evaluated the scale of the impact of cattle grazing on the primary constituent

3    elements within the Chemehuevi Critical Habitat Unit, and found: (1) utilization data from the Lazy

4    Daisy allotment showed that utilization was in the 0 to 10 percent range, which was characterized as

5    "none to slight" and that utilization levels were expected to continue to be low; (2) "all health standards

6    were being met" in the allotment; (3) the BLM removed approximately 21,600 acres of high quality

7    desert tortoise habitat from the Lazy Daisy allotment; (4) "some amount of grazing within the allotment

8    occurs either outside of the boundaries of the desert wildlife management area and critical habitat or

9    inside at elevations that generally do not support desert tortoise habitat"; and (5) that the BLM had taken

10   steps that reduced grazing from past levels.  NBO 12695.  "For these reasons, we conclude that the

11   intensity of grazing on the Lazy Daisy Allotment is low and that management of grazing within the

12   northern and eastern Colorado Desert planning area is compatible with the function and conservation

13   role of the Chemehuevi Critical Habitat Unit.  *Id*.

14        Plaintiffs also contend that FWS failed to assess the aggregate effects from all activities

15   authorized by the plans, such as areas where tortoises are subject to both grazing and OHV use within

16   critical habitat.  Again, however, plaintiffs ignore the actual language and analysis contained in the

17   BiOps,  which show that FWS evaluated the degree to which impacts in the aggregate would affect

18   critical habitat.  *See* WBO 14882-14884; NBO 12704-12707.

19

20                    **5.    Best available scientific data**

21        Plaintiffs contend that FWS failed to use the best scientific and commercial data in reaching its

22   conclusions in the BiOps.  To a large extent, plaintiffs' arguments simply repeat and repackage the

23   assertions discussed above regarding FWS's consideration of impacts to critical habitat.  For example,

24   plaintiffs contend that FWS ignored impacts to critical habitat when there was no conclusive proof that

25   they would cause complete extirpation of tortoises in the area, and that "nothing in the ESA requires that

26   each threat be quantified before it can be taken into account."  Rev. MSJ at 18.  For the reasons stated

27   above, these assertions mischaracterize the BiOps and lack merit because FWS did not ignore impacts

28   to critical habitat, and did not require "conclusive proof" of complete extirpation when formulating its

jeopardy and adverse modification findings.

Citing WBO 14817-18, plaintiffs also generally criticize FWS "for dismissing or ignoring findings in other studies." Plaintiffs' motion does not specify which studies plaintiffs contend FWS dismissed or ignored, nor do plaintiffs advance any argument as to why FWS's analysis was unsupported or arbitrary. The Court assumes that at least one study to which plaintiffs are referring is the Hoff and Marlow (2002) study discussed on WBO 14817-14818 (study found at WBO 4717-4724) regarding road density and desert tortoise mortality. FWS's discussion of this study is detailed, and FWS explains why it decided not to extrapolate certain information from the study. WBO 14817. Further, as a review of the BiOp demonstrates, FWS did not entirely dismiss or ignore that study. Plaintiffs have failed to show anything arbitrary or capricious about FWS's assessment of this study.

Plaintiffs also contend that FWS should have considered certain studies discussing the deleterious effects of grazing and OHV use. For example, plaintiffs argue that FWS ignored a study (Bury and Luckenbach (2002)) finding "current data suggest that the operation of ORVs in the western Mojave Desert results in major reductions in habitat and tortoise numbers, and possibly the body mass of surviving tortoises" and that studies "suggest both direct and sublethal effects on tortoises from operation of ORVs in their habitats. Such effects occur in areas with low to moderate ORV activities, which occupy large portions of the Mojave Desert." WSupp 465, 469 (Bury and Luckenbach study). Defendants argue that this study was not relevant to FWS's analysis of the WEMO and NECO planning areas because the study compared the effects of OHV use in open areas – i.e, areas similar to the Imperial Sand Dunes Recreation Area, where OHVs are for the most part permitted to go anywhere at any time – with areas closed to OHV use. In WEMO and NECO, in contrast, OHV use is materially different because such use is limited to a designated route network and navigable washes. Plaintiffs do not respond to this argument, nor do plaintiffs articulate why FWS was required to extrapolate the findings of the Bury and Luckenbach study to its analyses of the WEMO and NECO planning areas, particularly given the extensive discussions in both BiOps about the effects of OHV use.

Plaintiffs seek judicial notice of three scientific studies that they contend FWS should have considered in its assessment of the WEMO and NECO Plans. *See* Docket No. 122, Ex. 3 (Jennings (2002)); Ex. 4 (Oftedal *et al.* (2002)); Ex. 5 (Heaton (2007)). Defendants object to the Court taking

United States District Court
For the Northern District of California

judicial notice of studies outside the administrative record, while plaintiffs assert that these documents assist the Court in determining whether FWS considered all relevant factors.[51]  The Court will consider the Jennings and Oftedal studies for that limited purpose.[52]  The Jennings and Oftedal studies pertain to the effects of grazing on desert tortoise forage.  As the administrative record shows, FWS extensively considered these issues in the BiOps.  *See, e.g.*, WBO 14787 (desert tortoise diet), 14849-14882 (impact of livestock grazing on desert tortoise and critical habitat); NBO 12574 (desert tortoise diet), 12640-12646 (impact of livestock grazing on desert tortoise and critical habitat).  As with the Hoff & Marlow study discussed *supra*, plaintiffs do not advance any particular arguments about *why* FWS should have reviewed these particular studies in connection with the consultation.  Given the extensive discussions of livestock grazing and the impacts on desert tortoises and their critical habitat, the Court does not find anything arbitrary or capricious about FWS's decision not to consider these studies.

### C.     The Incidental Take Statements for the desert tortoise

Under Section 7 of the ESA, FWS is required to specify whether any "incidental taking" of protected species will occur as a result of the agency action.  *See* 16 U.S.C. § 1536(b)(4).  "Take" is defined to include harming, harassing, trapping, pursuing, collecting, shooting, capturing, wounding, or killing a protected species.  *See id.* at § 1532(19).  If FWS determines that an incidental taking will result, FWS must prepare an ITS which identifies areas where members of the protected species are at risk.  Any taking which is subject to an ITS, and in compliance with the terms and conditions of the statement, is not a prohibited taking under the ESA.  *See* 16 U.S.C. § 1536(o)(2).  As relevant here, the

---

[51] Defendants do not object to the Court taking judicial notice of Exhibits 1 and 2 to the Request for Judicial Notice because those documents are in fact part of the administrative record.  Accordingly, the Court GRANTS plaintiffs' request as to these documents.

[52] The Heaton study (2007) post-dates the BiOps at issue here, and thus could not have been considered by FWS when preparing the BiOps.  The Heaton study discusses FWS's 2005 distance sampling effort, which collected data on perceived threats to the desert tortoise.  Docket No. 122 Ex. 5.  The Executive Summary of the Heaton study states that FWS's 2005 Distance Sampling effort collected data on "exotic vegetation species, information on different dirt road types, trash, ravens, and canids.  These data represent the most comprehensive attempt to date to produce a spatial inventory of these perceived threats to desert tortoises.  This report provides a first-cut summary of the spatial distribution of these threats using simple spatial interpolation methods."  *Id.* at 2.  Not only did the Heaton study post-date the BiOps, but plaintiffs have not identified any findings in that study that would have altered FWS's analysis.

ITS must specify (1) the amount or extent of such incidental taking on the species; (2) the reasonable and prudent measures necessary to minimize such impacts; and (3) the terms and conditions that must be complied with to implement the reasonable and prudent measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)(i).

On November 30, 2007, FWS issued revised ITSs for the NECO and WEMO BiOps, which cover livestock grazing, removal of burros, and casual use activities within the action areas that are authorized by the approval of the CDCA Plan, as amended by the NECO and WEMO plans. NSupp ITS 1177, WSupp ITS 1020-21.

Plaintiffs raise four challenges to the amended ITSs. First, plaintiffs contend that FWS was not permitted to amend the ITSs, and instead was required to re-initiate consultation with the BLM and issue new BiOps with the new ITSs. Second, plaintiffs contend that the amended ITSs are invalid because FWS only considered direct take causing tortoise death and disregarded take due to habitat modification and degradation. Third, plaintiffs contend that the numbers of allowable take and re-initiation triggers are irrational. Finally, plaintiffs contend that the ITSs lack "terms and conditions" implementing the reasonable and prudent measures necessary to minimize the impact of authorized take on the desert tortoise.

### 1.    Legality of amendments

FWS amended the ITSs to address this Court's opinion reviewing the incidental take statement accompanying the BiOps for the Imperial Sand Dunes Recreation Area. *See CBD II*, 422 F. Supp. 2d at 1137-41 (holding invalid an ITS that did not provide specific estimate for take). The amended ITSs state:

> We are amending the incidental take statement to clarify our anticipated level of incidental take by providing specific estimates of the level of incidental take that we anticipate is likely to occur, along with our rationale for those specific estimates. . . .
>
> To more specifically determine the number of desert tortoises that are anticipated to be killed or injured by various casual uses, livestock grazing, and removal of burros, we have supplemented the analysis contained in the prior incidental take statement for the biological opinion for the Northern and Eastern Mojave Desert Management Plan and the Northern and Eastern Colorado Desert Coordinated Management Plan with various methodologies and analyses. To aid in determining the level of anticipated incidental take, we used the results of line-distance sampling throughout the range of the desert

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

tortoise to estimate its densities within the action area. The Service published the results of the first 5 years of line-distance sampling after the biological opinion was issued. The information presented in this amendment does not, in any way, alter the conclusions we reached in our biological opinion (Service 2005a); these methodologies and analyses serve to further quantify the number of desert tortoises that we anticipate will be killed or injured as a result of various casual uses, livestock grazing, and removal of burros within the action area. The amount or extent of take from such uses was previously expressed in a more qualitative manner in the biological opinion, and these quantitative assessments fall squarely within the scope of the qualitative analysis contained in the biological opinion. Furthermore, although the line-distance sampling data provided more detailed density information, it did not reveal any new or different effects of the action that may affect the listed species or critical habitat within the action area that would indicate that re-initiation of consultation was required. The inclusion of this information simply associates numerical values with the more qualitative assessment presented in the biological opinion. Therefore, because this amended incidental take statement only serves to clarify our previous analyses in the biological opinion, rather than substantively change or alter the analyses, re-initiation of formal consultation, as described at 50 *Code of Federal Regulation* § 402.16, is not required.

NSupp ITS 1175-76.

Plaintiffs contend that FWS was not permitted to amend the ITSs, and instead was required to reinitiate consultation and create an entirely new BiOp. As support, plaintiffs rely on *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Service*, 378 F.3d 1059 (9th Cir. 2004). In *Gifford Pinchot*, FWS amended several BiOps in a number of substantive ways. The Ninth Circuit held that these amendments were improper.

As a general rule, such "updates" are prohibited because they would render the consultation process "meaningless" and would allow the FWS to issue "unsupported Biological Opinions knowing that it could search for evidentiary support if the opinion was later challenged." *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1245. . . . If the data is new and the new data may affect the jeopardy or critical habitat analysis, then the FWS was obligated to reinitiate consultation pursuant to 50 C.F.R. § 402.16. If the data was preexisting, then the FWS is to be faulted for not generating the information in time for the initial BiOp. Stated another way, the evidence either was old and cumulative, added to the administrative record to bolster support, or was new data that mandated reconsideration.

*Id.* at 1077. However, under the ESA, an ITS is not part of the jeopardy analysis, but instead provides an exemption from liability under Section 9 of the ESA. *See Arizona Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1239, 1242 (9th Cir. 2001). An ITS is issued after FWS completes its jeopardy analysis. *See* 16 U.S.C. § 1536(b)(4) ("If after consultation under subsection (a)(2) of this section, the Secretary concludes that" the agency action and any incidental taking will not violate the substantive provisions of ESA § 7(a)(2), then "the Secretary shall provide the Federal agency" with an incidental take statement). In *Gifford Pinchot*, the BiOps were substantively amended, thus raising the

possibility that the amendments affected the jeopardy or critical habitat analyses. *Gifford Pinchot*, 378 F.3d 1077. Here, FWS amended the ITSs, not the BiOps, and specifically determined that the previously issued BiOps remained sound. *See* NSupp ITS 1176; WSupp ITS 1019 (concluding that "[t]he information presented in this amendment does not, in any way, alter the conclusions reached in" the NECO or WEMO BiOps). Because FWS concluded that the amendments did not alter the analyses or conclusions contained in the BiOps, FWS was not required to reinitiate consultation with the BLM. *See* 50 C.F.R. § 402.16 (reinitiation required when, *inter alia*, "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," or "[i]f the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion").

Plaintiffs have not identified any way in which the amendments to the ITSs substantively affect the jeopardy or critical habitat analyses, and instead the essence of their challenge is that FWS is procedurally prohibited from amending an ITS. However, plaintiffs do not cite any authority holding that an amendment to an ITS is unlawful as a matter of law, and the Court declines to so hold. Indeed, the facts of this case demonstrate why there are circumstances when proactive amendment might be necessary, as FWS amended the ITSs because the ITSs shared some of the same deficiencies identified in *CBD II*, 422 F. Supp. 2d at 1137-41.

## 2.    Take due to habitat modification and degradation

Plaintiffs also raise several substantive challenges to the amended ITSs. Plaintiffs contend that FWS disregarded take due to habitat modification and degradation which kills or injures tortoises by impairing essential behaviors such as feeding and sheltering. Plaintiffs argue that the ITSs fail to account for injury that will result from livestock grazing due to collapsed burrows used for sheltering or reduction of native forage critical to tortoise survival. However, both BiOps discuss at length the amount of grazing permitted within the planning areas; the BLM's management prescriptions governing authorized grazing activities; and the impacts on the species' habitat. *See* NBO 12544, 12559-12561, 12597, 12602, 12673-76, 12692-12695; WBO 14810-14814, 14848-14871. FWS concluded that authorized grazing  is not likely to result in significant habitat degradation such that injury or mortality

1    to desert tortoises is likely to occur.  *See id.*

2    Plaintiffs appear to equate any level of negative impacts with a "take" under the ESA.  However,

3    for habitat degradation to be considered a take, and therefore provide FWS with the authority to regulate

4    and exempt such a take in an ITS, there must be "significant impairment of the species' breeding or

5    feeding habits and [proof] that the habitat degradation prevents, or possibly, retards, recovery of the

6    species."  *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1513 (9th Cir. 1994).  As set forth

7    in the BiOps, FWS concluded that "[t]he measures proposed by [BLM] should ensure that habitat for

8    the desert tortoise on public lands is not substantially degraded from its current condition."  WBO

9    14859.

10    Plaintiffs also argue that the ITSs also failed to include injury from loss of forage and collapsed

11    burrows due to OHV use in washes.  However, FWS did analyze the likely effects of OHV use on desert

12    tortoise habitat, and concluded that "the Bureau's criteria for allowing vehicular use of a wash speaks

13    directly to the issue of these effects; specifically section 3.9.5 of the final environmental impact

14    statement . . . states that 'washes can be considered routes of travel only if soil stability is not adversely

15    affected consequent to passage of vehicles.'"  NBO12690; *see also id.* ("Vehicular use that does not

16    damage the banks of washes will avoid most burrows and caliche caves.  Again, the same passage we

17    quoted in the previous paragraph states that 'washes can be considered routes of travel only if wash

18    banks are not compromised.'").   Plaintiffs have not shown that FWS's decision not to include injury

19    from habitat degradation  due to grazing or OHV use in washes was arbitrary or capricious.

20

21                    **3.        Amount or extent of take**

22    An ITS is required to contain measurable guidelines to determine whether incidental take is

23    exceeded.  *See* 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(4).  In the ITSs, FWS estimated that 19

24    desert tortoises per year in WEMO and 32 desert tortoises per year in NECO and NEMO are anticipated

25    to be taken incidental to activities authorized under the plan amendments.  WSupp ITS 1033; NSupp

26    ITS 1194.  FWS explained in the ITS for WEMO,

27            We arrived at these estimates by considering the interrelationship of factors such as the
              intensity and frequency of the involved areas, the area over which the activities may
28            occur, and the estimated density of desert tortoise.  For example, an activity of higher

United States District Court
For the Northern District of California

> intensity that occurs infrequently in a relatively small area may yield a lower level of estimated incidental take than a less intense activity that occurs constantly over a wide area.
>
> Therefore, we anticipate that 19 desert tortoises per year are likely to be taken, in the form of injury or mortality, as a result of activities described in the Biological Opinion. We consider this number to be within the scope of the "relatively few" desert tortoises we anticipated would be killed or injured in the Biological Opinion, as it represents less than one-tenth of 1 percent of the desert tortoise population estimated to reside within the action area. The loss of these individuals is not likely to appreciably reduce the likelihood of the desert tortoise's ability to survive and recover.

WSupp 1032-1033; *see also* NSupp ITS 1194. The ITSs also contain "reinitiation triggers," which are the amount of dead or injured tortoises that indicate when anticipated take levels have been exceeded. If reached, the "reinitiation trigger" invalidates the safe harbor provision of an ITS and reinitiates consultation between the parties. *See Arizona Cattle Growers*, 273 F.3d at 1250 (describing trigger process). For WEMO, reinitiation of consultation is required "if 4 desert tortoises are found dead or injured in any 12-month period," WSupp ITS 1035. For NECO, reinitiation of consultation is required if six desert tortoises are found dead or injured in any 12-month period, NSupp ITS 1198, and for NEMO, the reinitiation trigger is 3 dead or injured desert tortoises in any 12-month period. *Id.*[53]

Plaintiffs raise several challenges to FWS's selection of the numbers of allowable take. Plaintiffs contend that the numerical values bear no rational connection to the biological analysis in the BiOps. Plaintiffs note that FWS staff initially believed that it was impossible to specify a number of take. However, the record reflects that FWS staff developed a methodology for calculating the number of desert tortoises in the action area, and then for estimating anticipated take. *See, e.g.*, WSupp ITS 526-532 (emails from FWS staff discussing process). The amended ITSs describe this methodology in detail:

> We estimate the density of desert tortoises within the desert wildlife management areas and critical habitat discussed in the Biological Opinion based on the average of the densities obtained from line-distance sampling conducted in the Western Mojave Recovery Unit over several years between 2001 and 2005 (Service 2006b). The densities of the areas surveyed during the line-distance sampling are highly unlikely to be uniform throughout the desert wildlife management areas and critical habitat within the recovery unit. However, the estimates provided by line-distance sampling comprise

---

[53] The ITSs contain discrepancies between the discussion sections and the terms & conditions regarding the numbers set for the reinitiation triggers. Defendants assert, and plaintiffs do not disagree, that the triggers contained in the terms & conditions are controlling. *See* 16 U.S.C. § 1536(b)(4)(C)(iv) (stating that terms and conditions "must be complied with").

1  the best available information on the densities of desert tortoises within these vast areas.

2  WSupp ITS 1023.

3  Plaintiffs criticize FWS for the manner in which it estimated densities of desert tortoises outside

4  of desert wildlife management areas and critical habitat in the action area.  For those areas, FWS took

5  the DWMA density numbers and multiplied by 0.1.  NSupp ITS 1181; WSupp ITS 1023.  However, as

6  FWS explained,

> We do not have extensive data on the density of desert tortoises in these areas; where
> data do exist (e.g., a Bureau study of desert tortoise density west of Highway 14 between
> Red Rock Canyon State Park and Highway 178 (Keith et al. 2005); various surveys of
> the eastern Antelope Valley, Victor Valley, and near the town of Rosamond), they were
> collected using methods other than line-distance sampling and are not comparable to the
> numbers obtained through the line-distance sampling conducted from 2001 through
> 2005.  We consider areas outside of desert wildlife management areas and critical habitat
> to support lower densities of desert tortoise based in part on the fact that some of these
> areas are near the periphery of the range of the desert tortoise and naturally support
> fewer animals because habitat conditions are not as favorable as within desert wildlife
> management areas and critical habitat; we also base this condition on the results of
> various surveys conducted in these areas.  In addition, urbanization and recreation likely
> have suppressed the density of desert tortoises in other areas.  In some locations, both
> of these factors may be responsible for the reduced densities. Our professional opinion
> is that densities of desert tortoises outside of desert wildlife management areas and
> critical habitat are well below those within the boundaries of these areas and that
> estimating such densities at 10 percent of the higher density areas is a reasonable
> approximation.

WSupp ITS 1023.  This discussion demonstrates that there is a reasonable scientific basis for FWS's

methodology, and that it is all that is required.  Moreover, as the Ninth Circuit recently emphasized in

*Lands Council*, the law "requires us to defer to an agency's determination in an area involving a high

level of technical expertise.  We are to be most deferential when the agency is making predictions,

within its area of special expertise, at the frontiers of science."  537 F.3d at 993 (internal citations and

quotations omitted); *cf. Greenpeace Action v. Franklin*, 14 F.3d 1324, 1336 (9th Cir. 1992) ("When an

agency relies on the analysis and opinion of experts and employs the best evidence available, the fact

that the evidence is 'weak,' and thus not dispositive, does not render the agency's determination

'arbitrary and capricious.'").

Plaintiffs also challenge FWS's treatment of juvenile desert tortoises in its estimation

methodology.  The ITSs state,

> [T]he estimates provided by line-distance sampling include only adult and sub-adult
> desert tortoises (Service 2006b).  Consequently, we suggest that the number of desert

84

United States District Court
For the Northern District of California

tortoises is best viewed in the context of a comparison of potential differences between various areas rather than an absolute assessment of population numbers.  For example, this methodology may underestimate the number of desert tortoises because individuals smaller than sub-adults are not detected during line-distance sampling.  On the other hand, this methodology may overestimate the number of desert tortoises because we did not exclude areas of non-habitat from our calculations.  However, we expect that, given the imprecision of survey results, the overall patchiness of the distribution of desert tortoises, and the relatively small amount of non-habitat areas in relation to suitable habitat, the inclusion of the acreage of non-habitat areas and the detection of only adult and sub-adult desert tortoises likely has little overall effect on the final estimations.  Although numerous factors contribute to the imprecision of determining the number of desert tortoises in the action area, we consider the line-distance sampling to be the best available scientific information, and have determined that the methodology used in this document is a reasonable approach to estimate desert tortoise densities within the action area.

WSupp ITS 1024-1025.  Contrary to plaintiffs' assertions, FWS did not "assum[e] that the take of smaller individuals omitted from the calculations would be roughly offset by FWS' inclusion of areas within critical habitat that may have had lower density of tortoises in the calculation."  Rev. MSJ at 22:11-13.  Instead, FWS simply recognized that due to the limitations of the line-distance sampling data, the estimates could be inflated in some regards, and lower in others.  The recognition of a limitation in the data – which FWS also considers to be the best available scientific information – demonstrates that FWS "consider[ed] an important aspect of the problem," and not that FWS acted in an arbitrary or capricious manner.  *Lands Council*, 537 F.3d at 993.

Plaintiffs also challenge the "reinitiation triggers" as arbitrary.  Plaintiffs contend that the triggers should have been set lower because of the difficulty in detecting tortoise deaths and assigning a definitive cause of death.  Plaintiffs rely on an FWS working paper, which stated  that "we are assuming that finding 10 percent of the animals that are killed or injured is a reasonable estimate."  WSupp ITS 00780.  However, as FWS notes, the working paper was a partial, early draft of the revised ITS, and the  statement about a ten percent trigger was made in the context of analyzing grazing activities in marginal habitat with low numbers of desert tortoises.  *See id*.  The final amended ITSs apply to the detection of desert tortoises throughout the planning areas and thus in areas of both marginal and suitable habitat, and lower and higher densities of desert tortoises.  *See* WSupp ITS 1021-1033; NSupp ITS 1178-1194.  The ITSs contain detailed explanations of the various factors FWS considered in arriving at the take numbers and reinitiation triggers, and plaintiffs have not shown that FWS "'relied on factors which Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or an explanation that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Lands Council*, 537 F.3d at 993 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *see also Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658-59 (2007) ("With regard to the various statements made by the involved agencies' regional offices during the early stages of consideration, the only "inconsistency" respondents can point to is the fact that the agencies changed their minds-something that, as long as the proper procedures were followed, they were fully entitled to do.").

Plaintiffs also suggest that the amended ITSs are internally inconsistent because they state both that finding carcasses is problematic due to the presence of numerous scavengers that are likely to find dead desert tortoises soon after they die, WSupp ITS 1021, and also that FWS expects that the cause of any injury or death resulting from grazing or casual use "is likely to be reasonably identifiable." *Id.* 1035-1036. These statements are not contradictory because there is a difference between locating desert tortoises that have been injured or killed in the planning areas, and identifying the cause of death or injury once a tortoise has been found. *See also* WSupp ITS 1036 ("For example, desert tortoises that are killed or injured by livestock will show signs of trampling; individuals may also be trapped in cattle guards. Desert tortoises that are killed or injured as a result of casual use activities will most likely be crushed.").

#### 4.    Reasonable and Prudent Measures and Terms and Conditions

Plaintiffs also raise several challenges to the reasonable and prudent measures ("RPMs") and corresponding terms and conditions ("T&C") contained in the ITSs. The ESA requires an ITS to specify those RPMs the Secretary deems "necessary or appropriate" to minimize the impact on listed species and set forth T&Cs implementing each RPM. 16 U.S.C. § 1536(b)(4)(C)(ii), (iv).

Plaintiffs first challenge RPM 4 and T&C 4 in the ITS for the NECO Plan. RPM 4 provides: "The Bureau must ensure that the use of the open wash zones in the Northern and Eastern Colorado Desert Planning Area does not result in the take of substantial numbers of desert tortoises." NSupp ITS 1196. T&C 4, which implements RPM 4, states "The Bureau must develop a monitoring plan that tracks

the types and levels of use in, and the effects of that use, within the open wash zones in the Northern and Eastern Colorado Desert Planning Area." *Id.* at 1197.  Plaintiffs argue RPM 4 is deficient because it does not define "substantial numbers," and FWS provides no explanation of how monitoring alone will minimize the impacts of take from OHV use in open wash zones.

Plaintiffs' challenges lack merit. First, RPM 4's usage of "substantial numbers" does not render that RPM hopelessly vague, particularly given relative specificity of the ITS as a whole, including the specific take numbers and reinitiation triggers.  With regard to T&C 4, plaintiffs concede that monitoring is essential to minimizing take from OHV use in open washes; plaintiffs' quibble is that there are no additional measures specified to minimize take.  However, that is not a basis for setting aside the ITS as invalid. Plaintiffs' reliance on *CBD II*, 422 F. Supp. 2d at 1140-41, is unavailing.  In that case, an RPM directed the BLM to "minimize the potential for incidental take of desert tortoises from recreational use, facility construction, and maintenance activities." *Id.* at 1140.  However, the corresponding T&C only addressed facility construction and maintenance activities, and did not address recreational use. *Id.*  Here, T&C 4 implements the corresponding RPM.

Plaintiffs next challenge RPM 1 in the WEMO ITS.  RPM 1 states "The Bureau must monitor its activities to ensure that the level of incidental take is commensurate with the analysis contained in the Biological Opinion."  WSupp ITS 1034.  Plaintiffs argue that because the WEMO BiOp noted that "[c]learly, establishing a well-defined system of marked routes would reduce the density of routes and thereby reduce mortality of desert tortoises," WBO 14875, FWS was required to devise an RPM that minimized the impact of the authorized route network by, for example, reducing overall route density or closing redundant routes.  However, the ESA grants FWS discretion to identify RPMs that it finds "necessary or appropriate," 16 U.S.C. § 1536(b)(4)(C)(ii), and does not require FWS to specify any particular RPMs. *See Bear Lake Watch, Inc. v. FERC*, 324 F.3d 1071, 1074 (9th Cir. 2003) (analyzing similar language in Federal Power Act, and holding that "where Congress has not directly said what 'necessary or appropriate' means," Congress "left the complex policy decision about how far [the agency] should extend its regulatory tentacles up to [the agency] itself.").  Moreover, the RPMs plaintiffs contend should have been included – such as reducing overall route density or closing redundant routes – are not "minor changes [to the proposed action] that do not alter the basic design,

location, duration, or timing of the action," Interagency Cooperation-Endangered Species Act of 1973, as Amended; Final Rule, 51 Fed. Reg.19,937 (June 3, 1986), but rather substantive changes to the BLM's proposed action.      Plaintiffs also criticize T&C 1, which implements RPM 1, because it requires development of a monitoring plan but does not include any timetables of specific requirements for monitoring.     However, T&C 1 contains numerous specific details, and is directly tied to implementing RPM 1:

> The Bureau must develop and implement a monitoring plan to determine the level of incidental take of desert tortoises associated with livestock grazing and casual uses in the action area. The monitoring plan must include a standardized mechanism for Bureau employees, contractors, permittees, and volunteers to report any observations of dead or injured desert tortoises to the Desert District office. The Desert District office must collect information obtained through the monitoring plan to include in the Bureau's annual report to the Service that is required by this incidental take statement and described in the "Reporting Requirements" section herein. At that time, the Service and the Bureau must review the circumstances surrounding the incident to determine whether any patterns of repeated authorized or unauthorized activities are occurring (e.g., use of an authorized area for stopping, parking and camping where habitat is being degraded, development of unauthorized routes or the beginnings of a trash-dumping site, or desert tortoises are being struck by vehicles in particular portions of routes) that may indicate that additional protective measures are required. If, after completion of the review, the Service and Bureau agree that additional protective measures are required and can be implemented within the existing scope of the action, the Bureau must implement the agreed-upon measures within a reasonable time frame; if the corrective actions cannot be implemented within the scope of the existing action, the Bureau and Service will determine whether re-initiation of consultation is appropriate.

WSupp ITS 1035. Plaintiffs have not shown anything arbitrary or capricious about this T&C.

### D.    No jeopardy finding for LMMV

In the January 9, 2006 BiOp, FWS also concluded that the WEMO Plan amendment was not likely to jeopardize the continued existence of the Lane Mountain milk-vetch. WBO 14921.[54]

> We reached this conclusion for two reasons. First, the general guidance provided by the California Desert Conservation Area Plan and the specific actions contained in the West Mojave Plan will ensure that actions the Bureau takes, funds, and authorizes are not likely to reduce appreciably, either directly or indirectly, the reproduction, numbers, or distribution of Lane Mountain milk-vetch; additionally, we did not detect any cumulative effects that would substantially alter the status of Lane Mountain milk-vetch in the action area. Second, the Bureau has proposed and, in some cases, already implemented, measures to avoid or reduce adverse effects to the Lane Mountain milk-vetch and to further its conservation. These measures include, but are not limited to:

---

[54]  LMMV is found only within the WEMO Plan area.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

- • The establishment of areas of critical environmental concern that will be managed in a manner that will promote the survival and recovery of the species within this portion of its range;

- • The designation of all lands within the area of critical environmental concern as Class L, which will provide increased protection to Lane Mountain milk-vetch over that currently provided by Class M;

- • Removal of livestock grazing from habitat occupied by the Lane Mountain milk-vetch;

- • Acquisition of private lands, which will result in a higher level of protection of Lane Mountain milk-vetch under the guidance of the California Desert Conservation Area Plan;

- • A limit of one percent of new disturbance within the area of critical environmental concern to reduce the loss of Lane Mountain milk-vetch, which will ensure that most individuals and their habitat in areas that are essential to their conservation will not be exposed to the adverse effects of human activities; and

- • The withdrawal of the area of critical environmental concern from mineral location and entry, which has the potential to reduce, to some degree the number of individuals of Lane Mountain milk-vetch that may be destroyed or disturbed during casual use and under future plans of operation.

- • The provision that no activities will be authorized that involve loss of individual Lane Mountain milk-vetch.

WBO 14921-14922.

Plaintiffs contend that FWS failed to assess the ability of the LMMV to survive and recover in the face of the effects of the WEMO Plan. Plaintiffs argue that FWS's no jeopardy finding was based on an unsupported assumption that route closures will improve conditions. Plaintiffs note that FWS recognized that "administrative designation of a route as closed may be ineffective" until funding is available to "eliminate the road on the ground." WBO 14920. However, plaintiffs ignore the next portion of that same sentence, where FWS explained that "funding that the Army has committed to provide to mitigate for the effects of the expansion of Fort Irwin should enable the Bureau to implement numerous route closure projects." *Id*. Thus, FWS's reliance on route closures was supported. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 936 (9th Cir. 2008) (agency may rely on "clear, definite commitment of resources for future improvements").

Plaintiffs also argue that FWS assumed impacts of dust on LMMV pollinators were "minor" although no studies had been done. WBO 14919. However, in reaching this conclusion, FWS stated,

89

United States District Court
For the Northern District of California

1

2

3

4

5

> The legal use of designated routes could negatively affect the Lane Mountain milk-vetch if dust generated by the passage of vehicles impairs the rate of photosynthesis or the effectiveness of pollinators.  The U.S. Geological Survey evaluated the effects of dust on Lane Mountain milk-vetch and concluded that, at the current level of use, dust generated by vehicle use of unpaved roads on Coolgardie Mesa does not greatly affect Lane Mountain milk-vetch (Wijayratne et al. 2005).  To date, the effects of dust on pollinators of Lane Mountain milk-vetch have not been studied; we anticipate that, at the current level of use, these effects will be minor because Lane Mountain milk-vetch plants reproduce in close proximity to the routes of travel.

6

7

8

9

10

11

WBO 14919.  As this discussion demonstrates, FWS had a reasoned basis for its conclusion that the effects of dust will be minor: the U.S. Geological Survey's evaluation, and the fact that LMMV reproduce in close proximity to the routes of travel.  There is nothing arbitrary or capricious about the FWS's assessment in this regard.  *See Oregon Trollers Ass'n v. Gutierrez*, 452 F.3d 1104, 1120 (9th Cir. 2006), *cert. denied*, 127 S. Ct. 2028 (2007) ("Bereft of any contrary science, plaintiffs' bare allegation that the agency's distinction conflicts with the 'best scientific evidence available' fails.").

12

13

14

15

16

17

18

19

20

Plaintiffs also argue that the "no jeopardy" decision is flawed because it is based on FWS's assessment of the WEMO Plan's measures to avoid or reduce adverse effects to the LMMV, such as the provision that no permits will be issued for activities that result in the loss of LMMV.  Plaintiffs argue that the permitting measure "may have little bearing on whether further loss of LMMV occurs because the WEMO plan authorizes many activities with no permit required, such as continued casual mining and stopping and parking within 50 feet of authorized routes.  However, the BiOp states that the disturbance from casual mining is "negligible," WBO 14917, and the WEMO Plan reduces the impact from vehicles stopping and parking by reducing the distance from the centerline of a route from 300 to 50 feet.  *Id.* at 14920.

21

22

23

24

25

26

Next, plaintiffs argue that although more than half of the known occurrences of LMMV are within the Fort Irwin expansion area, FWS failed to examine the impact the potential loss of this habitat will have on survival and recovery.  However, the BiOp at issue here – the January 9, 2006 WEMO BiOp – only examined the impact of the West Mojave plan; the Fort Irwin expansion was examined in an entirely different BiOp that is not challenged in this case.  The January 9, 2006 BiOp explained, by way of background,

27

28

> Note that the Service issued a biological opinion to the Army on March 15, 2004, regarding the proposed use of additional training lands at Fort Irwin.  In the biological opinion, we concluded that the proposed action was not likely to jeopardize the

United States District Court
For the Northern District of California

continued existence of the Lane Mountain milk-vetch.  The Army estimated that approximately 11,387 acres of Lane Mountain milk-vetch habitat would occur within Fort Irwin.  As a result of the proposed action, approximately 6,789 acres would be placed in conservation areas and a "no dig" zone; this amount comprises approximately 58.6 percent of the area within the occurrences.  The use of the new training lands would result in the loss of approximately 4,598 acres; this amount comprises approximately 21.5 percent of the known habitat for this species.

WBO 14915.  Thus, to the extent that plaintiffs contend that FWS did not examine the direct impact of the Fort Irwin expansion, that claim is misplaced in this lawsuit.[55]  To the extent that plaintiffs contend that FWS did not account for the impact of the Fort Irwin expansion when setting the environmental baseline of the LMMV in the 2006 BiOp, that contention lacks merit, as the BiOp repeatedly discusses the Fort Irwin expansion and states, *inter alia*, that "Given the area of occupied Lane Mountain milk-vetch habitat that will likely be disturbed by future training activities within Fort Irwin, conservation of the occurrences on public lands is essential."  *Id*. at 14916.

Finally, plaintiffs argue that FWS incorrectly stated that the one percent cap on new ground disturbance applied specifically within the West Paradise and Coolgardie Mesa conservation areas.  Plaintiffs assert that the one percent cap only applies to DWMAs as a whole, and not to particular subsections of the DWMAs.  In the WEMO BiOp, FWS stated that one of the protective measures was "[a] limit of one percent of new disturbance within the area of critical environmental concern to reduce the loss of Lane Mountain milk-vetch , which will ensure that most individuals and their habitat in areas that are essential to their conservation will not be exposed to the adverse effects of human activities."  WBO 14918.  Both West Paradise and Coolgardie Mesa lie entirely within the Superior-Cronese DWMA.  FWS correctly stated that the one percent threshold for new ground disturbance will apply in these conservation areas.  Plaintiffs are parsing FWS's language – particularly the use of "within" – to argue that FWS's statement is incorrect.  FWS's statement is susceptible to both interpretations, and given the extensive discussion throughout the BiOp about the one percent cap applying in DWMAs, the

---

[55]   The Fort Irwin expansion is relevant to the 2006 BiOp in that, in connection with the expansion project, the Army agreed to undertake various mitigation measures outside the expansion area and in the action area addressed in the 2006 BiOp.  *See* WBO 14917 ("As part of the proposed action for the use of additional training lands at Fort Irwin, the Army committed to providing funds or labor to close and rehabilitate roads in the Coolgardie Mesa and West Paradise Conservation Areas.  Closure and rehabilitation of unauthorized routes would be an important element in the conservation of the Lane Mountain milk-vetch.").

Court will assume that FWS meant that the one percent cap applied to these geographic areas by virtue of their inclusion in DWMAs, and not that FWS was stating that the one percent cap applied separately to each ACEC.

## CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part plaintiffs' motion for summary judgment, and GRANTS in part and DENIES in part defendants' motion for summary judgment. (Docket Nos. 159-161). The Court GRANTS summary judgment in favor of plaintiffs on the FLPMA claims, GRANTS summary judgment on some of the NEPA claims in favor of plaintiffs, and GRANTS summary judgment on some of the NEPA claims in favor of defendants, and GRANTS summary judgment in favor of defendants on the ESA claims. **The Court will hold a case management conference at 3:00 pm on October 30, 2009 to discuss the remedial phase of this litigation**. The parties are directed to meet and confer and to submit a joint case management statement one week prior to the conference setting forth any agreed-upon form of relief, as well as specific proposals on areas of disagreement.

**IT IS SO ORDERED.**

Dated: September 28, 2009

_____
SUSAN ILLSTON
United States District Judge

United States District Court
For the Northern District of California

92