Robert B. Wiygul, Esq. (LA Bar No. 17411)
Waltzer & Associates
1025 Division Street, Suite C
Biloxi, MS  39530
Telephone:  (228) 374-0700
Facsimile:  (228) 374-0725
Email:  robert@waltzerlaw.com

David J. Lazerwitz, Esq. (CA Bar No. 221349)
Sky C. Stanfield, Esq. (CA Bar No. 244966)
Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
Telephone:  (415) 954-4400
Facsimile:  (415) 954-4480
Email:  sstanfield@fbm.com

***Attorneys for Plaintiffs Alliance for Responsible Recreation, The
Wilderness Society, California Wilderness Coalition, Friends of
Juniper Flats, Western San Bernardino Landowners Ass'n,
California Native Plant Society, and Community ORV Watch***

***Additional Counsel on Listed on Signature Pages***

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>U.S. BUREAU OF LAND MANAGEMENT, *et al.*,<br><br>                    Defendants. | Case No. 3:06 CV 04884 SI<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL VACATUR AND INJUNCTIVE RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:        June 18, 2010<br>Time:        9:00 a.m.<br>Courtroom: 10, 19th Floor<br>Judge:       Hon. Susan Illston |

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF
No. 3:06 CV 04884 SI

21343\2235820.2

1   ### NOTICE OF MOTION AND MOTION

2   **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:**

3       **PLEASE TAKE NOTICE** that Plaintiffs Alliance for Responsible Recreation, The

4   Wilderness Society, California Wilderness Coalition, Friends of Juniper Flats, Western San

5   Bernardino Landowners Association, California Native Plant Society, Community ORV Watch,

6   Center for Biological Diversity, Sierra Club, Public Employees for Environmental Responsibility,

7   and Desert Survivors ("Plaintiffs") hereby jointly move this Court for partial vacatur of the

8   Record of Decision and for interim injunctive relief.  This motion is based on the accompanying

9   Memorandum of Points and Authorities, the supporting declarations, pleadings, records, and files

10  in this action, and other such documentary and oral evidence supplied at the hearing.  Hearing on

11  this motion is set for June 18, 2010.

12      Plaintiffs request that the Court vacate portions of the 2006 Record of Decision for the

13  West Mojave Plan that is the subject of this action and the Court's summary judgment ruling.

14  Plaintiffs also seek interim injunctive relief to protect the environment and natural resources

15  within the West Mojave planning area from further and continuing harm pending remand of the

16  West Mojave Plan to the Bureau of Land Management to comply with the requirements of the

17  Federal Land Policy Management Act, 43 U.S.C. §§ 1701, *et seq.*, and National Environmental

18  Policy Act, 42 U.S.C. §§ 4321, *et seq.*, as set forth in the Court's Summary Judgment Order.

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF
No. 3:06 CV 04884 SI

21343\2235820.2

1

## **TABLE OF CONTENTS**

2   INTRODUCTION AND SUMMARY OF REQUESTED RELIEF............................................1

3   ARGUMENT .............................................................................................................................3

4   I.   THE COURT SHOULD SET INTERIM AND FINAL COMPLIANCE
         DEADLINES FOR THE REMAND. ................................................................................3
5

6   II.  THE COURT SHOULD PARTIALLY VACATE THE ROD BY RETAINING
         ENVIRONMENTAL PROTECTION MEASURES AND LIMITING
7        ALLROUTE USE TO STREET LEGAL VEHICLES.......................................................5

8        A.   Full Vacatur Is the Usual APA Remedy for Unlawful Agency Action, but
              Partial Vacatur is Sometimes Appropriate in Environmental Cases.....................5

9        B.   Partial Vacatur Is the Most Appropriate Remedy in this Case ............................7

10       C.   Several Critical Protective Measures in the ROD Should Be Retained ................7

11       D.   The Court Should Partially Vacate Route Designations in the ROD by
              Limiting All Route Use to Street Legal Vehicles.................................................9
12

13       E.   The Remainder of the WEMO ROD Should Be Vacated.....................................11

14  III. SUBSEQUENT DECISIONS TIERED TO THE UNLAWFUL WEMO FEIS
         AND ROD SHOULD BE VACATED ............................................................................11

15       A.   Grazing Decisions ...............................................................................................12

16       B.   Subsequent Decision Reopening Rand Mountain Area Routes ............................13

17  IV.  INJUNCTIVE RELIEF IS NECESSARY TO PROTECT PUBLIC LAND
         RESOURCES FROM FURTHER DAMAGE DURING THE REMAND PERIOD ......14
18

19       A.   BLM's Failure to Properly Evaluate, Designate and Regulate The Use of
              OHVs Within the Western Mojave Is Causing Severe and Irreparable Harm
20            to Environmental and Cultural Resources in the Desert......................................14

21            1.   BLM's Failure to Analyze the Impacts of its Decision Prior to
                   Acting and to Inform the Public of those Impacts Constitutes
22                 Irreparable Harm...................................................................................14

23            2.   BLM's Failure to Designate Routes to Minimize Environmental
                   Impacts and to Adequately Implement the WEMO Plan is Resulting
                   in Continuing Irreparable Harm in the Western Mojave........................15
24

25                 a.   Irreparable Impacts to Soils ......................................................16

26                 b.   Irreparable Impacts to Vegetation .............................................18

27                 c.   Irreparable Impacts to Wildlife, Air Quality and Nearby
                        Uses ..........................................................................................19

28

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF          - i -                    21343\2235820.2
No. 3:06 CV 04884 SI

B.     The Irreparable Harm Caused By Unregulated OHV Use Will Continue Unabated – and Likely Multiply – During the Remand Period Unless the Court Issues Injunctive Relief Tailored to Address These Impacts. ................... 20

C.     The Court Should Impose Injunctive Relief Requiring BLM to (1) Implement Protective and Monitoring Measures Outlined in the WEMO Plan; and (2) Close Specific Areas Where Demonstrated Irreparable Harm is Occurring ......................................................................................................... 21

    1.     BLM Should be Required to Immediately Implement the Mitigation and Monitoring Measures Adopted in the WEMO Plan Itself ................ 22

    2.     BLM Should be Required to Close Specific and Defined Areas to all ORV Use Where Demonstrated Irreparable Harm is Occurring ......... 26

       a.     Juniper Flats ............................................................................. 26

          (1)     Arrastre Canyon ............................................................ 27

          (2)     Deep Creek .................................................................... 29

       b.     Wonder Valley/Poste Homestead ............................................... 29

          (1)     Failure to Implement Closures of Routes Accessing the Poste Homestead is Destroying a Cultural Resource and Fragile Dune Habitat ................................. 30

          (2)     BLM's Routes Across Checkerboard Lands Necessitate Trespass onto Private Property ..................... 31

       c.     Edwards Bowl .......................................................................... 33

D.     The Balance Of Equities Favors Issuing An Injunction ...................................... 34

E.     Issuance Of An Injunction Pending Remand Is In The Public Interest ............... 34

CONLCUSION ................................................................................................................ 35

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF      - ii -
No. 3:06 CV 04884 SI

21343\2235820.2

1

## <u>TABLE OF AUTHORITIES</u>

2

### FEDERAL CASES

3

*Alaska Ctr. for the Environment v. Browner,*
  20 F.3d 981 (9th Cir. 1994) ................................................................. 3, 4, 22

4

*Amoco Prod. Co. v. Village of Gambell,*
  480 U.S. 531 (1987) ................................................................................ 34

5

6

*Ariz. Electric Power Cooperative, Inc. v. United States,*
  816 F.2d 1366 (9th Cir. 1987) ................................................................... 3

7

*Comcast Corp. v. F.C.C.,*
  579 F.3d 1, 11-12 (D.C. Cir. 2009) ........................................................... 3

8

9

*Commonwealth of Mass. v. Watt,*
  716 F.2d 946 (1st Cir. 1983) .................................................................... 15

10

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,*
  No. C04-04324, 2005 WL 2000928 (N.D. Cal. Aug. 19, 2005) ................... 6, 7

11

12

*Earth Island Institute v. U.S. Forest Serv.,*
  442 F.3d 1147 (9th Cir. 2006) ................................................................. 35

13

*Earth Island Institute v. Evans,*
  256 F. Supp. 2d 1064 (N.D. Cal. 2003) ................................................... 16

14

15

*Fla. Power & Light Co. v. Lorion,*
  470 U.S. 729 (1985) .................................................................................. 5

16

*Ford Motor Co. v. NLRB,*
  305 U.S. 364 (1939) ................................................................................ 10

17

18

*Friends of the Earth, Inc. v. Coleman,*
  518 F.2d 323 (9th Cir. 1975) ................................................................... 15

19

*Ft. Funston Dog Walkers v. Babbitt,*
  96 F. Supp. 2d 1021 (N.D. Cal. 2000) ..................................................... 16

20

21

*High Sierra Hikers Association v. Blackwell,*
  390 F.3d 630 (9th Cir. 2004) ................................................................. 4, 15

22

*ICORE, Inc. v. FCC,*
  985 F.2d 1075 (D.C. Cir. 1993) ................................................................. 6

23

24

*Idaho Farm Bureau Federation v. Babbitt,*
  58 F.3d 1392 (9th Cir. 1995) ................................................................. 5, 6

25

*Idaho Watersheds Project v. Hahn,*
  307 F.3d 815 (9th Cir. 2002) ................................................................. 4, 22

26

27

*Indiana & Michigan Electric Co. v. FPC,*
  502 F.2d 336 (D.C.Cir. 1974) ................................................................. 10

28

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF
No. 3:06 CV 04884 SI

- iii -

21343\2235820.2

*Klamath Siskiyou Wildlands Center v. Boody*,
    468 F.3d 549 (9th Cir. 2006) ................................................................................ 11, 12

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976) ................................................................................................ 14

*L.A. Mem'l Coliseum Commission v. National Football League*,
    634 F.2d 1197 (9th Cir. 1980) ................................................................................ 34

*N.A.A.C.P. v. Secretary of HUD*,
    817 F.2d 149 (1st Cir. 1987) ................................................................................... 11

*National Wildlife Federation v. National Marine Fisheries Serv.*,
    481 F.3d 1224 (9th Cir. 2007) ......................................................................... 3, 21, 22

*National Parks & Conservation Association v. Babbitt*,
    241 F.3d 722 (9th Cir. 2001) .................................................................................. 15

*National Wildlife Federation v. Babbitt*,
    128 F. Supp. 2d 1274 (E.D. Cal. 2000) ................................................................... 15

*Natural Resources Defense Council v. Evans*,
    243 F. Supp. 2d 1046 (N.D. Cal. 2003) ................................................................. 3, 4

*Natural Resources Defense Council v. Kempthorne*,
    No. 1:05-cv-1207 OWW GSA, 2007 WL 4462391 (E.D. Cal. Dec. 14, 2007) ......... 4, 6, 8

*Natural Resources Defense Council v. Southwest Marine, Inc.*,
    236 F.3d 985 (9th Cir.2000) ................................................................................... 14

*Natural Resources Defense Council v. U.S. Department of the Interior*,
    275 F. Supp. 2d 1136 (C.D. Cal. 2002) .................................................................... 6

*Oregon Natural Desert Association v. BLM*,
    531 F.3d 1114 (9th Cir. 2008) ................................................................................ 15

*Oregon Natural Resources Council Fund v. Brong*,
    492 F.3d 1120 (9th Cir. 2007) .................................................................................. 5

*Pac. Coast Federation of Fisherman's Ass'ns v. Gutierrez*,
    606 F. Supp. 2d 1195 (E.D. Cal. 2008) ............................................................ 3, 4, 6, 8

*Paulsen v. Daniels*,
    413 F.3d 999 (9th Cir. 2005) .................................................................................... 1

*Se. Alaska Conservation Council v. U.S. Army Corps of Engineers*,
    479 F.3d 1148 (9th Cir. 2007) .................................................................................. 5

*Sierra Club v. Marsh*,
    872 F.2d 497 (1st Cir.1989) .................................................................................... 15

*Sierra Forest Legacy v. Rey*,
    577 F.3d 1015 (9th Cir. 2009) ................................................................................ 34

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF                    - iv -                         21343\2235820.2
No. 3:06 CV 04884 SI

*Stormans Inc. v. Selecky*,
        586 F.3d 1109 (9th Cir. 2009) ................................................................. 14

*The Lands Council v. McNair*,
        537 F.3d 981 (9th Cir. 2008) ................................................................... 35

*W. Watersheds Project v. Kempthorne*,
        No. CV 07-161-E-MHW 2008 WL. 4649130 (D. Idaho  Oct. 17, 2008) ......................... 3

*W. Oil & Gas Association v. EPA*,
        633 F.2d 803 (9th Cir. 1980) .................................................................... 6

*Winter v. NRDC*,
        129 S. Ct. 365 (2008), 555 U.S. __ ............................................................ 14

## FEDERAL STATUTES

5 U.S.C. § 706(2) ........................................................................... 5, 10, 11

40 C.F.R. § 1500.1(c) .......................................................................... 15

43 C.F.R. § 1610.5-3 ........................................................................... 12
        § 8342.1 ............................................................................... 16, 17
        § 8342.1(c) ............................................................................... 32
        § 1781(a)(1)-(2) .......................................................................... 14

16 U.S.C. § 1536(a)(2) .......................................................................... 2

28 U.S.C. § 2412 ............................................................................... 2

42 U.S.C. § 4321 ......................................................................... passim

43 U.S.C. § 1701 ......................................................................... passim

## STATE STATUTE

Cal. Vehicle Code § 38025 ...................................................................... 32

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF                     - v -                          21343\2235820.2
No. 3:06 CV 04884 SI

1

## LIST OF ACRONYMS AND ABBREVIATIONS

2

| | | |
|---|---|---|
| EA | - | Environmental Assessment |
| ACEC | - | Areas of Critical Environmental Concern |
| APA | - | Administrative Procedures Act |
| BLM | - | Bureau of Land Management |
| CDCA | - | California Desert Conservation Area |
| DWMAs | - | Desert Wildlife Management Areas |
| EA | - | Environmental Assessment |
| EIS | - | Environmental Impact Statement |
| FEIS | - | Final Environmental Impact Statement |
| FLPMA | - | Federal Land Policy and Management Act |
| FONSI | - | Finding of No Significant Impact |
| IBLA | - | Interior Board of Land Appeals |
| MAZs | - | Motorized Access Zones |
| NEPA | - | National Environmental Policy Act |
| NOFD | - | Notice of Final Decision |
| OHV | - | Off-Highway Vehicle |
| ORV | - | Off-Road Vehicle |
| ROD | - | Record of Decision |
| UPA | - | Unusual Plant Assemblages |
| WEMO | - | Western Mojave |
| WEMO BiOp | - | WEMO Biological Opinion |
| WEMO Plan | - | Western Mojave Plan |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF          - vi -
No. 3:06 CV 04884 SI

21343\2235820.2

**INTRODUCTION AND SUMMARY OF REQUESTED RELIEF**

In its "Order re: Summary Judgment Motions," the Court found that Defendants violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq*., and the Federal Land and Policy Management Act ("FLPMA"), 43 U.S.C. §§ 1701, *et seq.*, when they adopted the Western Mojave ("WEMO") management plan amendment. The normal remedy for such violations is vacatur of the Record of Decision ("ROD") for the action, which restores the *status quo ante*. *Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005) and cases cited therein ("The effect of invalidating an agency rule is to reinstate the rule previously in force."). However, as this Court found, it is unclear what the lawful *status quo ante* is for the route designations. Summary Judgment ("SJ") Order at 36, n.27 (noting that "it is difficult, if not impossible, to reconstruct the 1980 OHV route network"). Given these unique circumstances, Plaintiffs offer a practical remedy for interim management while BLM reconsiders the route designations and other aspects of the WEMO plan amendment and conducts new environmental review.

In particular, Plaintiffs seek partial vacatur of the ROD, coupled with a deadline for compliance with the Court's order and limited interim measures to protect vulnerable resources. Plaintiffs' proposed remedy consists of four distinct parts.

> (1) The Court should establish a deadline for Federal Defendants to come into compliance with the Summary Judgment Order. Plaintiffs suggest that two years is a reasonable deadline for Federal Defendants to complete the new NEPA process and issue a new ROD. The Court's remand order should impose both a final compliance deadline and certain interim milestones.
>
> (2) The Court should (a) retain those elements of the existing ROD that are necessary to protect environmental resources within the WEMO, as set forth more specifically in section II.C below; (b) partially vacate the route designations by limiting their use to less damaging street legal vehicles in order to prevent additional irreparable injury during the remand period; and (c) vacate the remainder of the ROD.
>
> (3) The Court should vacate any subsequent decisions made by BLM that relied on, or tiered to, the flawed environmental impact statement and WEMO ROD, as set forth more specifically in Section III below.
>
> (4) The Court should order targeted injunctive relief with respect to certain particularly vulnerable areas to avoid further harm while Federal Defendants reevaluate the WEMO plan, as set forth more

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF
No. 3:06 CV 04884 SI

- 1 -

21343\2235820.2

specifically in section IV below.  The targeted injunctive relief that Plaintiffs request includes (a) requiring BLM to implement specific mitigation measures during the remand period, primarily those which the agency relied upon in adopting the WEMO route designations in 2003 and 2006; and (b) requiring BLM to close specified areas to ORV use during the remand period where irreparable injury from illegal ORV use is presently occurring.[1]

There are compelling reasons why partial vacatur, together with the imposition of certain narrowly tailored interim protections and firm compliance deadlines, is the most appropriate remedy in this case.  First, in some areas, the natural resources at issue here receive greater protection under the ROD than under the *status quo ante*.  Consistent with the protective California Desert Conservation Area ("CDCA") provisions of FLPMA, those protections should remain in place while the BLM complies with the law as instructed by the Court.  Second, full vacatur of the ROD would undermine – and effectively invalidate – the January 9, 2006 WEMO Biological Opinion ("BiOp"), which the Court previously upheld and which is expressly predicated on implementation of the protective measures in the ROD.[2]  Finally, BLM has already explained that it cannot ascertain or reconstruct the *status quo ante* that existed under the last valid route designations in the 1980 plan.  In the absence of this critical information, the Court should not sanction the continued use of hundreds or thousands of post-1980 routes during an open-ended remand period; doing so would undermine the bedrock "look before you leap" purpose of NEPA, as well as the executive orders and regulations requiring minimization of impacts from OHV route designations.  In short, the unique circumstances of this case warrant a unique, carefully tailored remedy.

---

[1] Plaintiffs will also be applying to the Court for attorney's fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.  However, because the application is not due until thirty days of final judgment in the action, *id*. at § 2412(d)(1)(B), Plaintiffs will await the Court's entry of final judgment prior to seeking fees and costs.

[2] In particular, Amendments 1, 2, 3, 4, 5, 6, 7, 8, 10 and 11 of the WEMO BiOp are implemented through corresponding protective provisions in the ROD.  The findings of "no jeopardy" and "no adverse modification" in the BiOp are premised on these measures.  WEMO BO AR 14886-87, 14901-02, 14908-09, 14921-22; *see also* WEMO Supp ITS AR 01018-37 (ITS as amended).  If the ROD is wholly vacated and the measures are not implemented, BLM cannot rely on the BiOp's liability protections.  As a result, the BLM could not continue to authorize *any* activities that may affect listed species or destroy or adversely modify critical habitat within the WEMO planning area without violating the ESA.  16 U.S.C. § 1536(a)(2).

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF          - 2 -                                        21343\2235820.2
No. 3:06 CV 04884 SI

1    In the alternative, the Court should vacate the ROD in its entirety and enjoin the use of all

2    routes in the WEMO plan area that BLM cannot conclusively prove were part of the 1980 route

3    system until the BLM fully complies with all applicable laws.  When complete vacatur of an

4    unlawful action is the appropriate and presumptive remedy under the Administrative Procedure

5    Act, as it is here, courts may place the burden on agency defendants to demonstrate why any part

6    of that remedy should effectively be stayed during remand.  *See, e.g., Comcast Corp. v. F.C.C.*,

7    579 F.3d 1, 11-12 (D.C. Cir. 2009) (concurring opinion) (explaining that losing agency bears the

8    burden of convincing the court to stay vacatur).  In this case, BLM similarly should bear the

9    burden of demonstrating the *status quo ante*.

10                                          **ARGUMENT**

11   **I.      THE COURT SHOULD SET INTERIM AND FINAL COMPLIANCE
             DEADLINES FOR THE REMAND.**

12

13   The Court has authority to impose deadlines when remanding an agency decision of the

14   kind at issue here.  Some cases, including decisions in both the Ninth Circuit and the Northern

15   District of California, have affirmed this authority expressly.  *See, e.g.*, *Nat'l Wildlife Fed'n v.*

16   *Nat'l Marine Fisheries Serv.* ("*NWF v. NMFS*"), 481 F.3d 1224, 1242 (9th Cir. 2007)

17   (recognizing "court's discretionary authority to impose a deadline for the remand proceedings");

18   *Pac. Coast Fed'n of Fisherman's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1195, 1202 (E.D. Cal.

19   2008) ("The court has the discretionary authority to impose a deadline for remand proceedings.");

20   *Natural Res. Def. Council (NRDC) v. Evans*, 243 F. Supp. 2d 1046, 1047 (N.D. Cal. 2003)

21   ("Plaintiffs ask this court to set a timetable for compliance with its remand order as it has

22   authority to do.").  Others have simply relied on the courts' equitable discretion to set deadlines

23   for agency action on remand.  *See, e.g.*, *Alaska Ctr. for the Env't v. Browner*, 20 F.3d 981, 984,

24   986 (9th Cir. 1994) (noting court's "broad latitude in fashioning equitable relief" and setting

25   thirty-day, one-year, and ninety-day deadlines for agency actions during remand); *Ariz. Elec.*

26   *Power Coop., Inc. v. United States*, 816 F.2d 1366, 1376 (9th Cir. 1987) (sixty-day deadline); *W.*

27   *Watersheds Project v. Kempthorne*, No. CV 07-161-E-MHW, 2008 WL 4649130, at *6 (D. Idaho

28

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF          - 3 -
No. 3:06 CV 04884 SI

21343\2235820.2

Oct. 17, 2008) (collecting cases from various districts imposing deadlines for FWS actions on remand).

Deadlines on remand are appropriate when an agency has violated NEPA or other environmental statutes. The Ninth Circuit has affirmed injunctions setting deadlines for completing NEPA analysis and for issuing permits in compliance with NEPA. *See High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 640 (9th Cir. 2004); *Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 823 (9th Cir. 2002). Where EPA failed to comply with the Clean Water Act "for more than a decade," the Ninth Circuit upheld an order requiring EPA to take certain actions within prescribed time limits. *Alaska Ctr. for the Env't*, 20 F.3d at 984, 986. In *NRDC v. Evans*, the National Marine Fisheries Service violated the Magnuson-Stevens Fishery and Conservation Act, NEPA, and the APA. 243 F. Supp. 2d at 1049-50. The Court, despite concluding that "new deadlines would probably be futile" in the case, acknowledged its authority "to set a timetable for compliance with its remand order." *Id.* at 1047, 1058. And where a BiOp was found unlawful, arbitrary, and capricious, the court gave the agency approximately nine months to complete a new one. *Pac. Coast Fed'n*, 606 F. Supp. 2d at 1202; *NRDC v. Kempthorne*, No. 1:05-cv-1207 OWW GSA, 2007 WL 4462391, at *1 (E.D. Cal. Dec. 14, 2007) (companion case also setting nine-month deadline for completion of new BiOp).

Given that the pre-decisional *status quo* cannot accurately be assessed for the route designation, a compliance deadline for the new NEPA process is particularly appropriate. As the Court is aware, Plaintiffs' efforts to ensure that BLM's route designations in the CDCA comply with the applicable environmental laws have been ongoing for decades, and by BLM's own admission, the process to craft the latest, still legally deficient ROD has already consumed more than ten years. Not only did BLM fail to comply with applicable laws and its own planning document in adopting new route designations, it also failed to present a clear assessment of the routes in place in 1980 or those adopted since 1980 that would form the "baseline" or *status quo ante* for the route designation. SJ Order at 2-3, 7-8, 36. Attempting to determine the *status quo ante* for an *interim* route designation will be costly and time intensive and will only further delay a lawful management plan for the WEMO. Instead, the Court should impose a firm compliance

1   deadline on remand, together with the interim protective measures described below; this

2   imminently reasonable remedy will best ensure that BLM spends its time and limited resources

3   on the needed identification and analysis for a new route designation.

4        Specifically, the Court should order completion of the remand process within no more

5   than two years.  To ensure that the remand process remains on track, the Court also should

6   establish interim milestones.  Plaintiffs suggest that the following deadlines are consistent with

7   BLM's statutory obligations and allow BLM adequate time to prepare a legally sufficient

8   environmental review document:  (1) completion of scoping within 3 months of the final order in

9   this matter, (2) publication of a Draft EIS for public comment within 14 months of the final order

10  in this matter, (3) publication of a Final EIS within 20 months of the final order in this matter, and

11  (4) issuance of a new final decision within 24 months of the final order in this matter.

12  **II.    THE COURT SHOULD PARTIALLY VACATE THE ROD BY RETAINING**

13  **ENVIRONMENTAL PROTECTION MEASURES AND LIMITING ALLROUTE USE TO STREET LEGAL VEHICLES.**

14      **A.    Full Vacatur Is the Usual APA Remedy for Unlawful Agency Action, but**

15  **Partial Vacatur is Sometimes Appropriate in Environmental Cases.**

16      Under the Administrative Procedure Act ("APA"), courts normally "set aside" unlawful

17  agency actions and remand the matter for further consideration.  5 U.S.C. § 706(2); *see also Fla.*

18  *Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("[T]he proper course . . . is to remand to

19  the agency for additional investigation or explanation."); *Idaho Farm Bureau Fed'n v. Babbitt*, 58

20  F.3d 1392, 1405 (9th Cir. 1995) ("Ordinarily when a regulation is not promulgated in compliance

21  with the APA, the regulation is invalid.").  This general rule applies where, as here, a court finds

22  violations of NEPA and FLPMA in connection with an agency decision.  *Oregon Natural*

23  *Resources Council Fund v. Brong,* 492 F.3d 1120, 1124-25 (9th Cir. 2007).  Invalidation of an

24  agency decision reinstates the regime previously in force – that is, the *status quo ante.  See*

25  *Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005); *cf. Se. Alaska Conservation Council v.*

26  *U.S. Army Corps of Engineers*, 479 F.3d 1148, 1151 (9th Cir. 2007) (noting that, in case where

27  court intended to reverse and vacate record of decision and permits on appeal, "the whole point of

28  the injunction [pending appeal]" was to maintain *status quo*).

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF
No. 3:06 CV 04884 SI

- 5 -

21343\2235820.2

1    In environmental cases, however, courts sometimes exercise their equitable discretion to

2    order partial or no vacatur, as necessary to protect resources.  *See Idaho Farm Bureau*, 58 F.3d at

3    1405; *ICORE, Inc. v. FCC*, 985 F.2d 1075, 1082-83 (D.C. Cir. 1993) (collecting Ninth and D.C.

4    Circuit cases remanding but not vacating agency rules); *Ctr. for Biological Diversity v. U.S. Fish

5    & Wildlife Serv.* ("*CBD v. FWS*"), No. C04-04324, 2005 WL 2000928, at *16 (N.D. Cal. Aug. 19,

6    2005) (partially vacating agency listing rule).  They do so when, for instance, interim vacatur of

7    environmental regulations may have unpredictable or irreversible consequences.  *See Natural*

8    *Res. Def. Council v. U.S. Dept. of the Interior* ("*NRDC v. DOI*"), 275 F. Supp. 2d 1136, 1146

9    (C.D. Cal. 2002).  Thus, "when equity demands," a defective decision may be left in place while

10   the agency completes the proper procedures.  *Idaho Farm Bureau*, 58 F.3d at 1405.

11   The decision whether to vacate or retain a defective decision during remand generally

12   turns on the consequences of vacating the protections provided by the decision.  *See, e.g., W. Oil*

13   *& Gas Ass'n v. EPA*, 633 F.2d 803, 813 (9th Cir. 1980); *Pac. Coast Fed'n*, 606 F. Supp. 2d at

14   1202 (remanding biological opinion without vacatur because it contained mitigation and adaptive

15   management measures protecting species); *NRDC  v. Kempthorne*, 2007 WL 4462391, at *1

16   (remanding without vacatur to "avoid the potentially draconian consequences" that would result

17   otherwise).  The Ninth Circuit has expressly recognized that "undesirable consequences which we

18   cannot now predict" might flow from interim vacatur and has left in place challenged regulations

19   to avoid such consequences.  *W. Oil & Gas*, 633 F.2d at 813.  For example, in *Western Oil & Gas*

20   *Association v. EPA*, the Ninth Circuit remanded without vacatur "to avoid thwarting in an

21   unnecessary way the operation of the Clean Air Act in the State of California."  *Id.*  It acted

22   similarly in *Idaho Farm Bureau v. Babbitt* to avoid "the potential extinction of an animal

23   species."  58 F.3d at 1406; *see also Pac. Coast Fed'n*, 606 F. Supp. 2d at 1202; *NRDC v. DOI*,

24   275 F. Supp. 2d at 1146.

25   In deciding the scope of any vacatur, courts also consider the magnitude and substance of

26   the agency's administrative error, the potential prejudice from retaining the existing rule, and the

27   purposes of the substantive statutes under which the agency acted.  For example, in *Center for*

28   *Biological Diversity v. U.S. Fish & Wildlife Service,* 2005 WL 2000928, at *16, this Court

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF                - 6 -
No. 3:06 CV 04884 SI

21343\2235820.2

1   ordered partial vacatur of an agency decision, decrying the "irregular way" in which the agency

2   had acted and concluding that it would be "unseemly" to leave in place the parts of the decision

3   that were "so riddled with error."

4          **B.     Partial Vacatur Is the Most Appropriate Remedy in this Case.**

5          In this case, all of the equitable factors argue in favor of partial vacatur of the WEMO

6   ROD.  Complete vacatur of the ROD would have unpredictable and undesirable consequences on

7   important desert habitat that gained additional protections under the WEMO decision; however,

8   retention of the ROD in full – especially the new route designations – is equally inappropriate.

9   Like the defective decision in *CBD v. FWS*, BLM's route designation process here was "riddled

10  with error."  *See* 2005 WL 2000928, at *16.  BLM violated FLPMA by failing to consider the

11  prescribed "minimization criteria" and by authorizing numerous post-1980 routes that are

12  inconsistent with the CDCA Plan.  As the Court found, the agency's environmental impact

13  analysis fell short of NEPA in several key respects.  Thus, retaining the unlawful route

14  designations as written in the ROD during remand would, under the circumstances, be

15  "unseemly" and inconsistent with both NEPA and FLPMA.

16         Partial vacatur would avert both the negative environmental consequences of complete

17  vacatur and the perverse outcome of maintaining the defective route designations and other

18  management prescriptions in the WEMO Plan that were adopted in reliance on inadequate

19  environmental review.  Any resulting potential prejudice would be minimal because any

20  limitations on ORV routes and use of those routes would be limited to the duration of the

21  prescribed remand period.  Partial vacatur along the lines set forth below is, therefore, the best

22  way to preserve the *status quo* and still fulfill the environmental protection purposes of FLPMA

23  and NEPA.

24         **C.     Several Critical Protective Measures in the ROD Should Be Retained.**

25         As noted above, the ROD incorporates several key protective measures adopted in the

26  WEMO Plan amendment to protect species and habitats.  These measures form the foundation for

27  the BiOp – and the Court's conclusion that it complies with the Endangered Species Act.  *See* SJ

28

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF          - 7 -                                    21343\2235820.2
No. 3:06 CV 04884 SI

1   Order at 3; *see also* BLM AR WMP -200050[3] (ROD at 5); Incorporation of the Terms and

2   Conditions of the U.S. Fish and Wildlife Service BiOp).  Vacatur of these aspects of the ROD

3   would directly undermine the WEMO BiOp, meaning that BLM would be forced to reinitiate

4   ESA consultation over all activities it authorizes within the West Mojave planning area until a

5   new BiOp is completed.  Accordingly, Plaintiffs[4] submit that these key species and habitat

6   protection provisions remain in place during remand as detailed below.

7           The designation of DWMAs and ACECs and the development restrictions in those areas

8   should remain in place during the remand to protect listed species and habitats, and the protective

9   measures in the ROD and additional measures adopted in the WEMO Plan should be left in place

10  during remand.  The specific list of those items that should be retained are identified in <u>Exhibit A</u>

11  to this memorandum.  The remand order[5] should retain the features of the ROD identified in

12  <u>Exhibit A</u>, except for any portions of these sections that also adopt the Motorized Vehicle Access

13  Network because the Court found that the network was unlawfully adopted and retaining these

14  measures would not preserve the *status quo* or protect desert resources.

15          As other courts have concluded, there is no need here to abandon beneficial environmental

16  protections simply because BLM acted unlawfully.  *Pac. Coast Fed'n*, 606 F. Supp. 2d at 1202;

17  *NRDC v. Kempthorne*, 2007 WL 4462391, at *1 (leaving in place, in two companion cases,

18  unlawful BiOps on remand in order to avoid the "disastrous disruptions" of vacatur).  So too here;

19  while the unlawful ROD should be vacated in part during remand, its protective measures should

20  be retained in the interim remand period.

21

22  [3] All subsequent references to documents in the Administrative Record appear with the Bates
    Stamp preceded by an abbreviated prefix.  "*AR*" alone refers to documents with the Bates stamp
23  prefix of "BLM *AR* WMP", all other citations to portions of the Administrative Record include
    their full Bate Stamp prefix (*e.g. WEMO Supp ITS AR; WEMO AR BO*).

24  [4] Plaintiffs Center for Biological Diversity, Sierra Club, PEER, and Desert Survivors  ("CBD
    Plaintiffs") challenged the BiOp and reserve the right to challenge the adequacy of the BiOp on
25  appeal if necessary.  Nonetheless, in the interests of moving the BLM towards development of a
    new, legally adequate management plan for the West Mojave, CBD Plaintiffs join in this request
26  for relief that would allow the BiOp to remain in place with the understanding that during the
    limited interim period BLM's time would best be spent developing the information it needs for
27  the new planning effort.

28  [5] *See* Plaintiffs [Proposed] Order Granting Relief filed concurrently.

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF            - 8 -            21343\2235820.2
No. 3:06 CV 04884 SI

1

2

**D.      The Court Should Partially Vacate Route Designations in the ROD by Limiting All Route Use to Street Legal Vehicles.**

3

For the unique and complicated reasons explained above, Plaintiffs are willing to forego a

4

request for the normal APA remedy (vacatur of all route designations in the WEMO ROD) in

5

favor of a partial vacatur remedy that allows most route designations to remain in place for street

6

legal vehicles only[6] during the remand period.[7]  That is, the route network established by the

7

ROD (with the exceptions explained in section IV below) would remain intact, but during the

8

interim period the routes would all be considered "Limited" routes with the specific limitation on

9

the type of vehicles allowed.  BLM commonly considers and uses such vehicle type limitations to

10

protect fragile resources, including soils, wildlife, and riparian areas.  *See AR*-222480-81 (CDCA

11

Plan, access on routes may be limited in several ways including with respect to the types of

12

vehicles allowed.).  Notably, BLM adopted a street-legal only limitation in the recently released

13

ROD for the Carrizo Plain National Monument. *See* Declaration of Lisa Belenky in Support of

14

Request for Judicial Notice ("Belenky Decl.") Ex. 5 at II-69, II-71.

15

In this very case, BLM considered closing some areas of the DWMAs to all but street-

16

legal vehicles under Alternative D discussed in the EIS for the WEMO Plan for precisely this

17

reason.  *AR*-201904.  As the agency explained in the FEIS, closure of areas "to all but street-legal

18

vehicles would have a significant beneficial impact of prohibiting the types of vehicles most

19

likely to drive cross-country (e.g., dirt bikes, dune buggies, etc.) from tortoise conservation areas.

20

This would likely minimize impacts to tortoises, but be particularly important to habitats, which

21

are less likely to be degraded if vehicles remain on roads." *AR*-202410.  Similarly, in its cross-

22

motion for summary judgment, BLM defended the adequacy of its NEPA alternatives based on

23

24

25

26

---

[6] The distinction between street-legal and non-street legal vehicles was explained as follows in the WEMO Plan:  "street-legal vehicles (i.e. licensed by the California Department of Motor Vehicles in accordance with the State Vehicular Code as legal for operation on California's public roads and highways). . . include street-legal four-wheel drive vehicles and dual-sport motorcycles. Vehicles that are not street-legal but are only eligible for "green sticker" licensing (that is, approved for use off of highways) . . . include many types of dune buggies, sand rails, all terrain vehicles, quads and dirt bikes."

27

28

[7] As noted above, if the Court does not so limit the route designations, Plaintiffs ask that they be vacated in their entirety and that BLM bear the burden of proving the *status quo ante*.

the fact that non-street legal, so-called "green sticker" vehicles, are more likely to go off route

and damage resources.  *See* Federal Defendants' Revised Memorandum in Support of MSJ, Dkt.

159, p. 25 n. 25 (Alternative D limited routes to street legal vehicles "less likely to degrade

habitat and travel cross-country."); Federal Defendants' Revised Reply Brief in Support of MSJ,

Dkt. 164, p. 18 ("Alternative D (Enhanced Ecosystem Protection) would significantly limit OHV

access in six subregions, prohibiting entry by all non-street legal vehicles (most motorcycles,

dune buggies, quads and dirt bikes), which is important because they are more likely to leave

roads and degrade habitat than other vehicles. AR 201904.").

Indeed, BLM found that even limited area restrictions proposed under Alternative D for

non-street legal vehicles would be of substantial benefit to the Mojave fringe-toed lizard.  *AR*-

202418 ("The Mojave fringe-toed lizard would receive a *substantial benefit* compared to

Alternative A because of the restrictions in certain MAZ areas to street-legal vehicles.")

(emphasis added)); *see also AR*-202419 (substantial benefits to sensitive and listed plants).

Because this Court found that BLM failed to adequately address impacts to the Mojave fringe-

toed lizard in the EIS, SJ Order at 52, partial vacatur limiting route use to certain less destructive

vehicle types would be particularly appropriate as a remedy in this case during the interim period.

It would provide significant protections to many resources during the interim period without

restricting access for residents or other recreational opportunities.

Plaintiffs' partial route vacatur request is modest, reasonable, and appropriate to the

circumstances.  BLM's WEMO route network designation was illegal because it failed to

minimize impacts to soil, wildlife, riparian, and other these resources and because it failed to

comply with the 1980 route limitation, yet the agency concedes that it does not have sufficient

information to reconstruct the pre-decisional *status quo*.  Under these circumstances, the Court

should exercise its remedial discretion to "adjust its relief to the exigencies of the case in

accordance with the equitable principles governing judicial action."  *Indiana & Michigan Elec.

Co. v. FPC*, 502 F.2d 336, 346 (D.C.Cir. 1974) (quoting *Ford Motor Co. v. NLRB*, 305 U.S. 364

(1939)).  Rather than fully "set aside" the unlawful designation under APA section 706(2), "[a]

court, where it finds unlawful agency behavior, may tailor its remedy to the occasion."

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF
No. 3:06 CV 04884 SI                                        - 10 -                                21343\2235820.2

1   *N.A.A.C.P. v. Secretary of HUD*, 817 F.2d 149, 160-61(1st Cir. 1987) (Breyer, J.).  Thus, the

2   Court has inherent equitable authority to fashion the remedy that Plaintiffs seek – a remedy that

3   addresses the unusual facts of this case and has the advantage of being both easily understood and

4   enforceable.

5           **E.       The Remainder of the WEMO ROD Should Be Vacated.**

6           Except as discussed in sections C and D above, the remainder of the ROD should be

7   vacated in its entirety pursuant to 5 U.S.C. § 706(2).  The portions of the decision subject to full

8   vacatur include, but are not be limited to, the finding of consistency with the Clean Air Act (*see*

9   *AR*-202366, Conformity Analysis and Conclusion), which must be set aside based on the Court's

10  summary judgment ruling.  SJ Order at 53-54.

11  **III.   SUBSEQUENT DECISIONS TIERED TO THE UNLAWFUL WEMO FEIS AND
12          ROD SHOULD BE VACATED.**

13          The Court also should invalidate and remand certain management decisions made after the

14  WEMO Plan was adopted where the subsequent decision and/or its environmental review was

15  tiered to the ROD and the FEIS for the WEMO Plan.  The Court found the Plan amendment and

16  the FEIS invalid in several respects, including BLM's failure to minimize impacts to public lands

17  resources in the route designation process, adoption of a route network larger than the limits

18  imposed by the CDCA plan in 1980, failure to analyze an adequate range of alternatives

19  regarding routes and grazing, failure to adequately analyze impacts to soils and riparian resources,

20  and cultural resources from authorized activities, failure to adequately analyze impacts to air

21  quality, and failure to adequately assess cumulative impacts.  SJ Order at 30, 35-36, 42, 48, 50,

22  51, 53-54.  The Court also expressly held that the WEMO Plan route designations were in conflict

23  with the CDCA Plan and thereby violated FLPMA.  *Id.* at 35-36.

24          As a result, subsequent decisions implementing the WEMO Plan ROD and/or adopted by

25  BLM based on environmental review that was tiered to the FEIS also must be set aside and

26  remanded.  *Klamath Siskiyou Wildlands Center v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006)

27  (holding that a change in BLM management policy required an SEIS and setting aside two site-

28  specific timber sales that implemented the policy that was set aside); *see also Oregon Natural*

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF          - 11 -                              21343\2235820.2
No. 3:06 CV 04884 SI

1   *Res. Council Fund*, 492 F.3d at 1125 (holding that salvage logging decisions inconsistent with the

2   governing resource management plan and based on inadequate NEPA compliance must be set

3   aside).  Here, the subsequent decisions both tiered to the FEIS and conformed to the invalidated

4   WEMO plan amendments and are, therefore, invalid.  *Klamath Siskiyou Wildlands Center,* 468

5   F.3d at 562 (holding that subsequent decisions "are invalid and must be enjoined because they do

6   not 'conform to the approved [resource management] plan[s].'  43 C.F.R. § 1610.5-3.").

7        **A.**    **Grazing Decisions**

8        Renewal of grazing allotment leases based on environmental review tiered to the WEMO

9   Plan FEIS (in relevant ways) should be set aside and remanded.  The Court found that the FEIS

10   was flawed in the way that it assessed impacts from grazing on resources of these public lands,

11   including, in particular, soils and cumulative impacts from grazing and other activities authorized

12   under the Plan.  SJ Order at 48 (finding that "the FEIS should contain some discussion of the

13   particular impacts on soils of the proposed Plan, both with regard to the designated OHV route

14   network, and livestock grazing."), 51 (noting that "as with the FEIS's discussion of impacts to

15   soils, there is no discussion or analysis of the impacts flowing from the OHV route network

16   designated by the WEMO plan, or from grazing.").  In addition, the Court noted that the

17   alternatives analysis on remand would need to consider grazing issues.  *Id.* at 42, n. 33 (directing

18   that "[o]n remand, the BLM will consider a host of factors, including grazing issues, in its

19   alternatives analysis.").

20        Plaintiffs are aware of at least 16 grazing lease renewals that were adopted by BLM in

21   reliance on the WEMO Plan ROD and based on environmental review tiered to the WEMO FEIS.

22   (*See* Belenky Decl. at 2 (chart listing 16 renewals.[8]))  In each case, the Notice of Final Decision

23   ("NOFD") and Finding of No Significant Impact ("FONSI") expressly stated that the decision

24   was being made to conform with the WEMO Plan (denoted "WMP" in those documents).  *See,*

25

26  [8] Although Plaintiffs believe there is no disputed issue of fact that these grazing renewals were all implementing the WEMO ROD and tiered to the FEIS, Plaintiffs are providing the Court with copies of representative environmental assessments ("EAs") and decision documents for seven of

27  the grazing allotments and for the subsequent Rand Mountain Decision. *See* Declaration of L. Belenky in support of Plaintiffs' Request for Judicial Notice and exhibits 1-3 thereto Bates

28  stamped "Subsequent- 000001 to 000603."

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF    - 12 -          21343\2235820.2
No. 3:06 CV 04884 SI

1   *e.g., Subsequent-000099* (Ord Mtn NOFD), 000102 (Ord Mtn. FONSI).  And, in each case, the

2   Environmental Assessment ("EA") for the grazing allotment renewal stated that it was tiered to

3   the WEMO Plan FEIS, and the EA relied on the FEIS environmental review for cumulative

4   impacts analysis as well as others and noted that the decision conformed to the West Mojave Plan

5   amendment. *See, e.g., Subsequent*-000007-8, 000008-9, 0000042, 0000070 (Ord Mtn. EA);

6   000104 (Ord Mtn. FONSI).

7          Because these decisions were each tiered to the WEMO Plan FEIS and ROD regarding

8   relevant issues, the decisions must be set aside.  As a result, the *status quo ante* – the grazing

9   prescriptions in place before the ROD was signed (*see, e.g.*, *AR*-201814, *AR*-237098-99; *AR*-

10  218930- 219033) – should govern the management of these allotments until new decisions are

11  made.

12          **B.          Subsequent Decision Reopening Rand Mountain Area Routes**

13          The subsequent decision by BLM to reopen routes in the Rand Mountain Management

14  Area which was based on the WEMO Plan and the FEIS must also be set aside and the closures

15  reinstated.  On October 31, 2008, the BLM issued a decision to rescind the closed status of

16  several routes in the Rand Mountains Management Area.  *See* Exhibit 4, *Subsequent*-000639-643.

17  On the same day, BLM issued an EA and FONSI.  Exhibit 4, *Subsequent*-000604-635 (EA),

18  000636-638 (FONSI).   Plaintiff Center for Biological Diversity timely appealed that decision to

19  the Interior Board of Land Appeals ("IBLA").  (Appeal No. IBLA 2009-77, *CBD v. BLM*.)  On

20  September 28, 2009, this Court issued its Summary Judgment Order.  On October 14, 2009, the

21  BLM announced that it would extend the disputed Decision to rescind the closure for another

22  year, until October 1, 2010.  On December 31, 2009, in response to briefing from the parties to

23  that appeal, the IBLA issued an order to Set Aside and Remand the Decision.  Exhibit 4,

24  *Subsequent*-000644-647.  While the IBLA Order should have fully resolved the issue such that

25  this Court would not need to review this question, on January 11, 2010, BLM filed a Requested

26  for Stay of Order and Petition for Reconsideration En Banc, and the BLM has not reinstated the

27  route closures on the ground.  At present, the IBLA is still considering the request.  Therefore,

28  Plaintiffs now seek an order from this Court confirming that the decision to reopen the routes in

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF                    - 13 -                                    21343\2235820.2
No. 3:06 CV 04884 SI

1    the Rand Mountain Management Area, which was tiered to the WEMO FEIS and the WEMO

2    ROD, must be set aside and the route closures reinstated.

3    **IV.    INJUNCTIVE RELIEF IS NECESSARY TO PROTECT PUBLIC LAND**
     **RESOURCES FROM FURTHER DAMAGE DURING THE REMAND PERIOD**
4

5           In light of the significant environmental damage caused by OHV use within the Western

6    Mojave region, which would otherwise continue unabated during the remand period, Plaintiffs

7    concurrently move the Court for interim injunctive relief.  The Court may grant injunctive relief

8    where (1) a plaintiff shows that irreparable injury is likely to occur if relief is not granted; (2) the

9    balance of equities favors relief; and (3) granting an injunction would be in the public interest.

10   *Winter v. NRDC*, 129 S.Ct. 365, 374, 381 (2008), 555 US __; *Stormans Inc. v. Selecky*, 586 F.3d

11   1109, 1127 (9th Cir. 2009).  The Court has "broad latitude in fashioning equitable relief when

12   necessary to remedy an established wrong."  *NRDC v. Southwest Marine, Inc.*, 236 F.3d 985, 999

13   (9th Cir. 2000) (quotations omitted).

14          The widespread and long-lasting damage caused by OHV use in the Western Mojave

15   provides a classic illustration of the principle of irreparable environmental harm.  As recognized

16   by the Court in its Order and discussed further below, the Mojave Desert is an "extremely fragile"

17   ecosystem, which is "easily scarred, and slowly healed."  SJ Order at 6 (quoting 43 U.S.C.

18   § 1781(a)(1)-(2)).  BLM's failure to develop a route network that minimizes impacts to

19   environmental resources, and its failure to fully analyze the impacts of its decision, necessitates

20   the imposition of injunctive relief necessary to protect the desert from further permanent damage

21   during the remand period.

22          **A.    BLM's Failure to Properly Evaluate, Designate and Regulate The Use of**
                **OHVs Within the Western Mojave Is Causing Severe and Irreparable Harm**
23              **to Environmental and Cultural Resources in the Desert**

24               **1.    BLM's Failure to Analyze the Impacts of its Decision Prior to Acting**
                       **and to Inform the Public of those Impacts Constitutes Irreparable**
25                     **Harm**

26          NEPA requires environmental review because Congress believed an incomplete

27   understanding and inadequate information would naturally lead to poor decisions concerning how

28   to balance protection of the environment with human activity.  *Winter*, 129 S.Ct. at 376; *Kleppe v.*

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF            - 14 -                              21343\2235820.2
No. 3:06 CV 04884 SI

1   *Sierra Club*, 427 U.S. 390, 409-410 (1976); 42 U.S.C. § 4321; 40 C.F.R. § 1500.1(c).  The statute

2   achieves this goal through the action-forcing mechanism of requiring federal agencies to fully

3   disclose and consider the effects of their actions on the human environment prior to acting.  *See*

4   *National Wildlife Fed'n v. Babbitt*, 128 F. Supp.2d 1274, 1287 (E.D. Cal. 2000); *Sierra Club v.*

5   *Marsh*, 872 F.2d 497 (1st Cir.1989).

6          In adhering to NEPA's procedural mandate, the Ninth Circuit, as well as other circuits,

7   have concluded that irreparable injury flows directly from the failure to adequately evaluate

8   environmental impacts through the NEPA process.  *High Sierra Hikers*, 390 F.3d. at 630; *see also*

9   *Friends of the Earth, Inc. v. Coleman*, 518 F.2d 323, 330 (9th Cir. 1975) ("Irreparable damage

10  may in the context of an action to enforce NEPA be implied from the failure by responsible

11  authorities to evaluate fully the environmental impact of the proposed project, and consider

12  alternative proposals…."); *Commonwealth of Mass. v. Watt*, 716 F.2d 946, 952 (1st Cir. 1983);

13  *Sierra Club*, 872 F.2d 497.  In fact, the Ninth Circuit has stated that NEPA violations create a

14  presumption of irreparable harm that the government must overcome.  *High Sierra Hikers*, 390

15  F.3d. at 642; *National Parks & Conservation Ass'n v. Babbitt,* 241 F.3d 722, 737-38 n. 18 (9th

16  Cir. 2001).  Here, BLM's failure to comply with its legal requirements under NEPA (as well as

17  FLPMA) fundamentally undermine the fundamental public purpose underlying the law and, as a

18  result, mandate a finding of irreparable harm.

19         Even without the presumption of irreparable injury arising from BLM's NEPA violation,

20  as set out below, there is overwhelming and well-documented evidence showing that irreparable

21  harm is being inflicted on the Western Mojave as a result of BLM's failure to design and

22  implement a plan which minimizes impacts to the desert.[9]

23              **2.      BLM's Failure to Designate Routes to Minimize Environmental**
                         **Impacts and to Adequately Implement the WEMO Plan is Resulting in**
24                       **Continuing Irreparable Harm in the Western Mojave.**

25         The myriad of impacts that OHVs inflict on the desert landscape and its plant and animal

26  species have been well documented over the last 40 years.  *See Oregon Natural Desert Ass'n*  v.

27  ───────────────────────────
    [9] We emphasize that plaintiffs do not rely solely on any presumption of irreparable injury, and
28  will prove irreparable injury by a preponderance of the evidence.

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF                    - 15 -                    21343\2235820.2
No. 3:06 CV 04884 SI

1   *BLM*, 531 F.3d 1114, 1144 (9th Cir. 2008) ("There is no dispute that ORVs profoundly change

2   the lands across which they travel.").   Starting with soil disturbance, the impacts of OHVs causes

3   a chain reaction, harming the ability of native vegetation to flourish, increasing the spread of

4   invasive species, reducing the forage for animals, destroying burrows, crushing species, and

5   disturbing the natural patterns of animals due to their noise.  OHV use also damages cultural

6   resources, many of which have yet to even be identified by BLM.  It is the impacts to these

7   resources that FLPMA's implementing regulations require BLM to minimize when designating

8   off-road vehicle routes, and it is the impacts to these resources that the Court ruled were ignored

9   by BLM in its route designation process.  43 C.F.R. § 8342.1.  As detailed below, the on-going

10  irreparable harm includes adverse impacts to soils and vegetation, and the wildlife that depend

11  upon these critical and fragile resources.[10]

12                    a.      **Irreparable Impacts to Soils**

13          It is well established that OHV use in arid regions, and the Mojave Desert in particular,

14  causes extensive adverse impacts to soils and substrate.  *AR*-202232; Declaration of Tom Egan

15  ("Egan Decl.") at ¶¶ 12-13; *see generally* Lovich and Bainbridge, 1999 at 315-16, 319-20.[11]

16  Much of the soil in the Mojave is composed of a biological surface crust that is vital to its

17  stability and nutrient retention.  Egan Decl., ¶ 12; Belnap, 2007 at 2; Wilshire, 1983.  The use of

18  OHVs over desert soils tends to compact the soil which decreases its permeability, resulting in

19  increased flow of water across the ground and reduced absorption of water into the soil.  Egan

_____

20  [10] In demonstrating irreparable harm, Plaintiffs rely upon, among other things, the factual

21  declarations of witnesses with personal knowledge and expertise regarding OHV use and
    associated impacts within the Western Mojave.  The Court's reliance on declarations outside the

22  administrative record is entirely proper in an injunction context, and is not restricted by the
    summary judgment proceeding addressing BLM's action under the APA.  *See* E*arth Island*

23  *Institute v. Evans*, 256 F.Supp.2d 1064, 1078 n.16 (N.D. Cal. 2003) (allowing evidence outside of
    the administrative record in considering "the equitable and public interest considerations that

24  plaintiffs must address in order to obtain preliminary injunctive relief"); *Ft. Funston Dog Walkers
    v. Babbitt*, 96 F.Supp.2d 1021, 1035 (N.D. Cal. 2000) (use of evidence outside the administrative

25  record appropriate in considering claim of irreparable harm necessary for injunctive relief).

26  [11] True and correct copies of the scientific studies cited herein are provided in full as exhibits to
    Sky Stanfield's Declaration.  For ease of reading, the short cites are provided here while the full

27  citations to these studies can be found in the Stanfield Declaration.  The studies are organized in
    alphabetical order by the first author's last name to match the naming convention used for the

28  short cites.

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF                  - 16 -                            21343\2235820.2
No. 3:06 CV 04884 SI

1    Decl., ¶¶ 12-13; Ouren, 2007 at 5-11; Webb, 1983.  The compacted soil hinders root growth and

2    the reduced moisture content makes it harder for desert plants to survive.  Egan Decl. at ¶ 13;

3    Ouren, 2007 at 5-11; Webb, 1983; Adams, et. al., 1982; AR-237407; AR-237586.  The

4    compaction and displacement of surface soils, and the channeling of water flows in OHV tracks,

5    have also been shown to cause considerable erosion of desert soils, particularly in steeper terrain.

6    Egan Decl. at ¶¶ 12-13; L. Brooks, 2005 at 7 ("One of the most significant ecological effects that

7    vehicular routes have on soils in desert regions involves changes in water runoff patterns.

8    Vehicular routes that run straight up hillslopes can promote soil erosion . . . .") AR-237586, 602;

9    Iverson, 1980.  These effects are particularly damaging when you consider the critical foundation

10   that soils provide to the plant and animal species in the Mojave.

11        The harms caused by OHV use to desert soils are not short-lived; they clearly constitute

12   long-standing and, therefore, irreparable environmental harm.  Egan Decl. at ¶¶ 12-13.  For

13   example, one of the world's leading authorities on soil crusts, United States Geological Survey

14   ("USGS") scientist Jayne Belnap, recently wrote that recovery times for disturbed desert

15   biological soil crusts "are generally measured in decades or centuries."  Belnap, 2003 at 187-88;

16   see also AR-239122.  A study by Robert Webb of USGS found that the average time for

17   "[r]ecovery of severely disturbed desert soils and vegetation, as measured with penetration

18   resistance and bulk density, requires approximately a century in the Mojave Desert" for

19   compacted soils.  Webb, 2002, at 13.  These biological soil crusts "are a critical component of

20   most dryland ecosystems" including the Mojave.  Belnap, 2007 at 2.

21        BLM's regulations implementing FLPMA require that BLM locate areas and trails "to

22   minimize damage to soil" (see 43 C.F.R. § 8342.1), however, BLM's route designation process –

23   which the Court struck down – considered only the impacts to soil in an indirect manner, failing

24   to address whether a route would minimize impacts to this crucial foundation to all the desert's

25   ecosystem.  In addition, this Court found that the FEIS lacked a "discussion of how soils would

26   be impacted by the proposed WEMO OHV route network."  SJ Order at 48.  The adverse impacts

27   to soils caused by the 2006 route designations are evidenced in the photographs attached to the

28   Declarations of Jenny Wilder, Mark Heuston and Doug Parham and the 2010 Route Designation

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF          - 17 -          21343\2235820.2
No. 3:06 CV 04884 SI

1   and Implementation Studies prepared by Tom Egan (*see* Egan Decl. at ¶10, Ex. A).  In Wilder's

2   Declaration, she details the route proliferation that is occurring on the hillsides and resulting

3   erosion throughout Juniper Flats.  Declaration of Jenny Wilder ("Wilder Decl.") at ¶¶ 10-32 and

4   supporting photos.  In Wonder Valley, OHV users have traveled far off designated routes and

5   deeply scarred the desert pavement (a unique type of biological crust) that covers the surface of

6   the alluvial fan that runs out of the Cleghorn Lakes Wilderness Area.  Declaration of Mark

7   Heuston ("Heuston Decl.") at ¶¶ 24-26 and supporting photos.  Parham's declaration shows

8   numerous new tracks being created on a regular basis in Edwards Bowl.  Declaration of Doug

9   Parham ("Parham Decl.") at ¶ 15 and supporting photos.

10          The injunctive relief Plaintiffs seek is designed to limit this irreparable soil damage which

11  is actively being inflicted as a result of the WEMO Plan.

12                          b.      **Irreparable Impacts to Vegetation**

13          The irreparable harm caused by OHVs to fragile desert soils similarly results in adverse

14  impacts to the plant species that rely on that soil substrate and creates conditions facilitating non-

15  native plant growth and wildfire risk.  Egan Decl. at ¶ 13; Miller, 2008; Bolling and Walker,

16  2000; Lathrop, 1983.  The plants themselves also suffer a variety of direct impacts from OHV use

17  and grazing.  *Id.* The WEMO Plan failed to minimize these direct and indirect impacts to the

18  desert vegetation and we are seeing the results of that failure in the area at this time.

19          Desert plants tend to grow slowly and have shallow root systems which are easily

20  disturbed by OHVs which can crush and kill them in just a few passes.  Ouren, 2007 at 11.  As

21  noted in the discussion of impacts to soils, the erosion caused by OHV routes also wipes out

22  plants, either by smothering them with soil, or disturbing the soil stabilizers which hold plants in

23  place.  Adams, et. al., 1982, *AR*-237407; BLM AR NECO-126221; Lathrop, 1983; *see also*

24  Wilder Decl. at ¶¶ 13-18.  OHV compaction of soils makes it more difficult for roots to move

25  through the soil and desiccates the soil such that there is less moisture available for uptake by

26  parched desert plants.  Adams, et. al., 1982; Ouren, 2007 at 11; Bolling and Walker, 2000.

27  Moreover, fugitive dust and particulate matter generated by OHV use further reduces

28  photosynthetic capacity of plants, resulting in reduced growth and vigor.  Egan Decl. at ¶ 13.

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF                          - 18 -                                21343\2235820.2
No. 3:06 CV 04884 SI

Another key problem with OHV use is the rapid dispersion of invasive, non-native species they cause. Egan Decl. at ¶ 13; Brooks and Berry, 2006; Lovich and Bainbridge, 1999 at 317. These non-native species often out-compete native vegetation and there is evidence that the spread caused by OHVs goes much beyond the route borders. Egan Decl. at ¶ 13.; Brooks and Berry, 1999; Brooks and Lair at 8. The air pollutants emitted from OHV use includes nitrogen and other fertilizers which are deposited onto the soil and can lead to increased growth and dominance of non-native species, amongst other effects. Brooks, 2003; Brooks, 2007 at 153; Ouren, 2007 at 29-33 and references cited therein.

c.    **Irreparable Impacts to Wildlife, Air Quality and Nearby Uses**

The impacts to the animal species that reside in the Mojave is equally dire although it is harder to provide a generalized summary as the impacts on individual species varies. The habitat loss and fragmentation caused by OHV routes, the noise impacts, impacts to forage, and actual collisions with vehicles are some of the many impacts that animal species suffer as a result of OHV use. Egan Decl. at ¶ 14; Ouren, 2007 at 16-25 and references cited therein; Brattstrom and Bondello, 1983.

The dust caused by OHV use and the emissions from OHVs have a number of negative impacts on the air quality in California. SJ Order at 53; Ouren, 2007 at 29-33 and references cited therein; *http://www.slocleanair.org/pdf/PM2-ExecSummary.pdf* (Recent study which found that dangerously high levels of particulate matter were largely attributable to nearby OHV areas in California); *see also* Lovich and Bainbridge, 1999 at 317-18 (documenting the impacts OHV emissions can have on plant growth); Heuston Decl. at ¶¶ 9, 21. The entire Western Mojave region is out of compliance with federal standards for particulate matter and there are levels of concern for a number of other hazardous pollutants which OHVs contribute to. *AR*-201975-76.

Finally, the impact that noise from OHVs has on both humans and animals is significant and yet appears to have been utterly ignored in the route-designation process undertaken for the WEMO Plan. Egan Decl. at ¶ 14; Ouren, 2007 at 19-20 and references cited therein; Brattstrom and Bondello, 1983; Heuston Decl. at ¶¶ 8-9, 21; Declaration of Philip Klasky ("Klasky Decl.") at ¶¶ 15-24; Parham Decl. at ¶¶ 7-8.

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF                    - 19 -                    21343\2235820.2
No. 3:06 CV 04884 SI

**B.**   **The Irreparable Harm Caused By Unregulated OHV Use Will Continue Unabated – and Likely Multiply – During the Remand Period Unless the Court Issues Injunctive Relief Tailored to Address These Impacts.**

As discussed in Section II above, in light of the Court's ruling that BLM violated FLPMA and NEPA in designating OHV routes in the Western Mojave, BLM's 2006 route designations are invalid and therefore illegal.  Since, as discussed above, returning to the *status quo* would be difficult and would not serve the parties interests, Plaintiffs therefore propose that the Court leave the route designations in place for use by street-legal vehicles for the interim period, with the additional protective measures set forth below.

It is clear that protective measures are necessary.  Millions of acres of the WEMO are open to OHV use on some basis, and by all accounts OHV use is increasing every year.  As Plaintiffs noted in their summary judgment briefing, BLM acknowledges that, since at least the mid-1980s, extensive illegal route proliferation has occurred throughout the WEMO.[12]  *E.g. AR*-202203-04 (table indicating in some cases mileage of routes has doubled or tripled since mid-1980's), *AR*-218702 (Bates stamps on pages are missing, see Ch. 1, p. 5) ("The network of access routes has proliferated to an extensive level since the advent of mass-produced affordable rough terrain vehicles . . .").  The FEIS provides a comparison between the number of routes designated in 1985-87 and those inventoried for the WEMO Plan, through which it is apparent that the number of routes grew substantially.  *AR*-202203.  The survey done of the redesign areas for the WEMO Plan found a total of 4,442 miles of routes, which compares to 1,897 miles of routes designated in 1985-87.  *AR*-201832, 842.  No survey of existing (as opposed to legally designated) routes was performed for the non-redesign areas, but if the same ratio of existing to legally designated routes is present in those areas, there may be an additional 6000 miles of routes actually on the ground in those areas.  *AR*-201842 (2268 miles of designated routes in the non-redesign areas).

---

[12] The OHV intervenors will no doubt argue that route proliferation is the result of a few "bad apples."  This may or may not be true, but in any case it is irrelevant to the question whether continued OHV use in the Western Mojave leads to continued route proliferation and damage to public lands resources.  Based on the record and the evidence presented here, it is indisputable that it does.

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF
No. 3:06 CV 04884 SI                                    - 20 -                                    21343\2235820.2

The experience of the Plaintiff organizations is that the problems with route proliferation are compounding just as rapidly since the adoption of the WEMO Plan.  As attested to in their Declarations, Plaintiff organizations have found that a high rate of off-route travel is continuing in limited and/or closed areas.  Egan Decl. at ¶¶ 16-36 and supporting exhibits; Declaration of Jeffrey Aardahl ("Aardahl Decl.") at ¶ 12; Declaration of Edward Patrovsky ("Patrovsky Decl.") at ¶¶ 10-13, 17-18.  In the Juniper Flats area, Wilder testifies to seeing newly cut tracks and evidence of recent riding on "closed" routes on every visit she makes to the area.  Wilder Decl. at ¶¶ 10-13, 22.  Heuston and Klasky both state that the route proliferation continues, and has even worsened, in recent years.  Klasky Decl. at ¶¶ 16, 22; Heuston Decl. at ¶ 24.  Parham testifies that while BLM efforts "have had some degree of success, the fact remains that every weekend riders continue to ride on closed routes and to ride cross country, leaving new tracks and encouraging further riding in the Edwards Bowl area."  Parham Decl. at ¶¶ 17, 15.

Absent protective measures, this trend is virtually certain to continue.  The latest version of the National Survey on Recreation and the Environment shows that OHV use has undergone significant growth in the last twenty years.  Cordell, 2008 at 9-10.  The Government Accountability Office recently outlined how the extent of authorized and unauthorized OHV use on public lands has been growing rapidly in recent years.  GAO, 2009 at 11.  As the FEIS outlined, these figures hold true for OHV use in the Western Mojave.  *AR*- 202174-75.

**C.   The Court Should Impose Injunctive Relief Requiring BLM to (1) Implement Protective and Monitoring Measures Outlined in the WEMO Plan; and (2) Close Specific Areas Where Demonstrated Irreparable Harm is Occurring.**

In light of the documented route proliferation in the WEMO since 1980, and the virtual certainty of continued or expanded OHV use during the remand period, injunctive relief directing specific action by the BLM is an absolute necessity to preserve the *status quo* during remand.  Courts may "require specific actions from an agency on remand."  *NWF v. NMFS*, 481 F.3d at 1243.  In *NWF v. NMFS*, the district court imposed several requirements in addition to setting a timeframe for the remand proceedings.  *Id.* at 1241-43.  These included periodic status reports and consultation with interested states and Indian tribes during remand.  *Id.* at 1242.  The Ninth Circuit approved the remand order, declaring that "[t]he district court reasonably found that such

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF          - 21 -                              21343\2235820.2
No. 3:06 CV 04884 SI

specific direction was necessary in light of the agency's conduct on earlier remands . . . ." *Id.* The court highlighted the protracted "history of the litigation" in the case and likened it to EPA's "persistent failure" to comply with the Clean Water Act in *Alaska Center for the Environment v. Browner* (*ACE*), 20 F.3d at 986-87. *NWF v. NMFS,* 481 F.3d at 1242-43. In both cases, the Ninth Circuit found that ordering "specific steps" on remand was essential. *Id.* at 1243 (citing *ACE,* 20 F.3d at 986 ("In tailoring the relief granted, the district court correctly recognized that in order to bring about any progress toward achieving the congressional objectives of the CWA, the EPA would have to be directed to take specific steps.")))

The present case, like both *NWF v. NMFS* and *ACE,* has a long history of litigation. Yet BLM has repeatedly failed to comply with FLPMA and NEPA. Moreover, BLM has thusfar failed to come forward with any interim protective measures to ensure adherence to its legal requirements during the remand period as it has in analogous cases. *See, e.g., Idaho Watersheds Project,* 307 F.3d at 823, 830-31 (describing BLM's proposed terms for protective measures during remand[13] to allow grazing to continue despite vacatur of grazing decisions). As a result, this Court should direct BLM to take "specific actions" on remand. *See NWF v. NMFS,* 481 F.3d at 1243. Specifically, as discussed further below, the Court should (1) require BLM to immediately implement general mitigation measures which adopted through the WEMO route designations in 2003 and 2006 but has thus far failed to fully implement; and (2) close specified areas to all OHV use during the remand period.

> **1.     BLM Should be Required to Immediately Implement the Mitigation and Monitoring Measures Adopted in the WEMO Plan Itself**

Almost seven years after BLM first adopted the present OHV route network, the agency has failed to implement the physical barriers, signing and public information necessary to ensure compliance with its route designations and to allow effective enforcement of WEMO Plan requirements by BLM staff. In the FEIS, BLM addressed these issues by identifying the key

---

[13] As noted above, if the Court does not so limit the route designations, Plaintiffs ask that they be vacated in their entirety and that BLM bear the burden of proving the *status quo ante.*

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF                    - 22 -                    21343\2235820.2
No. 3:06 CV 04884 SI

1    measures necessary to assure compliance with its regulations and to minimize environmental

2    damage.  As explained by BLM itself,

3        The best program for achieving compliance in designated route areas
         involves:
4
5        • Keeping open routes well signed.

6        • Revegetating and otherwise rehabilitating closed routes so that they
           are not apparent or easy to use.

7        • Maintain a field presence of BLM personnel to contact, inform
           visitors, and enforce the law.
8
9        • Establishing BLM-trained and supervised volunteer groups who can
           assist in keeping the routes signed and who can contact visitors in
           order to explain applicable use policies.
10

11    *AR*-202179.

12        The WEMO Plan proceeded to therefore adopt specific protective measures designed to

13    ensure compliance with BLM's statutory and regulatory requirements and avoid adverse

14    environmental impacts while permitting measured OHV use within the Western Mojave.  As set

15    forth in the WEMO Plan, the adopted "implementation" measures included the following:

16       • Sign the open route network (do not sign the closed route network).

17       • Maintain the open route network with the principal goal being to
           make the open route network more attractive for use than the closed
18         route network.  Make ample use of the tools such as the York Rock
           Rake to shape, clear and contour the open route network.
19
         • Install informational kiosks and interpretive signing where it would
20         be most effective.

21       • Develop and publish maps that are up-to-date, readily available and
           have a readily understandable and useful format.
22
         • Regularly maintain signs, kiosks, routes, maps and brochures.
23

24    *AR*-211410-11 (EA); *AR*-201853 (FEIS).

25        Both the 2003 EA and the WEMO FEIS acknowledge that "[t]he success of the West

26    Mojave Plan's conservation strategy would depend, to a great degree, on the ability of the

27    participating agencies to ensure that its measures are being properly implemented, that its

28    strategies are effective and that the plan is flexible enough to adapt to changing conditions and

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF          - 23 -                                    21343\2235820.2
No. 3:06 CV 04884 SI

1   circumstances." *AR*-201860 (FEIS).  The FEIS relies at numerous points on continuing

2   monitoring of compliance with ORV route designations to assure that springs, riparian areas,

3   wildlife and other resources are protected.  *E.g.*, *AR*-211493 (continued monitoring required to

4   determine if dense route network detrimental to riparian communities in Bighorn subregion or

5   springs in Juniper subregion); *AR*-201889, 890 (desert tortoise data must be collected on

6   numerous impacts of routes including whether new routes are being created).

7        According to the timeline found at page 2-22 of the 2003 EA (*AR*-211410) (and 2-166 of

8   the FEIS (*AR*-201854) and further elaborated in Appendix C (*AR*-204532)), the majority of the

9   mitigation measures should have been implemented by this time.  At a minimum, those measures

10  addressing critical restoration issues and problem areas in the Ord, Juniper, Superior, Red

11  Mountain, Fremont, Kramer, El Paso, Newberry-Rodman, Ridgcrest, El Mirage, and Coyote

12  subregions were to have been addressed by 2010.  FEIS Appx. C.1, Task MV-9 (*AR*-204539).

13  Certainly at this point in time, four years after the 2006 plan approval, and seven years after

14  essentially the same route system was adopted in 2003, implementation of mitigation measures

15  and monitoring should have been carried out to determine whether the plan is effective.[14]

16       There is presently no public reporting of compliance with these commitments in the

17  WEMO Plan, and Plaintiff's request to BLM for this information in the Fall of 2009 has thusfar

18  received no response.  Based on the declarations submitted with this brief, however, it is clear that

19  BLM has done little to implement the mitigation measures set out in the WEMO Plan.  The

20  declarations and 2010 field study conducted on behalf of several organizations provide detailed

21  on-the-ground evidence that BLM's management and enforcement of OHV routes in the WEMO

22  is woefully inadequate and is failing to ensure compliance with route designations, protect public

23  lands resources and prevent further route proliferation.  *See* Egan Decl. at ¶¶ 16-36 (documenting

24  BLM's failure to adequately sign or effectively close routes designated as closed, to monitor

25  _____

26  [14] Plaintiffs are aware that, in its Summary Judgment Order, the Court found that the FEIS
    adequately discussed mitigation measures pursuant to NEPA.  SJ Order at 46.  However, the
27  extent to which these measures have been implemented at this point – seven years after the
    WEMO route designations were initially approved – is a distinct issue and directly relevant to the
28  need for injunctive relief, as well as the time frame that should be required to implement these
    measures.

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF                    - 24 -                    21343\2235820.2
No. 3:06 CV 04884 SI

compliance and to undertake enforcement measures); Heuston Decl. at ¶ 27, Aardahl Decl. at ¶¶ 10-12 (documenting widespread violation of route closures and lack of BLM enforcement to implement route network); Patrovsky Decl. at ¶¶ 12-17 (documenting lack of adequate signing and maintenance with simultaneous reduction in BLM law enforcement post-WEMO plan); Wilder Decl. at ¶22. BLM's failure to effectively implement its designated route network and to prevent further route proliferation is directly tied to its failure to adequately sign routes, which not only thwarts public knowledge regarding the route network but prohibits BLM personnel from undertaking enforcement action based on this lack of public notice. Aardahl Decl. at ¶¶ 10-12; Patrovsky Decl. at ¶ 13; Heuston Dec. at ¶¶ 22-23 and Ex. F.

In light of BLM's failure to effectively implement even those measures the agency itself stated were minimally necessary to implement its existing (but now-determined flawed) route designations, Plaintiffs request that the Court enter an order requiring BLM to undertake the following mitigation measures and actions to protect public resources during the remand period:

(1)     Within 60 days of the Court's order, BLM should provide the Court with a detailed implementation plan for signing all open routes in the WEMO. The signing should be completed within 180 days of the date of the Court's order.

(2)     Within 120 days of the Court's order, update all BLM-produced and available maps to include accurate and updated route information and, as necessary, include a notice in the form that can be seen to the right, in at least 20 point type, on all maps, pamphlets, kiosks, and other literature regarding WEMO ORV routes distributed by BLM.

**NOTICE**

MOTORIZED USE IS PERMITTED ONLY ON ROUTES SIGNED "OPEN." ANY ROUTE THAT DOES NOT HAVE AN "OPEN" SIGN IS NOT LEGAL FOR MOTORIZED USE. MOTORIZED USE OF ANY CLOSED ROUTE WILL RESULT IN A FINE OR CRIMINAL PROSECUTION.

(3)     Within 90 days of this Court's order, provide the Court with a monitoring plan to determine (a) compliance with route closures; and (b) whether new illegal routes are being

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF
No. 3:06 CV 04884 SI

- 25 -

21343\2235820.2

1  created.  The monitoring plan should demonstrate that the monitoring effort will be adequate to

2  determine compliance at a statistically significant level.

3  (4)     During the period of remand, but no longer than 24 months from the date of the

4  Court's order, carry out additional information gathering and monitoring regarding (a) air quality

5  in and around open areas through air quality monitoring, (b) status of the Mojave fringe-toed

6  lizard and its habitat, and (c) riparian areas and UPAs, including new "proper functioning

7  condition" ("PFC") assessments for all of the springs and seeps in the West Mojave planning.

8  (5)     Within 90 days, provide the Court and the parties with a plan for maintenance of

9  the open route network and installation of informational kiosks at all major ORV access points.

10  (6)     Within 90 days, provide the Court and the parties with a plan for providing

11  additional enforcement capability for the route network in the WEMO.

12  (7)     Provide the Court and the parties with quarterly reports indicating BLM's progress

13  in implementing requirements 1-6.

14  The Court should retain jurisdiction over the implementation of these interim injunctive

15  actions in the event that BLM fails to carry out these measures, or that the monitoring and

16  reporting demonstrates that irreparable harm to public resources is occurring at an unacceptable

17  level and additional relief is required.

18
19
        **2.      BLM Should be Required to Close Specific and Defined Areas to all
                   ORV Use Where Demonstrated Irreparable Harm is Occurring.**

        a.      **Juniper Flats**
20

21  Nestled in the mountains above the towns of Apple Valley and Hesperia is an area known

22  as Juniper Flats.  As shown on Maps 69 (*AR*-203045) and 72 (*AR*-203049), this swath of BLM

23  land abuts the San Bernardino National Forest to the south, and is surrounded by the urban areas

24  to the north.  Wilder Decl. at ¶ 5.  Included in the subregion is the Juniper Flats ACEC, which

25  was designated as such to protect the important cultural resources found in the area.  Due to the

26  hilly terrain and proximity to urban areas, Juniper Flats is a popular destination for OHV users,

27  and motorcyclists in particular.  *AR*-201849; Wilder Decl. at ¶ 11; Patrovsky Decl. at ¶ 18.  While

28  the entire subregion is heavily impacted by OHV use, Arrastre Canyon and Deep Creek are areas

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF           - 26 -                                    21343\2235820.2
No. 3:06 CV 04884 SI

1   of particular concern and demand immediate protection.  Wilder Decl. at ¶5.  All routes in

2   Arrastre Canyon and those feeding riders into the area should be closed during the interim period,

3   as detailed below.  Additionally, key routes which feed OHV riders into Deep Creek also need to

4   be closed and/or limited.

5                              (1)    **Arrastre Canyon**

6          Arrastre Canyon runs north to south through Juniper Flats and is home to riparian areas

7   and a rare desert waterfall.  Wilder Decl. at ¶¶ 5-9.  The Canyon is a popular motorcycle

8   recreation area with an extensive, and ever growing, network of routes crisscrossing the riparian

9   areas.  *AR*-201849.  The water that flows through the Canyon makes this a particularly rich area

10  for plants and animals. Wilder Decl. at ¶¶ 6-7.  For example, BLM conducted a bird survey in

11  Arrastre Canyon and found 64 species in the lower Canyon and 58 species in the upper Canyon.

12  *AR*-201849; *AR*-210243.  The Canyon contains likely habitat for the endangered least Bell's vireo

13  and for the southwestern willow flycatcher.  *Id.*; *AR*-206457; *see also AR*-201776.  The area is

14  also home to the San Diego Horned Lizard, which BLM describes as a "vehicle sensitive

15  species."  *AR*-201849; Wilder Decl. at ¶ 7.  In addition, there is evidence of cultural resources in

16  the Canyon that are worthy of protection.  Wilder Decl. at ¶¶ 8-9; see also *AR*-201849

17  (emphasizing the cultural resources near riparian areas).

18         BLM included Juniper Flats as a redesign area after substantial public concern was raised

19  about the impacts occurring in the area.  Sadly, though, the network BLM designed pursuant to

20  the faulty Decision Tree, has resulted in little, if any, improvement to the area.  Instead, the route

21  proliferation that is occurring is out of control despite efforts by BLM to sign the area and the

22  active monitoring and restoration efforts by Friends of Juniper Flats and the Sierra Club.  Jenny

23  Wilder's declaration and the supporting photographs detail the type of destruction seen in

24  Arrastre Canyon, using specific examples.  Wilder Decl. at ¶¶ 10-22; *see also* Patrovsky Decl. at

25  ¶ 11, 17.  Not only are riders regularly using the trails closed by the WEMO plan, they are cutting

26  new trails on a nearly daily basis.  Wilder Decl. at ¶¶ 12-24.  The problems are particularly

27  intense off of the route known as Powerline Road (RJ3002) and in the hills that rise up near

28

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF          - 27 -                              21343\2235820.2
No. 3:06 CV 04884 SI

1 Arrastre Falls, however, evidence of illegal riding is found throughout the upper and lower

2 canyon.  Wilder Decl. at ¶¶ 13-14, 17-21, and supporting photos.

3  As can be seen on Map 69 (*AR*-203045), the northern section of Powerline Road (RJ3002)

4 is extremely windy and runs horizontally along the hillside.  Wilder Decl. at ¶13, Photos A-12, A-

5 37.  Due to this, a devastating amount of route proliferation occurs off of the route as the OHV

6 users do not choose to follow the curves of the road and instead create short-cuts that connect the

7 numerous curves.  Wilder Decl. at ¶13, Photos A-13 to A-15.  The hillsides that rise up from the

8 waterfall have also been suffering intense scarring.  *Id.* at ¶¶ 16-17; Photos A-12, A-18 to A-24.

9 What started as one or two hill climbs, has now become an entire hillside covered with routes.

10 Wilder Decl. Photos A-21, A-23, & A-32.  These hillsides are nearly denuded of vegetation and

11 the erosion off of these hills is immense.  Riders have cut the fences repeatedly and have blatantly

12 ignored restoration signs installed by BLM.  Wilder Decl. at ¶¶ 16 to 21 and supporting photos.

13  The case for injunctive relief to remedy the irreparable harm occurring throughout

14 Arrastre Canyon is boosted by the fact that this area is feasible to close to OHV access due to

15 some preexisting geographic and physical barriers that bound the area.  The area suffered a

16 devastating fire, known as the Willow Fire, in August of 1999 and in order to restore the area

17 BLM closed the area and erected a barbed wire fence around much of Arrastre Canyon at that

18 time.[15]  *See* Wilder Decl. at ¶ 33; Patrovsky Decl. at ¶ 7.  The Wilder Declaration outlines the

19 exact boundaries of the area that should be closed along with descriptions of the fencing and other

20 boundaries.  Wilder Decl. at ¶ 34.  In order to protect Arrastre Canyon from further destruction,

21 all routes within those boundaries should be closed during the interim period.  *Id.* at ¶ 35 (provid-

22 ing a complete list of the routes within the closure area).  BLM should install "Area Closed" signs

23 throughout the boundaries of the area, which include clear warnings of the associated penalties

24 for illegal behavior, and begin a restoration program designed to disguise the many illegal tracks

25 that have been created.  Patrovsky Decl. at ¶¶ 14, 19 (description of what should go on signs).

---

[15] This restoration effort and the closure is generally considered to have been fairly effective at giving the area time to restore itself.  Petrovsky Decl. at ¶ 7.  However, the good work that was done during this period has been severely compromised as a result of the ineffective route network put in place by the WEMO Plan.  Wilder Decl. at ¶ 23; Petrovsky Decl. at ¶ 17.

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF - 28 - 21343\2235820.2
No. 3:06 CV 04884 SI

(2)    **Deep Creek**

Deep Creek, a tributary of the Mojave River, runs to the south of Juniper Flats through the San Bernardino National Forest. It is a proposed Wild and Scenic River and contains a set of natural hot springs which are popular with local residents. It is home to the southwestern arroyo toad which is a federal endangered species (*AR*-201961) and the southwestern pond turtle which is a California Species of Special Concern (*AR*-202113) whose biggest threat is habitat destruction. The Pacific Crest Trail runs along Deep Creek's course for nearly twenty miles. *AR*-202337. The Creek runs through a canyon with steep hillsides which run down to it. While the Creek itself does not cross BLM land, numerous of the access points originate on BLM land, principally off of Powerline Road and the Coxey Truck Trail (to the west of where they run through Arrastre Canyon). AR-201936; AR-202347; AR-201848-49; Wilder Decl. at ¶¶ 29 & 31.

Deep Creek is suffering from intense damage, from both illegal route proliferation and from cattle that escape due to fences cut by OHV users. The Creek is in a non-motorized zone on Forest Service Land, but the vehicle access provided by BLM land is making that harder to enforce. Wilder's declaration and the supporting photographs details the type of harm being inflicted by out-of-control off-roaders who continually cut the fences and create new hill climbs down to the Creek. Wilder Decl. at ¶¶ 29-32 and supporting photos A-33 to A-37. Patrovsky's declaration also identifies the problems caused by motorcycle incursions into Deep Creek and the associated enforcement challenges that make closure of the feeder routes necessary. Patrovsky Decl. at ¶ 11, 18.

While BLM worked with the U.S. Forest Service on connecting the Juniper Flats route network with National Forest land, the result has not been to reduce impacts on Deep Creek. *AR*-202347. In order to mitigate this destruction while BLM reassesses the harm being caused, the routes which lead to the Creek on BLM land need to be closed and/or limited. The Wilder declaration at paragraph 31 lists the exact route designations that need to be changed.

b.    **Wonder Valley/Poste Homestead**

The area known as Wonder Valley is located in the southeastern section of the WEMO planning area, and is shown on Map 80 (*AR*-203057). Near the town of Twentynine Palms, the

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF               - 29 -                    21343\2235820.2
No. 3:06 CV 04884 SI

1    area is bounded by the Cleghorn Lakes Wilderness and the Marine Corps Training Center to the

2    north, the Sheephole Wilderness to the east, and to the south is Joshua Tree National Park.

3    Heuston Decl. at ¶ 10; Klasky Decl. at ¶ 9.  This area was not one of the so-called redesign areas

4    and thus the WEMO plan and the FEIS contain almost no mention of the resources in the area or

5    the problems it is suffering, despite the fact that the WEMO route designations done in the area

6    are obligated to be in compliance with the minimization criteria just like those in the redesign

7    areas.  SJ Order at 30-33.

8                    (1)    **Failure to Implement Closures of Routes Accessing the**
                            **Poste Homestead is Destroying a Cultural Resource and**
9                           **Fragile Dune Habitat**

10           The Wonder Valley is an area rich in both Native American and early-Western history.

11   Heuston Decl. at ¶¶ 11-13; Klasky Decl. at ¶ 12.  There is one site that is of particular concern

12   which needs immediate protection in this area due to the heavy abuse it is suffering at the hands

13   of disrespectful OHV users.  Located off of Chadwick Road (Route MP246 on Map 80, *AR-*

14   *203057*) is an adobe ruin that contains the remains of one of the earliest Western settlements in

15   Wonder Valley.  Heuston Decl. at ¶ 12, photos A-2 to A-3, and Ex. C.  The site is known by

16   various names but is mostly commonly called the Poste Homestead after David and Anna Poste

17   who settled at the site in 1923.  The detailed history of the site and the role it plays in local history

18   was recently outlined in two articles by the Twentynine Palms Historical Society.  *See* Heuston

19   Decl. Ex. C.  The area surrounding it is a fragile dune habitat that is home to Mojave fringe-toed

20   lizards and other special status species.  *See* Heuston Decl. Ex. D (Poste Homestead interpretive

21   sign); Klasky Decl. at ¶¶ 10-12.

22           The routes accessing the site, numbers MP 2512 and MP 25, were designated closed by

23   the WEMO Plan, but have since been treated as open by BLM.  Recognizing the damage that

24   OHV use was causing to the cultural site and the surrounding habitat, some of the area

25   conservation groups have worked with BLM to install barriers and interpretive signs at the site.

26   Heuston Decl. at ¶14.  They also collaborated with BLM to organize a massive community work

27   day at the site in commemoration of National Public Lands Day on September 26, 2009.  Heuston

28   Decl. at ¶¶15-17; Klasky Decl. ¶13.  Roughly sixty volunteers removed piles of garbage, installed

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF          - 30 -                    21343\2235820.2
No. 3:06 CV 04884 SI

a kiosk which provided information on the route network, signed nearby open routes, and attempted to restore and camouflage some of the illegally created routes that were running into the dunes.  Heuston Decl. at ¶¶ 15-17 and supporting photographs A-6 to A-12, Ex. E (BLM press release on Public Lands Day Event); Klasky Decl. at ¶ 13.

Unbelievably, the hard work of BLM and the community was demolished within a month by OHV users.  The individuals drove over the restoration work that was carefully done, destroying the vertical mulching along the illegal routes and carving new routes into the dunes. Heuston Decl. at ¶ 18 and photos A-14 to A-19; Klasky Decl. at ¶ 14.  Fortunately, the barriers built to protect the adobe ruins held strong, but the balance of the area was heavily and adversely impacted.  Heuston Decl. at ¶ 18.

Due to clear and incontrovertible evidence of the irreparable harm being caused at this important natural and cultural resource, the closure of routes MP 2512 and MP 25 should be implemented immediately and the area should be signed closed.  It is only a short walk to the site from Chadwick Road so the area will remain accessible to visitors by foot.

(2)   **BLM's Routes Across Checkerboard Lands Necessitate Trespass onto Private Property**

One of the most important features in Wonder Valley, and source of problems, is the land ownership pattern that is scattered across the Valley floor.  As can be seen on Map 80, rather than the typical large segments of public land, a substantial portion of the area is broken into five acre parcels, some owned by BLM and some by private parties, creating a "checkerboard" land pattern.  *AR*-203057 (yellow parcels belong to BLM and white parcels are privately held).  This checkerboard pattern has made law enforcement in the area challenging since its inception. Heuston Decl. at ¶¶ 19-23 and Ex. F; Klasky Decl. at ¶¶ 15-19.  Central to this case, however, is the effect that this checkerboard ownership pattern has on routes that BLM designates across the area.  Take, for example, the utility corridor (route UK) that runs east to west across the midsection of Map 80, or route MP242 which runs north to south.  *AR*-203057.  Any rider traversing these routes must necessarily cross over numerous parcels of private property.  There are portions of these routes that simply cannot be accessed **without** trespassing on private

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF
No. 3:06 CV 04884 SI                    - 31 -                    21343\2235820.2

1   property.  Heuston Decl. at ¶19; Klasky Decl. at ¶¶15, 17.  The same is true for many of the other

2   routes in Wonder Valley which are designated as "open" by the WEMO Plan and are thereby

3   accessible to any rider, whether they are legitimately accessing private property along the route or

4   not. *AR*-203057.

5        BLM's route designations provide a green light to trespass on private property in Wonder

6   Valley, despite the mandate in 43 C.F.R. § 8342.1(c) to minimize conflicts with other uses and to

7   "ensure the compatibility of such uses with existing conditions in populated areas, taking into

8   account noise and other factors."  Along with the physical damage that OHV trespass causes, the

9   web of routes through this area of private residences results in innumerable other conflicts.  As

10  can be seen in the declarations of Mark Heuston and Phillip Klasky, homeowners in the area, the

11  noise and dust created by the OHV use in the area impairs the landowners ability to peacefully

12  enjoy their property.  Heuston Decl. at ¶¶ 8-9, 19-21 ("By placing these routes throughout the

13  residential area it means that residents can no longer expect to be free of the noise and the

14  nuisance dust associated with these routes."); Klasky Decl. at ¶¶ 16-22.

15       In order to put an end to this blanket invitation to trespass while BLM analyzes the

16  designation of these routes pursuant to the minimization criteria, routes within Wonder Valley

17  with segments that cannot be accessed without trespass to private property should be designated

18  as "Limited" with access given only to those with private property along the route (or permission

19  to pass by the owners).[16]  *See* Klasky Decl. at ¶ 29 for full list of routes.  Those routes that also

20  serve as County Service Area (CSA) roads should be Limited to only street-legal vehicles.[17]

21

22  _____

    [16] Plaintiffs are not at this time seeking closure of routes MP-235 and MP-241 in Wonder Valley.
23  Plaintiffs understand that there may be RS2477 claims with respect to these routes, and do not
    believe that this is the appropriate time for resolution of any such claims.

24  [17] According to the information available on the County's website, the following routes are also
    maintained as CSA roads:  Gammel Road (MP232); Pipeline (UK and MP351); Chadwick South
25  (MP2510); and Kern Roop/Wilson Road (MP242).  Exhibit A to Klasky Decl.  The California
    Vehicle Code prohibits the passage of off-highway vehicles on public highways except in a
26  limited number of circumstances, such as when transported in a trailer, when used to cross a
    highway, or when walked or pushed.  Cal.Vehicle Code § 38025.  California Vehicle Code
27  defines a Highway as "a way or place of whatever nature, publicly maintained and open to the use
    of the public for purposes of vehicular travel.  Highway includes street."  Cal. Vehicle Code §
28  360.  Thus, passage of OHVs on County maintained CSA roads is prohibited by state law.

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF          - 32 -                    21343\2235820.2
No. 3:06 CV 04884 SI

c.   **Edwards Bowl**

Located in the heart of desert tortoise habitat critical habitat is an area known as Edwards Bowl.   Parham Decl. at ¶ 5.   Like Wonder Valley, this area is comprised of a checkerboard of private and public lands.  *AR-201842-3*; *AR-202203*; *AR-219756*; Parham Decl. at ¶ 7.   Located near the El Mirage Open Area, the region suffers extreme spill-over effects from that unrestricted area, indeed BLM described Edwards Bowl as an area that is, in effect, "being treated as an open area[]."  *AR-202063*; Parham Decl. at ¶¶ 7, 10.   The FEIS itself admits that the "residual impacts" of the implementation of the plan would mean that Edwards Bowl, which is already heavily degraded, "would continue to be degraded."  *AR-202264* (Table 4-30).   Although proactive efforts by local groups have fenced and signed many of the private lands, and thus reduced the trespass issues, the public lands in the area are still suffering from extreme impacts from OHV use.  Parham Decl. at ¶¶ 7, 12.

The Edwards Bowl area provides potential habitat for a number of sensitive plant and animal species including the Barstow woolly sunflower, desert cymopterus and pygmy poppy. AR-219750, 764.  It is located in the Western Mojave Recovery Unit for the desert tortoise, is in the known range for the Mohave ground squirrel, the burrowing owl, and is home to numerous different raptors.  *Id.* at 219764-65; Parham Decl. at ¶ 5.

This area is popular for "staging" where a group of riders will gather in one place (often bringing their off-road equipment out to the site via trailer) and depart together from one point. *AR-202060-61* (Describing the Edwards Bowl as a heavy OHV use area.); Parham Decl. at ¶¶ 7, 15-16 and Photos A-15, A-17.  These group stagings are a source of considerable irreparable harm.  *Id.*  Along with resulting in heavy compaction of the soils in the areas they chose to stage from (see discussion above on impacts of soil compaction), it appears that much of the route proliferation results from these stagings.  *Id.*

A number of the illegal routes in the area underwent restoration using vertical mulching techniques in 2006-2007.  Unfortunately, virtually all of this restoration work has be undone by OHV users.  See Parham Decl. at ¶ 14 and Photos A-3 to A-6.  Thus, Edwards Bowl needs to be meaningfully closed to halt the epidemic of illegal behavior that has long existed in the area.  The

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF                     - 33 -                                      21343\2235820.2
No. 3:06 CV 04884 SI

closure area should include all the routes in the greater Edwards Bowl area, the exact route numbers are identified in Doug Parham's Declaration.  Parham Decl. at ¶ 17.

### D.      The Balance Of Equities Favors Issuing An Injunction

The Court's second consideration in issuing injunctive relief requires the balancing and weighing of the parties' respective equities.  In this instance, that balancing requires comparison of the substantial and continuing irreparable harm to fragile desert resources caused by OHVs against the resulting limited financial costs to BLM and restrictions on recreational OHV use during the remand period.

The Supreme Court has recognized that, unlike economic harm, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987).  As well documented above, in this instance, BLM's failure to adhere to its FLPMA and NEPA responsibilities has resulted in direct and irreparable harm to soils, vegetation, wildlife, air quality and recreational resources within the Western Mojave.  In contrast, the injunctive relief requested by Plaintiffs merely seeks to require BLM to implement mitigation measures BLM itself has committed – but failed – to implement over the past four years and to close specified areas representing well less than five percent of the OHV routes otherwise open for use in the Western Mojave.  The minor financial burden associated with immediate implementation of the mitigation measures and any recreational inconvenience associated with limited closures falls well short of outweighing the long-term harm that unrestricted OHV use and associated impacts would cause to the desert environment.  *See, e.g., L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) ("monetary injury is not normally considered irreparable.").  As a result, the balance of the equities favors the adoption of Plaintiffs' requested injunctive remedies in this case.

### E.      Issuance Of An Injunction Pending Remand Is In The Public Interest

Beyond considering irreparable harm and the balance of the harms, the Court must determine whether the public interest supports issuance of injunctive relief pending remand.  *See Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009).  It is well established that the

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF          - 34 -
No. 3:06 CV 04884 SI

21343\2235820.2

public has a considerable interest in preventing irreparable harm to the environment.  *See, e.g.,*
*The Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (en banc) ("[P]reserving
environmental resources is certainly in the public's interest."); *Earth Island Inst. v. U.S. Forest*
*Serv.*, 442 F.3d 1147, 1177 (9th Cir. 2006) ("The preservation of our environment, as required by
NEPA . . . is clearly in the public interest.").   As applied here, the narrowly tailored injunction
requested by Plaintiffs certainly serves the public interest during the remand period.

Plaintiffs request simply seeks to require BLM to immediately implement those measures
the BLM determined and committed – through the prior public NEPA process – were necessary
to implement in conjunction with designating and regulating OHV use within the Western
Mojave.  In this regard, BLM itself has already conceded that the public interest requires
implementation of these measures and, in light of the continuing harm caused by BLM's failure
to take such measures, the need for implementation is immediate.  Similarly, with regard to the
requested specific route closures, there is clearly a public interest in temporarily closing these
areas and preserving the status quo (and limiting continuing harm) while BLM addresses these
and other routes during the remand period.  Therefore, there can be little debate that the issuance
of the narrowly tailed injunction requested by Plaintiffs is in the public interest.

## CONLCUSION

For the foregoing reasons, Plaintiffs request for partial vacatur of the ROD and for interim
injunctive relief should be granted.


Dated:  April 16, 2010

_____
                    /s/
LISA T. BELENKY (CA Bar No. 203225)
Center For Biological Diversity
351 California St., Suite 600
San Francisco, CA  94104
Telephone:  (415) 436-9682 x 307
Facsimile:  (415) 436-9683
Email:  lbelenky@biologicaldiversity.org

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF
No. 3:06 CV 04884 SI

- 35 -

21343\2235820.2

1

2
_____/s/_____
DEBORAH A. SIVAS (CA Bar No. 135446)
Environmental Law Clinic
Mills Legal Clinic

3
Stanford Law School
Crown Quadrangle

4
559 Nathan Abbott Way
Stanford, CA  94305-8610

5
Telephone:  (650) 725-8571
Facsimile:  (650) 723-4426

6
Email:  dsivas@stanford.edu

7

8
**Attorneys for Plaintiffs Center for Biological**
**Diversity, Sierra Club, Public Employees for**
**Environmental Responsibility, and Desert**

9
**Survivors**

10
Dated:  April 16, 2010
_____/s/_____
ROBERT B. WIYGUL (LA Bar No. 17411)

11
(*pro hac vice*)
Waltzer & Associates

12
1011 Iberville Drive
Ocean Springs, MI  39564

13
Telephone:  (228) 872-1125
Facsimile:  (228) 872-1128

14
Email:  robert@waltzerlaw.com

15

16
_____/s/_____
SKY C. STANFIELD (CA Bar No. 244966)

17
David J. Lazerwitz (CA Bar No. 221349)
Farella Braun & Martel LLP

18
235 Montgomery Street, 17th Floor
San Francisco, CA  94104

19
Telephone:  (415) 954-4400
Facsimile:  (415) 954-4480

20
Email:  sstanfield@fbm.com

21

22
**Counsel for Plaintiffs Alliance for Responsible**
**Recreation, The Wilderness Society, the**
**California Wilderness Coalition, Friends of**

23
**Juniper Flats, Western San Bernardino**
**Landowners Association, the California Native**

24
**Plant Society, and Community ORV Watch**

25

26

27

28

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PLAINTIFFS' MOTION FOR PARTIAL
VACATUR AND INJUNCTIVE RELIEF
No. 3:06 CV 04884 SI                                    - 36 -                              21343\2235820.2

## EXHIBIT A

The following measures in the ROD should be left in place during remand (numbered subheadings reflect those found in the ROD as indicated below):

1.   Establish New Areas of Critical Environmental Concern (ROD at 6; *AR*-200051);

2.   Adjust Area of Critical Environmental Concern Boundaries (ROD at 6; *AR*-200051);

3.   Amend CDCA Plan Multiple-Use Classes (MUC) (ROD at 6-8; *AR*-200051-53);

4.   Establish Mojave Ground Squirrel Wildlife Habitat Management Area (ROD at 8; *AR*-200053);

5.   Amend Rand Mountains/Fremont Valley Management Plan (except for adoption of Motorized Vehicle Access Network) (ROD at 8-9; *AR*-200053-54);

6.   Modify Afton Canyon Natural Area (except for adoption of Motorized Vehicle Access Network) (ROD at 9; *AR*-200054);

7.   Modify West Mojave Land Tenure Adjustment Program (ROD at 9; *AR*-200054);

8.   Approve Regional Public Land Health Standards and Guidelines (ROD at 9; *AR*-200054);

9.   Control Motorize Vehicle Stopping, Parking and Vehicular Camping in DWMAs (ROD at 9; *AR*-200054);

10.   Delete Barstow to Vegas Race Course (ROD at 10; *AR*-200055);

11.    Modify Stoddard Valley to Johnson Valley Corridor (except for provision
       to "establish connector route") (ROD at 10; *AR*-200055);

12.    Implementation Schedule -- retain to extent consistent with portions of
       ROD not vacated on remand (ROD at 10; *AR*-200055).

In addition, the following sections of the ROD should remain in effect:

1.     Continue Temporary Administrative Closures in the Rand Mountains
       (ROD at 6; AR-200051);

2.     Mitigation Measures (ROD at 17; AR-200062);

3.     Monitoring Program (ROD at 18; AR-200063); and

4.     Errata (retain to extent consistent with portions of ROD not vacated on
       remand) (ROD at 10; AR-20055).

Finally, the following policy changes adopted under the WEMO Plan should remain in effect:

1.     The 1% limit on surface disturbance and development in all ACECs and
       DWMAs should remain in place  (see AR-201720-21; AR-201892);

2.     All routes that were closed under the WEMO decision should remain
       closed;

3.     The policy that all routes are to be considered closed unless signed "open"
       should remain in effect (AR-211408 (policy stated in route designation
       EA).[18]

---

[18] Notably, nothing in the policy adopted in the WEMO as a plan amendment prohibited BLM
from *also* signing "closed" routes or superseded other directives of the CDCA Plan regarding the
routes or relieves the BLM of the need to follow those directives.  Specifically, the CDCA Plan's
directive that decisions to limit (or close) the use of a road or area *must* be signed also remains in
place.  "Any decisions to limit use of a road or area must be reflected in on-the-ground signs.
Designated areas and their approved routes, open and closed area boundaries, and the primary
access network will receive priority in the signing program."  *AR*-222484.

4.    Provisions allowing for certain grazing allotments to be voluntarily relinquished and certain areas designated as not available for grazing and any subsequent decisions relinquish or retire any grazing allotments should remain in effect (AR-201821-24; AR-201891 (Alt B same as Alt A for grazing)).