Robert B. Wiygul, Esq. (LA Bar No. 17411)
Waltzer & Associates
1025 Division Street, Suite C
Biloxi, MS  39530
Telephone:  (228) 374-0700
Facsimile:  (228) 374-0725
Email:  robert@waltzerlaw.com

David J. Lazerwitz, Esq. (CA Bar No. 221349)
Sky C. Stanfield, Esq. (CA Bar No. 244966)
Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
Telephone:  (415) 954-4400
Facsimile:  (415) 954-4480
Email:  sstanfield@fbm.com

***Attorneys for Plaintiffs Alliance for Responsible Recreation, The Wilderness Society, California Wilderness Coalition, Friends of Juniper Flats, Western San Bernardino Landowners Ass'n, California Native Plant Society, and Community ORV Watch***

***Additional Counsel on Listed on Signature Pages***

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,<br><br>            Plaintiffs,<br><br>    vs.<br><br>U.S. BUREAU OF LAND MANAGEMENT, *et al.*,<br><br>            Defendants. | Case No. 3:06 CV 04884 SI |

## [PROPOSED] ORDER ON REMEDY AND INJUNCTIVE RELIEF

In its September 28, 2009 "Order re: Summary Judgment Motions," Doc. 169, the Court

found that Defendants violated the National Environmental Policy Act ("NEPA") and the Federal

[PROPOSED] ORDER ON REMEDY AND
INJUNCTIVE RELIEF
No. 3:06 CV 04884 SI

21343\2235083.1

1   Land and Policy Management Act ("FLPMA") in adopting the March 2006 Western Mojave

2   ("WEMO") management plan amendment.  After unsuccessful settlement talks, the parties agreed

3   to a briefing schedule for determining the appropriate remedy in this matter, including the terms

4   of vacatur of the decision, the terms of any remand, and any injunctive relief during the remand

5   period.  The parties submitted full briefing, including exhibits and declarations in support of their

6   respective positions, and on June 18, 2010, this Court held a hearing on the request for remedy.

7   Upon consideration of the papers and evidence submitted by the parties and the arguments of

8   counsel at the hearing, and for good cause appearing, the Court makes the following findings and

9   enters this Order.

10  **I.      TERMS OF THE REMAND**

11          This Court has authority to impose deadlines when remanding an agency decision of the

12  kind at issue here.  *See*, *e.g.*, *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.* ("*NWF v.*

13  *NMFS*"), 481 F.3d 1224, 1242 (9th Cir. 2007) (recognizing "court's discretionary authority to

14  impose a deadline for the remand proceedings"); *Pac. Coast Fed'n of Fisherman's Ass'ns v.*

15  *Gutierrez*, 606 F. Supp. 2d 1195, 1202 (E.D. Cal. 2008) ("The court has the discretionary

16  authority to impose a deadline for remand proceedings."); *Natural Res. Def. Council v. Evans*,

17  243 F. Supp. 2d 1046, 1047 (N.D. Cal. 2003) ("Plaintiffs ask this court to set a timetable for

18  compliance with its remand order as it has authority to do.").

19          Deadlines on remand are appropriate when an agency has violated NEPA or other

20  environmental statutes.  The Ninth Circuit has affirmed injunctions setting deadlines for

21  completing NEPA analysis and for issuing permits in compliance with NEPA.  *See High Sierra*

22  *Hikers Ass'n v. Blackwell*, 390 F.3d 630, 640 (9th Cir. 2004); *Idaho Watersheds Project v. Hahn*,

23  307 F.3d 815, 823 (9th Cir. 2002).  Where EPA failed to comply with the Clean Water Act "for

24  more than a decade," the Ninth Circuit upheld an order requiring EPA to take certain actions

25  within prescribed time limits.  *Alaska Ctr. for the Env't v. Browner*, 20 F.3d 981, 984, 986 (9th

26  Cir. 1994).

27          Given that BLM has conceded that the pre-decisional *status quo* cannot accurately be

28  assessed for the route designations, a compliance deadline for the new NEPA process is

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PROPOSED] ORDER ON REMEDY AND
INJUNCTIVE RELIEF                          - 2 -
No. 3:06 CV 04884 SI

21343\2235083.1

particularly appropriate.  The Court finds that a firm compliance deadline on remand, together with the interim protective measures described below will best insure protection of public resources and compliance with the law.

The Court finds that the following deadlines are consistent with BLM's statutory obligations and allow BLM adequate time to prepare a legally sufficient environmental review document:

> (1) BLM shall complete scoping on a new NEPA document within 3 months of entry of this Order.
>
> (2) BLM shall publish a Draft EIS for public comment within 14 months of entry of this Order.
>
> (3) BLM shall publish a Final EIS within 20 months of entry of this Order.
>
> (4) BLM shall issue a new final decision within 24 months of the date of this Order.

## II.    TERMS OF VACATUR OF THE DECISION

Under the Administrative Procedure Act ("APA"), courts normally "set aside" unlawful agency actions and remand the matter for further consideration.  5 U.S.C. § 706(2); *see also Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("[T]he proper course . . . is to remand to the agency for additional investigation or explanation."); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) ("Ordinarily when a regulation is not promulgated in compliance with the APA, the regulation is invalid.  Invalidation of an agency decision reinstates the regime previously in force – that is, the *status quo ante*. *See Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005); *cf. Se. Alaska Conservation Council v. U.S. Army Corps of Engineers*, 479 F.3d 1148, 1151 (9th Cir. 2007) (noting that, in case where court intended to reverse and vacate record of decision and permits on appeal, "the whole point of the injunction [pending appeal]" was to maintain *status quo*).

This Court retains the authority, however, to exercise its equitable discretion to order partial or no vacatur, as necessary to protect resources.  *See Idaho Farm Bureau*, 58 F.3d at 1405; *ICORE, Inc. v. FCC*, 985 F.2d 1075, 1082-83 (D.C. Cir. 1993) (collecting Ninth and D.C. Circuit cases remanding but not vacating agency rules); *Ctr. for Biological Diversity v. U.S. Fish &*

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PROPOSED] ORDER ON REMEDY AND
INJUNCTIVE RELIEF                    - 3 -                    21343\2235083.1
No. 3:06 CV 04884 SI

1    *Wildlife Serv.*, No. C04-04324, 2005 WL 2000928, at *16 (N.D. Cal. Aug. 19, 2005) (partially

2    vacating agency listing rule).  This is appropriate when, for instance, interim vacatur of

3    environmental regulations may have unpredictable or irreversible consequences.  *See Natural*

4    *Res. Def. Council v. U.S. Dept. of the Interior* (*NRDC v. DOI*), 275 F. Supp. 2d 1136, 1146 (C.D.

5    Cal. 2002).

6         Plaintiffs have requested a partial vacatur of the WEMO route designation decision.  The

7    Court finds that, under the facts of this case, the equitable factors argue in favor of partial vacatur

8    of the WEMO Record of Decision ("ROD").  Complete vacatur of the ROD would have

9    unpredictable and undesirable consequences on important desert habitat that gained additional

10   protections under the WEMO decision, while retention of the ROD in full – especially the new

11   route designations – is equally inappropriate, as the decision was "riddled with error."

12        The Court's determination in its September 29 Order that BLM's decision complies with

13   the Endangered Species Act, Document 169 at 3, was premised on Amendments 1, 2, 3, 4, 5, 6, 7,

14   8, 10 and 11 of the WEMO Biological Opinion ("BiOp").  These provisions are implemented

15   through corresponding protective provisions in the ROD.  The findings of "no jeopardy" and "no

16   adverse modification" in the BiOp are premised on these measures.  WEMO BiOp *AR*-14886-87,

17   14901-02, 14908-09, 14921-22; *see also* WEMO Supp ITS *AR*-01018-37 (ITS as amended).  If

18   the ROD is wholly vacated and the measures are not implemented, BLM cannot rely on the

19   BiOp's liability protections.  As a result, the BLM could not continue to authorize *any* activities

20   that may affect listed species or destroy or adversely modify critical habitat within the WEMO.

21   Vacatur of these aspects of the ROD would directly undermine the WEMO BiOp, meaning that

22   BLM will be forced to reinitiate ESA consultation over all activities it authorizes within the West

23   Mojave planning area until a new BiOp is completed.  Plaintiffs have therefore requested that

24   these key species and habitat protection provisions remain in place during remand.

25        The Court finds that in order to protect listed species and habitats the following protective

26   measures in the ROD (numbered subheadings reflect those found in the ROD as indicated below)

27   and additional measures adopted in the WEMO Plan shall be left in place during remand:

28

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PROPOSED] ORDER ON REMEDY AND
INJUNCTIVE RELIEF                    - 4 -                         21343\2235083.1
No. 3:06 CV 04884 SI

- Establish New Areas of Critical Environmental Concern (ROD at 6; *AR*-200051);

- Adjust Area of Critical Environmental Concern Boundaries (ROD at 6; *AR*-200051);

- Amend CDCA Plan Multiple-Use Classes (MUC) (ROD at 6-8; *AR*-200051-53);

- Establish Mojave Ground Squirrel Wildlife Habitat Management Area (ROD at 8; *AR*-200053);

- Amend Rand Mountains/Fremont Valley Management Plan (except for adoption of Motorized Vehicle Access Network) (ROD at 8-9; *AR*-200053-54);

- Modify Afton Canyon Natural Area (except for adoption of Motorized Vehicle Access Network) (ROD at 9; *AR*-200054);

- Modify West Mojave Land Tenure Adjustment Program (ROD at 9; *AR*-200054);

- Approve Regional Public Land Health Standards and Guidelines (ROD at 9; *AR*-200054);

- Control Motorize Vehicle Stopping, Parking and Vehicular Camping in DWMAs (ROD at 9; *AR*-200054);

- Delete Barstow to Vegas Race Course (ROD at 10; *AR*-200055);

- Modify Stoddard Valley to Johnson Valley Corridor (except for provision to "establish connector route") (ROD at 10; *AR*-200055);

- Implementation Schedule -- retain to extent consistent with portions of ROD not vacated on remand (ROD at 10; *AR*-200055).

In addition, the following sections of the ROD shall remain in effect:

- Continue Temporary Administrative Closures in the Rand Mountains (ROD at 6; *AR*-200051);

- Mitigation Measures (ROD at 17; *AR*-200062);

- Monitoring Program (ROD at 18; *AR*-200063); and

- Errata (retain to extent consistent with portions of ROD not vacated on remand) (ROD at 10; *AR*-20055).

The following policy changes adopted under the WEMO Plan shall remain in effect:

- The 1% limit on surface disturbance and development in all ACECs and DWMAs should remain in place (see *AR*-201720-21; *AR*-201892);

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PROPOSED] ORDER ON REMEDY AND
INJUNCTIVE RELIEF                    - 5 -                    21343\2235083.1
No. 3:06 CV 04884 SI

- All routes that were closed under the WEMO decision should remain closed;

- The policy that all routes are to be considered closed unless signed "open" should remain in effect (*AR*-211408 (policy stated in route designation EA).

- Provisions allowing for certain grazing allotments to be voluntarily relinquished and certain areas designated as not available for grazing and any subsequent decisions relinquish or retire any grazing allotments should remain in effect (*AR*-201821-24; *AR*-201891 (Alt B same as Alt A for grazing)).

Plaintiffs have further requested only partial vacatur of the WEMO route designations. Plaintiffs request that the 2003/2006 designations be vacated as to use by non-street legal vehicles only[1] during the remand period. That is, Plaintiffs request that the route network established by the ROD (with the exceptions explained in Section IV below) would remain intact, but, during the interim period, the routes would all be considered limited routes with the specific limitation on the type of vehicles allowed.

Based on the evidence submitted, the Court finds that a partial vacatur, vacating the 2003/2006 route designations as to non-street legal vehicles only is necessary and appropriate during the remand period. BLM commonly considers and uses such vehicle type limitations to protect fragile resources, including soils, wildlife and riparian areas. *See AR*-222480-81 (CDCA Plan, access on routes may be limited in several ways including with respect to the types of vehicles allowed.). As BLM explained in the FEIS, closure of areas "to all but street-legal vehicles would have a significant beneficial impact of prohibiting the types of vehicles most likely to drive cross-country (*e.g.*, dirt bikes, dune buggies, etc.) from tortoise conservation areas. This would likely minimize impacts to tortoises, but be particularly important to habitats, which are less likely to be degraded if vehicles remain on roads." *AR*-202410. Similarly, in its cross-motion for summary judgment, BLM defended the adequacy of its NEPA alternatives based on

---

[1] The distinction between street-legal and non-street legal vehicles was explained as follows in the WEMO Plan: "street-legal vehicles (*i.e.*, licensed by the California Department of Motor Vehicles in accordance with the State Vehicular Code as legal for operation on California's public roads and highways) . . . include street-legal four-wheel drive vehicles and dual-sport motorcycles. Vehicles that are not street-legal but are only eligible for "green sticker" licensing (that is, approved for use off of highways) . . . include many types of dune buggies, sand rails, all terrain vehicles, quads and dirt bikes."

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PROPOSED] ORDER ON REMEDY AND
INJUNCTIVE RELIEF                    - 6 -                    21343\2235083.1
No. 3:06 CV 04884 SI

1   the fact that non-street legal, so-called "green sticker" vehicles, are more likely to go off route

2   and damage resources.  *See* Federal Defendants' Revised Memorandum in Support of MSJ, Dkt.

3   159, p. 25 n. 25 (Alternative D limited routes to street legal vehicles "less likely to degrade

4   habitat and travel cross-country."); Federal Defendants' Revised Reply Brief in Support of MSJ,

5   Dkt. 164, p. 18 ("Alternative D (Enhanced Ecosystem Protection) would significantly limit OHV

6   access in six subregions, prohibiting entry by all non-street legal vehicles (most motorcycles,

7   dune buggies, quads and dirt bikes), which is important because they are more likely to leave

8   roads and degrade habitat than other vehicles.  *AR*-201904.").  Notably, BLM adopted a street-

9   legal only limitation in the recently released ROD for the Carrizo Plain National Monument.  *See*

10  Declaration of L. Belenky in Support of Request for Judicial Notice ("Belenky Decl.") Ex. 5 at II-

11  69, II-71.

12      Based on the evidence, the 2003/2006 WEMO route designations are vacated for any use

13  by non-street legal or "green sticker" vehicles.  Further, BLM is ordered to take reasonable steps

14  to inform the public of this partial vacatur as set out in the injunctive relief section of this Order.

15      Except as set forth above, the remainder of the ROD should be vacated in its entirety

16  pursuant to 5 U.S.C. § 706(2).  The portions of the decision subject to full vacatur include, but are

17  not be limited to, the finding of consistency with the Clean Air Act (*see AR*-202366 (Conformity

18  Analysis and Conclusion)), which must be set aside based on the Court's summary judgment

19  ruling.  SJ Order at 53-54.

20  ## III.   VACATUR OF SUBSEQUENT DECISIONS TIERED TO THE UNLAWFUL WEMO FEIS AND ROD

21

22      In the September 29, 2009 Order, the Court found the WEMO Plan amendment and the

23  FEIS invalid in several respects, including BLM's failure to minimize impacts to public lands

24  resources in the route designation process, adoption of a route network larger than the limits

25  imposed by the CDCA plan in 1980, failure to analyze and adequate range of alternatives

26  regarding routes and grazing, failure to adequately analyze impacts to soils and riparian resources,

27  and cultural resources from authorized activities, failure to adequately analyze impacts to air

28  quality, and failure to adequately assess cumulative impacts.  Dkt. 169 at 30, 35-36, 42, 48, 50,

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PROPOSED] ORDER ON REMEDY AND
INJUNCTIVE RELIEF                                           - 7 -                                21343\2235083.1
No. 3:06 CV 04884 SI

1    51, 53-54, 54.  The Court also expressly held that the WEMO Plan route designations were in

2    conflict with the CDCA Plan and thereby violated FLPMA.  *Id.* at 35-36 (citing *Oregon Natural*

3    *Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007)).

4         As a result, subsequent decisions implementing the WEMO Plan ROD and/or adopted by

5    BLM based on environmental review that was tiered to the FEIS also must be set aside and

6    remanded.  *Klamath Siskiyou Wildlands Center v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006)

7    (holding that a change in BLM management policy required an SEIS and setting aside two site-

8    specific timber sales that implemented the policy that was set aside); *see also Oregon Natural*

9    *Res. Council Fund*, 492 F.3d at 1125 (holding that salvage logging decisions inconsistent with the

10   governing resource management plan and based on inadequate NEPA compliance must be set

11   aside).  Here, the subsequent decisions both tiered to the FEIS and conform to the invalidated

12   WEMO plan amendments and are, therefore, invalid.  *Klamath Siskiyou Wildlands Center*, 468

13   F.3d at 562 (holding that subsequent decisions "are invalid and must be enjoined because they do

14   not 'conform to the approved [resource management] plan[s].'  43 C.F.R. § 1610.5-3.").

15        **A.    Grazing Decisions**

16        The Court finds that renewal of grazing allotment leases based on environmental review

17   tiered to the WEMO Plan FEIS (in relevant ways) should be set aside and remanded.  SJ Order at

18   48 (finding that "the FEIS should contain some discussion of the particular impacts on soils of the

19   proposed Plan, both with regard to the designated OHV route network, and livestock grazing."),

20   51 (noting that "as with the FEIS's discussion of impacts to soils, there is no discussion or

21   analysis of the impacts flowing from the OHV route network designated by the WEMO plan, or

22   from grazing.").  In addition, the Court noted that the alternatives analysis on remand would need

23   to consider grazing issues.  *Id.* at 42, fn. 33 (directing that "[o]n remand, the BLM will consider a

24   host of factors, including grazing issues, in its alternatives analysis.").

25        Plaintiffs have identified 16 grazing lease renewals that were adopted by BLM in reliance

26   on the WEMO Plan ROD and based on environmental review tiered to the WEMO FEIS.  (*See*

27   Belenky Decl. at 2 (chart listing 16 renewals.)  In each case, the Notice of Final Decision

28   ("NOFD") and Finding of No Significant Impact ("FONSI") expressly stated that the decision

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PROPOSED] ORDER ON REMEDY AND
INJUNCTIVE RELIEF                          - 8 -                         21343\2235083.1
No. 3:06 CV 04884 SI

1   was being made to conform with the WEMO Plan (denoted "WMP" in those documents).  *See,*

2   *e.g., Subsequent-000099* (Ord Mtn NOFD), 000102 (Ord Mtn. FONSI).  And in each case, the

3   Environmental Assessment ("EA") for the grazing allotment renewal stated that it was tiered to

4   the WEMO Plan FEIS and the EA relied on the FEIS environmental review for cumulative

5   impacts analysis as well as others and noted that the decision conformed to the West Mojave Plan

6   amendment.  *See, e.g., Subsequent*-000007-8, 000008-9, 0000042, 0000070 (Ord Mtn. EA);

7   000104 (Ord Mtn. FONSI).

8       Because these decisions were each tiered to the WEMO Plan FEIS and ROD regarding

9   relevant issues, the decisions must be set aside.  As a result the *status quo ante* – the grazing

10  prescriptions in place before the ROD was signed (*see, e.g*., AR-201814, AR-237098-99; *AR*-

11  218930-219033) – should govern the management of these allotments until new decisions are

12  made.

13          **B.       Subsequent Decision Reopening Rand Mountain Area Routes**

14      On October 31, 2008, the BLM issued a decision to rescind the closed status of several

15  routes in the Rand Mountains Management Area.  *See* Exhibit 4, *Subsequent*-000639-643.  On the

16  same day, BLM issued an EA and FONSI.  Exhibit 4, *Subsequent*-000604-635 (EA), 000636-638

17  (FONSI) Plaintiff Center for Biological Diversity timely appealed that decision to the Interior

18  Board of Land Appeals ("IBLA").  (Appeal No. IBLA 2009-77, *CBD v. BLM*.)  On September

19  28, 2009, this Court issued its Order Re:  Summary Judgment.  On October 14, 2009, the BLM

20  announced that it would extend disputed Decision to rescind the closure for another year, until

21  October 1, 2010.  On December 31, 2009, in response to briefing from the parties to that appeal,

22  the IBLA issued an order to Set Aside and Remand the Decision.  Exhibit 4, Subsequent-000644-

23  647.  While usually the IBLA Order should have fully resolved the issue such that this Court

24  would not need to review this question, on January 11, 2010, BLM filed a Request for Stay of

25  Order and Petition for Reconsideration En Banc.  The BLM has not reinstated the route closures

26  on the ground.  At present, the IBLA is still considering the request.  The Court finds that the

27  decision to re-open the Rand Mountain routes is tiered to the WEMO FEIS and the WEMO ROD,

28  and therefore must be set aside and the route closures reinstated.

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PROPOSED] ORDER ON REMEDY AND
INJUNCTIVE RELIEF                 - 9 -                          21343\2235083.1
No. 3:06 CV 04884 SI

## IV.    TERMS OF INJUNCTIVE RELIEF DURING REMAND

The Court may grant injunctive relief where (1) a plaintiff shows that irreparable injury is likely to occur if relief is not granted; (2) the balance of equities favors relief; and (3) granting an injunction would be in the public interest. *Winter v. NRDC*, 129 S.Ct. 365, 374, 381 (2008), 555 US __; *Stormans Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009). The Court has "broad latitude in fashioning equitable relief when necessary to remedy an established wrong." *NRDC v. Southwest Marine, Inc.*, 236 F.3d 985, 999 (9th Cir.2000) (quotations omitted). The Supreme Court has noted that the balance of equities in environmental cases tips in favor of an injunction once irreparable harm is shown to be "sufficiently likely" because "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 545 (1987).

NEPA requires environmental review because Congress believed an incomplete understanding and inadequate information would naturally lead to poor decisions concerning how to balance protection of the environment with human activity. *Winter*, 129 S.Ct. at 376; *Kleppe v. Sierra Club*, 427 U.S. 390, 409-410 (1976); 42 U.S.C. § 4321; 40 C.F.R. § 1500.1(c). The statute achieves this goal through the action-forcing mechanism of requiring federal agencies to fully disclose and consider the effects of their actions on the human environment prior to acting. *See National Wildlife Federation v. Babbitt*, 128 F. Supp.2d 1274, 1287 (E.D. Cal. 2000); *Sierra Club v. Marsh*, 872 F.2d 497 (1st Cir.1989).

In adhering to NEPA's procedural mandate, the Ninth Circuit, as well as other circuits, have concluded that irreparable injury flows directly from the failure to adequately evaluate environmental impacts through the NEPA process. *High Sierra Hikers*, 390 F.3d. at 630; *see also Friends of the Earth, Inc. v. Coleman*, 518 F.2d 323, 330 (9th Cir. 1975) ("Irreparable damage may in the context of an action to enforce NEPA be implied from the failure by responsible authorities to evaluate fully the environmental impact of the proposed project, and consider alternative proposals…"); *Commonwealth of Mass. v. Watt*, 716 F.2d 946, 952 (1st Cir. 1983). ; *Sierra Club*, 872 F.2d 497. In fact, the Ninth Circuit has stated that NEPA violations create a

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PROPOSED] ORDER ON REMEDY AND
INJUNCTIVE RELIEF                    - 10 -                    21343\2235083.1
No. 3:06 CV 04884 SI

1   presumption of irreparable harm that the government must overcome.  *See, High Sierra Hikers*,

2   390 F.3d. at 642; *National Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 737-38 n. 18

3   (9th Cir.2001); *Commonwealth of Mass. v. Watt*, 716 F.2d at 952.

4         The Court also finds, however, that in addition to any presumption of irreparable injury

5   arising from BLM's NEPA violation, that the plaintiffs have established that OHV use in the

6   Western Mojave is causing widespread and long-lasting damage which constitutes irreparable

7   environmental harm.  The Court finds that the plaintiffs have established irreparable injury

8   resulting from OHV use with respect to soils, vegetation, animals and habitat, air quality and

9   other resources. It is the impacts to these resources that the Court ruled were ignored by BLM in

10  its route designation process.  43 C.F.R. § 8342.1.  BLM's failure to develop a route network that

11  minimizes impacts to environmental resources, and its failure to fully analyze the impacts of its

12  decision, necessitates the imposition of injunctive relief necessary to protect the desert from

13  further permanent damage during the remand period.

14        It is well established that OHV use in arid regions, and the Mojave Desert in particular,

15  causes extensive adverse impacts to soils and substrate.  *AR*-202232; Declaration of Tom Egan

16  ("Egan Decl.") at ¶¶ 12-13; *see generally* Lovich and Bainbridge, 1999 at 315-16, 319-20.  Much

17  of the soil in the Mojave is composed of a biological surface crust that is vital to its stability and

18  nutrient retention.  Egan Decl., ¶ 12; Belnap, 2007 at 2; Wilshire, 1983.  The use of OHVs over

19  desert soils tends to compact the soil which decreases its permeability, resulting in increased flow

20  of water across the ground and reduced absorption of water into the soil.  Egan Decl., ¶¶ 12-13;

21  Ouren, 2007 at 5-11; Webb, 1983.  The compacted soil hinders root growth and the reduced

22  moisture content makes it harder for desert plants to survive.  Egan Decl. at ¶ 13; Ouren, 2007 at

23  5-11; Webb, 1983*; AR*-237415; *AR*-237407; *AR*-237586.  The compaction and displacement of

24  surface soils, and the channeling of water flows in OHV tracks, have also been shown to cause

25  considerable erosion of desert soils, particularly in steeper terrain.  Egan Decl. at ¶¶ 12-13; L.

26  Brooks, 2005 at 7 ("One of the most significant ecological effects that vehicular routes have on

27  soils in desert regions involves changes in water runoff patterns.  Vehicular routes that run

28  straight up hillslopes can promote soil erosion . . . .") *AR*-237586, 602; Iverson, 1980.

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PROPOSED] ORDER ON REMEDY AND
INJUNCTIVE RELIEF                          - 11 -                          21343\2235083.1
No. 3:06 CV 04884 SI

1    The harms caused by OHV use to desert soils are not short-lived; they clearly constitute

2    long-standing and, therefore, irreparable environmental harm.  Egan Decl. at ¶¶ 12-13.  For

3    example, one of the world's leading authorities on soil crusts, United States Geological Survey

4    ("USGS") scientist Jayne Belnap, recently wrote that recovery times for disturbed desert

5    biological soil crusts "are generally measured in decades or centuries."  Belnap, 2003 at 187-88;

6    *see also AR*-239122.  A study by Robert Webb of USGS found that the average time for

7    "[r]ecovery of severely disturbed desert soils and vegetation, as measured with penetration

8    resistance and bulk density, requires approximately a century in the Mojave Desert" for

9    compacted soils.  Webb, 2002, at 13.  These biological soil crusts "are a critical component of

10   most dryland ecosystems" including the Mojave.  Belnap, 2007 at 2.

11   The adverse impacts to soils caused by the 2006 route designations are evidenced in the

12   photographs attached to the Declarations of Jenny Wilder, Mark Heuston and Doug Parham and

13   the 2010 Route Designation and Implementation Studies prepared by Tom Egan (*see* Egan Decl.

14   at ¶ 10, Ex. A).  In Wilder's Declaration, she details the route proliferation that is occurring on the

15   hillsides and resulting erosion throughout Juniper Flats.  Declaration of Jenny Wilder ("Wilder

16   Decl.") at ¶¶ 10-32 and supporting photos.  In Wonder Valley, OHV users have traveled far off

17   designated routes and deeply scarred the desert pavement (a unique type of biological crust) that

18   covers the surface of the alluvial fan that runs out of the Cleghorn Lakes Wilderness Area.

19   Declaration of Mark Heuston ("Heuston Decl.") at ¶¶ 24-26 and supporting photos.  Parham's

20   declaration shows numerous new tracks being created on a regular basis in Edwards Bowl.

21   Declaration of Doug Parham ("Parham Decl.") at ¶ 15 and supporting photos.

22   The irreparable harm caused by OHVs to fragile desert soils similarly results in adverse

23   impacts to the plant species that rely on that soil substrate and creates conditions facilitating non-

24   native plant growth and wildfire risk.  Egan Decl. at ¶ 13; Miller, 2008; Bolling and Walker,

25   2000; Lathrop, 1983.  The plants themselves also suffer a variety of direct impacts from OHV use

26   and grazing.  *Id*.  The WEMO Plan failed to minimize these direct and indirect impacts to the

27   desert vegetation and we are seeing the results of that failure in the area at this time.

28

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PROPOSED] ORDER ON REMEDY AND
INJUNCTIVE RELIEF                          - 12 -                          21343\2235083.1
No. 3:06 CV 04884 SI

1    Desert plants tend to grow slowly and have shallow root systems which are easily

2 disturbed by OHVs which can crush and kill them in just a few passes. Ouren, 2007 at 11. As

3 noted in the discussion of impacts to soils, the erosion caused by OHV routes also wipes out

4 plants, either by smothering them with soil, or disturbing the soil stabilizers which hold plants in

5 place. *AR*-237415, *AR*-237407; BLM AR NECO-126221; Lathrop, 1983; *see also* Wilder Decl.

6 at ¶¶ 13 to 18. OHV compaction of soils makes it more difficult for roots to move through the

7 soil and desiccates the soil such that there is less moisture available for uptake by parched desert

8 plants. Adams, et. al., 1982 (*AR*-237415); Ouren, 2007 at 11; Bolling and Walker, 2000.

9 Moreover, fugitive dust and particulate matter generated by OHV use further reduces

10 photosynthetic capacity of plants, resulting in reduced growth and vigor. Egan Decl. at ¶ 13.

11    Another key problem with OHV use is the rapid dispersion of invasive, non-native species

12 they cause. Egan Decl. at ¶ 13; Brooks and Berry, 2006; Lovich and Bainbridge, 1999 at 317.

13 These non-native species often out-compete native vegetation and there is evidence that the

14 spread caused by OHVs goes much beyond the route borders. Egan Decl. at ¶ 13.; Brooks and

15 Berry, 1999; Brooks and Lair at 8. The air pollutants emitted from OHV use includes nitrogen

16 and other fertilizers which are deposited onto the soil and can lead to increased growth and

17 dominance of non-native species, amongst other effects. Brooks, 2003; Brooks, 2007 at 153;

18 Ouren, 2007 at 29-33 and references cited therein.

19    The impacts to the animal species that reside in the Mojave is equally dire although it is

20 harder to provide a generalized summary as the impacts on individual species varies. The habitat

21 loss and fragmentation caused by OHV routes, the noise impacts, impacts to forage, and actual

22 collisions with vehicles are some of the many impacts that animal species suffer as a result of

23 OHV use. Egan Decl. at ¶ 14; Ouren, 2007 at 16-25 and references cited therein; Brattstrom and

24 Bondello, 1983.

25    The dust caused by OHV use and the emissions from OHVs have a number of negative

26 impacts on the air quality in California. Order at 53; Ouren, 2007 at 29-33 and references cited

27 therein; *http://www.slocleanair.org/pdf/PM2-ExecSummary.pdf* (Recent study which found that

28 dangerously high levels of particulate matter were largely attributable to nearby OHV areas in

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PROPOSED] ORDER ON REMEDY AND
INJUNCTIVE RELIEF          - 13 -                        21343\2235083.1
No. 3:06 CV 04884 SI

California); *see also* Lovich and Bainbridge, 1999 at 317-18 (documenting the impacts OHV emissions can have on plant growth); Heuston Decl. at ¶¶ 9, 21.  The entire Western Mojave region is out of compliance with federal standards for particulate matter and there are levels of concern for a number of other hazardous pollutants which OHVs contribute to.  *AR-201975-76*.

Finally, the impact that noise from OHVs has on both humans and animals is significant and yet appears to have been utterly ignored in the route-designation process undertaken for the WEMO Plan.  Egan Decl. at ¶ 14; Ouren, 2007 at 19-20 and references cited therein; Brattstrom and Bondello, 1983; Heuston Decl. at ¶¶ 8-9, 21; Declaration of Philip Klasky ("Klasky Decl.") at ¶¶ 15-24; Parham Decl. at ¶¶ 7-8.

As noted above, this case presents something of a conundrum because BLM never adequately identified the original system, and there is no ready means of determining that system now.  SJ Order at 33 n. 26.  To address this issue, Plaintiffs have requested that the Court leave the route designations in place for use by street-legal vehicles, as set out in the preceding sections of this order, and in addition have requested that the Court order the additional protective measures spelled out below.

The Court finds that the requested additional, affirmative protective measures are necessary during the remand period.  BLM acknowledges that, since at least the mid-1980s, extensive illegal route proliferation has occurred throughout the WEMO.  *E.g.*, *AR-202203-04* (table indicating in some cases mileage of routes has doubled or tripled since mid-1980's), *AR-218702* (Bates stamps on pages are missing, see Ch. 1, p. 5) ("The network of access routes has proliferated to an extensive level since the advent of mass-produced affordable rough terrain vehicles . . .").  The FEIS provides a comparison between the number of routes designated in 1985-87 and those inventoried for the WEMO Plan, one can see that the number of routes grew substantially.  *AR-202203*.  The survey done of the redesign areas for the WEMO Plan found a total of 4,442 miles of routes, this compares to 1,897 miles of routes designated in 1985-87.  *AR-201832, 842*.  No survey of existing (as opposed to legally designated) routes was performed for the non-redesign areas, but if the same ratio of existing to legally designated routes is present in

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PROPOSED] ORDER ON REMEDY AND
INJUNCTIVE RELIEF                    - 14 -                    21343\2235083.1
No. 3:06 CV 04884 SI

1   those areas, there may be an additional 6000 miles of routes actually on the ground in those areas.

2   *AR*-201842 (2268 miles of designated routes in the non-redesign areas).

3          The affidavits submitted by the plaintiff organizations state that a high rate of off-route

4   travel is continuing in limited and/or closed areas.  Egan Decl. at ¶¶ 16-36; Declaration of Jeffrey

5   Aardahl ("Aardahl Decl.") at ¶ 12; Declaration of Edward Patrovsky ("Patrovsky Decl.") at

6   ¶¶ 10-13, 17-18.  In the Juniper Flats area, Wilder testifies to seeing newly cut tracks and

7   evidence of recent riding on "closed" routes on every visit she makes to the area.  Wilder Decl. at

8   ¶¶ 10-13, 22.  Heuston and Klasky both state that the route proliferation continues, and has even

9   worsened, in recent years.  Klasky Decl. at ¶¶ 16, 22; Heuston Decl. at ¶ 24.  Parham testifies that

10  while BLM efforts "have had some degree of success, the fact remains that every weekend riders

11  continue to ride on closed routes and to ride cross country, leaving new tracks and encouraging

12  further riding in the Edwards Bowl area."  Parham Decl. at ¶¶ 17, 15.

13         The latest version of the National Survey on Recreation and the Environment (NSRE)

14  shows, OHV use has undergone significant growth in the last twenty years.  NSRE, 2008 at 9-10.

15  The Government Accountability Office recently outlined how the popularity and extent of

16  authorized and unauthorized OHV use on public lands has been growing rapidly in recent years.

17  GAO, 2009 at 11.  As the FEIS outlined, these figures hold true for OHV use in the Western

18  Mojave.  *AR*- 202174-75.

19         In light of the documented route proliferation in the WEMO since 1980, and the

20  likelihood of continued or expanded OHV use during the remand period, injunctive relief

21  directing specific action by the BLM is an absolute necessity to preserve the status quo during

22  remand.  The Court finds that based on the law and the evidence presented, the following

23  injunctive relief is necessary to prevent irreparable injury during the remand period.

24         **A.**     **Implementation of Protective and Monitoring Measures Outlined in the**

25                **WEMO Plan**

26         In the FEIS, BLM identified what the agency considered the key measures necessary to

27  assure compliance with its regulations and to minimize environmental damage:

28         The best program for achieving compliance in designated route
           areas involves:

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PROPOSED] ORDER ON REMEDY AND
INJUNCTIVE RELIEF                                    - 15 -                              21343\2235083.1
No. 3:06 CV 04884 SI

- Keeping open routes well signed.

- Revegetating and otherwise rehabilitating closed routes so that they are not apparent or easy to use.

- Maintain a field presence of BLM personnel to contact, inform visitors, and enforce the law.

- Establishing BLM-trained and supervised volunteer groups who can assist in keeping the routes signed and who can contact visitors in order to explain applicable use policies.

*AR*-202179.

The WEMO Plan further adopted specific protective measures designed to ensure compliance with BLM's statutory and regulatory requirements and avoid adverse environmental impacts while permitting measured OHV use within the Western Mojave. As set forth in the WEMO Plan, the adopted "implementation" measures included the following:

- Sign the open route network (do not sign the closed route network).

- Maintain the open route network with the principal goal being to make the open route network more attractive for use than the closed route network. Make ample use of the tools such as the York Rock Rake to shape, clear and contour the open route network.

- Install informational kiosks and interpretive signing where it would be most effective.

- Develop and publish maps that are up-to-date, readily available and have a readily understandable and useful format.

- Regularly maintain signs, kiosks, routes, maps and brochures.

*AR*-211410-11 (EA); *AR*-201853 (FEIS).

Both the 2003 EA and the WEMO FEIS acknowledge that "[t]he success of the West Mojave Plan's conservation strategy would depend, to a great degree, on the ability of the participating agencies to ensure that its measures are being properly implemented, that its strategies are effective and that the plan is flexible enough to adapt to changing conditions and circumstances." *AR*-201860. The FEIS relies at numerous points on continuing monitoring of compliance with ORV route designations to assure that springs, riparian areas, wildlife and other resources are protected. *E.g.*, AR-211493 (EA) (continued monitoring required to determine if

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PROPOSED] ORDER ON REMEDY AND
INJUNCTIVE RELIEF                          - 16 -                          21343\2235083.1
No. 3:06 CV 04884 SI

1    dense route network detrimental to riparian communities in Bighorn subregion or springs in

2    Juniper subregion); *AR*-201889, 890 (desert tortoise data must be collected on numerous impacts

3    of routes including whether new routes are being created).

4         According to the timeline found at page 2-22 of the 2003 EA (*AR*-211410) (and 2-166 of

5    the FEIS (*AR*-201854) and further elaborated in Appendix C (*AR*-204532)), the majority of the

6    mitigation measures should have been implemented by this time.  At a minimum, those measures

7    addressing critical restoration issues and problem areas in the Ord, Juniper, Superior, Red

8    Mountain, Fremont, Kramer, El Paso, Newberry-Rodman, Ridgcrest, El Mirage, and Coyote

9    subregions were to have been addressed by 2010.  FEIS Appx. C.1, Task MV-9 (*AR*-204539).

10        Based on the evidence submitted, it is clear that BLM has done little to implement the

11   mitigation measures set out in the WEMO Plan.  The declarations and detailed 2010 field study

12   conducted on behalf of several organizations provide detailed on–the-ground evidence that

13   BLM's management and enforcement of OHV routes in the WEMO is woefully inadequate and

14   failing to ensure compliance with route designations, protect public lands resources and prevent

15   further route proliferation.  *See* Egan Decl. at ¶¶ 16-36 (documenting BLM's failure to adequately

16   sign or effectively close routes designated as closed, to monitor compliance and to undertake

17   enforcement measures); Heuston Decl. at ¶ 27, Aardahl Decl. at ¶¶ 10-12 (documenting

18   widespread violation of route closures and lack of BLM enforcement to implement route

19   network); Patrovsky Decl. at ¶¶ 12-17 (documenting lack of adequate signing and maintenance

20   with simultaneous reduction in BLM law enforcement post-WEMO plan); Wilder Decl. at ¶ 22.

21   BLM's failure to effectively implement its designated route network and to prevent further route

22   proliferation is directly tied to its failure to adequately sign open (or closed) routes, which not

23   only thwarts public knowledge regarding the route network but prohibits BLM personnel from

24   undertaking enforcement action based on this lack of public notice.  Aardahl Decl. at ¶¶ 10-12;

25   Patrovsky Decl. at ¶ 13; Heuston Dec. at ¶¶ 22-23 and Ex. F.

26        In light of BLM's failure to effectively implement these mitigation measures, the Court

27   orders the following injunctive relief.  BLM shall:

28

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PROPOSED] ORDER ON REMEDY AND
INJUNCTIVE RELIEF                          - 17 -                        21343\2235083.1
No. 3:06 CV 04884 SI

(1)     Within 60 days of this order, BLM should provide the Court with a detailed implementation plan for signing all open routes in the WEMO.  The signing should be completed within six months of the date of this order.

(2)     Within 210 days of the Court's order, update all BLM-produced and available maps to include accurate and updated route information and, as necessary, include a notice in the form below, in at least 20 point type, on all maps, pamphlets, kiosks, and other literature regarding WEMO ORV routes distributed by BLM.  BLM shall also update all materials to include the vacatur of the 2003/2007 route designations as to non-street legal vehicles.

NOTICE

MOTORIZED USE IS PERMITTED ONLY ON ROUTES SIGNED "OPEN."  ANY ROUTE THAT DOES NOT HAVE AN "OPEN" SIGN IS NOT LEGAL FOR MOTORIZED USE. MOTORIZED USE OF ANY CLOSED ROUTE WILL RESULT IN A FINE OR CRIMINAL PROSECUTION.

(3)     Within 90 days of this Court's order, provide the Court with a monitoring plan to determine (a) compliance with route closures; and (b) whether new illegal routes are being created.  The monitoring plan should demonstrate that the effort will be adequate to determine compliance at a statistically significant level.

(4)     Carry out additional information gathering and monitoring regarding (a) air quality in and around open areas through air quality monitoring, (b) status of the Mojave fringe-toed lizard and its habitat, and (c) riparian areas and UPAs, including new "proper functioning condition" ("PFC") assessments for all of the springs and seeps in the West Mojave planning.

(5)     Within 90 days of this court's order, provide the Court and the parties with a plan for maintenance of the open route network and installation of informational kiosks at all major ORV access points.

(6)     Within 90 days of this court's order, provide the Court and the parties with a plan for providing additional enforcement capability for the route network in the WEMO.

(7)     Provide the Court and the parties with quarterly reports indicating BLM's progress in implementing requirements 1-6.

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PROPOSED] ORDER ON REMEDY AND
INJUNCTIVE RELIEF                               - 18 -                               21343\2235083.1
No. 3:06 CV 04884 SI

1    The Court will retain jurisdiction over the implementation of these interim injunctive

2  actions in the event that BLM fails to carry out these measures, or that the monitoring and

3  reporting demonstrates that irreparable harm to public resources is occurring at an unacceptable

4  level and additional relief is required.

5    **B.**    **Specific Area Closures Where Irreparable Harm is Occurring**

6    Plaintiffs have provided concrete evidence of irreparable injury sufficient to warrant

7  closure to all OHVs of the following specified areas of the Western Mojave.

8    1.    Juniper Flats

9    Plaintiffs have demonstrated that the entire Juniper Flats subregion is heavily impacted by

10 OHV use, but have requested that only specified areas be closed. These include Arrastre Canyon

11 and Deep Creek.  Wilder Decl. at ¶ 5.

12    a.    *Arrastre Canyon*

13    Arrastre Canyon runs north to south through Juniper Flats and is home to riparian areas

14 and a rare desert waterfall.  Wilder Decl. at ¶¶ 5-9.  The Canyon is a popular motorcycle

15 recreation area with an extensive, and ever growing, network of routes crisscrossing the riparian

16 areas.  *AR*-201849.  The water that flows through the Canyon makes this a particularly rich area

17 for plants and animals.  Wilder Decl. at ¶¶ 6-7.  For example, BLM conducted a bird survey in

18 Arrastre Canyon and found 64 species in the lower Canyon and 58 species in the upper Canyon.

19 *AR*-201849; *AR*-210243.  The Canyon contains likely habitat for the endangered least Bell's vireo

20 and for the southwestern willow flycatcher.  *Id.*; *AR*-206457; *see also AR*-201776.  The area is

21 also home to the San Diego Horned Lizard, which BLM describes as a "vehicle sensitive

22 species."  *AR*-201849; Wilder Decl. at ¶ 7.  In addition, there is evidence of cultural resources in

23 the Canyon that are worthy of protection.  Wilder Decl. at ¶¶ 8-9; see also *AR*-201849

24 (emphasizing the cultural resources near riparian areas).

25    Plaintiffs have established that route proliferation and off route use is continuing to occur,

26 along with attendant resource damage, in the Arrastre Canyon area.  Wilder Decl. at ¶¶ 10-22; *see*

27 *also* Patrovsky Decl. at ¶ 17.  Riders have cut fences repeatedly and have ignored restoration

28 signs installed by BLM.  Wilder Decl. at ¶¶ 16 to 21.

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PROPOSED] ORDER ON REMEDY AND
INJUNCTIVE RELIEF                    - 19 -                    21343\2235083.1
No. 3:06 CV 04884 SI

The Court further finds that Arrastre Canyon is highly feasible to close to OHV access due to some preexisting geographic and physical barriers that bound the area. The area suffered a devastating fire, known as the Willow Fire, in August of 1999 and in order to restore the area BLM closed the area and erected a barbed wire fence around much of the area at that time. *See* Wilder Decl. at ¶ 33; Patrovsky Decl. at ¶ 7. The Wilder Declaration outlines the exact boundaries of the area that should be closed along with descriptions of the fencing and other boundaries. Wilder Decl. at ¶ 34.

As a consequence, the Court orders that all routes in Arrastre Canyon and those feeding riders into the Juniper Flats area shall be closed during the interim period, as detailed below. BLM shall install "Area Closed" signs throughout the boundaries of the area, which include clear warnings of the associated penalties for illegal behavior, and begin a restoration program designed to disguise the many illegal tracks that have been created. The following routes shall be closed under the specific terms noted:

RJ3002 (Powerline Road, this route shall be limited to utility vehicles only)

RJ3001 (Coxey Truck Trail, this route shall be a limited route, accessible only by street legal vehicles)

RJ3009

RJ3060

RJ3034

RJ3047 (This route shall continue to have a limited designation and be accessible only by those holding the mining claim that the route accesses)

RJ3012

RJ3036

RJ3030

RJ3025

RJ3061

RJ3043

RJ3028

PROPOSED] ORDER ON REMEDY AND INJUNCTIVE RELIEF No. 3:06 CV 04884 SI — 20 — 21343\2235083.1

1    RJ4002.

2              b.    *Deep Creek*

3         Plaintiffs have established that Deep Creek is suffering from intense damage, from both

4    illegal route proliferation and from cattle that escape due to fences cut by OHV users.  The Creek

5    is in a non-motorized zone on Forest Service Land, but the vehicle access provided by BLM land

6    is making that harder to enforce.  Wilder's declaration and the supporting photographs detail the

7    type of harm being inflicted by out-of-control off-roaders who continually cut the fences and

8    create new hill climbs down to the Creek.  Wilder Decl. at ¶¶ 29-32 and supporting photos A-33

9    to A-37.  Patrovsky's declaration also identifies the problems caused by motorcycle incursions

10   into Deep Creek and the associated enforcement challenges that make closure of the feeder routes

11   necessary.  Patrovsky Decl. at ¶ 18.  In order to mitigate this destruction while BLM reassesses

12   the harm being caused, the following routes which lead to Deep Creek on BLM land shall be

13   closed and/or limited:

14        •    The following routes shall be limited to street-legal vehicles only:  Powerline Road

15             from Deep Creek Road to 3N59A (the Forest Service route number):  RJ1019,

16             RJ2049, RJ2016, RJ2025, RJ2026, and any sections of 3N59A that are managed by

17             the BLM.

18        •    The following routes shall be closed from all points south of where they intersect with

19             the routes identified above:  RJ2004, RJ2051

20        •    The following routes that lead to the non-motorized zone in the USFS lands shall be

21             closed:  RJ2015, RJ2025, RJ2057

22              2.    <u>Wonder Valley/Poste Homestead</u>

23        The area known as Wonder Valley is located in the southeastern section of the WEMO

24   planning area, and is shown on Map 80 (*AR*-203057).  Located off of Chadwick Road (Route

25   MP246 on Map 80, *AR*-203057) is an adobe ruin that contains the remains of one of the earliest

26   settlements in Wonder Valley.  Heuston Decl. at ¶ 12, photos A-2 to A-3, and Ex. C.  The site is

27   known by various names but is mostly commonly called the Poste Homestead after David and

28   Anna Poste who settled at the site in 1923.  The detailed history of the site and the role it plays in

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PROPOSED] ORDER ON REMEDY AND
INJUNCTIVE RELIEF
No. 3:06 CV 04884 SI                     - 21 -                     21343\2235083.1

1    local history was recently outlined in two articles by the Twentynine Palms Historical Society.

2    *See* Heuston Decl. Ex. C  The area surrounding it is a fragile dune habitat that is home to Mojave

3    Fringetoed Lizards and other special status species.  *See* Heuston Decl. Ex. E (Poste Homestead

4    interpretive sign); Klasky Decl. at ¶¶  10-12.

5         The routes accessing the site, numbers MP 2512 and MP 25, were designated closed by

6    the WEMO Plan, but have since been treated as open by BLM.  Some of the area conservation

7    groups have worked with BLM to install barriers and interpretive signs at the site.  Heuston Decl.

8    at ¶ 14.  They also collaborated with BLM to organize a massive community work day at the site

9    in commemoration of National Public Lands Day on September 26, 2009.  Heuston Decl. at

10   ¶¶ 15-17; Klasky Decl. ¶ 13.  Roughly sixty volunteers removed piles of garbage, installed a

11   kiosk which provided information on the route network, signed nearby open routes, and attempted

12   to restore and camouflage some of the illegally created routes that were running into the dunes.

13   Heuston Decl. at ¶¶ 15-17 and supporting photographs A-6 to A-12, Ex. D (BLM press release on

14   Public Lands Day Event); Klasky Decl. at ¶ 13.

15        This restoration work was demolished within a month by OHV users.  The individuals

16   drove over the restoration work that was carefully done, destroying the vertical mulching along

17   the illegal routes and carving new routes into the dunes.  Heuston Decl. at ¶ 18 and supporting

18   photos A-14 to A-19; Klasky Decl. at ¶ 14.

19        The Court finds that this is clear and incontrovertible evidence of the irreparable harm

20   being caused at this important natural and cultural resource.  The Court further orders that routes

21   MP 2512 and MP 25 must be closed and the area should be signed closed.  It is only a short walk

22   to the site from Chadwick road so the area will remain accessible to visitors by foot.

23        A source of problems in Wonder Valley is the land ownership pattern that is scattered

24   across the Valley floor.  A substantial portion of the area is broken into five acre parcels, some

25   owned by BLM and some by private parties, creating a "checkerboard" land pattern.  *AR*-203057

26   (yellow parcels belong to BLM and white parcels are privately held).  This checkerboard pattern

27   has made law enforcement in the area challenging since its inception.  Heuston Decl. at ¶¶ 19-23

28   and Ex. F; Klasky Decl. at ¶¶ 15-19.  Central to this case, however, is the effect that this

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PROPOSED] ORDER ON REMEDY AND
INJUNCTION RELIEF                    - 22 -                    21343\2235083.1
No. 3:06 CV 04884 SI

1  checkerboard pattern has on routes that BLM designates across the area.  This checkerboard

2  pattern can require OHV users traversing these routes to cross private property.  For example, the

3  utility corridor (route UK) that runs east to west across the midsection of Map 80, or route MP242

4  which runs north to south.  *AR*-203057.  There are portions of these routes that *simply cannot be*

5  *accessed without trespassing* on private property.  Heuston Decl. at ¶ 19; Klasky Decl. at ¶¶ 15,

6  17.  The same is true for many of the other routes in Wonder Valley which are designated as

7  "open" by the WEMO Plan and are thereby accessible to any rider, whether they are legitimately

8  accessing private property along the route or not.  *AR*-203057.

9          The declarations of Mark Heuston and Phillip Klasky, homeowners in the area, establish

10  that the noise and dust created by the OHV use in the area impairs the landowners ability to

11  peacefully enjoy their property.  Heuston Decl. at ¶¶ 8-9, 19-21 ("By placing these routes

12  throughout the residential area it means that residents can no longer expect to be free of the noise

13  and the nuisance dust associated with these routes."); Klasky Decl. at ¶¶ 16-22.

14          The Court finds that injunctive relief is necessary as to the following routes within

15  Wonder Valley, which contain segments that cannot be accessed without trespass to private

16  property.  The Court finds that these routes shall be designated as "Limited" during the remand

17  period, with access given only to those with private property along the route (or permission to

18  pass by the owners):  MP456, UK, MP232, MP325, MP241, MP242, and MP456.

19          In addition, the following routes, which are CSA routes, shall be closed to non-street legal

20  vehicles:  Gammel Road (MP232); Pipeline (UK and MP351); Chadwick South (MP2510); and

21  Kern Roop/Wilson Road (MP242).[2]

22

23

24  _____

[2] According to the information available on the County's website, the following routes are also maintained as CSA roads:  Gammel Road (MP232); Pipeline (UK and MP351); Chadwick South (MP2510); and Kern Roop/Wilson Road (MP242).  Exhibit A to Klasky Decl.  The California Vehicle Code prohibits the passage of off-highway vehicles on public highways except in a limited number of circumstances, such as when transported in a trailer, when used to cross a highway, or when walked or pushed.  Cal.Vehicle Code § 38025.  California Vehicle Code defines a Highway as "a way or place of whatever nature, publicly maintained and open to the use of the public for purposes of vehicular travel.  Highway includes street."  Cal. Vehicle Code § 360.  Thus, passage of OHVs on County maintained CSA roads is prohibited by state law.

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PROPOSED] ORDER ON REMEDY AND
INJUNCTIVE RELIEF                          - 23 -                          21343\2235083.1
No. 3:06 CV 04884 SI

3. Edwards Bowl

Like Wonder Valley, the Edward Bowl area is comprised of a checkerboard of private and public lands. *AR*-201842-3; *AR*-202203; *AR*-219756; Parham Decl. at ¶ 7. Plaintiffs have established that this area suffers from extreme spill-over effects from the unrestricted El mirage open area. BLM described Edwards Bowl as an area that is, in effect, "being treated as an open area[]." *AR*-202063; Parham Decl. at ¶¶ 7, 10. The FEIS states that the "residual impacts" of the implementation of the plan would mean that Edwards Bowl, which is already heavily degraded, "would continue to be degraded." *AR*-202264 (Table 4-30). Although proactive efforts by local groups have fenced and signed many of the private lands, and thus reduced the trespass issues, the public lands in the area are still suffering from extreme impacts from OHV use. Parham Decl. at ¶¶ 7, 12.

The Edwards Bowl area provides potential habitat for a number of sensitive plant and animal species including the Barstow woolly sunflower, desert cymopterus and pygmy poppy. *AR*-219750, 764. It is located in the Western Mojave Recovery Unit for the desert tortoise, is in the known range for the Mohave ground squirrel, the burrowing owl, and is home to numerous different raptors. *Id*. at 219764-65; Parham Decl. at ¶ 5.

This area is popular for "staging" where a group of riders will gather in one place (often bringing their off-road equipment out to the site via trailer) and depart together from one point. *AR*-202060-61 (Describing the Edwards Bowl as a heavy OHV use area.); Parham Decl. at ¶¶ 7, 15-16; photo A-15. These group stagings are a source of considerable irreparable harm. *Id*. Along with resulting in heavy compaction of the soils in the areas they chose to stage from (see discussion above on impacts of soil compaction), it appears that much of the route proliferation results from these stagings. *Id*.

A number of the illegal routes in the area underwent restoration using vertical mulching techniques in 2006-2007. Plaintiffs have presented evidence that virtually all of this restoration work has been undone by OHV users. See Parham Decl. at ¶ 14 and photos A-3 to A-6. Thus, the Court finds that Edwards Bowl must be meaningfully closed to halt the epidemic of illegal behavior that has long existed in the area.

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PROPOSED] ORDER ON REMEDY AND
INJUNCTIVE RELIEF                    - 24 -                    21343\2235083.1
No. 3:06 CV 04884 SI

1        The Court therefore orders closure of the following routes (all using the prefix EM) in the

2    greater Edwards Bowl area:  1007, 1078, 2013, 2014, 2015, 2016, 2017, 2018, 2020, 2022, 2023,

3    2024, 2025, 2026, 2042, 2042E, 2042G, 2043, 2045, 2046 , 2048, 2049, 2050, 2052, 2053, 2055,

4    2059, 2061, 2063, 2066, 2067, 2069, 2071, 2077, 2078, 2080, 2082, 2082, 2083, 2084, 2085,

5    2088, 2089, 2092, 2096, 2098.

6        The Court further finds that the following routes should be designated as "Limited" and

7    only be open to street-legal vehicles:  EM 1005 (also known as Buckthorne Canyon Road), EM

8    1004 (also know as Powerline Road or the Diagonal Road), EM 2002, and EM 2019.

9        **C.    Balance of Harms**

10       The Court's second consideration in issuing injunctive relief requires the balancing and

11   weighing of the parties' respective equities.  In this instance, that balancing requires comparison

12   of the substantial and continuing irreparable harm to fragile desert resources caused by OHVs

13   against the resulting limited financial costs to BLM and restrictions on recreational OHV use

14   during the remand period.

15       The Supreme Court has recognized that, unlike economic harm, "[e]nvironmental injury,

16   by its nature, can seldom be adequately remedied by money damages and is often permanent or at

17   least of long duration, *i.e.,* irreparable."  *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531,

18   545 (1987).  As well documented above, in this instance, BLM's failure to adhere to its FLPMA

19   and NEPA responsibilities has resulted in direct and irreparable harm to soils, vegetation,

20   wildlife, air quality and recreational resources within the Western Mojave.  In contrast, the

21   injunctive relief requested by Plaintiffs merely seeks to require BLM to implement mitigation

22   measures BLM itself has committed – but failed – to implement over the past four years and to

23   close specified areas representing well less than five percent of the OHV routes otherwise open

24   for use in the Western Mojave.  The minor financial burden associated with immediate

25   implementation of the mitigation measures and any recreational inconvenience associated with

26   limited closures falls well short of outweighing the long-term harm that unrestricted OHV use and

27   associated impacts would cause to the desert environment.  *See, e.g., L.A. Mem'l Coliseum*

28   *Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) ("monetary injury is not

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PROPOSED] ORDER ON REMEDY AND
INJUNCTIVE RELIEF                    - 25 -                    21343\2235083.1
No. 3:06 CV 04884 SI

1    normally considered irreparable.").  As a result, the balance of the equities favors the adoption of

2    Plaintiffs' requested injunctive remedies in this case.

3         **D.      Public Interest Favors Injunctive Relief**

4         Beyond considering irreparable harm and the balance of the harms, the Court must

5    determine whether the public interest supports issuance of injunctive relief pending remand.  *See*

6    *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009).  It is well established that the

7    public has a considerable interest in preventing irreparable harm to the environment.  *See, e.g.,*

8    *The Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (en banc) ("[P]reserving

9    environmental resources is certainly in the public's interest."); *Earth Island Inst. v. U.S. Forest*

10   *Serv.*, 442 F.3d at 1177 ("The preservation of our environment, as required by NEPA . . . is

11   clearly in the public interest.").   As applied here, the narrowly tailored injunction requested by

12   Plaintiffs certainly serves the public interest during the remand period.

13        Plaintiffs request simply seeks to require BLM to immediately implement those measures

14   the BLM determined and committed – through the prior public NEPA process – were necessary

15   to implement in conjunction with designating and regulating OHV use within the Western

16   Mojave.  In this regard, BLM itself has already conceded that the public interest requires

17   implementation of these measures and, in light of the continuing harm caused by BLM's failure

18   to take such measures, the need for implementation is immediate.  Similarly, with regard to the

19   requested specific route closures, there is clearly a public interest in temporarily closing these

20   areas and preserving the status quo (and limiting continuing harm) while BLM addresses these

21   and other routes during the remand period.  Therefore, there can be little debate that the issuance

22   of the narrowly tailed injunction requested by Plaintiffs is in the public interest.

23   ////

24

25

26

27

28

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PROPOSED] ORDER ON REMEDY AND
INJUNCTIVE RELIEF                    - 26 -                          21343\2235083.1
No. 3:06 CV 04884 SI

1    **V.    CONCLUSION**

2           For the foregoing reasons, the Court finds that partial vacatur of the March 2006 Western

3    Mojave Plan Record of Decision is required.  Further, the injunctive relief specified in this Order

4    is granted.  Plaintiffs are ordered to submit any request for attorneys' fees and costs within 60

5    days of the date of this Order.

6

7

8           Dated this _____ day of _____, 2010.

9

10                                                      _____
                                                        UNITED STATES DISTRICT JUDGE

11

12   **Additional attorneys submitting:**

13   LISA T. BELENKY (CA Bar No. 203225)
     Center For Biological Diversity
14   351 California St., Suite 600
     San Francisco, CA  94104
15   Telephone:  (415) 436-9682 x 307
     Facsimile:  (415) 436-9683
16   Email:  lbelenky@biologicaldiversity.org

17   DEBORAH A. SIVAS (CA Bar No. 135446)
     Environmental Law Clinic
18   Mills Legal Clinic
     Stanford Law School
19   Crown Quadrangle
     559 Nathan Abbott Way
20   Stanford, CA  94305-8610
     Telephone:  (650) 725-8571
21   Facsimile:  (650) 723-4426
     Email:  dsivas@stanford.edu

22

23   **Attorneys for Plaintiffs Center for Biological Diversity, Sierra Club, Public Employees for**
     **Environmental Responsibility, and Desert Survivors**

24

25

26

27

28

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PROPOSED] ORDER ON REMEDY AND
INJUNCTIVE RELIEF                        - 27 -                        21343\2235083.1
No. 3:06 CV 04884 SI