IGNACIA S. MORENO, Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

CHARLES R. SHOCKEY, Attorney (D.C. Bar No. 914879)
Natural Resources Section, Sacramento Field Office
Environment and Natural Resources Division
United States Department of Justice
501 "I" Street, Suite 9-700
Sacramento, CA 95814-2322
Telephone:    (916) 930-2203
Facsimile:    (916) 930-2210
Email:        charles.shockey@usdoj.gov

Attorneys for Federal Defendants

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

---

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., Plaintiffs, ) | Case No. 3:06-cv-04884 SI |
| v. ) | **Declaration of William Haigh** |
| U.S. BUREAU OF LAND MANAGEMENT, et al., Federal Defendants, ) | |
| and ) | |
| KERN COUNTY, CALIFORNIA, et al., Intervenor-Defendants. ) | |

---

I, WILLIAM HAIGH, declare as follows. I am over 21 years old, I have personal knowledge of the following, and I could testify competently if called as a witness:

1.  I am currently the Field Office Manager for the Mother Lode Field Office (formerly known as the Folsom Field Office), Bureau of Land Management ("BLM"), United States Department of the Interior, in El Dorado Hills, California. I have held this position since July 2006.  From June 2004 to July 2006 I was the Field Office Manager for the South River Field Office, Roseburg District, Bureau of Land Management, United States Department of the Interior, in Roseburg, Oregon.

2.  I was the Project Manager for the preparation of the West Mojave ("WEMO") Plan from December 1996 until June 2004.  As Project Manager, I was responsible for all aspects of the preparation of the WEMO Plan.  I directed the work of all federal employees and contractors who were referred to as the "planning team."  I organized the involvement of all participating jurisdictions and agencies.  I attended all public meetings, and organized and facilitated most of them.  I reviewed all documents prepared by the planning team.  I reviewed and was familiar with all data collected by staff.  I communicated with the planning team, agency and jurisdiction staff and other stakeholders in person, by telephone, by postings on the West Mojave internet web page, and by electronic mail messages.

3.  I have worked for the Bureau of Land Management as both a field manager and a land use planner for twenty five years.  I also worked as an attorney with a private law firm for four years.

4.  I possess a Bachelor of Arts in Geography from the University of California at Los Angeles, and a Juris Doctor from the McGeorge School of Law in Sacramento.

5.  I have reviewed the plaintiffs' "Motion for Partial Vacatur and Injunctive Relief," along with the supporting declarations and documents.

6.  The WEMO Plan was an interagency land use management plan that was jointly prepared by cities, counties, state and federal agencies having jurisdiction over lands within the western Mojave Desert.  The Mojave Desert consists of approximately twenty million acres of land in Southern California.  The WEMO Plan area consists of approximately 9.35 million acres within the Mojave Desert.  About 3.26 million acres of the WEMO Plan area is under BLM jurisdiction managed by either the Barstow or Ridgecrest Field Office; about 0.29 million acres is administered by the National Park Service; about 2.67 million acres is administered by the Department of Defense; about 3.03 million acres is privately owned and about 0.10 million acres is administered by the State of California. (AR 201667)

7.  The CDCA Plan was approved by a Record of Decision (ROD) signed in December 1980.  (AR 234099)  It included a Motorized Vehicle Access element.  This element was revised by the 1982 CDCA Plan Amendment process, which was approved by a Record of Decision signed on May 17, 1983.  (AR 232586)

Declaration of William Haigh                    3                    Case No. 3:06-cv-04884 SI

8. The CDCA Plan's Motorized Vehicle Access element, as amended, designates all public lands as open, limited or closed for motorized vehicle use. These designations are referred to as "area designations." (AR 222004) Within the WEMO Plan area, there are seven (7) "open areas" covering approximately 0.36 million acres: Dove Springs, El Mirage, Jawbone Canyon, Johnson Valley, Rasor, Spangler Hills and Stoddard Valley. (AR 202173-202174) The Olancha Dunes are also designated as open. (AR 222206) (Map 2, attached to the Declaration of Beth Wenstrom) Within an open area, OHV's may use any part of the designated area; there are no designated routes.

9. All CDCA Plan decisions regarding the designation, location and management of open areas within the WEMO Plan area were made either by the December 1980 CDCA Plan ROD or by the May 17, 1983 amendment ROD. The WEMO Plan did not amend either of these decisions, nor did the WEMO Plan make any new open area designations. As a result, the WEMO Plan and EIS did not analyze, or have any reason to analyze, prior land use measures and prescriptions that were not affected by the proposed WEMO Plan amendment.

10. The CDCA Plan designated approximately 0.46 million acres as closed to motorized vehicle use. These acres were designated as wilderness. (AR 201933) (Map 2)

11. The CDCA Plan designated approximately 2.44 million acres of public as limited areas. Within limited areas, motorized vehicle access is allowed only on certain routes of travel. (AR 222005)

12. Within limited areas, the CDCA Plan requires that specific routes will be designated "open", "closed" or "limited". These are referred to as "route designations." (AR 222005)

13. Route access may be limited with respect to: number of vehicles allowed; types of vehicles allowed; time or season of vehicle use; permitted or licensed vehicle use only; and establishment of speed limits. (AR 222006) Examples of types of vehicles allowed include vehicles licensed for use on California public highways, which may include motorcycles (but not ATVs) (known as "street legal vehicles"), and vehicles (such as ATVs and off-road motorcycles) that are not licensed for use on California public highways.

14. Route designation began shortly after CDCA Plan approval. In June 1981, BLM published a set of 21 maps titled Motorized Vehicle Interim Access Guides (IAG), which covered all public lands within the CDCA. These maps were distributed to the public for their input and review, as part of an effort to gather information regarding the location of existing vehicle routes. (AR 230282)

15. The difference between "street legal" and "non-street legal" vehicles is that one is licensed while the other is not. The licensing of vehicles under California law to make them "street legal" does not impact public land resources any more or less than those

vehicles that are not licensed.  Impact to public land resources from off-highway vehicle use is a result of human behavior, and not whether the vehicle is or is not licensed.

16. From the early to middle 1980s, BLM also collected information from topographic maps, air photos and isolated field checks, although no intensive field inventory was conducted. (AR 230282-230283)

17. In accordance with the CDCA Plan, between 1985 and 1987, BLM staff designated a network of motorized vehicle routes throughout the WEMO Plan area.  BLM applied the minimization criteria set forth in 43 CFR 8342.1 and, for each route, documented the application of these criteria on a form titled "Vehicle Route Designation Record of Decision." Each form included the complete text of the 43 CFR 8342.1 criteria, identified the criteria that the designation was based on, and included a route-specific rationale for each decision. (AR 230292 – 230488)

18. Route designations within the WEMO Plan area became effective upon publication of notices in the Federal Register for the Ridgecrest Field Office (50 FR 33856 (August 21, 1985)) and for the Barstow Field Office (52 FR 23364 (June 19, 1987) and 52 FR 35589 (September 22, 1987)). (AR 202199)

19. The plaintiffs have focused on three areas for which they seek to prohibit or restrict OHV use until BLM adopts a revised plan for the WEMO area.  These include (1) Juniper

Flats, (2) Wonder Valley, and (3) the Edwards Bowl.  I describe below the development of the route networks for these areas.

20. The route network in Juniper Flats, including Arrastre Canyon, was designated as part of the Barstow Field Office route network established by publication of the Federal Register notice dated June 19, 1987.  (AR 230493)

21. The route network in the Edwards Bowl was designated as part of the Barstow Field Office route network established by publication of the Federal Register notice dated June 19, 1987.  (AR 230493)

22. The route network in Wonder Valley was designated as part of the Barstow Field Office route network established by publication of the Federal Register notice dated September 22, 1987.  (AR 230492)

23. In addition to the 1985 and 1987 route designations, routes were designated within each of twenty-six (26) Areas of Critical Environmental Concern ("ACEC") located in the WEMO Plan area between 1982 and 1996.  These ACEC designations included route networks for the following ACECs:  Afton Canyon (1989), Amboy Crater (year unknown), Barstow Woolly Sunflower (1982), Bedrock Springs (1987), Big Morongo Canyon (1982 and 1996), Black Mountain (1988), Calico Early Man Site (1984), Cronese Basin (1984), Desert Tortoise Research Natural Area (1988), Fossil Falls (1986), Great Falls Basin (1987), Harper Dry Lake (1982), Jawbone/Butterbredt (1982), Juniper Flats

(1988), Last Chance Canyon (1982), Mojave Fishhook Cactus (1990), Rainbow Basin (1991), Red Mountain Spring (1987), Rose Springs (1985), Sand Canyon (1989), Short Canyon (1990), Soggy Dry Lake Creosote Rings (1982), Steam Well (1982), Trona Pinnacles (1989), Upper Johnson Valley Yucca Rings (1982), Western Rand Mountains (1994) and Whitewater Canyon 1982).  (AR 202200 - 202202)  (Map 3, attached to the Declaration of Beth Wenstrom)

24. Between the late 1980s and the mid-1990s, BLM published twenty-one Desert Access Guide maps of the CDCA Plan area.  Within the Ridgecrest and Barstow field office boundaries, these maps displayed the route networks designated in 1985 and 1987, and the networks designated for the ACECs.  These DAGs were distributed for public use.

25. In April 1990 the Mojave population of the Desert Tortoise was listed by the United States Fish and Wildlife Service as threatened.

26. In the mid-1990s, BLM began a process to redesign a portion of the existing 1985 and 1987 route networks (WEMO redesign area).  The primary focus of the WEMO redesign area became Desert Tortoise critical habitat.  Certain other sensitive areas were also included in the redesign of the network.  (AR 201825)  This redesign effort was known as the Western Mojave Desert Off Road Vehicle Designation Project, and it was approved by a Decision Record signed on June 30, 2003 (2003 WEMO route designation project).  (AR 206756 – 206777)

27. An Ord Mountain Pilot Program ("Ord Pilot") was initiated in 1996 with the intent that it could serve as a pilot or template for regional route designations throughout the WEMO Plan area.  An air photo inventory was conducted and routes were ground-truthed by stakeholders in the field, allowing correction of the inventory.  An environmental assessment titled Ord Mountain Vehicle Route Designation was published on January 25, 2000.  (AR 221195 – 221458)

28. The Ord Pilot did not use the decision tree approach that was applied elsewhere in the WEMO redesign area.

29. The Ord Pilot was included as part of the network that was adopted by BLM through the 2003 WEMO route designation project.

30. The WEMO Plan covers an area more than twenty times as large as that addressed by the Ord Pilot.  (Map 2)  In July 1999 I determined that the most effective way to approach route designation was to subdivide most of the WEMO Plan area into "sub-regions," each of which would be of a size comparable to the area considered by the Ord Pilot.  My intent was to allow the planning team to identify issues and establish route designation planning goals on a reasonably site-specific basis.  These twenty (20) subregions included:  Amboy, Bighorn, Coyote, East Sierra, El Mirage, El Paso, Fremont, Granite, Juniper, Kramer, Middle Knob, Morongo, Newberry-Rodman, North Searles, Pinto, Ridgecrest, Red Mountain, Sleeping Beauty, South Searles and Superior. (Map 2)

31. Eleven (11) subregions were selected for new field inventories.  Seven of these subregions were within Desert Tortoise critical habitat:  Coyote, El Mirage, Fremont, Kramer, Newberry-Rodman, Red Mountain and Superior.  (Map 4, attached to the Declaration of Beth Wenstrom.)  Middle Knob included sensitive plant habitat.  Two others, El Paso and Ridgecrest were located close to the City of Ridgecrest, and both were popular areas with increasing motorized vehicle use.  Finally, the Juniper subregion was included for a new field inventory in response to comments made during the public review of the Draft WEMO environmental impact statement.  (Map 2)

32. The Edwards Bowl is located within the El Mirage subregion.  (Map 2)  Because this subregion is within Desert Tortoise critical habitat, new field inventories were conducted in this area.

33. Nine of these eleven subregions were further divided into Motorized Access Zones (MAZ).  Management issues and goals were identified for each MAZ.  (AR 201833 – 201840)  MAZ's were not identified for the El Paso and Juniper subregions.

34. A redesigned route network was developed for ten (10) of these eleven subregions, using the decision tree approach.

35. Route designation of the El Paso subregion was deferred.  The 2003 Decision Record established the El Paso Collaborative Access Planning Area for the El Paso subregion, and directed BLM to design a revised motorized vehicle access network for that

subregion in collaboration with local jurisdictions and the general public.  This
designation has not yet been completed.

36. Nine (9) subregions were not selected for new field inventories.  They included:  Amboy,
Bighorn, East Sierra, Granite, Morongo, North Searles, Pinto, Sleeping Beauty, and
South Searles.  These nine were not significantly affected by the issues associated with
the other subregions.  In these nine subregions, the existing 1985 and 1987 route
networks were retained.  The 2003 WEMO route designation project made only a few
minor corrections to the existing network in these subregions.  (Map 2)  These
corrections included the realignment of some routes at boundaries between the ACEC
networks and the 1985 and 1987 networks, to ensure that the routes connected
seamlessly.

37. Approximately one quarter of the 2.44 million acres of public lands designated as limited
areas by the CDCA plan was not included within the subregions.  These included the
twenty-six ACECs with designated route networks, certain remote lands in Inyo County
that were within the 1985 Ridgecrest Field Office route designation area, and lands
within the Barstow Field Office's Cady Mountains and Yucca Valley (including Wonder
Valley) that were addressed by the 1987 route designations.  (Maps 2 and 3)  These areas
were not significantly affected by the issues associated with the redesign area.  In these
areas, the existing 1985, 1987 and ACEC networks were retained (other than certain
minor revisions).

38. BLM published an environmental assessment for the WEMO route designation project on March 1, 2003.  The environmental assessment identified the 1985, 1987 and ACEC networks as its "No Action" alternative.  (AR 211415)

39. BLM adopted the WEMO route designation project by a Decision Record dated June 30, 2003. (AR 206756 – 206777)

40. **Summary:**  The June 30, 2003 Decision Record approved a new route network within ten subregions.  This new route network included designations of routes in the Coyote, El Mirage, Fremont, Juniper, Kramer, Middle Knob, Newberry-Rodman, Red Mountain, Ridgecrest and Superior subregions.  In all other areas, the 2003 Decision Record made no change to the existing designated route network (except for a few minor network connections).  The 2003 Decision Record approved the Ord Pilot network, based on the environmental assessment prepared for that area in 2000.  The existing route networks designated in 1985 and 1987, and for ACECs between 1982 and 1996, remained in effect. This includes the Western Rand Mountains ACEC network. The 2003 Decision Record established the El Paso Collaborative Access Planning Area for the El Paso sugregion, and directed BLM to design a revised motorized vehicle access network for that subregion in collaboration with local jurisdictions and the general public (not yet completed).  (Maps 2 and 3)

41. BLM adopted the WEMO Plan by Record of Decision dated March 13, 2006.  This Record of Decision made only minor changes in the designated route network.  Those

minor changes affected a small number of routes within both the redesign area and within the previously existing 1985-87, and ACEC route designation area. In my opinion, if the OHV route network adopted by the June 30, 2003 Decision Record and later modified slightly by the 2006 WEMO Plan ROD were to be set aside, the route network that was in existence before the 2003 Decision Record would become operative once again. That route network would consist of the 1985-87 network and the ACEC designations, which constituted the "no action" baseline prior to adoption of the 2003 Decision Record.

**RESPONSE TO DECLARATION OF THOMAS EGAN**

**I have reviewed the Declaration of Thomas Egan filed in support of the plaintiffs' Motion for Partial Vacatur and Injunctive Relief, and provide the following comments and responses**

42. **Paragraph 7:** The inventory of vehicle routes that was used during the "Box" route designation effort was based on air photos taken in 1994 and 1995, not 1984. Between summer 1997 and spring 1998, BLM's National Applied Resource Sciences Center ("NARSC") located in Denver, Colorado identified ground features on these photos that appeared to be vehicle routes ("Denver Photo Inventory"). The funds available to the Denver Photo Inventory team were not sufficient to allow NARSC to ground-truth the inventory; that is, NARSC identified what appeared to be vehicle routes on air photos, but they could not travel to California and drive all of these routes to ensure that they actually existed on the ground. Moreover, the nature of the route (single track, 4WD,

graded gravel, etc) and the level of use (heavy, moderate, or light) could not be determined through this process and was not included in the Denver Photo Inventory database.  The Denver Photo Inventory did not attempt to identify recreation or resource attributes, such as campsites, trail heads or scenic views.

43. During the "Box" route designation effort (conducted during the summer of 1998), BLM staff identified which of approximately 23 resource and access attributes were applicable as reasons for recommending the route as open.  The documentation prepared for the Box recorded only the fact that the attribute was considered in reaching an open recommendation for the entire route; the precise location of the attribute along the route was not documented.

44. For each recommended closure, attributes were assigned to a group of routes, known as a "closed clump."  Each clump consisted of all closed routes within a geographic area typically spread across several square miles of public lands.  Clumps consisted of webs of routes.  For each clump of closed routes, staff identified which of approximately 23 resource and access attributes were applicable as reasons for recommending that the routes within the clump be closed.  The documentation prepared for the Box recorded only the fact that the attribute was considered in reaching a closed recommendation for the clump; its precise location within the clump was not documented and, therefore, the rationale for closing any specific route was not recorded.

45. At no time did the Box teams record how they specifically applied the 43 CFR 8342.1 "minimization criteria." No such analysis was prepared either at the regional, "clump" or individual route scale.

46. As a result of this lack of specificity, it later proved nearly impossible to explain the rationale for the "Box" route designations.

47. Between early 2000 and August 2001, the WEMO planning team met with stakeholders to discuss the Box and distributed maps to allow stakeholders to field-check the network. These discussions and field checks revealed inaccuracies in the Denver Photo Inventory that significantly damaged its credibility with the public. These included a finding that approximately nine (9) percent of the Denver Photo Inventory's routes in the Red Mountain, Fremont, Kramer, Superior and Newberry-Rodman subregions did not exist on the ground. (AR 202364)

48. On page 4, line 23, Mr. Egan asserts that "much of the data compiled" for the Box was disregarded. This is incorrect. All of the data available to the Box team was retained and later utilized during the 2003 WEMO route designation process. This comparatively limited collection of data was augmented by the significant amount of additional resource information that was collected by the WEMO planning team through field inventories and literature review subsequent to the Box.

49. **Paragraph 9:**  The WEMO route network that was adopted by BLM in June 2003 and slightly modified by the WEMO Plan ROD in 2006 was developed and reviewed by BLM staff and contractors.  Mr. Parker participated as a key member of the team that designed the Ridgecrest Field Office's portion of the 2003 WEMO route designation project.  He was directly involved in developing the Middle Knob, Ridgecrest and Red Mountain redesign networks, and the routes designated as open were selected by Mr. Parker as lead wildlife biologist in collaboration with other field office specialists.  His was not an ancillary role.  I am not aware of any route network that was prepared by "recreation interests."

50. **Paragraph 15:**  Mr. Egan incorrectly asserts that only routes "identified as being in existence as of December 31, 1977 (the date of full CDCA aerial coverage)" are eligible for route designation.  This requirement (actually, the year set forth in the CDCA Plan was 1978) was deleted from the CDCA Plan by the May 17, 1983 CDCA Plan amendment ROD.  (AR 222005).  Mr. Egan then makes two unsupported assertions:  (1) that routes not existing in 1977 were designated as open for travel and (2) that "post-1980 route creation was highest" in certain subregions.  I am unaware of any evidence that documents the creation date of any designated route in the WEMO Plan area.  It is simply not possible to establish that any particular route did, or did not, exist in 1977.  Similarly, I am unaware of any route inventory data that indicate the relative number of routes that may, or may not, have been created in any particular subregion since 1980.

51. **Paragraph 34:** Bryman Bluffs and Point of Rocks Ridge are located east of the Kramer subregion, outside of the redesign area. (Map 2) Route designation within these MUC Unclassified lands occurred in 1987. Routes designated as open are depicted on maps 57 and 58 of the proposed route network in the WEMO Plan final environmental impact statement (AR 203032 and 203033) and on the Stoddard Valley Desert Access Guide published by BLM in the early 1990s.

I declare under penalty of perjury under 28 U.S.C. 1746 that the foregoing is true and correct and that this declaration was executed on June _15_, 2010 in Sacramento, California.

William Haigh