David P. Hubbard, Esq.
Gatzke Dillon & Ballance LLP
1525 Faraday Avenue, Suite 150
Carlsbad, CA  92008
Telephone: (760) 431-9501
Facsimile: (760) 431-9512
Email: dhubbard@gdandb.com

Attorneys for Intervenor-Defendants' AMA
District 37; California Off Road Vehicle
Association; Off Road Business Association;
San Diego Off Road Coalition; and American
Sand Association

Dennis L. Porter
Dennis L. Porter Attorney at Law
8120 36th Avenue
Sacramento, CA  95824
Telephone: (916) 381-8300
Facsimile: (916) 381-8726
Email: dlporter2@yahoo.com

Attorney for Intervenor-Defendants' Blue Ribbon
Coalition; California Association of Four-Wheel
Drive Clubs; and United Four-Wheel Drive
Associations

Paul Andrew Turcke
Moore Smith Buxton & Turcke
950 West Bannock Street, Suite 520
Boise, ID  83702
Telephone: (208) 331-1807
Facsimile: (208) 331-1202
Email: pat@msbtlaw.com

Attorney for Intervenor-Defendants Blue Ribbon Coalition, and  California Association of Four-
Wheel Drive Clubs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. BUREAU OF LAND MANAGEMENT, *et al.*,<br><br>Defendants,<br>_____<br>AMA DISTRICT 37 *et al.*<br><br>Intervenor-Defendants'<br>_____ | Case No. 06-cv-4884-SI<br><br>Honorable Susan Illston<br><br>**OHV INTERVENORS' RESPONSE TO PLAINTIFFS' MOTION FOR REMEDY**<br><br>Date:        September 3, 2010<br>Time:        9:00 a.m.<br>Courtroom:  10, 19th Floor<br>Judge:      Honorable Susan Illston |

**TABLE OF CONTENTS**

I       INTRODUCTION ................................................................................................ 1

II.      ARGUMENT ..................................................................................................... 3

    A.      PLAINTIFFS FAIL TO SATISFY THE PROPER STANDARD FOR
        INJUNCTIVE RELIEF .................................................................................. 3

    B.      PLAINTIFFS' EVIDENCE DOES NOT ESTABLISH THAT WEMO
        ROUTE NETWORK MUST BE LIMITED TO "STREET LEGAL"
        VEHICLES TO PREVENT IRREPARABLE INJURY .......................................... 5

        1.    Plaintiffs Have Not Established Likelihood of
            Irreparable Injury to Soils ................................................................ 6

        2.    Plaintiffs Have Not Established Likelihood of
            Irreparable Injury to Vegetation ................................................... 10

        3.    Plaintiffs Have Not Established Likelihood of
            Irreparable Injury to Wildlife ....................................................... 12

        4.    Plaintiffs Have Not Established Likelihood of
            Irreparable Injury to Air Quality ................................................... 15

        5.    Plaintiffs Have Not Established Likelihood of
            Irreparable Injury to the Ambient Sound Environment .............. 16

    C.      PLAINTIFFS' PROPOSAL TO RESTRICT ROUTE NETWORK TO
        "STREET LEGAL" VEHICLES WILL CREATE IMPACTS THAT HAVE
        NOT BEEN ANALYZED ............................................................................. 18

    D.      PLAINTIFFS' PROPOSAL TO RESTRICT WEMO ROUTE
        NETWORK TO STREET LEGAL VEHICLES WORKS A DISSERVICE
        ON THE PUBLIC INTEREST ...................................................................... 19

    E.      PLAINTIFFS FAIL TO SHOW THAT TRESPASS IS OCCURRING
        ON PRIVATE LAND IN WONDER VALLEY OR THAT STATE COURT
        REMEDIES ARE INADEQUATE FOR TRESPASS CLAIMS ............................. 20

        1.    California Law Allows Public Recreation on Private Land ..................... 20

        2.    Plaintiffs' Declarants Have Not Demonstrated
            Compliance With "Notice" Requirements of California
            Penal Code Section 602.8(a) .......................................................... 21

        3.    Plaintiffs' Declarants Have Not Availed Themselves
            of State Law Remedies ................................................................... 22

III.    CONCLUSION ................................................................................................ 24

# TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*American Motorcyclists Association v. Watt*
F.2d 962 (9th Cir. 1983)...................................................................................................... 18

*eBay Inorporated. v. MercExchange*
547 U.S. 388 (2006) ...................................................................................................... 3, 22

*High Sierra Hikers Association v. Blackwell*
390 F.3d 630 (9th Cir. 2004)................................................................................................ 5

*Idaho Watersheds Project v. Hahn*
307 F.3d 815 (9th Cir. 2002) ............................................................................................... 5

*Lands Council v. McNair*
537 F.3d 981 (9th Cir. 2008)................................................................................................ 4

*Monsanto Company v. Geertson Seed Farms*
___ U.S., ___, ___ S.Ct. ___, 2010 WL 2471057 (2010).............................. 1, 3, 4, 13, 19

*Northern Cheyenne Tribe v. Norton*
503 F.3d 836 (9th Cir. 2007)........................................................................................... 3, 4

*Weinberger v. Romero-Barcelo*
456 U.S. 305 (1982) ..................................................................................................... 4, 19

*Winter v. NRDC*
129 S. Ct. 365 (2008) ................................................................................. 3, 4, 5, 18, 19

*Yakus v. United States*
321 U.S. 414 (1944) ........................................................................................................... 4


**FEDERAL STATUTES**

United States Code, Title 16
§ 1536 ..................................................................................................................... 1

United States Code, Title 42
§§ 4321-32................................................................................................................. 1

United States Code, Title 43
§§ 1701-85.................................................................................................................. 1

**FEDERAL REGULATIONS**

Code of Federal Regulations, Title 40
§205.152........................................................................................................... 15

Page

**STATE CASES**

*Muzzy Ranch Company v. Solano County Airport Land Use Commission*
(2007) 41 Cal.4[th] 372....................................................................................................... 18, 19


**STATE STATUTES**

California Civil Code

    §1009 ........................................................................................................... 20, 21

California Penal Code

    §602.8(a) ...................................................................................................... 21, 22

California Public Resources Code

    §§ 21000, *et seq* ................................................................................................ 18

California Vehicle Code

    §38370 ......................................................................................................... 14, 15

I.      **INTRODUCTION**

The American Motorcyclists Association District 37, *et al.* (the "OHV intervenors"), respond to the motion for partial vacatur and injunctive relief filed by Plaintiffs, Center for Biological Diversity, *et al.* (the "Plaintiffs") (Doc. 185), with respect to the Western Mojave (WEMO) Plan adopted in 2006 by the U.S. Bureau of Land Management (BLM), *et al.* (the "federal defendants").

In its ruling on the merits of this action, the Court denied Plaintiffs' claims under the Endangered Species Act (ESA),[1] but found that the federal defendants, in adopting the WEMO Plan, failed to comply with certain aspects of the National Environmental Policy Act (NEPA)[2] and the Federal Land Policy and Management Act (FLPMA).[3]  Plaintiffs now move for specific interim remedies while the federal defendants cure the NEPA and FLPMA defects identified by the Court. First, Plaintiffs ask the Court to vacate those parts of the WEMO Plan Record of Decision (ROD) that established a new route network for OHV use.  Second, by way of injunction, Plaintiffs request that the Court (1) restrict use of the route network to "street legal" vehicles only; (2) prohibit all vehicle use in select areas of Juniper Flats, Wonder Valley, and Edwards Bowl; and (3) overturn BLM's post-ROD decisions to renew grazing allotment leases and reopen two OHV routes in the Rand Mountains.

The federal defendants have responded extensively to each of Plaintiffs' arguments and demands; and the OHV intervenors will not repeat that exercise here.  Instead, the OHV intervenors will confine their response to the following four issues:

1.  The extent to which Plaintiffs' request for injunctive relief is affected by the United States Supreme Court's recent decision in *Monsanto Co. v. Geertson Seed Farms*, ___ U.S., ___, ___ S.Ct. ___, 2010 WL 2471057 (2010), issued on June 21, 2010. As the OHV intervenors will show, the *Monsanto* opinion restricts the situations in which injunctive relief may be granted, and imposes a high evidentiary burden on parties claiming irreparable injury.

---

[1]     16 U.S.C. § 1536.
[2]     42 U.S.C. §§ 4321-32.
[3]     43 U.S.C. §§ 1701-85.

2. The technical/scientific basis for Plaintiffs' contention that soils, plants, wildlife, and other resources proximate to the WEMO OHV route network will suffer irreparable injury unless use of the network is limited to street legal vehicles. The OHV intervenors will demonstrate that the evidence supplied by Plaintiffs either (a) is not specific to the WEMO route network or (b) is so antiquated as to be worthless from a scientific, legal, and management perspective.

3. The extent to which Plaintiffs' proposed ban on "red" and "green" sticker vehicles (non-street legal) in the WEMO route network would produce "displacement" impacts on other areas of the California desert – impacts that have not been analyzed and may prove damaging to sensitive resources. The OHV intervenors will also explain how the proposed ban on non-street legal vehicles will create a disservice to the public interest by making large parts of the WEMO planning area inaccessible. This, in turn, will likely reduce recreational visitorship at the WEMO, negatively affecting the local communities that rely heavily on OHV-related revenues to survive economically.

4. The unfounded claim, made repeatedly by Plaintiffs, that unathorized OHV use on private land is, by definition, illegal trespass. As the OHV intervenors will show, California law expressly allows recreational use (including OHV use) of private land and does not treat such use as a trespass unless the property owner (a) cultivates the land, (b) fences it, or (c) posts it with "No Trespassing" signs at intervals not less than three to a mile. Plaintiffs have made no showing that they or any other complaining landowners have complied with this condition. Nor have they established that available state law remedies (trespass and nuisance) are inadequate to redress their complaints.

Ultimately, Plaintiffs have failed to demonstrate the requisite need for the injunctive relief requested. They have not proved that (1) such relief is necessary to prevent irreparable injury, (2) other less drastic remedies are inadequate, (3) the balance of equities tip in their favor, and (4) the

2

1    injunction will not result in a disservice to the public interest.  For these reasons, the request for

2    injunction must be rejected.

3    **II.      ARGUMENT**

4          **A.      PLAINTIFFS FAIL TO SATISFY THE PROPER STANDARD FOR INJUNCTIVE RELIEF**

5          Plaintiffs do not satisfy the applicable standards for imposition of any injunctive relief in

6    this case.  New developments in the caselaw, including the Supreme Court's June 21, 2010,

7    decision in *Monsanto v. Geertson Seed Farms*, ____U.S.____, 2010 WL 2471057, 78 USLW 4665

8    (2010), have increased the evidentiary burden that Plaintiffs must satisfy when seeking an

9    injunction in NEPA cases.  Plaintiffs not only have failed to satisfy this burden, they rely on

10   reasoning nearly identical to that rejected in *Monsanto*.

11         *Monsanto* continues an evolving line of authority – dominated by *Winter v. NRDC*, 129

12   S.Ct. 365 (2008) – which requires the moving party to pass a four-factor test before the court is

13   permitted to grant any injunctive relief.  Specifically, the movant must show: "(1) that it has

14   suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are

15   inadequate to compensate for that injury; (3) that, considering the balance of hardships between the

16   Plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not

17   be disserved by a permanent injunction."  *eBay Inc. v. MercExchange*, 547 U.S. 388, 391 (2006);

18   *Winter v. NRDC*, 129 S. Ct. 365, 374, 381 (2008) (applying the four factors to preliminary

19   injunctions); *N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843 (9th Cir. 2007).  *Monsanto* recognizes

20   that this four-part test applies when evaluating whether a permanent injunction is warranted "to

21   remedy a NEPA violation."  *Monsanto*, 2010 WL 2471057 at *11.  Most important for our case

22   here, the four-part test, as applied in *Monsanto*, rejects the notion that injunctive relief is to be

23   awarded as a matter of course in NEPA case.  *Ibid.*

24         In the present motion, Plaintiffs invite precisely the same error that led to reversal in

25   *Monsanto*.  In particular, Plaintiffs suggest this Court should err on the side of imposing injunctive

26   relief, based on the proposition "that NEPA violations create a presumption of irreparable harm that

27   the government must overcome."  (Pl. Memo (Doc. No. 185) at 15.)  This approach was explicitly

28   rejected in *Monsanto*, where the Court characterized such "pre-*Winter*" Ninth Circuit reasoning as

3

an unwarranted "thumb on the scales" which "invert[s] the proper mode of analysis." *Id.* at *12. Thus, an injunction "should issue <u>only</u> if the traditional four-factor test is satisfied." The Court further elaborated:

> It is not enough for a court considering a request for injunctive relief to ask whether there is a good reason why an injunction should *not* issue; rather, a court must determine that an injunction *should* issue under the traditional four-factor test set out above.

*Id.* (underlining added, italics in original).

Even before *Winter* and *Monsanto*, various decisions make clear that an injunction is an "extraordinary remedy" that "should issue only where the intervention of a court of equity is essential in order effectually to protect against injuries otherwise irremediable." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (quotations, citations, and alterations omitted). In particular, "a NEPA violation is subject to traditional standards in equity for injunctive relief and does not require an automatic blanket injunction . . . ." *N. Cheyenne Tribe*, 503 F.3d at 842; *see also Winter v. NRDC*, 129 S. Ct. 365, 375 (2008). A party moving for injunctive relief carries a particularly heavy burden where the result of the injunction is to impede the orderly administration of a governmental responsibility intended to serve the public interest. *Yakus v. United States*, 321 U.S. 414, 440 (1944); *Weinberger*, 456 U.S. at 312-313 (holding that a court may withhold relief when injunctive relief would harm the public interest even if doing so would burden the movant). An injunction "is not a remedy which issues as of course" and "has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the Plaintiff." *Weinberger* 456 U.S. at 311, 312 (citations omitted). "The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Id.* at 313; *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) ("we decline to adopt a rule that any potential environmental injury automatically merits an injunction").

Thus, even under prior decisions cited by Plaintiffs, as well as other decisions, courts in the Ninth Circuit have allowed challenged actions to proceed, or to proceed in part, pending the completion of further court-required NEPA review. *See*, *e.g.*, *N. Cheyenne Tribe*, 503 F.3d at 844-

45 (allowing some oil and gas development to proceed pending completion of an EIS); *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 638, 642-43 (9th Cir. 2004) (allowing limited access by commercial outfitters and guides to wilderness areas pending completion of further NEPA review); *Idaho Watersheds Proj. v. Hahn*, 307 F.3d 815, 833-34 (9th Cir. 2002) (allowing grazing activities to continue under conditions proposed by agency pending further NEPA review).

Plaintiffs do not properly acknowledge the correct standard and do not provide a defensible record on every element of the four-factor test to support entry of their proposed relief.   These omissions render Plaintiffs motion fatally defective.

**B.**   **PLAINTIFFS' EVIDENCE DOES NOT ESTABLISH THAT WEMO ROUTE NETWORK MUST BE LIMITED TO "STREET LEGAL" VEHICLES TO PREVENT IRREPARABLE INJURY**

As part of their proposed remedy, Plaintiffs ask the Court to close the entire WEMO route network – consisting of 5,098 miles of trails – to all vehicles except those meeting the definition of "street-legal." (Pl. Memo at 9.)  Plaintiffs contend that this extreme restriction on use is necessary to prevent "irreparable injury" to natural resources in the WEMO planning area.  (Pl. Memo at 15-21.)  However, Plaintiffs have not made an adequate showing of such injury.  None of the technical data provided by Plaintiffs or their designated declarants show that use of the proposed WEMO route network by non-street legal vehicles will cause irreparable injury to natural resources at or near any WEMO routes.  Even the evidence submitted with respect to alleged OHV-related damage at Juniper Flats, Wonder Valley, and Edwards Bowl has been strongly rebutted by counter-evidence submitted by the federal defendants.  (Fed. Def. Memo at 26-33, and Declarations of Roxie Trost, William Haigh, Lawrence F. LaPré, and Beth Wenstrom.)    Below, the OHV intervenors examine the technical data offered by Plaintiffs in support of their argument that the entire WEMO route network must be closed to non-street legal vehicles in order to prevent irreparable injury to soils, vegetation, wildlife, air quality, and the ambient sound environment.  As the OHV intervenors will show, Plaintiffs evidence falls well short of establishing that any of these resources is likely to sustain irreparable injury if the proposed injunction is not granted.  *Winter v. NRDC*, 129 S.Ct. 365, 375, 376 (stating plaintiffs must establish that irreparable injury is "likely" not just "possible").

---

5

1.   <u>Plaintiffs Have Not Established Likelihood of Irreparable Injury to Soils</u>

Plaintiffs' argue that the street-legal only limitation is necessary to prevent irreparable harm to desert soils in the WEMO.  (Pl. Memo at 16-18.)  However, no study submitted by Plaintiffs actually supports this argument.  One need only review each soils study attached to Plaintiffs' brief to see that this is so:

- Adams, et al (1982), Exhibit A to the Declaration of Sky Stanfield:[4]  This study, which is based on data collected more than 30 years ago, draws two unremarkable conclusions: (1) soil tends to become compacted after repeated vehicle passes, and (2) plants grow better in uncompacted soil than in compacted soil.  The study was conducted by driving a Ford Bronco (which is a street-legal vehicle) and a Yamaha motorcycle (which may or may not be street legal) across small, defined areas in Stoddard Valley and Johnson Valley.  They study does not show, and was not designed to show, that use of the WEMO route network by non-street legal vehicles would cause irreparable harm to desert soils or desert plants.

- Bolling and Walker (2000), Exhibit C to the Declaration of Sky Stanfield: This study did not assess OHV routes in the WEMO, but instead evaluated the impacts of abandoned dirt roads in mining towns and ghost towns in southern Nevada and northern Arizona.  Again, this study does not show, and was not designed to show, that use of the WEMO route network by non-street legal vehicles would cause irreparable harm to desert soils or desert plants.

- Brooks and Lair (2005 USGS), Exhibit G to the Declaration of Sky Stanfield: This article provides general information about the effect of OHVs on soils, but clearly states that the ecological impacts of any particular route are going to depend on the ecosystem in which the route is located. (p. 6)  It does not establish that the WEMO route network – or any particular trail within that

---

[4]    According to footnote 11 of Plaintiffs' Memorandum, all scientific studies cited by Plaintiffs are attached as exhibits to the Declaration of Sky Stanfield.

6

network – must be restricted to street legal vehicles to prevent irreparable injury to soils.

- Elvidge and Iverson (1980), Exhibit K to the Declaration of Sky Stanfield: This study, which relies on data that is more than 30 years old, examines the effect of OHVs on desert "pavement and varnish" as found in such places as Australia, Death Valley (California), the Sahara Desert, Arizona, and certain desert areas of Israel. (pp. 225-236)  It does not establish that the WEMO route network – or any particular trail within that network – must be restricted to street legal vehicles to prevent irreparable injury to soils.

- Ouren, et al. (2007 USGS), Exhibit M to the Declaration of Sky Stanfield: This study examines the host of potential environmental effects that might occur with OHV use.  It provides a generalized treatment of OHV-related soils impacts and makes one reference to a specific OHV route in the WEMO – the Johnson Valley-Parker OHV race course.  However, that race was discontinued years ago and the course is not part of the WEMO route network.  Therefore, the Ouren study, while an excellent compendium of the various literature on OHV impacts to environmental resources, does not establish that the WEMO route network must be restricted to street-legal vehicles in order to protect desert soils from irreparable injury.

- Lovich and Bainbridge (1999), Exhibit O to the Declaration of Sky Stanfield: The study examines human-caused impacts on the ecosystem of the Southern California Desert.  With respect to OHV use, the study draws very general conclusions about the effects of such vehicles on soils in the Mojave Desert. It does not, however, address any particular OHV route in the WEMO or the WEMO route network itself.  Therefore, it does not establish that the WEMO route network must be restricted to street-legal vehicles in order to protect desert soils and plants from irreparable injury.

- Webb and Wilshire (1983), Exhibit S to the Declaration of Sky Stanfield: This study examines the natural recovery of soils and vegetation following human disturbance. The data, most of which is more than 30 years old, was collected from areas throughout the southwestern United States, including the Mojave Desert. It discusses one "controlled" experiment involving motorcycle tracks created in March 1979 near Femont Peak in the Mojave Desert. It is unclear whether this trail relates to any portion of the WEMO route network or was created solely for the experiment. What *is* clear is that this study does not establish that the entire WEMO route network must be closed to non-street legal vehicles in order to protect soils and plants from irreparable injury.

- Webb (1983), Exhibit T to Declaration of Sky Stanfield: This study simply provides an expanded discussion of the March 1979 motorcycle experiment conducted at Fremont Peak, discussed above. It does not address the WEMO route network.

- Webb (2002), Exhibit U to the Declaration of Sky Stanfield: This study addresses the effects of military operations on soil compaction in the Mojave Desert. The study's data was collected from former World War II Army sites at Camps Ibis, Granite, Iron Mountain, Clipper, and Essex. It does not address soil compaction impacts on the WEMO OHV route network.

- Wilshire (1983), Exhibit V to Declaration of Sky Stanfield: This study evaluates the effects of OHV use on desert soil stabilizers; and while some of the data was derived from observations made in the Mojave Desert, there is no indication that the effects discussed in the study have occurred, or are likely to occur, on any part of the WEMO route network. In fact, much of the data discussed in the study, including the photographs, were generated in the late 1970s and early 1980s, so they have little bearing on the management regime that now exists in the WEMO or on the WEMO route network itself.

- Belnap (2003),[5] AR 239122:  This study simply discusses the composition and fragility of the biological crusts that cover some desert soils.  It is not specific to the WEMO and certainly does not establish that the WEMO route network must be restricted to street legal vehicles only to prevent irreparable injury to desert soils.

- Declaration of Tom Egan:  Mr. Egan does not contend that the WEMO route network, if used by non-street legal vehicles, will cause irreparable injury to soils and plants.  Instead, Egan complains primarily about the harmful effects of illegal and/or unauthorized OHV use that takes place *outside* the designated route network.  (Egan Declaration, ¶¶ 16—37, and Exhibits A-1 – A-32)  Granted, Egan believes that the route network facilitates illegal and unauthorized route proliferation, but that is an enforcement issue, not a designation issue.  As the federal defendants have shown in their responsive brief, BLM is addressing the enforcement issue aggressively, and there is no reason for the Court to intercede in that effort.

- Declaration of Jenny Wilder:  This declaration, while providing testimony specific to the WEMO, focuses on the soil impacts associated with illegal/unauthorized OHV use that occurs *outside* the established route network.  Therefore, it does not demonstrate that soils will suffer irreparable injury if the WEMO route network is open to non-street legal vehicles.

- Declaration of Mark Heuston:  Mr. Heuston's testimony, as it relates to soils, concerns illegal activity *outside* the established route network.

- Declaration of Doug Parham:  Mr. Parham's testimony, as it relates to soils, concerns illegal activity *outside* the established route network.

---

[5] In their soils impact discussion, Plaintiffs' brief also cites to "Belnap, 2007."  (Pl. Memo at 16.)  However, the Declaration of Sky Stanfield, which purports to provide each of the studies used in Plaintiffs' brief (See n.11 to Plaintiffs' Memo), makes no reference to "Belnap, 2007"; nor was a Belnap (2007) study attached as an exhibit to any other declaration submitted by Plaintiffs.

9

- The 2010 Route Designation Study:  This document has not been peer reviewed or published, so its quality and veracity has not been shown.  More important, it concerns itself with soils impacts from illegal riding *outside* the established route network.

2.   <u>Plaintiffs Have Not Established Likelihood of Irreparable Injury to Vegetation</u>

In Support of their request to ban all non-street legal vehicles from the WEMO route network, Plaintiffs argue that the ban is necessary to prevent irreparable injury to desert vegetation. (Pl. Memo at 18-19.)  However, the evidentiary basis for this argument is insufficient, as can be discerned by reviewing the data submitted by Plaintiffs and their declarants.

- Eagan Declaration, ¶13:  In this portion of his declaration, Mr. Egan makes very general statements about the effects of OHVs on vegetation in the WEMO.  No technical evidence is provided in support of this claim.  Nor does Mr. Egan identify any route within the WEMO network where non-street legal vehicles are causing, or will cause, irreparable injury to vegetation.

- Miller (2008), Exhibit P to Declaration of Sky Stanfield:  This study discusses soil structure and the way it affects the transmission of moisture to plants.  It does not address OHV use or the WEMO route network.

- Bolling and Walker (2000), Exhibit C to the Declaration of Sky Stanfield:  This study did not assess OHV routes in the WEMO, but instead evaluated the impacts of abandoned dirt roads in mining towns and ghost towns in southern Nevada and northern Arizona.  Again, this study does not show, and was not designed to show, that use of the WEMO route network by non-street legal vehicles would cause irreparable harm to desert plants.

- Lathrop (1983), Exhibit N to Declaration of Sky Stanfield:  This study predates many of BLM's efforts to manage OHV activity for the benefit of biological resourcers.  It studies impacts from the 1970s at nine locations in the Mojave Desert.  However, there is no indication that these nine locations

are within the 2006 WEMO route network or represent conditions as they now exist in the WEMO route network.  Lastly, the study focuses on a number of motorcycle race courses that are no longer used.

- Ouren, et al. (2007 USGS), Exhibit M to the Declaration of Sky Stanfield: This study examines the host of potential environmental effects that might occur with OHV use.  It provides a generalized treatment of OHV-related soils impacts, and makes one reference to a specific OHV route in the WEMO – the Johnson Valley-Parker OHV race course.  However, that race was discontinued years ago and the course is not part of the WEMO route network.  Therefore, the Ouren study, does not establish that WEMO route network must be restricted to street-legal vehicles in order to protect desert plants from irreparable injury.

- Adams, et al (1982), Exhibit A to the Declaration of Sky Stanfield:[6]  This study, which is based on data collected more than 30 years ago, concludes that (1) soil tends to become compacted after repeated vehicle passes, and (2) plants grow better in uncompacted soil than in compacted soil.  The study was conducted by driving a Ford Bronco (which is a street-legal vehicle) and a Yamaha motorcycle (which may or may not be street legal) across small, defined areas in Stoddard Valley and Johnson Valley.  They study does not show, and was not designed to show, that use of the WEMO route network by non-street legal vehicles would cause irreparable harm to desert soils or desert plants.

- Brooks and Berry (2006), Exhibit F to Declaration of Sky Stanfield:  This study attempts to determine whether there is a correlation in the Mojave Desert between the presence of dirt roads and the relative dominance of alien plant species over native species.  Although the study claims to have found

---

[6]     According to footnote 11 of Plaintiffs' Memorandum, all scientific studies cited by Plaintiffs are attached as exhibits to the Declaration of Sky Stanfield.

*OHV Intervenors' Response To Plaintiffs' Motion For Remedy*                                    *Case No. 06-cv-4884-SI*

such a correlation, it did not identify any areas near or within the route network that are being irreparably overtaken by invasive plants.

- Lovich and Bainbridge (1999), Exhibit O to the Declaration of Sky Stanfield: The study examines human-caused impacts on the ecosystem of the Southern California Desert.  With respect to OHV use, the study draws very general conclusions about the effects of such vehicles on soils and plants in the Mojave Desert.  It does not, however, address any particular OHV route in the WEMO or the WEMO route network itself.  Therefore, it does not establish that WEMO route network must be restricted to street-legal vehicles in order to protect desert soils and plants from irreparable injury.

- Brooks and Lair (2005 USGS), Exhibit G to the Declaration of Sky Stanfield: This article provides general information about the effect of OHVs on soils, but clearly states that the ecological impacts of any particular route are going to depend on the ecosystem in which the route is located. (p. 6)  It does not establish that the WEMO route network – or any particular trail within that network – must be restricted to street legal vehicles to prevent irreparable injury to soils or plants.

- Declaration of Jenny Wilder, at ¶¶ 13-18:  This portion of Ms. Wilder's declaration addresses *illegal* route proliferation in specific locations.  It does not establish that the entire WEMO route network must be closed to all but street legal vehicles in order to prevent irreparable injury to vegetation.

   3.   <u>Plaintiffs' Have Not Established Likelihood of Irreparable Injury to Wildlife</u>

Plaintiffs also claim that non-street legal vehicles, if allowed to use the WEMO route network, will cause irreparable injury to wildlife.  In support of this contention, Plaintiffs refer to the discussion of Alternative D in the WEMO Plan, where BLM acknowledged that a "street-legal only" restriction in Desert Wildlife Management Areas (DWMAs) would provide a "substantial benefit" to the Mojave fringe-toed lizard.  (Pl. Memo at 9-10.)  However, the

issue here is not whether a "street-legal only" restriction – whether imposed only in DWMAs or throughout the entire WEMO – provides a *benefit* to the Mojave fringe-toed lizard (or any other species), but whether such a restriction is necessary to prevent *irreparable injury* to the lizard (or any other species).  *Monsanto*, *supra*, at *12.  On this latter point, which is the only one under review, the Plaintiffs have not presented sufficient evidence that dirt bikes, ATVs, and other non-street legal vehicles, if allowed to use the WEMO route network, will cause irreparable harm to the Mojave fringe-toed lizard or to any other plant or animal.  Plaintiffs' other evidence regarding OHV impacts on wildlife is equally unpersuasive:

- Egan Declaration, ¶14:  In this paragraph of his declaration, Mr. Egan makes sweeping, unsupported claims about the effects of OHVs on wildlife in the WEMO.  For example, with no evidentiary foundation, he claims that "animals are *possibly* being killed or injured in vehicle collisions, entrapped or crushed within burrows associated with vehicle route designation in the WEMO planning area."  Mr. Egan's choice of words is interesting.  He says animals are "possibly" being killed or injured by OHVs.  And he says these "possible" injuries are occuring in places "associated with" vehicle route designation in the WEMO.  Whatever Mr. Egan is trying so cryptically to say, his testimony is far too speculative, general and unsupported to establish that non-street legal vehicles, if allowed to use any portion of the WEMO route network, would cause irreparable injury to wildlife.

- Ouren, et al. (2007 USGS), Exhibit M to the Declaration of Sky Stanfield: This study examines the host of potential environmental effects that might occur with OHV use.  It provides a generalized treatment of OHV-related soils impacts, it makes one reference to a specific OHV route in the WEMO – the Johnson Valley-Parker OHV race course.  However, that race was discontinued years ago and the course is not part of the WEMO route network.  Therefore, the Ouren study does not establish that WEMO route

1    network must be restricted to street-legal vehicles in order to protect wildlife

2    from irreparable injury.

3         As an additional illustration of the weakness of the plaintiffs'' technical data,

4    consider the study entitled, "Effects of Off-Road Vehicles on Desert Vertebrates," by Bayard. H.

5    Brattstrom and Michael C. Bondello (1983), attached as Exhibit D to the Declaration of Sky

6    Stanfield (the "Brattstrom and Bondello study").   Plaintiffs rely on the Brattstrom and Bondello

7    study in arguing that (1) OHV noise damages the hearing of vertebrates, and (2) for this reason,

8    non-street legal vehicles should be prohibited from using the WEMO route network.   In response to

9    this argument, the OHV intervenors retained an acoustical engineer, Robin T. Harrison, P.E., who

10   has significant experience and expertise regarding OHV noise, to review the Brattstrom and

11   Bondello study.   As Mr. Harrison explains in his declaration, he found that the study does not

12   conform to standard industry practice, and, due to its age, fails to account for the significant changes

13   in state and federal OHV noise regulations that have taken place since 1983.   (Harrison Decl., at ¶¶

14   3-28.)   For example, in September 2002, the California legislature passed Assembly Bill 2274,

15   which, among other things, amended the State Vehicle Code to establish more stringent noise

16   standards for both competitive and non-competitive OHVs, including non-street legal vehicles such

17   as dirt bikes and ATVs (quads).   (Harrison Decl, at ¶7.)   These new standards are set forth in

18   Vehicle Code §38370.   (*Ibid*.)[7]   For purposes of the case at bar, the most important provisions are

19   found at section 38370(h)(1):

20        (h) On and after January 1, 2003, off-highway motor vehicles, when operating
          pursuant to Section 38001, shall at all times be equipped with a silencer, or other
21        device, which limits noise emissions.

22        (1) Noise emissions of competition off-highway vehicles manufactured on or
          after January 1, 1998, shall be limited to not more than 96 <u>dBA</u>, and if
23        manufactured prior to January 1, 1998, to not more than 101 <u>dBA</u>, when
          measured from a distance of 20 inches using test procedures established by the
24        Society of Automotive Engineers under Standard J-1287, as applicable. Noise
          emissions of all other off-highway vehicles shall be limited to not more than 96
25        <u>dBA</u> if manufactured on or after January 1, 1986, and not more than 101 <u>dBA</u>
26        if manufactured prior to January 1, 1986, when measured from a distance of 20

27   _____

28   [7]   A true and correct copy of California Vehicle Code §38370 is attached as Exhibit 1 to the
     Declaration of David P. Hubbard.

inches using test procedures established by the Society of Automotive Engineers under Standard J-1287, as applicable.

Today, no motorcycle may be manufactured, sold, distributed, or used in California unless it meets the noise standards described in section 38370.  (Veh.Code §38370(a), (d)-(f), (h).)  Federal laws have also addressed the OHV noise issue and now limit off-road motorcycles larger than 169 cc to 82 dBA, and those smaller than 170 cc to 80 dBA, when measured at 50 feet under a wide-open throttle acceleration procedure.  (40 CFR §205.152; see also, Harrison Decl., at ¶6.)  As a result of these regulatory changes, modern OHVs – including dirt bikes – are much quieter than those in use just ten years ago, to say nothing of those in use 30 years ago when Brattstrom and Bondello gathered their noise data.

Ultimately, the most distressing thing about the Brattstrom and Bondello study is that Plaintiffs refer to it without disclosing that noise regulations and noise control technologies have advanced significantly since the study was conducted.  Rather than provide such simple and necessary caveats, the Plaintiffs rely on the Brattstrom and Bondello Study without qualification, giving the misimpression that noise regulation, as applied to OHVs, has remained static in the 27 years between 1983 and 2010.

In short, the Brattstrom and Bondello Study fails to demonstrate that modern non-street legal vehicles, if allowed to use the WEMO route network, will cause irreparable injury to wildlife in the desert.

4.    Plaintiffs Have Not Established Likelihood of Irreparable Injury to Air Quality

Plaintiffs argue that the proposed "street legal only" restriction is necessary to prevent irreparable injury to air quality.  However, Plaintiffs' supporting data are inadequate to make this case:

- Ouren, et al. (2007 USGS), Exhibit M to the Declaration of Sky Stanfield: This study examines the host of potential environmental effects that might occur with OHV use.  It provides a generalized treatment of OHV-related impacts.  However, it does not establish that WEMO route network must be

15

restricted to street-legal vehicles in order to protect existing air quality from irreparable injury.

- The OHV Intervenors would also point out that the federal defendants, in their responsive brief, demonstrated that the Mojave desert area is now in attainment for $PM_{10}$.

5. Plaintiffs Have Not Established Likelihood of Irreparable Injury to the Ambient Sound Environment

Plaintiffs contend that unless the Court prohibits non-street legal vehicles from using any part of the WEMO route network, the ambient sound environment will be irreparably damaged. However, the Plaintiffs' evidence on this point is weak and insufficient:

- Ouren, et al. (2007 USGS), Exhibit M to the Declaration of Sky Stanfield: This study examines the host of potential environmental effects that might occur with OHV use. It does not establish that WEMO route network must be restricted to street-legal vehicles in order to prevent irreparable injury to the ambient sound environment.

- Brattstrom and Bondello (1983): As discussed above, this study evaluated the effect of OHV noise on vertebrate species. The data were collected in the 1970s from vehicles which did not have to conform to modern noise regulations. As a result, the study sheds little light on the effect of *modern* OHVs on the sound environment.

- Declaration of Thomas Egan, ¶14: In this paragraph of his declaration, Mr. Egan simply states that OHV noise and human presence can cause stress in some animals. This certainly is not enough to establish that irreparable harm to wildlife will occur unless the entire WEMO route network is closed to all but street legal vehicles.

- Declaration of Mark Heuston, ¶¶8-9, 21: In these portions of his declaration, Mr. Heuston complains that OHV noise disrupts the quiet enjoyment of his property and otherwise constitutes a nuisance. However, Mr. Heuston does

not establish that the noise of which he complains violates any established noise threshold.  Further, it appears that Mr. Heuston's primary complaint relates to noise emanating from OHVs traveling *off* the established WEMO network.  For these reasons, his testimony does not establish that the entire WEMO route network must be closed to non-street legal vehicles in order to prevent irreparable injury to the existing sound environment.  Moreover, if Mr. Heuston is truly bothered by the sound of OHVs and believes the quiet enjoyment of his property has been unlawfully violated, he may seek legal redress under state law.

- Declaration of Phillip Klasky, ¶¶15-24:  In this portion of his declaration, Mr. Klasky complains that OHV noise disrupts the quiet enjoyment of his property and otherwise constitutes a nuisance.  However, Mr. Klasky does not establish that the noise of which he complains violates any established noise threshold.  As with Mr. Heuston, Mr. Klasky's primary complaint relates to noise emanating from OHVs traveling off the established WEMO network.  For these reasons, his testimony does not establish that the entire WEMO route network must be closed to all but street legal vehicles in order to prevent irreparable injury to the existing sound environment.  Further, if Mr. Klasky is bothered by the sound of OHVs and believes the quiet enjoyment of his property has been unlawfully violated, he may seek legal redress under state law.

- Declaration of Doug Parham, ¶¶ 7-8:  Mr. Parham's testimony does not relate to noise or any other impact category.  Instead, it focuses on alleged lawlessness of OHV riders in the Edwards Bowl (area).  This does not establish that the entire WEMO route network must be closed to non-street legal vehicles to prevent irreparable harm.

**C.     PLAINTIFFS' PROPOSAL TO RESTRICT ROUTE NETWORK TO "STREET LEGAL" VEHICLES WILL CREATE IMPACTS THAT HAVE NOT BEEN ANALYZED**

In *Winter v. NRDC,* 129 S.Ct. 365 (2008), the United States Supreme Court reiterated that injunctive relief must not itself create adverse impacts or otherwise run contrary to the public interest.  *Winter, supra,* 129 S.Ct. at 376-377; see also, *American Motorcyclists Ass'n v. Watt,* F.2d 962, 967 (9th Cir. 1983) (finding that public interest in protecting and managing the California desert outweighed Plaintiffs' request for injunction).

Here, Plaintiffs ask the Court to prohibit all but street legal vehicles from using the 5,098-mile OHV route network that the BLM developed for the WEMO.  This prohibition, if adopted, would potentially affect tens of thousands of OHV users in the California desert and force them to either (a) ride illegally in the WEMO or (b) ride legally elsewhere.  Neither of these "displacement" scenarios has been evaluated for its potential negative impacts on biological resources, soil erosion, public safety, public services, law enforcement, recreational supply, or recreational quality.

Not even the WEMO EIS can be pressed into service to provide the missing analysis.  As Plaintiffs argued in their summary judgment motion, the EIS did not assess any alternative that would have (a) appreciably reduced the size of the WEMO route network or (b) prohibited non-street legal vehicles from using significant portions of that network.[8]  For this reason, the EIS did not analyze the "displacement" impacts that will surely occur if the entire WEMO route network is closed to "red" and "green" sticker (i.e., non-street legal) vehicles.

Such displacement impacts are not merely theoretical or speculative.  The California Environmental Quality Act (CEQA)[9] – the state analog to NEPA – recognizes the damage potential of displacement impacts and requires that they be analyzed and, if found to be significant, mitigated.  Indeed, displacement impacts may even force an otherwise exempt project to forfeit its exemption.  This was discussed in *Muzzy Ranch Co. v. Solano County Airport Land Use Comm'n* (2007) 41 Cal.4th 372, where the California Supreme Court stated, "[a] government agency may

---

[8]     Alternative D would have restricted routes in certain biologically sensitive areas – e.g., Desert Wildlife Management Areas (DWMAs) – to street legal vehicles, but the remainder of the route network would have remained open to non-street legal OHVs.

[9]     Cal.Pub.Res. Code §§ 21000, *et seq.*

reasonably anticipate that its placing a ban on development in one area of a jurisdiction may have the consequence, notwithstanding zoning or land planning, of displacing development to other areas of the jurisdiction." (*Id.,* at 383).[10]  According to the Court in *Muzzy Ranch*, "nothing inherent in the notion of displaced development places such development, when it can be reasonably anticipated, categorically outside the concern of CEQA." (*Ibid.*)

There is little doubt that Plaintiffs' proposal to close the entire WEMO route network to non-street legal vehicles will cause significant displacement of OHV use.  Therefore, such displacement is a "reasonably anticipated" impact that should be analyzed.  Here, however, Plaintiffs ask the Court to facilitate these displacement impacts without first assessing them for potential harm to the environment, public safety, or the staffing demands of the BLM.  Given that both the *Winter* and the *Monsanto* decisions direct lower courts to avoid this very problem, the Court should reject Plaintiffs' request for a blanket closure of the WEMO route network to non-street legal OHVs.

### D.   PLAINTIFFS' PROPOSAL TO RESTRICT WEMO ROUTE NETWORK TO STREET LEGAL VEHICLES WORKS A DISSERVICE ON THE PUBLIC INTEREST

As made clear in *Winter* and *Monsanto*, no injunction shall issue if it would cause a disservice to the public interest, regardless of any irreparable injury identified by the movant. *Winter*, 129 S.Ct. at 376-377; *Monsanto*, at 12; see also, *Weinberger*, 456 U.S. at 311, 312. Plaintiffs' request that the Court enjoin non-street legal vehicles from using any part of the WEMO route network fails this crucial test.  Not only will the proposed injunction create displacement impacts (discussed above), it will make much of the Mojave Desert inaccessible to the public. Many of the trails in the WEMO route network are too narrow or too rugged to be traversed safely by street legal vehicles, which means the injunction requested by Plaintiffs, if granted, would preclude safe public use of much of the WEMO planning area.

The WEMO is a hugely popular recreational venue for the residents of and visitors to California.  The WEMO route network, from its earliest incarnation to its most recent design, was intended to serve both street legal and non-street legal OHVs and thereby provide safe access to the

---

[10]    A true and correct copy of the Muzzy Ranch decision is attached as Exhibit 2 to the Declaration of David P. Hubbard.

1   wilderness of the Western Mojave. Without both components, the route network cannot serve the

2   public as intended or as contemplated in BLM's "multiple use" mandate.

3          The adverse effects of Plaintiffs' proposal, however, extend beyond the route network itself.

4   If WEMO visitors are not allowed to use their non-street legal vehicles, they will likely forego their

5   trips to this part of the desert. Any substantial drop in visitorship will have an immediate and

6   profoundly negative impact on the communities near the WEMO planning area, as these

7   communities rely heavily on the revenues generated by OHV enthusiasts who come to the WEMO.

8          In light of these reasonably anticipated impacts, each of which creates a disservice to the

9   public interest, Plaintiffs request for injunction must be denied.

10      **E.    PLAINTIFFS FAIL TO SHOW THAT TRESPASS IS OCCURRING ON PRIVATE LAND IN
              WONDER VALLEY OR THAT STATE COURT REMEDIES ARE INADEQUATE FOR
11            TRESPASS CLAIMS**

12         As part of their request for a Court order closing certain OHV routes in Wonder Valley, the

13  Plaintiffs argue that such routes encourage illegal trespass onto private lands. Plaintiffs, however,

14  misstate the case, because public recreational use of private land is presumed to be *legal* in

15  California, unless the owner of land in question takes affirmative steps to notify the public that

16  passage across his or her property is forbidden. The OHV Intervenors explain this legal regime

17  below.

18         1.    California Law Allows Public Recreation on Private Land

19         Through Civil Code section 1009(a)(1), the California Legislature established a state

20  policy that encourages the owners of private real property to make their lands available for public

21  recreational use as a "supplement [to] opportunities available on tax-supported publicly owned

22  facilities."[11] Pursuant to this policy, the Legislature has provided certain legal protections for

23  landowners who open their property to public recreational use. Specifically, Civil Code section

24  1009(b) states that public recreational use of private land will never ripen into a property interest in

25  favor of the public. That is, the owner will never have to fear losing his or her property on claims of

26  adverse possession or prescription.

27

28  [11]    A true and correct copy of California Civil Code §1009 is attached as Exhibit 3 to the
        Declaration of David P. Hubbard.

In 1989, the Legislature adopted Penal Code section 602.8(a), which governs *unauthorized* recreational use of private land.[12]  Specifically, Section 602.8(a) provides as follows:

> "Any person who without the written permission of the landowner, the owner's agent, or the person in lawful possession of the land, willfully enters any lands *under cultivation* or *enclosed by fence*, belonging to, or occupied by, another, or who willfully enters upon uncultivated or unenclosed lands where signs forbidding trespass are displayed *at intervals not less than three to the mile along all exterior boundaries and at all roads and trails entering the lands*, is guilty of a public offence."

The practical effect of Section 602.8(a) is quite clear:  If a landowner wants to invoke the laws of trespass against a person traveling across her property without permission, she must first do one of three things: (a) plant crops, (b) enclose the land with a fence, or (c) post "No Trespassing" signs at intervals no less than three to a mile.  Failing to take at least one of these steps will preclude a claim of trespass.

> 2.   Plaintiffs' Declarants Have Not Demonstrated Compliance With "Notice" Requirements of California Penal Code Section 602.8(a)

In this case, Plaintiffs allege that, due to the "checkerboard" ownership pattern in Wonder Valley, certain BLM-designated OHV routes encourage public users to ride and drive across private parcels without permission.  (Pl. Memo at 31-32.)  They cite the declarations of Mark Heuston and Phillip Klasky – two landowners in the area – as support for this claim.  (*Id.*)  Plaintiffs argue further that the entrance by OHV users onto private land constitutes illegal trespass and should be enjoined by closing the BLM "feeder" routes.  (*Id.*)

As pointed out above, however, California law allows members of the public to recreate on private land, even if unauthorized, unless that land is under cultivation, fenced, or posted with "No Trespassing" signs three to a mile.   (Cal.Civ.Code  §  1009(a)(1);  Cal.Pen.Code  § 602.8(a)).  Despite the length and detail of their declarations, neither Mr. Heuston nor Mr. Klasky states that he has planted his land with crops or fenced it or posted it with No Trespassing signs at

---

[12]   A true and correct copy of California Penal Code §602.8(a) is attached as Exhibit 4 to the Declaration of David P. Hubbard.

the required interval.[13]   Without proof of having met these conditions precedent, Mr. Heuston and Mr. Klasky have no claim of trespass against anyone who crosses their land, whether that person be an OHV user or a hiker.  For these same reasons Plaintiffs also may not claim trespass as a means of seeking injunctive relief from this Court.

>            3.    Plaintiffs' Declarants Have Not Availed Themselves of State Law Remedies

As the Court well understands, injunctive relief is an extraordinary remedy to be granted only when no other form of legal redress is available to the aggrieved party.  *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d. 641 (2006).  In the case of the private property torts alleged by Plaintiffs' declarants (Heuston and Klasky), the injuries, to the extent they exist and are legally cognizable, can be readily addressed through the remedies afforded by the laws of the State of California.  First, the affected property owners, if they want to prevent trespass, can (and should) put their land to cultivation, fence it, or post it with "No Trespassing" signs at the appropriate intervals.  (Cal.Pen. Code § 602.8(a).)  Second, if these efforts fail to prevent unauthorized use of the land in question, the property owners may seek enforcement assistance from the San Bernardino County Sheriff's Department and then pursue a criminal or civil action against the offending party.  Nothing in the declarations of Mr. Heuston or Mr. Klasky indicates that they have availed themselves of these state law remedies.  Therefore, they have not demonstrated that they are entitled to injunctive relief from this Court.

//

//

//

//

//

//

//

//

---

[13]      Indeed, Mr. Heuston and Mr. Klasky provide no evidence that *any* landowner in Wonder Valley has complied with the notice requirements of Penal Code section 602.8(a).

III.     **CONCLUSION**

For the reasons set forth in this response, coupled with those set forth in the response submitted by the federal defendants, the Court should deny the relief sought by the Plaintiffs in this action.

July 2, 2010                                  Respectfully submitted,

David P. Hubbard
Gatzke Dillon & Ballance LLP

Attorneys for Intervenor-Defendants AMA District 37;
California Off Road Vehicle Association; Off Road
Business Association; San Diego Off Road Coalition;
and American Sand Association

By  _____*/s/ David P. Hubbard*_____
        David P. Hubbard

Dennis L. Porter
Dennis L. Porter Attorney at Law

Attorney for Intervenor-Defendants Blue Ribbon
Coalition, California Association of 4 Wheel Drive
Clubs and United 4 Wheel Drive Associations

By_____*/s/ Dennis L. Porter*_____
        Dennis L. Porter

Paul A. Turcke
Moore Smith Buxton & Turcke

Attorney for Intervenor-Defendants Blue Ribbon
Coalition and California Association of 4 Wheel Drive
Clubs

By_____*/s/ Paul A. Turcke*_____
        Paul A. Turcke

*OHV Intervenors' Response To Plaintiffs' Motion For Remedy*                    *Case No. 06-cv-4884-SI*